UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

The Estate of Joseph P. King, by and through its
Administratrix, Amy King, and Amy King in her own right,
                                      *Plaintiff*,   **STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

          -against-   9:20-CV-1413 (TJM/ML)

Anthony J. Annucci, Acting Commissioner, State of New
York Department of Corrections, in his individual capacity;
and Marie T. Sullivan, Commissioner, State of New York
Department of Mental Health, in her individual capacity;
Jami Palladino, Mid-State Social Worker, in her individual
capacity; Hal Meyers, Mid-State Chief Mental Health Counselor,
in his individual capacity;

                                      *Defendants*.
_____

      Pursuant to Rule 7.1(a)(3) of the Local Rules of this Court, Defendants Anthony J. Annucci, Acting Commissioner, State of New York Department of Corrections, in his individual capacity; Ann Marie T. Sullivan, Commissioner, State of New York Department of Mental Health, in her individual capacity; Jami Palladino, Mid-State Social Worker, in her individual capacity; and Hal Meyers, Mid-State Chief Mental Health Counselor[1], in his individual capacity ("Defendants") contend that as to the following material facts, no genuine issues exist:

1. Plaintiff, Amy King, was married to the decedent, Joseph P. King ("the decedent"), on August 14, 1999. (Declaration of Attorney Aimee Cowan [Cowan Dec.], Exhibit [Ex.] J at 9).

2. Plaintiff was appointed as the administratrix of decedent's estate after his death on November 16, 2018. (Id. at 99).

---

[1] Defendant Meyers was actually the Unit Chief at Mid-State Correctional Facility on the dates in question.

1

3. Plaintiff and the decedent had two children, Meghan King and Joseph King. (Id.).

4. The decedent was arrested on January 2, 2012 and subsequently convicted of arson. (Id. at 21, 42).

5. According to Plaintiff, decedent agreed to take a plea deal that sentenced him to four to twelve years in prison. (Id. at 42).

6. At the time the decedent was arrested, his daughter was eighteen and his son was thirteen. (Id. at 12).

7. The decedent spent fourteen months in the Essex County Jail. (Id. at 21).

8. The decedent began his incarceration in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") in or about August 2013. (Id.).

9. Decedent attempted suicide while incarcerated on July 11, 2016. (Id., Ex. B at bates stamp 000971).

10. He was placed in the Residential Crisis Treatment Program ("RCTP") at Mid-State Correctional Facility ("Mid-State") on July 11, 2016 and monitored there until his discharge on August 4, 2016. (Id. at 001015).

11. Plaintiff testified that after his July 2016 suicide attempt, the decedent told her multiple times that he would never attempt suicide again. (Id., Ex. J at 55-56).

12. The decedent did not make any other suicide attempts until his completed suicide at Mid-State on November 16, 2018. (Id. at 58).

13. Mid-State is operated by DOCCS. (Id., Ex. M at 36).

14. Mental health services are provided to incarcerated individuals on-site at Mid-State by Central New York Psychiatric Center ("CNYPC") staff. (Id.).

15. Defendant Jami Palladino is a licensed clinical social worker employed by the New York

State Office of Mental Health ("OMH"). (Id., Ex. L at 9).

16. In 2018, Palladino was employed as a general population therapist at Mid-State. (Id. at 10).

17. In 2018, Palladino managed a caseload of approximately 150-180 incarcerated individuals who received mental health services. (Id. at 10, 31).

18. Palladino's supervisor was Unit Chief, Defendant Harold Meyers. (Id. at 10).

19. Palladino began giving therapy to the decedent in 2013. (Id. at 14).

20. The policy at Mid-State is that an incarcerated individual open to mental health services will be seen by their therapist at a minimum once every thirty days. (Id. at 28; Id., Ex. K at 41).

21. However, in an emergency situation, the inmate could be seen more than once a month. (Id., Ex. L at 58).

22. Palladino met with the decedent approximately once a month to provide supportive counseling and verbal therapy. (Id. at 15).

23. Incarcerated individuals at Mid-State are required to visit their prescriber/psychiatrist at a minimum every three months. (Id., Ex. K at 41; Id., Ex. M at 37).

