UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

The Estate of Joseph P. King, by and through its
Administratrix, Amy King, and Amy King in her own right,
                                    *Plaintiff,*

-against-

Anthony J. Annucci, Acting Commissioner, State of New
York Department of Corrections, in his individual capacity;
and Marie T. Sullivan, Commissioner, State of New York
Department of Mental Health, in her individual capacity;
Jami Palladino, Mid-State Social Worker, in her individual
capacity; Hal Meyers, Mid-State Chief Mental Health Counselor,
in his individual capacity;

                                      *Defendants.*

**DECLARATION OF
JAMI PALLADINO**

9:20-CV-1413
(TJM/ML)

---

**Jami Palladino**, on the date noted below and pursuant to § 1746 of title 28 of the United States Code, declares the following to be true and correct under penalty of perjury under the laws of the United State of America:

1. I am named as a Defendant in the instant matter and make this declaration in support of Defendants' motion for summary judgment.

2. I am a licensed clinical social worker who has been employed by the New York State Office of Mental Health ("OMH") since 2013.

3. In November 2018, I was a general population therapist at Mid-State Correctional Facility ("Mid-State"). As of November 2018, I had been in that position since 2013.

4. In December 2018, I became a pre-release coordinator at Mid-State and I remain in that position today.

5. I have been informed that the Plaintiff brings this action against me on behalf

1

of the decedent, Joseph P. King, and claims that I violated Mr. King's Eighth Amendment rights, such that I was deliberately indifferent to his serious mental health needs. I was further informed that Plaintiff alleges my negligence led to Mr. King's suicide on November 16, 2018.

6. As a general population therapist, I managed a caseload of approximately 150-180 incarcerated individuals who were receiving mental health services. My supervisor was Unit Chief, Defendant Harold Meyers.

7. The policy at Mid-State is that an incarcerated individuals open to mental health services will be seen by their therapist at a minimum once every thirty days. However, in an emergency situation, the inmate could be seen more than once a month.

8. If an incarcerated individual wrote a letter asking to be seen sooner than once every thirty days, the inmate would be seen within two weeks of receipt of the letter. However, if an inmate expressed thoughts of self harm or psychotic symptoms, the inmate would be brought to the crisis unit immediately.

9. A suicide risk evaluation is completed for incarcerated individuals within two weeks of transferring into Mid-State. Every two years the suicide risk assessment is updated, or it is updated as indicated, such as when a new risk factor arose. A verbal suicide risk assessment is performed on a patient at every session and the risk assessment is updated accordingly.

10. I began giving therapy to the decedent, Joseph P. King, in 2013. In accordance with policy, I met with Mr. King approximately once a month to provide supportive counseling and verbal therapy.

11. In the last six months leading up to his death, I met with Mr. King for therapy on

six separate occasions—May 14, 2018, June 25, 2018, July 23, 2018, August 27, 2018, September 27, 2018, and November 2, 2018.

12. During his therapy sessions with me, Mr. King always denied psychotic symptoms or thoughts of harming himself. I performed a verbal suicide risk assessment at each session and based on his responses, I determined at each session that there was no evidence of any warning signs of acute suicide risk.

13. During my sessions with Mr. King, I encouraged him to use alternative coping skills in addition to medication in order to help him cope with prison. The alternative coping mechanisms included deep breathing, grounding techniques, and worksheets. However, Mr. King was not very receptive to trying alternative coping mechanisms.

14. I was aware that Mr. King attempted suicide in July 2016, but Mr. King consistently reassured me that he would never attempt suicide again.

15. During our June 25, 2018, session, I asked Mr. King if the passing of his mother the month before was a trigger for thoughts of suicide or harming himself, and he responded, "No way, I'll never do that again."

16. If Mr. King, or any incarcerated individual, indicated to me that he was having thoughts of self harm or if the incarcerated individual made threats of self-harm, I would immediately report to administration and the individual would be placed in a crisis unit.

17. Two weeks before his death, on November 2, 2018, I had a therapy session with Mr. King. He continued to deny thoughts of self harm, stating "I'll never do THAT again." Significantly, Mr. King shared with me that he had been going to church, attending AA (Alcoholics Anonymous) meetings, and going to the yard. He shared with me that he continued to maintain contact with his wife, his children, and his sister, who were all supportive of him. He further shared

that he had been working as a porter and was waiting to return to his ASAT (Alcohol and Substance Abuse Treatment) program.

18. During our last session on November 2, 2018, I noted: "There is no evidence of any warning signs of acute suicide risk in patient's behavior or affect. There were no signs of anger, anxiety, withdrawal, mood change, purposelessness, hopelessness, recklessness or feelings of being trapped. Patient's risk for suicide will be assessed on an ongoing basis. Patient denied suicidal ideation or thoughts." Mr. King did not express any potential suicide indicators to me.

19. With respect to Mr. King's medications, I am not a medical doctor, so my duties did not include patient medication management, such as whether to prescribe a patient medication, what medication to prescribe them or when to discontinue a medication. Consequently, I had no control over what medications Mr. King was prescribed or whether they would be discontinued.

20. I am not required to monitor any incarcerated individual's telephone calls and I did not monitor or review any phone calls Mr. King placed or received. Consequently, I was not aware that Mr. King believed his marriage was suffering, particularly in the days leading up to his death. I was not aware of anything he discussed with his family members on the telephone in the days leading up to his death. Mr. King never discussed any concerns about his marriage with me during our therapy sessions. He never discussed any fears that his wife was romantically involved with another man or that he feared she would divorce him.

21. I did not, and could not have, reasonably foreseen Mr. King's death. I was not aware of any increase in Mr. King's anxiety or depression leading up to his suicide. I did not have any concerns about him in the weeks leading up to his death and I was shocked to find out he had taken his own life.

Dated: 12/30/22
Marcy, New York

Jami Palladino LCSW-R
Jami Palladino

5