```
 1                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF NEW YORK
 2                     CIVIL ACTION NO.: 20-CV-01413

 3

 4   The Estate of Joseph P. King,
     by and through its Administrator
 5   ad Prosequendum Amy King,
     and in her own right,
 6
             Plaintiff,
 7
     v.
 8
     WARD, et al.,
 9
             Defendant.
10   _____

11

12              ************************************

13            REMOTE VIDEO DEPOSITION OF HAL MEYERS

14                        MAY 23, 2022

15              ************************************

16

17            REMOTE VIDEO DEPOSITION OF HAL MEYERS taken in

18   the above-styled and numbered cause on May 23, 2022,

19   commencing at 10:05 a.m. Eastern Standard Time, before Gina

20   Williams, Registered Professional Reporter, Certified

21   Realtime Reporter, and Certified Realtime Captioner.

22

23

24

25
```

Deposition of Hal Meyers                                    Estate of Joseph P. King v. Ward, et al.

```
 1                   A P P E A R A N C E S

 2              (All attorneys appearing remotely)

 3

 4    On behalf of Plaintiff:

 5         HACH ROSE SCHIRRIPA & CHEVERIE, LLP
           112 Madison Avenue, 10th Floor
 6         New York, New York 10016
      By:  YAMILE KALKACH, ESQUIRE
 7         HILLARY NAPPI, ESQUIRE

 8

 9    On behalf of Defendants:

10         NEW YORK STATE ATTORNEY GENERAL
           SYRACUSE REGIONAL OFFICE
11         300 South State Street
           Suite 300
12         Syracuse, New York 13202
      By:  AIMEE COWAN, ESQUIRE
13

14

15

16

17

18

19         QUOTATION MARKS ARE USED FOR CLARITY AND DO NOT
                NECESSARILY REFLECT A DIRECT QUOTE
20

21

22

23

24

25
```

```
 1                       I N D E X

 2   WITNESS                                    PAGE

 3   HAL MEYERS

 4   Examination by Ms. Kalkach                    4

 5                   -  -  -  -

 6                   E X H I B I T S

 7   Number

 8      Exhibit A   Amended Complaint             19

 9      Exhibit B   Answer to Amended Complaint   21

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   WHEREUPON,

 2                         HAL MEYERS

 3   was called as a witness and, after having been first duly

 4   sworn, was deposed and testified as follows:

 5                         EXAMINATION

 6   BY MS. KALKACH:

 7       Q      Good morning, Mr. Meyers.  My name is Yamile

 8   Kalkach, and I'm associated with the law firm that

 9   represents Plaintiff, the Estate of Joseph King.

10            Could you please state your full name and current

11   address for the record?

12       A      Harold Walter Meyers, 81 Merritt Place, New

13   Hartford, New York 13413.

14       Q      Thank you, Mr. Meyers.

15            I'm going to go through a few ground rules to

16   help today run as smoothly as possible.

17            Have you ever been deposed before?

18       A      Yes.

19       Q      How many times?

20       A      Once.

21       Q      Once before, okay.

22            Have you ever testified at trial?

23       A      No.

24       Q      And when you were deposed before, what was the

25   nature of the case?
```

```
 1        A      It was --

 2               It had to do with a suicide that occurred in a

 3    different correctional facility, but that individual had

 4    been at Mid-State, and it was basically to get a background

 5    to compare and contrast his care at Mid-State and the

 6    facility --

 7               I'm assuming it was to compare and contrast his

 8    care at Mid-State and the facility where unfortunately he

 9    committed suicide.

10        Q      Okay.  So then you're familiar with how the

11    deposition works?

12        A      It's been a number of years, but I have some

13    familiarity.

14        Q      Okay.  Do you understand that you are under oath

15    today?

16        A      Yes.

17        Q      And that this is the same oath that you would

18    take in the courtroom?

19        A      Yes.

20        Q      Okay.  Are you on any medications which may

21    affect your ability to testify truthfully today?

22        A      No, I'm not.

23        Q      Now, if you don't hear or understand a question

24    that I ask you, feel free to ask me to repeat or rephrase

25    the question, and I will, okay?
```

```
 1            Now, that means that if you answer a question
 2    that I ask, I will assume that you understood the question,
 3    and your answer was based on that understanding.
 4            It is also very important that you give verbal
 5    answers as opposed to like nodding or something like that so
 6    that the court reporter may take down your words.
 7            Understood?
 8       A    Yes.
 9       Q    And let's also try our best not to talk over one
10    another because, again, the court reporter is writing
11    everything down.
12       A    Yes.
13       Q    If at any time today you need a break, please
14    simply just say so, and we'll accommodate.
15            The only thing that I ask is, if there's a
16    question open, I will need you to answer it, and then we can
17    take the break.
18       A    Yes.
19       Q    Okay.  There may be many times today that your
20    attorney may object to a question that I ask you.
21            Only if your attorney directs you not to answer
22    the question, you must still answer.
23            Understood?
24       A    You said unless she does?
25       Q    Exactly.
```

```
 1              So unless she says you cannot -- that you don't
 2    answer, then you must answer.
 3         A    I've got it.
 4         Q    Okay.  Now please shut off all of the devices
 5    that you have around you, cell phone, Apple watch, iPad, et
 6    cetera, or other computers, and close any other document or
 7    program on your screen other than Zoom or the documents --
 8    or any other document that I will be showing you today.
 9              MS. COWAN:  Is that okay, Mr. Meyers?
10              Do you need to have any phones that are on
11         vibrate or anything in case there's an emergency?
12              THE WITNESS:  I guess -- I've already done an
13         "Away" message.
14              MS. COWAN:  Okay.
15    BY MS. KALKACH:
16         Q    Anything distracting or noises, et cetera, or
17    checking documents.
18         A    Well, I put the volume down on both of my mobile
19    devices.  So it probably would be judicious for me to turn
20    on my State phone in case there was an emergency, but I
21    won't be looking at it during the deposition.
22         Q    Are there any paper documents in front of you?
23         A    No.  No.
24              I mean, nearby.
25         Q    Okay.  Is there anybody else in the room with
```

1    you?

2        A    No, there's not.

3        Q    Are you currently under the influence of any

4    drugs or alcohol that in any way may affect the testimony

5    which you are about to give?

6        A    No, I'm not.

7        Q    Now, what did you do to prepare for today's

8    deposition?

9        A    I assisted with the response to -- I don't know

10   if I'm pronouncing it right -- interrogatories.

11            But beyond that, the only thing I did was do an

12   e-mail search, and only one e-mail came up.

13       Q    Okay.  Did you meet with your counsel?

14       A    We had some phone calls.

15       Q    Did you review any documents when you met with

16   your counsel?

17       A    Just the interrogatories.

18       Q    Interrogatories, okay.

19       A    Yep, that's it.

20       Q    Did you discuss today's deposition with anyone

21   other than counsel?

22       A    No.  The only counsel, Margaret Drake, she is

23   aware that this process is going on.

24       Q    I'm sorry.  Can you please repeat who?

25       A    Margaret Drake, the Office of Mental Health

```
 1     Counsel, and she's aware of this process, but I had no
 2     contact with her as far as preparing for today.
 3          Q     Okay.  You told me that you have been deposed
 4     before on a different case.
 5                Do you remember the name of the case?
 6          A     Benjamin Van Zant was the individual who passed.
 7          Q     Can you please spell the last name for me?
 8          A     I don't know how to spell it.  It's Van Zant.  I
 9     think it's similar to the person with Leonard Skynyrd, but I
10     don't know how to spell it.
11          Q     Okay.  Now, do you keep notes about your workday?
12          A     No, I do not.
13                Generally, I do not.
14          Q     Do you keep a diary about your work?
15          A     No.
16          Q     Have you ever used any other names?
17          A     No.
18          Q     Have you ever been convicted of a crime?
19          A     No, I have not.
20          Q     When were you born?
21          A     April 7, 1960.
22          Q     Where were you born?
23          A     In Camden, New Jersey.
24          Q     Are you married?
25          A     Divorced.
```

Deposition of Hal Meyers                                    Estate of Joseph P. King v. Ward, et al.

```
 1        Q      Divorced?

 2        A      Yes.

 3        Q      Do you have kids?

 4        A      Yes.

 5        Q      How old are they?

 6        A      31, 30 and 29.

 7        Q      What are their names?

 8              MS. COWAN:  I'm going to object to that.  I'm not

 9        really sure why we have to get this personal about his

10        family.  I think I'm going to direct him not to answer

11        this.

12              Is there some relevance to the case about who his

13        children are?

14              MS. KALKACH:  No.  It's just background

15        information.

16              MS. COWAN:  I'd rather not have him name his

17        children or family members for this case.

18              MS. KALKACH:  So you're directing him not to

19        answer?

20              MS. COWAN:  Yeah.  I mean, he gave you his

21        birthdate, his address, you know, where he was born.  I

22        don't know that we need to go too far into his family

23        life, I guess.

24   BY MS. KALKACH:

25        Q      Aside from this action, do you know if any
```

1    complaints or grievances have been filed against you?

2        A      Periodically incarcerated individuals will

3    make -- they'll write letters or, you know, have concerns

4    about their services generally around, you know, just issues

5    that might come up, but no formal complaints, no formal

6    issues like that.

7        Q      So were these complaints the subject of a

8    lawsuit?

9        A      No, no, they were not like formal complaints.

10   They were more letters of concern about, you know, some

11   grievance or something going on in somebody's life that they

12   wanted to share.

13       Q      Okay.  Were you ever the subject of a

14   disciplinary complaint?

15       A      No.

16       Q      Have you ever been a party in a lawsuit before?

17       A      Just the one that I referenced before in regards

18   to Mr. Van Zant.

19       Q      Okay.  When was this, what year?

20       A      I don't recall.

21       Q      Approximately was it 10 years ago, 20 years ago

22   or something else?

23              You know, do you have like an approximation?

24       A      Approximately 6 -- 6, 7 years ago.

25       Q      And what kind of witness were you?

```
 1              Were you an expert in the case, or were you a
 2   defendant?  Were you a fact witness?
 3       A    Well, I was a defendant in terms of working for
 4   New York State in the Office of Mental Health.
 5              I referenced at least what I thought why I was
 6   involved in the case was to contrast the care at the
 7   facility at Mid-State with --
 8              And I think they were trying to compare and
 9   contrast the care that Mr. Van Zant received at Mid-State as
10   opposed to the correctional facility where he successfully
11   committed suicide.
12       Q    You told me you did a search for e-mail, and I
13   would like to know what was that search about?
14              What was the e-mail you were looking for?
15       A    I wasn't looking for any specific e-mail.  Just
16   in preparation, I just wanted an idea of any e-mails I might
17   have sent or received in regards to Mr. King.
18       Q    The e-mail that came up, what did it say, and who
19   was it for?
20       A    I didn't generate it.
21              I was --
22              I was CC'd on it.
23              It was generated by the RCTP coordinator in
24   response to an inquiry from the Department of Correctional
25   and Community Services Mental Health Unit.  It was just a
```

```
 1   standard thing that they do after a successful suicide.

 2        Q     Do you remember the date of the e-mail?

 3        A     No.

 4              It would have been shortly after Mr. King's

 5   passing.

 6        Q     Do you have that e-mail right now with you?

 7        A     I have it nearby, yes.

 8              MS. KALKACH:  I'm going to take a really quick

 9        break.

10              MS. COWAN:  Okay.

11              THE WITNESS:  Okay.

12              (Recess was taken.)

13   BY MS. KALKACH:

14        Q     So you told me who generated the e-mail, but I

15   want to know to whom it was sent.

16              Who sent it?

17        A     It was sent to DOCCS, the DOCCS Mental Health in

18   Albany.  I don't recall the specific person from DOCCS

19   Mental Health that it was sent to.

20              It's a standard procedure after somebody's

21   passing.

22        Q     Okay.  Did you share this e-mail with your

23   attorney?

24        A     I do not recall sharing it with her, no.

25              MS. COWAN:  So I believe the e-mail that he's
```

Deposition of Hal Meyers                                    Estate of Joseph P. King v. Ward, et al.

```
 1        speaking about is contained within some of the OMH
 2        investigation documents that I gave you.  I'm searching
 3        for it right now to try to find the actual Bates stamp.
 4        But he was CC'd on an e-mail, so his name pops up.  So
 5        if you do like a word search for it, it should pop up,
 6        but I'm trying to search for it right now.
 7              MS. NAPPI:  You don't have to search for it now.
 8        We'll just make a demand to the extent that it was not
 9        produced, that it be produced.
10              MS. COWAN:  Sure, yeah.  When I was meeting with
11        him, we spoke about it, and I found it, and it should
12        be in the documents, but I'll make a search for it
13        after.
14              MS. KALKACH:  Okay, thank you.
15  BY MS. KALKACH:
16        Q     Okay.  Did you attend college?
17        A     Yes, I did.
18        Q     Where did you go to college?
19        A     All my colleges or just my most recent one?
20        Q     The most recent one.  I'll get to the other ones
21  afterwards.
22        A     Okay.  I went to the University at Albany School
23  of Social Work, and it's a State University.
24        Q     When was this?
25        A     I went part time between approximately 1985.  I
```

1   graduated in 1990.

2        Q     And besides this, did you do any other

3   certification program or licensing program or more college?

4        A     No.  Master's in social work is as far as I went.

5        Q     But before --

6              I mean besides this one, did you do any other

7   one, even if it was a different degree?

8              It doesn't have to be something higher.

9        A     Yes.  I have a two-year degree in Liberal Arts in

10  English, and that was at the Adirondack Community College in

11  Glens Falls.

12             And then after I completed the two-year program

13  or two year -- got my two-year degree, I went to the State

14  University at Utica-Rome, where I got a Bachelor's of

15  Professional Studies in Human Services.  And then I worked,

16  and that's when I was going part time to graduate school to

17  become a social worker.

18       Q     I see.

19             For the Liberal Arts, do you remember from when

20  to when did you go there?

21       A     I believe it was 1979 to 1982, and I believe --

22             I'm sorry.

23       Q     No, tell me.

24       A     And I graduated from SUNY in Utica-Rome in 1984.

25       Q     Okay.  Do you have any licenses?

```
 1        A      I have a license, Master of Social Work, yes.

 2        Q      Okay.  Could you briefly walk me through your

 3   employment history leading up to your current position?

 4        A      Would you like me to limit that to the Office of

 5   Mental Health?

 6        Q      I just want to go through like your whole

 7   employment history briefly.  You don't have to go into

 8   everything right now.  I just want to know where you have

 9   worked.

10        A      Okay.  After I got my four-year degree, I worked

11   for the House of Good Shepherd with emotionally disturbed

12   children.  That's when I started graduate school during that

13   period of time.

14               And then I worked for the United County of Mental

15   Health, first as an intake worker in the clinic for

16   approximately six months, and then I worked in the United

17   County Jail as a psychiatric social work assistant for

18   approximately three to four years.  Then I worked as a

19   county intensive case manager at the Lewis County Department

20   of Mental Health.

21               I obtained my Master's Degree in 1990, and then I

22   worked for what was then the Office of Mental Retardation,

23   OMRDD, and now it's OPPW.  I worked there from 1990 to 1996.

24               Then I worked for Oasis, the Office of Substance

25   Abuse Services.  I worked in a rehabilitation program,
```

Deposition of Hal Meyers                                    Estate of Joseph P. King v. Ward, et al.

1    McPike in Utica, where I helped develop treatment for people

2    with occurring disorders, addiction and mental health

3    concerns.

4            Then in 1998 I joined the Office of Mental

5    Health, where I worked as a Social Worker II at the

6    Mid-State Correctional Facility for approximately two years.

7            Then I worked in the Office of Mental Health

8    field office, which is located in Syracuse, and I was an

9    assistant outpatient treatment compliance specialist for

10   approximately four years.

11           Then I was a unit chief at the Auburn

12   Correctional Facility for Central New York Psychiatric

13   Center.  I was there for approximately three years.

14           Then I worked for one year at the Division of

15   Forensic Services in Albany.

16           Then I returned to Central New York Psychiatric

17   Center, where I served as a unit chief in the Special

18   Programs Office for about 18 months.

19           And then I became a unit chief at the Mid-State

20   Correctional Facility, and I was a unit chief there for

21   approximately 10 years before my current position, which is

22   Forensic Program Administrator II.

23       Q    When did you start the position you have right

24   now?

25       A    I think it was this 2019.

1       Q       Which month?

2       A       I'm not sure.  I don't recall.

3       Q       Okay.  Before the position that you were working

4    right now, can you just please repeat where you were

5    working?

6       A       I was working at the Mid-State Correctional

7    Facility for approximately 10 years as unit chief.

8       Q       Since you got --

9               For 10 years you were the unit chief?

10      A       Correct.

11      Q       What were your duties and responsibilities?

12      A       Mid-State is the largest mental health satellite

13   unit in the state, and it was my job to pretty much oversee

14   the day-to-day operations from an administrative vantage

15   point.

16      Q       Did you report to someone?

17      A       Yes, I did.

18      Q       Who did you report to?

19      A       I reported to the forensic program administrator,

20   and during the 10 years there was a number of them, Lauri

21   Seymour, Katrina Kemory, Lori Schatzel.

22              To the best of my knowledge, they were the -- one

23   more, Cristina -- I can't remember her last name, but I

24   think that would cover the number of people I reported to

25   over those 10 years.

1        Q      When did you start working, and when did you

2    finish working there?

3               I know you said 10 years, but that could be --

4               I just need to know from when to when.

5        A      Approximately 2009 to when I started as an FPA,

6    which was in 2019.

7        Q      And what was the reason you left this work?

8        A      From unit chief to forensic program

9    administrator?

10       Q      Yes.

11       A      It was a promotion.

12       Q      Okay.  Did you ever talk about this lawsuit with

13   anyone you work with?

14       A      Did I ever talk about what?

15       Q      This lawsuit.

16       A      No, I have not.

17       Q      Do you remember when this lawsuit was filed?

18       A      No, I do not.

19               MS. KALKACH:  Okay.  Now, I would like to offer

20       Mr. Meyers Exhibit A into evidence.

21               MS. NAPPI:  I'm sorry.  If the tech could put up

22       Exhibit A on the screen so Mr. Meyers can see it.

23               (Exhibit A was marked for identification.)

