```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF NEW YORK
 2                CIVIL ACTION NO.: 20-CV-01413

 3

 4   The Estate of Joseph P. King,
     by and through its Administrator
 5   ad Prosequendum Amy King,
     and in her own right,
 6
          Plaintiff,
 7
     v.
 8
     WARD, et al.,
 9
          Defendant.
10   _____

11

12            *************************************

13        REMOTE VIDEO DEPOSITION OF JAMI PALLADINO

14                    MAY 23, 2022

15            *************************************

16

17            REMOTE VIDEO DEPOSITION OF JAMI PALLADINO taken

18   in the above-styled and numbered cause on May 23, 2022,

19   commencing at 1:00 p.m. Eastern Standard Time, before Gina

20   Williams, Registered Professional Reporter, Certified

21   Realtime Reporter, and Certified Realtime Captioner.

22

23

24

25
```

```
 1                    A P P E A R A N C E S

 2                (All attorneys appearing remotely)

 3

 4    On behalf of Plaintiff:

 5         HACH ROSE SCHIRRIPA & CHEVERIE, LLP
           112 Madison Avenue, 10th Floor
 6         New York, New York 10016
      By:  YAMILE KALKACH, ESQUIRE
 7         HILLARY NAPPI, ESQUIRE

 8

 9    On behalf of Defendants:

10         NEW YORK STATE ATTORNEY GENERAL
           SYRACUSE REGIONAL OFFICE
11         300 South State Street
           Suite 300
12         Syracuse, New York 13202
      By:  AIMEE COWAN, ESQUIRE
13

14

15

16

17

18

19         QUOTATION MARKS ARE USED FOR CLARITY AND DO NOT
                NECESSARILY REFLECT A DIRECT QUOTE
20

21

22

23

24

25
```

Deposition of Jami Palladino                    Estate of Joseph P. King v. Ward, et al.

```
 1                    I N D E X

 2   WITNESS                                    PAGE

 3   JAMI PALLADINO

 4   Examination by Ms. Kalkach                    4

 5                    - - - -

 6                 E X H I B I T S

 7   Number

 8      Exhibit A   Amended Complaint             12

 9      Exhibit B   Answer to Amended Complaint   13

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1    WHEREUPON,

 2                          JAMI PALLADINO

 3    was called as a witness and, after having been first duly

 4    sworn, was deposed and testified as follows:

 5                          EXAMINATION

 6    BY MS. KALKACH:

 7         Q    Good morning, Ms. Palladino.  My name is Yamile

 8    Kalkach.  I'm an associate at the law firm that represents

 9    Plaintiff, the Estate of Joseph King.

10              Could you please state your full name and current

11    address for the record?

12         A    Jami Ann Palladino.

13              My work address or my home address?

14         Q    Your home address.

15         A    911 Culverton Road, Rome, New York 13440.

16         Q    Thank you.  Ms. Palladino, I'm going to go over a

17    few ground rules to help today to run as quickly and

18    smoothly as possible.

19              Have you ever been deposed before?

20         A    No.

21         Q    Have you ever testified at trial?

22         A    No.

23         Q    So you may not be familiar with how this works;

24    correct?

25         A    Yes.
```

1        Q      So do you understand that you are under oath

2    today?

3        A      Yes.

4        Q      And that this is the same oath that you would

5    take in a courtroom?

6        A      Yes.

7        Q      Are you on any medications which may affect your

8    ability to testify truthfully today?

9        A      No.

10       Q      So if you don't hear or understand a question

11   that I ask you, please feel free to ask me to repeat or

12   rephrase the question, and I will.

13              That means that if you answer a question that I

14   ask, I will assume that you understood the question and your

15   answer was based on that understanding, okay?

16       A      Yes.

17       Q      It's also important that you give me verbal

18   answers as opposed to a head nod or showing me things with

19   your hands, et cetera, so the court reporter may take down

20   your words.

21              Understood?

22       A      Yes.

23       Q      Let's try our best not to talk over one another.

24   Again, the court reporter is writing everything down, so if

25   we talk over one another, she may not be able to understand

```
 1   what we're both saying and write it down.

 2             Do you understand?

 3        A    Yes.

 4        Q    If at any time today you need a break, please

 5   simply just say so, and I will accommodate.  The only thing

 6   that I ask from you is that if I asked a question, you

 7   answer it before asking for the break, okay?

 8        A    Yes.

 9        Q    Perfect.

10             There may be many times today that your attorney

11   may object to a question that I ask you.  Unless your

12   attorney directs you not to answer the question, you still

13   must answer.

14             Understood?

15        A    Yes.

16        Q    Okay.  Now, please shut off or put on vibrate any

17   other device that you have around you.  It could be a cell

18   phone, Apple watch, iPad, or any other computer.

19             Also, please close any other document or program

20   on your screen other than Zoom and the ones that I will --

21   other than Zoom or the programs -- the documents that I will

22   be showing you today.

23             Are there any paper documents in front of you?

24        A    No.

25        Q    Is there anybody in the room with you?
```

215-341-3616   transcripts@everestdepo.com
Everest Court Reporting LLC                                                Page: 6

```
 1        A      No.

 2        Q      Are you currently under the influence of any

 3   drugs or alcohol that in any way may affect your testimony?

 4        A      No.

 5        Q      What did you do, if anything, to prepare for

 6   today's deposition?

 7        A      I conferred with my legal representation.

 8        Q      When?

 9        A      On May 10.

10        Q      For how long?

11        A      For about an hour.

12        Q      Other than your counsel, was anybody else

13   present?

14        A      No.

15        Q      Did you review any documents when you met with

16   your counsel?

17        A      No.

18        Q      Did you discuss today's deposition with anyone

19   else other than your counsel?

20        A      No.

21        Q      Do you keep notes about your workday?

22        A      Can you repeat the question?  I'm sorry.

23        Q      Yes.

24               Do you keep notes about your workday?

25        A      No.
```

```
 1        Q     Do you keep a diary about your workday?

 2        A     No.

 3        Q     Have you ever used any other names?

 4        A     No.

 5        Q     Have you ever been convicted of a crime?

 6        A     No.

 7        Q     When were you born?

 8        A     July 21, 1979.

 9        Q     Where were you born?

10        A     Minneola, New York.

11        Q     Are you married?

12        A     No.

13        Q     Do you have kids?

14        A     Yes.

15        Q     How many?

16        A     Three.

17        Q     Aside from the instant action, to your knowledge

18   have any complaints and/or grievances been filed against

19   you?

20        A     No.

21        Q     Have you ever been subject of a disciplinary

22   complaint?

23        A     No.

24        Q     Have you ever been a party in a lawsuit before?

25        A     No.
```

```
1          Q      Have you ever testified in court?

2          A      No.

3          Q      Have you ever testified in a deposition?

4          A      No.

5          Q      Okay.  Where did you --

6                 Please erase that.

7                 Did you attend college?

8          A      Yes.

9          Q      Where did you go?

10         A      I went to Stonybrook University.

11         Q      When did you go there?

12         A      2007 until 2010.

13         Q      What did you study?

14         A      Social work.

15         Q      Besides college, do you have any other --

16                Did you ever take any other certification program

17   or licensing program?

18         A      No.

19         Q      Do you have any licenses?

20         A      Yes.

21         Q      What are these licenses?

22         A      Licensed clinical social worker.

23         Q      When did you obtain it?

24         A      2017.

25         Q      How did you obtain it?
```

Deposition of Jami Palladino                                    Estate of Joseph P. King v. Ward, et al.

```
 1        A      I took a test.

 2        Q      Okay.  Could you briefly walk me through your

 3   employment history leading up to your current position?

 4        A      I started working with NTA Connections BRC in

 5   2006 to 2008.  I worked in case management from 2009 until

 6   2012 for Mental Health Association of Nassau County.  I

 7   worked in a PROs program from 2012 to 2013, and I've been at

 8   this position since 2013.

 9        Q      Which position are you currently in?

10        A      Currently I'm a discharge planner, prerelease

11   coordinator.

12        Q      When did you start working there?

13        A      I switched from general population therapist to

14   prerelease coordinator in December of 2018.

15        Q      Before that what were you doing?

16        A      I was a general population therapist from 2013 to

17   2018, same facility, different position.

18        Q      I understand.

19               What were your duties and responsibilities when

20   you were working as the general population therapist?

21        A      I managed a caseload of people that are open to

22   mental health services, provided monthly therapy.

23        Q      Who did you report to?

24        A      I reported to Hal Meyers, unit chief.

25        Q      And who reported to you?
```

```
 1        A     I'm sorry?

 2        Q     Who reported to you?

 3        A     Nobody.

 4        Q     Did you get training in this job?

 5        A     Yes.

 6        Q     Describe the training that you received.

 7        A     I would --

 8              One second.  I'm sorry.

 9              My training was, I shadowed another employee

10   where they taught me how to complete the documentation, how

11   to run a session with a patient.

12        Q     Besides this training, did you ever get any other

13   kind of training from the facility?

14        A     I've gotten many different trainings like in

15   different topics.

16        Q     Were those mandatory?

17        A     Yes.

18        Q     What were they?

19        A     I'm just thinking.  There's been quite a few.

20        Q     That's okay.

21        A     Workplace violence.  They have their mandatory

22   training of workplace violence, sexual harassment, of HIPAA,

23   of --

24              Those are the yearly trainings that we get every

25   year.
```

1       Q      Okay.   Only these three or just the ones you're
2   remembering right now?
3       A      Those are just the ones that I can remember right
4   now.
5       Q      Okay.   Did you talk about this lawsuit with
6   anyone you work with?
7       A      No.
8       Q      Do you remember when the lawsuit was filed?
9       A      I don't remember.
10      MS. KALKACH:   I offer Ms. Palladino Exhibit A
11     into evidence.
12      David, could you please show her Exhibit A?
13      (Exhibit A was marked for identification.)
14  BY MS. KALKACH:
15      Q      So just take a minute to read the document.
16      You don't have to read it line by line.   I just
17  want to know if you recognize it.
18      A      Yes.
19      Q      You do?
20      A      Yes.
21      Q      Okay.   What do you recognize this document to be?
22      A      This is the --
23      This is the civil action from the Estate of
24  Mr. King.
25      Q      How are you familiar with this document?

Deposition of Jami Palladino                          Estate of Joseph P. King v. Ward, et al.

```
1        A      I obtained a copy of this via e-mail.

2        Q      When?

3        A      I don't remember.

4        Q      An approximate date, month and year?

5        A      I don't remember.

6        Q      Do you remember the year?

7        A      The year that it was sent out.

8               No, I don't.

9        Q      Did you review this document prior to today?

10       A      Not since I've received them, no.

11              MS. KALKACH:  Okay.  Now, I offer Ms. Palladino

12       Exhibit B into evidence.

13              David, could you please show Ms. Palladino

14       Exhibit B?

15              (Exhibit B was marked for identification.)

16   BY MS. KALKACH:

17       Q      Ms. Palladino, please take a minute to review

18   this exhibit.  I just want to know if you recognize the

19   document or not.

20       A      Yes.

21              MS. KALKACH:  Okay.  Thank you, David.

22   BY MS. KALKACH:

23       Q      What do you recognize this document to be?

24       A      This is what's been from the Estate of Mr. King.

25       Q      Do you recognize specifically what this document
```

```
 1   is?

 2              What does it --

 3        A     It's requesting a jury trial.

 4        Q     So this is the Answer to the Complaint.

 5              Did you ever participate at any time in the

 6   drafting of this document?

 7        A     No.

 8        Q     Have you signed any written statements or made

 9   any recorded statements or spoken to attorneys or

10   investigators or reporters about the events related to this

11   lawsuit?

12        A     Just my counsel.

13        Q     Okay.  Did you know Mr. Joseph King?

14        A     Yes.

15        Q     Why did you know him?

16        A     He was my patient.

17        Q     When did you meet him?

18        A     2013.

19        Q     What was the nature of your relationship?

20        A     He was my patient.

21        Q     Do you know when he was incarcerated?

22        A     I don't remember.

23        Q     Do you know why he was incarcerated?

24        A     I don't remember.

25        Q     How often would you converse with Mr. King?
```

Deposition of Jami Palladino                                    Estate of Joseph P. King v. Ward, et al.

```
 1        A      Once a month.
 2        Q      What was your role in Mr. King's life while he
 3   was incarcerated?
 4        A      I was his therapist.
 5        Q      And what were your job duties as a therapist with
 6   respect to Mr. King?
 7        A      To provide supportive counseling, to provide
 8   verbal therapy.
 9        Q      Were you aware of any specific problems Mr. King
10   dealt while he was incarcerated?
11               MS. COWAN:  Objection.  You can answer.
12               THE WITNESS:  Answer?
13               MS. COWAN:  Yeah, you can answer.
14        A      Can you repeat the question?  I'm sorry.
15   BY MS. KALKACH:
16        Q      Yes.
17               Were you aware of any specific problems Mr. King
18   dealt with while he was incarcerated?
19        A      Yes.
20        Q      Which problems?
21        A      Difficulty in coping with the environment.
22        Q      Were you aware he thought his wife was sleeping
23   with another person?
24        A      No.
25        Q      Were you aware about his thought about his
```

Deposition of Jami Palladino                                    Estate of Joseph P. King v. Ward, et al.

```
 1   marriage suffering?
 2        A    No.
 3        Q    Were you aware that he had been fighting with his
 4   wife the week leading up to his suicide?
 5        A    No.
 6        Q    Do you know when was the last conversation he had
 7   with his wife?
 8        A    No.
 9        Q    Do you know when was the last conversation he had
10   with his children?
11        A    No.
12        Q    Were you aware he spoke to other inmates about
13   his mental state?
14        A    No.
15        Q    What was the sum and substance of the
16   conversations you had with Mr. King?
17             MS. COWAN:  Objection, but go ahead.
18        A    About his daily --
19             About how he was functioning in general
20   population.
21   BY MS. KALKACH:
22        Q    Did you speak about his behaviors towards other
23   inmates?
24        A    Not that I recall.
25        Q    Were you aware that Mr. King used Suboxone?
```

```
1         A     Yes.

2         Q     Did you speak to him about his use?

3         A     Yes.

4         Q     What did he tell you about his drug use?

5         A     He stated that he was not using.

6         Q     He stated he was not using, yet you were aware

7    that he was using?

8         A     I'm sorry?

9         Q     So he stated that he was using?

10        A     No.  He stated that he was not using.

11        Q     How did you become aware that he was using

12   Suboxone?

13        A     He had shared it with me.

14        Q     When did he share this with you?

15        A     During session.  I don't remember which one

16   though.

17        Q     Were you aware of any other drugs that he was

18   taking within the time of his incarceration?

19        A     No.

20        Q     Were you aware of any prescription drugs that he

21   was taking during the time of his incarceration?

22        A     Will you repeat that, please?

23        Q     Were you aware of any prescription medication

24   that he was taking during the time of his incarceration?

25        A     Yes.
```

