```
 1                   IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF NEW YORK
 2                      CIVIL ACTION NO.: 20-CV-01413

 3

 4   The Estate of Joseph P. King,
     by and through its Administrator
 5   ad Prosequendum Amy King,
     and in her own right,
 6
           Plaintiff,
 7
     v.
 8
     WARD, et al.,
 9
           Defendant.
10   _____

11

12            *************************************

13            REMOTE VIDEO DEPOSITION OF DR. LI-WEN LEE

14                        JUNE 17, 2022

15            *************************************

16

17        REMOTE VIDEO DEPOSITION OF DR. LI-WEN LEE taken in the

18   above-styled and numbered cause on June 17, 2022, commencing

19   at 10:06 a.m. Eastern Standard Time, before Gina Williams,

20   Registered Professional Reporter, Certified Realtime

21   Reporter, and Certified Realtime Captioner.

22

23

24

25
```

Deposition of Dr. Li-Wen Lee                                  Estate of Joseph P. King v. Ward, et al.

```
 1              A P P E A R A N C E S

 2          (All attorneys appearing remotely)

 3

 4  On behalf of Plaintiff:

 5       HACH ROSE SCHIRRIPA & CHEVERIE, LLP
         112 Madison Avenue, 10th Floor
 6       New York, New York 10016
    By:  YAMILE KALKACH, ESQUIRE
 7       HILLARY NAPPI, ESQUIRE

 8

 9  On behalf of Defendants:

10       NEW YORK STATE ATTORNEY GENERAL
         SYRACUSE REGIONAL OFFICE
11       300 South State Street
         Suite 300
12       Syracuse, New York 13202
    By:  AIMEE COWAN, ESQUIRE
13

14

15

16

17

18

19

20       QUOTATION MARKS ARE USED FOR CLARITY AND DO NOT
                NECESSARILY REFLECT A DIRECT QUOTE
21

22

23

24

25
```

```
 1                       I N D E X

 2    WITNESS                                    PAGE

 3    DR. LI-WEN LEE

 4    Examination by Ms. Kalkach                   4

 5                      -  -  -  -

 6                    E X H I B I T S

 7    Number

 8        Exhibit A   Amended Complaint           21

 9        Exhibit B   Answer to Amended Complaint  23

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   WHEREUPON,

 2                        DR. LI-WEN LEE

 3   was called as a witness and, after having been first duly

 4   sworn, was deposed and testified as follows:

 5                         EXAMINATION

 6   BY MS. KALKACH:

 7        Q     Good morning, Ms. Lee.  My name is Yamile

 8   Kalkach.  I'm with the law firm that represents the

 9   Plaintiff, the Estate of Joseph King.

10             Could you please state your full name and current

11   address for the record?

12             MS. COWAN:  You mean business address, right?

13             MS. KALKACH:  Yeah.

14             MS. COWAN:  Okay.

15        A     My full name, you need it spelled?

16   BY MS. KALKACH:

17        Q     Yes, please.

18        A     Li-Wen Lee, L-i - W-e-n, last name is Lee, L-e-e.

19             My address is -- work address is New York State

20   Office of Mental Health, New York City Field Office, 330

21   Fifth Avenue, 9th floor, New York, New York 10001.

22        Q     Thank you.

23             Ms. Lee, I'm going to go over a few ground rules

24   to help you today so we can run this deposition as quickly

25   and smoothly as possible.
```

```
 1                 Have you ever been deposed before?

 2       A     It's been a long time.  Once before.

 3       Q     Have you ever testified at trial?

 4       A     What kind of trial?

 5             With mental hygiene hearings, yes.

 6       Q     What was the nature of the case where you were

 7   deposed before?

 8       A     This was related to policy on transgender

 9   treatment.

10       Q     Do you remember the caption of the case?

11       A     No, I don't.

12       Q     Do you understand that you are under oath today?

13       A     Yes.

14       Q     And that this is the same oath that you would

15   take in a courtroom?

16       A     Yes.

17       Q     Are you on any medications which may affect your

18   ability to testify truthfully today?

19             I'm sorry?

20       A     No.

21       Q     If you don't hear or understand a question that I

22   ask you, please feel free to ask me to repeat or rephrase

23   the question, and I will.

24             That also means that if you answer a question

25   that I ask, I will assume you understood the question and
```

1    your answer was based on that understanding.

2            It is also important that you give verbal answers

3    as opposed to a head nod so that the court reporter may take

4    down your words, okay?

5        A    Okay.

6        Q    And it's also best not to talk over one another.

7    Otherwise the court reporter is going to have a hard time

8    writing down what we're saying.

9            If at any time today you need a break, please

10   just let me know, and we will accommodate.

11           The only thing I ask from you is that if there's

12   a question that hasn't been answered, it has to be answered

13   before we take the break, okay?

14       A    Yes.

15       Q    Now, there may be many times today that your

16   attorney may object to a question, but unless she directs

17   you not to answer, then you still must answer, okay?

18       A    Okay.

19       Q    Now, please turn off all other devices that you

20   have around you, cell phone, Apple watch, iPad, computers,

21   et cetera, or put them on mute or silent.

22       A    Okay.

23       Q    Please also close any other documents or programs

24   on your screen other than Zoom and the ones that -- other

25   than the ones I'll be showing you today.

| 1 | A | Okay. |
|---|---|---|

1      A    Okay.

2      Q    Do you have any paper documents in front of you?

3      A    I have a question.

4          Should I be opening up the exhibit link now, or

5 is that --

6      Q    No, we will do that.  You don't have to be --

7      A    Okay.

8      Q    So there's no other paper documents in front of

9 you?

10     A    No.

11     Q    Okay.  Is there anyone else in the room with you?

12     A    No.

13     Q    Are you under the influence of any drugs or

14 alcohol that in any way may affect the testimony which you

15 are about to give?

16     A    No.

17     Q    Okay.  So what did you do to prepare for today's

18 deposition?

19     A    For today's deposition, I spoke with Aimee Cowan,

20 and I reviewed some older documents related to this case,

21 including the psychological autopsy and some of the CNYPC

22 policies.

23     Q    Which policies did you review?

24     A    Around risk assessment, risk management review

25 practices at CNYPC.

```
 1        Q      For how long did you meet with your counsel?

 2        A      I think about an hour.

 3        Q      Other than your counsel, was anyone else present?

 4        A      No.

 5        Q      Did you discuss today's depositions with anyone

 6   other than your counsel?

 7        A      No.

 8        Q      Have you ever used any other names?

 9        A      No.

10        Q      Have you ever been convicted of a crime?

11        A      No.

12        Q      When were you born?

13        A      July 18, 1974.

14        Q      Where were you born?

15        A      Houston, Texas.

16        Q      Are you married?

17        A      Yes.

18        Q      Do you have kids?

19        A      Yes.

20        Q      Have you ever been subject of a disciplinary

21   complaint?

22        A      No.

23        Q      Have any complaints or grievances been filed

24   against you?

25        A      Not that I'm aware of.
```

Deposition of Dr. Li-Wen Lee                                    Estate of Joseph P. King v. Ward, et al.

1      Q      Have you ever been a party of a lawsuit before?

2      A      Not personally.

3      Q      So you told me you testified in court.

4             When was this?

5      A      I'm sorry.  I'm trying to think back.  It's been

6    a while.

7      Q      That's okay.

8      A      I was a clinician up until 2008.  So back then

9    there would have been occasional hearings for treatment over

10   objection or retention hearings, those kinds of hearings,

11   treatment hearings.

12            After that in my OMH role, there were a handful

13   of hearings related to Article 10 -- Mental Hygiene Law

14   Article 10 type decisions.  They've not been recent, not

15   within a few years.

16     Q      When was the last time?

17     A      I don't remember the exact year, so I think if I

18   came up with something, I would be guessing.  Something

19   pre-pandemic.

20     Q      Do you have an approximation, let's say, I

21   mean --     .

22     A      I don't remember exactly.  I'm sorry.

23            Maybe 2018.

24     Q      What kind of witness were you?

25     A      I was the commissioner's designee for those

```
 1    Article 10 hearings.  It's a technical term in Article 10.

 2         Q    Okay.  And you told me you testified in a

 3    deposition.

 4              When was this?

 5         A    I don't remember the year.  Maybe 10 years ago.

 6         Q    What was the lawsuit about?

 7         A    Over a provision of transgender treatment.

 8         Q    What kind of witness were you?

 9         A    Just explaining policy.

10         Q    Did you attend college?

11         A    Yes.

12         Q    Where did you go?

13         A    University of Texas.

14         Q    When did you go there?

15         A    1992 to 1996.

16         Q    What did you major in?

17         A    Chemical engineering.

18         Q    And did you go to graduate school?

19         A    I went to medical school.

20         Q    When did you go to medical school?

21         A    1996 to 2000.

22         Q    When did you become a medical doctor?

23         A    In 2000 when I received my medical degree.

24         Q    Do you have any other licenses?

25         A    No.  Just medicine.
```

1      Q    Where did you go to graduate school -- to med

2  school?

3      A    University of Texas Medical Branch.

4      Q    Did you specialize in a specific field?

5      A    Psychiatry and then forensic psychiatry.

6      Q    Where did you specialize?

7      A    Sorry?

8      Q    Where did you specialize?

9      A    You mean where did I do my residency training?

10     Q    Yes.

11     A    I completed my residency training at Beth Israel

12 Medical Center in New York City.  And then I did my forensic

13 psychiatry fellowship through Albert Einstein College of

14 Medicine, Bronx.

15     Q    Besides what we have discussed, have you taken

16 any other certification program or licensing program?

17     A    No.

18     Q    Could you briefly walk me through your employment

19 history leading up to your current position?

20     A    After fellowship I took a position at Bellevue

21 Hospital Center on the Inpatient Forensic Psychiatry Unit,

22 and I was there as an attending psychiatrist, and then later

23 as unit chief until 2008.

24     So in 2008 I left Bellevue to come to the Office

25 of Mental Health in a position of medical director for the

1   Division of Forensic Services, and I have been at OMH since

2   that time.

3             I have a different title.  I'm no longer the

4   medical director.  Beginning in late 2019, I moved into the

5   associate commissioner role.  Someone else has the medical

6   director role now.

7       Q     Okay.  Now, what were the roles and

8   responsibilities that you had at the Division of Forensic

9   Services?

10      A     The Division of Forensic Services at OMH is

11  responsible for working with the OMH Forensic Psychiatric

12  Centers, as well as local jurisdictions around the

13  statutorily mandated populations, and those include

14  individuals who have been found unfit to stand trial and are

15  in need of restoration to fitness to return to their legal

16  proceedings, as well as the management of individuals who

17  have been found not responsible by reason of mental disease

18  or defect, not in terms of whether or not they reach that

19  verdict, but what happens afterwards.

20            There's also the state prison mental health

21  services that are offered to individuals in state custody,

22  both the inpatient program, as well as the

23  correctional-based programs, and sex offender management

24  under mental hygiene Article 10.

25            So within the Division of Forensic Services,

1    we're not providing any of those services directly, but we

2    are working with the facilities to help them with the

3    responsibilities and the services that they're providing, as

4    well as coordinating with any other stakeholders.

5          So local jurisdictions that might have patients

6    coming to and from services or the court systems

7    correctional facilities, those kinds of parties.  In broad

8    strokes, that's --

9          The medical director, the role was to provide

10   some of that clinical insight and understanding into the

11   services that were being provided to assist the central

12   office in navigating those relationships, as well as helping

13   the facilities in certain situations.

14   Q    Okay.  Division of Forensic Services, how long

15   did you work -- did you work there?

16   A    Since 2008.

17   Q    To whom did you report?

18   A    As a medical director, I would report to the

19   associate commissioner.

20   Q    Both?

21          I'll separate it.

22          To whom did you report when you were medical

23   director?

24   A    As medical director, I reported to whoever the

25   associate commissioner was at the time.

```
 1        Q      What's the name of the position you have right
 2   now?
 3        A      Associate commissioner for the Division of
 4   Forensic Services.
 5        Q      Who do you report to now?
 6        A      Now I report to --
 7               What's his title?
 8               -- deputy commissioner.
 9        Q      What's the name of the deputy commissioner?
10        A      Jeremy Darman.
11        Q      Who reports to you?
12        A      We have a deputy director within the Division of
13   Forensic Services who reports to me, and the medical
14   director also directly reports to me.
15        Q      Do you know Ann Marie Sullivan?
16        A      I do know Ann Maria Sullivan.
17        Q      You do?
18        A      Yes.
19        Q      What is your relationship with her?
20        A      She is the commissioner for the Office of Mental
21   Health, and so I know her in her role as the commissioner
22   for our agency.
23        Q      So do you have projects together?
24        A      There are times that we would -- she would have
25   something that she would want looked into, or there are
```

1    overall agency projects that the division might be

2    participating in.

3              We do not interact with her on a daily basis.

4       Q    Did you have a conversation with her before this

5    deposition?

6       A    Not about this deposition.

7       Q    When was the last time that you spoke to her?

8       A    Today is Friday.  I spoke to her on Tuesday.

9              MS. COWAN:  I think we lost you on video.

10             Is anyone else able to see her?

11             MS. KALKACH:  For me it's the other way around.

12     I cannot see anyone, I just noticed.  Like I can see

13        my --

14             Oh, my God, what is going on?

15             MS. COWAN:  We can see you now.

16             MS. KALKACH:  You can see me?

17             MS. COWAN:  Yes.

18             MS. KALKACH:  I don't know what's going on with

19        all my devices, apparently.

20             MS. COWAN:  Let's go off the record for a second.

21             (Discussion was held off the record.)

22             (Last question was read back.)

23   BY MS. KALKACH:

24      Q    Did she reach out to you or you reach out to her

25   or something else?

```
 1        A      I reached out to her.  I had a question.

 2        Q      So what was the sum and substance of this

 3   conversation?

 4        A      I wanted to ask her about her thoughts on

 5   accreditation options for the Article 10 program.

 6        Q      Did you have a conversation with her regarding

 7   this case?

 8        A      No.

 9        Q      Are you aware of what this lawsuit is about?

10        A      I think in large part, yes.

11        Q      How did you become aware of that information?

12        A      When I was contacted in terms of the

13   deposition -- this deposition.

14        Q      So when you say "in large part, yes," what does

15   that entail?

16        A      That this is about an inmate suicide -- inmate

17   patient suicide.

18        Q      Do you know Mr. Hal Meyers?

19        A      I do know him, yes.

20        Q      What is your relationship with him?

21        A      He has had --

22               He works for Central New York Psychiatric Center

23   in corrections-based operations, so there are times when he

24   will be at a meeting that the facility is having for

25   different reasons.
```

1              There is also a brief period when I had first
2     started working at OMH within the Division of Forensic
3     Services when he was also working within the Division of
4     Forensic Services.
5              I do not know how long he was there, but he was
6     not there much longer after I got there.
7        Q     Did you have a conversation with him about this
8     deposition?
9        A     No.
10       Q     Did you have a conversation with him before this
11    deposition?
12       A     I've known him since 2008, so at various times
13    I've talked to him.
14       Q     When was the last time that you spoke to him?
15       A     The last time that I've personally spoken to him
16    has been quite some time.  I cannot put a time frame on it
17    because I don't remember.  Not this year.
18       Q     How is the Office of Mental Health organized?
19             MS. COWAN:  Objection.
20       A     Well, it's --
21             There are different components within the central
22    office.  Some of them are folks on the community side, some
23    of them on licensing.
24             There is an Adult & Children's Division that
25    focuses on civil -- the civil side.

Deposition of Dr. Li-Wen Lee                                    Estate of Joseph P. King v. Ward, et al.

```
 1              And then there's also forensics, which I've
 2    described in terms of the key areas that are covered or
 3    encompassed within forensics.
 4              But there are also the psychiatric centers, which
 5    is how direct services are organized.  The psychiatric
 6    centers, some of them deliver only inpatient services.  Some
 7    of them have an outpatient footprint as well.  And they have
 8    their own structure of administration and supervision.
 9    BY MS. KALKACH:
10         Q    How many divisions does the Office of Mental
11    Health have?
12         A    How many what?
13         Q    Divisions.
14         A    How many divisions?
15         Q    Yes.
16         A    I mean, I know it will sound odd, but I will
17    actually need to look at it to count up the formal
18    divisions.  They're not all called divisions.  Some are
19    bureaus.  It gets complicated.
20         Q    I'm going to move to strike the portions that are
21    not responsive.
22              And what is the objective of the Office of Mental
23    Health for New York State?
24              MS. COWAN:  Objection.
25         A    The Office of Mental Health is a combination of
```

```
 1   providing mental health services in the public sector, as
 2   well as promoting and establishing policies for delivery of
 3   mental health services in New York State beyond the
 4   state-operated services.
 5   BY MS. KALKACH:
 6       Q     What is the mission of the Office of Mental
 7   Health for New York State?
 8       A     I can't quote it to you.
 9       Q     Okay.  Do you know the specific facts of this
10   case?
11             MS. COWAN:  Objection.
12       A     I know facts about this case.  I don't know if I
13   know every single fact about this case that you might know
14   or be thinking about.
15   BY MS. KALKACH:
16       Q     Were you aware that Mr. King committed suicide in
17   the New York State correctional facility?
18       A     Yes.
19       Q     Are you aware that Mr. King used his shoelaces to
20   commit suicide?
21       A     Yes.
22       Q     Are you aware that Mr. King had already attempted
23   to commit suicide with his shoelaces a couple of years
24   before?
25       A     Yes.
```

```
 1        Q     Did you ever talk about this lawsuit with anybody
 2   you work with?
 3        A     With the lawsuit, only in the context of this
 4   deposition and being asked to come and testify.
 5        Q     So, yes, you did?
 6        A     Yes.
 7        Q     Who did you speak to?
 8        A     We have our counsel who notified me that somebody
 9   was needed to testify for the commissioner, and she sent me
10   information connecting me with the Attorney General's
11   Office.
12        Q     Okay.  What are the names of these co-workers?
13        A     Peggy Drake.  Margaret Drake.
14              MS. COWAN:  OMH counsel, just so you know.
15   BY MS. KALKACH:
16        Q     When did you speak to them?
17        A     I think around the time that I was asked to
18   testify for the deposition, which may be about a month ago
19   or so, in order to understand what I was going to be
20   speaking to.
21        Q     Okay.  So what were the sum and substance of the
22   conversation you had with the commissioner?
23        A     With the commissioner?
24              Which conversation?
25              I'm sorry.  I don't understand.
```

```
 1        Q     I'm sorry.  I thought --
 2              I'm going to rephrase that.
 3              Can you please repeat the names of the two people
 4   you spoke with?
 5        A     It was one person.  I'm sorry.  Peggy and
 6   Margaret are the same person.
 7        Q     Okay.  What was the sum and substance of the
 8   conversation with Margaret?
 9              MS. COWAN:  Yeah, I'm going to object to that and
10        direct her not to answer.  That's an attorney that she
11        was speaking with from OMH.
12   BY MS. KALKACH:
13        Q     Do you remember when the lawsuit was filed?
14        A     No, I don't.
15              MS. KALKACH:  Off the record.
16              (Discussion was held off the record.)
17              MS. KALKACH:  I offer Exhibit A into evidence, if
18        you could please put Exhibit A.
19              VIDEO TECHNICIAN:  That will be marked; is that
20        correct?
21              MS. KALKACH:  Yes, that's correct.
22              (Exhibit A was marked for identification.)
23   BY MS. KALKACH:
24        Q     Dr. Lee, please take a minute to review this
25   exhibit.
```

Deposition of Dr. Li-Wen Lee                                    Estate of Joseph P. King v. Ward, et al.

```
 1              MS. KALKACH:  Technician, if you could please

 2        just scroll down.  She doesn't have to read every word,

 3        just to see if she recognizes the document.

 4   BY MS. KALKACH:

 5        Q     Dr. Lee, if you could please let me know when

 6   you're finished reviewing this document.

 7        A     These complaints don't come to me.

 8        Q     Are you finished reviewing the document?

 9        A     I'm on page 2, but what I'm trying to say is, no,

10   I did not read this before.

11              MS. KALKACH:  Okay.  We can stop showing

12        Exhibit A.  Thank you.

13   BY MS. KALKACH:

14        Q     Do you recognize the document which has been

15   marked as Exhibit A?

16        A     You mean have I seen it before?

17              I have not spent time with that document before.

18        Q     Do you recognize it?

19        A     What are you asking me by asking if I recognize

20   it?

21        Q     Have you seen it before?

22        A     No, I haven't read that.

23        Q     But have you seen it before?

24              You could have seen it, yet not read it.

25        A     I'm somewhat confused by that question.
```

Deposition of Dr. Li-Wen Lee                                    Estate of Joseph P. King v. Ward, et al.

```
 1        Q     Is this the first time that you see the document
 2   that was marked as Exhibit A?
 3        A     I believe so, yes.  I haven't read it.
 4              MS. KALKACH:  Okay.  I'm going to move to strike
 5         the portions not responsive.
 6              Now I would like to mark Exhibit B into evidence.
 7         Could you please show it to her?
 8   BY MS. KALKACH:
 9        Q     Please take a minute to review this exhibit, and
10   when you're finished, let me know.
11        A     I'm sorry.  It's too small.
12        Q     Is that better?
13        A     That's better.
14              VIDEO TECHNICIAN:  Did you want to take control
15         and walk through the document, Ms. Lee, or did you just
16         want to keep scrolling?
17              THE WITNESS:  You're fine.
18              MS. COWAN:  Were you going to ask if she's ever
19         seen this before?
20              MS. KALKACH:  Yes, yes, but it's -- that's what
21         I'm going to do.
22              (Exhibit B was marked for identification.)
23   BY MS. KALKACH:
24        Q     Just let me know if you're finished reviewing the
25   document.  I just want to know if you recognize it and if
```

1    you have seen it before.

