**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

———————————————————

|  |  |  |
|---|---|---|
| The Estate of Joseph P. King, | } | |
| by and through its Administratrix, | } | |
| Amy King, and Amy King, in her own right, | } | |
|  | } | |
| Plaintiffs, | } | Docket No.  9:20-cv-1413 |
|  | } | |
| v. | } | |
|  | } | |
| Anthony J. Annucci, Acting Commissioner, | } | |
| State of New York Department of | } | |
| Corrections, in his individual capacity; and | } | |
| Marie T. Sullivan, MD, Commissioner, | } | |
| State of New York Department of Mental | } | |
| Health, in her individual capacity | } | |
| Jami Palladino, Mid-State Social | } | |
| Worker, in her individual capacity; Hal | } | |
| Meyers, Mid-State Chief Mental Health | } | |
| Counselor, in his individual capacity; | } | |
|  | } | |
| Defendants. | } | |

———————————————————}

## PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS

Pursuant to Rule 7.1(a)(3) of the Local Rules of this Court, Plaintiffs submit this Response

to Defendants Anthony J. Annucci, Acting Commissioner, State of New York Department of

Corrections, in his individual capacity; Ann Marie T. Sullivan, Commissioner, State of New York

Department of Mental Health, in her individual capacity; Jami Palladino, Mid-State Social Worker,

in her individual capacity; and Hal Meyers, Mid-State Chief Mental Health Counselor1, in his

individual capacity ("Defendants") Statement of Material Facts:

**Statement No. 1:**
Plaintiff, Amy King, was married to the decedent, Joseph P. King ("the decedent"), on August
14, 1999. (Declaration of Attorney Aimee Cowan [Cowan Dec.], Exhibit [Ex.] J at 9).

**Response No. 1:**
Admitted.

**Statement No. 2:**
Plaintiff was appointed as the administratrix of decedent's estate after his death on November 16, 2018. (Id. at 99).

**Response No. 2:**
Admitted.

**Statement No. 3:**
Plaintiff and the decedent had two children, Meghan King and Joseph King. (Id.).

**Response No.3:**
Admitted.

**Statement No. 4:**
The decedent was arrested on January 2, 2012 and subsequently convicted of arson. (Id. at 21, 42).

**Response No. 4:**
Admitted.

**Statement No. 5:**
According to Plaintiff, decedent agreed to take a plea deal that sentenced him to four to twelve years in prison. (Id. at 42).

**Response No. 5:**
Admitted.

**Statement No. 6:**
At the time the decedent was arrested, his daughter was eighteen and his son was thirteen. (Id. at 12).

**Response No. 6:**
Admitted.

**Statement No. 7:**
The decedent spent fourteen months in the Essex County Jail. (Id. at 21).

**Response No. 7:**
Admitted.

**Statement No. 8:**
The decedent began his incarceration in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") in or about August 2013. (Id.).

**Response No. 8:**
Admitted.

**Statement No. 9:**
Decedent attempted suicide while incarcerated on July 11, 2016. (Id., Ex. B at bates stamp 000971).

**Response No. 9:**
Admitted.

**Statement No. 10:**
He was placed in the Residential Crisis Treatment Program ("RCTP") at Mid-State Correctional Facility ("Mid-State") on July 11, 2016 and monitored there until his discharge on August 4, 2016. (Id. at 001015).

**Response No. 10:**
Admitted.

**Statement No. 11:**
Plaintiff testified that after his July 2016 suicide attempt, the decedent told her multiple times that he would never attempt suicide again. (Id., Ex. J at 55-56).

**Response No. 11:**
Admitted.

**Statement No. 12:**
The decedent did not make any other suicide attempts until his completed suicide at Mid- State on November 16, 2018. (Id. at 58).

**Response No. 12:**
Admitted to the extent that is what the testimony reads.

**Statement No. 13:**
Mid-State is operated by DOCCS. (Id., Ex. M at 36).

**Response No. 13:**
Admitted.

**Statement No. 14:**
Mental health services are provided to incarcerated individuals on-site at Mid-State by Central New York Psychiatric Center ("CNYPC") staff. (Id.).

**Response No. 14:**
Admitted.

**Statement No. 15:**
Defendant Jami Palladino is a licensed clinical social worker employed by the New York State

Office of Mental Health ("OMH"). (Id., Ex. L at 9).

