UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| The Estate of Joseph P. King, by and through its Administratrix, Amy King, and Amy King, in her own right,<br><br>Plaintiffs,<br><br>v.<br><br>Anthony J. Annucci, Acting Commissioner, State of New York Department of Corrections, in his individual capacity; and Marie T. Sullivan, MD, Commissioner, State of New York Department of Mental Health, in her individual capacity Jami Palladino, Mid-State Social Worker, in her individual capacity; Hal Meyers, Mid-State Chief Mental Health Counselor, in his individual capacity;<br><br>Defendants. | Docket No. 9:20-cv-1413 |

## PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS

In support of Plaintiffs' Response in Opposition Defendants' Motion for Summary Judgment, Plaintiffs respectfully submit the following Supplemental Statement of Material Facts Not in Dispute pursuant to Rule 7.1of the Local Rules of this Court:

1) In November 2018, Defendant Annucci's position was Acting Commissioner of the Department of Corrections and Community Supervision. Nappi Decl., Ex. A, Annucci Interrogatory Responses at 7.

2) Defendant Annucci's responsibilities related to Decedent are the general duties of, superintendence, management and control of the correctional facilities of the Department and of the incarcerated individuals therein. Id.

3) In 2018, Defendant Sullivan was the Commissioner of the Office of Mental Health. Nappi Decl., Ex. C, Sullivan Interrogatory Responses at 7.

1

4) Her responsibility included fulfilling primary executive responsibility for the direction of State and Office of Mental Health policy; conducting liaison activities with executive staff in other agencies and with the Office of the Governor; providing operational leadership and policy direction and oversight to the State's psychiatric hospitals; implementing mental health initiatives by fostering collaboration between stakeholders and federal, State, and local governments, including prisons. *Id.*

5) Additionally, she led the implementation of a community based system of care and the implementation of a managed care system which provides access to appropriate and effective mental health services for adults with serious mental illness, children with serious emotional disturbance, and consumers with special needs. *Id*.

6) In 2018, Defendant Meyers was I was responsible for ensuring that all policies and procedures pertaining to all OMH patients were followed as a Unit Chief. Nappi Decl., Ex. B, Meyers Interrogatory Responses at 8.

7) Mid-State at times had over 800 people active a mental health caseload in 2018 because it's a medium-security facility and inmates are coming and going all the time. Nappi Decl. Ex. E., Meyers Dep. Tran. 23:7-9.

8) Meyers' primary role was to ensure that policies and procedures were being followed, not just for Mr. King, but for all the individuals who we provided service to; Meyers was more responsible for administrative functions rather than like clinical determinations. Nappi Decl. Ex. E., Meyers Dep. Tran. 24:2-6.

9) Meyers was responsible for inmates, and Mr. King, getting appropriate mental health services like other people that were opened up to services, but was less involved in the part of the clinical treatment aspects of services. Nappi Decl. Ex. E., Meyers Dep. Tran. 28:8-12.

10) Meyers received training around suicide factors, but also weaved in "just basically constantly assessing for suicide risk pretty much every time someone writes a note." Nappi Decl. Ex. E., Meyers Dep. Tran. 44:16-20.

11) Meyers described that there are "certain things we look for that may be indicative of potential suicide risk and based on those things, someone would be placed -- potentially placed on watch or RCTP status" Nappi Decl. Ex. E., Meyers Dep. Tran.. 46:17-20.

12) Meyers identified the potential suicide factors as follows: "[t]here's a number of things. Some would be the same type of things you would think about in the community. Someone that -- maintaining friendships, being withdrawn, maybe a change in their alcohol or drug use where they might become more impulsive. In the community, many times it's signs and symptoms of depression that get worse over time until such time as, you know, someone sees harming themselves or committing suicide as a viable option or a choice. In a correctional setting, there's additional risk factors that are specific to corrections, and they could involve conflicts with other incarcerated

2

individuals, you know, gangs, drug debts, just a number of -- a number of things, you know, being stressed about being in a correctional setting." Nappi Decl. Ex. E., Meyers Dep. Tran. 46:22-47:18

13) According to Defendant Meyers "[r]egardless if somebody is in the community or in a correctional setting, we try to observe for changes. And when we see changes, that's when it would be appropriate to make a referral or to determine that someone needs a higher level of care for a limited amount of time." *Id*.

14) OMH gets notified when there is a parole board hearing and if it is believe that a mental health evaluation is needed to help the parole commissioners, then a request to the Office of Mental Health will perform parole evaluation for purposes of the commissioner and to recommend appropriate care and treatment for the individual in the event that they are released from prison, what types of supports they would need in the community, and then sometimes they would become condition of parole to help the person stay in the community and try to promote continuity of mental health care and treatment. Nappi Decl. Ex. E., Meyers Dep. Tran.48:17-49:3.