24. According to Li-Wen Lee, M.D., the Associate Commissioner for OMH, there is flexibility left for additional in-between sessions, left to clinical judgment. (Id., Ex. M at 14, 37).

25. If an incarcerated individual wrote a letter asking to be seen by their therapist sooner than once every thirty days, the incarcerated individual would be seen within two weeks of receipt of the letter. (Id., Ex. L at 28-29).

26. If an incarcerated individual expressed thoughts of self harm or psychotic symptoms, the incarcerated individual would be brought to the crisis unit immediately. (Id. at 57).

27. A suicide risk evaluation was completed for incarcerated individuals within two weeks of

transferring into Mid-State. (Id. at 50).

28. Every two years the suicide risk assessment is updated, or it is updated as indicated, such as when a new risk factor arose. (Id.).

29. A verbal suicide risk assessment is performed on an incarcerated individual at every session and the risk assessment is updated accordingly. (Id. at 51-52).

30. In the six months leading up to his death, decedent received mental health treatment at Mid-State. (Id., see gen., Ex. B).

31. In the last six months leading up to his death, Palladino met with decedent for therapy on six separate occasions—May 14, 2018, June 25, 2018, July 23, 2018, August 27, 2018, September 27, 2018, and November 2, 2018. (Declaration of Jami Palladino [Palladino Dec.], ¶ 11).

32. On May 14, 2018, decedent was evaluated by a psychiatric provider, Karen Thomas, M.D. (Cowan Dec., Ex. B at bates stamp 000892-000893).

33. At that time, decedent was diagnosed with adjustment disorder with mixed anxiety and depressed mood. (Id.).

34. A suicide assessment was performed at that session and decedent denied suicidal ideation. (Id.)

35. At that time, decedent was prescribed Celexa for his depression and Vistaril for his anxiety. (Id. at 000893).

36. Decedent also received therapy from his primary therapist, Jami Palladino, on May 14, 2018. (Id. at 001058-001059).

37. During their session, decedent denied psychotic symptoms or wanting to harm himself. (Id. at 001058).

38. Palladino determined there were no evidence of any warning signs of acute suicide risk.

(Id. at 001059).

39. On June 25, 2018, decedent was evaluated by his psychiatric provider, Karen Thomas, M.D. (Id., at 000894-000895).

40. Her progress note indicates that decedent received a misbehavior ticket for taking suboxone. (Id. at 000894).

41. Suboxone was not prescribed to decedent. (Id., Ex. J at 49).

42. Decedent admitted to Dr. Thomas that he had used suboxone a few times since the last session on May 14, 2018. (Id., Ex. B at 000894).

43. A suicide assessment was performed, and no warning signs were present. (Id.).

44. Dr. Thomas discussed decedent's suboxone use with him. (Id. at 000895).

45. Dr. Thomas decided to taper off and discontinue the Celexa and Vistaril because decedent did not find the mediations to be effective. (Id.).

46. Decedent was also evaluated by his primary therapist, Jami Palladino, on this date, June 25, 2018. (Id. at 001061-001062).

47. Decedent denied experiencing thoughts of self harm or psychotic symptoms. (Id. at 001061).

48. Decedent acknowledged that he had been using suboxone recently and had received disciplinary tickets for drug use. (Id.).

49. Palladino asked decedent if the passing of his mother the month before was a trigger for thoughts of suicide or harming himself, and he responded, "No way, I'll never do that again." (Id.).

50. Palladino's progress note echoes Dr. Thomas' note, which indicates that decedent will taper the use of his medications and would be seen in one month by the prescriber to follow up on how he was doing and whether medication was clinically indicated. (Id.).

51. Palladino determined there were no evidence of any warning signs of acute suicide risk. (Id. at 001062).

52. On July 23, 2018, decedent was evaluated by his psychiatric provider, Karen Thomas, M.D. (Id., at 000896-000897).

53. Decedent reported he felt more depressed but denied suicidal ideation. (Id.).

54. A suicide risk assessment was performed, and no warning signs were present. (Id.).

55. Decedent was prescribed Zoloft and Trazodone for his depression and anxiety. (Id. at 000897).

56. Decedent was also given therapy from his primary therapist, Jami Palladino, on July 23, 2018. (Id. at 001063-00164).

57. Palladino determined there were no evidence of any warning signs of acute suicide risk. (Id. at 001064).

58. On August 27, 2018, decedent was evaluated by his psychiatric provider, Karen Thomas, M.D. (Id. at 000898-000899).

59. Decedent admitted to using suboxone 2-3 times since the last visit. (Id.).

60. Decedent denied suicidal ideation and no suicidal warning signs were present. (Id.).

61. Dr. Thomas counseled decedent on the harms of substance use. (Id. at 000899).

62. Decedent indicated to Dr. Thomas that he understood that medications would be stopped if the drug use continued. (Id.).