24       A      I see it, thank you.

25

```
 1   BY MS. KALKACH:

 2        Q     Perfect.  Please take a moment to review this

 3   exhibit.  Let us know or let the tech to go down if you need

 4   to, switch pages whenever you need it.

 5        A     Okay, I recall I was served with this.

 6        Q     Okay.  You can take a minute to review it, and

 7   then just let me know when you're done.

 8        A     I can scroll it myself?

 9        Q     I think the tech is the one that needs to do

10   that.  Just ask the tech to scroll it.

11        A     Next.

12             MS. COWAN:  Do you want him to read it fully

13        because it's 19 pages?  Maybe just kind of scroll

14        through it.

15             MS. KALKACH:  Yeah, just to scroll through,

16        exactly.

17             MS. COWAN:  Yes.

18        A     I was originally served this, but it was a while

19   ago.

20   BY MS. KALKACH:

21        Q     Okay.  So --

22        A     Okay.

23        Q     Okay.  I don't think we need to go through the

24   whole document.  I just want to know if you recognize the

25   document that has been marked as Exhibit A.
```

```
 1      A     Yes, I do.

 2      Q     Okay.  What do you recognize the document to be?

 3      A     This was a copy of the lawsuit that I was served,

 4 you know, some is time ago.  It appears to be.

 5      Q     Okay.  So how are you familiar with this

 6 document?

 7      A     I was served.

 8      Q     Did you review this document prior to today?

 9      A     I reviewed it at --

10            I have reviewed it, but not recently.

11      Q     When was the last time that you reviewed it?

12      A     It's probably been at least three or four months.

13            MS. KALKACH:  Okay.  Now, please, if you could, I

14      would like to offer Mr. Meyers' Exhibit B into

15      evidence.  So could you pull it up?

16            (Exhibit B was marked for identification.)

17 BY MS. KALKACH:

18      Q     Okay.  Now, Mr. Meyers, please now again take a

19 minute to review this document, and when you're finished

20 reviewing it, please let me know.

21      A     Okay.

22      Q     If you could scroll down.  I just need to know if

23 he recognizes the document.  Thank you.  Perfect, thank you.

24            Do you recognize the document which has been

25 marked as Exhibit B?
```

```
 1        A     I think so.

 2        Q     What is this document?

 3        A     It looks like it would be the next step to the

 4   lawsuit that was filed.  I'm not sure.

 5        Q     Okay.  Did you participate in a drafting of this

 6   document?

 7        A     Is this the interrogatory?

 8        Q     No?

 9              MS. COWAN:  For the record, Exhibit B is the

10        Answer to the Amended Complaint, which I drafted and

11        filed with the Court.  Mr. Meyers didn't draft this

12        document.

13              MS. KALKACH:  Okay.  I understand he didn't draft

14        it, but I want to know if he participated with the

15        information in order for it to be drafted.

16   BY MS. KALKACH:

17        Q     Mr. Meyers, did you participate in this document,

18   not necessarily drafting, but giving information?

19        A     Yeah, to the best of my knowledge, I believe that

20   I had a phone call with the AG, yes.

21        Q     Thank you.  Have you signed any recent statements

22   or made any recorded statements or spoken to any attorneys

23   or investigators or reporters about the events related to

24   this lawsuit?

25        A     Just Ms. Cowan.
```

```
 1        Q     Okay.  All right.  Did you know Mr. Joseph King?
 2        A     I knew that he was open to mental health
 3   services, but I don't recall meeting him.
 4              I know that I did meet him once with Ms.
 5   Palladino, but I wouldn't have known Mr. King --
 6              I didn't meet individually with him.  Mid-State
 7   at times had over 800 people active on our caseload.  And
 8   because it's a medium-security facility, there's people
 9   coming and going all the time.            .
10        Q     I understand, but you remember that you met with
11   him once with Ms. Palladino?
12        A     Yes, but that's the extent of my recollection.
13        Q     Okay.  And when was this?
14        A     I don't recall.
15        Q     And who is Ms. Palladino?
16        A     She's a social worker at the Mid-State
17   Correctional Facility.
18        Q     Do you know when Mr. King was incarcerated?
19        A     No, I don't.
20        Q     Do you know why he was incarcerated?
21        A     I do not.
22        Q     Besides that one time that you met with him, did
23   you ever have any other conversation with Mr. King?
24        A     Not that I can recall.
25        Q     What would have been your role in Mr. King's life
```

1   while he was incarcerated?

2       A    My primary role was to ensure that policies and

3   procedures were being followed, not just for Mr. King, but

4   for all the individuals who we provided service to.

5           I was more responsible for administrative

6   functions rather than like clinical determinations.

7       Q    And were you aware of any specific problems that

8   Mr. King dealt with while being incarcerated?

9           MS. COWAN:  Objection.  You can answer.

10      A    I recall that Ms. Palladino shared, you know,

11  just that he had concerns about being open on the caseload,

12  you know, just general things like that, which wasn't

13  uncommon.

14          Sometimes people are open for mental health

15  services, and they don't want to be.

16  BY MS. KALKACH:

17      Q    You said that you met with him and Ms. Palladino.

18          What was the reason that you had that meeting?

19          What prompted it?

20      A    Ms. Palladino asked me to join them.

21      Q    Why?

22      A    I don't recall the specifics of the meeting, but

23  a lot of times, not just for Mr. King, but for other people,

24  sometimes I'd meet with the individual and their therapist

25  and let them know about, you know, a policy or procedure

1    that might be impacting upon them and their care.

2        Q    So do you remember what policy or procedure they

3    asked to meet with them about?

4        A    I don't recall specifically.

5        Q    Were you aware that Mr. King used Suboxone?

6        A    Yes, I was.  It was noted in the one document

7    that I found that I was CC'd on.

8        Q    Okay.

9        A    I'm sorry.  I don't know --

10            I have no way of knowing whether that's based on

11   his self-report or if he was tested, if it was ever found on

12   him, if it was in the box.

13            I have no idea, just that Suboxone was referenced

14   in the one document that was CC'd to me.

15       Q    So when you say that Mr. King was worried about

16   being open on the caseload, what do you mean by that?

17       A    What I said was that it wasn't uncommon for

18   individuals open to mental health services sometimes not

19   to -- wouldn't be open to mental health services.

20       Q    Could you explain --

21       A    They would have --

22            I'm sorry.

23       Q    I asked if you could explain -- if you could

24   please explain a little bit further.

25       A    Depending on your identified mental health needs,

Deposition of Hal Meyers                                    Estate of Joseph P. King v. Ward, et al.

```
 1   that determines what facility you're housed in to make sure
 2   that the mental health resources match what are seen as the
 3   mental health needs of an individual at any point in time.
 4        Q     Okay.  And then what was your understanding of
 5   his concerns regarding this, Mr. King?
 6        A     My recollection, Mr. King and other individuals,
 7   is that by having their case closed or their mental health
 8   level increased, that allows them to move within New York
 9   State many times closer to their families.
10        Q     So were you aware about the status of his
11   marriage suffering?
12             MS. COWAN:  Objection.  Sorry, I don't think I
13        understood the question.
14   BY MS. KALKACH:
15        Q     So I'm just asking like if he was aware that
16   Mr. King thought that his marriage was suffering.
17        A     I didn't provide direct therapy to Mr. King.  I
18   wasn't aware of his perception, you know, that his marriage
19   was suffering.
20        Q     Okay.  So during the conversation that you had
21   with him, did Mr. King want his mental health services
22   increased or lowered, or what were his concerns?
23             What did he want?
24             MS. COWAN:  Objection.
25        A     I don't --
```

```
 1              MS. COWAN:  Go ahead.  Sorry.
 2        A     I don't recall the specific things that were
 3   discussed during the one time that I can recall that I met
 4   with Ms. Palladino and Mr. King.
 5   BY MS. KALKACH:
 6        Q     Normally when you go to these meetings, do you
 7   take notes?
 8        A     I'm not one of the treating providers.
 9              What happens commonly is, if I was in a meeting,
10   the person who normally would --
11              Like a therapist in this case --
12              No.
13              Therapist and unit chief met with, you know,
14   so-and-so on this date, what was discussed.
15        Q     So who took notes for this meeting?
16        A     If Ms. Palladino saw him, she did a note.
17              I haven't seen the note.  I don't know anything
18   about the note, what it reflects, what it doesn't reflect.
19        Q     And when you meet with --
20              When you meet with inmates and talk to them about
21   policies, et cetera, I understand you don't make notes, but
22   do you have to make reports afterwards?
23              Do you have to memorialize your meetings in any
24   way?
25        A     No.  It would be very rare that I would be
```

 1   meeting directly with an individual.

 2        Q     All right.  So what impact would your job have

 3   had on Mr. King's daily life at Mid-State?

 4              MS. COWAN:  Objection.

 5              MS. KALKACH:  Can he answer?

 6              MS. COWAN:  Yeah, you can answer if you

 7        understand.

 8        A     Just trying to make sure that he was getting

 9   appropriate mental health services like other people that

10   were opened up to services.

11              But as far as like clinical treatment aspects, I

12   would be less involved in that.

13   BY MS. KALKACH:

14        Q     Okay.  So you told me that you did have certain

15   functions at Mid-State.

16              Could you please tell me what were those?

17        A     I monitored people's performance.  I participated

18   in people's evaluations -- their performance evaluations of

19   some of the staff, not all of them.  I was involved, but

20   more directly involved with work performance of clinical

21   staff.

22              Prescribers and nursing staff kind of had their

23   own silo.

24              MS. NAPPI:  Can we take a 10-minute break?

25              MS. KALKACH:  Yes.

```
 1                 MS. COWAN:  Sure.

 2                 (Recess was taken.)

 3    BY MS. KALKACH:

 4        Q    Mr. Meyers, you testified earlier that you

 5    received letters from inmates with complaints; is that

 6    correct?

 7        A    I would rather call them letters of concern

 8    because a lot of times there are questions about things, and

 9    people are looking for --

10                 They're looking for answers, you know, to exert

11    what little control someone, you know, has from the

12    perspective of an incarcerated individual.

13        Q    Okay.  Do you have keep these letters?

14        A    They're part of --

15                 They're part of the record.

16        Q    Part of which record?

17        A    They would be under the correspondence section of

18    the patient's record, as would my response to a letter of

19    concern.

20        Q    Were these complaints of any kind of mental

21    health?

22                 MS. COWAN:  Objection.

23    BY MS. KALKACH:

24        Q    Were some of these letters of concern about

25    mental health?
```

1      A      Yes, it would be common for me to receive letters

2   of concern around issues related to mental health.

3      Q      Were some of the concerns related to medications

4   inmates received?

5      A      Yeah, sometimes.

6      Q      Did you ever receive a letter of concern from

7   Mr. Joseph King?

8      A      I don't recall.

9      Q      Okay.  You testified earlier that you have been

10  sued by Benjamin Van Zant regarding his suicide; is that

11  correct?

12     A      I was one of the people named in it, yes.

13     Q      Okay.  Where did he commit suicide?

14     A      My recollection, at the Sullivan Correctional

15  Center in the Intermediate Care Program.

16     Q      And what was the nature of how he committed

17  suicide?

18     A      My recollection is it was by hanging.

19     Q      By hanging.

20     A      That's my recollection.

21            It happened at another facility after he had

22  already transferred from the facility where I knew him.

23     Q      Okay.  And how were you involved with Mr. Van

24  Zant?

25     A      I wasn't involved with him.  I had no connection

1    to the Sullivan Correctional Facility at the time of his

2    death.   He had transferred from Mid-State to Sullivan.

3         Q     Okay.   In general, do you speak to other inmates?

4         A     In my current role, I do not.

5         Q     Not in your current one.

6               The one at Mid-State.

7         A     Periodically.

8         Q     To whom do you speak or --

9               To whom do you speak?

10              MS. COWAN:   Objection.   I'm not sure I understand

11         the question.

12   BY MS. KALKACH:

13        Q     I'm going to try to explain.   I'm rephrasing.

14              What would be a reason for you to talk to any

15   other inmates?

16        A     Sometimes a therapist would have a patient who

17   they were seeing, and the patient wanted kind of validation

18   of what the therapist was telling them that it was in fact

19   policies and procedures or what would -- you know, what

20   would need to happen for this -- for whatever the

21   individual's concern was.

22        Q     Okay.   Did you speak to any inmates who knew

23   Mr. King?

24        A     No.   No.   After his suicide, the people at the

25   prison where it happened, they don't -- they're not involved

Deposition of Hal Meyers                                    Estate of Joseph P. King v. Ward, et al.

```
 1   directly in any --

 2           I wouldn't have been involved in any

 3   investigations.

 4       Q     Okay.  And what about before, before the suicide,

 5   did you ever speak to any inmate who was familiar with

 6   Mr. King?

 7       A     No, I don't recall ever speaking with another

 8   inmate in reference to Mr. King because that would be a

 9   violation of confidentiality.

10           There would be instances where we could listen to

11   an inmate about another inmate, but we would never talk to

12   an incarcerated individual about another incarcerated

13   individual.

14       Q     Okay.  And at any time did any other inmate spoke

15   to you about any concerns with Mr. King?

16       A     No.

17       Q     Did you ever receive a letter or statement from

18   any other inmate about any concerns with Mr. King?

19       A     Not that I recall.

20       Q     How is the correctional facility arranged?

21       A     A maximum correctional facility, people have

22   their own cells that they're referred to as sometimes their

23   houses, and they're separate cubicles.

24           In a medium-correctional facility such as

25   Mid-State, people live in large dorms.
```

Deposition of Hal Meyers                                    Estate of Joseph P. King v. Ward, et al.

```
 1         Q      Okay.  How many inmates do you have per dorm?
 2         A      Mid-State wasn't built as a correctional facility
 3    from scratch.  Over the years it had been a number of
 4    different things, including a psychiatric center, a
 5    treatment place for people with addictions.  So not all the
 6    buildings were the same size, so the dorms could range
 7    anywhere from approximately 6 people, some people had
 8    private rooms, up to 20.  It all depended on where someone
 9    was housed.
10         Q      Did you ever speak to anyone sharing a dorm with
11    Mr. King within the week leading up to Mr. King's suicide?
12         A      No.
13         Q      Okay.  Were you aware that Mr. King tried to
14    commit suicide with his shoelaces?
15         A      That was also reflected in the one document that
16    I was CC'd on.
17                So I have limited knowledge, yes.
18         Q      Okay.  But when did you become aware?
19         A      I would have been aware if it occurred at
20    Mid-State in realtime, whenever it occurred.  I just
21    don't --
22                I don't recall when it happened or, you know, a
23    lot of the circumstances around it.  But as a unit chief, if
24    there was any serious self-injury or suicide, I would be
25    aware of it, but more in real time.
```

Deposition of Hal Meyers                                    Estate of Joseph P. King v. Ward, et al.

1      Q      Are you aware of any policy regarding shoelaces

2    and inmates?

3      A      I'm not aware of any --

4             MS. COWAN:  Sorry.

5      A      The only --

6             My only knowledge would be, when someone is in

7    the small hospital in the crisis unit, the Residential

8    Crisis Treatment Program, that they would have limited

9    amenities, which could include not having shoelaces.

10   BY MS. KALKACH:

11     Q      Do you know how I can find those policies?

12            MS. COWAN:  Are you referring to the crisis

13        center policy that he just referred to?

14            MS. KALKACH:  Yes.

15            MS. COWAN:  I did provide that.  It was attached

16        to his interrogatories.

17   BY MS. KALKACH:

18     Q      When --

19            MS. COWAN:  Oh, sorry.  I think it was Exhibit B

20        to his interrogatories.  It's "RCTP Observation Cells

21        and Dormitory Beds."

22            MS. KALKACH:  Oh, yes, I understand.  I just

23        wanted him to --

24            I just wanted to know if he knew where to find

25        them and how to find them, if he could.

Deposition of Hal Meyers                                    Estate of Joseph P. King v. Ward, et al.

```
 1                    MS. COWAN:  Okay.
 2                    MS. KALKACH:  I was going to go a little bit
 3            further with that but, yes, thank you.
 4     BY MS. KALKACH:
 5            Q     So admits to the hospital, are they given their
 6     shoelaces back?
 7            A     While they're in the Residential Crisis Treatment
 8     Program, it depends on why they're -- why they're there.
 9     There's a variety of reasons why people might be in one of
10     these observation cells.
11            Q     What would be those reasons?
12            A     Sometimes it could be a result of someone
13     engaging in self-injurious behaviors, but many times it's
14     just like in a hospital in a community.  Someone could be
15     experiencing psychiatric decompensation, difficulties with
16     their medications.
17                    There's a variety of reasons why someone would be
18     in a Residential Crisis Treatment Program.  And so some
19     people there, it would be clinically determined what
20     amenities someone would be provided because we don't want to
21     violate someone's human rights, but we want to keep them
22     safe during that time period.
23            Q     Okay.  And who decides when inmates go to the
24     hospital or observation cells?
25            A     There's generally an RCTP coordinator, a
```

 1   clinician who would evaluate the individual and determine if
 2   they needed a higher level of care, and sometimes that would
 3   be in conjunction with a prescriber who would also be part
 4   of the treatment team in the Residential Crisis Treatment
 5   Program.
 6        Q     How did you learn about all of these policies?
 7        A     It's a very important --
 8              I mean, all of our policies and procedures are
 9   important, but one of the main places we emphasize our care
10   are in the special housing units and in the RCTP.
11              Policies can change over time, so rather than
12   like print off policies, when someone needs to know one of
13   our policies, generally they would go electronically and
14   follow the current policy, or at least verify that if they
15   did print out a policy previously, that that's still the
16   current policy.
17        Q     Okay.  You were speaking about human rights.
18              Do you think it's a human right to have
19   shoelaces?
20              MS. COWAN:  Objection.  Go ahead.
21        A     It would be, in my mind, a violation of human
22   rights, for someone who wasn't a danger of themselves,
23   depriving them of their clothing and their shoelaces.
24   BY MS. KALKACH:
25        Q     If someone had previously tried to commit suicide

```
 1   with shoelaces, you would still think it's a human right to

 2   give them their shoelaces back?

 3            MS. COWAN:  Objection.  Go ahead.

 4       A    Every time that someone would be admitted to the

 5   residential crisis treatment program, we would look at the

 6   reasons why they were being admitted at that time, and

 7   sometimes there might be some historical context if someone

 8   had just recently been in for harming themselves or

 9   something like that.

10            But generally we would look at the

11   circumstances -- the individual circumstances that would

12   lead to each admission to the RCTP, and then their treatment

13   and our care would be based upon their presenting problems

14   and needs.

15   BY MS. KALKACH:

16       Q    So in this case, in your opinion, it was a best

17   practice to give shoelaces to an inmate who already tried to

18   commit suicide with shoelaces?

19            MS. COWAN:  Objection.

20       A    If someone was admitted to an RCTP following a

21   suicide attempt, following self-injurious behaviors, for the

22   period of time that they were in the RCTP receiving

23   treatment, clinically the team would probably determine to

24   limit their amenities because they were considered a danger

25   to self at the time that they were in the Residential Crisis
```

1  Treatment Program.

2  BY MS. KALKACH:

3      Q      Who is this team that decides?

4      A      I referenced it before.  It would be the

5  Residential Crisis Treatment Program Coordinator, who is

6  generally a clinician, and then a prescriber who is the

7  other part of the RCTP treatment team.

8      Q      Are correctional facilities assigned a mental

9  health level?

10     A      Yes.  Every incarcerated individual has three

11  levels, a medical level that's given by DOCCS, a security

12  level that's given by DOCCS, and a mental health level

13  that's given by the Office of Mental Health.

14     Q      What mental health level was the correctional

15  facility where Mr. King was an inmate?

16     A      It's a full mental health satellite unit, so it's

17  a Level 1 facility, but not all individuals receiving care

18  at Mid-State had mental health services of 1.