Deposition of Jami Palladino                                    Estate of Joseph P. King v. Ward, et al.

```
 1        Q     What kind of prescription medication was he
 2   taking?
 3        A     I don't recall.
 4        Q     Do you know what they were used for?
 5        A     For antianxiety and antidepressants.
 6        Q     When was he taking them, which period of time?
 7        A     He was taking medication for most of his
 8   incarceration.
 9        Q     Who prescribed them?
10        A     The prescriber.
11        Q     Do you know his name?
12        A     Dr. Thomas, Dr. Hernandez, Ms. Citrin.
13              There was three of them.
14        Q     There were three of them?
15              Can you please repeat the names?
16        A     Dr. Thomas.
17        Q     Do you know his last name?
18        A     That's her --
19              It's Karen Thomas.
20              Dr. Hernandez.  I don't remember his first name.
21              Kari Citrin.
22        Q     Can you spell that last name for me, please?
23        A     C-i-t-r-i-n.
24        Q     Was he still taking these medications at the time
25   of the suicide?
```

```
 1        A      I think they were discontinued.

 2        Q      Do you know when he stopped taking them?

 3        A      I don't recall.

 4        Q      Do you know why they were discontinued?

 5        A      He was --

 6               He expressed complaints about his symptoms.   The

 7    doctor discontinued the medication and was scheduled to meet

 8    with him in two weeks in order to restart medication.

 9        Q      When was this?

10        A      That was my last visit with him, November -- the

11    end of November, 2018.

12        Q      Do you know if the medication was cut off at

13    once?

14        A      I don't recall.

15        Q      Who was aware of the decision of taking him off

16    his medication?

17               MS. COWAN:  Objection.  Go ahead.

18        A      The --

19               I guess the nurses.

20    BY MS. KALKACH:

21        Q      Only the nurses and yourself?

22        A      And the prescriber.

23        Q      The three of them?

24        A      There was only one doctor, the last doctor --

25               It was three different doctors at three different
```

```
 1   periods.

 2        Q     Okay.

 3        A     Dr. Thomas was the last one.

 4        Q     What was the period that Dr. Thomas was his

 5   prescriber?

 6        A     I don't know.

 7        Q     Which one was the first one?

 8        A     I don't know.  I can't remember.

 9        Q     Was Mr. King worried about his medication being

10   cut off?

11        A     Not at the time.

12        Q     At which time?

13        A     Not at the time of when it was discontinued.

14              It was an agreement between the doctor and

15   patient.

16        Q     When did he become concerned or worried about

17   discontinuance of his medication?

18        A     Not to my --

19              Not to my knowledge.

20        Q     I said when.

21              Because you said that at the beginning he wasn't.

22              Was he ever worried that it could affect him not

23   having his medication?

24        A     Not that I'm aware of.

25        Q     Okay.  What if any were Mr. King's feelings about
```

Deposition of Jami Palladino                                    Estate of Joseph P. King v. Ward, et al.

```
 1   his medication not being given to him anymore?
 2        A     I did not receive anything indicating that he had
 3   any issues about it not being given.
 4        Q     Did he ever send you letters?
 5        A     Yes.
 6        Q     How many letters did you receive?
 7        A     A few.
 8        Q     When you say "a few," you mean from 1 to 5, 5 to
 9   10, 10 to 20, or something else?
10        A     No, probably between 5 to 10, but that's over the
11   duration of the time that we worked together from 2013 to
12   2018.
13        Q     And what was the content of the letters, the sum
14   and substance of what they said?
15        A     Concerns about --
16              They were concerns about his medication being
17   discontinued earlier on before that.
18        Q     Before --
19              Before what?
20        A     Before his final --
21              Before the last one.
22              Before the last time when he met with the doctor.
23   There have been other periods that he discontinued
24   medication.
25        Q     I understand.
```

```
 1              What if anything you did in response of the
 2    letters that you received?
 3        A      Follow protocol.
 4              Our policy is to see the patient within two weeks
 5    of receiving a letter, discuss what the concerns are, and
 6    bring it to the prescriber's attention.
 7        Q      So did you set up sessions to address the
 8    letters?
 9        A      Yes.
10        Q      And did you report his concerns to the
11    prescriber?
12        A      Yes.
13        Q      Were you aware of Mr. King sending letters to any
14    other of your co-workers?
15        A      Could have been to the prescribers.
16        Q      How did you become aware?
17        A      They were in the chart.
18        Q      Did you ever read those letters?
19        A      Sorry.  I'm in my office.  I'm sorry.
20              Can you repeat that again?
21        Q      Did you ever read those letters?
22        A      Yes.
23        Q      What were the sum and substance of those letters?
24        A      Expressing his concerns about the symptoms he's
25    experiencing and requesting to be seen by the doctor earlier
```

```
 1   or in response to his concerns.
 2        Q     And what if anything did you do with this
 3   information?
 4        A     Conferred with the doctor to make sure to see if
 5   the doctor had addressed it.
 6        Q     And what did the doctor say to you?
 7        A     That his appointment would be scheduled, and he
 8   would be seen accordingly.
 9        Q     Did you follow up on his appointments being
10   scheduled?
11        A     No.
12        Q     Was Mr. King suffering from withdrawal?
13              MS. COWAN:  Objection.  Go ahead.
14        A     I don't know.
15   BY MS. KALKACH:
16        Q     Did you ever speak to his wife about the way his
17   drugs were administered?
18        A     No.
19        Q     Did you speak with his wife at all about his care
20   while he was incarcerated?
21        A     One time.  I spoke to Mrs. King once.
22        Q     What was the sum and substance of that
23   conversation?
24        A     Mrs. King --
25              You know, Mrs. King expressed concern about
```

1    because Mr. King was writing -- wrote quite a few letters

2    consecutively, and she wanted to make me aware that he was

3    having some anxiety.

4            And I had an appointment scheduled with him, and

5    I explained to her that I've been trying to work on him --

6    work on with him to use alternative coping skills in

7    addition to medication to help him cope, which he was not

8    receptive to.

9        Q    What was the alternative coping?

10       A    I'm sorry?

11       Q    What were those alternative coping mechanisms?

12       A    Deep breathing, distress intolerance, grounding

13   techniques, and there were worksheets.  I had a bunch of

14   different worksheets that I'd try to give him to use to

15   complete and bring them back to me so he can get a

16   completion certificate for it, but he was not receptive.

17       Q    Why was he not receptive?

18       A    He always wanted to talk about medication, which

19   I had no control over.

20       Q    How close in time to his suicide did you receive

21   a letter from Mr. King?

22       A    I don't recall.  I don't remember.

23       Q    Do you know how close in time to his suicide that

24   Mrs. King received a letter from Mrs. King -- from Mr. King?

25       A    No.

Deposition of Jami Palladino                    Estate of Joseph P. King v. Ward, et al.

```
 1          Q      How close in time to his suicide did you speak to
 2    Mrs. King?
 3          A      Years.  A couple years before.
 4          Q      How close in time to his suicide did you try to
 5    do this alternative coping therapy?
 6          A      Every time I met with him.
 7          Q      So up to the session in November, you were still
 8    trying to?
 9          A      Yes.
10          Q      Besides Suboxone and the prescription drugs, were
11    you aware of any other drugs that he was taking?
12          A      No.
13          Q      Was Mr. King ever disciplined while he was
14    incarcerated?
15          A      I don't know.
16          Q      Was he ever in isolation?
17          A      Can you repeat that?
18          Q      Was he ever in isolation?
19                 MS. COWAN:  Objection.  Go ahead.
20          A      He was in the crisis unit.  Whether he was in the
21    special housing unit, I don't recall.
22    BY MS. KALKACH:
23          Q      In which unit did you say he was?
24          A      I know he went to the crisis unit in 2016.
25          Q      Did he ever get sanctioned?
```

Deposition of Jami Palladino                                    Estate of Joseph P. King v. Ward, et al.

```
 1        A      I don't remember.

 2        Q      Do you know if there were any misbehavior

 3   reports?

 4               MS. COWAN:   Against Mr. King?

 5               MS. KALKACH:   Yes, against Mr. King.

 6        A      Yes.

 7   BY MS. KALKACH:

 8        Q      Who made the reports?

 9        A      Corrections.   It was corrections officers,

10   DOCCS-related.

11        Q      For what were the misbehavior reports?

12        A      I'm pretty sure it was drug use.

13        Q      Did you speak to Mr. King about parole?

14        A      Yes.

15        Q      Did you speak to him about his upcoming parole

16   hearing?

17        A      I don't remember.

18        Q      When did you speak to him about parole?

19        A      Usually we would talk about it before the parole

20   board would come up because we would discuss discharge

21   planning, so whatever the previous board to that was two

22   years prior to that.

23        Q      And what were his feelings about parole hearing?

24        A      He was hoping to make the board so he could leave

25   so he could go home to his family.
```

1        Q       Was he worried?

2        A       Yes.

3        Q       Did he express any concern about getting more

4    years?

5        A       No.

6        Q       Why was he worried?

7        A       Because he didn't know if he was going to --

8                If he didn't make the board, then it would take

9    longer for him until his conditional release date to go

10   home.

11       Q       Did he think it would lead to his wife leaving

12   him for someone else?

13       A       I don't know.

14       Q       Did you know about Mr. King's mental health

15   diagnosis?

16       A       Yes.

17       Q       What was his diagnosis?

18       A       I don't remember.

19       Q       Were you aware that he tried to commit suicide?

20       A       Yes.

21       Q       Do you know when he tried to commit suicide?

22       A       2016.

23       Q       Do you know the month?

24       A       No.

25       Q       Did he tell you what led him to his suicide

1    attempt?

2        A      No.

3        Q      Let me clarify this one.

4               Did he tell you what led him to the suicide

5    attempt of 2016?

6        A      No.

7        Q      Are you aware of how he tried to do it?

8        A      Yes.

9        Q      How?

10       A      With shoelaces he tried to hang up.

11       Q      Did you ever speak to him about how he was

12   feeling while in prison regarding suicide?

13       A      Yes.

14       Q      And what was the sum and substance of his

15   conversation with you about it?

16       A      That he would never try that again.

17       Q      How often did you see Mr. King?

18       A      I saw him once a month.

19       Q      Where would you meet?

20       A      In a private room down in the mental health

21   building.

22       Q      Were the meetings established or done by request

23   or something else?

24       A      Policy is for the patient to be seen once every

25   30 days.  And if they wrote a letter, it was within two

 1   weeks of the letter.

 2            So I would see him once a month.  I don't

 3   remember how often or not, but if he wrote a letter, I would

 4   see him within two weeks of the letter.

 5        Q    Are you allowed to take notes when you see

 6   inmates?

 7        A    Yes.

 8        Q    Does anyone else have access to these notes?

 9        A    No.

10        Q    Did you take any notes about what you spoke with

11   Mr. King?

12        A    Yes.

13        Q    Where do you keep the notes that you take during

14   a meeting?

15        A    I write my progress notes using those notes that

16   I keep, and then I shred them.

17        Q    Before you shred them, did anybody else review

18   them?

19        A    No.

20        Q    So do you still have the notes that you took

21   during Mr. King's meeting?

22        A    No, not the shredded notes, not my own personal

23   notes.

24        Q    Did you make reports of your meeting with

25   inmates?

```
 1        A      Can you clarify that?

 2        Q      Yes.

 3               So after you met with an inmate, you would make

 4    the notes, and then did you have to make a report?

 5        A      No.

 6               I would write my progress note, file it in the

 7    chart, unless I had a concern.

 8        Q      What would make you concerned about an inmate?

 9        A      If somebody is reporting psychotic symptoms or if

10    somebody is having suicidal ideation or if somebody is

11    having thoughts of self-harm.

12        Q      And who do you report this to?

13        A      To my unit chief and to the crisis coordinator if

14    the person requires a high level of care.

15        Q      Did you ever report to your unit chief at any

16    point?

17               MS. COWAN:  Objection.  With respect to Mr. King

18        or anybody?

19               MS. KALKACH:  With respect to Mr. King, yes.

20        Yes, with respect to Mr. King.

21        A      No.

22    BY MS. KALKACH:

23        Q      Did you ever have a meeting with Hal Meyers,

24    Mr. King and yourself?

25        A      I don't think so, no.
```

1    Q    Did you have concerns about Mr. King in the weeks

2    leading up to the suicide?

3    A    No.

4    Q    Okay.  In general, do you speak to other inmates?

5    A    Yes.

6    Q    To whom do you speak?

7    A    I speak to my caseload, the people that are on my

8    caseload.

9    Q    How many people do you have on your caseload?

10   A    Right now I only have seven.  I do discharge

11   planning.

12   Q    And back in 2018, how many people did you have in

13   your caseload?

14   A    Anywhere between 150 and 180.

15   Q    Why do you have way less inmates in your caseload

16   now?

17   A    Because I do discharge planning.  I no longer do

18   therapy.

19   Q    I see.

20        Did any of the inmates that you spoke to back in

21   2018 know Mr. King?

22   A    I don't know.

23   Q    How is the correctional facility arranged?

24   A    I don't understand what you're asking.

25   Q    So are there cells, dorms, cubes?

```
 1                    How are the inmates organized?

 2                    How is the whole facility organized?

 3       A      Honestly, I'm not sure.  I don't really venture

 4   out of the mental health building.

 5       Q      Were you aware if Mr. King had inmates that he

 6   shared his cube with, or dorm?

 7       A      No, I wasn't sure.

 8       Q      So did you speak with any other inmate after

 9   Mr. King's suicide?

10       A      Yes.

11       Q      Who did you speak with?

12       A      His name was Thomas Aikens, and my understanding

13   is that he was in the same dorm, but I couldn't tell you how

14   it was arranged.

15       Q      I understand.

16              What was the sum and substance of the

17   communication?

18       A      That he was -- he reported that he was

19   traumatized by the suicide of Mr. King.

20       Q      Did he tell you anything about Mr. King's

21   behavior leading up to the suicide?

22       A      That he was --

23              That --

24              What Mr. Aikens had talked about was that he just

25   couldn't believe that somebody that he lived with did
```

1    something like that.

2        Q    Did he say anything about Mr. King's behavior or

3    just his perception?

4        A    His perception.

5            Just his perception of the event.

6        Q    Have you ever spoken to this inmate before the

7    suicide?

8        A    In regards to --

9            Can you reframe that, please?

10       Q    Have you ever spoke to this inmate before --

11   before the suicide about anything?

12       A    Yes.  He was on my caseload.

13       Q    Okay.  Did he ever tell you anything about

14   Mr. King's behavior?

15       A    No.

16       Q    Did you speak to anybody else besides Thomas

17   Aikens after the suicide?

18       A    No.

19            Not about Mr. King, no.

20       Q    Were you aware of statements made to any of your

21   co-workers about Mr. King's state of mind within the week

22   leading up to the suicide?