2         A    I haven't seen it before, and I don't recognize

3    it.

4              MS. KALKACH:  Okay.  Thank you so much,

5         Technician.

6    BY MS. KALKACH:

7         Q    Have you signed any written statements or made

8    any recorded statements or spoken to any attorneys or

9    investigators or reporters about the events related to this

10   lawsuit?

11        A    Not related to the lawsuit.

12             Speaking with Aimee, counsel.

13        Q    Did you know Joseph King?

14        A    I do not know him, no.

15        Q    Before today have you ever heard about Mr. Joseph

16   King?

17        A    Yes, I have.

18        Q    When did you hear about him?

19        A    At the time of his suicide, Central New York has

20   a notification procedure, so they sent out notice.

21        Q    How did you receive notice?

22        A    E-mail notification saying that a suicide has

23   occurred.  It provides a little bit of basic information,

24   where, when, that kind of thing.

25        Q    Do you remember this other information that was

Deposition of Dr. Li-Wen Lee                                    Estate of Joseph P. King v. Ward, et al.

1     in the notice?

2          A     The usual notice is generally the same.  It's got

3     the location, the date, basic information, demographic

4     information, age of the individual, some other diagnoses, if

5     there was -- how suicided.

6                It's usually very preliminary information, and

7     it's considered just the notification.

8          Q     Do you know when he was incarcerated?

9          A     I believe that was starting in 2013.

10         Q     How many of these notices have you received in

11    the past year?

12         A     In the past year?

13         Q     Yes.

14         A     I don't have that number accurately off the top

15    of my head.

16               If you want an estimate, I can give you an

17    estimate.

18         Q     Yeah.  Do you have an estimate?

19         A     Maybe in the last 365 days, 8 or so.

20         Q     In 2018 do you have an approximate of how many of

21    these notices that you received?

22         A     2018, the number varies somewhere between --

23    2018, I don't remember the exact number.  For 2018, there

24    might have been around 15 or so.

25               I'm sorry.  When I said earlier about 6 or 8

```
 1    notices, I didn't mean 365 days.  That was an inaccuracy.  I
 2    meant for the last -- starting for 2022.
 3         Q    I see.  So approximately over a year --
 4              Okay, strike that.
 5              Is there an approximate number of notices that
 6    you receive per year since you have been working at the OMH?
 7         A    Yeah, there's a range.  It might be maybe 12 to
 8    20, in there somewhere.  Every year is different.
 9         Q    Do you have access to that information?
10         A    Yes, I do.
11         Q    Is there a yearly report, or where is this
12    information?
13         A    We go over suicides on a recurring basis through
14    the year to try to understand if there are trends or other
15    areas to make a change.
16              So we do talk about the numbers on an ongoing
17    basis with Central New York.
18         Q    How often do you go over the suicide trends?
19         A    It depends.  We talk about trends at least twice
20    a year.
21              Central New York talks about trends internally
22    much more often than that.
23         Q    Once you have the meeting, is there a report that
24    comes out of it or any official document at the conclusion
25    of these meetings?
```

1      A     We don't make an official report.  It's more of a

2  discussion.

3      Q     Who was involved in the discussion?

4      A     There's --

5            So there's a discussion to look at trends, which

6  would involve the medical director for the Division of

7  Forensic Services, deputy director for Central New York's

8  corrections-based operations, director of suicide

9  prevention, clinical director, chief psychologist, executive

10  director, to talk about it.

11            And they have also, again, their own meetings,

12  including some meetings with Department of Corrections, to

13  talk about suicide prevention.

14      Q     Are you aware of any policy regarding inmates

15  with mental illness?

16            MS. COWAN:  Objection.

17      A     Central New York has a whole slew of policies

18  around how they provide services to inmates with mental

19  illness.

20  BY MS. KALKACH:

21      Q     What are the names of these policies?

22      A     I don't know the names of all of them.  There's a

23  lot.

24            They have a policy manual.  If I need something,

25  I'll look it up, but I don't have them off the top of my

1   head.

2        Q      Who creates these policies?

3        A      Central New York Psychiatric Center creates those

4   policies to be consistent with OMH agency policies.

5        Q      And who approves the policies?

6        A      The facility policies, they have an internal

7   policy approval that also involves their medical staff

8   organization.

9        Q      So what I want to understand is, what is the

10  process of creating a policy from beginning to end?

11       A      I'm not involved in their policy creation.  I'm

12  not sure I can describe that to you with any accuracy.

13       Q      Do you know how often the policies get updated?

14       A      That's going to depend.  Sometimes I know that if

15  they change a practice, they're going to update a policy.

16              If they set up a new program, they're going to

17  update the policy.

18              If there's a change in a joint commission

19  requirement, they'll change policy to be consistent.

20              So there are different things that will trigger a

21  policy update.

22       Q      Would a trend in suicide be something that would

23  trigger a change in policy?

24       A      A trend by itself doesn't trigger a change in

25  policy, but if there's a change in practice related to a

```
 1   trend, then that would trigger a change in policy.

 2        Q     Can you please explain this a little bit further?

 3        A     I'm trying to think of a way to explain it.

 4              So systems of care in psychiatric centers

 5   included -- have quality management, quality improvement

 6   practices to review the care that's been delivered and

 7   review outcomes.

 8              If they identify a problem, then they look at how

 9   to -- whether it's a systemic issue or a one-time issue and

10   try to make decisions about how to improve upon those

11   issues, those problems, and sometimes those reviews result

12   in deciding to make a modification to a policy.

13              So it would depend.  It's not always a specific

14   trend.  It might just be an area that they're continuously

15   looking to improve upon, so maybe no specific trend, but

16   just something that they think is better, and they might be

17   responding to that.

18        Q     Understood.

19              Who is in charge of updating the policies?

20        A     The facilities update their own policies.

21        Q     Do you know what the process from beginning to

22   end for updating a policy is?

23        A     No, only generally.  I don't know the beginning

24   to end.

25        Q     Can you explain generally how it works?
```

1       A       The psyche centers have their own structure of

2    administration and supervision.

3               When they identify a need, either one of these --

4               Maybe a joint commission accreditation

5    requirement has changed.

6               Maybe they've decided to update a practice.

7               Whatever it is, if they've decided that there's a

8    need to change a policy, then they will pull the policies

9    that are impacted by this change, and they have their own

10   process to revise and review.  I'm not qualified to speak to

11   their internal steps.

12      Q       I understand.

13              When you say "they," do you know what the

14   position of the people that decide when to revise and review

15   are?

16      A       I don't know if it's a specific person that

17   you're looking for who would say, okay, it's time to revise

18   a policy, but they have a team approach to administration

19   and supervision.

20      Q       So this goes to my next question.

21              Which department is in charge of overseeing the

22   updates of the policies?

23      A       It's a combination I think in terms of

24   responsibility for policy development.  They have quality

25   management involved.  The clinical director would be

 1   involved, the deputy director.

 2            There might be other individuals, depending on

 3   what kind of policy it is.

 4       Q    Who within the department is in charge of

 5   overseeing that the policies get updated?

 6       A    I don't know who the specific person would be

 7   that they would give that to.

 8       Q    Would they be in charge of the team that

 9   administrates and supervises the policies?

10       A    Their policy development?

11            I'm not involved in their process of policy

12   development.  These questions I don't know the specific

13   answers to.

14       Q    Okay.  After the policy is updated, do you know

15   who is in charge of distribution?

16       A    I do not know who specifically is in charge of

17   distribution.

18       Q    Do you know the position of the person that would

19   be in charge of distribution?

20       A    No.

21            All I know about policy distribution is that when

22   they decide on a new policy, that they have a process of

23   distributing it, but I do not get involved in how they do

24   that.

25       Q    Okay.  Do you know if it's an electronic or paper

1    distribution?

2        A     I would imagine so.

3        Q     Both, electronic and paper or electronic or only

4    paper?

5        A     I would have to guess.

6              These days there's a lot of electronic

7    distribution, and sometimes there's paper, and sometimes

8    there's both.

9        Q     I'd rather not have you guessing.

10             If you don't know, just --

11       A     I don't know.  That's what I'm trying to say is,

12   I don't know.

13       Q     Do you know who makes sure that the new policy

14   gets delivered to their distribution destination?

15       A     No, I don't.

16       Q     Do you know who ensures that the policy gets

17   taught to the people who are supposed to follow it?

18       A     No, I don't keep track of that either.

19       Q     Do you know --

20             Do you know the amount of time that could pass

21   between the update of a policy and the training of all the

22   people that are obliged by a policy?

23             MS. COWAN:  Objection.

24       A     I can't answer that.  I don't actually know.

25

```
 1    BY MS. KALKACH:

 2        Q     Have you read any of the policies regarding

 3    inmates with mental illnesses?

 4        A     Some of them, yes.

 5        Q     Which ones have you read?

 6        A     I think I'd need to see the manual, and then I

 7    could tell you.  I don't have those memorized.

 8        Q     How long ago did you read them?

 9        A     I read them on an ongoing basis, depending what

10    I'm looking for, you know.  There's --

11              It can be sporadic, sometimes more often than

12    others.  I'm not sure how to answer that.

13        Q     Why did you read them?

14        A     Usually because I'm looking for how something is

15    defined.

16              There are a lot of different statutes that are

17    put out or proposed that might impact how services are

18    delivered, so I would refer to a policy to understand what

19    that might mean.

20        Q     What did you learn about them?

21        A     What did I learn about what?

22        Q     About the policies as they existed, what did you

23    learn about them?

24        A     Oh, I mean, every psyche center has policies.

25              So when we're looking for policies, we ask the
```

```
 1   psyche center for access.

 2        Q     Do you get training on these policies, or do you

 3   learn them on your own?

 4        A     No.

 5              I'm not a facility-based staff person.  I

 6   wouldn't get training in their policies.

 7        Q     At the facility centers, do you know who provides

 8   the training?

 9        A     They have an admin training department who

10   provides training.

11        Q     Do they get continuing training, or do they only

12   train once?

13        A     I don't know their schedule for training, but I

14   know that Central New York has a continuous approach to

15   keeping their staff up to date.

16        Q     Do all the people that need to follow the policy

17   receive training when they join the company?

18        A     You want to know if every new employee gets

19   training?

20        Q     Yes.

21        A     All the employees are oriented to a facility and

22   what they need to do.

23        Q     Do they get training in policies?

24        A     I have never sat in on their new employee

25   training.
```

Deposition of Dr. Li-Wen Lee                    Estate of Joseph P. King v. Ward, et al.

```
 1        Q     Do you know if the training for the policies is
 2   voluntary or mandatory or something else?
 3        A     I would have to assume.  I'm not involved in
 4   their training.
 5        Q     Now I'm going to go back a little bit about when
 6   we were speaking about the processes.
 7              Who would know all this information?
 8              MS. COWAN:  Objection.
 9   BY MS. KALKACH:
10        Q     Who specific --
11              Who would know the process from beginning to end
12   for updating a policy?
13        A     Central New York administration would be.
14        Q     Are you aware of any document that has all this
15   information?
16        A     There might be.  I don't know.
17        Q     Okay.  Are you aware of any policies regarding
18   shoelaces and inmates?
19        A     Not specifically about shoelaces.
20        Q     Okay.  Are correctional facilities assigned a
21   mental health level?
22        A     Yes.
23        Q     Are you aware which facility Mr. King was housed?
24        A     He was at Mid-State.
25        Q     Do you know which mental health level was it
```

```
 1   assigned?

 2        A    I would want to check that to be sure instead of

 3   telling you what I think.

 4        Q    So you don't know?

 5        A    No.

 6        Q    How do the correctional facilities obtain their

 7   health level?

 8        A    It's decided jointly between OMH and the

 9   Department of Corrections in terms of where logistically

10   they can set up services, how much capacity is needed.

11        Q    What is the relationship between Mid-State

12   Correctional Facility and the Office of Mental Health of New

13   York?

14             MS. COWAN:  Objection.

15        A    Are you asking --

16             Well, so at Mid-State Correctional Facility, that

17   is a facility operated by the Department of Corrections and

18   Community Services, and they have their own hierarchy.

19             Mental health services are provided on site by

20   Central New York Psychiatric Center staff.  CNYPC is an OMH

21   psychiatric center.

22   BY MS. KALKACH:

23        Q    Okay.  How is it decided when an inmate should be

24   assigned to a specific correctional facility?

25        A    There are different factors that are considered,
```

Deposition of Dr. Li-Wen Lee                                    Estate of Joseph P. King v. Ward, et al.

1   and they're not all up to CNYPC.  But if an individual is

2   admitted to caseload, the clinician will decide what level

3   of services is appropriate, and that will be one of the

4   considerations in terms of which facility they then go to.

5           The Department of Corrections has other

6   considerations for which facility they should go to.

7      Q     When do they see the clinician?

8      A     When do they see the clinician?

9      Q     Yes.

10     A     They need to see --

11          Depending what kinds of services they're getting,

12   but in general population they would be expected to see the

13   psychiatrist minimally every 90 days and primary therapist

14   monthly, and there's flexibility left for additional

15   in-between sessions left to clinical judgment.

16     Q     When would an in-between session happen?

17          Why would it happen?

18          MS. COWAN:  Objection.

19     A     Hypotheticals, if the clinician and patient were

20   trying to change something, and they thought an in-between

21   session made sense.  If there was some increased level of

22   concern, they might see them more frequently.  If a patient

23   had an issue, they might be seen sooner.

24          It would depend.

25

```
 1  BY MS. KALKACH:

 2       Q      I understand.

 3              Are there any guidelines for a therapist to know

 4  when to assign these in-between sessions?

 5       A      They're asked to consider circumstances and,

 6  again, clinical judgment.

 7       Q      Okay.  Are you familiar with the screening that

 8  is done to the inmates?

 9              MS. COWAN:  Objection.

10       A      Which screening?

11  BY MS. KALKACH:

12       Q      The initial screening.

13       A      Yes.

14       Q      What could be the consequences of the screening?

15              MS. COWAN:  Objection.

16       A      The screening is looking for individuals who

17  might need mental health services.

18              So some individuals wind up being determined to

19  not need any, and they won't be opened to services, others

20  will be, or sometimes additional information is needed.

21  BY MS. KALKACH:

22       Q      Would the screening affect the supervision and

23  treatment that an inmate may receive?

24       A      The screening is used to determine who needs

25  treatment.
```

```
 1       Q       So would it affect the supervision and treatment
 2    that an inmate may receive?
 3               Yes or no?
 4               MS. COWAN:   Objection.
 5       A       Yes.
 6    BY MS. KALKACH:
 7       Q       Who's in charge of prescribing medication to
 8    inmates?
 9       A       Psychotropic medications or medications in
10    general?
11       Q       Medications in general.
12       A       Then that depends.
13               If it's related to psychiatric treatment, it
14    would be a psychiatrist or nurse practitioner working for
15    Central New York Psychiatric Center.
16               If it's for general medical treatment, then
17    that's the purview of the DOCCS Medical.
18       Q       How many times does an inmate see a medical
19    doctor that could prescribe medication?
20       A       I'm sorry.  For psychiatric treatment or medical
21    treatment?
22       Q       For both.  Let's separate it.
23               How many times does an inmate see a medical
24    doctor for psychiatric treatment that could prescribe
25    medication?
```

 1      A      If they're taking medication, the minimum is once

 2   every 90 days.

 3      Q      And how many times does an inmate see a medical

 4   doctor that could prescribe medication, the regular one?

 5             MS. COWAN:  Objection.

 6      A      They can request a call-out.  I can't speak to

 7   DOCCS medical policy.

 8   BY MS. KALKACH:

 9      Q      How often does an inmate see his or her social

10   worker?

11             MS. COWAN:  Objection.

12      A      You mean the primary therapist?

13   BY MS. KALKACH:

14      Q      Yes.

15      A      They need to see that person monthly.

16      Q      Is there a policy that specifies how often should

17   an inmate see his or her social worker?

18      A      I'm sure there is.

19      Q      Is there a policy that specifies how often should

20   an inmate see his or her medical doctor?

21             MS. COWAN:  Objection.

22      A      Medical doctors in DOCCS medical-medical doctor

23   or if a medical doctor as an MD psychiatrist?