**Response No. 15:**
Admitted.

**Statement No. 16:**
In 2018, Palladino was employed as a general population therapist at Mid-State. (Id. at 10).

**Response No. 16:**
Admitted.

**Statement No. 17:**
In 2018, Palladino managed a caseload of approximately 150-180 incarcerated individuals who received mental health services. (Id. at 10, 31).

**Response No. 17:**
Admitted.

**Statement No. 18:**
Palladino's supervisor was Unit Chief, Defendant Harold Meyers. (Id. at 10).

**Response No. 18:**
Admitted.

**Statement No. 19:**
Palladino began giving therapy to the decedent in 2013. (Id. at 14).

**Response No. 19:**
Admitted.

**Statement No. 20:**
The policy at Mid-State is that an incarcerated individual open to mental health services will be seen by their therapist at a minimum once every thirty days. (Id. at 28; Id., Ex. K at 41).

**Response No. 20:**
Admitted.

**Statement No. 21:**
However, in an emergency situation, the inmate could be seen more than once a month. (Id., Ex. L at 58).

**Response No. 21:**
Admitted.


**Statement No. 22:**

Palladino met with the decedent approximately once a month to provide supportive counseling and verbal therapy. (Id. at 15).

**Response No. 22:**
Admitted.


**Statement No. 23:**

Incarcerated individuals at Mid-State are required to visit their prescriber/psychiatrist at a minimum every three months. (Id., Ex. K at 41; Id., Ex. M at 37).

**Response No. 23:**
Admitted.


**Statement No. 24:**
According to Li-Wen Lee, M.D., the Associate Commissioner for OMH, there is flexibility left for additional in-between sessions, left to clinical judgment. (Id., Ex. M at 14, 37).

**Response No. 24:**
Admitted.


**Statement No. 25:**
If an incarcerated individual wrote a letter asking to be seen by their therapist sooner than once every thirty days, the incarcerated individual would be seen within two weeks of receipt of the letter. (Id., Ex. L at 28-29).

**Response No. 25:**
Admitted.


**Statement No. 26:**
If an incarcerated individual expressed thoughts of self-harm or psychotic symptoms, the incarcerated individual would be brought to the crisis unit immediately. (Id. at 57).

**Response No. 26:**
Admitted.


**Statement No. 27:**
A suicide risk evaluation was completed for incarcerated individuals within two weeks of transferring into Mid-State. (Id. at 50).

**Response No. 27:**
Admitted.

**Statement No. 28:**
Every two years the suicide risk assessment is updated, or it is updated as indicated, such as when a new risk factor arose. (Id.).

**Response No. 28:**
Admitted.

**Statement No. 29:**
A verbal suicide risk assessment is performed on an incarcerated individual at every session and the risk assessment is updated accordingly. (Id. at 51-52).

**Response No. 29:**
Admitted.

**Statement No. 30:**
In the six months leading up to his death, decedent received mental health treatment at Mid-State. (Id., see gen., Ex. B).

**Response No. 30:**
Admitted.

**Statement No. 31:**
In the last six months leading up to his death, Palladino met with decedent for therapy on six separate occasions—May 14, 2018, June 25, 2018, July 23, 2018, August 27, 2018, September 27, 2018, and November 2, 2018. (Declaration of Jami Palladino [Palladino Dec.], ¶ 11).

**Response No. 31:**
Admitted.

**Statement No. 32:**
On May 14, 2018, decedent was evaluated by a psychiatric provider, Karen Thomas, M.D. (Cowan Dec., Ex. B at bates stamp 000892-000893).

**Response No. 32:**
Admitted.

**Statement No. 33:**
At that time, decedent was diagnosed with adjustment disorder with mixed anxiety and depressed mood. (Id.).

**Response No. 33:**
Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time refenced by the citation.

**Statement No. 34:**
A suicide assessment was performed at that session and decedent denied suicidal ideation. (<u>Id</u>.)

**Response No. 34:**
Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 35:**
At that time, decedent was prescribed Celexa for his depression and Vistaril for his anxiety. (<u>Id</u>. at 000893).

**Response No. 35:**
Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 36:**
Decedent also received therapy from his primary therapist, Jami Palladino, on May 14, 2018. (<u>Id</u>. at 001058-001059).

**Response No. 36:**
Admitted.

**Statement No. 37:**
During their session, decedent denied psychotic symptoms or wanting to harm himself. (<u>Id</u>. at 001058).

**Response No. 37:**
Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 38:**
Palladino determined there were no evidence of any warning signs of acute suicide risk. (<u>Id</u>. at 001059).