15) The evaluation does not provide insight to what the inmate will face if he is denied parole. *Id*.

16) Decedent King was Jami Pallidno's patient. She provided monthly therapy sessions to her patients unless they request to be seen more often or an emergency arose. Nappi Decl., Ex. D, Palladino Interrogatory Responses at 7.

17) According to OMH records, she only provided the required monthly therapy session to Decedent King in November 2018.

18) In November 2018, Myers was Palladino's supervisor. Id.

19) In 2018, Palladino managed a caseload of people that are open to mental health services, provided monthly therapy. Nappi Decl., Ex F., Palladino Tran. 10:19-22.

20) Ms. Palladino was aware that Mr. King was using suboxone because he told her he was using it. Nappi Decl., Ex F., Palladino Tran. 16:25-17:14.

21) Palladino was aware that at times Mr. King's medications were discontinued. Nappi Decl., Ex F., Palladino Tran.  20:9-24.

22) Mr. King wrote Palladino letters throughout her time treating him. Nappi Decl., Ex F., Palladino Tran.  21:4-25.

23) The letters contained King's considered expressing his concerns about the symptoms he was experiencing and requesting to be seen by the doctor earlier or in response to his concerns. Nappi Decl., Ex F., Palladino Tran.  21:23-22:1.

24) Upon receipt of those letters, Palladino had to follow protocol and wait approximately two weeks to see him and address his concerns. Nappi Decl., Ex F., Palladino Tran. 22:2-6.

25) Palladino did not follow up on the scheduling of the King's follow up appointments with doctors. Nappi Decl., Ex F., Palladino Tran. 23:9-11.

26) In 2018, Palladino had 150 and 180 patients on her caseload. Nappi Decl., Ex F., Palladino Tran. 31:12-14.

27) Palladino was trained by trained by the correctional facility on the reporting inmates discloses about suicide. Nappi Decl., Ex F., Palladino Tran. 38:10-16.

28) Palladino was trained by reading the policies and following them. Nappi Decl., Ex F., Palladino Tran. 38: 17-19

29) Palladino would have made the call to place an inmate, including Mr. King, in the crisis unit. I would have assessed the situation, and then if it warranted a higher level of care, then they would be placed in a crisis unit. Nappi Decl., Ex F., Palladino Tran. 47:13-17.

30) Palladino admitted that King presented with suicide factors within the year before he killed himself. Nappi Decl., Ex F., Palladino Tran. 50:24-51:6.

31) Documented data demonstrates that suicide risk exists within the forensic population. Therefore, CNYPC clinicians complete the ongoing process of Comprehensive Suicide Risk Assessment to ensure inmate patient safe ty and timely interventions and to maximize positive inmate-patient outcomes. Nappi Decl., Ex. I at 000529.

32) Results and recommendations from the suicide risk assessment are taken into consideration whim developing and updating the treatment plan and in making the decision regarding whether to admit to a higher level of care. *Id*.

33) The Comprehensive Suicide Risk Assessment (CSRA) process begins at the time an OMH clinician screens an inmate or admits an inmate-patient to services. Suicide risk assessment is an on-going process from admission to discharge  *Id*. at  000530.

34) At the time the Treatment Plan is developed, progress notes and the CSRA Form are reviewed for chronic and acute risk factors, protective factors, warning signs and recommendation/plan for addressing suicide risk. Treatment recommendations related to suicide risk are documented on the Treatment Plan. *Id*.

35) If the inmate-patient is at risk for suicide, this problem should be listed and incorporated into the Treatment Plan with goals, objectives and methods to include addressing dynamic risk factors and increasing protective factors to reduce overall suicide risk. *Id*.

36) The CSRA Form will be reviewed at each Treatment Plan Review (TPR). The review will be documented in the TPR identifying any changes to the CSRA Form and subsequent updates to treatment goals, objectives and methods, as indicated. *Id*.

37) DOCCS and OMH staff will utilize suicide watches to insure the safety of inmate patients exhibiting or threatening suicidal behavior. Nappi Decl., Ex. N at 000541

38) The Crisis Intervention Services Policy defines Suicide Watch as the constant observation of an inmate-patient believed to be at risk of suicide. The ratio will never exceed one Corrections officer providing constant and simultaneous observation of two inmate-patients. *Id*.

39) The policy fails to define what constitutes exhibiting suicide behavior. *Id*.