63. Decedent continued his Zoloft and Trazodone prescription. (Id.).

64.  Decedent was also given therapy from his primary therapist, Jami Palladino, on August 27, 2018. (Id. at 001065-00166).

65. Decedent denied experiencing any psychotic symptoms or wanting to harm himself. (Id.

at 001065).

66. Palladino told decedent that his medication may be discontinued if he continued to use substances because they cannot effectively treat him if he is also using other substances at the same time. (Id.).

67. Palladino determined there were no evidence of any warning signs of acute suicide risk. (Id. at 001066).

68. On September 27, 2018, Decedent was given therapy from his primary therapist, Jami Palladino. (Id. at 001067-00168).

69. Palladino determined there were no evidence of any warning signs of acute suicide risk. (Id. at 001068).

70. On October 16, 2018, decedent was evaluated by psychiatric nurse practitioner Carrie Citrin. (Id. at 000900-000901).

71. A suicide risk assessment revealed no acute risk of suicide. (Id.).

72. The provider discussed with decedent the expectation that he participates in treatment. (Id. at 000901).

73. A trial morning dose of Prozac was prescribed to decedent. (Id.).

74. However, the provider noted that it "appears at this time [patient's] primary dysfunction is his continued substance abuse." (Id.).

75. Decedent was prescribed Prozac for the morning and trazodone for the evening. (Id.).

76. A follow-up for 45 days was scheduled, "or otherwise clinically indicated." (Id.).

77. Decedent was directed to be placed into group therapy to assist with skill building. (Id.).

78. On October 27, 2018, decedent refused his prescribed medication. (Id. at 001070).

79. On October 31, 2018, decedent refused his prescribed medication. (Id. at 001071).

80. Two weeks before his death, on November 2, 2018, Decedent was given therapy from his primary therapist, Jami Palladino. (Id. at 001073-00174).

81. Palladino noted that decedent had been refusing medication, stating that it "made him feel weird." (Id. at 001073).

82. Decedent continued to deny thoughts of self harm, stating "I'll never do THAT [attempt suicide] again." (Id.).

83. Decedent shared that he had been going to church, attending AA (Alcoholics Anonymous) meetings, and going to the recreation yard. (Id.).

84. Decedent shared that he continued to maintain contact with his wife, his children, and his sister, who were all supportive of him. (Id.).

85. He shared that he had been working as a porter and was waiting to return to his ASAT (Alcohol and Substance Abuse Treatment) program. (Id.).

86. Palladino noted: "There is no evidence of any warning signs of acute suicide risk in patient's behavior or affect. There were no signs of anger, anxiety, withdrawal, mood change, purposelessness, hopelessness, recklessness or feelings of being trapped. Patient's risk for suicide will be assessed on an ongoing basis. Patient denied suicidal ideation or thoughts." (Id. at 001074).

87. Decedent did not express any potential suicide indicators to her. (Id., Ex. L at 43-44).

88. On November 5, 2018, decedent refused his prescribed medication. (Id., Ex. B at 001072).

89. On November 6, 2018, decedent's prescriber discontinued his Prozac and Trazadone prescription. (Id. at 001097).

90. As a social worker, Palladino's duties did not include patient medication management, such

as whether to prescribe a patient medication, what medication to prescribe them or when to discontinue a medication. (Palladino Dec., at ⁋ 19).

91. Palladino had no control over what medications decedent was prescribed or whether they would be discontinued. (Id.).

92. Palladino was not required to monitor any incarcerated individual's telephone calls and she did not monitor or review any phone calls decedent placed or received. (Id. at ⁋ 20).

93. Palladino was not aware that decedent believed his marriage was suffering, particularly in the days leading up to his death. (Id.).