19     Q      Was he at this facility since the beginning of

20  his sentence?

21     A      I cannot recall.

22     Q      Was he ever in a mental health care unit?

23     A      He was in the residential --

24            To the best of my knowledge, he was in the

25  Residential Crisis Treatment Program after the suicide

 1 | attempt that you talked about earlier with the shoelaces.

 2 |     Q      When was he transferred to a different one?

 3 |            MS. COWAN:  Do you understand?  Go ahead.

 4 |     A      He was at Mid-State after the suicide attempt

 5 | with shoelaces.

 6 |            I'm not aware of him being transferred somewhere

 7 | else.  I don't recall.

 8 |            MS. KALKACH:  I need to take a quick break.

 9 |            MS. COWAN:  Okay.

10 |            (Recess was taken.)

11 | BY MS. KALKACH:

12 |     Q      Okay, Mr. Meyers, can you please explain to me

13 | how the different levels work for every inmate?

14 |     A      So these would be mental health service levels.

15 |     Q      Okay.

16 |     A      The ones that are related to the incarcerated

17 | individuals.

18 |     Q      And what are these levels?

19 |     A      Okay.  Again, these are levels specific to the

20 | individuals, not the facilities.

21 |     Q      Yes.  And how many levels are they?

22 |     A      There's five.  They go from 1 to 6, and for

23 | whatever reason they skip 5.

24 |     Q      I see.

25 |     A      Someone who's a Level 6 is not currently -- is

 1    not currently open to mental health services.

 2              Someone who's a Level 4 is either being screened

 3    for active services.  They can be seen up to three times

 4    before we make a determination whether to open them or not,

 5    or they could be open with very minor mental health concerns

 6    and not on medications.

 7              A Level 3 would be someone again with relatively

 8    minor mental health conditions in the spectrum of mental

 9    health concerns, but receive some type of psychotropic

10    medications.

11              A Level 2 you would start to get into someone who

12    has a more significant mental health diagnosis, and in most

13    cases would be on medications.

14              A Level 1 is someone with more significant mental

15    health concerns that may or may not be well-controlled.  And

16    it's determined that if they have a Level 1 that they should

17    be in a facility like Mid-State that has a lot of mental

18    health resources, where if you're a Level 2 or a 3 or a 4,

19    you can be in a facility that just basically just has clinic

20    services just like in the community where you go in and

21    maybe do verbal therapy.

22              In a Level 1 facility, there's essentially a day

23    treatment program, there's a small hospital, and there's

24    also clinic services, but the resources are there in place

25    ready to go.

```
 1              So if somebody has a Level 1, we've made a
 2   determination that it would be in their best interest to be
 3   in a facility that has a wide array of mental health
 4   services readily available to that individual.
 5        Q    Okay.  To switch from one to another, that's a
 6   decision made by the therapist, correct, or no?
 7        A    To change the mental health service level?
 8        Q    Yes.
 9        A    The therapist would generally do that in
10   conjunction with the prescriber, who is also assigned to
11   that individual, sometimes the full treatment team, and then
12   they would submit a level change form, and a unit chief
13   signs the level change form.
14        Q    Who signs?
15        A    The unit chief.
16        Q    The unit chief, okay.
17              And how often --
18              How often do inmates see their therapists?
19        A    A minimum --
20              It depends on their mental health service level.
21              Someplace like Mid-State, the majority of
22   individuals being served would see their therapist at a
23   minimum once a month and a prescriber at a minimum every
24   three months, and that's if they were just in general
25   population, you know, going about their daily life.
```

Deposition of Hal Meyers                                    Estate of Joseph P. King v. Ward, et al.

```
 1      Q      In order to decide that they have to be switched

 2   from one to another, you have to get, I understand, the

 3   prescriber in conjunction with the therapist, but I want to

 4   know the process to make that change from one level to the

 5   other one.

 6      A      A clinician and a prescriber would see a change

 7   in someone.  Sometimes it could be an indication that they

 8   need more services.  Sometimes it's an indication that

 9   people benefited from services and are doing well, and their

10   mental health service level should reflect their progress

11   and treatment.  It could go either way.

12      Q      Is there a questionnaire a report or some sort of

13   screening that every inmate has to obtain when they come

14   into the correctional facility?

15      A      Yes.  That would be done at reception.

16      Q      And how is it done?

17      A      When someone comes into the prison system, they

18   go to the reception center, and that's when they would

19   determine -- DOCCS would determine their security level,

20   their medical level.  We would determine their mental health

21   level.

22             And based on those levels, that would determine

23   what facility would make the most sense for that individual

24   to meet their needs.

25      Q      I see.
```

```
 1            If at some point it's not working, then is it up
 2   to the therapist or prescriber to figure it out and screen
 3   again, or who does -- is it a different screening?
 4            How would a transfer happen when an inmate is
 5   already in the facility, but needs different care?
 6       A    We'd be looking at things based on clinical
 7   reasons.
 8            As I talked about before, if someone's clinical
 9   needs appear to be increasing, their mental health level
10   might be dropped.  They might be at a Level 2 or 3 facility
11   where there's just clinic services and then, based on
12   whatever is going on in their life, somebody might make the
13   determination that that's not enough mental health resources
14   for that person, and they're going to lower their level.
15            And if somebody is doing well over time, their
16   level could -- could be increased.
17       Q    When it's determined that someone is to change a
18   level, how long does it take for the facility to do it -- to
19   make a transfer?
20       A    They're separate things.  Someone could be at
21   let's say Mid-State, for example, where someone has a mental
22   health service Level 1, they have to be in a satellite unit,
23   but not all the people at Mid-State are Level 1s.  There's
24   people there that are 2s and 3s and 4s.
25            So just by changing someone's level, it just
```

1    indicates what their chronic and projected -- short-term

2    projected mental health needs are.  It wouldn't necessarily

3    mean that someone would be transferred.  But if DOCCS wanted

4    to transfer someone, and at a higher mental health level,

5    that would increase the number of facilities that person

6    could potentially be transferred to, but the Office of

7    Mental Health would play no part in that.

8         Q    Okay.  Are you aware of any potential suicide

9    indicators in any of the policies that the facility must

10   follow?

11             MS. COWAN:  Objection.  Go ahead.

12        A    Yes, I believe those policies were provided to

13   you, but I am aware of them, yes.

14   BY MS. KALKACH:

15        Q    What are those potential suicide indicators?

16        A    We receive training, everyone who works for the

17   Office of Mental Health and the prisons, around suicide

18   factors, but there's also different ways that we weave in

19   just basically constantly assessing for suicide risk pretty

20   much every time someone writes a note.

21        Q    How often do you receive training?

22        A    At least --

23             At least --

24             At least once a year, but a lot of staff are

25   involved in numerous suicide trainings, either attending

1  them or providing them, so they would be exposed to the

2  suicide prevention concerns on a very frequent basis.

3       Q    Are they mandatory, these trainings?

4       A    Yes.  We have an Education & Training Department

5  at Central New York that keeps track of all trainings that

6  staff attend or are provided.

7            MS. KALKACH:  Give me one minute just to read

8       over my notes.

9            THE WITNESS:  I'm going to grab a water.

10 BY MS. KALKACH:

11      Q    Do you know what a suicide watch commander is?

12      A    A suicide watch commander?

13      Q    Yes.

14      A    No.

15      Q    Do you know what suicide watch is?

16      A    It's an older term now.

17      Q    What is the new term?

18      A    We used to have people in the small hospital --

19 physically in the small hospital.  They would be considered

20 to be in RCTP.

21           And then on occasion there would be people

22 elsewhere in the facility who would be on a watch because

23 they were considered to be a danger to self or others,

24 usually to self, and there would be a corrections officer --

25 DOCCS would provide a corrections officer to monitor that

1    individual.

2          Now all individuals, whether they're in a

3    physical cell in the Residential Crisis Treatment Program or

4    if they're on a watch somewhere else in the facility,

5    they're considered in the RCTP.

6      Q    Well, before when the suicide watch existed, when

7    would an inmate be placed on suicide watch?

8      A    When someone determined that they were a danger

9    to self.

10     Q    And this someone determining are the same people

11   that would determine the level, or who?

12     A    It could be a variety of people.  Someone could

13   present with risk at any time.

14     Q    Are there standard items or anything that someone

15   should be looking for in order to know if an inmate should

16   be placed in suicide watch?

17     A    There's certain things we look for that may be

18   indicative of potential suicide risk.  And based on those

19   things, someone would be placed -- potentially placed on

20   watch or RCTP status.

21     Q    Okay.  And what are those things that would be --

22   that are like potential suicide indicators?

23     A    There's a number of things.  Some would be the

24   same type of things you would think about in the community.

25     Q    Which are?

```
 1        A      Someone that -- maintaining friendships, being
 2   withdrawn, maybe a change in their alcohol or drug use where
 3   they might become more impulsive.
 4              In the community, many times it's signs and
 5   symptoms of depression that get worse over time until such
 6   time as, you know, someone sees harming themselves or
 7   committing suicide as a viable option or a choice.
 8              In a correctional setting, there's additional
 9   risk factors that are specific to corrections, and they
10   could involve conflicts with other incarcerated individuals,
11   you know, gangs, drug debts, just a number of -- a number of
12   things, you know, being stressed about being in a
13   correctional setting.
14              Regardless if somebody is in the community or in
15   a correctional setting, we try to observe for changes.  And
16   when we see changes, that's when it would be appropriate to
17   make a referral or to determine that someone needs a higher
18   level of care for a limited amount of time.
19        Q      So is there any reason to send an inmate to a
20   special housing unit?
21              MS. COWAN:  Objection.  Go ahead.
22        A      A special housing unit is more a disciplinary
23   setting.  And now with the HALT legislation, it's no longer
24   a place where someone could be on RCTP status or a
25   one-to-one watch could be provided, but in a medium-security
```

1    place where they live in dorms, it wouldn't be safe to allow

2    someone to stay like in an open space where they might be

3    able to get ahold of stuff.

4           So in the past, sometimes people would be placed

5    in a SHU cell, but not for disciplinary reasons, but just

6    because that's the safest place to hold them.  An infirmary

7    would be another place.

8           If someone is a danger to themselves, they have

9    to be removed from the dorm environment and monitored

10   somewhere else for their safety.

11   Q    Do you know what a parole board hearing is?

12   A    Yes.

13   Q    Okay.  Do you get notified when an inmate is

14   going to get his or her parole board hearing?

15   A    The Office of Mental Health?

16   Q    Yes.

17   A    Yes, the Office of Mental Health is notified when

18   someone basically DOCCS is parole is part of DOCCS now.

19          If they believe that a mental health evaluation

20   is needed to help the parole commissioners, then they

21   will -- they will make a request to the Office of Mental

22   Health that we do a parole evaluation for purposes of the

23   commissioner and to recommend appropriate care and treatment

24   for the individual in the event that they are released from

25   prison, what types of supports they would need in the

1    community, and then sometimes they would become conditions

2    of parole to help the person stay in the community and try

3    to promote continuity of mental health care and treatment.

4        Q     I see.

5              And are there common emotional changes in inmates

6    when the hearing is approaching?

7              MS. COWAN:  Objection.  Go ahead.

8        A     It varies.  It depends on the individual.  But

9    that's potentially something that, you know, a therapist

10   might support somebody around if it came up as an issue or

11   concern.

12   BY MS. KALKACH:

13       Q     Did you ever receive training or education on

14   suicide prevention?

15       A     Yes, I have.

16       Q     When did you receive it?

17       A     I receive it like on a regular basis, you know,

18   at a minimum once a year, but I've actually -- I train, you

19   know, DOCCS staff throughout the state on different mental

20   health training, and we usually incorporate suicide

21   prevention in most of those trainings.  It's one of the

22   things we always include.

23       Q     Okay.  And who paid for the training?

24       A     It's all within the State of New York.

25             The Office of Mental Health, we have internal

1   suicide prevention training, and then the Office of Mental

2   Health provides suicide prevention training to employees of

3   the Department of Correctional and Community Services.

4        Q     Okay.  And how long does the training last?

5        A     Generally suicide prevention is a portion of each

6   training.  I would say it goes anywhere from 15 minutes to 4

7   hours, depending on the nature of that specific training.

8        Q     So you get training on suicide prevention for 15

9   minutes once a year, or maybe sometimes --

10       A     No.

11             Every training we do, regardless of the subject,

12  every DOCCS training that we do, we incorporate an element

13  of suicide prevention.

14             So depending on that individual training, it can

15  go anywhere from a smaller amount of time, let's say 15

16  minutes -- probably a half hour would be the minimum -- to

17  as much as 4 hours.

18             It can vary, depending on the nature of the

19  training, the purpose of the training, what we're trying to

20  get across to the staff.

21       Q     Are there training conventions, or how do those

22  work?

23             How does it work?

24       A     We have an Education & Training Department, and

25  they work with DOCCS education and training, and they

1   coordinate what trainings we're going to do each year, how

2   many, where they're going to be.

3        Q     Did the correctional do official evaluations for

4   suicide risk?

5              MS. COWAN:  Objection.  Can you answer?

6        A     In certain circumstances.

7   BY MS. KALKACH:

8        Q     What circumstances?

9        A     Just a few examples would be when someone enters

10  disciplinary housing, when someone enters the prison system,

11  when they're transferred.  That would be the main times, but

12  that's a DOCCS function.  It's not a function of the Office

13  of Mental Health.

14       Q     Okay.  Are you aware of any other suicides that

15  happened in the prison from 2013 to 2018?

16             MS. COWAN:  Objection.  Go ahead.

17       A     Unfortunately suicides, regardless of our best

18  efforts, they do occur in the correctional setting for a

19  variety of reasons, and the number of suicides each year, it

20  can vary.

21  BY MS. KALKACH:

22       Q     Okay.  So you are aware?

23       A     I'm sorry.  Yes, I'm aware there's suicides in

24  prison, and they occurred during that period of time, yes.

25       Q     How many, approximately, per year?

```
 1        A     I don't have the stats in front of me.  It
 2   definitely would be approximate, but generally they run
 3   between 10 a year, and I think as a high of 18 or 19.
 4             MS. COWAN:  Is that from Mid-State, Mr. Meyers,
 5        or is that for all of DOCCS?
 6             THE WITNESS:  That would be the whole DOCCS
 7        system.
 8             MS. COWAN:  Okay.
 9             THE WITNESS:  In the 10 years I was at Mid-State,
10        there was a very limited number of suicides.
11   BY MS. KALKACH:
12        Q     Do you know how many?
13        A     I don't know exactly, but it was something that
14   was -- didn't occur very often.
15             I would say, again --
16        Q     You can give an approximation.
17        A     Two or three over the 10 years.  And being that
18   Mid-State was the largest satellite unit with the largest
19   number of people with mental health concerns, in my
20   estimation, it demonstrated that, you know, we were doing a
21   good job.
22             MS. NAPPI:  Objection, move to strike that
23        answer.  It wasn't in response to a question that was
24        pending.
25             THE WITNESS:  Sorry.
```

```
 1              MS. COWAN:  Okay.  Go ahead.
 2   BY MS. KALKACH:
 3       Q    How many of those were related to a mental health
 4   illness?
 5              MS. COWAN:  Objection.  If you can answer.
 6       A    Out of the three, I don't know.  But the larger
 7   numbers that I gave you before, a lot of years it reached
 8   down around 50 percent of people who were open to mental
 9   health services, and about 50 percent aren't at the time of
10   their death.
11   BY MS. KALKACH:
12       Q    Are you aware of any changes to the policies and
13   directives as a consequence?
14              MS. COWAN:  Objection.  Go ahead.
15       A    What happens is, after every suicide, you know,
16   it's looked at by a number of entities, including the Office
17   of Mental Health.  And based on trends that we see,
18   sometimes that does lead to policy changes.
19              Policies particularly around suicide, they're
20   changed on an ongoing basis to reflect the most current
21   knowledge so everyone can do the best job they can to
22   prevent suicide.
23   BY MS. KALKACH:
24       Q    Did the correctional facility keep a suicide log?
25       A    If someone is on RCTP status and they're in one
```

```
 1   of the hospital cells, then --
 2            They have their logbook, you know, for everyone.
 3   If someone is on RCTP status and they're on a one-to-one
 4   watch, then it's my understanding that DOCCS would keep a
 5   log of what was going on with that person.
 6            But again, that's not a function related to the
 7   Office of Mental Health.
 8       Q    Who would have access to the suicide watch log?
 9            MS. COWAN:  Objection.  Answer if you can.
10       A    DOCCS staff and then OMH staff, if they were, you
11   know --
12            When they were seeing the individual that was on
13   the one-to-one watch, they would have a chance to review the
14   log, but they don't write in the log.  They don't make any
15   entries in the log.  It's a DOCCS document .
16   BY MS. KALKACH:
17       Q    I see.
18            Where were you on November 16, 2018?
19       A    I don't recall.
20       Q    It's the date Mr. Joseph King took his life.
21       A    I don't recall.
22       Q    How did you learn about Mr. King's suicide?
23       A    I think someone called me.
24            I don't recall.
25       Q    Who called you?
```

```
 1        A      I don't recall whether it was a phone call to me
 2   or it was when I went to -- when I went to work the next
 3   time.
 4              It's a pretty significant event when someone
 5   commits suicide, so probably someone called me at home and
 6   let me know what had happened because --
 7        Q      So you were at home --
 8              Or probably someone called you at home?
 9        A      To the --
10              That would --
11              If it was outside of normal business hours, which
12   are like 8 to 4:30 or on the weekend, yes, someone would
13   have called me at home.  I wouldn't have been in the
14   correctional facility.
15        Q      Did you go to the scene?
16        A      I don't recall if I went to the scene.
17              I wouldn't actually go to the scene-scene because
18   it's kind of like a crime scene, but one of the duties of a
19   unit chief is to make sure that the clinical record is
20   secured if someone has unfortunately passed as a result of
21   suicide.
22              Sometimes that's done physically, and sometimes
23   someone is delegated to someone to secure the chart and lock
24   it safely until the unit chief can get ahold of it.
25        Q      In the case of Mr. King, do you know who was the
```

1    one taking care of this?

2         A     I don't recall whether I physically drove to the

3    facility or I directed someone to secure the chart, but I

4    was aware of the need to secure the chart, and it would have

5    been secured one way or the other.  I would have made sure

6    that was taken care of.

7         Q     Did anyone explain how the suicide occurred?

8         A     I can't --

9               I can't remember all the details.

10              One of the things that happens is, once the chart

11   is secure, we would answer questions to people at Mid-State

12   to anyone that came in to investigate, but we wouldn't

13   really be doing a lot of the investigation ourselves.

14        Q     Okay.  Are you aware of what Mr. King used to

15   kill himself?

16        A     My limited recollection is that he hung himself

17   in a bathroom area.

18        Q     Are you aware with what -- what did he use?

19        A     No, I don't recall.

20        Q     Are you aware of any investigation from the

21   correctional facility after his suicide?

22        A     Yes.  As far as I know, the normal investigative

23   procedures and entities did what they were supposed to do.