23       A    No.

24       Q    Did you speak to any of your co-workers about

25   Mr. King's sessions?

```
 1        A      No.

 2        Q      Did any of your co-workers speak to you about

 3   anything related to Mr. King?

 4        A      No.

 5        Q      Were you aware of any written or spoken

 6   statements made to his family about Mr. King's feelings

 7   within the month leading up to his suicide?

 8        A      No.

 9        Q      Were you aware of any written or spoken

10   statements made by Mr. King to his friends about his

11   feelings within the month leading up to his suicide?

12        A      No.

13        Q      Did you ever see the suicide note Mr. King wrote

14   on November 15, 2018?

15        A      No.

16        Q      In general, does anybody read notes before they

17   are delivered to inmates' family and friends?

18               MS. COWAN:  Objection.  Go ahead.

19        A      I don't know.  They might be.

20   BY MS. KALKACH:

21        Q      Have you ever spoken to your family about

22   Mr. King?

23        A      No.

24        Q      Are you aware of any policy regarding shoelaces

25   and inmates?
```

```
 1        A      No.

 2        Q      Are correctional facilities assigned a mental

 3    health level?

 4        A      Yes.

 5        Q      What mental health level was the correctional

 6    facility where Mr. King was an inmate?

 7        A      Level 1.

 8        Q      Was he at this facility at the beginning of his

 9    sentence?

10        A      I don't know.

11        Q      Was he ever at a mental healthcare unit?

12        A      Yes.

13        Q      When?

14        A      2016 following his previous suicide attempt.

15        Q      Was he at this unit when he committed suicide?

16        A      No.

17        Q      Why?

18        A      He was not in the crisis unit.

19               There was --

20        Q      Where was he when he committed suicide?

21        A      My understanding is, he was in the bathroom of

22    his dorm.

23        Q      Okay.  Back in 2016 when he was in mental

24    healthcare unit, when was he transferred outside of that

25    unit?
```

```
 1        A      I don't recall.

 2        Q      Do you know why he was transferred out of that

 3   unit?

 4        A      He would have been deemed appropriate to return

 5   to general population.

 6        Q      Who deems it appropriate?

 7        A      The clinical team that runs the crisis unit.

 8        Q      Do you know who was this team at that time in

 9   2016?

10        A      Dr. Farago and --

11        Q      Can you please spell that last name for me?

12        A      F-a-r-a-g-o, first name Lawrence, and the crisis

13   coordinator was at that time Lisa Williams-Burns.

14        Q      Was he screened again to know where he's supposed

15   to be to receive adequate supervision and treatment?

16               MS. COWAN:  Objection.  Go ahead.

17        A      Can you rephrase that?

18   BY MS. KALKACH:

19        Q      Yes.

20               When he left the mental healthcare unit in 2016,

21   was he screened again to know what kind of treatment he

22   needed to receive at the new facility?

23        A      It wasn't a new facility.  It was here.

24               He was just released from the crisis unit back to

25   general population.
```

Deposition of Jami Palladino                                    Estate of Joseph P. King v. Ward, et al.

```
 1          Q      When he was released back to general population,
 2     was he screened again to know what kind of care he needed?
 3          A      He would have been screened by the crisis
 4     coordinator -- would have deemed him appropriate to leave
 5     and returned back to his dorm, which then policy is to be
 6     seen within seven days of his release, which he would have
 7     been seen by me seven days from that release.
 8          Q      Did he speak to you about his transfer to general
 9     population?
10          A      Yes.
11          Q      What were the sum and substance of that
12     conversation?
13          A      I don't remember.
14          Q      Was he worried about going back to general
15     population?
16          A      Not to my knowledge.
17          Q      Did his wife speak to you about his transfer to
18     general population?
19          A      No.
20          Q      Are you aware of any policy regarding inmates
21     with mental illness?
22          A      Yes.
23          Q      What are they?
24                 MS. COWAN:  Objection.  Go ahead.
25          A      Any specific policy?
```

```
 1                  There's many policies.
 2    BY MS. KALKACH:
 3        Q     Okay.  Have you read them?
 4        A     Yes.
 5        Q     How long ago?
 6        A     Not since 2018.
 7              In regards to how often a person seen, in regards
 8    to that they're seen by -- if they went to the crisis unit,
 9    they had to be seen within seven days.
10        Q     So were you trained by the correctional facility
11    how to deal with inmates with mental illness?
12        A     Yes.
13        Q     Were you trained by the correctional facility on
14    the process to report when an inmate speaks to you about
15    suicide?
16        A     Yes.
17        Q     How were you trained?
18        A     I was trained by following -- reading the
19    policies and following them.
20        Q     Who gets this training?
21        A     Everybody that works here should.
22        Q     Is it mandatory training?
23        A     Yes.
24        Q     Is this part of the training that you take once a
25    year?
```

```
 1        A       I think you only just --

 2                I mean, the policies are always available to

 3    refer back to.

 4        Q       But you don't get an actual training where you

 5    have to go see someone explain --

 6                How is this training?

 7        A       No.

 8                Usually when you first come, when you first

 9    start, and then as necessary.

10        Q       "As necessary" meaning?

11        A       Sometimes they get updated.  If it gets updated,

12    then you have to review them.

13        Q       Do you get an e-mail with the updates, or you

14    have to do it by yourself, or how does it work?

15        A       Get an e-mail with the updates.

16        Q       Does anybody follow up to see if you read the

17    policy?

18        A       No.

19        Q       So the update is not really mandatory?

20                MS. COWAN:  Hang on one second.  Are people

21        trying to come in your office?  Is that what's going

22        on?

23                THE WITNESS:  Yes, of course.  If I wasn't doing

24        anything, nobody would want to talk to me.

25                MS. COWAN:  All right.  Sorry.
```

Deposition of Jami Palladino                                    Estate of Joseph P. King v. Ward, et al.

```
 1        A    Can you repeat that again?
 2   BY MS. KALKACH:
 3        Q    I asked if the training then is really mandatory.
 4        A    Yes.
 5        Q    Yet nobody follows up?
 6        A    Right.
 7        Q    Do people with mental illnesses receive any
 8   special care within the correctional?
 9             MS. COWAN:  Objection.  Go ahead.
10        A    In regards to?
11             Can you explain better?
12             I'm sorry.
13   BY MS. KALKACH:
14        Q    What kind of special treatment in regards to
15   anything.
16             So, yes or no, if they receive any special care
17   when they have a mental illness.
18        A    Not --
19             No.
20             I'm sorry.
21             MS. COWAN:  Objection.
22   BY MS. KALKACH:
23        Q    Okay.  Is there a specific area within the
24   correctional facility where people with mental illness
25   should be?
```

```
 1        A      No, not exactly.

 2               There is an area for individuals that have been

 3     diagnosed with a severe mental illness and that are having

 4     difficulty functioning because of their mental illness.

 5        Q      Was Mr. King there?

 6        A      No.

 7        Q      Do people that have tried to commit suicide

 8     inside the correctional get any special attention or care?

 9               MS. COWAN:  Objection.

10        A      No.

11     BY MS. KALKACH:

12        Q      Your answer was "no," correct?

13        A      Yes.

14        Q      Do you know why Mr. King was allowed to have his

15     shoelaces after he had attempted suicide with them in the

16     past?

17        A      I don't know why.

18        Q      Do you know who made that decision?

19        A      Corrections.

20        Q      Do you know which person?

21        A      No.

22        Q      After Mr. King attempted to commit suicide, was

23     there any change in the treatment at the correctional?

24               MS. COWAN:  Objection.  Can you answer that?  I

25          don't really understand myself but...
```

Deposition of Jami Palladino                                    Estate of Joseph P. King v. Ward, et al.

```
 1        A     Can you rephrase that?
 2   BY MS. KALKACH:
 3        Q     Yes.
 4              After Mr. King attempted to commit suicide, was
 5   there any change to medication that he received?
 6        A     I don't recall.
 7        Q     Was there any change on the way that he was being
 8   treated by the staff?
 9        A     No.
10        Q     Was there any change on the place he was staying?
11        A     No.
12              MS. COWAN:  Objection.
13   BY MS. KALKACH:
14        Q     Was there any change on the supervision that he
15   was getting?
16              MS. COWAN:  Objection, because when we're talking
17        about someone in the correction facility, we're talking
18        about corrections staff and mental health staff, so
19        there's a lot that goes into that.
20              So if you're talking about supervision, I think
21        maybe a little more specific would help.
22              MS. KALKACH:  I'm just waiting to see if she
23        answers or --
24        A     Can you repeat that?
25              MS. KALKACH:  Yes.  Gina, could you please repeat
```

Deposition of Jami Palladino                                    Estate of Joseph P. King v. Ward, et al.

```
 1          my question?
 2                  (Last question was read back.)
 3      A       Supervision from whom?
 4  BY MS. KALKACH:
 5      Q       From the staff after he committed suicide.
 6              MS. COWAN:  Same objection.  Answer if you can.
 7      A       After he attempted suicide, he was brought to the
 8  crisis care unit.
 9  BY MS. KALKACH:
10      Q       Okay.
11      A       So it's a higher level of care.
12      Q       Was he screened in order to know that he needed
13  to be there?
14      A       Usually after a suicide attempt, they're placed
15  in --
16              They are taken --
17              That is kind of their screening.  They take them
18  to the crisis unit for eminent risk.
19      Q       Were there any potential indicators that Mr. King
20  was going to attempt suicide for a second time?
21              MS. COWAN:  Objection.  Go ahead.
22      A       No.
23  BY MS. KALKACH:
24      Q       What are potential suicide indicators?
25      A       Isolation, separation, usually if somebody is
```

Deposition of Jami Palladino                                    Estate of Joseph P. King v. Ward, et al.

```
 1    expressing thoughts of self-harm or suicidal ideation, a
 2    recent loss.
 3              There's many different things that could be
 4    indicated.
 5        Q    Did Mr. King show any of the ones that you told
 6    me before?
 7        A    In our last session, no.
 8        Q    Not in the last session, but what about in the
 9    six months following -- I mean leading up to the suicide?
10        A    My understanding is that his mom passed way
11    within that, and I updated his suicide risk assessment
12    accordingly, but he adamantly denied thoughts of self-harm.
13              MS. KALKACH:  I move to strike the portions that
14        are nonresponsive.
15    BY MS. KALKACH:
16        Q    Was there any support offered to you by the
17    correctional facility after the suicide?
18        A    Not that I remember.
19        Q    Did Mr. King show increased level of agitation?
20        A    No.
21        Q    Did Mr. King show an increased level of anxiety?
22        A    No.
23        Q    When you spoke about his mom passing, what were
24    his feelings towards that?
25        A    That his mother was in her 90s and that she was
```

Deposition of Jami Palladino                                    Estate of Joseph P. King v. Ward, et al.

```
 1    chronically ill, and he got to speak to her before she
 2    passed.
 3        Q    What were his feelings regarding the drugs that
 4    he was taking?
 5            MS. COWAN:  Objection.  You're talking about the
 6        illegal drugs or the prescription drugs or --
 7            MS. KALKACH:  Both.
 8            MS. COWAN:  Maybe during like a certain time
 9        period?
10    BY MS. KALKACH:
11        Q    Six months leading up to the suicide attempt.
12        A    He was --
13            I don't recall.
14        Q    Did his anxiety level increase because of his
15    parole board hearing?
16        A    Not that I was aware of.
17        Q    Did Mr. King show increased level of depression?
18        A    Not that I was aware of.
19        Q    Do you know what a suicide watch commander is?
20        A    Yes.
21        Q    Who had that position?
22        A    That's --
23            The watch commander?
24        Q    Yes.
25        A    It's one of the sergeants or the deputies up at
```

 1    the corrections.

 2        Q     And what are this person's duties?

 3        A     I don't know.

 4              MS. COWAN:  So the watch commander, not the

 5        suicide watch commander; right?

 6              MS. KALKACH:  No.  The suicide watch commander.

 7              MS. COWAN:  Okay.  Are you familiar with the

 8        suicide watch commander?

 9              THE WITNESS:  No.

10    BY MS. KALKACH:

11        Q     Do you know what suicide watch is?

12        A     Yes.

13        Q     When is an inmate placed on a suicide watch?

14        A     When someone engages in self-harm or is

15    expressing thoughts of -- or if there are threats of

16    self-harm or actually engage in acts of self-harm or a

17    suicide attempt.

18        Q     And what does suicide watch entail?

19        A     Usually they have somebody --

20              They wind up in the crisis unit in a cell -- in

21    an observation cell with all their amenities stripped or

22    they are on a one-to-one watch with a corrections officer.

23        Q     Are there standard items that the inmate could

24    have or could not have?

25        A     Depending on the person's situation.

Deposition of Jami Palladino                                 Estate of Joseph P. King v. Ward, et al.

```
 1        Q     Was Mr. King ever placed on suicide watch?
 2        A     I don't recall.  I don't know.              .
 3        Q     Do you know what a parole board hearing is?
 4        A     Yes.
 5        Q     Did you have any role in placing an inmate on
 6   suicide watch?
 7        A     Yes.
 8        Q     What was your role?
 9        A     If somebody --
10              If somebody told me that they were having
11   thoughts of self-harm or threats of self-harm, they would be
12   placed in the crisis unit.
13        Q     Yes, but your involvement, what would you do?
14        A     I would make the call to place him in the crisis
15   unit.  I would have assessed the situation, and then if it
16   warranted a higher level of care, then they would be placed
17   in a crisis unit.
18        Q     Okay.  Do you have to report it to someone?
19              How does it get --
20        A     Yes.
21        Q     What was the process?
22        A     I would let the officer at our front desk know,
23   who would let nursing know, and also the watch commander and
24   movement.
25        Q     Did you ever make this call for Mr. King?
```

```
 1        A      No.

 2        Q      Do you get notified when an inmate is going to

 3   get his or her parole board hearing?

 4        A      Usually they give us a parole evaluation to

 5   complete, so about 30 days to a couple months before.

 6        Q      What does this parole evaluation contain?

 7        A      Their mental health history, are they taking

 8   medication, are they compliant with medication, when they

 9   came to the facility, and when they're scheduled to be

10   released.

11        Q      Are there common emotional changes on inmates

12   when the hearing is approaching?

13               MS. COWAN:  Objection.

14        A      I don't understand.

15   BY MS. KALKACH:

16        Q      Is there something special that you need to watch

17   when there's a parole hearing coming?

18        A      No.

19        Q      And why do you get notified 30 days before it's

20   coming?

21        A      To complete the evaluation.  They give us the

22   evaluation.  It can be anywhere like a couple months to like

23   a month before.

24        Q      And is there any -- any different consequences

25   that --
```

1               Okay, scratch that.

2               Were you aware that Mr. King had a parole hearing

3   in January 2019?

4       A      No.

5       Q      Could there be different outcomes after you

6   complete a parole evaluation --

7               MS. COWAN:   Objection.

8   BY MS. KALKACH:

9       Q      -- depending on -- depending on what you find?

10      A      No.

11              I don't know.

12      Q      Who do you give the parole evaluation to?

13      A      We complete it and provide it to community

14  supervision.

15      Q      Did you speak to Mr. King about his parole

16  hearing that was coming in January of 2019?

17      A      No.

18      Q      Have you ever received training or education on

19  suicide prevention?

20      A      Yes.

21      Q      When did you receive it?

22      A      We receive it --

23              It's one of the mandatory trainings we get

24  yearly.

25      Q      Who provides it?

```
 1        A       CNYPC, Central New York Psychiatric Center.

 2        Q       Who?

 3        A       Education & Training.

 4        Q       Who pays for it?

 5        A       I don't know.

 6        Q       How long does the training last?

 7        A       It's usually probably about an hour.

 8        Q       So one hour every year to talk about suicide

 9   prevention, approximately?

10        A       Yes.

11        Q       Did you do official evaluations for suicide risk?

12        A       Can you repeat that, please?

13        Q       Yes.

14                Did you do any official evaluations for suicide

15   risk?

16        A       Yes.

17        Q       How often would you do those evaluations?

18        A       Within two weeks of somebody being --

19   transferring into the facility.  And policy was, once every

20   two years or as indicated, like if new risks came up, if

21   there were new risks or protective factors.

22        Q       Okay.  And who would indicate it?

23        A       The patient.

24        Q       What would you consider a suicide risk factor?

25        A       Suicide history, family history, substance abuse,
```

```
 1   mental health hospital -- history of mental health

 2   hospitalizations, adverse outcome to a parole board, or if

 3   somebody got tickets.

 4       Q     Within the last year, had Mr. King presented with

 5   any of those?

 6       A     Yes.

 7       Q     How would you perform the evaluation?

 8       A     Yes.

 9       Q     I mean how.

10       A     How?

11             Based on a discussion with Mr. King.

12       Q     Okay.

13       A     And also if I receive information about -- like

14   if there was a ticket or if he told me about a ticket, then

15   I'd update it to make sure it reflects what was going on in

16   his life at that time.

17       Q     How much time did you take to perform the suicide

18   risk evaluation?

19       A     Usually during a session.

20             It's done --

21             It's done in every session with every patient we

22   assess them for risk.

23       Q     So there are official ones that you do within two

24   weeks of transferring, et cetera, but you also have the ones

25   that you do every session?
```

| | | |
|---|---|---|
| 1 | A | Yeah.  Basically we review that same one and |

check for new risk or protective factors and update it

accordingly.

4    Q    How long do the sessions normally take?

5    A    Between 30 and 45 minutes.

6    Q    And when you do the official evaluation, do you

take -- is it a different session, or is it also within --

8    A    It's usually within the first session.  It's

usually --

10        We do the core documentation.  Usually the first

session is a little longer than the rest of them.

12    Q    How long is it approximately?

13    A    Probably between 45 minutes to an hour.

14    Q    How did you learn to take the evaluations?

15    A    I was trained in my training when I started here.

16    Q    Who gave you the training?

17    A    It was the person that trained me from when I

started working here.