24   BY MS. KALKACH:

25      Q      Both.

```
 1        A    So, again, I don't -- I can't speak to another

 2   agency's policies for medical practices.

 3             For medication management, it's once every 90

 4   days.

 5        Q    If an inmate requests to see a doctor, how

 6   quickly should they be addressed?

 7             MS. COWAN:  Objection.

 8        A    I don't remember what the CYNPC policy is on how

 9   quickly they respond to it.

10   BY MS. KALKACH:

11        Q    Is there a policy that states so?

12        A    If they --

13             States what though?

14             I'm sorry.  Can you reframe your question?

15        Q    Yes, I can.

16             If an inmate requests to see a doctor, is there a

17   policy that states how quickly they should be addressed?

18             MS. COWAN:  Objection.

19        A    I don't know what the actual policy would be on

20   that.

21   BY MS. KALKACH:

22        Q    In general who or what organization oversees that

23   all mental health policies are followed?

24             MS. COWAN:  Objection.

25        A    There's multiple layers of review.
```

```
 1              Within Central New York Psychiatric Center, they

 2   have supervisors who work with clinicians.  There are

 3   outside entities that review for following policies, the

 4   Justice Center, the Commission on Correction.

 5   BY MS. KALKACH:

 6       Q     What are the consequences of not following a

 7   policy?

 8              MS. COWAN:  Objection.

 9       A     It depends.

10   BY MS. KALKACH:

11       Q     I'm going to make it more specific.

12              What are the consequences of a correctional

13   facility that does not follow a policy?

14              MS. COWAN:  Objection.

15       A     I don't understand.

16   BY MS. KALKACH:

17       Q     So if a correctional facility is not following a

18   policy, what would be the consequences of this?

19              MS. COWAN:  Objection.

20       A     I don't --

21              I don't think we think of a facility not

22   following a policy.

23              Do you mean a staff person not following a

24   policy?

25
```

```
 1    BY MS. KALKACH:

 2         Q     Yes.

 3         A     It depends on in what way the policy wasn't

 4    followed or what that policy was, what the consequences of

 5    not following a policy were.

 6         Q     Are there --

 7               Scratch that.

 8               Is there audits or a system that is followed to

 9    have correctional facilities in check with their policy

10    compliance?

11         A     Yes, there is accreditation on the correctional

12    side.  We have direct commission accreditation.  Internal

13    CNYPC has their own mechanism for reviewing quality of care.

14         Q     What is the name of this mechanism?

15         A     The mechanism?

16               I don't know what you mean.

17         Q     Scratch that.

18               How does the accreditation work?

19               MS. COWAN:  Objection.

20         A     Accreditation?

21    BY MS. KALKACH:

22         Q     Yes.

23         A     Joint Commission on Accreditation is around every

24    three years.  The Joint Commission will come into the

25    facility, Central New York Psychiatric Center, and while
```

```
 1   they are accrediting CNYPC, they will also visit some of the
 2   correctional locations for CNYPC.
 3              While they're there they will look at
 4   documentation.  They will talk to staff.  They will ask
 5   questions.  They will look at the environment of care.
 6        Q    So you said they go to some of the correctional
 7   facilities.
 8              How do they choose which facilities to go to?
 9              MS. COWAN:  Objection.
10        A    I don't know.  I have no idea.
11   BY MS. KALKACH:
12        Q    Are there any sanctions that should be put in
13   place when a correctional facility does not follow the
14   policies?
15              MS. COWAN:  Objection.
16        A    I don't understand what you're asking.
17   BY MS. KALKACH:
18        Q    So after they do the audit and they look at the
19   documentation and everything, if a correctional facility is
20   not complying with the policies, is there any sanction that
21   they get?
22        A    You're asking about accreditation?
23        Q    Yes.
24        A    When the Joint Commission has completed the
25   review, they will tell the facility -- by this I mean
```

```
 1   Central New York Psychiatric Center -- what their findings
 2   are and if there needs to be a corrective action plan or
 3   not.  That's up to the Joint Commission.
 4           It's theoretically possible that a location could
 5   lose accreditation.  That hasn't happened.
 6      Q     Could you please repeat that last?
 7      A     That hasn't happened.
 8      Q     Before that.
 9      A     It's theoretically possible to lose
10   accreditation.
11           They're not accredited by individual correctional
12   facility.  Their accreditation is for Central New York.
13      Q     Are there any policies regarding inmates that
14   have attempted to commit suicide?
15           MS. COWAN:  Objection.
16      A     There are policies around suicide, risk
17   assessment, policies for different units.
18   BY MS. KALKACH:
19      Q     Who drafted these policies?
20      A     Those would have been drafted by Central New York
21   Psychiatric Center.
22      Q     Who oversees these policies are followed?
23      A     CNYPC.
24      Q     How often do the policies get updated?
25           MS. COWAN:  Objection.
```

Deposition of Dr. Li-Wen Lee                                    Estate of Joseph P. King v. Ward, et al.

```
 1   BY MS. KALKACH:

 2        Q    I'm sorry.  What was your answer?

 3        A    It depends.

 4        Q    What does it depend on?

 5        A    It could depend on if there's a review of a

 6   negative outcome.  If they identify a problem and they

 7   wanted to change their policy, they might update it then.

 8   If they decided to improve their suicide risk assessment,

 9   they might update it then as well.

10             It might not be linked to a specific problem.  If

11   there's a change in requirement somewhere else from the

12   Joint Commission or something like that, they might update

13   it then as well.

14        Q    Do you know who is in charge of updating these

15   policies?

16        A    The CYNPC has their process for updating their

17   policies.

18             I'm not involved in their day-to-day work on

19   updating policies.

20        Q    So you don't know the process from beginning to

21   end on how to update the policies for CYNPC?

22        A    I do not.

23        Q    Okay.  Do you know how they get distributed?

24        A    I know they get distributed.  I don't get

25   involved in how they distribute, so no.
```

Deposition of Dr. Li-Wen Lee                               Estate of Joseph P. King v. Ward, et al.

```
 1        Q     Is there a policy about how to deal with an
 2   inmate with a mental illness?
 3             MS. COWAN:  Objection.
 4        A     I'm not sure how to answer that question, how to
 5   deal with an inmate with a mental illness.
 6   BY MS. KALKACH:
 7        Q     Yes.  Let me try to rephrase that one.
 8             Is there a policy about how to treat an inmate
 9   with a mental illness?
10             MS. COWAN:  Objection.
11        A     Treatment isn't dictated through policy.
12   Treatment is guided by clinical judgment, clinical practice.
13   BY MS. KALKACH:
14        Q     When I say "treat," I don't mean it as treatment
15   like medical treatment, but more about how they conduct all
16   the actions that you must take when an inmate has a mental
17   illness.
18             MS. COWAN:  Objection.
19        A     Policies are structural.  They talk about
20   documentation and program structure.  They don't tell a
21   clinician how to treat someone.
22   BY MS. KALKACH:
23        Q     Again, I'm not talking about treatment.  Please
24   scratch that.
25             Is there a process to report an inmate when they
```

```
 1   speak about suicide?

 2            MS. COWAN:  Objection.

 3        A    When an inmate says they feel suicidal, is there

 4   a process to report it?

 5            Is that what you're asking?

 6   BY MS. KALKACH:

 7        Q    Yes.

 8        A    There is an expectation that an inmate who

 9   reports suicidal ideation is assessed, and then the

10   clinician takes appropriate steps.

11        Q    So if there's an inmate that has been speaking

12   about suicide, which people in a correctional facility would

13   need to be aware of it?

14            MS. COWAN:  Objection.

15        A    In general, if there's an individual who is

16   reporting suicidal ideation, then we would want the mental

17   health unit made aware so that the individual could be

18   assessed, and they could make a determination about the

19   circumstances and individually assess that person to

20   determine what's appropriate.

21   BY MS. KALKACH:

22        Q    And how would mental health be made aware --

23            Okay, scratch that.

24            Who are the people in a correctional facility

25   that would need to be aware of the process?
```

Deposition of Dr. Li-Wen Lee                                    Estate of Joseph P. King v. Ward, et al.

```
 1                   MS. COWAN:  Objection.
 2         A     What happened --
 3    BY MS. KALKACH:
 4         Q     Of the process to report, yes.
 5         A     I think staff and correctional facilities on the
 6    correctional side or on the mental health side are aware
 7    that if an inmate reports suicidal ideation that it needs to
 8    be communicated to the mental health unit.
 9         Q     How are all of these people that you mentioned
10    made aware of the process?
11         A     I don't know.  I'm not responsible for training
12    any of them.  They're their own policies.
13         Q     Is there a policy that contains any guidance
14    regarding special treatment inside the correctional?
15                   MS. COWAN:  Objection.
16         A     What do you mean by "special treatment"?
17    BY MS. KALKACH:
18         Q     Special treatment to people -- inmates with
19    mental illness.
20                   MS. COWAN:  Objection.
21         A     There are policies about the programs that are
22    established where they can be or can't be within a
23    correctional facility, what happens in disciplinary.
24                   There are policies, but I'm not sure what you
25    mean.
```

```
 1   BY MS. KALKACH:

 2       Q     Is there a specific area within the correctional

 3   facility where people with mental illness should be?

 4             MS. COWAN:  Objection.

 5       A     There are different levels of treatment, so it

 6   depends on the clinical assessment of their needs.

 7   BY MS. KALKACH:

 8       Q     Okay.  What are these different levels of

 9   treatment?

10       A     They are similar to the community structure of

11   treatment.  So in the community outside of prisons, just

12   because a person has a mental illness doesn't mean by itself

13   where they should or shouldn't be.

14             So within a correctional facility, some

15   individuals who need mental health treatment, but only need

16   clinic-level services can stay in general population and

17   come to the mental health unit for their appointments.

18             Some individuals may live in a more structured

19   unit intended for individuals with serious mental illness

20   who need more support, and some may need inpatient-level

21   treatment, so they would go to CYNPC.

22             There's an assortment of programs trying to

23   provide a spectrum of services.

24       Q     Should people that have tried to commit suicide

25   inside a correctional get any special attention or care?
```

Deposition of Dr. Li-Wen Lee                                    Estate of Joseph P. King v. Ward, et al.

```
 1              MS. COWAN:  Objection.
 2      A     If a person has attempted suicide in the past,
 3   that's important information, but what kind of care they
 4   need currently is going to depend on a number of different
 5   factors besides what's happened in the past.
 6   BY MS. KALKACH:
 7      Q     Which ones are these factors?
 8      A     Current circumstances, their symptoms, the
 9   overall clinical presentation, how their presentation is
10   understood, what the different contributing issues might be.
11              Individuals who have committed suicide, their
12   clinical presentation and assessment will change over time.
13   There's not an automatic assumption that once you've
14   committed suicide that there's anything -- that you're
15   permanently placed in any particular location.
16              Just like in the community, there are individuals
17   who have committed suicide, but they return home and go
18   about their daily lives again.
19      Q     According to the policies, would an inmate be
20   allowed to have his shoelaces after he had attempted suicide
21   with them in the past?
22              MS. COWAN:  Objection.
23      A     So it depends if they had acute risk and were
24   currently in crisis and admitted to the crisis unit.
25              Maybe not but, if not and they're more stable or
```

 1   living in general population, people get their shoelaces

 2   back.

 3   BY MS. KALKACH:

 4        Q     Who makes this decision?

 5        A     The treatment team makes these decisions.

 6        Q     After a suicide attempt, should an inmate be

 7   reevaluated?

 8        A     Reassessed after something as serious as a

 9   suicide attempt, yes.

10        Q     After a suicide attempt, should an inmate be

11   screened again to know where he's supposed to be to receive

12   adequate supervision and treatment?

13             MS. COWAN:  Objection.

14        A     Part of the assessment is deciding what kind of

15   treatment they need.

16   BY MS. KALKACH:

17        Q     Are you familiar with Special Housing Unit?

18        A     Yes.

19        Q     Is there any reason to send an inmate to a

20   Special Housing Unit?

21             MS. COWAN:  Objection.

22        A     Special Housing Units are run by the Department

23   of Corrections.  They make those decisions about who goes.

24   BY MS. KALKACH:

25        Q     Do you know the reasons for sending an inmate to

Deposition of Dr. Li-Wen Lee                    Estate of Joseph P. King v. Ward, et al.

```
 1   Special Housing Unit?
 2       A     It's related to an individual sustaining an
 3   infraction.
 4       Q     What do you mean by that?
 5       A     Breaking one of the rules within the Department
 6   of Corrections, they decide -- security decides what the
 7   appropriate action is.  Sometimes they decide to send
 8   someone to the Special Housing Unit.
 9       Q     So it would be only something related to an
10   infraction in order to be sent to a Special Housing Unit?
11       A     To go to Special --
12             Yes.
13       Q     Do you know what a suicide watch commander is?
14             MS. COWAN:  Objection.
15       A     That's on the correctional side.  I'm aware of
16   the term.
17   BY MS. KALKACH:
18       Q     You are aware of the term, or no?
19       A     Yes.
20       Q     Do you know who has this position?
21       A     No, I don't.
22       Q     Do you know what this person's duties are?
23       A     They work with the mental health team on those on
24   suicide watch.
25       Q     Do you know who appoints this person?
```

1      A     No, I do not.

2      Q     Do you know what suicide watch is?

3      A     Yes.

4      Q     When is an inmate placed on suicide watch?

5      A     When there is concern about an inmate's suicide

6   potential for some reason, there can be a decision to put

7   them on watch until it can be assessed.

8      Q     Are there any standard items that an inmate

9   should have when he's put in suicide watch?

10           MS. COWAN:  Objection.

11     A     Standard items of --

12           There are --

13           There can be decisions about what they can't

14   have.

15   BY MS. KALKACH:

16     Q     Who makes these decisions?

17     A     It depends.

18     Q     On what?

19     A     The Department of Corrections DOCCS staff can

20   initiate watches if it's off-hours.  But if someone goes

21   into the RCTP, the mental health treatment team would decide

22   what's appropriate or not appropriate in terms of

23   restrictions.

24     Q     Do you know what a parole board hearing is?

25     A     No, that I don't.

```
 1        Q      Is there a policy on suicide prevention?

 2        A      There's a policy on suicide risk assessment.

 3        Q      Who drafted this policy?

 4        A      It's a CNYPC policy.

 5        Q      Who oversees that the policy is followed?

 6        A      Also CNYPC.

 7        Q      Who knows how often the policy gets updated?

 8        A      That would depend on different things, like if

 9   there's a change -- change in environments or they've

10   decided to change their own practice to try to improve what

11   they're doing.  It depends.

12        Q      If this policy, suicide risk assessment, is not

13   being followed, is there an organization within OMH that

14   follows up on the correctional facilities complying with it?

15        A      Organization within Office of Mental Health

16   that --

17               CYNPC has an incident review process, and they

18   determined if policies are not followed.  They also decide

19   what kind of intervention is appropriate.

20        Q      Which kind of intervention do they have?

21        A      It depends.  Sometimes it might be retraining.

22   In other circumstances it might be other kinds of individual

23   supervision.

24        Q      Are there more, or those are the only

25   interventions?
```

1        A       I'm sure there are others, and I think it would

2    depend.

3        Q       Who is in charge of the incident review process?

4        A       At the facility level, they have their process,

5    and their administration supervisors are involved in this

6    review process.

7        Q       Who decides the kind of intervention that would

8    apply to the specific case?

9        A       CNYPC administration and the supervisor that's

10   appropriate, depending on what the staff person's discipline

11   was, would decide.

12       Q       Are there training or education on suicide

13   prevention?

14       A       There are, yes.

15       Q       Who receives it?

16       A       There might be some variation in the exact

17   audience, but they provide training to all of their staff.

18               There's also training to the Department of

19   Corrections staff.

20       Q       How often do they receive it?

21       A       New staff receive it.  I believe it's annually

22   given to the Department of Corrections.  Mental health

23   staff, they have different trainings at different points.

24       Q       Okay.  So for a training that is annually, when

25   is this given?

```
 1        A     I don't know when they do that.

 2        Q     Do you know who provides it?

 3        A     There's joint training between the Department of

 4   Corrections and OMH and CNYPC.

 5        Q     And who pays for the training?

 6        A     Who pays for it?

 7        Q     Mm-hmm.

 8        A     I suppose both, staff time.

 9        Q     How long does a training last?

10        A     I don't know that off the top of my head.

11        Q     Is there a policy that speaks about official

12   evaluations for suicide risk?

13        A     They have an official suicide risk assessment

14   tool, yes.

15        Q     Do you know which policy is the one that has this

16   official evaluation?

17        A     The policies are numbered, and I don't remember.

18        Q     Do you know who drafted this policy?

19        A     I don't know which specific person drafted it,

20   no.

21        Q     Do you know which position would this person

22   have -- the person that drafted the policy have?

23        A     My understanding is that their policies are

24   drafted jointly.  It's not one single person who's writing

25   all of these.
```

1    Q     Okay.  What are the positions of the people that
2    draft the policies?
3    A     I don't know which specific people get involved
4    in each policy.  But in general policy development, they
5    have an administrative and supervisory structure who would
6    be involved in some of the revisions, or at least reviewing
7    them.
8    Q     Who oversees that the policy is followed?
9    A     CNYPC has a supervisory structure, and they
10   ensure that their policies are followed.
11   Q     So evaluation for suicide risk, the policies that
12   contain this official evaluation, who oversees that this
13   policy is followed?
14         MS. COWAN:  Objection.
15   A     I feel like you're asking for a specific person.
16         Is that what you're asking?
17   BY MS. KALKACH:
18   Q     No.  I'm asking for either a department or a team
19   or something else.
20   A     Clinical supervision, and there's a structure for
21   that.
22   Q     How often do the evaluations for suicide risk
23   should be made?
24   A     When somebody comes off of services, they get
25   reassessed or the packet is reviewed, potential risks redone

```
 1   and transferred to pending.

 2              It needs to be redone if the circumstances change

 3   or if they've been admitted to the inpatient and are

 4   returning to the facility.  They need to be redone.

 5        Q     What is a risk factor?

 6              MS. COWAN:  Objection.

 7        A     I'm sorry.  I talked over you and didn't hear

 8   what you said.

 9   BY MS. KALKACH:

10        Q     What is a risk factor according with the

11   policies?

12        A     A risk factor is something that increases a

13   person's chances of some sort of outcome that you're trying

14   to avoid.

15        Q     Is there a list of risk factors?

16        A     There's a list of risk factors in CNYPC's risk

17   assessment tool.

18        Q     Do you know what the list is?

19        A     I've seen the list.  There's a lot of them.  It's

20   a combination of historical risk factors, clinical risk

21   factors, acute stressors.

22        Q     Okay.  So how is the evaluation for suicide risk

23   performed?

24        A     It's partly based on the clinical assessment, the

25   interview with the individual, what they have to say, but it
```

 1   also takes into account historical information.

 2            So it's both of those things that provide the

 3   foundation for the information used to fill out the suicide

 4   risk assessment.

 5        Q     Who performs the evaluation?

 6        A     The primary therapist who is doing the

 7   assessment.

 8        Q     Are the people performing the evaluation trained?

 9        A     Yes.

10        Q     How often?

11        A     I don't know how often exactly that they're

12   trained.

13        Q     How long are the trainings?

14        A     I've never delivered one of the trainings.  I do

15   not know how long they are.

16        Q     Who would receive the training?

17        A     Mental health staff at the units.

18        Q     Are you aware of any other suicides that happened

19   in the Mid-State Correctional Facility during 2013 to 2018?

20        A     There might be.  I did not go back and look at

21   that specifically for today.

22        Q     Are you aware of any changes to the policies and

23   directives of Mid-State Correctional Facility as a

24   consequence of other suicides during 2013 to 2018?