**Response No. 38:**
Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 39:**
On June 25, 2018, decedent was evaluated by his psychiatric provider, Karen Thomas, M.D. (<u>Id</u>., at 000894-000895).

**Response No. 39:**
Admitted.

**Statement No. 40:**

Her progress note indicates that decedent received a misbehavior ticket for taking suboxone. (Id. at 000894).

**Response No. 40:**

Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 41:**

Suboxone was not prescribed to decedent. (Id., Ex. J at 49).

**Response No. 41:**

Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 42:**

Decedent admitted to Dr. Thomas that he had used suboxone a few times since the last session on May 14, 2018. (Id., Ex. B at 000894).

**Response No. 42:**

Admitted.

**Statement No. 43:**

A suicide assessment was performed, and no warning signs were present. (Id.).

**Response No. 43:**

Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 44:**

Dr. Thomas discussed decedent's suboxone use with him. (Id. at 000895).

**Response No. 44:**

Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 45:**

Dr. Thomas decided to taper off and discontinue the Celexa and Vistaril because decedent did not find the mediations to be effective. (Id.).

**Response No. 45:**

Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 46:**
Decedent was also evaluated by his primary therapist, Jami Palladino, on this date, June 25, 2018. (Id. at 001061-001062).

**Response No. 46:**
Admitted.

**Statement No. 47:**
Decedent denied experiencing thoughts of self harm or psychotic symptoms. (Id. at 001061).

**Response No. 47:**
Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 48:**
Decedent acknowledged that he had been using suboxone recently and had received disciplinary tickets for drug use. (Id.).

**Response No. 48:**
Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 49:**
Palladino asked decedent if the passing of his mother the month before was a trigger for thoughts of suicide or harming himself, and he responded, "No way, I'll never do that again." (Id.).

**Response No. 49:**
Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 50:**
Palladino's progress note echoes Dr. Thomas' note, which indicates that decedent will taper the use of his medications and would be seen in one month by the prescriber to follow up on how he was doing and whether medication was clinically indicated. (Id.).

**Response No. 50:**
Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 51:**
Palladino determined there were no evidence of any warning signs of acute suicide risk. (Id. at 001062).

**<u>Response No. 51:</u>**
Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**<u>Statement No. 52:</u>**
On July 23, 2018, decedent was evaluated by his psychiatric provider, Karen Thomas, M.D. (<u>Id</u>., at 000896-000897).

**<u>Response No. 52:</u>**
Admitted.

**<u>Statement No. 53:</u>**
Decedent reported he felt more depressed but denied suicidal ideation. (<u>Id</u>.).

**<u>Response No. 53:</u>**
Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time refenced by the citation.

**<u>Statement No. 54:</u>**
A suicide risk assessment was performed, and no warning signs were present. (<u>Id</u>.).

**<u>Response No. 54:</u>**
Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**<u>Statement No. 55:</u>**
Decedent was prescribed Zoloft and Trazodone for his depression and anxiety. (<u>Id</u>. at 000897).

**<u>Response No. 55:</u>**
Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**<u>Statement No. 56:</u>**
Decedent was also given therapy from his primary therapist, Jami Palladino, on July 23, 2018. (<u>Id</u>. at 001063-00164).

**<u>Response No. 56:</u>**
Admitted.

**<u>Statement No. 57:</u>**
Palladino determined there were no evidence of any warning signs of acute suicide risk. (<u>Id</u>. at 001064).

**<u>Response No. 57:</u>**
Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied

as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 58:**
On August 27, 2018, decedent was evaluated by his psychiatric provider, Karen Thomas, M.D. (Id. at 000898-000899).

**Response No. 58:**
Admitted.

**Statement No. 59:**
Decedent admitted to using suboxone 2-3 times since the last visit. (Id.).

**Response No. 59:**
Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 60:**
Decedent denied suicidal ideation and no suicidal warning signs were present. (Id.).

**Response No. 60:**
Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 61:**
Dr. Thomas counseled decedent on the harms of substance use. (Id. at 000899).

**Response No. 61:**
Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 62**
Decedent indicated to Dr. Thomas that he understood that medications would be stopped if the drug use continued. (Id.).

**Response No. 62:**
Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 63**
Decedent continued his Zoloft and Trazodone prescription. (Id.).

**Response No. 63:**
Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 64**

Decedent was also given therapy from his primary therapist, Jami Palladino, on August 27, 2018. (Id. at 001065-00166).

**Response No. 64:**

Admitted.

**Statement No. 65**

Decedent denied experiencing any psychotic symptoms or wanting to harm himself. (Id. at 001065).