40) Instead, the policy states, "An inmate-patient will be placed on a suicide watch by designated OMH or DOCCS staff, if they engage in behavior which is imminently dangerous to him/herself, or if they threaten either explicitly or implicitly to engage in such behavior." *Id*.

41) The comprehensive suicide risk assessment process policy If an inmate is admitted to services, the clinician assesses and documents acute and chronic risk factors and protective factors, notes the presence or absence of warning signs (IS PA TH WARM) of imminent suicide risk, and documents a plan of action to address any suicide risk identified. Results and recommendations from the suicide risk assessment are taken into consideration when developing and updating the treatment plan and in making the decision regarding whether to admit to a higher level of care. Nappi Decl., Ex. H at 000550.

42) The Joint Commission National Patient Safety Goal #15 IS PATH WARM mnemonic (American Association of Suicidology, www.suicidologv.org) is a HOT FLAGS mnemonic for prison-based risk factors for imminent suicide risk. *Id*.

43) The comprehensive suicide risk assessment process policy defines the waring signs indicators of imminent suicidal behavior, summarized by the IS PATH WARM. Id.

44) IS PATH WARM is defined as:
- Ideation - Threats, talk about death, dying, suicide
- Substance Abuse - Increased use of alcohol, of drugs
- Purposeless - Feeling like a failure, burden, no reasons for living
- Anxiety - Agitation, restlessness, unable to sleep
- Trapped - No options, no way out
- Hopelessness - Defeated, no value to anyone, nobody cares
- Withdrawal - From friends, family, sleeping all the time
- Anger - Irritable, enraged, seeking revenge
- Recklessness - Impulsive, risky activities
- Mood Changes - Depressed, preoccupied, agitated, sudden calm

*Id*.

45) The policy requires progress notes be made to indicate that the primary therapist, psychiatrist or nurse practitioner address the suicide risk. *Id*. at 000551.

5

46) There is no specific written policy "concerning the use of shoelaces by inmates." New York State DOCCS Directive #4101 includes information on clothing issued to incarcerated individuals on suicide watch. Nappi Decl., Ex. A, Annucci Interrogatory Responses at 11.

47) In the six months leading up to his death, Mr. King consistently reported that he was depressed and anxious. However, there were not any overt symptoms of depression or anxiety observed during the sessions. Nappi Decl., Ex. P at 000554.

48) The clinical record indicated that Mr. King was using substances (Suboxone) periodically from May 2018 until September 2018. *Id*. at 000555

49) During that time Mr. King was prescribed psychotropic medications to help manage the depression and anxiety symptoms he reported. *Id*.

50) The psychiatric and clinical team continued to provide medication education and voiced their concerns about how it was difficult to treat Mr. King's reported symptomatic complaints with psychotropic medications if he continued his substance use. *Id*.

51) Mr. King consistently wanted medication changes as he felt the psychotropic medications he was prescribed were ineffective. *Id*.

52) The Primary Therapist Progress Notes suicide risk assessment sections dated 6/25/2018, 7/23/2018, 9/27/2018, and 11/2/2018 read "No warning signs present" when the focus of the sessions notes Mr. King reported symptoms of depression, anxiety, sleep difficulties, recent hospital visit (June- medically related), and substance use. *Id*. at 000556.

53) The section "Are there any changes in acute or chronic risk factors noted on the CSRA' should have checked "Yes" and noted the changes in the risk and protective factors. *Id*.

54) Additionally, section B should have listed the warning signs/triggers that were present and noted in the "Focus of Session" section of the document. *Id*.

55) The recent loss of his mother and his Suboxone use should have been listed in section B in every progress note completed from May through last contact. *Id*.

56) In addition, the Psychiatric Progress Notes assessment of suicide risk section dated 6/25/2018, 7/23/2018, 8/27/18 read "No warning signs present'. The documentation notes warning signs/risk factors of increased substance use continued/increased depression/anxiety, loss of his mother in May 2018, and sleep disturbance. *Id*.

57) Both of these events should have been identified as significant risk factors for suicide and the CSRA should have been updated in May of 2018; however, the CSRA was not updated until 8/27/2018. *Id*. at 000557

58) While the 8/27/2018 CSRA has substance abuse/dependence history" checked on the front of the form Mr. King's recent return to Suboxone use was not mentioned in the narrative description. *Id*.

59) Additionally, the narrative section of the 8/27/2018 CSRA did not address the fact that Mr. King's protective factors changed after the loss of his mother and his strained relationship with his wife, both of which were mentioned in the 8/27/2018 primary therapist progress note. *Id*.