94. Palladino was not aware of anything decedent discussed with his family members on the telephone in the days leading up to his death. (Id.).

95. Decedent never discussed any concerns about his marriage with Palladino during their therapy sessions. (Id.).

96. Decedent never discussed with Palladino any fears that his wife was romantically involved with another man or that he feared she would divorce him. (Id.).

97. Palladino was not aware that the decedent believed his wife was "sleeping with another person." (Cowan Dec., Ex. L at 15).

98. During their therapy sessions, Palladino encouraged decedent to use alternative coping skills in addition to medication in order to help him cope with prison. (Id. at 24).

99. The alternative coping mechanisms included deep breathing, grounding techniques, and worksheets. (Id.).

100. Up until the last session, Palladino tried to provide alternative coping therapy to decedent. (Id. at 25).

101. Palladino was not aware of any increase in decedent's anxiety or depression

leading up to his suicide. (Id. at 45).

102.	If an incarcerated individual indicated to her that he was having thoughts of self harm or made threats of self-harm, Palladino would report to administration and the incarcerated individual would be placed in a crisis unit. (Id. at 47).

103.	After his suicide attempt in July 2016, decedent told Palladino that he would never attempt suicide again. (Id. at 28).

104.	Palladino did not have any concerns about decedent in the weeks leading up to his death. (Id. at 31).

105.	Plaintiff testified that she has no allegations specifically against Defendant Palladino with respect to the mental health treatment decedent was provided. (Id., Ex. J at 68).

106.	Plaintiff testified that she did not believe Defendant Palladino played any role in decedent's death. (Id. at 69).

107.	Palladino testified there was nothing she could have done differently to prevent decedent's suicide. (Id., Ex. L at 56).

108.	Defendant Harold Meyers is a licensed master social worker employed by OMH. (Id., Ex. K at 16-17, 19).

109.	Meyers was the Unit Chief at Mid-State in 2018. (Id. at 17).

110.	As the Unit Chief, Meyers' duties included overseeing the day-to-day operations of Mid-State from an administrative vantage point. (Id. at 18).

111.	Meyers' duties did not include clinical determinations. (Id. at 24).

112.	Meyers was responsible for supervising approximately twenty-eight (28) OMH employees, some of whom managed a caseload of incarcerated individuals who were receiving mental health services. (Declaration of Harold Meyers [Meyers Dec.], at ¶7).

113. At times, there were over 800 incarcerated individuals active on the mental health caseload. (Cowan Dec., Ex. K at 23).

114. Meyers did not meet individually with the decedent, other than on one occasion with the decedent's therapist, Palladino, in a supervisory capacity only. (Meyers Dec. at ¶9).

115. Meyers did not provide direct therapy to the decedent. (Id. at ¶8, 9).

116. Meyers never received any letters or correspondence from decedent. (Id. at ¶10).

117. Meyers was not required to monitor any incarcerated individual's telephone calls and he did not monitor or review any phone calls decedent placed or received. (Id. at ¶11).

118. Meyers was not aware that decedent believed his marriage was suffering, particularly in the days leading up to his death. (Id.).

119. Meyers was not aware of anything decedent discussed with his family members on the telephone in the days leading up to his death. (Id.).

120. Meyers is not aware of any policies or procedures that were not followed that could have contributed to the decedent's death. (Id., Ex. K at 57).

121. OMH reviews inmate suicides on a recurring basis throughout the year to determine whether there are trends or other areas to make change. (Id., Ex. M at 26).

122. Central New York Psychiatric Center ("CNYPC") creates policies regarding how they provide services to inmates with mental illness. (Id. at 27).

123. CNYPC creates these policies to be consistent with OMH agency policies. (Id. at 28).

124. The facilities have an internal policy approval that involves their medical staff as well. (Id.).

125. Policies regarding suicide risk assessment are drafted, overseen, and updated by

CNYPC. (Id. at 45-46).

126.    If an incarcerated individual has attempted suicide in the past, the type of mental health care they receive depends on a number of factors, including current circumstances, current symptoms, their overall clinical presentation and other contributing issues. (Id. at 51).

127.    Incarcerated individuals who have attempted suicide in the past are not automatically permanently placed in any particular location within a facility. (Id.).