24        Q     Do you know the exact location of the suicide?

25        A     To the best of my recollection, it was Building

1    20 maybe.  I can't recall.  It was in a housing unit area.

2    That's what I recall.

3         Q    Do you know who discovered the attempt?

4         A    No, I don't recall.

5         Q    Do you know if Mr. King was sent to a hospital?

6         A    I don't recall, but it's not uncommon that if

7    someone completes suicide that they're taken to a hospital

8    and pronounced or examined, but that would be a DOCCS -- a

9    DOCCS procedure, not anything to do with the Office of

10   Mental Health.

11        Q    Do you know if the family was notified?

12        A    DOCCS would be notifying the family in most

13   cases.

14             I'm hoping they were notified in a timely basis,

15   but I don't know.

16        Q    Okay.  Was there anything different that you

17   could have done to prevent his suicide?

18             MS. COWAN:  Objection.

19        A    In my administrative role, I'm not aware of any

20   policies and procedures that were not followed that could

21   have contributed to his death.

22             MS. KALKACH:  Okay.  I'm going to review my notes

23        to see if I have some follow-up questions, and I'm

24        going to ask for a little break to do that, and I hope

25        I don't have that many follow-ups.

1           MS. COWAN:  Sounds good.

2               (Recess was taken.)

3           MS. KALKACH:  I have no further questions.  Thank

4       you so much.

5           THE WITNESS:  Thank you.

6           MS. COWAN:  I don't have any questions, so we are

7       good.  You can go off the record.

8               (Whereupon, the deposition was concluded at

9       11:51 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Deposition of Hal Meyers                                    Estate of Joseph P. King v. Ward, et al.

```
 1                    CERTIFICATE
 2              I, Gina Williams, Registered Professional Court
 3    Reporter, do certify that the above deposition was reported
 4    by me and that the foregoing transcript is a true and
 5    accurate record to the best of my knowledge, skills, and
 6    ability.
 7              I further certify that I am not an employee of
 8    counsel or any of the parties, nor a relative or employee of
 9    any attorney or counsel connected with the action, nor
10    financially interested in the action.
11              Subscribed and sworn to before me when taken this
12    23rd day of May, 2022.
13
14                        _Gina Williams_
15                        GINA WILLIAMS, RPR, CRR
16
17
18
19
20
21
22
23
24
25
```

Deposition of Hal Meyers                                    Estate of Joseph P. King v. Ward, et al.

1                        ACKNOWLEDGMENT OF DEPONENT

2

3            I, HAL MEYERS, do hereby certify that I have read

4    the foregoing pages and that the same is a correct

5    transcription of the answers given by me to the questions

6    therein propounded, except for the corrections or changes in

7    form or substance, if any, noted in the attached Errata

8    Sheet.

9

10

11   _____

12   HAL MEYERS                                          Date

13

14   Subscribed and sworn to before me this

15   ___ day of _____, 2022.

16   My commission expires:_____

17

18   _____

19   Notary Public

20

21

22

23

24

25

Deposition of Hal Meyers                                    Estate of Joseph P. King v. Ward, et al.

```
 1                      _ _ _ _ _ _

 2                        ERRATA

 3                      _ _ _ _ _ _

 4      PAGE   LINE                    CHANGE/REASON

 5      ____   ____    _____

 6      ____   ____    _____

 7      ____   ____    _____

 8      ____   ____    _____

 9      ____   ____    _____

10      ____   ____    _____

11      ____   ____    _____

12      ____   ____    _____

13      ____   ____    _____

14      ____   ____    _____

15      ____   ____    _____

16      ____   ____    _____

17      ____   ____    _____

18      ____   ____    _____

19      ____   ____    _____

20      ____   ____    _____

21      ____   ____    _____

22      ____   ____    _____

23      ____   ____    _____

24      ____   ____    _____

25
```

## WORD INDEX

< 1 >
1  38:*17, 18*  39:*22*
40:*14, 16, 22*  41:*1*
43:*22*
10  11:*21*  17:*21*  18:*7,
9, 20, 25*  19:*3*  52:*3, 9,
17*
10:05  1:*19*
10016  2:*6*
10-minute  28:*24*
10th  2:*5*
11:51  58:*9*
112  2:*5*
13202  2:*12*
13413  4:*13*
15  50:*6, 8, 15*
16  54:*18*
18  17:*18*  52:*3*
19  3:*8*  20:*13*  52:*3*
1960  9:*21*
1979  15:*21*
1982  15:*21*
1984  15:*24*
1985  14:*25*
1990  15:*1*  16:*21, 23*
1996  16:*23*
1998  17:*4*
1s  43:*23*

< 2 >
2  40:*11, 18*  43:*10*
20  11:*21*  33:*8*  57:*1*
2009  19:*5*
2013  51:*15*
2018  51:*15*  54:*18*
2019  17:*25*  19:*6*
2022  1:*14, 18*  59:*12*
60:*15*
20-CV-01413  1:*2*
21  3:*9*
23  1:*14, 18*
23rd  59:*12*
29  10:*6*
2s  43:*24*

< 3 >
3  40:*7, 18*  43:*10*

30  10:*6*
300  2:*11*
31  10:*6*
3s  43:*24*

< 4 >
4  3:*4*  40:*2, 18*  50:*6,
17*
4:30  55:*12*
4s  43:*24*

< 5 >
5  39:*23*
50  53:*8, 9*

< 6 >
6  11:*24*  33:*7*  39:*22,
25*

< 7 >
7  9:*21*  11:*24*

< 8 >
8  55:*12*
800  23:*7*
81  4:*12*

< A >
a.m  1:*19*  58:*9*
ability  5:*21*  59:*6*
able  48:*3*
above-styled  1:*18*
Abuse  16:*25*
access  54:*8*
accommodate  6:*14*
accurate  59:*5*
ACKNOWLEDGMEN
T  60:*1*
ACTION  1:*2*  10:*25*
59:*9, 10*
active  23:*7*  40:*3*
actual  14:*3*
ad  1:*5*
addiction  17:*2*
addictions  33:*5*
additional  47:*8*
address  4:*11*  10:*21*
Adirondack  15:*10*
administrative  18:*14*
24:*5*  57:*19*

Administrator  1:*4*
17:*22*  18:*19*  19:*9*
admission  37:*12*
admits  35:*5*
admitted  37:*4, 6, 20*
affect  5:*21*  8:*4*
AG  22:*20*
ago  11:*21, 24*  20:*19*
21:*4*
ahead  27:*1*  36:*20*
37:*3*  39:*3*  44:*11*
47:*21*  49:*7*  51:*16*
53:*1, 14*
ahold  48:*3*  55:*24*
AIMEE  2:*12*
al  1:*5*
Albany  13:*18*  14:*22*
17:*15*
alcohol  8:*4*  47:*2*
allow  48:*1*
allows  26:*8*
Amended  3:*8, 9*
22:*10*
amenities  34:*9*  35:*20*
37:*24*
amount  47:*18*  50:*15*
Amy  1:*5*
Answer  3:*9*  6:*1, 3,
16, 21, 22*  7:*2*  10:*10,
19*  22:*10*  24:*9*  28:*5,
6*  51:*5*  52:*23*  53:*5*
54:*9*  56:*11*
answers  6:*5*  29:*10*
60:*5*
anybody  7:*25*
appear  43:*9*
appearing  2:*2*
appears  21:*4*
Apple  7:*5*
approaching  49:*6*
appropriate  28:*9*
47:*16*  48:*23*
approximate  52:*2*
Approximately  11:*21,
24*  14:*25*  16:*16, 18*
17:*6, 10, 13, 21*  18:*7*
19:*5*  33:*7*  51:*25*
approximation  11:*23*
52:*16*

April  9:*21*
area  56:*17*  57:*1*
arranged  32:*20*
array  41:*3*
Arts  15:*9, 19*
Aside  10:*25*
asked  24:*20*  25:*3, 23*
asking  26:*15*
aspects  28:*11*
assessing  44:*19*
assigned  38:*8*  41:*10*
assistant  16:*17*  17:*9*
assisted  8:*9*
associated  4:*8*
assume  6:*2*
assuming  5:*7*
attached  34:*15*  60:*7*
attempt  37:*21*  39:*1,
4*  57:*3*
attend  14:*16*  45:*6*
attending  44:*25*
ATTORNEY  2:*10*
6:*20, 21*  13:*23*  59:*9*
attorneys  2:*2*  22:*22*
Auburn  17:*11*
available  41:*4*
Avenue  2:*5*
aware  8:*23*  9:*1*
24:*7*  25:*5*  26:*10, 15,
18*  33:*13, 18, 19, 25*
34:*1, 3*  39:*6*  44:*8, 13*
51:*14, 22, 23*  53:*12*
56:*4, 14, 18, 20*  57:*19*

< B >
Bachelor's  15:*14*
back  35:*6*  37:*2*
background  5:*4*
10:*14*
based  6:*3*  25:*10*
37:*13*  42:*22*  43:*6, 11*
46:*18*  53:*17*
basically  5:*4*  40:*19*
44:*19*  48:*18*
basis  45:*2*  49:*17*
53:*20*  57:*14*
Bates  14:*3*
bathroom  56:*17*
Beds  34:*21*

Deposition of Hal Meyers

Estate of Joseph P. King v. Ward, et al.

beginning  38:*19*
behalf  2:*4*, *9*
behaviors  35:*13*
*37*:*21*
believe  13:*25*  15:*21*
22:*19*  44:*12*  48:*19*
benefited  42:*9*
Benjamin  9:*6*  30:*10*
best  6:*9*  18:*22*
22:*19*  37:*16*  38:*24*
41:*2*  51:*17*  53:*21*
56:*25*  59:*5*
beyond  8:*11*
birthdate  10:*21*
bit  25:*24*  35:*2*
board  48:*11*, *14*
born  9:*20*, *22*  10:*21*
box  25:*12*
break  6:*13*, *17*  13:*9*
28:*24*  39:*8*  57:*24*
briefly  16:*2*, *7*
Building  56:*25*
buildings  33:*6*
built  33:*2*
business  55:*11*

**< C >**
call  22:*20*  29:*7*  55:*1*
called  4:*3*  54:*23*, *25*
55:*5*, *8*, *13*
calls  8:*14*
Camden  9:*23*
Captioner  1:*21*
care  5:*5*, *8*  12:*6*, *9*
25:*1*  30:*15*  36:*2*, *9*
37:*13*  38:*17*, *22*  43:*5*
47:*18*  48:*23*  49:*3*
56:*1*, *6*
case  4:*25*  7:*11*, *20*
9:*4*, *5*  10:*12*, *17*  12:*1*,
*6*  16:*19*  26:*7*  27:*11*
37:*16*  55:*25*
caseload  23:*7*  24:*11*
25:*16*
cases  40:*13*  57:*13*
cause  1:*18*
CC'd  12:*22*  14:*4*
25:*7*, *14*  33:*16*
cell  7:*5*  46:*3*  48:*5*

cells  32:*22*  34:*20*
35:*10*, *24*  54:*1*
Center  17:*13*, *17*
30:*15*  33:*4*  34:*13*
42:*18*
Central  17:*12*, *16*
45:*5*
certain  28:*14*  46:*17*
51:*6*
CERTIFICATE  59:*1*
certification  15:*3*
Certified  1:*20*, *21*
certify  59:*3*, *7*  60:*3*
cetera  7:*6*, *16*  27:*21*
chance  54:*13*
change  36:*11*  41:*7*,
*12*, *13*  42:*4*, *6*  43:*17*
47:*2*
CHANGE/REASON
61:*4*
changed  53:*20*
changes  47:*15*, *16*
49:*5*  53:*12*, *18*  60:*6*
changing  43:*25*
chart  55:*23*  56:*3*, *4*,
*10*
checking  7:*17*
CHEVERIE  2:*5*
chief  17:*11*, *17*, *19*, *20*
18:*7*, *9*  19:*8*  27:*13*
33:*23*  41:*12*, *15*, *16*
55:*19*, *24*
children  10:*13*, *17*
16:*12*
choice  47:*7*
chronic  44:*1*
circumstances  33:*23*
37:*11*  51:*6*, *8*
CIVIL  1:*2*
CLARITY  2:*19*
clinic  16:*15*  40:*19*,
*24*  43:*11*
clinical  24:*6*  28:*11*,
*20*  43:*6*, *8*  55:*19*
clinically  35:*19*  37:*23*
clinician  36:*1*  38:*6*
42:*6*
close  7:*6*
closed  26:*7*

closer  26:*9*
clothing  36:*23*
college  14:*16*, *18*
15:*3*, *10*
colleges  14:*19*
come  11:*5*  42:*13*
comes  42:*17*
coming  23:*9*
commander  45:*11*, *12*
commencing  1:*19*
commission  60:*16*
commissioner  48:*23*
commissioners  48:*20*
commit  30:*13*  33:*14*
36:*25*  37:*18*
commits  55:*5*
committed  5:*9*  12:*11*
30:*16*
committing  47:*7*
common  30:*1*  49:*5*
commonly  27:*9*
Community  12:*25*
15:*10*  35:*14*  40:*20*
46:*24*  47:*4*, *14*  49:*1*,
*2*  50:*3*
compare  5:*5*, *7*  12:*8*
Complaint  3:*8*, *9*
11:*14*  22:*10*
complaints  11:*1*, *5*, *7*,
*9*  29:*5*, *20*
completed  15:*12*
completes  57:*7*
compliance  17:*9*
computers  7:*6*
concern  11:*10*  29:*7*,
*19*, *24*  30:*2*, *6*  31:*21*
49:*11*
concerns  11:*3*  17:*3*
24:*11*  26:*5*, *22*  30:*3*
32:*15*, *18*  40:*5*, *9*, *15*
45:*2*  52:*19*
concluded  58:*8*
conditions  40:*8*  49:*1*
confidentiality  32:*9*
conflicts  47:*10*
conjunction  36:*3*
41:*10*  42:*3*
connected  59:*9*
connection  30:*25*
consequence  53:*13*

considered  37:*24*
45:*19*, *23*  46:*5*
constantly  44:*19*
contact  9:*2*
contained  14:*1*
context  37:*7*
continuity  49:*3*
contrast  5:*5*, *7*  12:*6*,
*9*
contributed  57:*21*
control  29:*11*
conventions  50:*21*
conversation  23:*23*
26:*20*
convicted  9:*18*
coordinate  51:*1*
coordinator  12:*23*
35:*25*  38:*5*
copy  21:*3*
Correct  18:*10*  29:*6*
30:*11*  41:*6*  60:*4*
correctional  5:*3*
12:*10*, *24*  17:*6*, *12*, *20*
18:*6*  23:*17*  30:*14*
31:*1*  32:*20*, *21*  33:*2*
38:*8*, *14*  42:*14*  47:*8*,
*13*, *15*  50:*3*  51:*3*, *18*
53:*24*  55:*14*  56:*21*
corrections  45:*24*, *25*
47:*9*  60:*6*
correspondence  29:*17*
counsel  8:*13*, *16*, *21*,
*22*  9:*1*  59:*8*, *9*
County  16:*14*, *17*, *19*
COURT  1:*1*  6:*6*, *10*
22:*11*  59:*2*
courtroom  5:*18*
cover  18:*24*
COWAN  2:*12*  7:*9*,
*14*  10:*8*, *16*, *20*  13:*10*,
*25*  14:*10*  20:*12*, *17*
22:*9*, *25*  24:*9*  26:*12*,
*24*  27:*1*  28:*4*, *6*  29:*1*,
*22*  31:*10*  34:*4*, *12*, *15*,
*19*  35:*1*  36:*20*  37:*3*,
*19*  39:*3*, *9*  44:*11*
47:*21*  49:*7*  51:*5*, *16*
52:*4*, *8*  53:*1*, *5*, *14*
54:*9*  57:*18*  58:*1*, *6*
crime  9:*18*  55:*18*

Estate of Joseph P. King v. Ward, et al.

crisis  34:*7, 8, 12*
 35:*7, 18*  36:*4*  37:*5,*
 *25*  38:*5, 25*  46:*3*
Cristina  18:*23*
CRR  59:*15*
cubicles  32:*23*
current  4:*10*  16:*3*
 17:*21*  31:*4, 5*  36:*14,*
 *16*  53:*20*
currently  8:*3*  39:*25*
 40:*1*

< D >

daily  28:*3*  41:*25*
danger  36:*22*  37:*24*
 45:*23*  46:*8*  48:*8*
date  13:*2*  27:*14*
 54:*20*  60:*12*
day  40:*22*  59:*12*
 60:*15*
day-to-day  18:*14*
dealt  24:*8*
death  31:*2*  53:*10*
 57:*21*
debts  47:*11*
decide  42:*1*
decides  35:*23*  38:*3*
decision  41:*6*
decompensation
 35:*15*
Defendant  1:*5*  12:*2,*
 *3*
Defendants  2:*9*
definitely  52:*2*
degree  15:*7, 9, 13*
 16:*10, 21*
delegated  55:*23*
demand  14:*8*
demonstrated  52:*20*
Department  12:*24*
 16:*19*  45:*4*  50:*3, 24*
depended  33:*8*
Depending  25:*25*
 50:*7, 14, 18*
depends  35:*8*  41:*20*
 49:*8*
DEPONENT  60:*1*
deposed  4:*4, 17, 24*
 9:*3*

DEPOSITION  1:*13,*
 *17*  5:*11*  7:*21*  8:*8, 20*
 58:*8*  59:*3*
depression  47:*5*
depriving  36:*23*
details  56:*9*
determination  40:*4*
 41:*2*  43:*13*
determinations  24:*6*
determine  36:*1*
 37:*23*  42:*19, 20, 22*
 46:*11*  47:*17*
determined  35:*19*
 40:*16*  43:*17*  46:*8*
determines  26:*1*
determining  46:*10*
develop  17:*1*
devices  7:*4, 19*
diagnosis  40:*12*
diary  9:*14*
different  5:*3*  9:*4*
 15:*7*  33:*4*  39:*2, 13*
 43:*3, 5*  44:*18*  49:*19*
 57:*16*
difficulties  35:*15*
DIRECT  2:*19*  10:*10*
 26:*17*
directed  56:*3*
directing  10:*18*
directives  53:*13*
directly  28:*1, 20*  32:*1*
directs  6:*21*
disciplinary  11:*14*
 47:*22*  48:*5*  51:*10*
discovered  57:*3*
discuss  8:*20*
discussed  27:*3, 14*
disorders  17:*2*
distracting  7:*16*
DISTRICT  1:*1*
disturbed  16:*11*
Division  17:*14*
Divorced  9:*25*  10:*1*
DOCCS  13:*17, 18*
 38:*11, 12*  42:*19*  44:*3*
 45:*25*  48:*18*  49:*19*
 50:*12, 25*  51:*12*  52:*5,*
 *6*  54:*4, 10, 15*  57:*8, 9,*
 *12*

document  7:*6, 8*
 20:*24, 25*  21:*2, 6, 8,*
 *19, 23, 24*  22:*2, 6, 12,*
 *17*  25:*6, 14*  33:*15*
 54:*15*
documents  7:*7, 17, 22*
 8:*15*  14:*2, 12*
doing  42:*9*  43:*15*
 52:*20*  56:*13*
dorm  33:*1, 10*  48:*9*
Dormitory  34:*21*
dorms  32:*25*  33:*6*
 48:*1*
draft  22:*11, 13*
drafted  22:*10, 15*
drafting  22:*5, 18*
Drake  8:*22, 25*
dropped  43:*10*
drove  56:*2*
drug  47:*2, 11*
drugs  8:*4*
duly  4:*3*
duties  18:*11*  55:*18*