19    Q    What was the name of the department that gives

the training?

21    A    It's not a department.  It's usually a fellow

therapist that was training me.

23    Q    The one that you were shadowing?

24    A    Yes.

25    Q    Do you remember his name or her name?

```
 1        A      Her name was Amy Sowich.

 2        Q      Can you spell last name for me?

 3        A      S-o-w-i-c-h.

 4        Q      How often would you have the training?

 5        A      I was trained for probably the first couple weeks

 6   that I was here in 2013.

 7        Q      How long was the training session?

 8        A      Oh, I was trained for the entire day.

 9        Q      So the entire day for the first couple of weeks?

10        A      Weeks, yes.

11        Q      When you say "the first couple of weeks," you

12   mean two weeks, three weeks, four weeks or something else?

13        A      Probably about three weeks -- three, four weeks.

14        Q      Are you aware of any other suicides that happened

15   in the prison during 2013 through 2018?

16        A      Not that I can recall.

17        Q      Do you know if the correctional facility kept a

18   suicide watch log?

19        A      I don't know.

20        Q      Where were you on November 16, 2018?

21               This is the date that Mr. Joseph King took his

22   life.

23        A      I was here.  I came to work.  By the time I --

24               It had already happened by the time I got in to

25   work.
```

```
 1          Q      How did you learn about the event?

 2          A      My co-worker informed me.

 3          Q      What's the name of your co-worker?

 4          A      It was Amanda Knoeller.

 5          Q      Can you please spell that for me?

 6          A      K-n-o-e-l-l-e-r.   She was the SHU coordinator.

 7          Q      When did you receive notice?

 8          A      Official notice?

 9          Q      Yes.

10          A      Later on that afternoon from the acting unit

11    chief.

12          Q      Was it in person, or did you receive an e-mail,

13    or how did they give you official notice?

14          A      They send out an e-mail to make the facility

15    aware that there's a passing.

16          Q      Where were you when you received notice?

17          A      I was at my desk.

18          Q      And where were you when you were informally told

19    about the event?

20          A      I was at the front door before I walked in the

21    building.

22          Q      Did you go to the scene?

23          A      No.

24          Q      Did anyone explain to you how the suicide

25    occurred?
```

```
 1        A     Yes.

 2        Q     Who explained it to you?

 3        A     Hal Meyers, the unit chief.

 4        Q     Are you aware of what Mr. King used to kill

 5   himself?

 6        A     No.

 7        Q     How did the suicide occur?

 8        A     My understanding is that he put his shoes in one

 9   bathroom stall and that he hung himself in another one to

10   make it look like he was in a different stall and that he

11   hung up.

12        Q     Do you know what he used to hang himself?

13        A     No.

14        Q     Are you aware of any investigation from the

15   correctional facility after his suicide?

16        A     No.

17        Q     Do you know the exact location of the suicide?

18        A     No.

19        Q     Do you know who discovered the attempt?

20              Was it staff, inmate, or someone else?

21        A     I don't know.

22        Q     Do you know if he was sent to the hospital?

23        A     I don't know.

24        Q     Do you know if the family was notified?

25        A     I don't know.
```

```
1        Q     Do you know who was Mr. King's emergency contact?

2        A     It was his wife.

3        Q     Do you know his wife's name?

4        A     Amy King.

5        Q     Do you know if she was notified?

6        A     I don't know.

7        Q     Do you know Mr. King's reasons for his actions?

8        A     I'm sorry.

9              Can you repeat that?

10       Q     Yes.

11             Do you know Mr. King's reasons for his actions?

12       A     No.

13       Q     Was there anything different that you could have

14  done to prevent his suicide?

15             MS. COWAN:  Objection.

16       A     No.

17             MS. KALKACH:  Now I'm going to ask for a couple

18       of minutes to review my notes and see if I have any

19       more questions.

20             MS. COWAN:  Okay.

21             MS. KALKACH:  Thank you.

22             (Recess was taken.)

23             MS. KALKACH:  I only have a couple of follow-up

24       questions.

25
```

1    BY MS. KALKACH:

2         Q     Ms. Palladino?

3         A     Yes.

4         Q     After an inmate expresses that they need to see a

5    doctor, you testified that it could take a week or two to be

6    seen; is that correct?

7         A     If an inmate is requesting to see a doctor and

8    it's not an emergency situation, it could take --

9              It depends on the person's situation.  It depends

10   on the circumstance.

11        Q     What could be understood as an emergency

12   situation?

13        A     If somebody is expressing thoughts of self-harm

14   or they're having psychotic symptoms, they may be able to --

15   they would be brought to the crisis unit.

16             Otherwise, prescribers usually don't see their

17   patients --

18             They see them once every three months.

19        Q     And in your opinion, does that meet what could be

20   a serious need to see a mental health provider?

21             MS. COWAN:  Objection.  Go ahead.

22        A     If a person's experiencing thoughts of self-harm

23   or if they're having a -- if they're having psychotic

24   symptoms, yes.

25

```
 1   BY MS. KALKACH:

 2       Q     Okay.  You also testified that you routinely see

 3   inmates -- saw inmates once per month; is that correct?

 4       A     Yes.

 5       Q     In your opinion, is this policy sufficient to

 6   provide care for an inmate with a health illness?

 7             MS. COWAN:  Objection.  Go ahead.

 8       A     Yes, as long as the situation is warranted.

 9             If there's an emergency, then they may be seen

10   more than one time a month.

11   BY MS. KALKACH:

12       Q     You've got to use a lot of discretion in your

13   role; correct?

14       A     Yes.

15             MS. KALKACH:  I have no further questions.

16             MS. COWAN:  All right.  I don't have any

17       questions for you, so we can go off the record now.  I

18       want them to read and sign.  I totally forgot to

19       mention that during Mr. Meyers' deposition.  Sorry

20       about that.  If you could just add that to the

21       transcript, that would be great.

22             (Whereupon, the deposition was concluded at

23       2:31 p.m.)

24

25
```

```
 1                            CERTIFICATE

 2            I, Gina Williams, Registered Professional Court

 3   Reporter, do certify that the above deposition was reported

 4   by me and that the foregoing transcript is a true and

 5   accurate record to the best of my knowledge, skills, and

 6   ability.

 7            I further certify that I am not an employee of

 8   counsel or any of the parties, nor a relative or employee of

 9   any attorney or counsel connected with the action, nor

10   financially interested in the action.

11            Subscribed and sworn to before me when taken this

12   23rd day of May, 2022.

13

14                          _Gina Williams_

15                       GINA WILLIAMS, RPR, CRR

16

17

18

19

20

21

22

23

24

25
```

Deposition of Jami Palladino                                    Estate of Joseph P. King v. Ward, et al.

1                        ACKNOWLEDGMENT OF DEPONENT

2

3            I, JAMI PALLADINO, do hereby certify that I have

4    read the foregoing pages and that the same is a correct

5    transcription of the answers given by me to the questions

6    therein propounded, except for the corrections or changes in

7    form or substance, if any, noted in the attached Errata

8    Sheet.

9

10

11   _____

12   JAMI PALLADINO                                          Date

13

14   Subscribed and sworn to before me this

15   ___ day of _____, 2022.

16   My commission expires:_____

17

18   _____

19   Notary Public

20

21

22

23

24

25

Deposition of Jami Palladino                                    Estate of Joseph P. King v. Ward, et al.

```
 1                    _ _ _ _ _ _
 2                       ERRATA
 3                    _ _ _ _ _ _
 4    PAGE   LINE                  CHANGE/REASON
 5    ____   ____    _____
 6    ____   ____    _____
 7    ____   ____    _____
 8    ____   ____    _____
 9    ____   ____    _____
10    ____   ____    _____
11    ____   ____    _____
12    ____   ____    _____
13    ____   ____    _____
14    ____   ____    _____
15    ____   ____    _____
16    ____   ____    _____
17    ____   ____    _____
18    ____   ____    _____
19    ____   ____    _____
20    ____   ____    _____
21    ____   ____    _____
22    ____   ____    _____
23    ____   ____    _____
24    ____   ____    _____
25
```

Deposition of Jami Palladino                                      Estate of Joseph P. King v. Ward, et al.

## WORD INDEX

**< 1 >**
**1**  21:*8*  35:*7*
**1:00**  1:*19*
**10**  7:*9*  21:*9, 10*
**10016**  2:*6*
**10th**  2:*5*
**112**  2:*5*
**12**  3:*8*
**13**  3:*9*
**13202**  2:*12*
**13440**  4:*15*
**15**  34:*14*
**150**  31:*14*
**16**  53:*20*
**180**  31:*14*
**1979**  8:*8*

**< 2 >**
**2:31**  58:*23*
**20**  21:*9*
**2006**  10:*5*
**2007**  9:*12*
**2008**  10:*5*
**2009**  10:*5*
**2010**  9:*12*
**2012**  10:*6, 7*
**2013**  10:*7, 8, 16*
  14:*18*  21:*11*  53:*6, 15*
**2016**  25:*24*  27:*22*
  28:*5*  35:*14, 23*  36:*9,
20*
**2017**  9:*24*
**2018**  10:*14, 17*  19:*11*
  21:*12*  31:*12, 21*
  34:*14*  38:*6*  53:*15, 20*
**2019**  49:*3, 16*
**2022**  1:*14, 18*  59:*12*
  60:*15*
**20-CV-01413**  1:*2*
**21**  8:*8*
**23**  1:*14, 18*
**23rd**  59:*12*

**< 3 >**
**30**  28:*25*  48:*5, 19*
  52:*5*
**300**  2:*11*

**< 4 >**
**4**  3:*4*
**45**  52:*5, 13*

**< 5 >**
**5**  21:*8, 10*

**< 9 >**
**90s**  44:*25*
**911**  4:*15*

**< A >**
**ability**  5:*8*  59:*6*
**able**  5:*25*  57:*14*
**above-styled**  1:*18*
**abuse**  50:*25*
**access**  29:*8*
**accommodate**  6:*5*
**accurate**  59:*5*
**ACKNOWLEDGMEN
T**  60:*1*
**acting**  54:*10*
**ACTION**  1:*2*  8:*17*
  12:*23*  59:*9, 10*
**actions**  56:*7, 11*
**acts**  46:*16*
**actual**  39:*4*
**ad**  1:*5*
**adamantly**  44:*12*
**add**  58:*20*
**addition**  24:*7*
**address**  4:*11, 13, 14*
  22:*7*
**addressed**  23:*5*
**adequate**  36:*15*
**administered**  23:*17*
**Administrator**  1:*4*
**adverse**  51:*2*
**affect**  5:*7*  7:*3*  20:*22*
**afternoon**  54:*10*
**agitation**  44:*19*
**ago**  38:*5*
**agreement**  20:*14*
**ahead**  16:*17*  19:*17*
  23:*13*  25:*19*  34:*18*
  36:*16*  37:*24*  40:*9*
  43:*21*  57:*21*  58:*7*
**Aikens**  32:*12, 24*

**33**:*17*
**AIMEE**  2:*12*
**al**  1:*5*
**alcohol**  7:*3*
**allowed**  29:*5*  41:*14*
**alternative**  24:*6, 9, 11*
  25:*5*
**Amanda**  54:*4*
**Amended**  3:*8, 9*
**amenities**  46:*21*
**Amy**  1:*5*  53:*1*  56:*4*
**and/or**  8:*18*
**Ann**  4:*12*
**Answer**  3:*9*  5:*13, 15*
  6:*7, 12, 13*  14:*4*
  15:*11, 12, 13*  41:*12,
24*  43:*6*
**answers**  5:*18*  42:*23*
  60:*5*
**antianxiety**  18:*5*
**antidepressants**  18:*5*
**anxiety**  24:*3*  44:*21*
  45:*14*
**anybody**  6:*25*  7:*12*
  29:*17*  30:*18*  33:*16*
  34:*16*  39:*16*
**anymore**  21:*1*
**appearing**  2:*2*
**Apple**  6:*18*
**appointment**  23:*7*
  24:*4*
**appointments**  23:*9*
**approaching**  48:*12*
**appropriate**  36:*4, 6*
  37:*4*
**approximate**  13:*4*
**approximately**  50:*9*
  52:*12*
**area**  40:*23*  41:*2*
**arranged**  31:*23*
  32:*14*
**Aside**  8:*17*
**asked**  6:*6*  40:*3*
**asking**  6:*7*  31:*24*
**assess**  51:*22*
**assessed**  47:*15*
**assessment**  44:*11*
**assigned**  35:*2*
**associate**  4:*8*

**Association**  10:*6*
**assume**  5:*14*
**attached**  60:*7*
**attempt**  28:*1, 5*
  35:*14*  43:*14, 20*
  45:*11*  46:*17*  55:*19*
**attempted**  41:*15, 22*
  42:*4*  43:*7*
**attend**  9:*7*
**attention**  22:*6*  41:*8*
**ATTORNEY**  2:*10*
  6:*10, 12*  59:*9*
**attorneys**  2:*2*  14:*9*
**available**  39:*2*
**Avenue**  2:*5*
**aware**  15:*9, 17, 22, 25*
  16:*3, 12, 25*  17:*6, 11,
17, 20, 23*  19:*15*
  20:*24*  22:*13, 16*  24:*2*
  25:*11*  27:*19*  28:*7*
  32:*5*  33:*20*  34:*5, 9,
24*  37:*20*  45:*16, 18*
  49:*2*  53:*14*  54:*15*
  55:*4, 14*

**< B >**
**back**  24:*15*  31:*12, 20*
  35:*23*  36:*24*  37:*1, 5,
14*  39:*3*  43:*2*
**based**  5:*15*  51:*11*
**Basically**  52:*1*
**bathroom**  35:*21*  55:*9*
**beginning**  20:*21*  35:*8*
**behalf**  2:*4, 9*
**behavior**  32:*21*  33:*2,
14*
**behaviors**  16:*22*
**believe**  32:*25*
**best**  5:*23*  59:*5*
**better**  40:*11*
**board**  26:*20, 21, 24*
  27:*8*  45:*15*  47:*3*
  48:*3*  51:*2*
**born**  8:*7, 9*
**BRC**  10:*4*
**break**  6:*4, 7*
**breathing**  24:*12*
**briefly**  10:*2*
**bring**  22:*6*  24:*15*
**brought**  43:*7*  57:*15*

Deposition of Jami Palladino

Estate of Joseph P. King v. Ward, et al.