25            MS. COWAN:  Objection.

```
 1          A      I don't know that specifically.
 2    BY MS. KALKACH:
 3          Q      Do you know if Mid-State Correctional Facility
 4    kept a suicide watch log?
 5          A      I would have to guess that they did, but I did
 6    not see it.  I don't know.
 7          Q      In general, who has access to a facility suicide
 8    watch log?
 9          A      I've never gotten involved in that question.  I
10    don't know the answer to it.
11          Q      Okay.  Are there any policies about suicide?
12                 MS. COWAN:  Objection.
13          A      Policies about suicide?
14                 There's policies, and some of them encompass
15    suicide.
16    BY MS. KALKACH:
17          Q      Do you know the name of them?
18          A      No, I don't know the specific name.
19          Q      What would be the procedure that needs to be
20    taken after a person commits suicide?
21          A      After a suicide, the facility would make
22    notifications.  They notify Central Office.  They notify the
23    Justice Center.  They notify the Commission on Corrections.
24    They start the process of internal review, which includes
25    communication with the Department of Corrections to try to
```

 1   get available information, talking to staff, talking to
 2   peers, reviewing the record.
 3          It's meant to determine if policies were
 4   followed, also meant to take a look at things clinically and
 5   try to understand why the suicide happened.
 6      Q    Who needs to be notified after a suicide occurs?
 7      A    Central Office and then the Justice Center,
 8   Commission on Corrections.  The family is also notified if
 9   they haven't been notified already.
10      Q    Who gives the notifications?
11      A    CNYPC staff have their process for doing so.
12          MS. KALKACH:  Can I have just one minute please?
13      Oh, never mind.
14          MS. COWAN:  Do you want to take like a
15      five-minute break since we've been going for about two
16      hours?
17          MS. KALKACH:  Yes, definitely, but I have three
18      more questions, and then I want to review my notes so
19      that we can take a break then.
20          MS. COWAN:  Okay, yeah.
21          MS. KALKACH:  Back on the record.
22   BY MS. KALKACH:
23      Q    Was there anything different that should be
24   changed to prevent these situations from happening?
25          MS. COWAN:  Objection.

```
 1          A      That seems very broad.
 2    BY MS. KALKACH:
 3          Q      I'm going to rephrase.
 4               In your opinion, is there anything different that
 5    should be changed to prevent suicides in
 6    correctional facilities from happening?
 7          A      Suicides are often very individual, and
 8    individual circumstances are unique.
 9               So sometimes in looking at adverse events,
10    including suicides, there are things that could have been
11    decided differently sometimes in hindsight, but you couldn't
12    have known it at the time, or there are opportunities for
13    improved communication.  Sometimes somebody knew something
14    and didn't say anything.  Sometimes a peer knew or family
15    member knew.
16               So there are lots of different examples, I
17    suppose, where clinically somebody might try to learn --
18    have lesson learned and try to respond to it, but it
19    depends.
20               In our look at suicides over the years, there
21    haven't been overarching trends that connect them all
22    together that would lead to one solution.
23               MS. KALKACH:  Okay.  I will move to strike the
24         portion not responsive.
25               Now I would like to -- I would like to take a few
```

```
 1          minutes to review my notes and see what else, and then

 2          come back.  So we can take a five-minute break.

 3                  MS. COWAN:  Okay.

 4                  (Recess was taken.)

 5                  MS. KALKACH:  I have no further questions.  Thank

 6          you so much, Ms. Lee, for your time.

 7                  MS. COWAN:  I don't have any questions.  I just

 8          want to put on the record, though, that I'll have Dr.

 9          Lee read and sign.

10                  Typically what I have done is, the person that

11          notices the deposition pays for the transcript, so I

12          wasn't sure what everyone else's practice was on that.

13          That's what I've always practiced.

14                  MS. NAPPI:  That's exactly what we're going to do

15          here and in the prior.

16                  (Whereupon, the deposition was concluded at

17          12:10 p.m.)

18

19

20

21

22

23

24

25
```

```
 1                        CERTIFICATE

 2              I, Gina Williams, Registered Professional Court

 3    Reporter, do certify that the above deposition was reported

 4    by me and that the foregoing transcript is a true and

 5    accurate record to the best of my knowledge, skills, and

 6    ability.

 7              I further certify that I am not an employee of

 8    counsel or any of the parties, nor a relative or employee of

 9    any attorney or counsel connected with the action, nor

10    financially interested in the action.

11              Subscribed and sworn to before me when taken this

12    17th day of June, 2022.

13

14                          _Gina Williams_

15                     GINA WILLIAMS, RPR, CRR

16

17

18

19

20

21

22

23

24

25
```

Deposition of Dr. Li-Wen Lee                                          Estate of Joseph P. King v. Ward, et al.

1                          ACKNOWLEDGMENT OF DEPONENT

2

3              I, DR. LI-WEN LEE, do hereby certify that I have

4    read the foregoing pages and that the same is a correct

5    transcription of the answers given by me to the questions

6    therein propounded, except for the corrections or changes in

7    form or substance, if any, noted in the attached Errata

8    Sheet.

9

10

11    _____

12    DR. LI-WEN LEE                                          Date

13

14    Subscribed and sworn to before me this

15    ___ day of _____, 2022.

16    My commission expires:_____

17

18    _____

19    Notary Public

20

21

22

23

24

25

Deposition of Dr. Li-Wen Lee                                    Estate of Joseph P. King v. Ward, et al.

```
 1                        _  _  _  _  _  _  _

 2                             ERRATA

 3                        _  _  _  _  _  _  _

 4      PAGE   LINE                        CHANGE/REASON

 5      _____  _____   _____

 6      _____  _____   _____

 7      _____  _____   _____

 8      _____  _____   _____

 9      _____  _____   _____

10      _____  _____   _____

11      _____  _____   _____

12      _____  _____   _____

13      _____  _____   _____

14      _____  _____   _____

15      _____  _____   _____

16      _____  _____   _____

17      _____  _____   _____

18      _____  _____   _____

19      _____  _____   _____

20      _____  _____   _____

21      _____  _____   _____

22      _____  _____   _____

23      _____  _____   _____

24      _____  _____   _____

25
```

Deposition of Dr. Li-Wen Lee    Estate of Joseph P. King v. Ward, et al.

## WORD INDEX

**< 1 >**
**10** 9:*13, 14* 10:*1, 5*
 12:*24* 16:5
**10:06** 1:*19*
**10001** 4:*21*
**10016** 2:6
**10th** 2:*5*
**112** 2:5
**12** 26:7
**12:10** 64:*17*
**13202** 2:*12*
**15** 25:*24*
**17** 1:*14, 18*
**17th** 65:*12*
**18** 8:*13*
**1974** 8:*13*
**1992** 10:*15*
**1996** 10:*15, 21*

**< 2 >**
**2** 22:*9*
**20** 26:*8*
**2000** 10:*21, 23*
**2008** 9:*8* 11:*23, 24*
 13:*16* 17:*12*
**2013** 25:*9* 60:*19, 24*
**2018** 9:*23* 25:*20, 22,*
 *23* 60:*19, 24*
**2019** 12:*4*
**2022** 1:*14, 18* 26:2
 65:*12* 66:*15*
**20-CV-01413** 1:*2*
**21** 3:*8*
**23** 3:*9*

**< 3 >**
**300** 2:*11*
**330** 4:*20*
**365** 25:*19* 26:*1*

**< 4 >**
**4** 3:*4*

**< 6 >**
**6** 25:*25*

**< 8 >**

**8** 25:*19, 25*

**< 9 >**
**90** 37:*13* 40:*2* 41:*3*
**9th** 4:*21*

**< A >**
**a.m** 1:*19*
**ability** 5:*18* 65:6
**able** 15:*10*
**above-styled** 1:*18*
**access** 26:*9* 34:*1*
 61:*7*
**accommodate** 6:*10*
**account** 60:*1*
**accreditation** 16:5
 30:*4* 43:*11, 12, 18, 20,*
 *23* 44:*22* 45:*5, 10, 12*
**accredited** 45:*11*
**accrediting** 44:*1*
**accuracy** 28:*12*
**accurate** 65:*5*
**accurately** 25:*14*
**ACKNOWLEDGMEN
 T** 66:*1*
**ACTION** 1:*2* 45:*2*
 53:*7* 65:*9, 10*
**actions** 47:*16*
**actual** 41:*19*
**acute** 51:*23* 59:*21*
**ad** 1:*5*
**additional** 37:*14*
 38:*20*
**address** 4:*11, 12, 19*
**addressed** 41:*6, 17*
**adequate** 52:*12*
**admin** 34:*9*
**administrates** 31:*9*
**administration** 18:*8*
 30:*2, 18* 35:*13* 56:*5,*
 *9*
**administrative** 58:*5*
**Administrator** 1:*4*
**admitted** 37:*2* 51:*24*
 59:*3*
**Adult** 17:*24*
**adverse** 63:*9*
**affect** 5:*17* 7:*14*
 38:*22* 39:*1*
**age** 25:*4*

**agency** 14:*22* 15:*1*
 28:*4*
**agency's** 41:*2*
**ago** 10:*5* 20:*18* 33:*8*
**AIMEE** 2:*12* 7:*19*
 24:*12*
**al** 1:*5*
**Albert** 11:*13*
**alcohol** 7:*14*
**allowed** 51:*20*
**Amended** 3:*8, 9*
**amount** 32:*20*
**Amy** 1:*5*
**Ann** 14:*15, 16*
**annually** 56:*21, 24*
**Answer** 3:*9* 5:*24*
 6:*1, 17* 21:*10* 32:*24*
 33:*12* 46:*2* 47:*4*
 61:*11*
**answered** 6:*12*
**answers** 6:*2* 31:*13*
 66:*5*
**anybody** 20:*1*
**apparently** 15:*19*
**appearing** 2:*2*
**Apple** 6:*20*
**apply** 56:*8*
**appointments** 50:*17*
**appoints** 53:*25*
**approach** 30:*18*
 34:*14*
**appropriate** 37:*3*
 48:*10, 20* 53:*7* 54:*22*
 55:*19* 56:*10*
**approval** 28:*7*
**approves** 28:*5*
**approximate** 25:*20*
 26:*5*
**approximately** 26:*3*
**approximation** 9:*20*
**area** 29:*14* 50:*2*
**areas** 18:*2* 26:*15*
**Article** 9:*13, 14* 10:*1*
 12:*24* 16:5
**asked** 20:*4, 17* 38:*5*
**asking** 22:*19* 36:*15*
 44:*16, 22* 48:*5* 58:*15,*
 *16, 18*
**assess** 48:*19*

**assessed** 48:*9, 18*
 54:*7*
**assessment** 7:*24*
 45:*17* 46:*8* 50:*6*
 51:*12* 52:*14* 55:*2, 12*
 57:*13* 59:*17, 24* 60:*4,*
 *7*
**assign** 38:*4*
**assigned** 35:*20* 36:*1,*
 *24*
**assist** 13:*11*
**associate** 12:*5* 13:*19,*
 *25* 14:*3*
**assortment** 50:*22*
**assume** 5:*25* 35:*3*
**assumption** 51:*13*
**attached** 66:*7*
**attempt** 52:*6, 9, 10*
**attempted** 19:*22*
 45:*14* 51:*2, 20*
**attend** 10:*10*
**attending** 11:*22*
**attention** 50:*25*
**ATTORNEY** 2:*10*
 6:*16* 20:*10* 21:*10*
 65:*9*
**attorneys** 2:*2* 24:*8*
**audience** 56:*17*
**audit** 44:*18*
**audits** 43:*8*
**automatic** 51:*13*
**autopsy** 7:*21*
**available** 62:*1*
**Avenue** 2:*5* 4:*21*
**avoid** 59:*14*
**aware** 8:*25* 16:*9, 11*
 19:*16, 19, 22* 27:*14*
 35:*14, 17, 23* 48:*13,*
 *17, 22, 25* 49:*6, 10*
 53:*15, 18* 60:*18, 22*

**< B >**
**back** 9:*5, 8* 15:*22*
 35:*5* 52:*2* 60:*20*
 62:*21* 64:*2*
**based** 6:*1* 59:*24*
**basic** 24:*23* 25:*3*
**basis** 15:*3* 26:*13, 17*
 33:*9*

Deposition of Dr. Li-Wen Lee                                                                  Estate of Joseph P. King v. Ward, et al.

**Beginning** 12:*4*
28:*10* 29:*21, 23*
35:*11* 46:*20*
**behalf** 2:*4, 9*
**believe** 23:*3* 25:*9*
56:*21*
**Bellevue** 11:*20, 24*
**best** 6:*6* 65:*5*
**Beth** 11:*11*
**better** 23:*12, 13*
29:*16*
**beyond** 19:*3*
**bit** 24:*23* 29:*2* 35:*5*
**board** 54:*24*
**born** 8:*12, 14*
**Branch** 11:*3*
**break** 6:*9, 13* 62:*15,*
*19* 64:*2*
**Breaking** 53:*5*
**brief** 17:*1*
**briefly** 11:*18*
**broad** 13:*7* 63:*1*
**Bronx** 11:*14*
**bureaus** 18:*19*
**business** 4:*12*

**< C >**
**called** 4:*3* 18:*18*
**call-out** 40:*6*
**capacity** 36:*10*
**caption** 5:*10*
**Captioner** 1:*21*
**care** 29:*4, 6* 43:*13*
44:*5* 50:*25* 51:*3*
**case** 5:*6, 10* 7:*20*
16:*7* 19:*10, 12, 13*
56:*8*
**caseload** 37:*2*
**cause** 1:*18*
**cell** 6:*20*
**Center** 11:*12, 21*
16:*22* 28:*3* 33:*24*
34:*1* 36:*20, 21* 39:*15*
42:*1, 4* 43:*25* 45:*1,*
*21* 61:*23* 62:*7*
**Centers** 12:*12* 18:*4,*
*6* 29:*4* 30:*1* 34:*7*
**central** 13:*11* 16:*22*
17:*21* 24:*19* 26:*17,*
*21* 27:*7, 17* 28:*3*

34:*14* 35:*13* 36:*20*
39:*15* 42:*1* 43:*25*
45:*1, 12, 20* 61:*22*
62:*7*
**certain** 13:*13*
**CERTIFICATE** 65:*1*
**certification** 11:*16*
**Certified** 1:*20, 21*
**certify** 65:*3, 7* 66:*3*
**cetera** 6:*21*
**chances** 59:*13*
**change** 26:*15* 28:*15,*
*18, 19, 23, 24, 25* 29:*1*
30:*8, 9* 37:*20* 46:*7,*
*11* 51:*12* 55:*9, 10*
59:*2*
**CHANGE/REASON**
67:*4*
**changed** 30:*5* 62:*24*
63:*5*
**changes** 60:*22* 66:*6*
**charge** 29:*19* 30:*21*
31:*4, 8, 15, 16, 19*
39:*7* 46:*14* 56:*3*
**check** 36:*2* 43:*9*
**Chemical** 10:*17*
**CHEVERIE** 2:*5*
**chief** 11:*23* 27:*9*
**Children's** 17:*24*
**choose** 44:*8*
**circumstances** 38:*5*
48:*19* 51:*8* 55:*22*
59:*2* 63:*8*
**City** 4:*20* 11:*12*
**CIVIL** 1:*2* 17:*25*
**CLARITY** 2:*20*
**clinical** 13:*10* 27:*9*
30:*25* 37:*15* 38:*6*
47:*12* 50:*6* 51:*9, 12*
58:*20* 59:*20, 24*
**clinically** 62:*4* 63:*17*
**clinician** 9:*8* 37:*2, 7,*
*8, 19* 47:*21* 48:*10*
**clinicians** 42:*2*
**clinic-level** 50:*16*
**close** 6:*23*
**CNYPC** 7:*21, 25*
36:*20* 37:*1* 43:*13*
44:*1, 2* 45:*23* 55:*4, 6*

56:*9* 57:*4* 58:*9*
62:*11*
**CNYPC's** 59:*16*
**college** 10:*10* 11:*13*
**combination** 18:*25*
30:*23* 59:*20*
**come** 11:*24* 20:*4*
22:*7* 43:*24* 50:*17*
64:*2*
**comes** 26:*24* 58:*24*
**coming** 13:*6*
**commander** 53:*13*
**commencing** 1:*18*
**commission** 28:*18*
30:*4* 42:*4* 43:*12, 23,*
*24* 44:*24* 45:*3* 46:*12*
61:*23* 62:*8* 66:*16*
**commissioner** 12:*5*
13:*19, 25* 14:*3, 8, 9,*
*20, 21* 20:*9, 22, 23*
**commissioner's** 9:*25*
**commit** 19:*20, 23*
45:*14* 50:*24*
**commits** 61:*20*
**committed** 19:*16*
51:*11, 14, 17*
**communicated** 49:*8*
**communication** 61:*25*
63:*13*
**community** 17:*22*
36:*18* 50:*10, 11*
51:*16*
**company** 34:*17*
**Complaint** 3:*8, 9*
8:*21*
**complaints** 8:*23* 22:*7*
**completed** 11:*11*
44:*24*
**compliance** 43:*10*
**complicated** 18:*19*
**complying** 44:*20*
55:*14*
**components** 17:*21*
**computers** 6:*20*
**concern** 37:*22* 54:*5*
**concluded** 64:*16*
**conclusion** 26:*24*
**conduct** 47:*15*
**confused** 22:*25*

**connect** 63:*21*
**connected** 65:*9*
**connecting** 20:*10*
**consequence** 60:*24*
**consequences** 38:*14*
42:*6, 12, 18* 43:*4*
**consider** 38:*5*
**considerations** 37:*4, 6*
**considered** 25:*7*
36:*25*
**consistent** 28:*4, 19*
**contacted** 16:*12*
**contain** 58:*12*
**contains** 49:*13*
**context** 20:*3*
**continuing** 34:*11*
**continuous** 34:*14*
**continuously** 29:*14*
**contributing** 51:*10*
**control** 23:*14*
**conversation** 15:*4*
16:*3, 6* 17:*7, 10*
20:*22, 24* 21:*8*
**convicted** 8:*10*
**coordinating** 13:*4*
**correct** 21:*20, 21*
66:*4*
**Correction** 42:*4*
**correctional** 13:*7*
19:*17* 35:*20* 36:*6, 12,*
*16, 24* 42:*12, 17* 43:*9,*
*11* 44:*2, 6, 13, 19*
45:*11* 48:*12, 24* 49:*5,*
*6, 14, 23* 50:*2, 14, 25*
53:*15* 55:*14* 60:*19,*
*23* 61:*3* 63:*6*
**correctional-based**
12:*23*
**Corrections** 27:*12*
36:*9, 17* 37:*5* 52:*23*
53:*6* 54:*19* 56:*19, 22*
57:*4* 61:*23, 25* 62:*8*
66:*6*
**corrections-based**
16:*23* 27:*8*
**corrective** 45:*2*
**counsel** 8:*1, 3, 6*
20:*8, 14* 24:*12* 65:*8,*
*9*

Deposition of Dr. Li-Wen Lee                                             Estate of Joseph P. King v. Ward, et al.

count 18:*17*
couple 19:*23*
COURT 1:*1* 6:*3, 7*
 9:*3* 13:*6* 65:*2*
courtroom 5:*15*
covered 18:*2*
COWAN 2:*12* 4:*12,
 14* 7:*19* 15:*9, 15, 17,
 20* 17:*19* 18:*24*
 19:*11* 20:*14* 21:*9*
 23:*18* 27:*16* 32:*23*
 35:*8* 36:*14* 37:*18*
 38:*9, 15* 39:*4* 40:*5,
 11, 21* 41:*7, 18, 24*
 42:*8, 14, 19* 43:*19*
 44:*9, 15* 45:*15, 25*
 47:*3, 10, 18* 48:*2, 14*
 49:*1, 15, 20* 50:*4*
 51:*1, 22* 52:*13, 21*
 53:*14* 54:*10* 58:*14*
 59:*6* 60:*25* 61:*12*
 62:*14, 20, 25* 64:*3, 7*
co-workers 20:*12*
creates 28:*2, 3*
creating 28:*10*
creation 28:*11*
crime 8:*10*
crisis 51:*24*
CRR 65:*15*
current 4:*10* 11:*19*
 51:*8*
currently 51:*4, 24*
custody 12:*21*
CYNPC 41:*8* 46:*16,
 21* 50:*21* 55:*17*