**Response No. 65:**

Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 66**

Palladino told decedent that his medication may be discontinued if he continued to use substances because they cannot effectively treat him if he is also using other substances at the same time. (Id.).

**Response No. 66:**

Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 67**

Palladino determined there were no evidence of any warning signs of acute suicide risk. (Id. at 001066).

**Response No. 67:**

Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 68**

On September 27, 2018, Decedent was given therapy from his primary therapist, Jami Palladino. (Id. at 001067-00168).

**Response No. 68:**

Admitted.

**Statement No. 69**

Palladino determined there were no evidence of any warning signs of acute suicide risk. (Id. at 001068).

**Response No. 69:**

Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied

as to the truth of his statement for any period of time other than time referenced by the citation.

**Statement No. 70**
On October 16, 2018, decedent was evaluated by psychiatric nurse practitioner Carrie Citrin. (Id. at 000900-000901).

**Response No. 70:**
Admitted.

**Statement No. 71**
A suicide risk assessment revealed no acute risk of suicide. (Id.).

**Response No. 71:**
Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 72**
The provider discussed with decedent the expectation that he participates in treatment. (Id. at 000901).

**Response No. 72:**
Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 73**
A trial morning dose of Prozac was prescribed to decedent. (Id.).

**Response No. 73:**
Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No.74**
However, the provider noted that it "appears at this time [patient's] primary dysfunction is his continued substance abuse." (Id.).

**Response No. 74:**
Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 75**
Decedent was prescribed Prozac for the morning and trazodone for the evening. (Id.).

**Response No. 75:**
Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 76**
A follow-up for 45 days was scheduled, "or otherwise clinically indicated." (Id.).

**Response No. 76:**
Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 77:**
Decedent was directed to be placed into group therapy to assist with skill building. (Id.).

**Response No. 77:**
Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 78**
On October 27, 2018, decedent refused his prescribed medication. (Id. at 001070).

**Response No. 78:**
Admitted.

**Statement No. 79**
On October 31, 2018, decedent refused his prescribed medication. (Id. at 001071).

**Response No. 78:**
Admitted.

**Statement No. 80**
Two weeks before his death, on November 2, 2018, Decedent was given therapy from his primary therapist, Jami Palladino. (Id. at 001073-00174).

**Response No. 80:**
Admitted.

**Statement No. 81**
Palladino noted that decedent had been refusing medication, stating that it "made him feel weird." (Id. at 001073).

**Response No. 81:**
Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 82**
Decedent continued to deny thoughts of self harm, stating "I'll never do THAT [attempt suicide]

again." (Id.).

**Response No. 82:**
Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 83**
Decedent shared that he had been going to church, attending AA (Alcoholics Anonymous) meetings, and going to the recreation yard. (Id.).

**Response No. 83:**
Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 84**
Decedent shared that he continued to maintain contact with his wife, his children, and his sister, who were all supportive of him. (Id.).

**Response No. 84:**
Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 85**
He shared that he had been working as a porter and was waiting to return to his ASAT (Alcohol and Substance Abuse Treatment) program. (Id.).

**Response No. 85:**
Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 86**
Palladino noted: "There is no evidence of any warning signs of acute suicide risk in patient's behavior or affect. There were no signs of anger, anxiety, withdrawal, mood change, purposelessness, hopelessness, recklessness or feelings of being trapped. Patient's risk for suicide will be assessed on an ongoing basis. Patient denied suicidal ideation or thoughts." (Id. at 001074).

**Response No. 86:**
Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 87**
Decedent did not express any potential suicide indicators to her. (Id., Ex. L at 43-44).

**Response No. 87:**
Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied

as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 88**

On November 5, 2018, decedent refused his prescribed medication. (Id., Ex. B at 001072).

**Response No. 88:**

Admitted.

**Statement No. 89**

On November 6, 2018, decedent's prescriber discontinued his Prozac and Trazadone prescription. (Id. at 001097).

**Response No. 89:**

Admitted.

**Statement No. 90**

As a social worker, Palladino's duties did not include patient medication management, such as whether to prescribe a patient medication, what medication to prescribe them or when to discontinue a medication. (Palladino Dec., at ¶ 19).

**Response No. 90:**

Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 91**

Palladino had no control over what medications decedent was prescribed or whether they would be discontinued. (Id.).

**Response No. 91:**

Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 92**

Palladino was not required to monitor any incarcerated individual's telephone calls and she did not monitor or review any phone calls decedent placed or received. (Id. at ¶ 20).