60) Although the 8/27/2018 CSRA does mention Mr. King's mother passed, it incorrectly notes that she passed in June 2018, rather than May 2018. *Id.*

61) The Justice Center for the Protection of People with Special Needs (the Justice Center) completed a review of the mental health services provided to Joseph King (DIN #13A3662), an inmate/patient who died on November 16, 2018 at the Mid-State Correctional Facility (CF). Nappi Decl., Ex. L.

62) The Justice Center's review found concerns related to the standard of care set forth by the Central New York Psychiatric Center (CNYPC) and the Department of Corrections and Community Supervision (DOCCS). Nappi Decl., Ex. L. 000562.

63) At the time of his death, Mr. King was a 50-year old white male serving his first NYS Bid for Arson in the Third Degree with a sentence of 4-12 years. *Id*. at 000564

64) He had a conditional release date of May 22, 2020 and a maximum release date of May 22, 2024. *Id*

65) Prior to incarceration, Mr. King reported receiving outpatient mental health treatment in the community between 2009 and 2013. *Id.*

66) Mr. King also reported his participation in mental health treatment was inconsistent and he most recently attended for two months prior to incarceration. *Id*.

67) He endorsed a history of cutting to relieve stress and he would often consume alcohol when engaging in the behavior. *Id.*

68) Mr. King entered DOCCS reception at the Clinton Correctional Facility in August 2013 and was admitted to the mental health caseload as a mental health service level (MHSL). *Id.*

69) Mr. King was diagnosed with Adjustment Disorder with Mixed Anxiety and Depressed Mood, Alcohol and Cannabis Use Disorder in February 2015. *Id.*

70) The Justice Center concluded that Mr. King had extensive changes to his medication regimen in the five months prior to his suicide. *Id.* at 000566.

71) Mr. King received a disciplinary drug ticket in May 2018 for Suboxone use. *Id.*

72) Clinical progress notes indicated that Mr. King was reminded of the dangers of using drugs with psychotropic medications. *Id.*

73) A determination was made on June 25, 2018 to discontinue all medications (Celexa and Vistaril) in order to start over and determine what medications would be helpful. *Id.*

74) Following complaints of "panic attacks, pacing and a lot of anxiety" in July 2018, Mr. King was prescribed Trazadone and Zoloft. *Id.*

75) He continued to voice mental health concerns in August and September however clinical staff informed Mr. King that he couldn't be helped if he wasn't willing to help himself and he didn't appear to be motivated for change. *Id.*

76) During a psychiatric call out in September, his participation in treatment was discussed in detail and it was documented that he would be placed in group therapy to assist with skill building and that time, his Zoloft was discontinued, Prozac was started and Trazadone was continued. *Id.*

77) The following month, during Mr. King's last scheduled contact with clinical staff, he acknowledged that he was going to church, attending AA meetings, and going to the yard. *Id*.

78) It was noted that Mr. King had been refusing his Prozac, stating it made him feel weird, and that he finds himself waiting all day to receive his Trazadone because it is the only time he feels relatively all **n**ight. *Id.*

79) Mr. King was then encouraged to speak with psychiatric staff about any concerns he had about his medications, which according to a previous Psychiatric Progress Note, would have been on or around November 30. *Id.*

80) Mr. King's Physician's Orders indicate that on November 6, 2018, his medications were discontinued, including his Trazadone. This occurred ten days prior to his suicide, without Mr. King being assessed by psychiatric staff. *Id*.

81) The Justice Center concluded that OMH failed to recognize the suicide risk factors and warning signs displayed by Mr. King prior to his suicide. *Id.*. Additionally, his symptoms appeared to increase and there was minimal documentary evidence that additional support, programming or crisis intervention was offered. *Id*.

82) Mr. King had a documented history of a recent suicide attempt in 2016 in which he tried to hang himself and reported that his triggers were being overwhelmed with his prison sentence and substance abuse. *Id*.

83) Three months prior to his death, Mr. King reported experiencing no energy or motivation, "I lay in bed all day, and I can't sleep. I only get like three or four hours of sleep at night. I'm tired of doing the same thing every day. I can't take this anymore." *Id*. at 000567.

84) Mr. King asked for medication adjustments but was informed by mental health staff on. numerous callouts that his medication would not be changed until he attempted to use alternative coping skills. *Id*.

85) Mental health staff noted that in the last year before his death, Mr. King had an increase in substance use, quit his paint crew job, stopped attending AA/NA meetings and stopped going to religious services. *Id*.

86) In January of 2018, the clinician expressed concern that Mr. King resigned from his painting job, quit AA meetings and no longer attended church which he had previously reported that those activities had helped him going bad. *Id*.

87) Of note, records indicated that his wife had not been on a visit since April of 2018. *Id*.

88) Mr. King was again removed from his drug treatment programming due to his drug use and tickets, and that his mother had passed. *Id*.