128.    If an incarcerated individual had attempted suicide using shoelaces in the past, that incarcerated individual may not be allowed to have shoelaces in the future, but only if they had acute suicide risk and are currently in crisis and admitted to a crisis unit. (Id.; Id., Ex. K at 34).

129.    If an incarcerated individual is determined to be stable and living in general population, they are allowed to have shoelaces. (Id., Ex M at 51-52).

130.    After a suicide attempt, the incarcerated individual's treatment team makes the decision to release the inmate from a crisis unit back into general population. (Id. at 52).

131.    Plaintiff testified that she and decedent's daughter visited the decedent the weekend before his death and at no point did decedent indicate that he wanted to hurt himself or attempt suicide. (Id., Ex. J at 77; Id., Ex. O at 31).

132.    Decedent's son testified that he visited decedent "a few weekends" before his death and decedent did not give any indication he was thinking of hurting himself. (Id., Ex. N at 43).

133.    The day before decedent's death, Plaintiff spoke to decedent on the phone and told him that she was talking to another man. (Id., Ex. J at 85).

134.    Plaintiff knew decedent was concerned that she was talking to and spending time with another man. (Id.).

135. Two days before his death, on November 14, 2018, decedent called his son and his daughter at 6:02 p.m. (Id., Ex. C, 11/14/18, 6:02 p.m.; Id., Ex. H at 3).

136. While speaking with his daughter, decedent stated that Plaintiff was leaving him. (Id., Ex. C, 11/14/18, 6:02 p.m. at 01:30).

137. Decedent stated that he is "not going to make it through the night," to which decedent's daughter threatened to relay his statement to Plaintiff and that Plaintiff would call his counselor. (Id., 11/14/18, 6:02 p.m. at 03:21).

138. Decedent instructed his daughter not to tell Plaintiff what he had just stated to her. (Id.).

139. Decedent spoke with his daughter approximately thirty minutes later. (Id., 11/14/18, 6:33 p.m.; Id., Ex. H at 3).

140. Decedent stated to his daughter that he "don't want to live anymore," to which his daughter threatened to tell Plaintiff to "call that building."  (Id., 11/14/18, 6:33 p.m. at 01:11).

141. Decedent stated that he "can't take this anymore…. I am going fucking crazy…. I don't know what I am going to do…" (Id., 11/14/18, 6:33 p.m. at 03:26).

142. Decedent's daughter indicated that he should "go to that building" but decedent directed her not to tell Plaintiff. (Id.).

143. The day before his death, November 15, 2018, decedent called his family approximately 15 times. (Id., Ex. C; Id., Ex. H at 4-6).

144. During a phone call at approximately 9:19 a.m., decedent discussed a man he believed Plaintiff was spending time with, stating that Plaintiff "goes and sees him constantly," that the man pays for everything and that he brought Plaintiff out to his cabin. (Id., Ex. C, 11/15/18, 9:19 a.m. at 04:30).

13

145.     Decedent stated on the phone call that he is "going to die of a broken heart," and several times stated he wished he would "die right now" and "I can't take this." (Id., 11/15/18 at 06:12, 11:14, 12:50).

146.     Decedent telephoned his daughter, Meghan, at approximately 10:47 a.m. on November 15, 2018. (Id., Ex. C at 11/15/18 10:47 a.m.; Id., Ex. H at 4).

147.     During the phone call, decedent asked his daughter to ask Plaintiff if she planned on leaving him. (Id., Ex. C, 11/15/18 at 10:47 a.m. at 0:39).

148.     Decedent stated to his daughter "this is driving me crazy….I can't do it anymore, this is killing me, it's all I think about all day long…" (Id., Ex. C, 11/15/18, 10:47 a.m. at 07:54).

149.     Decedent called Plaintiff approximately six times on November 15, 2018. (Id., Ex. C; Id., Ex. H at 5-7).

150.     Decedent telephoned his wife at 4:56 p.m. on November 15, 2018. (Id., Ex. H, at 5; Id., Ex. C, 11/15/18, 4:56 p.m.).

151.     During the phone call, decedent and Plaintiff discussed Plaintiff's plans to spend time with another man. (Id., Ex. C, 11/15/18, 4:56 p.m. at 04:26).