< E >

earlier  29:*4*  30:*9*
 39:*1*
Eastern  1:*19*
Education  45:*4*
 49:*13*  50:*24, 25*
efforts  51:*18*
either  40:*2*  42:*11*
 44:*25*
electronically  36:*13*
element  50:*12*
e-mail  8:*12*  12:*12,*
 *14, 15, 18*  13:*2, 6, 14,*
 *22, 25*  14:*4*
e-mails  12:*16*
emergency  7:*11, 20*
emotional  49:*5*
emotionally  16:*11*
emphasize  36:*9*
employee  59:*7, 8*
employees  50:*2*
employment  16:*3, 7*
engaging  35:*13*
English  15:*10*
ensure  24:*2*

enters  51:*9, 10*
entities  53:*16*  56:*23*
entries  54:*15*
environment  48:*9*
Errata  60:*7*  61:*2*
ESQUIRE  2:*6, 7, 12*
essentially  40:*22*
Estate  1:*4*  4:*9*
estimation  52:*20*
et  1:*5*  7:*5, 16*  27:*21*
evaluate  36:*1*
evaluation  48:*19, 22*
evaluations  28:*18*
 51:*3*
event  48:*24*  55:*4*
events  22:*23*
evidence  19:*20*  21:*15*
exact  56:*24*
Exactly  6:*25*  20:*16*
 52:*13*
Examination  3:*4*  4:*5*
examined  57:*8*
example  43:*21*
examples  51:*9*
exert  29:*10*
Exhibit  3:*8, 9*  19:*20,*
 *22, 23*  20:*3, 25*  21:*14,*
 *16, 25*  22:*9*  34:*19*
existed  46:*6*
experiencing  35:*15*
expert  12:*1*
expires  60:*16*
explain  25:*20, 23, 24*
 31:*13*  39:*12*  56:*7*
exposed  45:*1*
extent  14:*8*  23:*12*

< F >

facilities  38:*8*  39:*20*
 44:*5*
facility  5:*3, 6, 8*  12:*7,*
 *10*  17:*6, 12, 20*  18:*7*
 23:*8, 17*  26:*1*  30:*21,*
 *22*  31:*1*  32:*20, 21, 24*
 33:*2*  38:*15, 17, 19*
 40:*17, 19, 22*  41:*3*
 42:*14, 23*  43:*5, 10, 18*
 44:*9*  45:*22*  46:*4*
 53:*24*  55:*14*  56:*3, 21*

Deposition of Hal Meyers                                                    Estate of Joseph P. King v. Ward, et al.

fact  12:2  31:18
factors  44:18  47:9
Falls  15:11
familiar  5:10  21:5
 32:5
familiarity  5:13
families  26:9
family  10:10, 17, 22
 57:11, 12
far  9:2  10:22  15:4
 28:11  56:22
feel  5:24
field  17:8
figure  43:2
filed  11:1  19:17
 22:4, 11
financially  59:10
find  14:3  34:11, 24,
 25
finish  19:2
finished  21:19
firm  4:8
first  4:3  16:15
five  39:22
Floor  2:5
follow  36:14  44:10
followed  24:3  57:20
following  37:20, 21
follows  4:4
follow-up  57:23
follow-ups  57:25
foregoing  59:4  60:4
Forensic  17:15, 22
 18:19  19:8
form  41:12, 13  60:7
formal  11:5, 9
found  14:11  25:7, 11
four  16:18  17:10
 21:12
four-year  16:10
FPA  19:5
free  5:24
frequent  45:2
friendships  47:1
front  7:22  52:1
full  4:10  38:16
 41:11
fully  20:12
function  51:12  54:6
functions  24:6  28:15

further  25:24  35:3
 58:3  59:7

< G >
gangs  47:11
GENERAL  2:10
 24:12  31:3  41:24
Generally  9:13  11:4
 35:25  36:13  37:10
 38:6  41:9  50:5  52:2
generate  12:20
generated  12:23
 13:14
getting  28:8
Gina  1:19  59:2, 15
give  6:4  8:5  37:2,
 17  45:7  52:16
given  35:5  38:11, 12,
 13  60:5
giving  22:18
Glens  15:11
go  4:15  10:22  14:18
 15:20  16:6, 7  20:3,
 23  27:1, 6  35:2, 23
 36:13, 20  37:3  39:3,
 22  40:20, 25  42:11,
 18  44:11  47:21  49:7
 50:15  51:16  53:1, 14
 55:15, 17  58:7
goes  50:6
going  4:15  8:23
 10:8, 10  11:11  13:8
 15:16  23:9  31:13
 35:2  41:25  43:12, 14
 45:9  48:14  51:1, 2
 54:5  57:22, 24
Good  4:7  16:11
 52:21  58:1, 7
grab  45:9
graduate  15:16  16:12
graduated  15:1, 24
grievance  11:11
grievances  11:1
ground  4:15
guess  7:12  10:23

< H >
HACH  2:5
HAL  1:13, 17  3:3

 4:2  60:3, 12
half  50:16
HALT  47:23
hanging  30:18, 19
happen  31:20  43:4
happened  30:21
 31:25  33:22  51:15
 55:6
happens  27:9  53:15
 56:10
harming  37:8  47:6
Harold  4:12
Hartford  4:13
Health  8:25  12:4, 25
 13:17, 19  16:5, 15, 20
 17:2, 5, 7  18:12  23:2
 24:14  25:18, 19, 25
 26:2, 3, 7, 21  28:9
 29:21, 25  30:2  38:9,
 12, 13, 14, 16, 18, 22
 39:14  40:1, 5, 8, 9, 12,
 15, 18  41:3, 7, 20
 42:10, 20  43:9, 13, 22
 44:2, 4, 7, 17  48:15,
 17, 19, 22  49:3, 20, 25
 50:2  51:13  52:19
 53:3, 9, 17  54:7
 57:10
hear  5:23
hearing  48:11, 14
 49:6
help  4:16  48:20
 49:2
helped  17:1
high  52:3
higher  15:8  36:2
 44:4  47:17
HILLARY  2:7
historical  37:7
history  16:3, 7
hold  48:6
home  55:5, 7, 8, 13
hope  57:24
hoping  57:14
hospital  34:7  35:5,
 14, 24  40:23  45:18,
 19  54:1  57:5, 7
hour  50:16
hours  50:7, 17  55:11

House  16:11
housed  26:1  33:9
houses  32:23
housing  36:10  47:20,
 22  51:10  57:1
Human  15:15  35:21
 36:17, 18, 21  37:1
hung  56:16

< I >
idea  12:16  25:13
identification  19:23
 21:16
identified  25:25
II  17:5, 22
illness  53:4
impact  28:2
impacting  25:1
important  6:4  36:7, 9
impulsive  47:3
incarcerated  11:2
 23:18, 20  24:1, 8
 29:12  32:12  38:10
 39:16  47:10
include  34:9  49:22
including  33:4  53:16
incorporate  49:20
 50:12
increase  44:5
increased  26:8, 22
 43:16
increasing  43:9
indicates  44:1
indication  42:7, 8
indicative  46:18
indicators  44:9, 15
 46:22
individual  5:3  9:6
 24:24  26:3  28:1
 29:12  32:12, 13  36:1
 37:11  38:10  41:4, 11
 42:23  46:1  48:24
 49:8  50:14  54:12
individually  23:6
individuals  11:2
 24:4  25:18  26:6
 38:17  39:17, 20
 41:22  46:2  47:10
individual's  31:21

Deposition of Hal Meyers                                                           Estate of Joseph P. King v. Ward, et al.

**infirmary** 48:*6*
**influence** 8:*3*
**information** 10:*15*
  22:*15, 18*
**inmate** 32:*5, 8, 11, 14,*
  *18*  37:*17*  38:*15*
  39:*13*  42:*13*  43:*4*
  46:*7, 15*  47:*19*  48:*13*
**inmates** 27:*20*  29:*5*
  30:*4*  31:*3, 15, 22*
  33:*1*  34:*2*  35:*23*
  41:*18*  49:*5*
**inquiry** 12:*24*
**instances** 32:*10*
**intake** 16:*15*
**intensive** 16:*19*
**interest** 41:*2*
**interested** 59:*10*
**Intermediate** 30:*15*
**internal** 49:*25*
**interrogatories** 8:*10,*
  *17, 18*  34:*16, 20*
**interrogatory** 22:*7*
**investigate** 56:*12*
**investigation** 14:*2*
  56:*13, 20*
**investigations** 32:*3*
**investigative** 56:*22*
**investigators** 22:*23*
**involve** 47:*10*
**involved** 12:*6*  28:*12,*
  *19, 20*  30:*23, 25*
  31:*25*  32:*2*  44:*25*
**iPad** 7:*5*
**issue** 49:*10*
**issues** 11:*4, 6*  30:*2*
**items** 46:*14*
**its** 1:*4*

**< J >**
**Jail** 16:*17*
**Jersey** 9:*23*
**job** 18:*13*  28:*2*
  *52:21*  53:*21*
**join** 24:*20*
**joined** 17:*4*
**Joseph** 1:*4*  4:*9*  23:*1*
  30:*7*  54:*20*
**judicious** 7:*19*

**< K >**
**KALKACH** 2:*6*  3:*4*
  4:*6, 8*  7:*15*  10:*14, 18,*
  *24*  13:*8, 13*  14:*14, 15*
  19:*19*  20:*1, 15, 20*
  21:*13, 17*  22:*13, 16*
  24:*16*  26:*14*  27:*5*
  28:*5, 13, 25*  29:*3, 23*
  31:*12*  34:*10, 14, 17,*
  *22*  35:*2, 4*  36:*24*
  37:*15*  38:*2*  39:*8, 11*
  44:*14*  45:*7, 10*  49:*12*
  51:*7, 21*  52:*11*  53:*2,*
  *11, 23*  54:*16*  57:*22*
  58:*3*
**Katrina** 18:*21*
**keep** 9:*11, 14*  29:*13*
  35:*21*  53:*24*  54:*4*
**keeps** 45:*5*
**Kemory** 18:*21*
**kids** 10:*3*
**kill** 56:*15*
**kind** 11:*25*  20:*13*
  28:*22*  29:*20*  31:*17*
  55:*18*
**King** 1:*4, 5*  4:*9*
  12:*17*  23:*1, 5, 18, 23*
  24:*3, 8, 23*  25:*5, 15*
  26:*5, 6, 16, 17, 21*
  27:*4*  30:*7*  31:*23*
  32:*6, 8, 15, 18*  33:*11,*
  *13*  38:*15*  54:*20*
  55:*25*  56:*14*  57:*5*
**King's** 13:*4*  23:*25*
  28:*3*  33:*11*  54:*22*
**knew** 23:*2*  30:*22*
  31:*22*  34:*24*
**know** 8:*9*  9:*8, 10*
  10:*21, 22, 25*  11:*3, 4,*
  *10, 23*  12:*13*  13:*15*
  16:*8*  19:*3, 4*  20:*3, 7,*
  *24*  21:*4, 20, 22*  22:*14*
  23:*1, 4, 18, 20*  24:*10,*
  *12, 25*  25:*9*  26:*18*
  27:*13, 17*  29:*10, 11*
  31:*19*  33:*22*  34:*11,*
  *24*  36:*12*  41:*25*  42:*4*
  45:*11, 15*  46:*15*  47:*6,*
  *11, 12*  48:*11*  49:*9, 17,*

  *19*  52:*12, 13, 20*  53:*6,*
  *15*  54:*2, 11*  55:*6, 25*
  56:*22, 24*  57:*3, 5, 11,*
  *15*
**knowing** 25:*10*
**knowledge** 18:*22*
  22:*19*  33:*17*  34:*6*
  38:*24*  53:*21*  59:*5*
**known** 23:*5*

**< L >**
**large** 32:*25*
**larger** 53:*6*
**largest** 18:*12*  52:*18*
**Lauri** 18:*20*
**law** 4:*8*
**lawsuit** 11:*8, 16*
  19:*12, 15, 17*  21:*3*
  22:*4, 24*
**lead** 37:*12*  53:*18*
**leading** 16:*3*  33:*11*
**learn** 36:*6*  54:*22*
**left** 19:*7*
**legislation** 47:*23*
**Leonard** 9:*9*
**letter** 29:*18*  30:*6*
  32:*17*
**letters** 11:*3, 10*  29:*5,*
  *7, 13, 24*  30:*1*
**level** 26:*8*  36:*2*  38:*9,*
  *11, 12, 14, 17*  39:*25*
  40:*2, 7, 11, 14, 16, 18,*
  *22*  41:*1, 7, 12, 13, 20*
  42:*4, 10, 19, 20, 21*
  43:*9, 10, 14, 16, 18, 22,*
  *23, 25*  44:*4*  46:*11*
  47:*18*
**levels** 38:*11*  39:*13,*
  *14, 18, 19, 21*  42:*22*
**Lewis** 16:*19*
**Liberal** 15:*9, 19*
**license** 16:*1*
**licenses** 15:*25*
**licensing** 15:*3*
**life** 10:*23*  11:*11*
  23:*25*  28:*3*  41:*25*
  43:*12*  54:*20*
**limit** 16:*4*  37:*24*
**limited** 33:*17*  34:*8*

  47:*18*  52:*10*  56:*16*
**LINE** 61:*4*
**listen** 32:*10*
**little** 25:*24*  29:*11*
  35:*2*  57:*24*
**live** 32:*25*  48:*1*
**LLP** 2:*5*
**located** 17:*8*
**location** 56:*24*
**lock** 55:*23*
**log** 53:*24*  54:*5, 8, 14,*
  *15*
**logbook** 54:*2*
**long** 43:*18*  50:*4*
**longer** 47:*23*
**look** 37:*5, 10*  46:*17*
**looked** 53:*16*
**looking** 7:*21*  12:*14,*
  *15*  29:*9, 10*  43:*6*
  46:*15*
**looks** 22:*3*
**Lori** 18:*21*
**lot** 24:*23*  29:*8*
  33:*23*  40:*17*  44:*24*
  53:*7*  56:*13*
**lower** 43:*14*
**lowered** 26:*22*

**< M >**
**Madison** 2:*5*
**main** 36:*9*  51:*11*
**maintaining** 47:*1*
**majority** 41:*21*
**manager** 16:*19*
**mandatory** 45:*3*
**Margaret** 8:*22, 25*
**marked** 19:*23*  20:*25*
  21:*16, 25*
**MARKS** 2:*19*
**marriage** 26:*11, 16,*
  *18*
**married** 9:*24*
**Master** 16:*1*
**Master's** 15:*4*  16:*21*
**match** 26:*2*
**maximum** 32:*21*
**McPike** 17:*1*
**mean** 7:*24*  10:*20*
  15:*6*  25:*16*  36:*8*

Deposition of Hal Meyers                                              Estate of Joseph P. King v. Ward, et al.

44:*3*
**means** 6:*1*
**medical** 38:*11* 42:*20*
**medications** 5:*20*
  30:*3* 35:*16* 40:*6, 10,*
  *13*
**medium-correctional**
  32:*24*
**medium-security**
  23:*8* 47:*25*
**meet** 8:*13* 23:*4, 6*
  24:*24* 25:*3* 27:*19, 20*
  42:*24*
**meeting** 14:*10* 23:*3*
  24:*18, 22* 27:*9, 15*
  28:*1*
**meetings** 27:*6, 23*
**members** 10:*17*
**memorialize** 27:*23*
**Mental** 8:*25* 12:*4, 25*
  13:*17, 19* 16:*5, 14, 20,*
  *22* 17:*2, 4, 7* 18:*12*
  23:*2* 24:*14* 25:*18, 19,*
  *25* 26:*2, 3, 7, 21* 28:*9*
  29:*20, 25* 30:*2* 38:*8,*
  *12, 13, 14, 16, 18, 22*
  39:*14* 40:*1, 5, 8, 12,*
  *14, 17* 41:*3, 7, 20*
  42:*10, 20* 43:*9, 13, 21*
  44:*2, 4, 7, 17* 48:*15,*
  *17, 19, 21* 49:*3, 19, 25*
  50:*1* 51:*13* 52:*19*
  53:*3, 8, 17* 54:*7*
  *57:10*
**Merritt** 4:*12*
**message** 7:*13*
**met** 8:*15* 23:*10, 22*
  24:*17* 27:*3, 13*
**MEYERS** 1:*13, 17*
  3:*3* 4:*2, 7, 12, 14* 7:*9*
  19:*20, 22* 21:*14, 18*
  22:*11, 17* 29:*4* 39:*12*
  52:*4* 60:*3, 12*
**Mid-State** 5:*4, 5, 8*
  12:*7, 9* 17:*6, 19* 18:*6,*
  *12* 23:*6, 16* 28:*3, 15*
  31:*2, 6* 32:*25* 33:*2,*
  *20* 38:*18* 39:*4* 40:*17*
  41:*21* 43:*21, 23* 52:*4,*

*9, 18* 56:*11*
**mind** 36:*21*
**minimum** 41:*19, 23*
  49:*18* 50:*16*
**minor** 40:*5, 8*
**minute** 20:*6* 21:*19*
  45:*7*
**minutes** 50:*6, 9, 16*
**mobile** 7:*18*
**moment** 20:*2*
**monitor** 45:*25*
**monitored** 28:*17*
  48:*9*
**month** 18:*1* 41:*23*
**months** 16:*16* 17:*18*
  21:*12* 41:*24*
**morning** 4:*7*
**move** 26:*8* 52:*22*

**< N >**
**name** 4:*7, 10* 9:*5, 7*
  10:*16* 14:*4* 18:*23*
**named** 30:*12*
**names** 9:*16* 10:*7*
**NAPPI** 2:*7* 14:*7*
  19:*21* 28:*24* 52:*22*
**nature** 4:*25* 30:*16*
  50:*7, 18*
**nearby** 7:*24* 13:*7*
**NECESSARILY** 2:*19*
  22:*18* 44:*2*
**need** 6:*13, 16* 7:*10*
  10:*22* 19:*4* 20:*3, 4,*
  *23* 21:*22* 31:*20* 39:*8*
  42:*8* 48:*25* 56:*4*
**needed** 36:*2* 48:*20*
**needs** 20:*9* 25:*25*
  26:*3* 36:*12* 37:*14*
  42:*24* 43:*5, 9* 44:*2*
  47:*17*
**never** 32:*11*
**NEW** 1:*1* 2:*6, 10, 12*
  4:*12, 13* 9:*23* 12:*4*
  17:*12, 16* 26:*8* 45:*5,*
  *17* 49:*24*
**nodding** 6:*5*
**noises** 7:*16*
**normal** 55:*11* 56:*22*
**Normally** 27:*6, 10*