building 28:*21* 32:*4*
 54:*21*
bunch 24:*13*

< C >
call 47:*14, 25*
called 4:*3*
Captioner 1:*21*
care 23:*19* 30:*14*
 37:*2* 40:*8, 16* 41:*8*
 43:*8, 11* 47:*16* 58:6
case 10:*5*
caseload 10:*21* 31:*7,*
 *8, 9, 13, 15* 33:*12*
cause 1:*18*
cell 6:*17* 46:*20, 21*
cells 31:*25*
Center 50:*1*
Central 50:*1*
certain 45:*8*
certificate 24:*16* 59:*1*
certification 9:*16*
Certified 1:*20, 21*
certify 59:*3, 7* 60:*3*
cetera 5:*19* 51:*24*
change 41:*23* 42:*5, 7,*
 *10, 14*
CHANGE/REASON
 61:*4*
changes 48:*11* 60:*6*
chart 22:*17* 30:*7*
check 52:*2*
CHEVERIE 2:*5*
chief 10:*24* 30:*13, 15*
 54:*11* 55:*3*
children 16:*10*
chronically 45:*1*
circumstance 57:*10*
Citrin 18:*12, 21*
C-i-t-r-i-n 18:*23*
CIVIL 1:*2* 12:*23*
clarify 28:*3* 30:*1*
CLARITY 2:*19*
clinical 9:*22* 36:*7*
close 6:*19* 24:*20, 23*
 25:*1, 4*
CNYPC 50:*1*
college 9:*7, 15*
come 26:*20* 39:*8, 21*

coming 48:*17, 20*
 49:*16*
commander 45:*19, 23*
 46:*4, 5, 6, 8* 47:*23*
commencing 1:*19*
commission 60:*16*
commit 27:*19, 21*
 41:*7, 22* 42:*4*
committed 35:*15, 20*
 43:*5*
common 48:*11*
communication 32:*17*
community 49:*13*
Complaint 3:*8, 9*
 8:*22* 14:*4*
complaints 8:*18* 19:6
complete 11:*10*
 24:*15* 48:*5, 21* 49:*6,*
 *13*
completion 24:*16*
compliant 48:*8*
computer 6:*18*
concern 23:*25* 27:*3*
 30:*7*
concerned 20:*16*
 30:*8*
Concerns 21:*15, 16*
 22:*5, 10, 24* 23:*1*
 31:*1*
concluded 58:*22*
conditional 27:*9*
conferred 7:*7* 23:*4*
connected 59:*9*
Connections 10:*4*
consecutively 24:*2*
consequences 48:*24*
consider 50:*24*
contact 56:*1*
contain 48:*6*
content 21:*13*
control 24:*19*
conversation 16:*6, 9*
 23:*23* 28:*15* 37:*12*
conversations 16:*16*
converse 14:*25*
convicted 8:*5*
coordinator 10:*11, 14*
 30:*13* 36:*13* 37:*4*
 54:*6*
cope 24:*7*

coping 15:*21* 24:*6, 9,*
 *11* 25:*5*
copy 13:*1*
core 52:*10*
correct 4:*24* 41:*12*
 57:6 58:*3, 13* 60:*4*
correction 42:*17*
correctional 31:*23*
 35:*2, 5* 38:*10, 13*
 40:*8, 24* 41:*8, 23*
 44:*17* 53:*17* 55:*15*
Corrections 26:*9*
 41:*19* 42:*18* 46:*1, 22*
 60:6
counsel 7:*12, 16, 19*
 14:*12* 59:*8, 9*
counseling 15:*7*
County 10:*6*
couple 25:*3* 48:*5, 22*
 53:*5, 9, 11* 56:*17, 23*
course 39:*23*
COURT 1:*1* 5:*19,*
 *24* 9:*1* 59:*2*
courtroom 5:*5*
COWAN 2:*12* 15:*11,*
 *13* 16:*17* 19:*17*
 23:*13* 25:*19* 26:*4*
 30:*17* 34:*18* 36:*16*
 37:*24* 39:*20, 25* 40:*9,*
 *21* 41:*9, 24* 42:*12, 16*
 43:*6, 21* 45:*5, 8* 46:*4,*
 *7* 48:*13* 49:*7* 56:*15,*
 *20* 57:*21* 58:*7, 16*
co-worker 54:*2, 3*
co-workers 22:*14*
 33:*21, 24* 34:*2*
crime 8:*5*
crisis 25:*20, 24*
 30:*13* 35:*18* 36:*7, 12,*
 *24* 37:*3* 38:*8* 43:*8,*
 *18* 46:*20* 47:*12, 14,*
 *17* 57:*15*
CRR 59:*15*
cube 32:6
cubes 31:*25*
Culverton 4:*15*
current 4:*10* 10:*3*
currently 7:*2* 10:*9,*
 *10*

cut 19:*12* 20:*10*

< D >
daily 16:*18*
date 13:*4* 27:*9*
 53:*21* 60:*12*
David 12:*12* 13:*13,*
 *21*
day 53:*8, 9* 59:*12*
 60:*15*
days 28:*25* 37:*6, 7*
 38:*9* 48:*5, 19*
deal 38:*11*
dealt 15:*10, 18*
December 10:*14*
decision 19:*15* 41:*18*
deemed 36:*4* 37:*4*
deems 36:6
Deep 24:*12*
Defendant 1:*5*
Defendants 2:*9*
delivered 34:*17*
denied 44:*12*
department 52:*19, 21*
Depending 46:*25*
 49:*9*
depends 57:*9*
DEPONENT 60:*1*
deposed 4:*4, 19*
DEPOSITION 1:*13,*
 *17* 7:6, *18* 9:*3* 58:*19,*
 *22* 59:*3*
depression 45:*17*
deputies 45:*25*
Describe 11:6
desk 47:*22* 54:*17*
device 6:*17*
diagnosed 41:*3*
diagnosis 27:*15, 17*
diary 8:*1*
different 10:*17*
 11:*14, 15* 19:*25*
 24:*14* 44:*3* 48:*24*
 49:*5* 52:*7* 55:*10*
 56:*13*
Difficulty 15:*21* 41:*4*
DIRECT 2:*19*
directs 6:*12*
discharge 10:*10*

Deposition of Jami Palladino                                        Estate of Joseph P. King v. Ward, et al.

26:20  31:*10*, *17*
**disciplinary**  8:*21*
**disciplined**  25:*13*
**discontinuance**  20:*17*
**discontinued**  19:*1*, *4*,
*7*  20:*13*  21:*17*, *23*
**discovered**  55:*19*
**discretion**  58:*12*
**discuss**  7:*18*  22:*5*
26:*20*
**discussion**  51:*11*
**distress**  24:*12*
**DISTRICT**  1:*1*
**DOCCS-related**  26:*10*
**doctor**  19:*7*, *24*
20:*14*  21:*22*  22:*25*
23:*4*, *5*, *6*  57:*5*, *7*
**doctors**  19:*25*
**document**  6:*19*
12:*15*, *21*, *25*  13:*9*, *19*,
*23*, *25*  14:*6*
**documentation**  11:*10*
52:*10*
**documents**  6:*21*, *23*
7:*15*
**doing**  10:*15*  39:*23*
**door**  54:*20*
**dorm**  32:*6*, *13*  35:*22*
37:*5*
**dorms**  31:*25*
**Dr**  18:*12*, *16*, *20*
20:*3*, *4*  36:*10*
**drafting**  14:*6*
**drug**  17:*4*  26:*12*
**drugs**  7:*3*  17:*17*, *20*
23:*17*  25:*10*, *11*  45:*3*,
*6*
**duly**  4:*3*
**duration**  21:*11*
**duties**  10:*19*  15:*5*
46:*2*

**< E >**
**earlier**  21:*17*  22:*25*
**Eastern**  1:*19*
**education**  49:*18*  50:*3*
**e-mail**  13:*1*  39:*13*,
*15*  54:*12*, *14*
**emergency**  56:*1*  57:*8*,

*11*  58:*9*
**eminent**  43:*18*
**emotional**  48:*11*
**employee**  11:*9*  59:*7*,
*8*
**employment**  10:*3*
**engage**  46:*16*
**engages**  46:*14*
**entail**  46:*18*
**entire**  53:*8*, *9*
**environment**  15:*21*
**erase**  9:*6*
**Errata**  60:*7*  61:*2*
**ESQUIRE**  2:*6*, *7*, *12*
**established**  28:*22*
**Estate**  1:*4*  4:*9*
12:*23*  13:*24*
**et**  1:*5*  5:*19*  51:*24*
**evaluation**  48:*4*, *6*, *21*,
*22*  49:*6*, *12*  51:*7*, *18*
52:*6*
**evaluations**  50:*11*, *14*,
*17*  52:*14*
**event**  33:*5*  54:*1*, *19*
**events**  14:*10*
**Everybody**  38:*21*
**evidence**  12:*11*  13:*12*
**exact**  55:*17*
**exactly**  41:*1*
**Examination**  3:*4*  4:*5*
**Exhibit**  3:*8*, *9*  12:*10*,
*12*, *13*  13:*12*, *14*, *15*,
*18*
**experiencing**  22:*25*
57:*22*
**expires**  60:*16*
**explain**  39:*5*  40:*11*
54:*24*
**explained**  24:*5*  55:*2*
**express**  27:*3*
**expressed**  19:*6*  23:*25*
**expresses**  57:*4*
**Expressing**  22:*24*
44:*1*  46:*15*  57:*13*

**< F >**
**facilities**  35:*2*
**facility**  10:*17*  11:*13*
31:*23*  32:*2*  35:*6*, *8*
36:*22*, *23*  38:*10*, *13*

40:*24*  42:*17*  44:*17*
48:*9*  50:*19*  53:*17*
54:*14*  55:*15*
**factor**  50:*24*
**factors**  50:*21*  52:*2*
**familiar**  4:*23*  12:*25*
46:*7*
**family**  26:*25*  34:*6*,
*17*, *21*  50:*25*  55:*24*
**Farago**  36:*10*
**F-a-r-a-g-o**  36:*12*
**feel**  5:*11*
**feeling**  28:*12*
**feelings**  20:*25*  26:*23*
34:*6*, *11*  44:*24*  45:*3*
**fellow**  52:*21*
**fighting**  16:*3*
**file**  30:*6*
**filed**  8:*18*  12:*8*
**final**  21:*20*
**financially**  59:*10*
**find**  49:*9*
**firm**  4:*8*
**first**  4:*3*  18:*20*  20:*7*
36:*12*  39:*8*  52:*8*, *10*
53:*5*, *9*, *11*
**Floor**  2:*5*
**Follow**  22:*3*  23:*9*
39:*16*
**following**  35:*14*
38:*18*, *19*  44:*9*
**follows**  4:*4*  40:*5*
**follow-up**  56:*23*
**foregoing**  59:*4*  60:*4*
**forgot**  58:*18*
**form**  60:*7*
**four**  53:*12*, *13*
**free**  5:*11*
**friends**  34:*10*, *17*
**front**  6:*23*  47:*22*
54:*20*
**full**  4:*10*
**functioning**  16:*19*
41:*4*
**further**  58:*15*  59:*7*

**< G >**
**GENERAL**  2:*10*
10:*13*, *16*, *20*  16:*19*

**31:***4*  34:*16*  36:*5*, *25*
37:*1*, *8*, *14*, *18*
**getting**  27:*3*  42:*15*
**Gina**  1:*19*  42:*25*
59:*2*, *15*
**give**  5:*17*  24:*14*
48:*4*, *21*  49:*12*  54:*13*
**given**  21:*1*, *3*  60:*5*
**gives**  52:*19*
**go**  4:*16*  9:*9*, *11*
16:*17*  19:*17*  23:*13*
25:*19*  26:*25*  27:*9*
34:*18*  36:*16*  37:*24*
39:*5*  40:*9*  43:*21*
54:*22*  57:*21*  58:*7*, *17*
**goes**  42:*19*
**going**  4:*16*  27:*7*
37:*14*  39:*21*  43:*20*
48:*2*  51:*15*  56:*17*
**Good**  4:*7*
**gotten**  11:*14*
**great**  58:*21*
**grievances**  8:*18*
**ground**  4:*17*
**grounding**  24:*12*
**guess**  19:*19*

**< H >**
**HACH**  2:*5*
**Hal**  10:*24*  30:*23*
55:*3*
**hands**  5:*19*
**hang**  28:*10*  39:*20*
55:*12*
**happened**  53:*14*, *24*
**harassment**  11:*22*
**head**  5:*18*
**Health**  10:*6*, *22*
27:*14*  28:*20*  32:*4*
35:*3*, *5*  42:*18*  48:*7*
51:*1*  57:*20*  58:*6*
**healthcare**  35:*11*, *24*
36:*20*
**hear**  5:*10*
**hearing**  26:*16*, *23*
45:*15*  47:*3*  48:*3*, *12*,
*17*  49:*2*, *16*
**help**  4:*17*  24:*7*
42:*21*

Deposition of Jami Palladino                                                                Estate of Joseph P. King v. Ward, et al.

Hernandez  18:*12*, *20*
high  30:*14*
higher  43:*11*  47:*16*
HILLARY  2:*7*
HIPAA  11:*22*
history  10:*3*  48:*7*
 50:*25*  51:*1*
home  4:*13*, *14*  26:*25*
 27:*10*
Honestly  32:*3*
hoping  26:*24*
hospital  51:*1*  55:*22*
hospitalizations  51:*2*
hour  7:*11*  50:*7*, *8*
 52:*13*
housing  25:*21*
hung  55:*9*, *11*

< I >
ideation  30:*10*  44:*1*
identification  12:*13*
 13:*15*
ill  45:*1*
illegal  45:*6*
illness  37:*21*  38:*11*
 40:*17*, *24*  41:*3*, *4*
 58:*6*
illnesses  40:*7*
important  5:*17*
incarcerated  14:*21*,
 *23*  15:*3*, *10*, *18*  23:*20*
 25:*14*
incarceration  17:*18*,
 *21*, *24*  18:*8*
increase  45:*14*
increased  44:*19*, *21*
 45:*17*
indicate  50:*22*
indicated  44:*4*  50:*20*
indicating  21:*2*
indicators  43:*19*, *24*
individuals  41:*2*
influence  7:*2*
informally  54:*18*
information  23:*3*
 51:*13*
informed  54:*2*
inmate  30:*3*, *8*  32:*8*
 33:*6*, *10*  35:*6*  38:*14*

46:*13*, *23*  47:*5*  48:*2*
 55:*20*  57:*4*, *7*  58:*6*
inmates  16:*12*, *23*
 29:*6*, *25*  31:*4*, *15*, *20*
 32:*1*, *5*  34:*17*, *25*
 37:*20*  38:*11*  48:*11*
 58:*3*
inside  41:*8*
instant  8:*17*
interested  59:*10*
intolerance  24:*12*
investigation  55:*14*
investigators  14:*10*
involvement  47:*13*
iPad  6:*18*
isolation  25:*16*, *18*
 43:*25*
issues  21:*3*
items  46:*23*
its  1:*4*

< J >
JAMI  1:*13*, *17*  3:*3*
 4:*2*, *12*  60:*3*, *12*
January  49:*3*, *16*
job  11:*4*  15:*5*
Joseph  1:*4*  4:*9*
 14:*13*  53:*21*
July  8:*8*
jury  14:*3*

< K >
KALKACH  2:*6*  3:*4*
 4:*6*, *8*  12:*10*, *14*
 13:*11*, *16*, *21*, *22*
 15:*15*  16:*21*  19:*20*
 23:*15*  25:*22*  26:*5*, *7*
 30:*19*, *22*  34:*20*
 36:*18*  38:*2*  40:*2*, *13*,
 *22*  41:*11*  42:*2*, *13*, *22*,
 *25*  43:*4*, *9*, *23*  44:*13*,
 *15*  45:*7*, *10*  46:*6*, *10*
 48:*15*  49:*8*  56:*17*, *21*,
 *23*  57:*1*  58:*1*, *11*, *15*
Karen  18:*19*
Kari  18:*21*
keep  7:*21*, *24*  8:*1*
 29:*13*, *16*
kept  53:*17*

kids  8:*13*
kill  55:*4*
kind  11:*13*  18:*1*
 36:*21*  37:*2*  40:*14*
 43:*17*
King  1:*4*, *5*  4:*9*
 12:*24*  13:*24*  14:*13*,
 *25*  15:*6*, *9*, *17*  16:*16*,
 *25*  20:*9*  22:*13*  23:*12*,
 *21*, *24*, *25*  24:*1*, *21*, *24*
 25:*2*, *13*  26:*4*, *5*, *13*
 28:*17*  29:*11*  30:*17*,
 *19*, *20*, *24*  31:*1*, *21*
 32:*5*, *19*  33:*19*  34:*3*,
 *10*, *13*, *22*  35:*6*  41:*5*,
 *14*, *22*  42:*4*  43:*19*
 44:*5*, *19*, *21*  45:*17*
 47:*1*, *25*  49:*2*, *15*
 51:*4*, *11*  53:*21*  55:*4*
 56:*4*
King's  15:*2*  20:*25*
 27:*14*  29:*21*  32:*9*, *20*
 33:*2*, *14*, *21*, *25*  34:*6*
 56:*1*, *7*, *11*
Knoeller  54:*4*
K-n-o-e-l-l-e-r  54:*6*
know  12:*17*  13:*18*
 14:*13*, *15*, *21*, *23*  16:*6*,
 *9*  18:*4*, *11*, *17*  19:*2*, *4*,
 *12*  20:*6*, *8*  23:*14*, *25*
 24:*23*  25:*15*, *24*  26:*2*
 27:*7*, *13*, *14*, *21*, *23*
 31:*21*, *22*  34:*19*
 35:*10*  36:*2*, *8*, *14*, *21*
 37:*2*  41:*14*, *17*, *18*, *20*
 43:*12*  45:*19*  46:*3*, *11*
 47:*2*, *3*, *22*, *23*  49:*11*
 50:*5*  53:*17*, *19*  55:*12*,
 *17*, *19*, *21*, *22*, *23*, *24*,
 *25*  56:*1*, *3*, *5*, *6*, *7*, *11*
knowledge  8:*17*
 20:*19*  37:*16*  59:*5*