< D >
daily 15:*3* 51:*18*
Darman 14:*10*
date 25:*3* 34:*15*
 66:*12*
day 65:*12* 66:*15*
days 25:*19* 26:*1*
 32:*6* 37:*13* 40:*2*
 41:*4*
day-to-day 46:*18*
deal 47:*1, 5*
decide 30:*14* 31:*22*
 37:*2* 53:*6, 7* 54:*21*
 55:*18* 56:*11*

decided 30:*6, 7* 36:*8,
 23* 46:*8* 55:*10* 63:*11*
decides 53:*6* 56:*7*
deciding 29:*12* 52:*14*
decision 52:*4* 54:*6*
decisions 9:*14* 29:*10*
 52:*5, 23* 54:*13, 16*
defect 12:*18*
Defendant 1:*5*
Defendants 2:*9*
defined 33:*15*
definitely 62:*17*
degree 10:*23*
deliver 18:*6*
delivered 29:*6* 32:*14*
 33:*18* 60:*14*
delivery 19:*2*
demographic 25:*3*
Department 27:*12*
 30:*21* 31:*4* 34:*9*
 36:*9, 17* 37:*5* 52:*22*
 53:*5* 54:*19* 56:*18, 22*
 57:*3* 58:*18* 61:*25*
depend 28:*14* 29:*13*
 37:*24* 46:*4, 5* 51:*4*
 55:*8* 56:*2*
depending 31:*2* 33:*9*
 37:*11* 56:*10*
depends 26:*19* 39:*12*
 42:*9* 43:*3* 46:*3* 50:*6*
 51:*23* 54:*17* 55:*11,
 21* 63:*19*
DEPONENT 66:*1*
deposed 4:*4* 5:*1, 7*
DEPOSITION 1:*13,
 17* 4:*24* 7:*18, 19*
 10:*3* 15:*5, 6* 16:*13*
 17:*8, 11* 20:*4, 18*
 64:*11, 16* 65:*3*
depositions 8:*5*
deputy 14:*8, 9, 12*
 27:*7* 31:*1*
describe 28:*12*
described 18:*2*
designee 9:*25*
destination 32:*14*
determination 48:*18*
determine 38:*24*
 48:*20* 62:*3*

determined 38:*18*
 55:*18*
development 30:*24*
 31:*10, 12* 58:*4*
devices 6:*19* 15:*19*
diagnoses 25:*4*
dictated 47:*11*
different 12:*3* 16:*25*
 17:*21* 26:*8* 28:*20*
 33:*16* 36:*25* 45:*17*
 50:*5, 8* 51:*4, 10* 55:*8*
 56:*23* 62:*23* 63:*4, 16*
differently 63:*11*
DIRECT 2:*20* 18:*5*
 21:*10* 43:*12*
directives 60:*23*
directly 13:*1* 14:*14*
director 11:*25* 12:*4,
 6* 13:*9, 18, 23, 24*
 14:*12, 14* 27:*6, 7, 8, 9,
 10* 30:*25* 31:*1*
directs 6:*16*
disciplinary 8:*20*
 49:*23*
discipline 56:*10*
discuss 8:*5*
discussed 11:*15*
Discussion 15:*21*
 21:*16* 27:*2, 3, 5*
disease 12:*17*
distribute 46:*25*
distributed 46:*23, 24*
distributing 31:*23*
distribution 31:*15, 17,
 19, 21* 32:*1, 7, 14*
DISTRICT 1:*1*
Division 12:*1, 8, 10,
 25* 13:*14* 14:*3, 12*
 15:*1* 17:*2, 3, 24* 27:*6*
divisions 18:*10, 13,
 14, 18*
DOCCS 39:*17* 40:*7,
 22* 54:*19*
doctor 10:*22* 39:*19,
 24* 40:*4, 20, 22, 23*
 41:*5, 16*
doctors 40:*22*
document 22:*3, 6, 8,
 14, 17* 23:*1, 15, 25*
 26:*24* 35:*14*

documentation 44:*4,
 19* 47:*20*
documents 6:*23* 7:*2,
 8, 20*
doing 55:*11* 60:*6*
 62:*11*
DR 1:*13, 17* 3:*3* 4:*2*
 21:*24* 22:*5* 64:*8*
 66:*3, 12*
draft 58:*2*
drafted 45:*19, 20*
 55:*3* 57:*18, 19, 22, 24*
Drake 20:*13*
drugs 7:*13*
duly 4:*3*
duties 53:*22*

< E >
earlier 25:*25*
Eastern 1:*19*
education 56:*12*
Einstein 11:*13*
either 30:*3* 32:*18*
 58:*18*
electronic 31:*25*
 32:*3, 6*
else's 64:*12*
E-mail 24:*22*
employee 34:*18, 24*
 65:*7, 8*
employees 34:*21*
employment 11:*18*
encompass 61:*14*
encompassed 18:*3*
engineering 10:*17*
ensure 58:*10*
ensures 32:*16*
entail 16:*15*
entities 42:*3*
environment 44:*5*
environments 55:*9*
Errata 66:*7* 67:*2*
ESQUIRE 2:*6, 7, 12*
established 49:*22*
establishing 19:*2*
Estate 1:*4* 4:*9*
estimate 25:*16, 17, 18*
et 1:*5* 6:*21*

Deposition of Dr. Li-Wen Lee                                Estate of Joseph P. King v. Ward, et al.

evaluation  57:*16*
 58:*11, 12*  59:*22*  60:*5,*
 *8*
evaluations  57:*12*
 58:*22*
events  24:*9*  63:*9*
evidence  21:*17*  23:*6*
exact  9:*17*  25:*23*
 56:*16*
exactly  9:*22*  60:*11*
 64:*14*
Examination  3:*4*  4:*5*
examples  63:*16*
executive  27:*9*
Exhibit  3:*8, 9*  7:*4*
 21:*17, 18, 22, 25*
 22:*12, 15*  23:*2, 6, 9,*
 *22*
existed  33:*22*
expectation  48:*8*
expected  37:*12*
expires  66:*16*
explain  29:*2, 3, 25*
explaining  10:*9*

< F >
facilities  13:*2, 7, 13*
 29:*20*  35:*20*  36:*6*
 43:*9*  44:*7, 8*  49:*5*
 55:*14*  63:*6*
facility  16:*24*  19:*17*
 28:*6*  34:*7, 21*  35:*23*
 36:*12, 16, 17, 24*  37:*4,*
 *6*  42:*13, 17, 21*  43:*25*
 44:*13, 19, 25*  45:*12*
 48:*12, 24*  49:*23*  50:*3,*
 *14*  56:*4*  59:*4*  60:*19,*
 *23*  61:*3, 7, 21*
facility-based  34:*5*
fact  19:*13*
factor  59:*5, 10, 12*
factors  36:*25*  51:*5, 7*
 59:*15, 16, 20, 21*
facts  19:*9, 12*
familiar  38:*7*  52:*17*
family  62:*8*  63:*14*
feel  5:*22*  48:*3*  58:*15*
fellowship  11:*13, 20*
Field  4:*20*  11:*4*

Fifth  4:*21*
filed  8:*23*  21:*13*
fill  60:*3*
financially  65:*10*
findings  45:*1*
fine  23:*17*
finished  22:*6, 8*
 23:*10, 24*
firm  4:*8*
first  4:*3*  17:*1*  23:*1*
fitness  12:*15*
five-minute  62:*15*
 64:*2*
flexibility  37:*14*
Floor  2:*5*  4:*21*
focuses  17:*25*
folks  17:*22*
follow  32:*17*  34:*16*
 42:*13*  44:*13*
followed  41:*23*  43:*4,*
 *8*  45:*22*  55:*5, 13, 18*
 58:*8, 10, 13*  62:*4*
following  42:*3, 6, 17,*
 *22, 23*  43:*5*
follows  4:*4*  55:*14*
footprint  18:*7*
foregoing  65:*4*  66:*4*
forensic  11:*5, 12, 21*
 12:*1, 8, 10, 11, 25*
 13:*14*  14:*4, 13*  17:*2,*
 *4*  27:*7*
forensics  18:*1, 3*
form  66:*7*
formal  18:*17*
found  12:*14, 17*
foundation  60:*3*
frame  17:*16*
free  5:*22*
frequently  37:*22*
Friday  15:*8*
front  7:*2, 8*
full  4:*10, 15*
further  29:*2*  64:*5*
 65:*7*

< G >
GENERAL  2:*10*
 37:*12*  39:*10, 11, 16*
 41:*22*  48:*15*  50:*16*
 52:*1*  58:*4*  61:*7*

generally  25:*2*  29:*23,*
 *25*
General's  20:*10*
getting  37:*11*
Gina  1:*19*  65:*2, 15*
give  6:*2*  7:*15*  25:*16*
 31:*7*
given  56:*22, 25*  66:*5*
gives  62:*10*
go  4:*23*  10:*12, 14, 18,*
 *20*  11:*1*  15:*20*  26:*13,*
 *18*  35:*5*  37:*4, 6*  44:*6,*
 *8*  50:*21*  51:*17*  53:*11*
 60:*20*
God  15:*14*
goes  30:*20*  52:*23*
 54:*20*
going  4:*23*  6:*7*
 15:*14, 18*  18:*20*
 20:*19*  21:*2, 9*  23:*4,*
 *18, 21*  28:*14, 15, 16*
 35:*5*  42:*11*  51:*4*
 62:*15*  63:*3*  64:*14*
Good  4:*7*
gotten  61:*9*
graduate  10:*18*  11:*1*
grievances  8:*23*
ground  4:*23*
guess  32:*5*  61:*5*
guessing  9:*18*  32:*9*
guidance  49:*13*
guided  47:*12*
guidelines  38:*3*

< H >
HACH  2:*5*
Hal  16:*18*
handful  9:*12*
happen  37:*16, 17*
happened  45:*5, 7*
 49:*2*  51:*5*  60:*18*
 62:*5*
happening  62:*24*
 63:*6*
happens  12:*19*  49:*23*
hard  6:*7*
head  6:*3*  25:*15*  28:*1*
 57:*10*
Health  4:*20*  11:*25*
 12:*20*  14:*21*  17:*18*

18:*11, 23, 25*  19:*1, 3,*
 *7*  35:*21, 25*  36:*7, 12,*
 *19*  38:*17*  41:*23*
 48:*17, 22*  49:*6, 8*
 50:*15, 17*  53:*23*
 54:*21*  55:*15*  56:*22*
 60:*17*
hear  5:*21*  24:*18*
 59:*7*
heard  24:*15*
hearing  54:*24*
hearings  5:*5*  9:*9, 10,*
 *11, 13*  10:*1*
held  15:*21*  21:*16*
help  4:*24*  13:*2*
helping  13:*12*
hierarchy  36:*18*
HILLARY  2:*7*
hindsight  63:*11*
historical  59:*20*  60:*1*
history  11:*19*
home  51:*17*
Hospital  11:*21*
hour  8:*2*
hours  62:*16*
housed  35:*23*
Housing  52:*17, 20, 22*
 53:*1, 8, 10*
Houston  8:*15*
hygiene  5:*5*  9:*13*
 12:*24*
Hypotheticals  37:*19*

< I >
idea  44:*10*
ideation  48:*9, 16*
 49:*7*
identification  21:*22*
 23:*22*
identify  29:*8*  30:*3*
 46:*6*
illness  27:*15, 19*
 47:*2, 5, 9, 17*  49:*19*
 50:*3, 12, 19*
illnesses  33:*3*
imagine  32:*2*
impact  33:*17*
impacted  30:*9*
important  6:*2*  51:*3*

Deposition of Dr. Li-Wen Lee                                    Estate of Joseph P. King v. Ward, et al.

improve  29:*10*, *15*
 46:8  55:*10*
improved  63:*13*
improvement  29:*5*
inaccuracy  26:*1*
in-between  37:*15*, *16*,
 *20*  38:*4*
incarcerated  25:*8*
incident  55:*17*  56:*3*
include  12:*13*
included  29:*5*
includes  61:*24*
including  7:*21*  27:*12*
 *63*:*10*
increased  37:*21*
increases  59:*12*
individual  25:*4*  37:*1*
 45:*11*  48:*15*, *17*  53:*2*
 55:*22*  59:*25*  63:*7*, *8*
individually  48:*19*
individuals  12:*14*, *16*,
 *21*  31:*2*  38:*16*, *18*
 50:*15*, *18*, *19*  51:*11*,
 *16*
influence  7:*13*
information  16:*11*
 20:*10*  24:*23*, *25*  25:*3*,
 *4*, *6*  26:*9*, *12*  35:*7*, *15*
 38:*20*  51:*3*  60:*1*, *3*
 62:*1*
infraction  53:*3*, *10*
initial  38:*12*
initiate  54:*20*
inmate  16:*16*  36:*23*
 38:*23*  39:*2*, *18*, *23*
 40:*3*, *9*, *17*, *20*  41:*5*,
 *16*  47:*2*, *5*, *8*, *16*, *25*
 48:*3*, *8*, *11*  49:*7*
 51:*19*  52:*6*, *10*, *19*, *25*
 54:*4*, *8*
inmates  27:*14*, *18*
 33:*3*  35:*18*  38:*8*
 39:*8*  45:*13*  49:*18*
inmate's  54:*5*
Inpatient  11:*21*
 12:*22*  18:*6*  59:*3*
inpatient-level  50:*20*
inside  49:*14*  50:*25*
insight  13:*10*

intended  50:*19*
interact  15:*3*
interested  65:*10*
internal  28:6  30:*11*
 43:*12*  61:*24*
internally  26:*21*
intervention  55:*19*,
 *20*  56:*7*
interventions  55:*25*
interview  59:*25*
investigators  24:*9*
involve  27:*6*
involved  27:*3*  28:*11*
 30:*25*  31:*1*, *11*, *23*
 35:*3*  46:*18*, *25*  56:*5*
 58:*3*, *6*  61:*9*
involves  28:*7*
iPad  6:*20*
Israel  11:*11*
issue  29:*9*  37:*23*
issues  29:*11*  51:*10*
items  54:*8*, *11*
its  1:*4*

< J >
Jeremy  14:*10*
join  34:*17*
joint  28:*18*  30:*4*
 43:*23*, *24*  44:*24*  45:*3*
 46:*12*  57:*3*
jointly  36:*8*  57:*24*
Joseph  1:*4*  4:*9*
 24:*13*, *15*
judgment  37:*15*
 38:*6*  47:*12*
July  8:*13*
JUNE  1:*14*, *18*  65:*12*
jurisdictions  12:*12*
 13:*5*
Justice  42:*4*  61:*23*
 62:*7*

< K >
KALKACH  2:*6*  3:*4*
 4:*6*, *8*, *13*, *16*  15:*11*,
 *16*, *18*, *23*  18:*9*  19:*5*,
 *15*  20:*15*  21:*12*, *15*,
 *17*, *21*, *23*  22:*1*, *4*, *11*,
 *13*  23:*4*, *8*, *20*, *23*
 24:*4*, *6*  27:*20*  33:*1*

35:*9*  36:*22*  38:*1*, *11*,
 *21*  39:*6*  40:*8*, *13*, *24*
 41:*10*, *21*  42:*5*, *10*, *16*
 43:*1*, *21*  44:*11*, *17*
 45:*18*  46:*1*  47:*6*, *13*,
 *22*  48:*6*, *21*  49:*3*, *17*
 50:*1*, *7*  51:*6*  52:*3*, *16*,
 *24*  53:*17*  54:*15*
 58:*17*  59:*9*  61:*2*, *16*
 62:*12*, *17*, *21*, *22*  63:*2*,
 *23*  64:*5*
keep  23:*16*  32:*18*
keeping  34:*15*
kept  61:*4*
key  18:*2*
kids  8:*18*
kind  5:*4*  9:*24*  10:*8*
 24:*24*  31:*3*  51:*3*
 52:*14*  55:*19*, *20*  56:*7*
kinds  9:*10*  13:*7*
 37:*11*  55:*22*
King  1:*4*, *5*  4:*9*
 19:*16*, *19*, *22*  24:*13*,
 *16*  35:*23*
knew  63:*13*, *14*, *15*
know  6:*10*  14:*15*, *16*,
 *21*  15:*18*  16:*18*, *19*
 17:*5*  18:*16*  19:*9*, *12*,
 *13*  20:*14*  22:*5*  23:*10*,
 *24*, *25*  24:*13*, *14*  25:*8*
 27:*22*  28:*13*, *14*
 29:*21*, *23*  30:*13*, *16*
 31:*6*, *12*, *14*, *16*, *18*, *21*,
 *25*  32:*10*, *11*, *12*, *13*,
 *16*, *19*, *20*, *24*  33:*10*
 34:*7*, *13*, *14*, *18*  35:*1*,
 *7*, *11*, *16*, *25*  36:*4*
 38:*3*  41:*19*  43:*16*
 44:*10*  46:*14*, *20*, *23*,
 *24*  49:*11*  52:*11*, *25*
 53:*13*, *20*, *22*, *25*  54:*2*,
 *24*  57:*1*, *2*, *10*, *15*, *18*,
 *19*, *21*  58:*3*  59:*18*
 60:*11*, *15*  61:*1*, *3*, *6*,
 *10*, *17*, *18*
knowledge  65:*5*
known  17:*12*  63:*12*
knows  55:*7*

< L >
large  16:*10*, *14*
late  12:*4*
law  4:*8*  9:*13*
lawsuit  9:*1*  10:*6*
 16:*9*  20:*1*, *3*  21:*13*
 24:*10*, *11*
layers  41:*25*
lead  63:*22*
leading  11:*19*
learn  33:*20*, *21*, *23*
 34:*3*  63:*17*
learned  63:*18*
LEE  1:*13*, *17*  3:*3*
 4:*2*, *7*, *18*, *23*  21:*24*
 22:*5*  23:*15*  64:*6*, *9*
 66:*3*, *12*
L-e-e  4:*18*
left  11:*24*  37:*14*, *15*
legal  12:*15*
lesson  63:*18*
level  35:*21*, *25*  36:*7*
 37:*2*, *21*  56:*4*
levels  50:*5*, *8*
L-i  4:*18*
licenses  10:*24*
licensing  11:*16*  17:*23*
LINE  67:*4*
link  7:*4*
linked  46:*10*
list  59:*15*, *16*, *18*, *19*
little  24:*23*  29:*2*
 35:*5*
live  50:*18*
lives  51:*18*
living  52:*1*
LI-WEN  1:*13*, *17*
 3:*3*  4:*2*, *18*  66:*3*, *12*
LLP  2:*5*
local  12:*12*  13:*5*
location  25:*3*  45:*4*
 51:*15*
locations  44:*2*
log  61:*4*, *8*
logistically  36:*9*
long  5:*2*  8:*1*  13:*14*
 17:*5*  33:*8*  57:*9*
 60:*13*, *15*
longer  12:*3*  17:*6*

look  18:*17*  27:*5, 25*
  29:*8*  44:*3, 5, 18*
  60:*20*  62:*4*  63:*20*
looked  14:*25*
looking  29:*15*  30:*17*
  33:*10, 14, 25*  38:*16*
  63:*9*
lose  45:*5, 9*
lost  15:*9*
lot  27:*23*  32:*6*
  33:*16*  59:*19*
lots  63:*16*