**Response No. 92:**

Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 93**

Palladino was not aware that decedent believed his marriage was suffering, particularly in the days leading up to his death. (Id.).

**Response No. 93:**
Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 94**
Palladino was not aware of anything decedent discussed with his family members on the telephone in the days leading up to his death. (Id.).

**Response No. 94:**
Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 95**
Decedent never discussed any concerns about his marriage with Palladino during their therapy sessions. (Id.).

**Response No. 95:**
Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 96**
Decedent never discussed with Palladino any fears that his wife was romantically involved with another man or that he feared she would divorce him. (Id.).

**Response No. 96:**
Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 97**
Palladino was not aware that the decedent believed his wife was "sleeping with another person." (Cowan Dec., Ex. L at 15).

**Response No. 97:**
Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 98**
During their therapy sessions, Palladino encouraged decedent to use alternative coping skills in addition to medication in order to help him cope with prison. (Id. at 24).

**Response No. 98:**
Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 99**
The alternative coping mechanisms included deep breathing, grounding techniques, and worksheets. (Id.).

**Response No. 99:**
Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 100**
Up until the last session, Palladino tried to provide alternative coping therapy to decedent. (Id. at 25).

**Response No. 100:**
Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 101**
Palladino was not aware of any increase in decedent's anxiety or depression leading up to his suicide. (Id. at 45).

**Response No. 101:**

Denied. Palladino testified that Decedent self reported increases in anxiety.

**Statement No. 102**
If an incarcerated individual indicated to her that he was having thoughts of self harm or made threats of self-harm, Palladino would report to administration and the incarcerated individual would be placed in a crisis unit. (Id. at 47).

**Response No. 102:**
Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 103**
After his suicide attempt in July 2016, decedent told Palladino that he would never attempt suicide again. (Id. at 28).

**Response No. 103:**
Admitted.

**Statement No. 104**
Palladino did not have any concerns about decedent in the weeks leading up to his death. (Id. at 31).

**Response No. 104:**
Admitted.

**Statement No. 105**
Plaintiff testified that she has no allegations specifically against Defendant Palladino with respect to the mental health treatment decedent was provided. (Id., Ex. J at 68).

**Response No. 105:**
Denied. Plaintiff testified that she did not know what Palladino's role was. See Def. Statement of Material Facts Ex J.

**Statement No. 106**
Plaintiff testified that she did not believe Defendant Palladino played any role in decedent's death. (Id. at 69).

**Response No. 106:**
Denied. Plaintiff testified that she did not know what Palladino's role was. See Def. Statement of Material Facts Ex J.

**Statement No. 107**
Palladino testified there was nothing she could have done differently to prevent decedent's suicide. (Id., Ex. L at 56).

**Response No. 107:**
Admitted.

**Statement No. 108**
Defendant Harold Meyers is a licensed master social worker employed by OMH. (Id., Ex. K at 16-17, 19).

**Response No. 108:**
Admitted.

**Statement No. 109**
Meyers was the Unit Chief at Mid-State in 2018. (Id. at 17).

**Response No. 109:**
Admitted.

**Statement No. 110**
As the Unit Chief, Meyers' duties included overseeing the day-to-day operations of Mid-State from an administrative vantage point. (Id. at 18).

**Response No. 110:**
Admitted.

**Statement No. 111**
Meyers' duties did not include clinical determinations. (Id. at 24).

**Response No. 111**
Admitted.

**Statement No. 112**

Meyers was responsible for supervising approximately twenty-eight (28) OMH employees, some of whom managed a caseload of incarcerated individuals who were receiving mental health services. (Declaration of Harold Meyers [Meyers Dec.], at ¶7).

**Response No. 112:**
Admitted.

**Statement No. 113**

At times, there were over 800 incarcerated individuals active on the mental health caseload. (Cowan Dec., Ex. K at 23).

**Response No. 113:**
Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 114**
Meyers did not meet individually with the decedent, other than on one occasion with the decedent's therapist, Palladino, in a supervisory capacity only. (Meyers Dec. at ¶9).

**Response No. 114:**
Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 115**
Meyers did not provide direct therapy to the decedent. (Id. at ¶8, 9).

**Response No. 115:**
Admitted to the extent this statement refers to the date mentioned in the citation referenced. Denied as to the truth of this statement for any period of time other than time referenced by the citation.

**Statement No. 116**
Meyers never received any letters or correspondence from decedent. (Id. at ¶10).

**Response No. 116:**
Denied.

**Statement No. 117**
Meyers was not required to monitor any incarcerated individual's telephone calls and he did not monitor or review any phone calls decedent placed or received. (Id. at ¶11).