89) Mr. King reported using illicit substances and that it was due to visits with his wife.

90) In January of 2018, the clinician expressed concern that Mr. King resigned from his painting job, quit AA meetings and no longer attended church which he had previously reported that those activities had helped him, and that his mother had passed. *Id*.

91) He reported using illicit substances and that it was due to visits with his wife. *Id*.

92) In the two weeks leading up to his death, Mr. King continued to express to mental health staff his frustration with his inability to deal with his reported edginess and worry, even though he reported attending church, AA meetings and going to the yard. *Id*.

93) In the two weeks leading up to his death, Mr. King expressed concerns with his medication and the way they were making him feel and was encouraged by mental health staff to speak with psychiatric staff regarding his medication. *Id*.

94) The Mortality and Morbidity Review Committee concluded, "[t]here were many predisposing risk factors for Mr. King's suicide. He had a documented history of mental health treatment both in the community and in his incarceration. Mr. King had an extensive substances abuse history and was continuing to use illicit substances while in prison. He also had one serious suicide attempt while incarcerated following withdrawal from substances. Mr. King was facing marital discord, the death of his mother, various medication changes, and concerns about having to remain in prison for another 2 years with his upcoming parole board." Nappi Decl., Ex. M at 000575.

95) In their recommendations for improvement, Mortality and Morbidity Review recommended, that " if patients are displaying an increase in symptoms, they should be seen more frequently in RCTP from their respective housing unit. It would also be beneficial for more frequent follow-ups when the team receives information from a patient's family that the patient is engaging in odd behavior." *Id*.

96) Further recommendations included, "[if] a clinician is sitting in on the VTC session and wants this contact be considered a monthly contact, it is important for the clinician to write a full monthly progress note to be compliant with policy versus just saying that he or she was present for the VTC contact." *Id*.

97) The Mortality and Morbidity Review also "recommended, based upon findings of recent psych autopsies, to retrieve telephone records/transcripts as they can play a direct role in suicide.

9

Thus, additional collaboration from DOCCS is needed in order to obtain these records, especially when the suicide occurs within 24 hours of the phone conversation." *Id*.

98) .Though patients can be designated an S due to recent suicide attempts, his diagnosis of Adjustment Disorder should have been revisited as his symptoms persisted longer than six months. If needed, a testing referral should have been submitted to assist in diagnostic clarification. *Id*.

99) Specifically, the Mortality and Morbidity Review also declared, "Mr. King was made a mental health level IS in August of 2016. This change occurred following his July suicide attempt; and although, patients can be designated an S due to **recent** suicide attempts, his diagnosis of Adjustment Disorder should have been revisited as his symptoms persisted longer than six months. If needed, a testing referral should have been submitted to assist in diagnostic clarification." *Id*. at 000586.

100) Meghan King had a close relationship with her father prior to his incarceration and they would spend quality time together doing normal father daughter things.". Nappi Decl., Ex. R, Meghan King Deposition Tran. 15:16-22.

101) Meghan's relationship did not change with Mr. King despite his incarceration. Nappi Decl., Ex. R, Meghan King Deposition Tran. 24:6-9.

102) Meghan visited her father every other week. Nappi Decl., Ex. R, Meghan King Deposition Tran. 24:15-16.

103) Meghan spoke with her father every other day on the telephone. Nappi Decl., Ex. R, Meghan King Deposition Tran. 25:1-13.

104) Prior to his incarceration, Mr. King worked at various jobs, including a full time job at Walmart. Nappi Decl., Ex. R, Meghan King Deposition Tran. 16:13-17:16.. :

Dated:  New York, New York
　　　　March 31, 2023　　　　　　　HACH ROSE SCHIRRIPA & CHEVERIE, LLP

　　　　　　　　　　　　　　　　By:  */s/ Hillary Nappi*

　　　　　　　　　　　　　　　　Hillary M. Nappi
　　　　　　　　　　　　　　　　112 Madison Avenue, 10th Floor
　　　　　　　　　　　　　　　　New York, NY 10016
　　　　　　　　　　　　　　　　Telephone: (212) 213-8311
　　　　　　　　　　　　　　　　Facsimile: (212) 779-0028
　　　　　　　　　　　　　　　　*Counsel for Plaintiffs*

CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of March 2023, I caused the foregoing **Plaintiffs' Supplemental Statement of Undisputed Facts** to be filed electronically with the Clerk of the Court by using the CM/ECF system which will serve a copy on all interested parties registered for electronic filing, and is available for viewing and downloading from the ECF system.

      /s/ *Hillary Nappi*
      Hillary M. Nappi