152.     Plaintiff stated she does like "this person" and does not know what she is going to do [with respect to their marriage]. (Id., Ex. C, 11/15/18, 4:56 p.m. at 07:15).

153.     Decedent asked if it [their marriage] was "over" and Plaintiff stated she did not know. (Id., Ex. C, 11/15/18, 4:56 p.m. at 08:30).

154.     Plaintiff stated "I wish you wouldn't threaten to kill yourself when you have two kids at home." (Id., Ex. C, 11/15/18, 4:56 p.m. at 09:30).

155.     On November 15, 2018, at approximately 10:30 p.m., the decedent spoke on the phone with Plaintiff. (Id., Ex. H at 7; Id., Ex. C, 11/15/18, 0:00 to 6:21).

156.	Decedent asked Plaintiff if she wanted him to stop calling her, to which she replied, "If you're going to do this." (Id., Ex. C, 11/15/18, 10:30 p.m.at 01:25).

157.	Decedent accused Plaintiff of not wanting to speak with him and stated: "I wish you would just tell me not to call anymore." (Id., Ex. C, 11/15/18 at 04:45-06:21).

158.	Approximately four hours after decedent's last phone call with Plaintiff, Correction Officer Adam Smaldon heard a loud bang and responded to the bathroom area of the 4B housing unit at Mid-State at approximately 2:50 a.m. (Id., Ex. P at bates stamp 000070).

159.	Officer Smaldon observed a towel over the bathroom stall door and sneakers on the floor. (Id.).

160.	He asked who was in the stall but did not receive a response. (Id.).

161.	Officer Smaldon opened the stall door and found it empty. (Id.).

162.	However, he opened the adjacent stall door to find the decedent sitting on the floor with a shoestring around his neck. (Id.).

163.	Officer Smaldon broke the shoestring and called a medical response. (Id.).

164.	Officer Smaldon immediately began CPR. (Id. at 000071).

165.	The decedent was brought to St. Elizabeth's Hospital by ambulance, where he was pronounced dead. (Id.).

166.	 DOCCS staff located a letter in decedent's living space that he had written to his wife, dated November 15, 2016. (Id.; Id., Ex. Q).

167.	The letter stated, in part: "I just got off the phone with you. And you get so aggravated with me. I really think you want to end our relationship. I don't want to hurt you or the kids, but I don't really think I'll make it through the night. I feel it's time [to] say goodbye. I hope your [sic] happy to do what you want now that I'm out of your life. because I know you really

15

don't want me anymore. And I can't live with myself…I am so sad, unhappy and you are breaking my heart. I just can't do this anymore. I'm sorry. I love you!...tell Megan and Joseph I love them and I'm sorry." (Id., Ex. Q).

168.    Plaintiff's only out of pocket expenses were some funeral costs, of which Plaintiff's sister paid a portion. (Id., Ex. J at 93-94).

169.    In response to Defendants' discovery demands Plaintiff never listed or provided evidence of any special damages. (Id., Ex. G at 6, 7; Id., Ex. I at 4, 5).

170.    Plaintiff is not claiming lost wages on behalf of decedent. (Id., Ex. I at 5).

171.    Plaintiff testified that she does not know the value of decedent's estate. (Id., Ex. J at 100).

172.    At the time of his death, decedent had been incarcerated since approximately 2012 and his release date was uncertain. (Id. at 47).

173.    Decedent provided no financial support to his family from prison. (Id., Ex. O at 24).

174.    Plaintiff presents no expert report detailing any pecuniary losses sustained by any distributees. (Id., Ex. D at 7-8).

175.    At the time of decedent's death, decedent's daughter Megan King was twenty-four years old and his son Joseph was nineteen years old. (Id., Ex. O at 31; Id., Ex. N at 45).

Dated:    January 12, 2023

                                                   LETITIA JAMES
Attorney General of the State of New York
Attorney for Defendants
300 S. State Street, Ste. 300
Syracuse, New York 13202

By: _s/Aimee Cowan_____
Aimee Cowan, Esq.
Assistant Attorney General
Bar Roll No. 516178

Telephone: (315) 448-4800
Fax: (315) 448-4853
Email: aimee.cowan@ag.ny.gov