**NORTHERN** 1:*1*
**Notary** 60:*19*
**note** 27:*16, 17, 18*
  44:*20*
**noted** 25:*6* 60:*7*
**notes** 9:*11* 27:*7, 15,*
  *21* 45:*8* 57:*22*
**notified** 48:*13, 17*
  57:*11, 14*
**notifying** 57:*12*
**November** 54:*18*
**Number** 3:*7* 5:*12*
  18:*20, 24* 33:*3* 44:*5*
  46:*23* 47:*11* 51:*19*
  52:*10, 19* 53:*16*
**numbered** 1:*18*
**numbers** 53:*7*
**numerous** 44:*25*
**nursing** 28:*22*

**< O >**
**Oasis** 16:*24*
**oath** 5:*14, 17*
**object** 6:*20* 10:*8*
**Objection** 24:*9*
  26:*12, 24* 28:*4* 29:*22*
  31:*10* 36:*20* 37:*3, 19*
  44:*11* 47:*21* 49:*7*
  51:*5, 16* 52:*22* 53:*5,*
  *14* 54:*9* 57:*18*
**Observation** 34:*20*
  35:*10, 24*
**observe** 47:*15*
**obtain** 42:*13*
**obtained** 16:*21*
**occasion** 45:*21*
**occur** 51:*18* 52:*14*
**occurred** 5:*2* 33:*19,*
  *20* 51:*24* 56:*7*
**occurring** 17:*2*
**offer** 19:*19* 21:*14*
**OFFICE** 2:*10* 8:*25*
  12:*4* 16:*4, 22, 24*
  17:*4, 7, 8, 18* 38:*13*
  44:*6, 17* 48:*15, 17, 21*
  49:*25* 50:*1* 51:*12*
  53:*16* 54:*7* 57:*9*
**officer** 45:*24, 25*
**official** 51:*3*
**Oh** 34:*19, 22*

**okay** 4:*21* 5:*10, 14,*
  *20, 25* 6:*19* 7:*4, 9, 14,*
  *25* 8:*13, 18* 9:*3, 11*
  11:*13, 19* 13:*10, 11,*
  *22* 14:*14, 16, 22*
  15:*25* 16:*2, 10* 18:*3*
  19:*12, 19* 20:*5, 6, 21,*
  *22, 23* 21:*2, 5, 13, 18,*
  *21* 22:*5, 13* 23:*1, 13*
  25:*8* 26:*4, 20* 28:*14*
  29:*13* 30:*9, 13, 23*
  31:*3, 22* 32:*4, 14*
  33:*1, 13, 18* 35:*1, 23*
  36:*17* 39:*9, 12, 15, 19*
  41:*5, 16* 44:*8* 46:*21*
  48:*13* 49:*23* 50:*4*
  51:*14, 22* 52:*8* 53:*1*
  56:*14* 57:*16, 22*
**old** 10:*5*
**older** 45:*16*
**OMH** 14:*1* 54:*10*
**OMRDD** 16:*23*
**Once** 4:*20, 21* 23:*4,*
  *11* 41:*23* 44:*24*
  49:*18* 50:*9* 56:*10*
**ones** 14:*20* 39:*16*
**one-to-one** 47:*25*
  54:*3, 13*
**ongoing** 53:*20*
**open** 6:*16* 23:*2*
  24:*11, 14* 25:*16, 18,*
  *19* 40:*1, 4, 5* 48:*2*
  53:*8*
**opened** 28:*10*
**operations** 18:*14*
**opinion** 37:*16*
**opposed** 6:*5* 12:*10*
**OPPW** 16:*23*
**option** 47:*7*
**order** 22:*15* 42:*1*
  46:*15*
**originally** 20:*18*
**outpatient** 17:*9*
**outside** 55:*11*
**oversee** 18:*13*

**< P >**
**PAGE** 3:*2* 61:*4*
**pages** 20:*4, 13* 60:*4*
**paid** 49:*23*

Deposition of Hal Meyers                                                    Estate of Joseph P. King v. Ward, et al.

**Palladino** 23:*5, 11, 15*
24:*10, 17, 20* 27:*4, 16*
**paper** 7:*22*
**parole** 48:*11, 14, 18,*
*20, 22* 49:*2*
**part** 14:*25* 15:*16*
29:*14, 15, 16* 36:*3*
38:*7* 44:*7* 48:*18*
**participate** 22:*5, 17*
**participated** 22:*14*
28:*17*
**particularly** 53:*19*
**parties** 59:*8*
**party** 11:*16*
**passed** 9:*6* 55:*20*
**passing** 13:*5, 21*
**patient** 31:*16, 17*
**patient's** 29:*18*
**pending** 52:*24*
**people** 17:*1* 18:*24*
23:*7, 8* 24:*14, 23*
28:*9* 29:*9* 30:*12*
31:*24* 32:*21, 25* 33:*5,*
*7* 35:*9, 19* 42:*9*
43:*23, 24* 45:*18, 21*
46:*10, 12* 48:*4* 52:*19*
53:*8* 56:*11*
**people's** 28:*17, 18*
**percent** 53:*8, 9*
**perception** 26:*18*
**Perfect** 20:*2* 21:*23*
**performance** 28:*17,*
*18, 20*
**period** 16:*13* 35:*22*
37:*22* 51:*24*
**Periodically** 11:*2*
31:*7*
**person** 9:*9* 13:*18*
27:*10* 43:*14* 44:*5*
49:*2* 54:*5*
**personal** 10:*9*
**perspective** 29:*12*
**phone** 7:*5, 20* 8:*14*
22:*20* 55:*1*
**phones** 7:*10*
**physical** 46:*3*
**physically** 45:*19*
55:*22* 56:*2*

**Place** 4:*12* 33:*5*
40:*24* 47:*24* 48:*1, 6,*
*7*
**placed** 46:*7, 16, 19*
48:*4*
**places** 36:*9*
**Plaintiff** 1:*5* 2:*4* 4:*9*
**play** 44:*7*
**please** 4:*10* 6:*13*
7:*4* 8:*24* 9:*7* 18:*4*
20:*2* 21:*13, 18, 20*
25:*24* 28:*16* 39:*12*
**point** 18:*15* 26:*3*
43:*1*
**policies** 24:*2* 27:*21*
31:*19* 34:*11* 36:*6, 8,*
*11, 12, 13* 44:*9, 12*
53:*12, 19* 57:*20*
**policy** 24:*25* 25:*2*
34:*1, 13* 36:*14, 15, 16*
53:*18*
**pop** 14:*5*
**pops** 14:*4*
**population** 41:*25*
**portion** 50:*5*
**position** 16:*3* 17:*21,*
*23* 18:*3*
**possible** 4:*16*
**potential** 44:*8, 15*
46:*18, 22*
**potentially** 44:*6*
46:*19* 49:*9*
**practice** 37:*17*
**preparation** 12:*16*
**prepare** 8:*7*
**preparing** 9:*2*
**prescriber** 36:*3* 38:*6*
41:*10, 23* 42:*3, 6*
43:*2*
**Prescribers** 28:*22*
**present** 46:*13*
**presenting** 37:*13*
**pretty** 18:*13* 44:*19*
55:*4*
**prevent** 53:*22* 57:*17*
**prevention** 45:*2*
49:*14, 21* 50:*1, 2, 5, 8,*
*13*
**previously** 36:*15, 25*

**primary** 24:*2*
**print** 36:*12, 15*
**prior** 21:*8*
**prison** 31:*25* 42:*17*
48:*25* 51:*10, 15, 24*
**prisons** 44:*17*
**private** 33:*8*
**probably** 7:*19* 21:*12*
37:*23* 50:*16* 55:*5, 8*
**problems** 24:*7* 37:*13*
**procedure** 13:*20*
24:*25* 25:*2* 57:*9*
**procedures** 24:*3*
31:*19* 36:*8* 56:*23*
57:*20*
**process** 8:*23* 9:*1*
42:*4*
**produced** 14:*9*
**Professional** 1:*20*
15:*15* 59:*2*
**program** 7:*7* 15:*3,*
*12* 16:*25* 17:*22*
18:*19* 19:*8* 30:*15*
34:*8* 35:*8, 18* 36:*5*
37:*5* 38:*1, 5, 25*
40:*23* 46:*3*
**Programs** 17:*18*
**progress** 42:*10*
**projected** 44:*1, 2*
**promote** 49:*3*
**promotion** 19:*11*
**prompted** 24:*19*
**pronounced** 57:*8*
**pronouncing** 8:*10*
**propounded** 60:*6*
**Prosequendum** 1:*5*
**provide** 26:*17* 34:*15*
45:*25*
**provided** 24:*4* 35:*20*
44:*12* 45:*6* 47:*25*
**providers** 27:*8*
**provides** 50:*2*
**providing** 45:*1*
**psychiatric** 16:*17*
17:*12, 16* 33:*4* 35:*15*
**psychotropic** 40:*9*
**Public** 60:*19*
**pull** 21:*15*
**purpose** 50:*19*

**purposes** 48:*22*
**put** 7:*18* 19:*21*

**< Q >**
**question** 5:*23, 25*
6:*1, 2, 16, 20, 22*
26:*13* 31:*11* 52:*23*
**questionnaire** 42:*12*
**questions** 29:*8* 56:*11*
57:*23* 58:*3, 6* 60:*5*
**quick** 13:*8* 39:*8*
**QUOTATION** 2:*19*
**QUOTE** 2:*19*

**< R >**
**range** 33:*6*
**rare** 27:*25*
**RCTP** 12:*23* 34:*20*
35:*25* 36:*10* 37:*12,*
*20, 22* 38:*7* 45:*20*
46:*5, 20* 47:*24* 53:*25*
54:*3*
**reached** 53:*7*
**read** 20:*12* 45:*7*
60:*3*
**readily** 41:*4*
**ready** 40:*25*
**real** 33:*25*
**really** 10:*9* 13:*8*
56:*13*
**Realtime** 1:*21* 33:*20*
**reason** 19:*7* 24:*18*
31:*14* 39:*23* 47:*19*
**reasons** 35:*9, 11, 17*
37:*6* 43:*7* 48:*5*
51:*19*
**recall** 11:*20* 13:*18,*
*24* 18:*2* 20:*5* 23:*3,*
*14, 24* 24:*10, 22* 25:*4*
27:*2, 3* 30:*8* 32:*7, 19*
33:*22* 38:*21* 39:*7*
54:*19, 21, 24* 55:*1, 16*
56:*2, 19* 57:*1, 2, 4, 6*
**receive** 30:*1, 6* 32:*17*
40:*9* 44:*16, 21* 49:*13,*
*16, 17*
**received** 12:*9, 17*
29:*5* 30:*4*
**receiving** 37:*22*

38:*17*
**reception** 42:*15*, *18*
**Recess** 13:*12* 29:2
39:*10* 58:2
**recognize** 20:*24* 21:*2*,
*24*
**recognizes** 21:*23*
**recollection** 23:*12*
26:6 30:*14*, *18*, 20
56:*16*, 25
**recommend** 48:*23*
**record** 4:*11* 22:9
29:*15*, *16*, *18* 55:*19*
58:7 59:5
**recorded** 22:22
**reference** 32:8
**referenced** 11:*17*
12:5 25:*13* 38:*4*
**referral** 47:*17*
**referred** 32:22 34:*13*
**referring** 34:*12*
**REFLECT** 2:*19*
27:*18* 42:*10* 53:*20*
**reflected** 33:*15*
**reflects** 27:*18*
**regarding** 26:5
30:*10* 34:*1*
**Regardless** 47:*14*
50:*11* 51:*17*
**regards** 11:*17* 12:*17*
**REGIONAL** 2:*10*
**Registered** 1:*20* 59:2
**regular** 49:*17*
**rehabilitation** 16:25
**related** 22:*23* 30:2, *3*
39:*16* 53:*3* 54:6
**relative** 59:8
**relatively** 40:7
**released** 48:*24*
**relevance** 10:*12*
**remember** 9:5 13:2
15:*19* 18:*23* 19:*17*
23:*10* 25:2 56:9
**REMOTE** 1:*13*, *17*
**remotely** 2:2
**removed** 48:9
**repeat** 5:*24* 8:*24*
18:*4*
**rephrase** 5:*24*
**rephrasing** 31:*13*

**report** 18:*16*, *18*
42:*12*
**reported** 18:*19*, *24*
59:*3*
**Reporter** 1:*20*, *21*
6:*6*, *10* 59:*3*
**reporters** 22:*23*
**reports** 27:22
**represents** 4:9
**request** 48:*21*
**Residential** 34:7
35:7, *18* 36:*4* 37:*5*,
*25* 38:*5*, *23*, *25* 46:*3*
**resources** 26:2 40:*18*,
*24* 43:*13*
**response** 8:9 12:*24*
29:*18* 52:*23*
**responsibilities** 18:*11*
**responsible** 24:5
**result** 35:*12* 55:*20*
**Retardation** 16:22
**returned** 17:*16*
**review** 8:*15* 20:2, *6*
21:*8*, *19* 54:*13* 57:22
**reviewed** 21:9, *10*, *11*
**reviewing** 21:*20*
**right** 1:5 8:*10* 13:6
14:*3*, *6* 16:8 17:*23*
18:*4* 23:*1* 28:2
36:*18* 37:*1*
**rights** 35:*21* 36:*17*,
*22*
**risk** 44:*19* 46:*13*, *18*
47:9 51:*4*
**role** 23:*25* 24:2
31:*4* 57:*19*
**room** 7:*25*
**rooms** 33:8
**ROSE** 2:5
**RPR** 59:*15*
**rules** 4:*15*
**run** 4:*16* 52:2

**< S >**
**safe** 35:22 48:*1*
**safely** 55:*24*
**safest** 48:6
**safety** 48:*10*
**satellite** 18:*12* 38:*16*

43:*22* 52:*18*
**saw** 27:*16*
**says** 7:*1*
**scene** 55:*15*, *16*, *18*
**scene-scene** 55:*17*
**Schatzel** 18:*21*
**SCHIRRIPA** 2:5
**School** 14:*22* 15:*16*
16:*12*
**scratch** 33:*3*
**screen** 7:7 19:*22*
43:*2*
**screened** 40:2
**screening** 42:*13* 43:*3*
**scroll** 20:*8*, *10*, *13*, *15*
21:*22*
**search** 8:*12* 12:*12*,
*13* 14:*5*, *6*, *7*, *12*
**searching** 14:2
**section** 29:*17*
**secure** 55:*23* 56:*3*, *4*,
*11*
**secured** 55:*20* 56:5
**security** 38:*11* 42:*19*
**see** 15:*18* 19:*22*, *24*
39:*24* 41:*18*, *22* 42:*6*,
*25* 47:*16* 49:*4* 53:*17*
54:*17* 57:*23*
**seeing** 31:*17* 54:*12*
**seen** 26:2 27:*17*
40:*3*
**sees** 47:6
**self** 37:*25* 45:*23*, *24*
46:9
**self-injurious** 35:*13*
37:*21*
**self-injury** 33:*24*
**self-report** 25:*11*
**send** 47:*19*
**sense** 42:*23*
**sent** 12:*17* 13:*15*, *16*,
*17*, *19* 57:*5*
**sentence** 38:*20*
**separate** 32:*23* 43:*20*
**serious** 33:*24*
**served** 17:*17* 20:*5*,
*18* 21:*3*, *7* 41:*22*
**service** 24:*4* 39:*14*
41:*7*, *20* 42:*10* 43:*22*

**services** 11:*4* 12:*25*
15:*15* 16:*25* 17:*15*
23:*3* 24:*15* 25:*18*, *19*
26:*21* 28:9, *10* 38:*18*
40:*1*, *3*, *20*, *24* 41:*4*
42:*8*, *9* 43:*11* 50:*3*
53:*9*
**setting** 47:*8*, *13*, *15*,
*23* 51:*18*
**Seymour** 18:*21*
**share** 11:*12* 13:*22*
**shared** 24:*10*
**sharing** 13:*24* 33:*10*
**Sheet** 60:*8*
**Shepherd** 16:*11*
**shoelaces** 33:*14* 34:*1*,
*9* 35:6 36:*19*, *23*
37:*1*, *2*, *17*, *18* 39:*1*, *5*
**shortly** 13:*4*
**short-term** 44:*1*
**showing** 7:8
**SHU** 48:5
**shut** 7:*4*
**signed** 22:*21*
**significant** 40:*12*, *14*
55:*4*
**signs** 41:*13*, *14* 47:*4*
**silo** 28:*23*
**similar** 9:9
**simply** 6:*14*
**six** 16:*16*
**size** 33:6
**skills** 59:5
**skip** 39:*23*
**Skynyrd** 9:9
**small** 34:7 40:*23*
45:*18*, *19*
**smaller** 50:*15*
**smoothly** 4:*16*
**so-and-so** 27:*14*
**Social** 14:*23* 15:*4*, *17*
16:*1*, *17* 17:5 23:*16*
**somebody** 41:*1*
43:*12*, *15* 47:*14*
49:*10*
**somebody's** 11:*11*
13:*20*
**someone's** 35:*21*
43:*8*, *25*
**Someplace** 41:*21*

sorry  8:*24*  15:*22*
  19:*21*  25:*9, 22*  26:*12*
  27:*1*  34:*4, 19*  51:*23*
  52:*25*
sort  42:*12*
Sounds  58:*1*
South  2:*11*
space  48:*2*
speak  31:*3, 8, 9, 22*
  32:*5*  33:*10*
speaking  14:*1*  32:*7*
  36:*17*
Special  17:*17*  36:*10*
  47:*20, 22*
specialist  17:*9*
specific  12:*15*  13:*18*
  24:*7*  27:*2*  39:*19*
  47:*9*  50:*7*
specifically  25:*4*
specifics  24:*22*
spectrum  40:*8*
spell  9:*7, 8, 10*
spoke  14:*11*  32:*14*
spoken  22:*22*
staff  28:*19, 21, 22*
  44:*24*  45:*6*  49:*19*
  50:*20*  54:*10*
stamp  14:*3*
Standard  1:*19*  13:*1,*
  20  46:*14*
start  17:*23*  19:*1*
  40:*11*
started  16:*12*  19:*5*
STATE  2:*10, 11*
  4:*10*  7:*20*  12:*4*
  14:*23*  15:*13*  18:*13*
  26:*9*  49:*19, 24*
statement  32:*17*
statements  22:*21, 22*
STATES  1:*1*
stats  52:*1*
status  26:*10*  46:*20*
  47:*24*  53:*25*  54:*3*
stay  48:*2*  49:*2*
step  22:*3*
Street  2:*11*
stressed  47:*12*
strike  52:*22*
Studies  15:*15*
stuff  48:*3*

subject  11:*7, 13*
  50:*11*
submit  41:*12*
Suboxone  25:*5, 13*
Subscribed  59:*11*
  60:*14*
Substance  16:*24*  60:*7*
successful  13:*1*
successfully  12:*10*
sued  30:*10*
suffering  26:*11, 16, 19*
suicide  5:*2, 9*  12:*11*
  13:*1*  30:*10, 13, 17*
  31:*24*  32:*4*  33:*11, 14,*
  24  36:*25*  37:*18, 21*
  38:*25*  39:*4*  44:*8, 15,*
  17, 19, 25  45:*2, 11, 12,*
  15  46:*6, 7, 16, 18, 22*
  47:*7*  49:*14, 20*  50:*1,*
  2, 5, 8, 13  51:*4*  53:*15,*
  19, 22, 24  54:*8, 22*
  55:*5, 21*  56:*7, 21, 24*
  57:*7, 17*
suicides  51:*14, 17, 19,*
  23  52:*10*
Suite  2:*11*
Sullivan  30:*14*  31:*1,*
  2
SUNY  15:*24*
support  49:*10*
supports  48:*25*
supposed  56:*23*
sure  10:*9*  14:*10*
  18:*2*  22:*4*  26:*1*  28:*8*
  29:*1*  31:*10*  55:*19*
  56:*5*
switch  20:*4*  41:*5*
switched  42:*1*
sworn  4:*4*  59:*11*
  60:*14*
symptoms  47:*5*
SYRACUSE  2:*10, 12*
  17:*8*
system  42:*17*  51:*10*
  52:*7*