< L >
law  4:*8*
Lawrence  36:*12*
lawsuit  8:*24*  12:*5*, *8*
 14:*11*
lead  27:*11*

leading  10:*3*  16:*4*
 31:*2*  32:*21*  33:*22*
 34:*7*, *11*  44:*9*  45:*11*
learn  52:*14*  54:*1*
leave  26:*24*  37:*4*
leaving  27:*11*
led  27:*25*  28:*4*
left  36:*20*
legal  7:*7*
letter  22:*5*  24:*21*, *24*
 28:*25*  29:*1*, *3*, *4*
letters  21:*4*, *6*, *13*
 22:*2*, *8*, *13*, *18*, *21*, *23*
 24:*1*
level  30:*14*  35:*3*, *5*, *7*
 43:*11*  44:*19*, *21*
 45:*14*, *17*  47:*16*
Licensed  9:*22*
licenses  9:*19*, *21*
licensing  9:*17*
life  15:*2*  51:*16*
 53:*22*
line  12:*16*  61:*4*
Lisa  36:*13*
little  42:*21*  52:*11*
lived  32:*25*
LLP  2:*5*
location  55:*17*
log  53:*18*
long  7:*10*  38:*5*  50:*6*
 52:*4*, *12*  53:*7*  58:*8*
longer  27:*9*  31:*17*
 52:*11*
look  55:*10*
loss  44:*2*
lot  42:*19*  58:*12*

< M >
Madison  2:*5*
managed  10:*21*
management  10:*5*
mandatory  11:*16*, *21*
 38:*22*  39:*19*  40:*3*
 49:*23*
marked  12:*13*  13:*15*
MARKS  2:*19*
marriage  16:*1*
married  8:*11*
mean  21:*8*  39:*2*

Deposition of Jami Palladino                                                      Estate of Joseph P. King v. Ward, et al.

44:9  51:9  53:12
meaning  39:10
means  5:13
mechanisms  24:11
medication  17:23
  18:1, 7  19:7, 8, 12, 16
  20:9, 17, 23  21:1, 16,
  24  24:7, 18  42:5
  48:8
medications  5:7
  18:24
meet  14:17  19:7
  28:19  57:19
meeting  29:14, 21, 24
  30:23
meetings  28:22
Mental  10:6, 22
  16:13  27:14  28:20
  32:4  35:2, 5, 11, 23
  36:20  37:21  38:11
  40:7, 17, 24  41:3, 4
  42:18  48:7  51:1
  57:20
mention  58:19
met  7:15  21:22
  25:6  30:3
Meyers  10:24  30:23
  55:3  58:19
mind  33:21
Minneola  8:10
minute  12:15  13:17
minutes  52:5, 13
  56:18
misbehavior  26:2, 11
mom  44:10, 23
month  13:4  15:1
  27:23  28:18  29:2
  34:7, 11  48:23  58:3,
  10
monthly  10:22
months  44:9  45:11
  48:5, 22  57:18
morning  4:7
mother  44:25
move  44:13
movement  47:24


< N >
name  4:7, 10  18:11,
  17, 20, 22  32:12

36:11, 12  52:19, 25
  53:1, 2  54:3  56:3
names  8:3  18:15
NAPPI  2:7
Nassau  10:6
nature  14:19
NECESSARILY  2:19
necessary  39:9, 10
need  6:4  48:16  57:4,
  20
needed  36:22  37:2
  43:12
never  28:16
NEW  1:1  2:6, 10, 12
  4:15  8:10  36:22, 23
  50:1, 20, 21  52:2
nod  5:18
nonresponsive  44:14
normally  52:4
NORTHERN  1:1
Notary  60:19
note  30:6  34:13
noted  60:7
notes  7:21, 24  29:5,
  8, 10, 13, 15, 20, 22, 23
  30:4  34:16  56:18
notice  54:7, 8, 13, 16
notified  48:2, 19
  55:24  56:5
November  19:10, 11
  25:7  34:14  53:20
NTA  10:4
Number  3:7
numbered  1:18
nurses  19:19, 21
nursing  47:23


< O >
oath  5:1, 4
object  6:11
Objection  15:11
  16:17  19:17  23:13
  25:19  30:17  34:18
  36:16  37:24  40:9, 21
  41:9, 24  42:12, 16
  43:6, 21  45:5  48:13
  49:7  56:15  57:21
  58:7
observation  46:21

obtain  9:23, 25
obtained  13:1
occur  55:7
occurred  54:25
offer  12:10  13:11
offered  44:16
OFFICE  2:10  22:19
  39:21
officer  46:22  47:22
officers  26:9
official  50:11, 14
  51:23  52:6  54:8, 13
Oh  53:8
okay  5:15  6:7, 16
  9:5  10:2  11:20  12:1,
  5, 21  13:11, 21  14:13
  20:2, 25  31:4  33:13
  35:23  38:3  40:23
  43:10  46:7  47:18
  49:1  50:22  51:12
  56:20  58:2
Once  15:1  19:13
  23:21  28:18, 24  29:2
  38:24  50:19  57:18
  58:3
ones  6:20  12:1, 3
  44:5  51:23, 24
one-to-one  46:22
open  10:21
opinion  57:19  58:5
opposed  5:18
order  19:8  43:12
organized  32:1, 2
outcome  51:2
outcomes  49:5
outside  35:24


< P >
p.m  1:19  58:23
PAGE  3:2  61:4
pages  60:4
PALLADINO  1:13,
  17  3:3  4:2, 7, 12, 16
  12:10  13:11, 13, 17
  57:2  60:3, 12
paper  6:23
parole  26:13, 15, 18,
  19, 23  45:15  47:3
  48:3, 4, 6, 17  49:2, 6,

12, 15  51:2
part  38:24
participate  14:5
parties  59:8
party  8:24
passed  44:10  45:2
passing  44:23  54:15
patient  11:11  14:16,
  20  20:15  22:4  28:24
  50:23  51:21
patients  57:17
pays  50:4
people  10:21  31:7, 9,
  12  39:20  40:7, 24
  41:7
perception  33:3, 4, 5
Perfect  6:9
perform  51:7, 17
period  18:6  20:4
  45:9
periods  20:1  21:23
person  15:23  30:14
  38:7  41:20  52:17
  54:12
personal  29:22
person's  46:2, 25
  57:9, 22
phone  6:18
place  42:10  47:14
placed  43:14  46:13
  47:1, 12, 16
placing  47:5
Plaintiff  1:5  2:4  4:9
planner  10:10
planning  26:21
  31:11, 17
please  4:10  5:11
  6:4, 16, 19  9:6  12:12
  13:13, 17  17:22
  18:15, 22  33:9  36:11
  42:25  50:12  54:5
point  30:16
policies  38:1, 19  39:2
policy  22:4  28:24
  34:24  37:5, 20, 25
  39:17  50:19  58:5
population  10:13, 16,
  20  16:20  36:5, 25
  37:1, 9, 15, 18
portions  44:13

Deposition of Jami Palladino                                        Estate of Joseph P. King v. Ward, et al.

position 10:*3, 8, 9, 17*
45:*21*
possible 4:*18*
potential 43:*19, 24*
prepare 7:*5*
prerelease 10:*10, 14*
prescribed 18:*9*
prescriber 18:*10*
19:*22* 20:*5* 22:*11*
prescribers 22:*15*
57:*16*
prescriber's 22:*6*
prescription 17:*20,*
23 18:*1* 25:*10* 45:*6*
present 7:*13*
presented 51:*4*
pretty 26:*12*
prevent 56:*14*
prevention 49:*19*
50:*9*
previous 26:*21* 35:*14*
prior 13:*9* 26:*22*
prison 28:*12* 53:*15*
private 28:*20*
probably 21:*10* 50:*7*
52:*13* 53:*5, 13*
problems 15:*9, 17, 20*
process 38:*14* 47:*21*
Professional 1:*20*
59:*2*
program 6:*19* 9:*16,*
17 10:*7*
programs 6:*21*
progress 29:*15* 30:*6*
propounded 60:*6*
PROs 10:*7*
Prosequendum 1:*5*
protective 50:*21* 52:*2*
protocol 22:*3*
provide 15:*7* 49:*13*
58:*6*
provided 10:*22*
provider 57:*20*
provides 49:*25*
Psychiatric 50:*1*
psychotic 30:*9* 57:*14,*
23
Public 60:*19*
put 6:*16* 55:*8*

< Q >
question 5:*10, 12, 13,*
14 6:*6, 11, 12* 7:*22*
15:*14* 43:*1, 2*
questions 56:*19, 24*
58:*15, 17* 60:*5*
quickly 4:*17*
quite 11:*19* 24:*1*
QUOTATION 2:*19*
QUOTE 2:*19*

< R >
read 12:*15, 16* 22:*18,*
21 34:*16* 38:*3* 39:*16*
43:*2* 58:*18* 60:*4*
reading 38:*18*
really 32:*3* 39:*19*
40:*3* 41:*25*
Realtime 1:*21*
reasons 56:*7, 11*
recall 16:*24* 18:*3*
19:*3, 14* 24:*22* 25:*21*
36:*1* 42:*6* 45:*13*
47:*2* 53:*16*
receive 21:*2, 6* 24:*20*
36:*15, 22* 40:*7, 16*
49:*21, 22* 51:*13* 54:*7,*
12
received 11:*6* 13:*10*
22:*2* 24:*24* 42:*5*
49:*18* 54:*16*
receiving 22:*5*
receptive 24:*8, 16, 17*
Recess 56:*22*
recognize 12:*17, 21*
13:*18, 23, 25*
record 4:*11* 58:*17*
59:*5*
recorded 14:*9*
refer 39:*3*
REFLECT 2:*19*
reflects 51:*15*
reframe 33:*9*
regarding 28:*12*
34:*24* 37:*20* 45:*3*
regards 33:*8* 38:*7*
40:*10, 14*
REGIONAL 2:*10*

Registered 1:*20* 59:*2*
related 14:*10* 34:*3*
relationship 14:*19*
relative 59:*8*
release 27:*9* 37:*6, 7*
released 36:*24* 37:*1*
48:*10*
remember 12:*3, 8, 9*
13:*3, 5, 6* 14:*22, 24*
17:*15* 18:*20* 20:*8*
24:*22* 26:*1, 17* 27:*18*
29:*3* 37:*13* 44:*18*
52:*25*
remembering 12:*2*
REMOTE 1:*13, 17*
remotely 2:*2*
repeat 5:*11* 7:*22*
15:*14* 17:*22* 18:*15*
22:*20* 25:*17* 40:*1*
42:*24, 25* 50:*12* 56:*9*
rephrase 5:*12* 36:*17*
42:*1*
report 10:*23* 22:*10*
30:*4, 12, 15* 38:*14*
47:*18*
reported 10:*24, 25*
11:*2* 32:*18* 59:*3*
Reporter 1:*20, 21*
5:*19, 24* 59:*3*
reporters 14:*10*
reporting 30:*9*
reports 26:*3, 8, 11*
29:*24*
representation 7:*7*
represents 4:*8*
request 28:*22*
requesting 14:*3*
22:*25* 57:*7*
requires 30:*14*
respect 15:*6* 30:*17,*
19, 20
response 22:*1* 23:*1*
responsibilities 10:*19*
rest 52:*11*
restart 19:*8*
return 36:*4*
returned 37:*5*
review 7:*15* 13:*9, 17*
29:*17* 39:*12* 52:*1*
56:*18*

right 1:*5* 12:*2, 3*
31:*10* 39:*25* 40:*6*
46:*5* 58:*16*
risk 43:*18* 44:*11*
50:*11, 15, 24* 51:*18,*
22 52:*2*
risks 50:*20, 21*
Road 4:*15*
role 15:*2* 47:*5, 8*
58:*13*
Rome 4:*15*
room 6:*25* 28:*20*
ROSE 2:*5*
routinely 58:*2*
RPR 59:*15*
rules 4:*17*
run 4:*17* 11:*11*
runs 36:*7*

< S >
sanctioned 25:*25*
saw 28:*18* 58:*3*
saying 6:*1*
scene 54:*22*
scheduled 19:*7* 23:*7,*
10 24:*4* 48:*9*
SCHIRRIPA 2:*5*
scratch 49:*1*
screen 6:*20*
screened 36:*14, 21*
37:*2, 3* 43:*12*
screening 43:*17*
second 11:*8* 39:*20*
43:*20*
see 22:*4* 23:*4* 28:*17*
29:*2, 4, 5* 31:*19*
34:*13* 39:*5, 16* 42:*22*
56:*18* 57:*4, 7, 16, 18,*
20 58:*2*
seen 22:*25* 23:*8*
28:*24* 37:*6, 7* 38:*7, 8,*
9 57:*6* 58:*9*
self-harm 30:*11* 44:*1,*
12 46:*14, 16* 47:*11*
57:*13, 22*
send 21:*4* 54:*14*
sending 22:*13*
sent 13:*7* 55:*22*
sentence 35:*9*

Deposition of Jami Palladino                                                Estate of Joseph P. King v. Ward. et al.

separation   43:*25*
sergeants   45:*25*
serious   57:*20*
services   10:*22*
session   11:*11*   17:*15*
  25:*7*   44:*7, 8*   51:*19,*
  *21, 25*   52:*7, 8, 11*
  53:*7*
sessions   22:*7*   33:*25*
  52:*4*
set   22:*7*
seven   31:*10*   37:*6, 7*
  38:*9*
severe   41:*3*
sexual   11:*22*
shadowed   11:*9*
shadowing   52:*23*
share   17:*14*
shared   17:*13*   32:*6*
Sheet   60:*8*
shoelaces   28:*10*
  34:*24*   41:*15*
shoes   55:*8*
show   12:*12*   13:*13*
  44:*5, 19, 21*   45:*17*
showing   5:*18*   6:*22*
shred   29:*16, 17*
shredded   29:*22*
SHU   54:*6*
shut   6:*16*
sign   58:*18*
signed   14:*8*
simply   6:*5*
situation   46:*25*
  47:*15*   57:*8, 9, 12*
  58:*8*
six   44:*9*   45:*11*
skills   24:*6*   59:*5*
sleeping   15:*22*
smoothly   4:*18*
Social   9:*14, 22*
somebody   30:*9, 10*
  32:*25*   43:*25*   46:*19*
  47:*9, 10*   50:*18*   51:*3*
  57:*13*
sorry   7:*22*   11:*1, 8*
  15:*14*   17:*8*   22:*19*
  24:*10*   39:*25*   40:*12,*
  *20*   56:*8*   58:*19*