**< M >**
Madison  2:*5*
major  10:*16*
management  7:*24*
  12:*16, 23*  29:*5*  30:*25*
  41:*3*
mandated  12:*13*
mandatory  35:*2*
manual  27:*24*  33:*6*
Margaret  20:*13*  21:*6,
8*
Maria  14:*16*
Marie  14:*15*
mark  23:*6*
marked  21:*19, 22*
  22:*15*  23:*2, 22*
MARKS  2:*20*
married  8:*16*
MD  40:*23*
mean  4:*12*  9:*21*
  11:*9*  18:*16*  22:*16*
  26:*1*  33:*19, 24*  40:*12*
  42:*23*  43:*16*  44:*25*
  47:*14*  49:*16, 25*
  50:*12*  53:*4*
means  5:*24*
meant  26:*2*  62:*3, 4*
mechanism  43:*13, 14,
15*
med  11:*1*
medical  10:*19, 20, 22,
23*  11:*3, 12, 25*  12:*4,
5*  13:*9, 18, 22, 24*
  14:*13*  27:*6*  28:*7*
  39:*16, 17, 18, 20, 23*
  40:*3, 7, 20, 22, 23*
  41:*2*  47:*15*

medical-medical
  40:*22*
medication  39:*7, 19,
25*  40:*1, 4*  41:*3*
medications  5:*17*
  39:*9, 11*
medicine  10:*25*  11:*14*
meet  8:*1*
meeting  16:*24*  26:*23*
meetings  26:*25*
  27:*11, 12*
member  63:*15*
memorized  33:*7*
Mental  4:*20*  5:*5*
  9:*13*  11:*25*  12:*17, 20,
24*  14:*20*  17:*18*
  18:*10, 22, 25*  19:*1, 3,
6*  27:*15, 18*  33:*3*
  35:*21, 25*  36:*12, 19*
  38:*17*  41:*23*  47:*2, 5,
9, 16*  48:*16, 22*  49:*6,
8, 19*  50:*3, 12, 15, 17,
19*  53:*23*  54:*21*
  55:*15*  56:*22*  60:*17*
mentioned  49:*9*
Meyers  16:*18*
Mid-State  35:*24*
  36:*11, 16*  60:*19, 23*
  61:*3*
mind  62:*13*
minimally  37:*13*
minimum  40:*1*
minute  21:*24*  23:*9*
  62:*12*
minutes  64:*1*
mission  19:*6*
Mm-hmm  57:*7*
modification  29:*12*
month  20:*18*
monthly  37:*14*  40:*15*
morning  4:*7*
move  18:*20*  23:*4*
  63:*23*
moved  12:*4*
multiple  41:*25*
mute  6:*21*

**< N >**

name  4:*7, 10, 15, 18*
  14:*1, 9*  43:*14*  61:*17,
18*
names  8:*8*  20:*12*
  21:*3*  27:*21, 22*
NAPPI  2:*7*  64:*14*
nature  5:*6*
navigating  13:*12*
NECESSARILY  2:*20*
need  4:*15*  6:*9*  12:*15*
  18:*17*  27:*24*  30:*3, 8*
  33:*6*  34:*16, 22*  37:*10*
  38:*17, 19*  40:*15*
  48:*13, 25*  50:*15, 20*
needed  20:*9*  36:*10*
  38:*20*
needs  38:*24*  45:*2*
  49:*7*  50:*6*  59:*2*
  61:*19*  62:*6*
negative  46:*6*
never  34:*24*  60:*14*
  61:*9*  62:*13*
NEW  1:*1*  2:*6, 10, 12*
  4:*19, 20, 21*  11:*12*
  16:*22*  18:*23*  19:*3, 7,
17*  24:*19*  26:*17, 21*
  27:*7, 17*  28:*3, 16*
  31:*22*  32:*13*  34:*14,
18, 24*  35:*13*  36:*12,
20*  39:*15*  42:*1*  43:*25*
  45:*1, 12, 20*  56:*21*
nod  6:*3*
NORTHERN  1:*1*
Notary  66:*19*
noted  66:*7*
notes  62:*18*  64:*1*
notice  24:*20, 21*  25:*1,
2*
noticed  15:*12*
notices  25:*10, 21*
  26:*1, 5*  64:*11*
notification  24:*20, 22*
  25:*7*
notifications  61:*22*
  62:*10*
notified  20:*8*  62:*6, 8,
9*
notify  61:*22, 23*

Number  3:*7*  25:*14,
22, 23*  26:*5*  51:*4*
numbered  1:*18*
  57:*17*
numbers  26:*16*
nurse  39:*14*

**< O >**
oath  5:*12, 14*
object  6:*16*  21:*9*
objection  9:*10*  17:*19*
  18:*24*  19:*11*  27:*16*
  32:*23*  35:*8*  36:*14*
  37:*18*  38:*9, 15*  39:*4*
  40:*5, 11, 21*  41:*7, 18,
24*  42:*8, 14, 19*  43:*19*
  44:*9, 15*  45:*15, 25*
  47:*3, 10, 18*  48:*2, 14*
  49:*1, 15, 20*  50:*4*
  51:*1, 22*  52:*13, 21*
  53:*14*  54:*10*  58:*14*
  59:*6*  60:*25*  61:*12*
  62:*25*
objective  18:*22*
obliged  32:*22*
obtain  36:*6*
occasional  9:*9*
occurred  24:*23*
occurs  62:*6*
odd  18:*16*
offender  12:*23*
offer  21:*17*
offered  12:*21*
off-hours  54:*20*
OFFICE  2:*10*  4:*20*
  11:*24*  13:*12*  14:*20*
  17:*18, 22*  18:*10, 22,
25*  19:*6*  20:*11*  36:*12*
  55:*15*  61:*22*  62:*7*
official  26:*24*  27:*1*
  57:*11, 13, 16*  58:*12*
Oh  15:*14*  33:*24*
  62:*13*
Okay  4:*14*  6:*4, 5, 13,
17, 18, 22*  7:*1, 7, 11,
17*  9:*7*  10:*2*  12:*7*
  13:*14*  19:*9*  20:*12, 21*
  21:*7*  22:*11*  23:*4*
  24:*4*  26:*4*  30:*17*
  31:*14, 25*  35:*17, 20*

Deposition of Dr. Li-Wen Lee                                                                   Estate of Joseph P. King v. Ward, et al.

36:*23*  38:*7*  46:*23*
48:*23*  50:*8*  56:*24*
58:*1*  59:*22*  61:*11*
62:*20*  63:*23*  64:*3*
**older**  7:*20*
**OMH**  9:*12*  12:*1, 10,*
*11*  17:*2*  20:*14*  21:*11*
26:*6*  28:*4*  36:*8, 20*
55:*13*  57:*4*
**Once**  5:*2*  26:*23*
34:*12*  40:*1*  41:*3*
51:*13*
**ones**  6:*24, 25*  33:*5*
51:*7*
**one-time**  29:*9*
**ongoing**  26:*16*  33:*9*
**opened**  38:*19*
**opening**  7:*4*
**operated**  36:*17*
**operations**  16:*23*
27:*8*
**opinion**  63:*4*
**opportunities**  63:*12*
**opposed**  6:*3*
**options**  16:*5*
**order**  20:*19*  53:*10*
**organization**  28:*8*
41:*22*  55:*13, 15*
**organized**  17:*18*  18:*5*
**oriented**  34:*21*
**outcome**  46:*6*  59:*13*
**outcomes**  29:*7*
**outpatient**  18:*7*
**outside**  42:*3*  50:*11*
**overall**  15:*1*  51:*9*
**overarching**  63:*21*
**overseeing**  30:*21*
31:*5*
**oversees**  41:*22*  45:*22*
55:*5*  58:*8, 12*

**< P >**
**p.m**  64:*17*
**packet**  58:*25*
**PAGE**  3:*2*  22:*9*  67:*4*
**pages**  66:*4*
**paper**  7:*2, 8*  31:*25*
32:*3, 4, 7*
**parole**  54:*24*

**part**  16:*10, 14*  52:*14*
**participating**  15:*2*
**particular**  51:*15*
**parties**  13:*7*  65:*8*
**partly**  59:*24*
**party**  9:*1*
**pass**  32:*20*
**patient**  16:*17*  37:*19,*
*22*
**patients**  13:*5*
**pays**  57:*5, 6*  64:*11*
**peer**  63:*14*
**peers**  62:*2*
**Peggy**  20:*13*  21:*5*
**pending**  59:*1*
**people**  21:*3*  30:*14*
32:*17, 22*  34:*16*
48:*12, 24*  49:*9, 18*
50:*3, 24*  52:*1*  58:*1, 3*
60:*8*
**performed**  59:*23*
**performing**  60:*8*
**performs**  60:*5*
**period**  17:*1*
**permanently**  51:*15*
**person**  21:*5, 6*  30:*16*
31:*6, 18*  34:*5*  40:*15*
42:*23*  48:*19*  50:*12*
51:*2*  53:*25*  57:*19, 21,*
*22, 24*  58:*15*  61:*20*
64:*10*
**personally**  9:*2*  17:*15*
**person's**  53:*22*  56:*10*
59:*13*
**phone**  6:*20*
**place**  44:*13*
**placed**  51:*15*  54:*4*
**Plaintiff**  1:*5*  2:*4*  4:*9*
**plan**  45:*2*
**please**  4:*10, 17*  5:*22*
6:*9, 19, 23*  21:*3, 18,*
*24*  22:*1, 5*  23:*7, 9*
29:*2*  45:*6*  47:*23*
62:*12*
**points**  56:*23*
**policies**  7:*22, 23*
19:*2*  27:*17, 21*  28:*2,*
*4, 5, 6, 13*  29:*19, 20*
30:*8, 22*  31:*5, 9*  33:*2,*
*22, 23, 25*  34:*2, 6, 23*

35:*1, 17*  41:*2, 23*
42:*3*  44:*14, 20*  45:*13,*
*16, 17, 19, 22, 24*
46:*15, 17, 19, 21*
47:*19*  49:*12, 21, 24*
51:*19*  55:*18*  57:*17,*
*23*  58:*2, 10, 11*  59:*11*
60:*22*  61:*11, 13, 14*
62:*3*
**policy**  5:*8*  10:*9*
27:*14, 24*  28:*7, 10, 11,*
*15, 17, 19, 21, 23, 25*
29:*1, 12, 22*  30:*8, 18,*
*24*  31:*3, 10, 11, 14, 21,*
*22*  32:*13, 16, 21, 22*
33:*18*  34:*16*  35:*12*
40:*7, 16, 19*  41:*8, 11,*
*17, 19*  42:*7, 13, 18, 22,*
*24*  43:*3, 4, 5, 9*  46:*7*
47:*1, 8, 11*  49:*13*
55:*1, 2, 3, 4, 5, 7, 12*
57:*11, 15, 18, 22*  58:*4,*
*8, 13*
**population**  37:*12*
50:*16*  52:*1*
**populations**  12:*13*
**portion**  63:*24*
**portions**  18:*20*  23:*5*
**position**  11:*19, 20, 25*
14:*1*  30:*14*  31:*18*
53:*20*  57:*21*
**positions**  58:*1*
**possible**  4:*25*  45:*4, 9*
**potential**  54:*6*  58:*25*
**practice**  28:*15, 25*
30:*6*  47:*12*  55:*10*
64:*12*
**practiced**  64:*13*
**practices**  7:*25*  29:*6*
41:*2*
**practitioner**  39:*14*
**preliminary**  25:*6*
**pre-pandemic**  9:*19*
**prepare**  7:*17*
**prescribe**  39:*19, 24*
40:*1*
**prescribing**  39:*7*
**present**  8:*3*
**presentation**  51:*9, 12*
**prevent**  62:*24*  63:*5*

**prevention**  27:*9, 13*
55:*1*  56:*13*
**primary**  37:*13*  40:*12*
60:*6*
**prior**  64:*15*
**prison**  12:*20*
**prisons**  50:*11*
**problem**  29:*8*  46:*6,*
*10*
**problems**  29:*11*
**procedure**  24:*20*
61:*19*
**proceedings**  12:*16*
**process**  28:*10*  29:*21*
30:*10*  31:*11, 22*
35:*11*  46:*16, 20*
47:*25*  48:*4, 25*  49:*4,*
*10*  55:*17*  56:*3, 4, 6*
61:*24*  62:*11*
**processes**  35:*6*
**Professional**  1:*20*
65:*2*
**program**  11:*16*
12:*22*  16:*5*  28:*16*
47:*20*
**programs**  6:*23*
12:*23*  49:*21*  50:*22*
**projects**  14:*23*  15:*1*
**promoting**  19:*2*
**proposed**  33:*17*
**propounded**  66:*6*
**Prosequendum**  1:*5*
**provide**  13:*9*  27:*18*
50:*23*  56:*17*  60:*2*
**provided**  13:*11*  36:*19*
**provides**  24:*23*  34:*7,*
*10*  57:*2*
**providing**  13:*1, 3*
19:*1*
**provision**  10:*7*
**psyche**  30:*1*  33:*24*
34:*1*
**Psychiatric**  12:*11*
16:*22*  18:*4, 5*  28:*3*
29:*4*  36:*20, 21*  39:*13,*
*15, 20, 24*  42:*1*  43:*25*
45:*1, 21*
**psychiatrist**  11:*22*
37:*13*  39:*14*  40:*23*

Psychiatry  11:5, 13, 21
psychological  7:21
psychologist  27:9
Psychotropic  39:9
public  19:1  66:19
pull  30:8
purview  39:17
put  6:21  17:16 21:18  33:17  44:12 54:6, 9  64:8

< Q >
qualified  30:10
quality  29:5  30:24 43:13
question  5:21, 23, 24, 25  6:12, 16  7:3 15:22  16:1  22:25 30:20  41:14  47:4 61:9
questions  31:12  44:5 62:18  64:5, 7  66:5
quickly  4:24  41:6, 9, 17
quite  17:16
QUOTATION  2:20
QUOTE  2:20  19:8

< R >
range  26:7
RCTP  54:21
reach  12:18  15:24
reached  16:1
read  15:22  22:2, 10, 22, 24  23:3  33:2, 5, 8, 9, 13  64:9  66:4
Realtime  1:20, 21
reason  12:17  52:19 54:6
reasons  16:25  52:25
Reassessed  52:8 58:25
receive  24:21  26:6 34:17  38:23  39:2 52:11  56:20, 21 60:16
received  10:23  25:10, 21

receives  56:15
Recess  64:4
recognize  22:14, 18, 19  23:25  24:2
recognizes  22:3
record  4:11  15:20, 21  21:15, 16  62:2, 21 64:8  65:5
recorded  24:8
recurring  26:13
redone  58:25  59:2, 4
reevaluated  52:7
refer  33:18
REFLECT  2:20
reframe  41:14
regarding  16:6 27:14  33:2  35:17 45:13  49:14
REGIONAL  2:10
Registered  1:20  65:2
regular  40:4
related  5:8  7:20 9:13  24:9, 11  28:25 39:13  53:2, 9
relationship  14:19 16:20  36:11
relationships  13:12
relative  65:8
remember  5:10  9:17, 22  10:5  17:17  21:13 24:25  25:23  41:8 57:17
REMOTE  1:13, 17
remotely  2:2
repeat  5:22  21:3 45:6
rephrase  5:22  21:2 47:7  63:3
report  13:17, 18, 22 14:5, 6  26:11, 23 27:1  47:25  48:4 49:4
reported  13:24  65:3
Reporter  1:20, 21 6:3, 7  65:3
reporters  24:9
reporting  48:16
reports  14:11, 13, 14 48:9  49:7

represents  4:8
request  40:6
requests  41:5, 16
requirement  28:19 30:5  46:11
residency  11:9, 11
respond  41:9  63:18
responding  29:17
responsibilities  12:8 13:3
responsibility  30:24
responsible  12:11, 17 49:11
responsive  18:21 23:5  63:24
restoration  12:15
restrictions  54:23
result  29:11
retention  9:10
retraining  55:21
return  12:15  51:17
returning  59:4
review  7:23, 24 21:24  23:9  29:6, 7 30:10, 14  41:25  42:3 44:25  46:5  55:17 56:3, 6  61:24  62:18 64:1
reviewed  7:20  58:25
reviewing  22:6, 8 23:24  43:13  58:6 62:2
reviews  29:11
revise  30:10, 14, 17
revisions  58:6
right  1:5  4:12  14:1
risk  7:24  45:16 46:8  51:23  55:2, 12 57:12, 13  58:11, 22 59:5, 10, 12, 15, 16, 20, 22  60:4
risks  58:25
role  9:12  12:5, 6 13:9  14:21
roles  12:7
room  7:11
ROSE  2:5
RPR  65:15
rules  4:23  53:5

run  4:24  52:22

< S >
sanction  44:20
sanctions  44:12
sat  34:24
saying  6:8  24:22
says  48:3
schedule  34:13
SCHIRRIPA  2:5
school  10:18, 19, 20 11:1, 2
Scratch  43:7, 17 47:24  48:23
screen  6:24
screened  52:11
screening  38:7, 10, 12, 14, 16, 22, 24
scroll  22:2
scrolling  23:16
second  15:20
sector  19:1
security  53:6
see  15:10, 12, 15, 16 22:3  23:1  26:3  33:6 37:7, 8, 10, 12, 22 39:18, 23  40:3, 9, 15, 17, 20  41:5, 16  61:6 64:1
seen  22:16, 21, 23, 24 23:19  24:1, 2  37:23 59:19
send  52:19  53:7
sending  52:25
sense  37:21
sent  20:9  24:20 53:10
separate  13:21  39:22
serious  50:19  52:8
Services  12:1, 9, 10, 21, 25  13:1, 3, 6, 11, 14  14:4, 13  17:3, 4 18:5, 6  19:1, 3, 4 27:7, 18  33:17  36:10, 18, 19  37:3, 11  38:17, 19  50:16, 23  58:24
session  37:16, 21
sessions  37:15  38:4
set  28:16  36:10

Deposition of Dr. Li-Wen Lee                                                      Estate of Joseph P. King v. Ward, et al.