**Response No. 117**
Admitted.

**Statement No. 118**
Meyers was not aware that decedent believed his marriage was suffering, particularly in the days leading up to his death. (Id.).

**Response No. 118:**
Admitted.

**Statement No. 119**
Meyers was not aware of anything decedent discussed with his family members on the telephone in the days leading up to his death. (Id.).

**Response No.119:**
Admitted.

**Statement No. 120**
Meyers is not aware of any policies or procedures that were not followed that could have contributed to the decedent's death. (Id., Ex. K at 57).

**Response No. 120**
Admitted.

**Statement No. 121**
OMH reviews inmate suicides on a recurring basis throughout the year to determine whether there are trends or other areas to make change. (Id., Ex. M at 26).

**Response No. 121**
Admitted.

**Statement No. 122**
Central New York Psychiatric Center ("CNYPC") creates policies regarding how they provide services to inmates with mental illness. (Id. at 27).

**Response No. 122**
Admitted

**Statement No. 123**
CNYPC creates these policies to be consistent with OMH agency policies. (Id. at 28).

**Response No. 123**
Admitted

**Statement No. 124**
The facilities have an internal policy approval that involves their medical staff as well. (Id.).

**Response No. 124**
Admitted

**Statement No. 125**
Policies regarding suicide risk assessment are drafted, overseen, and updated by CNYPC. (Id. at 45-46).

**Response No. 125**
Admitted.

**Statement No. 126**
If an incarcerated individual has attempted suicide in the past, the type of mental health care they receive depends on a number of factors, including current circumstances, current symptoms, their overall clinical presentation and other contributing issues. (Id. at 51).

**Response No. 126**
Admitted.

**Statement No. 127**
Incarcerated individuals who have attempted suicide in the past are not automatically permanently placed in any particular location within a facility. (Id.).

**Response No. 127:**
Admitted.

**Statement No. 128**
If an incarcerated individual had attempted suicide using shoelaces in the past, that incarcerated individual may not be allowed to have shoelaces in the future, but only if they had acute suicide risk and are currently in crisis and admitted to a crisis unit. (Id.; Id., Ex. K at 34).

**Response No. 128**
Admitted

**Statement No. 129**
If an incarcerated individual is determined to be stable and living in general population, they are allowed to have shoelaces. (Id., Ex M at 51-52).

**Response No. 129**
Admitted

**Statement No. 130**
After a suicide attempt, the incarcerated individual's treatment team makes the decision to release the inmate from a crisis unit back into general population. (Id. at 52).

**Response No. 130**
Admitted

**Statement No. 131**
Plaintiff testified that she and decedent's daughter visited the decedent the weekend before his death and at no point did decedent indicate that he wanted to hurt himself or attempt suicide. (Id., Ex. J at 77; Id., Ex. O at 31).

**Response No. 131**
Admitted

**Statement No. 132**
Decedent's son testified that he visited decedent "a few weekends" before his death and decedent did not give any indication he was thinking of hurting himself. (Id., Ex. N at 43).

**Response No. 132**
Admitted

**Statement No. 133**
The day before decedent's death, Plaintiff spoke to decedent on the phone and told him that she was talking to another man. (Id., Ex. J at 85).

**Response No. 133:**
Admitted

**Statement No. 134**
Plaintiff knew decedent was concerned that she was talking to and spending time with another man. (Id.).

**Response No. 134:**
Admitted

**Statement No. 135**
Two days before his death, on November 14, 2018, decedent called his son and his daughter at 6:02 p.m. (Id., Ex. C, 11/14/18, 6:02 p.m.; Id., Ex. H at 3).

**Response No. 135:**
Admitted

**Statement No. 136**
While speaking with his daughter, decedent stated that Plaintiff was leaving him. (Id., Ex. C, 11/14/18, 6:02 p.m. at 01:30).

**Response No. 136:**
Admitted

23

**Statement No. 137**
Decedent stated that he is "not going to make it through the night," to which decedent's daughter threatened to relay his statement to Plaintiff and that Plaintiff would call his counselor. (<u>Id</u>., 11/14/18, 6:02 p.m. at 03:21).

**Response No. 137**
<u>Admitted</u>

**Statement No. 138**
Decedent instructed his daughter not to tell Plaintiff what he had just stated to her. (<u>Id</u>.).