< T >
take  5:*18*  6:*6, 17*
  13:*8*  20:*2, 6*  21:*18*

27:*7*  28:*24*  39:*8*
  43:*18*
taken  1:*17*  13:*12*
  29:*2*  39:*10*  56:*6*
  57:*7*  58:*2*  59:*11*
talk  6:*9*  19:*12, 14*
  27:*20*  31:*14*  32:*11*
talked  39:*1*  43:*8*
team  36:*4*  37:*23*
  38:*3, 7*  41:*11*
tech  19:*21*  20:*3, 9, 10*
tell  15:*23*  28:*16*
telling  31:*18*
term  45:*16, 17*
terms  12:*3*
tested  25:*11*
testified  4:*4, 22*  29:*4*
  30:*9*
testify  5:*21*
testimony  8:*4*
Thank  4:*14*  14:*14*
  19:*24*  21:*23*  22:*21*
  35:*3*  58:*3, 5*
therapist  24:*24*
  27:*11, 13*  31:*16, 18*
  41:*6, 9, 22*  42:*3*  43:*2*
  49:*9*
therapists  41:*18*
therapy  26:*17*  40:*21*
thing  6:*15*  8:*11*  13:*1*
things  24:*12*  27:*2*
  29:*8*  33:*4*  43:*6, 20*
  46:*17, 19, 21, 23, 24*
  47:*12*  49:*22*  56:*10*
think  9:*9*  10:*10*
  12:*8*  17:*25*  18:*24*
  20:*9, 23*  22:*1*  26:*12*
  34:*19*  36:*18*  37:*1*
  46:*24*  52:*3*  54:*23*
thought  12:*5*  26:*16*
three  16:*18*  17:*13*
  21:*12*  38:*10*  40:*3*
  41:*24*  52:*17*  53:*6*
Time  1:*19*  6:*13*
  14:*25*  15:*16*  16:*13*
  21:*4, 11*  23:*9, 22*
  26:*3*  27:*3*  31:*1*
  32:*14*  33:*25*  35:*22*
  36:*11*  37:*4, 6, 22, 25*
  43:*15*  44:*20*  46:*13*

47:*5, 6, 18*  50:*15*
  51:*24*  53:*9*  55:*3*
timely  57:*14*
times  4:*19*  6:*19*
  23:*7*  24:*23*  26:*9*
  29:*8*  35:*13*  40:*3*
  47:*4*  51:*11*
today  4:*16*  5:*15, 21*
  6:*13, 19*  7:*8*  9:*2*
  21:*8*
today's  8:*7, 20*
told  9:*3*  12:*12*
  13:*14*  28:*14*
track  45:*5*
train  49:*18*
training  44:*16, 21*
  45:*4*  49:*13, 20, 23*
  50:*1, 2, 4, 6, 7, 8, 11,*
  12, 14, 19, 21, 24, 25*
trainings  44:*25*  45:*3,*
  5  49:*21*  51:*1*
transcript  59:*4*
transcription  60:*5*
transfer  43:*4, 19*
  44:*4*
transferred  30:*22*
  31:*2*  39:*2, 6*  44:*3, 6*
  51:*11*
treating  27:*8*
treatment  17:*1, 9*
  28:*11*  33:*5*  34:*8*
  35:*7, 18*  36:*4*  37:*5,*
  12, 23*  38:*1, 5, 7, 25*
  40:*23*  41:*11*  42:*11*
  46:*3*  48:*23*  49:*3*
trends  53:*17*
trial  4:*22*
tried  33:*13*  36:*25*
  37:*17*
true  59:*4*
truthfully  5:*21*
try  6:*9*  14:*3*  31:*13*
  47:*15*  49:*2*
trying  12:*8*  14:*6*
  28:*8*  50:*19*
turn  7:*19*
two  15:*13*  17:*6*
  52:*17*
two-year  15:*9, 12, 13*

Deposition of Hal Meyers                                                                 Estate of Joseph P. King v. Ward, et al.

type  40:*9*  46:*24*
types  48:*25*

**< U >**
uncommon  24:*13*
 25:*17*  57:6
understand  5:*14, 23*
 22:*13*  23:*10*  27:*21*
 28:7  31:*10*  34:*22*
 39:*3*  42:*2*
understanding  6:*3*
 26:*4*  54:*4*
understood  6:*2, 7, 23*
 26:*13*
unfortunately  5:*8*
 51:*17*  55:*20*
Unit  12:*25*  17:*11, 17,*
 *19, 20*  18:*7, 9, 13*
 19:*8*  27:*13*  33:*23*
 34:*7*  38:*16, 22*  41:*12,*
 *15, 16*  43:*22*  47:*20,*
 *22*  52:*18*  55:*19, 24*
 *57:1*
UNITED  1:*1*  16:*14,*
 *16*
units  36:*10*
University  14:*22, 23*
 15:*14*
use  47:*2*  56:*18*
usually  45:*24*  49:*20*
Utica  17:*1*
Utica-Rome  15:*14, 24*

**< V >**
validation  31:*17*
Van  9:*6, 8*  11:*18*
 12:*9*  30:*10, 23*
vantage  18:*14*
varies  49:*8*
variety  35:*9, 17*
 46:*12*  51:*19*
vary  50:*18*  51:*20*
verbal  6:*4*  40:*21*
verify  36:*14*
viable  47:*7*
vibrate  7:*11*
**VIDEO**  1:*13, 17*
violate  35:*21*
violation  32:9  36:*21*

volume  7:*18*

**< W >**
walk  16:*2*
Walter  4:*12*
want  13:*15*  16:*6, 8*
 20:*12, 24*  22:*14*
 24:*15*  26:*21, 23*
 35:*20, 21*  42:*3*
wanted  11:*12*  12:*16*
 31:*17*  34:*23, 24*  44:*3*
**WARD**  1:*5*
watch  7:*5*  45:*11, 12,*
 *15, 22*  46:*4, 6, 7, 16,*
 *20*  47:*25*  54:*4, 8, 13*
water  45:*9*
way  8:*4*  25:*10*
 27:*24*  42:*11*  56:*5*
ways  44:*18*
weave  44:*18*
week  33:*11*
weekend  55:*12*
**Well**  7:*18*  12:*3*  42:*9*
 43:*15*  46:*6*
well-controlled  40:*15*
went  14:*22, 25*  15:*4,*
 *13*  55:*2, 16*
we're  50:*19*  51:*1*
we've  41:*1*
wide  41:*3*
**Williams**  1:*20*  59:*2,*
 *15*
withdrawn  47:*2*
**WITNESS**  3:*2*  4:*3*
 7:*12*  11:*25*  12:*2*
 13:*11*  45:*9*  52:*6, 9,*
 *25*  58:*5*
word  14:*5*
words  6:*6*
work  9:*14*  14:*23*
 15:*4*  16:*1, 17*  19:*7,*
 *13*  28:*20*  39:*13*
 50:*22, 23, 25*  55:*2*
workday  9:*11*
worked  15:*15*  16:*9,*
 *10, 14, 16, 18, 22, 23,*
 *24, 25*  17:*5, 7, 14*
worker  15:*17*  16:*15*
 17:*5*  23:*16*

working  12:*3*  18:*3, 5,*
 *6*  19:*1, 2*  43:*1*
works  5:*11*  44:*16*
worried  25:*15*
worse  47:*5*
write  11:*3*  54:*14*
writes  44:*20*
writing  6:*10*

**< Y >**
**YAMILE**  2:*6*  4:*7*
**Yeah**  10:*20*  14:*10*
 20:*15*  22:*19*  28:*6*
 30:*5*
year  11:*19*  15:*13*
 17:*14*  44:*24*  49:*18*
 50:*9*  51:*1, 19, 25*
 52:*3*
years  5:*12*  11:*21, 24*
 16:*18*  17:*6, 10, 13, 21*
 18:*7, 9, 20, 25*  19:*3*
 33:*3*  52:*9, 17*  53:*7*
**Yep**  8:*19*
**YORK**  1:*1*  2:*6, 10,*
 *12*  4:*13*  12:*4*  17:*12,*
 *16*  26:*8*  45:*5*  49:*24*

**< Z >**
**Zant**  9:*6, 8*  11:*18*
 12:*9*  30:*10, 24*
**Zoom**  7:*7*

Deposition of Hal Meyers

Estate of Joseph P. King v. Ward, et al.

## WORD LIST

**< 1 >**
**1**  (*8*)
**10**  (*10*)
**10:05**  (*1*)
**10016**  (*1*)
**10-minute**  (*1*)
**10th**  (*1*)
**11:51**  (*1*)
**112**  (*1*)
**13202**  (*1*)
**13413**  (*1*)
**15**  (*3*)
**16**  (*1*)
**18**  (*2*)
**19**  (*3*)
**1960**  (*1*)
**1979**  (*1*)
**1982**  (*1*)
**1984**  (*1*)
**1985**  (*1*)
**1990**  (*3*)
**1996**  (*1*)
**1998**  (*1*)
**1s**  (*1*)

**< 2 >**
**2**  (*3*)
**20**  (*3*)
**2009**  (*1*)
**2013**  (*1*)
**2018**  (*2*)
**2019**  (*2*)
**2022**  (*4*)
**20-CV-01413**  (*1*)
**21**  (*1*)
**23**  (*2*)
**23rd**  (*1*)
**29**  (*1*)
**2s**  (*1*)

**< 3 >**
**3**  (*3*)
**30**  (*1*)
**300**  (*2*)
**31**  (*1*)
**3s**  (*1*)

**< 4 >**
**4**  (*5*)
**4:30**  (*1*)
**4s**  (*1*)

**< 5 >**
**5**  (*1*)
**50**  (*2*)

**< 6 >**
**6**  (*5*)

**< 7 >**
**7**  (*2*)

**< 8 >**
**8**  (*1*)
**800**  (*1*)
**81**  (*1*)

**< A >**
**a.m**  (*2*)
**ability**  (*2*)
**able**  (*1*)
**above-styled**  (*1*)
**Abuse**  (*1*)
**access**  (*1*)
**accommodate**  (*1*)
**accurate**  (*1*)
**ACKNOWLEDGMEN**
**T**  (*1*)
**ACTION**  (*4*)
**active**  (*2*)
**actual**  (*1*)
**ad**  (*1*)
**addiction**  (*1*)
**addictions**  (*1*)
**additional**  (*1*)
**address**  (*2*)
**Adirondack**  (*1*)
**administrative**  (*3*)
**Administrator**  (*4*)
**admission**  (*1*)
**admits**  (*1*)
**admitted**  (*3*)
**affect**  (*2*)
**AG**  (*1*)
**ago**  (*5*)
**ahead**  (*10*)

**ahold**  (*2*)
**AIMEE**  (*1*)
**al**  (*1*)
**Albany**  (*3*)
**alcohol**  (*2*)
**allow**  (*1*)
**allows**  (*1*)
**Amended**  (*3*)
**amenities**  (*3*)
**amount**  (*2*)
**Amy**  (*1*)
**Answer**  (*19*)
**answers**  (*3*)
**anybody**  (*1*)
**appear**  (*1*)
**appearing**  (*1*)
**appears**  (*1*)
**Apple**  (*1*)
**approaching**  (*1*)
**appropriate**  (*3*)
**approximate**  (*1*)
**Approximately**  (*13*)
**approximation**  (*2*)
**April**  (*1*)
**area**  (*2*)
**arranged**  (*1*)
**array**  (*1*)
**Arts**  (*2*)
**Aside**  (*1*)
**asked**  (*3*)
**asking**  (*1*)
**aspects**  (*1*)
**assessing**  (*1*)
**assigned**  (*2*)
**assistant**  (*2*)
**assisted**  (*1*)
**associated**  (*1*)
**assume**  (*1*)
**assuming**  (*1*)
**attached**  (*2*)
**attempt**  (*4*)
**attend**  (*2*)
**attending**  (*1*)
**ATTORNEY**  (*5*)
**attorneys**  (*2*)
**Auburn**  (*1*)
**available**  (*1*)
**Avenue**  (*1*)
**aware**  (*25*)

**< B >**
**Bachelor's**  (*1*)
**back**  (*2*)
**background**  (*2*)
**based**  (*8*)
**basically**  (*4*)
**basis**  (*4*)
**Bates**  (*1*)
**bathroom**  (*1*)
**Beds**  (*1*)
**beginning**  (*1*)
**behalf**  (*2*)
**behaviors**  (*2*)
**believe**  (*6*)
**benefited**  (*1*)
**Benjamin**  (*2*)
**best**  (*10*)
**beyond**  (*1*)
**birthdate**  (*1*)
**bit**  (*2*)
**board**  (*2*)
**born**  (*3*)
**box**  (*1*)
**break**  (*6*)
**briefly**  (*2*)
**Building**  (*1*)
**buildings**  (*1*)
**built**  (*1*)
**business**  (*1*)

**< C >**
**call**  (*3*)
**called**  (*6*)
**calls**  (*1*)
**Camden**  (*1*)
**Captioner**  (*1*)
**care**  (*17*)
**case**  (*14*)
**caseload**  (*3*)
**cases**  (*2*)
**cause**  (*1*)
**CC'd**  (*5*)
**cell**  (*3*)
**cells**  (*5*)
**Center**  (*6*)
**Central**  (*3*)
**certain**  (*3*)
**CERTIFICATE**  (*1*)

Estate of Joseph P. King v. Ward, et al.

certification  (*1*)
Certified  (*2*)
certify  (*3*)
cetera  (*3*)
chance  (*1*)
change  (*8*)
CHANGE/REASON
  (*1*)
changed  (*1*)
changes  (*6*)
changing  (*1*)
chart  (*4*)
checking  (*1*)
CHEVERIE  (*1*)
chief  (*14*)
children  (*3*)
choice  (*1*)
chronic  (*1*)
circumstances  (*5*)
CIVIL  (*1*)
CLARITY  (*1*)
clinic  (*4*)
clinical  (*6*)
clinically  (*2*)
clinician  (*3*)
close  (*1*)
closed  (*1*)
closer  (*1*)
clothing  (*1*)
college  (*4*)
colleges  (*1*)
come  (*2*)
comes  (*1*)
coming  (*1*)
commander  (*2*)
commencing  (*1*)
commission  (*1*)
commissioner  (*1*)
commissioners  (*1*)
commit  (*4*)
commits  (*1*)
committed  (*3*)
committing  (*1*)
common  (*2*)
commonly  (*1*)
Community  (*10*)
compare  (*3*)
Complaint  (*4*)
complaints  (*6*)

completed  (*1*)
completes  (*1*)
compliance  (*1*)
computers  (*1*)
concern  (*8*)
concerns  (*13*)
concluded  (*1*)
conditions  (*2*)
confidentiality  (*1*)
conflicts  (*1*)
conjunction  (*3*)
connected  (*1*)
connection  (*1*)
consequence  (*1*)
considered  (*1*)
constantly  (*1*)
contact  (*1*)
contained  (*1*)
context  (*1*)
continuity  (*1*)
contrast  (*4*)
contributed  (*1*)
control  (*1*)
conventions  (*1*)
conversation  (*2*)
convicted  (*1*)
coordinate  (*1*)
coordinator  (*3*)
copy  (*1*)
Correct  (*5*)
correctional  (*25*)
corrections  (*4*)
correspondence  (*1*)
counsel  (*7*)
County  (*4*)
COURT  (*5*)
courtroom  (*1*)
cover  (*1*)
COWAN  (*46*)
crime  (*2*)
crisis  (*11*)
Cristina  (*1*)
CRR  (*1*)
cubicles  (*1*)
current  (*8*)
currently  (*3*)

< D >
daily  (*2*)

danger  (*5*)
date  (*4*)
day  (*3*)
day-to-day  (*1*)
dealt  (*1*)
death  (*3*)
debts  (*1*)
decide  (*1*)
decides  (*2*)
decision  (*1*)
decompensation  (*1*)
Defendant  (*3*)
Defendants  (*1*)
definitely  (*1*)
degree  (*5*)
delegated  (*1*)
demand  (*1*)
demonstrated  (*1*)
Department  (*5*)
depended  (*1*)
Depending  (*4*)
depends  (*3*)
DEPONENT  (*1*)
deposed  (*4*)
DEPOSITION  (*8*)
depression  (*1*)
depriving  (*1*)
details  (*1*)
determination  (*3*)
determinations  (*1*)
determine  (*8*)
determined  (*4*)
determines  (*1*)
determining  (*1*)
develop  (*1*)
devices  (*2*)
diagnosis  (*1*)
diary  (*1*)
different  (*11*)
difficulties  (*1*)
DIRECT  (*3*)
directed  (*1*)
directing  (*1*)
directives  (*1*)
directly  (*3*)
directs  (*1*)
disciplinary  (*4*)
discovered  (*1*)
discuss  (*1*)

discussed  (*2*)
disorders  (*1*)
distracting  (*1*)
DISTRICT  (*2*)
disturbed  (*1*)
Division  (*1*)
Divorced  (*2*)
DOCCS  (*22*)
document  (*18*)
documents  (*6*)
doing  (*4*)
dorm  (*3*)
Dormitory  (*1*)
dorms  (*3*)
draft  (*2*)
drafted  (*2*)
drafting  (*2*)
Drake  (*2*)
dropped  (*1*)
drove  (*1*)
drug  (*2*)
drugs  (*1*)
duly  (*1*)
duties  (*2*)

< E >
earlier  (*3*)
Eastern  (*1*)
Education  (*4*)
efforts  (*1*)
either  (*3*)
electronically  (*1*)
element  (*1*)
e-mail  (*12*)
e-mails  (*1*)
emergency  (*2*)
emotional  (*1*)
emotionally  (*1*)
emphasize  (*1*)
employee  (*2*)
employees  (*1*)
employment  (*2*)
engaging  (*1*)
English  (*1*)
ensure  (*1*)
enters  (*2*)
entities  (*2*)
entries  (*1*)
environment  (*1*)