South   2:*11*
Sowich   53:*1*
S-o-w-i-c-h   53:*3*
speak   16:*22*   17:*2*
  23:*16, 19*   25:*1*   26:*13,*
  *15, 18*   28:*11*   31:*4, 6,*
  *7*   32:*8, 11*   33:*16, 24*
  34:*2*   37:*8, 17*   45:*1*
  49:*15*
speaks   38:*14*
special   25:*21*   40:*8,*
  *14, 16*   41:*8*   48:*16*
specific   15:*9, 17*
  37:*25*   40:*23*   42:*21*
specifically   13:*25*
spell   18:*22*   36:*11*
  53:*2*   54:*5*
spoke   16:*12*   23:*21*
  29:*10*   31:*20*   33:*10*
  44:*23*
spoken   14:*9*   33:*6*
  34:*5, 9, 21*
staff   42:*8, 18*   43:*5*
  55:*20*
stall   55:*9, 10*
Standard   1:*19*   46:*23*
start   10:*12*   39:*9*
started   10:*4*   52:*15,*
  *18*
STATE   2:*10, 11*
  4:*10*   16:*13*   33:*21*
stated   17:*5, 6, 9, 10*
statements   14:*8, 9*
  33:*20*   34:*6, 10*
STATES   1:*1*
staying   42:*10*
Stonybrook   9:*10*
stopped   19:*2*
Street   2:*11*
strike   44:*13*
stripped   46:*21*
study   9:*13*
subject   8:*21*
Suboxone   16:*25*
  17:*12*   25:*10*
Subscribed   59:*11*
  60:*14*
substance   16:*15*
  21:*14*   22:*23*   23:*22*

28:*14*   32:*16*   37:*11*
  50:*25*   60:*7*
suffering   16:*1*   23:*12*
sufficient   58:*5*
suicidal   30:*10*   44:*1*
suicide   16:*4*   18:*25*
  24:*20, 23*   25:*1, 4*
  27:*19, 21, 25*   28:*4, 12*
  31:*2*   32:*9, 19, 21*
  33:*7, 11, 17, 22*   34:*7,*
  *11, 13*   35:*14, 15, 20*
  38:*15*   41:*7, 15, 22*
  42:*4*   43:*5, 7, 14, 20,*
  *24*   44:*9, 11, 17*   45:*11,*
  *19*   46:*5, 6, 8, 11, 13,*
  *17, 18*   47:*1, 6*   49:*19*
  50:*8, 11, 14, 24, 25*
  51:*17*   53:*18*   54:*24*
  55:*7, 15, 17*   56:*14*
suicides   53:*14*
Suite   2:*11*
sum   16:*15*   21:*13*
  22:*23*   23:*22*   28:*14*
  32:*16*   37:*11*
supervision   36:*15*
  42:*14, 20*   43:*3*   49:*14*
support   44:*16*
supportive   15:*7*
supposed   36:*14*
sure   23:*4*   26:*12*
  32:*3, 7*   51:*15*
switched   10:*13*
sworn   4:*4*   59:*11*
  60:*14*
symptoms   19:*6*
  22:*24*   30:*9*   57:*14, 24*
SYRACUSE   2:*10, 12*

< T >
take   5:*5, 19*   9:*16*
  12:*15*   13:*17*   27:*8*
  29:*5, 10, 13*   38:*24*
  43:*17*   51:*17*   52:*4, 7,*
  *14*   57:*5, 8*
taken   1:*17*   43:*16*
  56:*22*   59:*11*
talk   5:*23, 25*   12:*5*
  24:*18*   26:*19*   39:*24*
  50:*8*
talked   32:*24*

talking   42:*16, 17, 20*
  45:*5*
taught   11:*10*
team   36:*7, 8*
techniques   24:*13*
tell   17:*4*   27:*25*   28:*4*
  32:*13, 20*   33:*13*
test   10:*1*
testified   4:*4, 21*   9:*1,*
  *3*   57:*5*   58:*2*
testify   5:*8*
testimony   7:*3*
Thank   4:*16*   13:*21*
  56:*21*
therapist   10:*13, 16,*
  *20*   15:*4, 5*   52:*22*
therapy   10:*22*   15:*8*
  25:*5*   31:*18*
thing   6:*5*
things   5:*18*   44:*3*
think   19:*1*   27:*11*
  30:*25*   39:*1*   42:*20*
thinking   11:*19*
Thomas   18:*12, 16, 19*
  20:*3, 4*   32:*12*   33:*16*
thought   15:*22, 25*
thoughts   30:*11*   44:*1,*
  *12*   46:*15*   47:*11*
  57:*13, 22*
threats   46:*15*   47:*11*
Three   8:*16*   12:*1*
  18:*13, 14*   19:*23, 25*
  53:*12, 13*   57:*18*
ticket   51:*14*
tickets   51:*3*
Time   1:*19*   6:*4*   14:*5*
  17:*18, 21, 24*   18:*6, 24*
  20:*11, 12, 13*   21:*11,*
  *22*   23:*21*   24:*20, 23*
  25:*1, 4, 6*   36:*8, 13*
  43:*20*   45:*8*   51:*16, 17*
  53:*23, 24*   58:*10*
times   6:*10*
today   4:*17*   5:*2, 8*
  6:*4, 10, 22*   13:*9*
today's   7:*6, 18*
told   44:*5*   47:*10*
  51:*14*   54:*18*
topics   11:*15*
totally   58:*18*

Deposition of Jami Palladino                                            Estate of Joseph P. King v. Ward, et al.

**trained**  38:*10, 13, 17,*
*18*  52:*15, 17*  53:*5, 8*
**training**  11:*4, 6, 9, 12,*
*13, 22*  38:*20, 22, 24*
39:*4, 6*  40:*3*  49:*18*
50:*3, 6*  52:*15, 16, 20,*
*22*  53:*4, 7*
**trainings**  11:*14, 24*
49:*23*
**transcript**  58:*21*  59:*4*
**transcription**  60:*5*
**transfer**  37:*8, 17*
**transferred**  35:*24*
*36:2*
**transferring**  50:*19*
51:*24*
**traumatized**  32:*19*
**treated**  42:*8*
**treatment**  36:*15, 21*
40:*14*  41:*23*
**trial**  4:*21*  14:*3*
**tried**  27:*19, 21*  28:*7,*
*10*  41:*7*
**true**  59:*4*
**truthfully**  5:*8*
**try**  5:*23*  24:*14*  25:*4*
28:*16*
**trying**  24:*5*  25:*8*
39:*21*
**two**  19:*8*  22:*4*  26:*21*
28:*25*  29:*4*  50:*18, 20*
51:*23*  53:*12*  57:*5*

**< U >**
**understand**  5:*1, 10,*
*25*  6:*2*  10:*18*  21:*25*
31:*24*  32:*15*  41:*25*
48:*14*
**understanding**  5:*15*
32:*12*  35:*21*  44:*10*
55:*8*
**understood**  5:*14, 21*
6:*14*  57:*11*
**unit**  10:*24*  25:*20, 21,*
*23, 24*  30:*13, 15*
35:*11, 15, 18, 24, 25*
36:*3, 7, 20, 24*  38:*8*
43:*8, 18*  46:*20*  47:*12,*
*15, 17*  54:*10*  55:*3*

57:*15*
**UNITED**  1:*1*
**University**  9:*10*
**upcoming**  26:*15*
**update**  39:*19*  51:*15*
52:*2*
**updated**  39:*11*  44:*11*
**updates**  39:*13, 15*
**use**  17:*2, 4*  24:*6, 14*
26:*12*  58:*12*
**Usually**  26:*19*  39:*8*
43:*14, 25*  46:*19*  48:*4*
50:*7*  51:*19*  52:*8, 9,*
*10, 21*  57:*16*

**< V >**
**venture**  32:*3*
**verbal**  5:*17*  15:*8*
**vibrate**  6:*16*
**VIDEO**  1:*13, 17*
**violence**  11:*21, 22*
**visit**  19:*10*

**< W >**
**waiting**  42:*22*
**walk**  10:*2*
**walked**  54:*20*
**want**  12:*17*  13:*18*
39:*24*  58:*18*
**wanted**  24:*2, 18*
**WARD**  1:*5*
**warranted**  47:*16*
58:*8*
**watch**  6:*18*  45:*19, 23*
46:*4, 5, 6, 8, 11, 13, 18,*
*22*  47:*1, 6, 23*  48:*16*
53:*18*
**way**  7:*3*  23:*16*
31:*15*  42:*7*  44:*10*
**week**  16:*4*  33:*21*
57:*5*
**weeks**  19:*8*  22:*4*
29:*1, 4*  31:*1*  50:*18*
51:*24*  53:*5, 9, 10, 11,*
*12, 13*
**went**  9:*10*  25:*24*
38:*8*
**we're**  6:*1*  42:*16, 17*

**wife**  15:*22*  16:*4, 7*
23:*16, 19*  27:*11*
37:*17*  56:*2*
**wife's**  56:*3*
**Williams**  1:*20*  59:*2,*
*15*
**Williams-Burns**  36:*13*
**wind**  46:*20*
**withdrawal**  23:*12*
**WITNESS**  3:*2*  4:*3*
15:*12*  39:*23*  46:*9*
**words**  5:*20*
**work**  4:*13*  9:*14*
12:*6*  24:*5, 6*  39:*14*
53:*23, 25*
**workday**  7:*21, 24*  8:*1*
**worked**  10:*5, 7*  21:*11*
**worker**  9:*22*
**working**  10:*4, 12, 20*
52:*18*
**Workplace**  11:*21, 22*
**works**  4:*23*  38:*21*
**worksheets**  24:*13, 14*
**worried**  20:*9, 16, 22*
27:*1, 6*  37:*14*
**write**  6:*1*  29:*15*  30:*6*
**writing**  5:*24*  24:*1*
**written**  14:*8*  34:*5, 9*
**wrote**  24:*1*  28:*25*
29:*3*  34:*13*

**< Y >**
**YAMILE**  2:*6*  4:*7*
**Yeah**  15:*13*  52:*1*
**year**  11:*25*  13:*4, 6, 7*
38:*25*  50:*8*  51:*4*
**yearly**  11:*24*  49:*24*
**Years**  25:*3*  26:*22*
27:*4*  50:*20*
**YORK**  1:*1*  2:*6, 10,*
*12*  4:*15*  8:*10*  50:*1*

**< Z >**
**Zoom**  6:*20, 21*

Deposition of Jami Palladino          Estate of Joseph P. King v. Ward, et al.

### WORD LIST

**< 1 >**
1  (*2*)
1:00  (*1*)
10  (*4*)
10016  (*1*)
10th  (*1*)
112  (*1*)
12  (*1*)
13  (*1*)
13202  (*1*)
13440  (*1*)
15  (*1*)
150  (*1*)
16  (*1*)
180  (*1*)
1979  (*1*)

**< 2 >**
2:31  (*1*)
20  (*1*)
2006  (*1*)
2007  (*1*)
2008  (*1*)
2009  (*1*)
2010  (*1*)
2012  (*2*)
2013  (*7*)
2016  (*7*)
2017  (*1*)
2018  (*10*)
2019  (*2*)
2022  (*4*)
20-CV-01413  (*1*)
21  (*1*)
23  (*2*)
23rd  (*1*)

**< 3 >**
30  (*4*)
300  (*2*)

**< 4 >**
4  (*1*)
45  (*2*)

**< 5 >**
5  (*3*)

**< 9 >**
90s  (*1*)
911  (*1*)

**< A >**
ability  (*2*)
able  (*2*)
above-styled  (*1*)
abuse  (*1*)
access  (*1*)
accommodate  (*1*)
accurate  (*1*)
ACKNOWLEDGMEN
T  (*1*)
acting  (*1*)
ACTION  (*5*)
actions  (*2*)
acts  (*1*)
actual  (*1*)
ad  (*1*)
adamantly  (*1*)
add  (*1*)
addition  (*1*)
address  (*5*)
addressed  (*1*)
adequate  (*1*)
administered  (*1*)
Administrator  (*1*)
adverse  (*1*)
affect  (*3*)
afternoon  (*1*)
agitation  (*1*)
ago  (*1*)
agreement  (*1*)
ahead  (*11*)
Aikens  (*3*)
AIMEE  (*1*)
al  (*1*)
alcohol  (*1*)
allowed  (*2*)
alternative  (*4*)
Amanda  (*1*)
Amended  (*2*)
amenities  (*1*)
Amy  (*3*)
and/or  (*1*)
Ann  (*1*)
Answer  (*13*)

answers  (*3*)
antianxiety  (*1*)
antidepressants  (*1*)
anxiety  (*3*)
anybody  (*7*)
anymore  (*1*)
appearing  (*1*)
Apple  (*1*)
appointment  (*2*)
appointments  (*1*)
approaching  (*1*)
appropriate  (*3*)
approximate  (*1*)
approximately  (*2*)
area  (*2*)
arranged  (*2*)
Aside  (*1*)
asked  (*2*)
asking  (*2*)
assess  (*1*)
assessed  (*1*)
assessment  (*1*)
assigned  (*1*)
associate  (*1*)
Association  (*1*)
assume  (*1*)
attached  (*1*)
attempt  (*8*)
attempted  (*4*)
attend  (*1*)
attention  (*2*)
ATTORNEY  (*4*)
attorneys  (*2*)
available  (*1*)
Avenue  (*1*)
aware  (*33*)

**< B >**
back  (*10*)
based  (*2*)
Basically  (*1*)
bathroom  (*2*)
beginning  (*2*)
behalf  (*2*)
behavior  (*3*)
behaviors  (*1*)
believe  (*1*)
best  (*2*)
better  (*1*)

board  (*8*)
born  (*2*)
BRC  (*1*)
break  (*2*)
breathing  (*1*)
briefly  (*1*)
bring  (*2*)
brought  (*2*)
building  (*3*)
bunch  (*1*)

**< C >**
call  (*2*)
called  (*1*)
Captioner  (*1*)
care  (*10*)
case  (*1*)
caseload  (*7*)
cause  (*1*)
cell  (*3*)
cells  (*1*)
Center  (*1*)
Central  (*1*)
certain  (*1*)
certificate  (*2*)
certification  (*1*)
Certified  (*2*)
certify  (*3*)
cetera  (*2*)
change  (*5*)
CHANGE/REASON  (*1*)
changes  (*2*)
chart  (*2*)
check  (*1*)
CHEVERIE  (*1*)
chief  (*5*)
children  (*1*)
chronically  (*1*)
circumstance  (*1*)
Citrin  (*2*)
C-i-t-r-i-n  (*1*)
CIVIL  (*1*)
clarify  (*2*)
CLARITY  (*1*)
clinical  (*2*)
close  (*5*)
CNYPC  (*1*)
college  (*2*)

come  (3)
coming  (3)
commander  (7)
commencing  (1)
commission  (1)
commit  (5)
committed  (3)
common  (1)
communication  (1)
community  (1)
Complaint  (4)
complaints  (2)
complete  (6)
completion  (1)
compliant  (1)
computer  (1)
concern  (3)
concerned  (2)
Concerns  (7)
concluded  (1)
conditional  (1)
conferred  (2)
connected  (1)
Connections  (1)
consecutively  (1)
consequences  (1)
consider  (1)
contact  (1)
contain  (1)
content  (1)
control  (1)
conversation  (5)
conversations  (1)
converse  (1)
convicted  (1)
coordinator  (6)
cope  (1)
coping  (5)
copy  (1)
core  (1)
correct  (6)
correction  (1)
correctional  (12)
Corrections  (7)
counsel  (6)
counseling  (1)
County  (1)
couple  (8)
course  (1)

COURT  (5)
courtroom  (1)
COWAN  (33)
co-worker  (2)
co-workers  (4)
crime  (1)
crisis  (16)
CRR  (1)
cube  (1)
cubes  (1)
Culverton  (1)
current  (2)
currently  (3)
cut  (2)