sex 12:*23*
**Sheet** 66:*8*
shoelaces 19:*19*, *23*
 35:*18*, *19* 51:*20* 52:*1*
show 23:*7*
showing 6:*25* 22:*11*
side 17:*22*, *25* 43:*12*
 49:*6* 53:*15*
sign 64:*9*
signed 24:*7*
silent 6:*21*
similar 50:*10*
single 19:*13* 57:*24*
site 36:*19*
situations 13:*13*
 62:*24*
skills 65:*5*
slew 27:*17*
small 23:*11*
smoothly 4:*25*
social 40:*9*, *17*
solution 63:*22*
somebody 20:*8*
 58:*24* 63:*13*, *17*
somewhat 22:*25*
sooner 37:*23*
sorry 5:*19* 9:*5*, *22*
 11:*7* 20:*25* 21:*1*, *5*
 23:*11* 25:*25* 39:*20*
 41:*14* 46:*2* 59:*7*
sort 59:*13*
sound 18:*16*
South 2:*11*
speak 20:*7*, *16* 30:*10*
 40:*6* 41:*1* 48:*1*
speaking 20:*20*
 21:*11* 24:*12* 35:*6*
 48:*11*
speaks 57:*11*
special 49:*14*, *16*, *18*
 50:*25* 52:*17*, *20*, *22*
 53:*1*, *8*, *10*, *11*
specialize 11:*4*, *6*, *8*
specific 11:*4* 19:*9*
 29:*13*, *15* 30:*16* 31:*6*,
 *12* 35:*10* 36:*24*
 42:*11* 46:*10* 50:*2*
 56:*8* 57:*19* 58:*3*, *15*
 61:*18*

specifically 31:*16*
 35:*19* 60:*21* 61:*1*
specifies 40:*16*, *19*
spectrum 50:*23*
spelled 4:*15*
spent 22:*17*
spoke 7:*19* 15:*7*, *8*
 17:*14* 21:*4*
spoken 17:*15* 24:*8*
sporadic 33:*11*
stable 51:*25*
staff 28:*7* 34:*5*, *15*
 36:*20* 42:*23* 44:*4*
 49:*5* 54:*19* 56:*10*, *17*,
 *19*, *21*, *23* 57:*8* 60:*17*
 62:*1*, *11*
stakeholders 13:*4*
stand 12:*14*
**Standard** 1:*19* 54:*8*,
*11*
start 61:*24*
started 17:*2*
starting 25:*9* 26:*2*
**STATE** 2:*10*, *11*
 4:*10*, *19* 12:*20*, *21*
 18:*23* 19:*3*, *7*, *17*
statements 24:*7*, *8*
state-operated 19:*4*
**STATES** 1:*1* 41:*11*,
*13*, *17*
statutes 33:*16*
statutorily 12:*13*
stay 50:*16*
steps 30:*11* 48:*10*
stop 22:*11*
**Street** 2:*11*
stressors 59:*21*
strike 18:*20* 23:*4*
 26:*4* 63:*23*
strokes 13:*8*
structural 47:*19*
structure 18:*8* 30:*1*
 47:*20* 50:*10* 58:*5*, *9*,
 *20*
structured 50:*18*
subject 8:*20*
**Subscribed** 65:*11*
 66:*14*
substance 16:*2*
 20:*21* 21:*7* 66:*7*

suicidal 48:*3*, *9*, *16*
 49:*7*
suicide 16:*16*, *17*
 19:*16*, *20*, *23* 24:*19*,
 *22* 26:*18* 27:*8*, *13*
 28:*22* 45:*14*, *16* 46:*8*
 48:*1*, *12* 50:*24* 51:*2*,
 *11*, *14*, *17*, *20* 52:*6*, *9*,
 *10* 53:*13*, *24* 54:*2*, *4*,
 *5*, *9* 55:*1*, *2*, *12* 56:*12*
 57:*12*, *13* 58:*11*, *22*
 59:*22* 60:*3* 61:*4*, *7*,
 *11*, *13*, *15*, *20*, *21* 62:*5*,
 *6*
suicided 25:*5*
suicides 26:*13* 60:*18*,
 *24* 63:*5*, *7*, *10*, *20*
**Suite** 2:*11*
**Sullivan** 14:*15*, *16*
sum 16:*2* 20:*21* 21:*7*
supervises 31:*9*
supervision 18:*8*
 30:*2*, *19* 38:*22* 39:*1*
 52:*12* 55:*23* 58:*20*
supervisor 56:*9*
supervisors 42:*2*
 56:*5*
supervisory 58:*5*, *9*
support 50:*20*
suppose 57:*8* 63:*17*
supposed 32:*17*
 52:*11*
sure 28:*12* 32:*13*
 33:*12* 36:*2* 40:*18*
 47:*4* 49:*24* 56:*1*
 64:*12*
sustaining 53:*2*
sworn 4:*4* 65:*11*
 66:*14*
symptoms 51:*8*
**SYRACUSE** 2:*10*, *12*
system 43:*8*
systemic 29:*9*
systems 13:*6* 29:*4*

< T >
take 5:*15* 6:*3*, *13*
 21:*24* 23:*9*, *14* 47:*16*
 62:*4*, *14*, *19* 63:*25*
 64:*2*

taken 1:*17* 11:*15*
 61:*20* 64:*4* 65:*11*
takes 48:*10* 60:*1*
talk 6:*6* 20:*1* 26:*16*,
 *19* 27:*10*, *13* 44:*4*
 47:*19*
talked 17:*13* 59:*7*
talking 47:*23* 62:*1*
talks 26:*21*
taught 32:*17*
team 30:*18* 31:*8*
 52:*5* 53:*23* 54:*21*
 58:*18*
technical 10:*1*
**TECHNICIAN** 21:*19*
 22:*1* 23:*14* 24:*5*
tell 33:*7* 44:*25*
 47:*20*
telling 36:*3*
term 10:*1* 53:*16*, *18*
terms 12:*18* 16:*12*
 18:*2* 30:*23* 36:*9*
 37:*4* 54:*22*
testified 4:*4* 5:*3* 9:*3*
 10:*2*
testify 5:*18* 20:*4*, *9*,
 *18*
testimony 7:*14*
**Texas** 8:*15* 10:*13*
 11:*3*
**Thank** 4:*22* 22:*12*
 24:*4* 64:*5*
theoretically 45:*4*, *9*
therapist 37:*13* 38:*3*
 40:*12* 60:*6*
thing 6:*11* 24:*24*
things 28:*20* 55:*8*
 60:*2* 62:*4* 63:*10*
think 8:*2* 9:*5*, *17*
 15:*9* 16:*10* 20:*17*
 29:*3*, *16* 30:*23* 33:*6*
 36:*3* 42:*21* 49:*5*
 56:*1*
thinking 19:*14*
thought 21:*1* 37:*20*
thoughts 16:*4*
three 43:*24* 62:*17*
**Time** 1:*19* 5:*2* 6:*7*,
 *9* 9:*16* 12:*2* 13:*25*
 15:*7* 17:*14*, *15*, *16*

20:*17*  22:*17*  23:*1*
24:*19*  30:*17*  32:*20*
51:*12*  57:*8*  63:*12*
64:*6*
**times**  6:*15*  14:*24*
16:*23*  17:*12*  39:*18*,
23  40:*3*
**title**  12:*3*  14:*7*
**today**  4:*24*  5:*12*, *18*
6:*9*, *15*, *25*  15:*8*
24:*15*  60:*21*
**today's**  7:*17*, *19*  8:*5*
**told**  9:*3*  10:*2*
**tool**  57:*14*  59:*17*
**top**  25:*14*  27:*25*
57:*10*
**track**  32:*18*
**train**  34:*12*
**trained**  60:*8*, *12*
**training**  11:*9*, *11*
32:*21*  34:*2*, *6*, *8*, *9*, *10*,
*11*, *13*, *17*, *19*, *23*, *25*
35:*1*, *4*  49:*11*  56:*12*,
*17*, *18*, *24*  57:*3*, *5*, *9*
60:*16*
**trainings**  56:*23*
60:*13*, *14*
**transcript**  64:*11*  65:*4*
**transcription**  66:*5*
**transferred**  59:*1*
**transgender**  5:*8*  10:*7*
**treat**  47:*8*, *14*, *21*
**treatment**  5:*9*  9:*9*,
*11*  10:*7*  38:*23*, *25*
39:*1*, *13*, *16*, *20*, *21*, *24*
47:*11*, *12*, *14*, *15*, *23*
49:*14*, *16*, *18*  50:*5*, *9*,
*11*, *15*, *21*  52:*5*, *12*, *15*
54:*21*
**trend**  28:*22*, *24*  29:*1*,
*14*, *15*
**trends**  26:*14*, *18*, *19*,
*21*  27:*5*  63:*21*
**trial**  5:*3*, *4*  12:*14*
**tried**  50:*24*
**trigger**  28:*20*, *23*, *24*
29:*1*
**true**  65:*4*
**truthfully**  5:*18*

**try**  26:*14*  29:*10*
47:*7*  55:*10*  61:*25*
62:*5*  63:*17*, *18*
**trying**  9:*5*  22:*9*
29:*3*  32:*11*  37:*20*
50:*22*  59:*13*
**Tuesday**  15:*8*
**turn**  6:*19*
**twice**  26:*19*
**two**  21:*3*  62:*15*
**type**  9:*14*
**Typically**  64:*10*

**< U >**
**understand**  5:*12*, *21*
20:*19*, *25*  26:*14*  28:*9*
30:*12*  33:*18*  38:*2*
42:*15*  44:*16*  62:*5*
**understanding**  6:*1*
13:*10*  57:*23*
**understood**  5:*25*
29:*18*  51:*10*
**unfit**  12:*14*
**unique**  63:*8*
**Unit**  11:*21*, *23*  48:*17*
49:*8*  50:*17*, *19*  51:*24*
52:*17*, *20*  53:*1*, *8*, *10*
**UNITED**  1:*1*
**units**  45:*17*  52:*22*
60:*17*
**University**  10:*13*
11:*3*
**update**  28:*15*, *17*, *21*
29:*20*  30:*6*  32:*21*
46:*7*, *9*, *12*, *21*
**updated**  28:*13*  31:*5*,
*14*  45:*24*  55:*7*
**updates**  30:*22*
**updating**  29:*19*, *22*
35:*12*  46:*14*, *16*, *19*
**usual**  25:*2*
**usually**  25:*6*  33:*14*

**< V >**
**variation**  56:*16*
**varies**  25:*22*
**various**  17:*12*
**verbal**  6:*2*
**verdict**  12:*19*

**VIDEO**  1:*13*, *17*
15:*9*  21:*19*  23:*14*
**visit**  44:*1*
**voluntary**  35:*2*

**< W >**
**walk**  11:*18*  23:*15*
**want**  14:*25*  23:*14*,
*16*, *25*  25:*16*  28:*9*
34:*18*  36:*2*  48:*16*
62:*14*, *18*  64:*8*
**wanted**  16:*4*  46:*7*
**WARD**  1:*5*
**watch**  6:*20*  53:*13*, *24*
54:*2*, *4*, *7*, *9*  61:*4*, *8*
**watches**  54:*20*
**way**  7:*14*  15:*11*
29:*3*  43:*3*
**well**  12:*12*, *16*, *22*
13:*4*, *12*  17:*20*  18:*7*
19:*2*  36:*16*  46:*9*, *13*
**W-e-n**  4:*18*
**went**  10:*19*
**we're**  6:*8*  13:*1*
33:*25*  64:*14*
**we've**  62:*15*
**Williams**  1:*19*  65:*2*,
*15*
**wind**  38:*18*
**WITNESS**  3:*2*  4:*3*
9:*24*  10:*8*  23:*17*
**word**  22:*2*
**words**  6:*4*
**work**  4:*19*  13:*15*
20:*2*  42:*2*  43:*18*
46:*18*  53:*23*
**worker**  40:*10*, *17*
**working**  12:*11*  13:*2*
17:*2*, *3*  26:*6*  39:*14*
**works**  16:*22*  29:*25*
**writing**  6:*8*  57:*24*
**written**  24:*7*

**< Y >**
**YAMILE**  2:*6*  4:*7*
**Yeah**  4:*13*  21:*9*
25:*18*  26:*7*  62:*20*
**year**  9:*17*  10:*5*
17:*17*  25:*11*, *12*  26:*3*,

6, *8*, *14*, *20*
**yearly**  26:*11*
**years**  9:*15*  10:*5*
19:*23*  43:*24*  63:*20*
**YORK**  1:*1*  2:*6*, *10*,
*12*  4:*19*, *20*, *21*  11:*12*
16:*22*  18:*23*  19:*3*, *7*,
*17*  24:*19*  26:*17*, *21*
27:*17*  28:*3*  34:*14*
35:*13*  36:*13*, *20*
39:*15*  42:*1*  43:*25*
45:*1*, *12*, *20*
**York's**  27:*7*

**< Z >**
**Zoom**  6:*24*

### WORD LIST

**< 1 >**
**10**  (*7*)
**10:06**  (*1*)
**10001**  (*1*)
**10016**  (*1*)
**10th**  (*1*)
**112**  (*1*)
**12**  (*1*)
**12:10**  (*1*)
**13202**  (*1*)
**15**  (*1*)
**17**  (*2*)
**17th**  (*1*)
**18**  (*1*)
**1974**  (*1*)
**1992**  (*1*)
**1996**  (*2*)

**< 2 >**
**2**  (*1*)
**20**  (*1*)
**2000**  (*2*)
**2008**  (*5*)
**2013**  (*3*)
**2018**  (*7*)
**2019**  (*1*)
**2022**  (*5*)
**20-CV-01413**  (*1*)
**21**  (*1*)
**23**  (*1*)

**< 3 >**
**300**  (*2*)
**330**  (*1*)
**365**  (*2*)

**< 4 >**
**4**  (*1*)

**< 6 >**
**6**  (*1*)

**< 8 >**
**8**  (*2*)

**< 9 >**
**90**  (*3*)

**9th**  (*1*)

**< A >**
**a.m**  (*1*)
**ability**  (*2*)
**able**  (*1*)
**above-styled**  (*1*)
**access**  (*3*)
**accommodate**  (*1*)
**account**  (*1*)
**accreditation**  (*11*)
**accredited**  (*1*)
**accrediting**  (*1*)
**accuracy**  (*1*)
**accurate**  (*1*)
**accurately**  (*1*)
**ACKNOWLEDGMEN
T**  (*1*)
**ACTION**  (*5*)
**actions**  (*1*)
**actual**  (*1*)
**acute**  (*2*)
**ad**  (*1*)
**additional**  (*2*)
**address**  (*4*)
**addressed**  (*2*)
**adequate**  (*1*)
**admin**  (*1*)
**administrates**  (*1*)
**administration**  (*6*)
**administrative**  (*1*)
**Administrator**  (*1*)
**admitted**  (*3*)
**Adult**  (*1*)
**adverse**  (*1*)
**affect**  (*4*)
**age**  (*1*)
**agency**  (*3*)
**agency's**  (*1*)
**ago**  (*3*)
**AIMEE**  (*3*)
**al**  (*1*)
**Albert**  (*1*)
**alcohol**  (*1*)
**allowed**  (*1*)
**Amended**  (*2*)
**amount**  (*1*)
**Amy**  (*1*)
**Ann**  (*2*)

**annually**  (*2*)
**Answer**  (*11*)
**answered**  (*2*)
**answers**  (*3*)
**anybody**  (*1*)
**apparently**  (*1*)
**appearing**  (*1*)
**Apple**  (*1*)
**apply**  (*1*)
**appointments**  (*1*)
**appoints**  (*1*)
**approach**  (*2*)
**appropriate**  (*8*)
**approval**  (*1*)
**approves**  (*1*)
**approximate**  (*2*)
**approximately**  (*1*)
**approximation**  (*1*)
**area**  (*2*)
**areas**  (*2*)
**Article**  (*6*)
**asked**  (*3*)
**asking**  (*9*)
**assess**  (*1*)
**assessed**  (*3*)
**assessment**  (*13*)
**assign**  (*1*)
**assigned**  (*3*)
**assist**  (*1*)
**associate**  (*4*)
**assortment**  (*1*)
**assume**  (*2*)
**assumption**  (*1*)
**attached**  (*1*)
**attempt**  (*3*)
**attempted**  (*4*)
**attend**  (*1*)
**attending**  (*1*)
**attention**  (*1*)
**ATTORNEY**  (*5*)
**attorneys**  (*2*)
**audience**  (*1*)
**audit**  (*1*)
**audits**  (*1*)
**automatic**  (*1*)
**autopsy**  (*1*)
**available**  (*1*)
**Avenue**  (*2*)
**avoid**  (*1*)

**aware**  (*20*)

**< B >**
**back**  (*8*)
**based**  (*2*)
**basic**  (*2*)
**basis**  (*4*)
**Beginning**  (*6*)
**behalf**  (*2*)
**believe**  (*3*)
**Bellevue**  (*2*)
**best**  (*2*)
**Beth**  (*1*)
**better**  (*3*)
**beyond**  (*1*)
**bit**  (*3*)
**board**  (*1*)
**born**  (*2*)
**Branch**  (*1*)
**break**  (*5*)
**Breaking**  (*1*)
**brief**  (*1*)
**briefly**  (*1*)
**broad**  (*2*)
**Bronx**  (*1*)
**bureaus**  (*1*)
**business**  (*1*)

**< C >**
**called**  (*2*)
**call-out**  (*1*)
**capacity**  (*1*)
**caption**  (*1*)
**Captioner**  (*1*)
**care**  (*6*)
**case**  (*8*)
**caseload**  (*1*)
**cause**  (*1*)
**cell**  (*1*)
**Center**  (*16*)
**Centers**  (*6*)
**central**  (*20*)
**certain**  (*1*)
**CERTIFICATE**  (*1*)
**certification**  (*1*)
**Certified**  (*2*)
**certify**  (*3*)
**cetera**  (*1*)
**chances**  (*1*)
**change**  (*18*)

**CHANGE/REASON** (*1*)
changed (*3*)
changes (*2*)
charge (*10*)
check (*2*)
Chemical (*1*)
CHEVERIE (*1*)
chief (*2*)
Children's (*1*)
choose (*1*)
circumstances (*6*)
City (*2*)
CIVIL (*3*)
CLARITY (*1*)
clinical (*13*)
clinically (*2*)
clinician (*7*)
clinicians (*1*)
clinic-level (*1*)
close (*1*)
CNYPC (*14*)
CNYPC's (*1*)
college (*2*)
combination (*3*)
come (*6*)
comes (*2*)
coming (*1*)
commander (*1*)
commencing (*1*)
commission (*12*)
commissioner (*11*)
commissioner's (*1*)
commit (*4*)
commits (*1*)
committed (*4*)
communicated (*1*)
communication (*2*)
community (*5*)
company (*1*)
Complaint (*3*)
complaints (*2*)
completed (*2*)
compliance (*1*)
complicated (*1*)
complying (*2*)
components (*1*)
computers (*1*)
concern (*2*)

concluded (*1*)
conclusion (*1*)
conduct (*1*)
confused (*1*)
connect (*1*)
connected (*1*)
connecting (*1*)
consequence (*1*)
consequences (*5*)
consider (*1*)
considerations (*2*)
considered (*2*)
consistent (*2*)
contacted (*1*)
contain (*1*)
contains (*1*)
context (*1*)
continuing (*1*)
continuous (*1*)
continuously (*1*)
contributing (*1*)
control (*1*)
conversation (*8*)
convicted (*1*)
coordinating (*1*)
correct (*3*)
Correction (*1*)
correctional (*31*)
correctional-based (*1*)
Corrections (*14*)
corrections-based (*2*)
corrective (*1*)
counsel (*8*)
count (*1*)
couple (*1*)
COURT (*6*)
courtroom (*1*)
covered (*1*)
COWAN (*60*)
co-workers (*1*)
creates (*2*)
creating (*1*)
creation (*1*)
crime (*1*)
crisis (*2*)
CRR (*1*)
current (*3*)
currently (*2*)
custody (*1*)

CYNPC (*5*)

**< D >**
daily (*2*)
Darman (*1*)
date (*3*)
day (*2*)
days (*6*)
day-to-day (*1*)
deal (*2*)
decide (*8*)
decided (*7*)
decides (*2*)
deciding (*2*)
decision (*2*)
decisions (*6*)
defect (*1*)
Defendant (*1*)
Defendants (*1*)
defined (*1*)
definitely (*1*)
degree (*1*)
deliver (*1*)
delivered (*4*)
delivery (*1*)
demographic (*1*)
Department (*15*)
depend (*8*)
depending (*4*)
depends (*11*)
DEPONENT (*1*)
deposed (*3*)
DEPOSITION (*17*)
depositions (*1*)
deputy (*5*)
describe (*1*)
described (*1*)
designee (*1*)
destination (*1*)
determination (*1*)
determine (*3*)
determined (*2*)
development (*4*)
devices (*2*)
diagnoses (*1*)
dictated (*1*)
different (*18*)
differently (*1*)
DIRECT (*4*)

directives (*1*)
directly (*2*)
director (*16*)
directs (*1*)
disciplinary (*2*)
discipline (*1*)
discuss (*1*)
discussed (*1*)
Discussion (*5*)
disease (*1*)
distribute (*1*)
distributed (*2*)
distributing (*1*)
distribution (*7*)
DISTRICT (*2*)
Division (*12*)
divisions (*5*)
DOCCS (*4*)
doctor (*9*)
doctors (*1*)
document (*10*)
documentation (*3*)
documents (*4*)
doing (*3*)
DR (*9*)
draft (*1*)
drafted (*7*)
Drake (*2*)
drugs (*1*)
duly (*1*)
duties (*1*)