**Response No. 138**
Admitted

**Statement No. 139**
Decedent spoke with his daughter approximately thirty minutes later. (<u>Id</u>., 11/14/18, 6:33 p.m.; <u>Id</u>., Ex. H at 3).

**Response No. 139**
Admitted

**Statement No. 140**
Decedent stated to his daughter that he "don't want to live anymore," to which his daughter threatened to tell Plaintiff to "call that building." (<u>Id</u>., 11/14/18, 6:33 p.m. at 01:11).

**Response No. 140:**
Admitted

**Statement No. 141**
Decedent stated that he "can't take this anymore…. I am going fucking crazy…. I don't know what I am going to do…" (<u>Id</u>., 11/14/18, 6:33 p.m. at 03:26).

**Response No. 141**
Admitted

**Statement No. 142**
Decedent's daughter indicated that he should "go to that building" but decedent directed her not to tell Plaintiff. (<u>Id</u>.).

**Response No. 142**
Admitted

**Statement No. 143**
The day before his death, November 15, 2018, decedent called his family approximately 15 times. (<u>Id</u>., Ex. C; <u>Id</u>., Ex. H at 4-6).

**Response No. 143**
Admitted

**Statement No. 144**
During a phone call at approximately 9:19 a.m., decedent discussed a man he believed Plaintiff was spending time with, stating that Plaintiff "goes and sees him constantly," that the man pays for everything and that he brought Plaintiff out to his cabin. (Id., Ex. C, 11/15/18, 9:19 a.m. at 04:30).

**Response No. 144**
Admitted

**Statement No. 145**
Decedent stated on the phone call that he is "going to die of a broken heart," and several times stated he wished he would "die right now" and "I can't take this." (Id., 11/15/18 at 06:12, 11:14, 12:50).

**Response No. 145**
Admitted

**Statement No. 146**
Decedent telephoned his daughter, Meghan, at approximately 10:47 a.m. on November 15, 2018. (Id., Ex. C at 11/15/18 10:47 a.m.; Id., Ex. H at 4).

**Response No. 146**
Admitted

**Statement No. 147**
During the phone call, decedent asked his daughter to ask Plaintiff if she planned on leaving him. (Id., Ex. C, 11/15/18 at 10:47 a.m. at 0:39).

**Response No. 147**
Admitted

**Statement No. 148**
Decedent stated to his daughter "this is driving me crazy….I can't do it anymore , this is killing me, it's all I think about all day long…" (Id., Ex. C, 11/15/18, 10:47 a.m. at 07:54).

**Response No. 148:**
Admitted

**Statement No. 149**
Decedent called Plaintiff approximately six times on November 15, 2018. (Id., Ex. C; Id., Ex. H at 5-7)

**Response No. 149**
Admitted

**Statement No. 150**
Decedent telephoned his wife at 4:56 p.m. on November 15, 2018. (Id., Ex. H, at 5; Id., Ex. C, 11/15/18, 4:56 p.m.).

**Response No. 150:**
Admitted

**Statement No. 151**
During the phone call, decedent and Plaintiff discussed Plaintiff's plans to spend time with another man. (Id., Ex. C, 11/15/18, 4:56 p.m. at 04:26).

**Response No. 151:**
Admitted

**Statement No. 152**
Plaintiff stated she does like "this person" and does not know what she is going to do [with respect to their marriage]. (Id., Ex. C, 11/15/18, 4:56 p.m. at 07:15).

**Response No. 152:**
Admitted

**Statement No. 153**
Decedent asked if it [their marriage] was "over" and Plaintiff stated she did not know. (Id., Ex. C, 11/15/18, 4:56 p.m. at 08:30).

**Response No. 153**
Admitted

**Statement No. 154**
Plaintiff stated "I wish you wouldn't threaten to kill yourself when you have two kids at home." (Id., Ex. C, 11/15/18, 4:56 p.m. at 09:30).

**Response No. 154**
Admitted

**Statement No. 155**
On November 15, 2018, at approximately 10:30 p.m., the decedent spoke on the phone with Plaintiff. (Id., Ex. H at 7; Id., Ex. C, 11/15/18, 0:00 to 6:21).

**Response No. 155:**
Admitted

**Statement No. 156**
Decedent asked Plaintiff if she wanted him to stop calling her, to which she replied, "If you're going to do this." (Id., Ex. C, 11/15/18, 10:30 p.m. at 01:25).

**Response No. 156:**
Admitted

**Statement No. 157**
Decedent accused Plaintiff of not wanting to speak with him and stated: "I wish you would just tell me not to call anymore." (Id., Ex. C, 11/15/18 at 04:45-06:21).