Errata  (*2*)
ESQUIRE  (*3*)
essentially  (*1*)
Estate  (*2*)
estimation  (*1*)
et  (*4*)
evaluate  (*1*)
evaluation  (*2*)
evaluations  (*3*)
event  (*2*)
events  (*1*)
evidence  (*2*)
exact  (*1*)
Exactly  (*3*)
Examination  (*2*)
examined  (*1*)
example  (*1*)
examples  (*1*)
exert  (*1*)
Exhibit  (*12*)
existed  (*1*)
experiencing  (*1*)
expert  (*1*)
expires  (*1*)
explain  (*6*)
exposed  (*1*)
extent  (*2*)

< F >
facilities  (*3*)
facility  (*38*)
fact  (*2*)
factors  (*2*)
Falls  (*1*)
familiar  (*3*)
familiarity  (*1*)
families  (*1*)
family  (*5*)
far  (*5*)
feel  (*1*)
field  (*1*)
figure  (*1*)
filed  (*4*)
financially  (*1*)
find  (*4*)
finish  (*1*)
finished  (*1*)
firm  (*1*)
first  (*2*)

five  (*1*)
Floor  (*1*)
follow  (*2*)
followed  (*2*)
following  (*2*)
follows  (*1*)
follow-up  (*1*)
follow-ups  (*1*)
foregoing  (*2*)
Forensic  (*4*)
form  (*3*)
formal  (*3*)
found  (*3*)
four  (*3*)
four-year  (*1*)
FPA  (*1*)
free  (*1*)
frequent  (*1*)
friendships  (*1*)
front  (*2*)
full  (*3*)
fully  (*1*)
function  (*3*)
functions  (*2*)
further  (*4*)

< G >
gangs  (*1*)
GENERAL  (*4*)
Generally  (*9*)
generate  (*1*)
generated  (*2*)
getting  (*1*)
Gina  (*3*)
give  (*6*)
given  (*5*)
giving  (*1*)
Glens  (*1*)
go  (*31*)
goes  (*1*)
going  (*20*)
Good  (*5*)
grab  (*1*)
graduate  (*2*)
graduated  (*2*)
grievance  (*1*)
grievances  (*1*)
ground  (*1*)
guess  (*2*)

< H >
HACH  (*1*)
HAL  (*6*)
half  (*1*)
HALT  (*1*)
hanging  (*2*)
happen  (*2*)
happened  (*5*)
happens  (*3*)
harming  (*2*)
Harold  (*1*)
Hartford  (*1*)
Health  (*67*)
hear  (*1*)
hearing  (*3*)
help  (*3*)
helped  (*1*)
high  (*1*)
higher  (*4*)
HILLARY  (*1*)
historical  (*1*)
history  (*2*)
hold  (*1*)
home  (*4*)
hope  (*1*)
hoping  (*1*)
hospital  (*10*)
hour  (*1*)
hours  (*3*)
House  (*1*)
housed  (*2*)
houses  (*1*)
housing  (*5*)
Human  (*6*)
hung  (*1*)

< I >
idea  (*2*)
identification  (*2*)
identified  (*1*)
II  (*2*)
illness  (*1*)
impact  (*1*)
impacting  (*1*)
important  (*3*)
impulsive  (*1*)
incarcerated  (*11*)
include  (*2*)

including  (*2*)
incorporate  (*2*)
increase  (*1*)
increased  (*3*)
increasing  (*1*)
indicates  (*1*)
indication  (*2*)
indicative  (*1*)
indicators  (*1*)
individual  (*19*)
individually  (*1*)
individuals  (*10*)
individual's  (*1*)
infirmary  (*1*)
influence  (*1*)
information  (*3*)
inmate  (*15*)
inmates  (*11*)
inquiry  (*1*)
instances  (*1*)
intake  (*1*)
intensive  (*1*)
interest  (*1*)
interested  (*1*)
Intermediate  (*1*)
internal  (*1*)
interrogatories  (*5*)
interrogatory  (*1*)
investigate  (*1*)
investigation  (*3*)
investigations  (*1*)
investigative  (*1*)
investigators  (*1*)
involve  (*1*)
involved  (*9*)
iPad  (*1*)
issue  (*1*)
issues  (*3*)
items  (*1*)
its  (*1*)

< J >
Jail  (*1*)
Jersey  (*1*)
job  (*4*)
join  (*1*)
joined  (*1*)
Joseph  (*5*)
judicious  (*1*)

**< K >**
KALKACH (*53*)
Katrina (*1*)
keep (*6*)
keeps (*1*)
Kemory (*1*)
kids (*1*)
kill (*1*)
kind (*6*)
King (*32*)
King's (*5*)
knew (*4*)
know (*68*)
knowing (*1*)
knowledge (*7*)
known (*1*)

**< L >**
large (*1*)
larger (*1*)
largest (*3*)
Lauri (*1*)
law (*1*)
lawsuit (*8*)
lead (*2*)
leading (*2*)
learn (*2*)
left (*1*)
legislation (*1*)
Leonard (*1*)
letter (*3*)
letters (*7*)
level (*37*)
levels (*7*)
Lewis (*1*)
Liberal (*2*)
license (*1*)
licenses (*1*)
licensing (*1*)
life (*7*)
limit (*2*)
limited (*5*)
LINE (*1*)
listen (*1*)
little (*4*)
live (*2*)
LLP (*1*)
located (*1*)

location (*1*)
lock (*1*)
log (*6*)
logbook (*1*)
long (*2*)
longer (*1*)
look (*3*)
looked (*1*)
looking (*7*)
looks (*1*)
Lori (*1*)
lot (*7*)
lower (*1*)
lowered (*1*)

**< M >**
Madison (*1*)
main (*2*)
maintaining (*1*)
majority (*1*)
manager (*1*)
mandatory (*1*)
Margaret (*2*)
marked (*4*)
MARKS (*1*)
marriage (*3*)
married (*1*)
Master (*1*)
Master's (*2*)
match (*1*)
maximum (*1*)
McPike (*1*)
mean (*6*)
means (*1*)
medical (*2*)
medications (*6*)
medium-correctional (*1*)
medium-security (*2*)
meet (*8*)
meeting (*7*)
meetings (*2*)
members (*1*)
memorialize (*1*)
Mental (*68*)
Merritt (*1*)
message (*1*)
met (*6*)
MEYERS (*19*)

Mid-State (*28*)
mind (*1*)
minimum (*5*)
minor (*2*)
minute (*3*)
minutes (*3*)
mobile (*1*)
moment (*1*)
monitor (*1*)
monitored (*2*)
month (*2*)
months (*4*)
morning (*1*)
move (*2*)

**< N >**
name (*7*)
named (*1*)
names (*2*)
NAPPI (*5*)
nature (*4*)
nearby (*2*)
NECESSARILY (*3*)
need (*14*)
needed (*2*)
needs (*10*)
never (*1*)
NEW (*15*)
nodding (*1*)
noises (*1*)
normal (*2*)
Normally (*2*)
NORTHERN (*1*)
Notary (*1*)
note (*4*)
noted (*2*)
notes (*6*)
notified (*4*)
notifying (*1*)
November (*1*)
Number (*13*)
numbered (*1*)
numbers (*1*)
numerous (*1*)
nursing (*1*)

**< O >**
Oasis (*1*)
oath (*2*)

object (*2*)
Objection (*19*)
Observation (*3*)
observe (*1*)
obtain (*1*)
obtained (*1*)
occasion (*1*)
occur (*2*)
occurred (*5*)
occurring (*1*)
offer (*2*)
OFFICE (*22*)
officer (*2*)
official (*1*)
Oh (*2*)
okay (*78*)
old (*1*)
older (*1*)
OMH (*2*)
OMRDD (*1*)
Once (*9*)
ones (*2*)
one-to-one (*3*)
ongoing (*1*)
open (*12*)
opened (*1*)
operations (*1*)
opinion (*1*)
opposed (*2*)
OPPW (*1*)
option (*1*)
order (*3*)
originally (*1*)
outpatient (*1*)
outside (*1*)
oversee (*1*)

**< P >**
PAGE (*2*)
pages (*3*)
paid (*1*)
Palladino (*8*)
paper (*1*)
parole (*6*)
part (*9*)
participate (*2*)
participated (*2*)
particularly (*1*)
parties (*1*)

party  (*1*)
passed  (*2*)
passing  (*2*)
patient  (*2*)
patient's  (*1*)
pending  (*1*)
people  (*28*)
people's  (*2*)
percent  (*2*)
perception  (*1*)
Perfect  (*2*)
performance  (*3*)
period  (*4*)
Periodically  (*2*)
person  (*7*)
personal  (*1*)
perspective  (*1*)
phone  (*5*)
phones  (*1*)
physical  (*1*)
physically  (*3*)
Place  (*7*)
placed  (*5*)
places  (*1*)
Plaintiff  (*3*)
play  (*1*)
please  (*13*)
point  (*3*)
policies  (*14*)
policy  (*8*)
pop  (*1*)
pops  (*1*)
population  (*1*)
portion  (*1*)
position  (*4*)
possible  (*1*)
potential  (*4*)
potentially  (*3*)
practice  (*1*)
preparation  (*1*)
prepare  (*1*)
preparing  (*1*)
prescriber  (*7*)
Prescribers  (*1*)
present  (*1*)
presenting  (*1*)
pretty  (*3*)
prevent  (*2*)
prevention  (*8*)

previously  (*2*)
primary  (*1*)
print  (*2*)
prior  (*1*)
prison  (*6*)
prisons  (*1*)
private  (*1*)
probably  (*6*)
problems  (*2*)
procedure  (*4*)
procedures  (*5*)
process  (*3*)
produced  (*2*)
Professional  (*3*)
program  (*19*)
Programs  (*1*)
progress  (*1*)
projected  (*2*)
promote  (*1*)
promotion  (*1*)
prompted  (*1*)
pronounced  (*1*)
pronouncing  (*1*)
propounded  (*1*)
Prosequendum  (*1*)
provide  (*3*)
provided  (*5*)
providers  (*1*)
provides  (*1*)
providing  (*1*)
psychiatric  (*5*)
psychotropic  (*1*)
Public  (*1*)
pull  (*1*)
purpose  (*1*)
purposes  (*1*)
put  (*2*)

< Q >
question  (*10*)
questionnaire  (*1*)
questions  (*6*)
quick  (*2*)
QUOTATION  (*1*)
QUOTE  (*1*)

< R >
range  (*1*)
rare  (*1*)

RCTP  (*14*)
reached  (*1*)
read  (*3*)
readily  (*1*)
ready  (*1*)
real  (*1*)
really  (*3*)
Realtime  (*3*)
reason  (*5*)
reasons  (*7*)
recall  (*30*)
receive  (*9*)
received  (*4*)
receiving  (*2*)
reception  (*2*)
Recess  (*4*)
recognize  (*3*)
recognizes  (*1*)
recollection  (*7*)
recommend  (*1*)
record  (*8*)
recorded  (*1*)
reference  (*1*)
referenced  (*4*)
referral  (*1*)
referred  (*2*)
referring  (*1*)
REFLECT  (*4*)
reflected  (*1*)
reflects  (*1*)
regarding  (*3*)
Regardless  (*3*)
regards  (*2*)
REGIONAL  (*1*)
Registered  (*2*)
regular  (*1*)
rehabilitation  (*1*)
related  (*6*)
relative  (*1*)
relatively  (*1*)
released  (*1*)
relevance  (*1*)
remember  (*8*)
REMOTE  (*2*)
remotely  (*1*)
removed  (*1*)
repeat  (*3*)
rephrase  (*1*)
rephrasing  (*1*)

report  (*3*)
reported  (*3*)
Reporter  (*5*)
reporters  (*1*)
reports  (*1*)
represents  (*1*)
request  (*1*)
Residential  (*10*)
resources  (*4*)
response  (*4*)
responsibilities  (*1*)
responsible  (*1*)
result  (*2*)
Retardation  (*1*)
returned  (*1*)
review  (*7*)
reviewed  (*3*)
reviewing  (*1*)
right  (*12*)
rights  (*3*)
risk  (*5*)
role  (*4*)
room  (*1*)
rooms  (*1*)
ROSE  (*1*)
RPR  (*1*)
rules  (*1*)
run  (*2*)

< S >
safe  (*2*)
safely  (*1*)
safest  (*1*)
safety  (*1*)
satellite  (*4*)
saw  (*1*)
says  (*1*)
scene  (*3*)
scene-scene  (*1*)
Schatzel  (*1*)
SCHIRRIPA  (*1*)
School  (*3*)
scratch  (*1*)
screen  (*3*)
screened  (*1*)
screening  (*2*)
scroll  (*5*)
search  (*7*)
searching  (*1*)

section  (1)
secure  (4)
secured  (2)
security  (2)
see  (13)
seeing  (2)
seen  (3)
sees  (1)
self  (4)
self-injurious  (2)
self-injury  (1)
self-report  (1)
send  (1)
sense  (1)
sent  (6)
sentence  (1)
separate  (2)
serious  (1)
served  (6)
service  (6)
services  (23)
setting  (5)
Seymour  (1)
share  (2)
shared  (1)
sharing  (2)
Sheet  (1)
Shepherd  (1)
shoelaces  (12)
shortly  (1)
short-term  (1)
showing  (1)
SHU  (1)
shut  (1)
signed  (1)
significant  (3)
signs  (3)
silo  (1)
similar  (1)
simply  (1)
six  (1)
size  (1)
skills  (1)
skip  (1)
Skynyrd  (1)
small  (4)
smaller  (1)
smoothly  (1)
so-and-so  (1)

Social  (7)
somebody  (5)
somebody's  (2)
someone's  (3)
Someplace  (1)
sorry  (11)
sort  (1)
Sounds  (1)
South  (1)
space  (1)
speak  (6)
speaking  (3)
Special  (4)
specialist  (1)
specific  (7)
specifically  (1)
specifics  (1)
spectrum  (1)
spell  (3)
spoke  (2)
spoken  (1)
staff  (9)
stamp  (1)
Standard  (4)
start  (3)
started  (2)
STATE  (11)
statement  (1)
statements  (2)
STATES  (1)
stats  (1)
status  (5)
stay  (2)
step  (1)
Street  (1)
stressed  (1)
strike  (1)
Studies  (1)
stuff  (1)
subject  (3)
submit  (1)
Suboxone  (2)
Subscribed  (2)
Substance  (2)
successful  (1)
successfully  (1)
sued  (1)
suffering  (3)
suicide  (53)

suicides  (5)
Suite  (1)
Sullivan  (3)
SUNY  (1)
support  (1)
supports  (1)
supposed  (1)
sure  (10)
switch  (2)
switched  (1)
sworn  (3)
symptoms  (1)
SYRACUSE  (3)
system  (3)

< T >
take  (11)
taken  (8)
talk  (6)
talked  (2)
team  (5)
tech  (4)
tell  (2)
telling  (1)
term  (2)
terms  (1)
tested  (1)
testified  (4)
testify  (1)
testimony  (1)
Thank  (9)
therapist  (11)
therapists  (1)
therapy  (2)
thing  (3)
things  (14)
think  (15)
thought  (2)
three  (8)
Time  (30)
timely  (1)
times  (10)
today  (8)
today's  (2)
told  (4)
track  (1)
train  (1)
training  (20)
trainings  (5)

transcript  (1)
transcription  (1)
transfer  (3)
transferred  (7)
treating  (1)
treatment  (22)
trends  (1)
trial  (1)
tried  (3)
true  (1)
truthfully  (1)
try  (5)
trying  (4)
turn  (1)
two  (3)
two-year  (3)
type  (2)
types  (1)

< U >
uncommon  (3)
understand  (10)
understanding  (3)
understood  (4)
unfortunately  (3)
Unit  (24)
UNITED  (3)
units  (1)
University  (3)
use  (2)
usually  (2)
Utica  (1)
Utica-Rome  (2)

< V >
validation  (1)
Van  (6)
vantage  (1)
varies  (1)
variety  (4)
vary  (2)
verbal  (2)
verify  (1)
viable  (1)
vibrate  (1)
VIDEO  (2)
violate  (1)
violation  (2)
volume  (1)

Deposition of Hal Meyers                                    Estate of Joseph P. King v. Ward, et al.

**< W >**
**walk**  *(1)*
**Walter**  *(1)*
**want**  *(12)*
**wanted**  *(6)*
**WARD**  *(1)*
**watch**  *(14)*
**water**  *(1)*
**way**  *(5)*
**ways**  *(1)*
**weave**  *(1)*
**week**  *(1)*
**weekend**  *(1)*
**Well**  *(5)*
**well-controlled**  *(1)*
**went**  *(7)*
**we're**  *(2)*
**we've**  *(1)*
**wide**  *(1)*
**Williams**  *(3)*
**withdrawn**  *(1)*
**WITNESS**  *(11)*
**word**  *(1)*
**words**  *(1)*
**work**  *(13)*
**workday**  *(1)*
**worked**  *(13)*
**worker**  *(4)*
**working**  *(7)*
**works**  *(2)*
**worried**  *(1)*
**worse**  *(1)*
**write**  *(2)*
**writes**  *(1)*
**writing**  *(1)*

**< Y >**
**YAMILE**  *(2)*
**Yeah**  *(6)*
**year**  *(10)*
**years**  *(18)*
**Yep**  *(1)*
**YORK**  *(12)*

**< Z >**
**Zant**  *(6)*
**Zoom**  *(1)*

```
 1                    ACKNOWLEDGMENT OF DEPONENT

 2

 3           I, HAL MEYERS, do hereby certify that I have read

 4    the foregoing pages and that the same is a correct

 5    transcription of the answers given by me to the questions

 6    therein propounded, except for the corrections or changes in

 7    form or substance, if any, noted in the attached Errata

 8    Sheet.

 9

10

11    _____          6/29/22

12    HAL MEYERS                                     Date

13

14    Subscribed and sworn to before me this

15    29 day of ___June___, 2022.

16    My commission expires: 2/27/2005

17

18    _____

19    Notary Public

20

21

22              JESSICA L. WILDEY
          NOTARY PUBLIC - STATE OF NEW YORK
23              NO: 01WI6355209
          QUALIFIED IN HERKIMER COUNTY
24    COMMISSION EXPIRES FEBRUARY 27, 20___

25
```

```
 1                          — — — — — — —

 2                              ERRATA

 3                          — — — — — — —

 4     PAGE   LINE                      CHANGE/REASON

 5     __16_  __16__           Change "United" to "Oneida"

 6     __17_____9__          Change "assistant" to "assisted"

 7     __18_____20__            Change "Lauri" to "Lori"

 8     _18_____21__          Change "Kemory" to "Kemmery"

 9     __44_____1__           Change "chronic" to "current"

10     ____  ____     _____

11     ____  ____     _____

12     ____  ____     _____

13     ____  ____     _____

14     ____  ____     _____

15     ____  ____     _____

16     ____  ____     _____

17     ____  ____     _____

18     ____  ____     _____

19     ____  ____     _____

20     ____  ____     _____

21     ____  ____     _____

22     ____  ____     _____

23     ____  ____     _____

24     ____  ____     _____

25
```