< D >
daily  (1)
date  (4)
David  (3)
day  (4)
days  (6)
deal  (1)
dealt  (2)
December  (1)
decision  (2)
deemed  (2)
deems  (1)
Deep  (1)
Defendant  (1)
Defendants  (1)
delivered  (1)
denied  (1)
department  (2)
Depending  (3)
depends  (2)
DEPONENT  (1)
deposed  (2)
DEPOSITION  (8)
depression  (1)
deputies  (1)
Describe  (1)
desk  (2)
device  (1)
diagnosed  (1)
diagnosis  (2)
diary  (1)
different  (12)
Difficulty  (2)
DIRECT  (1)

directs  (1)
discharge  (4)
disciplinary  (1)
disciplined  (1)
discontinuance  (1)
discontinued  (6)
discovered  (1)
discretion  (1)
discuss  (3)
discussion  (1)
distress  (1)
DISTRICT  (2)
DOCCS-related  (1)
doctor  (11)
doctors  (1)
document  (9)
documentation  (2)
documents  (3)
doing  (2)
door  (1)
dorm  (4)
dorms  (1)
Dr  (7)
drafting  (1)
drug  (2)
drugs  (9)
duly  (1)
duration  (1)
duties  (3)

< E >
earlier  (2)
Eastern  (1)
education  (2)
e-mail  (5)
emergency  (4)
eminent  (1)
emotional  (1)
employee  (3)
employment  (1)
engage  (1)
engages  (1)
entail  (1)
entire  (2)
environment  (1)
erase  (1)
Errata  (2)
ESQUIRE  (3)
established  (1)

Estate  (4)
et  (3)
evaluation  (9)
evaluations  (4)
event  (3)
events  (1)
Everybody  (1)
evidence  (2)
exact  (1)
exactly  (1)
Examination  (2)
Exhibit  (9)
experiencing  (2)
expires  (1)
explain  (3)
explained  (2)
express  (1)
expressed  (2)
expresses  (1)
Expressing  (4)

< F >
facilities  (1)
facility  (18)
factor  (1)
factors  (2)
familiar  (3)
family  (6)
Farago  (1)
F-a-r-a-g-o  (1)
feel  (1)
feeling  (1)
feelings  (6)
fellow  (1)
fighting  (1)
file  (1)
filed  (2)
final  (1)
financially  (1)
find  (1)
firm  (1)
first  (11)
Floor  (1)
Follow  (3)
following  (4)
follows  (2)
follow-up  (1)
foregoing  (2)
forgot  (1)

form  (*1*)
four  (*2*)
free  (*1*)
friends  (*2*)
front  (*3*)
full  (*1*)
functioning  (*2*)
further  (*2*)

< G >
GENERAL  (*13*)
getting  (*2*)
Gina  (*4*)
give  (*6*)
given  (*3*)
gives  (*1*)
go  (*19*)
goes  (*1*)
going  (*8*)
Good  (*1*)
gotten  (*1*)
great  (*1*)
grievances  (*1*)
ground  (*1*)
grounding  (*1*)
guess  (*1*)

< H >
HACH  (*1*)
Hal  (*3*)
hands  (*1*)
hang  (*3*)
happened  (*2*)
harassment  (*1*)
head  (*1*)
Health  (*13*)
healthcare  (*3*)
hear  (*1*)
hearing  (*9*)
help  (*3*)
Hernandez  (*2*)
high  (*1*)
higher  (*2*)
HILLARY  (*1*)
HIPAA  (*1*)
history  (*5*)
home  (*4*)
Honestly  (*1*)
hoping  (*1*)

hospital  (*2*)
hospitalizations  (*1*)
hour  (*4*)
housing  (*1*)
hung  (*2*)

< I >
ideation  (*2*)
identification  (*2*)
ill  (*1*)
illegal  (*1*)
illness  (*7*)
illnesses  (*1*)
important  (*1*)
incarcerated  (*7*)
incarceration  (*4*)
increase  (*1*)
increased  (*3*)
indicate  (*1*)
indicated  (*2*)
indicating  (*1*)
indicators  (*2*)
individuals  (*1*)
influence  (*1*)
informally  (*1*)
information  (*2*)
informed  (*1*)
inmate  (*15*)
inmates  (*16*)
inside  (*1*)
instant  (*1*)
interested  (*1*)
intolerance  (*1*)
investigation  (*1*)
investigators  (*1*)
involvement  (*1*)
iPad  (*1*)
isolation  (*3*)
issues  (*1*)
items  (*1*)
its  (*1*)

< J >
JAMI  (*7*)
January  (*2*)
job  (*2*)
Joseph  (*4*)
July  (*1*)
jury  (*1*)

< K >
KALKACH  (*48*)
Karen  (*1*)
Kari  (*1*)
keep  (*5*)
kept  (*1*)
kids  (*1*)
kill  (*1*)
kind  (*6*)
King  (*62*)
King's  (*14*)
Knoeller  (*1*)
K-n-o-e-l-l-e-r  (*1*)
know  (*66*)
knowledge  (*4*)

< L >
law  (*1*)
Lawrence  (*1*)
lawsuit  (*4*)
lead  (*1*)
leading  (*9*)
learn  (*2*)
leave  (*2*)
leaving  (*1*)
led  (*2*)
left  (*1*)
legal  (*1*)
letter  (*7*)
letters  (*10*)
level  (*10*)
Licensed  (*1*)
licenses  (*2*)
licensing  (*1*)
life  (*3*)
line  (*3*)
Lisa  (*1*)
little  (*2*)
lived  (*1*)
LLP  (*1*)
location  (*1*)
log  (*1*)
long  (*7*)
longer  (*3*)
look  (*1*)
loss  (*1*)
lot  (*2*)

< M >
Madison  (*1*)
managed  (*1*)
management  (*1*)
mandatory  (*6*)
marked  (*2*)
MARKS  (*1*)
marriage  (*1*)
married  (*1*)
mean  (*5*)
meaning  (*1*)
means  (*1*)
mechanisms  (*1*)
medication  (*18*)
medications  (*2*)
meet  (*4*)
meeting  (*4*)
meetings  (*1*)
Mental  (*23*)
mention  (*1*)
met  (*4*)
Meyers  (*4*)
mind  (*1*)
Minneola  (*1*)
minute  (*2*)
minutes  (*3*)
misbehavior  (*2*)
mom  (*2*)
month  (*10*)
monthly  (*1*)
months  (*5*)
morning  (*1*)
mother  (*1*)
move  (*1*)
movement  (*1*)

< N >
name  (*16*)
names  (*2*)
NAPPI  (*1*)
Nassau  (*1*)
nature  (*1*)
NECESSARILY  (*1*)
necessary  (*2*)
need  (*4*)
needed  (*3*)
never  (*1*)
NEW  (*13*)
nod  (*1*)

nonresponsive  (*1*)
normally  (*1*)
NORTHERN  (*1*)
Notary  (*1*)
note  (*2*)
noted  (*1*)
notes  (*14*)
notice  (*4*)
notified  (*4*)
November  (*5*)
NTA  (*1*)
Number  (*1*)
numbered  (*1*)
nurses  (*2*)
nursing  (*1*)

< O >
oath  (*2*)
object  (*1*)
Objection  (*23*)
observation  (*1*)
obtain  (*2*)
obtained  (*1*)
occur  (*1*)
occurred  (*1*)
offer  (*2*)
offered  (*1*)
OFFICE  (*3*)
officer  (*2*)
officers  (*1*)
official  (*6*)
Oh  (*1*)
okay  (*27*)
Once  (*10*)
ones  (*6*)
one-to-one  (*1*)
open  (*1*)
opinion  (*2*)
opposed  (*1*)
order  (*2*)
organized  (*2*)
outcome  (*1*)
outcomes  (*1*)
outside  (*1*)

< P >
p.m  (*2*)
PAGE  (*2*)
pages  (*1*)

PALLADINO  (*14*)
paper  (*1*)
parole  (*16*)
part  (*1*)
participate  (*1*)
parties  (*1*)
party  (*1*)
passed  (*2*)
passing  (*2*)
patient  (*8*)
patients  (*1*)
pays  (*1*)
people  (*8*)
perception  (*3*)
Perfect  (*1*)
perform  (*2*)
period  (*3*)
periods  (*2*)
person  (*6*)
personal  (*1*)
person's  (*4*)
phone  (*1*)
place  (*2*)
placed  (*5*)
placing  (*1*)
Plaintiff  (*3*)
planner  (*1*)
planning  (*3*)
please  (*17*)
point  (*1*)
policies  (*3*)
policy  (*9*)
population  (*10*)
portions  (*1*)
position  (*5*)
possible  (*1*)
potential  (*2*)
prepare  (*1*)
prerelease  (*2*)
prescribed  (*1*)
prescriber  (*4*)
prescribers  (*2*)
prescriber's  (*1*)
prescription  (*5*)
present  (*1*)
presented  (*1*)
pretty  (*1*)
prevent  (*1*)
prevention  (*2*)

previous  (*2*)
prior  (*2*)
prison  (*2*)
private  (*1*)
probably  (*5*)
problems  (*3*)
process  (*2*)
Professional  (*2*)
program  (*4*)
programs  (*1*)
progress  (*2*)
propounded  (*1*)
PROs  (*1*)
Prosequendum  (*1*)
protective  (*2*)
protocol  (*1*)
provide  (*4*)
provided  (*1*)
provider  (*1*)
provides  (*1*)
Psychiatric  (*1*)
psychotic  (*3*)
Public  (*1*)
put  (*2*)

< Q >
question  (*11*)
questions  (*5*)
quickly  (*1*)
quite  (*2*)
QUOTATION  (*1*)
QUOTE  (*1*)

< R >
read  (*10*)
reading  (*1*)
really  (*4*)
Realtime  (*2*)
reasons  (*2*)
recall  (*11*)
receive  (*12*)
received  (*7*)
receiving  (*1*)
receptive  (*3*)
Recess  (*1*)
recognize  (*5*)
record  (*3*)
recorded  (*1*)
refer  (*1*)

REFLECT  (*1*)
reflects  (*1*)
reframe  (*1*)
regarding  (*4*)
regards  (*5*)
REGIONAL  (*1*)
Registered  (*2*)
related  (*2*)
relationship  (*1*)
relative  (*1*)
release  (*3*)
released  (*3*)
remember  (*19*)
remembering  (*1*)
REMOTE  (*2*)
remotely  (*1*)
repeat  (*12*)
rephrase  (*3*)
report  (*7*)
reported  (*5*)
Reporter  (*5*)
reporters  (*1*)
reporting  (*1*)
reports  (*4*)
representation  (*1*)
represents  (*1*)
request  (*1*)
requesting  (*3*)
requires  (*1*)
respect  (*4*)
response  (*2*)
responsibilities  (*1*)
rest  (*1*)
restart  (*1*)
return  (*1*)
returned  (*1*)
review  (*7*)
right  (*8*)
risk  (*8*)
risks  (*2*)
Road  (*1*)
role  (*4*)
Rome  (*1*)
room  (*2*)
ROSE  (*1*)
routinely  (*1*)
RPR  (*1*)
rules  (*1*)
run  (*2*)

Deposition of Jami Palladino

Estate of Joseph P. King v. Ward, et al.

runs  *(1)*

< S >
sanctioned  *(1)*
saw  *(2)*
saying  *(1)*
scene  *(1)*
scheduled  *(5)*
SCHIRRIPA  *(1)*
scratch  *(1)*
screen  *(1)*
screened  *(5)*
screening  *(1)*
second  *(3)*
see  *(18)*
seen  *(10)*
self-harm  *(10)*
send  *(2)*
sending  *(1)*
sent  *(2)*
sentence  *(1)*
separation  *(1)*
sergeants  *(1)*
serious  *(1)*
services  *(1)*
session  *(12)*
sessions  *(3)*
set  *(1)*
seven  *(4)*
severe  *(1)*
sexual  *(1)*
shadowed  *(1)*
shadowing  *(1)*
share  *(1)*
shared  *(2)*
Sheet  *(1)*
shoelaces  *(3)*
shoes  *(1)*
show  *(6)*
showing  *(2)*
shred  *(2)*
shredded  *(1)*
SHU  *(1)*
shut  *(1)*
sign  *(1)*
signed  *(1)*
simply  *(1)*
situation  *(6)*
six  *(2)*

skills  *(2)*
sleeping  *(1)*
smoothly  *(1)*
Social  *(2)*
somebody  *(11)*
sorry  *(13)*
South  *(1)*
Sowich  *(1)*
S-o-w-i-c-h  *(1)*
speak  *(21)*
speaks  *(1)*
special  *(6)*
specific  *(5)*
specifically  *(1)*
spell  *(4)*
spoke  *(6)*
spoken  *(5)*
staff  *(5)*
stall  *(2)*
Standard  *(2)*
start  *(2)*
started  *(3)*
STATE  *(5)*
stated  *(4)*
statements  *(5)*
STATES  *(1)*
staying  *(1)*
Stonybrook  *(1)*
stopped  *(1)*
Street  *(1)*
strike  *(1)*
stripped  *(1)*
study  *(1)*
subject  *(1)*
Suboxone  *(3)*
Subscribed  *(2)*
substance  *(9)*
suffering  *(2)*
sufficient  *(1)*
suicidal  *(2)*
suicide  *(62)*
suicides  *(1)*
Suite  *(1)*
sum  *(7)*
supervision  *(5)*
support  *(1)*
supportive  *(1)*
supposed  *(1)*
sure  *(5)*

switched  *(1)*
sworn  *(3)*
symptoms  *(5)*
SYRACUSE  *(2)*

< T >
take  *(17)*
taken  *(4)*
talk  *(7)*
talked  *(1)*
talking  *(4)*
taught  *(1)*
team  *(2)*
techniques  *(1)*
tell  *(6)*
test  *(1)*
testified  *(6)*
testify  *(1)*
testimony  *(1)*
Thank  *(3)*
therapist  *(6)*
therapy  *(4)*
thing  *(1)*
things  *(2)*
think  *(5)*
thinking  *(1)*
Thomas  *(7)*
thought  *(2)*
thoughts  *(7)*
threats  *(2)*
Three  *(11)*
ticket  *(2)*
tickets  *(1)*
Time  *(28)*
times  *(1)*
today  *(7)*
today's  *(2)*
told  *(4)*
topics  *(1)*
totally  *(1)*
trained  *(8)*
training  *(21)*
trainings  *(3)*
transcript  *(2)*
transcription  *(1)*
transfer  *(2)*
transferred  *(2)*
transferring  *(2)*
traumatized  *(1)*

treated  *(1)*
treatment  *(4)*
trial  *(2)*
tried  *(5)*
true  *(1)*
truthfully  *(1)*
try  *(4)*
trying  *(3)*
two  *(10)*

< U >
understand  *(10)*
understanding  *(5)*
understood  *(4)*
unit  *(26)*
UNITED  *(1)*
University  *(1)*
upcoming  *(1)*
update  *(3)*
updated  *(3)*
updates  *(2)*
use  *(6)*
Usually  *(13)*

< V >
venture  *(1)*
verbal  *(2)*
vibrate  *(1)*
VIDEO  *(2)*
violence  *(2)*
visit  *(1)*

< W >
waiting  *(1)*
walk  *(1)*
walked  *(1)*
want  *(4)*
wanted  *(2)*
WARD  *(1)*
warranted  *(2)*
watch  *(16)*
way  *(5)*
week  *(3)*
weeks  *(16)*
went  *(3)*
we're  *(3)*
wife  *(8)*
wife's  *(1)*
Williams  *(3)*

**Williams-Burns** (*1*)
**wind** (*1*)
**withdrawal** (*1*)
**WITNESS** (*5*)
**words** (*1*)
**work** (*8*)
**workday** (*3*)
**worked** (*3*)
**worker** (*1*)
**working** (*4*)
**Workplace** (*2*)
**works** (*2*)
**worksheets** (*2*)
**worried** (*6*)
**write** (*3*)
**writing** (*2*)
**written** (*3*)
**wrote** (*4*)

**< Y >**
**YAMILE** (*2*)
**Yeah** (*2*)
**year** (*7*)
**yearly** (*2*)
**Years** (*5*)
**YORK** (*8*)

**< Z >**
**Zoom** (*2*)