**< E >**
earlier (*1*)
Eastern (*1*)
education (*1*)
Einstein (*1*)
either (*3*)
electronic (*4*)
else's (*1*)
E-mail (*1*)
employee (*4*)
employees (*1*)
employment (*1*)
encompass (*1*)
encompassed (*1*)
engineering (*1*)
ensure (*1*)
ensures (*1*)

entail  (*1*)
entities  (*1*)
environment  (*1*)
environments  (*1*)
Errata  (*2*)
ESQUIRE  (*3*)
established  (*1*)
establishing  (*1*)
Estate  (*2*)
estimate  (*3*)
et  (*2*)
evaluation  (*6*)
evaluations  (*2*)
events  (*2*)
evidence  (*2*)
exact  (*3*)
exactly  (*3*)
Examination  (*2*)
examples  (*1*)
executive  (*1*)
Exhibit  (*13*)
existed  (*1*)
expectation  (*1*)
expected  (*1*)
expires  (*1*)
explain  (*3*)
explaining  (*1*)

< F >
facilities  (*12*)
facility  (*32*)
facility-based  (*1*)
fact  (*1*)
factor  (*3*)
factors  (*7*)
facts  (*2*)
familiar  (*2*)
family  (*2*)
feel  (*3*)
fellowship  (*2*)
Field  (*2*)
Fifth  (*1*)
filed  (*2*)
fill  (*1*)
financially  (*1*)
findings  (*1*)
fine  (*1*)
finished  (*4*)
firm  (*1*)

first  (*3*)
fitness  (*1*)
five-minute  (*2*)
flexibility  (*1*)
Floor  (*2*)
focuses  (*1*)
folks  (*1*)
follow  (*4*)
followed  (*11*)
following  (*6*)
follows  (*2*)
footprint  (*1*)
foregoing  (*2*)
forensic  (*14*)
forensics  (*2*)
form  (*1*)
formal  (*1*)
found  (*2*)
foundation  (*1*)
frame  (*1*)
free  (*1*)
frequently  (*1*)
Friday  (*1*)
front  (*2*)
full  (*2*)
further  (*3*)

< G >
GENERAL  (*11*)
generally  (*3*)
General's  (*1*)
getting  (*1*)
Gina  (*1*)
give  (*4*)
given  (*3*)
gives  (*1*)
go  (*18*)
God  (*1*)
goes  (*3*)
going  (*20*)
Good  (*1*)
gotten  (*1*)
graduate  (*2*)
grievances  (*1*)
ground  (*1*)
guess  (*2*)
guessing  (*2*)
guidance  (*1*)
guided  (*1*)

guidelines  (*1*)

< H >
HACH  (*1*)
Hal  (*1*)
handful  (*1*)
happen  (*2*)
happened  (*6*)
happening  (*2*)
happens  (*2*)
hard  (*1*)
head  (*4*)
Health  (*29*)
hear  (*3*)
heard  (*1*)
hearing  (*1*)
hearings  (*7*)
held  (*2*)
help  (*2*)
helping  (*1*)
hierarchy  (*1*)
HILLARY  (*1*)
hindsight  (*1*)
historical  (*2*)
history  (*1*)
home  (*1*)
Hospital  (*1*)
hour  (*1*)
hours  (*1*)
housed  (*1*)
Housing  (*6*)
Houston  (*1*)
hygiene  (*3*)
Hypotheticals  (*1*)

< I >
idea  (*1*)
ideation  (*3*)
identification  (*2*)
identify  (*3*)
illness  (*10*)
illnesses  (*1*)
imagine  (*1*)
impact  (*1*)
impacted  (*1*)
important  (*2*)
improve  (*4*)
improved  (*1*)
improvement  (*1*)

inaccuracy  (*1*)
in-between  (*4*)
incarcerated  (*1*)
incident  (*2*)
include  (*1*)
included  (*1*)
includes  (*1*)
including  (*3*)
increased  (*1*)
increases  (*1*)
individual  (*10*)
individually  (*1*)
individuals  (*11*)
influence  (*1*)
information  (*16*)
infraction  (*2*)
initial  (*1*)
initiate  (*1*)
inmate  (*29*)
inmates  (*8*)
inmate's  (*1*)
Inpatient  (*4*)
inpatient-level  (*1*)
inside  (*2*)
insight  (*1*)
intended  (*1*)
interact  (*1*)
interested  (*1*)
internal  (*4*)
internally  (*1*)
intervention  (*3*)
interventions  (*1*)
interview  (*1*)
investigators  (*1*)
involve  (*1*)
involved  (*13*)
involves  (*1*)
iPad  (*1*)
Israel  (*1*)
issue  (*3*)
issues  (*2*)
items  (*2*)
its  (*1*)

< J >
Jeremy  (*1*)
join  (*1*)
joint  (*8*)
jointly  (*2*)

Deposition of Dr. Li-Wen Lee                                                                 Estate of Joseph P. King v. Ward, et al.

Joseph  (*4*)
judgment  (*3*)
July  (*1*)
JUNE  (*3*)
jurisdictions  (*2*)
Justice  (*3*)

< K >
KALKACH  (*77*)
keep  (*2*)
keeping  (*1*)
kept  (*1*)
key  (*1*)
kids  (*1*)
kind  (*10*)
kinds  (*4*)
King  (*9*)
knew  (*3*)
know  (*89*)
knowledge  (*1*)
known  (*2*)
knows  (*1*)

< L >
large  (*2*)
late  (*1*)
law  (*2*)
lawsuit  (*8*)
layers  (*1*)
lead  (*1*)
leading  (*1*)
learn  (*5*)
learned  (*1*)
LEE  (*15*)
L-e-e  (*1*)
left  (*3*)
legal  (*1*)
lesson  (*1*)
level  (*6*)
levels  (*2*)
L-i  (*1*)
licenses  (*1*)
licensing  (*2*)
LINE  (*1*)
link  (*1*)
linked  (*1*)
list  (*4*)
little  (*3*)
live  (*1*)

lives  (*1*)
living  (*1*)
LI-WEN  (*7*)
LLP  (*1*)
local  (*2*)
location  (*3*)
locations  (*1*)
log  (*2*)
logistically  (*1*)
long  (*8*)
longer  (*2*)
look  (*10*)
looked  (*1*)
looking  (*7*)
lose  (*2*)
lost  (*1*)
lot  (*4*)
lots  (*1*)

< M >
Madison  (*1*)
major  (*1*)
management  (*6*)
mandated  (*1*)
mandatory  (*1*)
manual  (*2*)
Margaret  (*3*)
Maria  (*1*)
Marie  (*1*)
mark  (*1*)
marked  (*5*)
MARKS  (*1*)
married  (*1*)
MD  (*1*)
mean  (*17*)
means  (*1*)
meant  (*3*)
mechanism  (*3*)
med  (*1*)
medical  (*28*)
medical-medical  (*1*)
medication  (*6*)
medications  (*4*)
medicine  (*2*)
meet  (*1*)
meeting  (*2*)
meetings  (*3*)
member  (*1*)
memorized  (*1*)

Mental  (*43*)
mentioned  (*1*)
Meyers  (*1*)
Mid-State  (*6*)
mind  (*1*)
minimally  (*1*)
minimum  (*1*)
minute  (*3*)
minutes  (*1*)
mission  (*1*)
Mm-hmm  (*1*)
modification  (*1*)
month  (*1*)
monthly  (*2*)
morning  (*1*)
move  (*3*)
moved  (*1*)
multiple  (*1*)
mute  (*1*)

< N >
name  (*9*)
names  (*5*)
NAPPI  (*2*)
nature  (*1*)
navigating  (*1*)
NECESSARILY  (*1*)
need  (*23*)
needed  (*3*)
needs  (*7*)
negative  (*1*)
never  (*4*)
NEW  (*37*)
nod  (*1*)
NORTHERN  (*1*)
Notary  (*1*)
noted  (*1*)
notes  (*2*)
notice  (*4*)
noticed  (*1*)
notices  (*5*)
notification  (*3*)
notifications  (*2*)
notified  (*4*)
notify  (*3*)
Number  (*6*)
numbered  (*2*)
numbers  (*1*)
nurse  (*1*)

< O >
oath  (*2*)
object  (*2*)
objection  (*46*)
objective  (*1*)
obliged  (*1*)
obtain  (*1*)
occasional  (*1*)
occurred  (*1*)
occurs  (*1*)
odd  (*1*)
offender  (*1*)
offer  (*1*)
offered  (*1*)
off-hours  (*1*)
OFFICE  (*17*)
official  (*6*)
Oh  (*3*)
Okay  (*40*)
older  (*1*)
OMH  (*13*)
Once  (*6*)
ones  (*4*)
one-time  (*1*)
ongoing  (*2*)
opened  (*1*)
opening  (*1*)
operated  (*1*)
operations  (*2*)
opinion  (*1*)
opportunities  (*1*)
opposed  (*1*)
options  (*1*)
order  (*2*)
organization  (*4*)
organized  (*2*)
oriented  (*1*)
outcome  (*2*)
outcomes  (*1*)
outpatient  (*1*)
outside  (*2*)
overall  (*2*)
overarching  (*1*)
overseeing  (*2*)
oversees  (*5*)

< P >
p.m  (*1*)

packet  (*1*)
PAGE  (*3*)
pages  (*1*)
paper  (*6*)
parole  (*1*)
part  (*3*)
participating  (*1*)
particular  (*1*)
parties  (*2*)
partly  (*1*)
party  (*1*)
pass  (*1*)
patient  (*3*)
patients  (*1*)
pays  (*3*)
peer  (*1*)
peers  (*1*)
Peggy  (*2*)
pending  (*1*)
people  (*15*)
performed  (*1*)
performing  (*1*)
performs  (*1*)
period  (*1*)
permanently  (*1*)
person  (*19*)
personally  (*2*)
person's  (*3*)
phone  (*1*)
place  (*1*)
placed  (*2*)
Plaintiff  (*3*)
plan  (*1*)
please  (*17*)
points  (*1*)
policies  (*58*)
policy  (*68*)
population  (*3*)
populations  (*1*)
portion  (*1*)
portions  (*2*)
position  (*8*)
positions  (*1*)
possible  (*3*)
potential  (*2*)
practice  (*6*)
practiced  (*1*)
practices  (*3*)
practitioner  (*1*)

preliminary  (*1*)
pre-pandemic  (*1*)
prepare  (*1*)
prescribe  (*3*)
prescribing  (*1*)
present  (*1*)
presentation  (*3*)
prevent  (*2*)
prevention  (*4*)
primary  (*3*)
prior  (*1*)
prison  (*1*)
prisons  (*1*)
problem  (*3*)
problems  (*1*)
procedure  (*2*)
proceedings  (*1*)
process  (*19*)
processes  (*1*)
Professional  (*2*)
program  (*6*)
programs  (*4*)
projects  (*2*)
promoting  (*1*)
proposed  (*1*)
propounded  (*1*)
Prosequendum  (*1*)
provide  (*5*)
provided  (*2*)
provides  (*4*)
providing  (*3*)
provision  (*1*)
psyche  (*3*)
Psychiatric  (*16*)
psychiatrist  (*4*)
Psychiatry  (*4*)
psychological  (*1*)
psychologist  (*1*)
Psychotropic  (*1*)
public  (*2*)
pull  (*1*)
purview  (*1*)
put  (*8*)

< Q >
qualified  (*1*)
quality  (*4*)
question  (*14*)
questions  (*6*)

quickly  (*4*)
quite  (*1*)
QUOTATION  (*1*)
QUOTE  (*2*)

< R >
range  (*1*)
RCTP  (*1*)
reach  (*3*)
reached  (*1*)
read  (*13*)
Realtime  (*2*)
reason  (*3*)
reasons  (*2*)
Reassessed  (*2*)
receive  (*9*)
received  (*3*)
receives  (*1*)
Recess  (*1*)
recognize  (*5*)
recognizes  (*1*)
record  (*9*)
recorded  (*1*)
recurring  (*1*)
redone  (*3*)
reevaluated  (*1*)
refer  (*1*)
REFLECT  (*1*)
reframe  (*1*)
regarding  (*6*)
REGIONAL  (*1*)
Registered  (*2*)
regular  (*1*)
related  (*9*)
relationship  (*3*)
relationships  (*1*)
relative  (*1*)
remember  (*10*)
REMOTE  (*2*)
remotely  (*1*)
repeat  (*3*)
rephrase  (*4*)
report  (*11*)
reported  (*2*)
Reporter  (*5*)
reporters  (*1*)
reporting  (*1*)
reports  (*5*)
represents  (*1*)

request  (*1*)
requests  (*2*)
requirement  (*3*)
residency  (*2*)
respond  (*2*)
responding  (*1*)
responsibilities  (*2*)
responsibility  (*1*)
responsible  (*3*)
responsive  (*3*)
restoration  (*1*)
restrictions  (*1*)
result  (*1*)
retention  (*1*)
retraining  (*1*)
return  (*2*)
returning  (*1*)
review  (*18*)
reviewed  (*2*)
reviewing  (*6*)
reviews  (*1*)
revise  (*3*)
revisions  (*1*)
right  (*3*)
risk  (*21*)
risks  (*1*)
role  (*5*)
roles  (*1*)
room  (*1*)
ROSE  (*1*)
RPR  (*1*)
rules  (*2*)
run  (*2*)

< S >
sanction  (*1*)
sanctions  (*1*)
sat  (*1*)
saying  (*2*)
says  (*1*)
schedule  (*1*)
SCHIRRIPA  (*1*)
school  (*5*)
Scratch  (*4*)
screen  (*1*)
screened  (*1*)
screening  (*7*)
scroll  (*1*)
scrolling  (*1*)

Deposition of Dr. Li-Wen Lee                                    Estate of Joseph P. King v. Ward, et al.

second  (*1*)
sector  (*1*)
security  (*1*)
see  (*25*)
seen  (*9*)
send  (*2*)
sending  (*1*)
sense  (*1*)
sent  (*3*)
separate  (*2*)
serious  (*2*)
Services  (*32*)
session  (*2*)
sessions  (*2*)
set  (*2*)
sex  (*1*)
Sheet  (*1*)
shoelaces  (*6*)
show  (*1*)
showing  (*2*)
side  (*6*)
sign  (*1*)
signed  (*1*)
silent  (*1*)
similar  (*1*)
single  (*2*)
site  (*1*)
situations  (*2*)
skills  (*1*)
slew  (*1*)
small  (*1*)
smoothly  (*1*)
social  (*2*)
solution  (*1*)
somebody  (*4*)
somewhat  (*1*)
sooner  (*1*)
sorry  (*13*)
sort  (*1*)
sound  (*1*)
South  (*1*)
speak  (*6*)
speaking  (*5*)
speaks  (*1*)
special  (*11*)
specialize  (*3*)
specific  (*17*)
specifically  (*4*)
specifies  (*2*)

spectrum  (*1*)
spelled  (*1*)
spent  (*1*)
spoke  (*5*)
spoken  (*2*)
sporadic  (*1*)
stable  (*1*)
staff  (*17*)
stakeholders  (*1*)
stand  (*1*)
Standard  (*3*)
start  (*1*)
started  (*1*)
starting  (*2*)
STATE  (*10*)
statements  (*2*)
state-operated  (*1*)
STATES  (*4*)
statutes  (*1*)
statutorily  (*1*)
stay  (*1*)
steps  (*2*)
stop  (*1*)
Street  (*1*)
stressors  (*1*)
strike  (*4*)
strokes  (*1*)
structural  (*1*)
structure  (*7*)
structured  (*1*)
subject  (*1*)
Subscribed  (*2*)
substance  (*4*)
suicidal  (*4*)
suicide  (*50*)
suicided  (*1*)
suicides  (*7*)
Suite  (*1*)
Sullivan  (*2*)
sum  (*3*)
supervises  (*1*)
supervision  (*8*)
supervisor  (*1*)
supervisors  (*2*)
supervisory  (*2*)
support  (*1*)
suppose  (*2*)
supposed  (*2*)
sure  (*9*)

sustaining  (*1*)
sworn  (*3*)
symptoms  (*1*)
SYRACUSE  (*2*)
system  (*1*)
systemic  (*1*)
systems  (*2*)

< T >
take  (*12*)
taken  (*5*)
takes  (*2*)
talk  (*8*)
talked  (*2*)
talking  (*3*)
talks  (*1*)
taught  (*1*)
team  (*6*)
technical  (*1*)
TECHNICIAN  (*4*)
tell  (*3*)
telling  (*1*)
term  (*3*)
terms  (*7*)
testified  (*4*)
testify  (*4*)
testimony  (*1*)
Texas  (*3*)
Thank  (*4*)
theoretically  (*2*)
therapist  (*4*)
thing  (*2*)
things  (*5*)
think  (*15*)
thinking  (*1*)
thought  (*2*)
thoughts  (*1*)
three  (*2*)
Time  (*22*)
times  (*7*)
title  (*2*)
today  (*9*)
today's  (*3*)
told  (*2*)
tool  (*2*)
top  (*3*)
track  (*1*)
train  (*1*)
trained  (*2*)

training  (*25*)
trainings  (*3*)
transcript  (*2*)
transcription  (*1*)
transferred  (*1*)
transgender  (*2*)
treat  (*3*)
treatment  (*29*)
trend  (*5*)
trends  (*6*)
trial  (*3*)
tried  (*1*)
trigger  (*4*)
true  (*1*)
truthfully  (*1*)
try  (*8*)
trying  (*7*)
Tuesday  (*1*)
turn  (*1*)
twice  (*1*)
two  (*2*)
type  (*1*)
Typically  (*1*)

< U >
understand  (*12*)
understanding  (*3*)
understood  (*3*)
unfit  (*1*)
unique  (*1*)
Unit  (*12*)
UNITED  (*1*)
units  (*3*)
University  (*2*)
update  (*10*)
updated  (*5*)
updates  (*1*)
updating  (*6*)
usual  (*1*)
usually  (*2*)

< V >
variation  (*1*)
varies  (*1*)
various  (*1*)
verbal  (*1*)
verdict  (*1*)
VIDEO  (*5*)
visit  (*1*)

Deposition of Dr. Li-Wen Lee                                    Estate of Joseph P. King v. Ward, et al.

**voluntary**  (*1*)

**< W >**
**walk**  (*2*)
**want**  (*12*)
**wanted**  (*2*)
**WARD**  (*1*)
**watch**  (*9*)
**watches**  (*1*)
**way**  (*4*)
**well**  (*11*)
**W-e-n**  (*1*)
**went**  (*1*)
**we're**  (*4*)
**we've**  (*1*)
**Williams**  (*3*)
**wind**  (*1*)
**WITNESS**  (*5*)
**word**  (*1*)
**words**  (*1*)
**work**  (*8*)
**worker**  (*2*)
**working**  (*6*)
**works**  (*2*)
**writing**  (*2*)
**written**  (*1*)

**< Y >**
**YAMILE**  (*2*)
**Yeah**  (*5*)
**year**  (*10*)
**yearly**  (*1*)
**years**  (*5*)
**YORK** (*30*)
**York's**  (*1*)

**< Z >**
**Zoom**  (*1*)