**Response No. 157:**
Admitted

**Statement No. 158**
Approximately four hours after decedent's last phone call with Plaintiff, Correction Officer Adam Smaldon heard a loud bang and responded to the bathroom area of the 4B housing unit at Mid-State at approximately 2:50 a.m. (Id., Ex. P at bates stamp 000070).

**Response No. 158:**
Admitted

**Statement No. 159**
Officer Smaldon observed a towel over the bathroom stall door and sneakers on the floor. (Id.).

**Response No. 159:**
Admitted

**Statement No. 160**
He asked who was in the stall but did not receive a response. (Id.).

**Response No. 161:**
Admitted

**Statement No. 162**
Officer Smaldon opened the stall door and found it empty. (Id.).

**Response No. 162:**
Admitted

**Statement No. 163**
However, he opened the adjacent stall door to find the decedent sitting on the floor with a shoestring around his neck. (Id.).

27

**Response No. 163:**
Admitted


**Statement No. 164**
Officer Smaldon broke the shoestring and called a medical response. (Id.).

**Response No. 164:**
Admitted

**Statement No. 165**
Officer Smaldon immediately began CPR. (Id. at 000071).

**Response No. 165:**
Admitted

**Statement No. 166**
The decedent was brought to St. Elizabeth's Hospital by ambulance, where he was pronounced dead. (Id.).

**Response No. 166:**
Admitted

**Statement No. 167**
DOCCS staff located a letter in decedent's living space that he had written to his wife, dated November 15, 2016. (Id.; Id., Ex. Q).

**Response No. 167:**
Admitted


**Statement No. 168**
The letter stated, in part: "I just got off the phone with you. And you get so aggravated with me. I really think you want to end our relationship. I don't want to hurt you or the kids, but I don't really think I'll make it through the night. I feel it's time [to] say goodbye. I hope your [sic] happy to do what you want now that I'm out of your life. because I know you really don't want me anymore. And I can't live with myself…I am so sad, unhappy and you are breaking my heart. I just can't do this anymore. I'm sorry. I love you!...tell Megan and Joseph I love them and I'm sorry." (Id., Ex. Q).

**Response No. 168:**
Admitted


**Statement No. 169**
Plaintiff's only out of pocket expenses were some funeral costs, of which Plaintiff's sister paid a portion. (Id., Ex. J at 93-94).

**Response No. 169:**
Admitted


**Statement No. 170**
In response to Defendants' discovery demands Plaintiff never listed or provided evidence of any special damages. (Id., Ex. G at 6, 7; Id., Ex. I at 4, 5).


**Response No. 170:**
Admitted

**Statement No. 171**
Plaintiff is not claiming lost wages on behalf of decedent. (Id., Ex. I at 5).


**Response No. 171:**
Admitted

**Statement No. 172**
Plaintiff testified that she does not know the value of decedent's estate. (Id., Ex. J at 100).


**Response No. 172:**

Admitted

**Statement No. 173**
At the time of his death, decedent had been incarcerated since approximately 2012 and his release date was uncertain. (Id. at 47).


**Response No. 173:**
Admitted

**Statement No. 174**
Decedent provided no financial support to his family from prison. (Id., Ex. O at 24).


**Response No. 174:**
Admitted.


**Statement No. 175**

Plaintiff presents no expert report detailing any pecuniary losses sustained by any distributees. (Id., Ex. D at 7-8).


**Response No. 175**

Admitted


**Statement No. 176**
At the time of decedent's death, decedent's daughter Megan King was twenty- four years old and his son Joseph was nineteen years old. (Id., Ex. O at 31; Id., Ex. N at 45).

**Response No. 176:**
Admitted.


Dated:  New York, New York
       March 31, 2023          HACH ROSE SCHIRRIPA & CHEVERIE, LLP

                    By: */s/ Hillary Nappi*

                    Hillary M. Nappi
                    112 Madison Avenue, 10th Floor
                    New York, NY 10016
                    Telephone: (212) 213-8311
                    Facsimile: (212) 779-0028
                    *Counsel for Plaintiffs*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 31st day of March 2023, I caused the foregoing **Response to Defendants' Statement of Material Fact** to be filed electronically with the Clerk of the Court by using the CM/ECF system which will serve a copy on all interested parties registered for electronic filing, and is available for viewing and downloading from the ECF system.


 /s/ *Hillary Nappi*
Hillary M. Nappi