# EXHIBIT E

Case 9:20-cv-01413-TJM-ML   Document 79-5   Filed 03/31/23   Page 2 of 38

Deposition of Hal Meyers                                   Estate of Joseph P. King v. Ward, et al.

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF NEW YORK
 2                 CIVIL ACTION NO.: 20-CV-01413

 3

 4   The Estate of Joseph P. King,
     by and through its Administrator
 5   ad Prosequendum Amy King,
     and in her own right,
 6
          Plaintiff,
 7
     v.
 8
     WARD, et al.,
 9
          Defendant.
10   _____

11

12            ************************************

13            REMOTE VIDEO DEPOSITION OF HAL MEYERS

14                      MAY 23, 2022

15            ************************************

16

17            REMOTE VIDEO DEPOSITION OF HAL MEYERS taken in

18   the above-styled and numbered cause on May 23, 2022,

19   commencing at 10:05 a.m. Eastern Standard Time, before Gina

20   Williams, Registered Professional Reporter, Certified

21   Realtime Reporter, and Certified Realtime Captioner.

22

23

24

25
```

```
 1              A P P E A R A N C E S

 2            (All attorneys appearing remotely)

 3

 4   On behalf of Plaintiff:

 5        HACH ROSE SCHIRRIPA & CHEVERIE, LLP
          112 Madison Avenue, 10th Floor
 6        New York, New York 10016
     By:  YAMILE KALKACH, ESQUIRE
 7        HILLARY NAPPI, ESQUIRE

 8

 9   On behalf of Defendants:

10        NEW YORK STATE ATTORNEY GENERAL
          SYRACUSE REGIONAL OFFICE
11        300 South State Street
          Suite 300
12        Syracuse, New York 13202
     By:  AIMEE COWAN, ESQUIRE
13

14

15

16

17

18

19        QUOTATION MARKS ARE USED FOR CLARITY AND DO NOT
               NECESSARILY REFLECT A DIRECT QUOTE
20

21

22

23

24

25
```

```
 1                          I N D E X

 2    WITNESS                                          PAGE

 3    HAL MEYERS

 4    Examination by Ms. Kalkach                          4

 5                        -  -  -  -

 6                      E X H I B I T S

 7    Number

 8      Exhibit A    Amended Complaint                  19

 9      Exhibit B    Answer to Amended Complaint        21

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

1  WHEREUPON,
2          HAL MEYERS
3  was called as a witness and, after having been first duly
4  sworn, was deposed and testified as follows:
5          EXAMINATION
6  BY MS. KALKACH:
7      Q   Good morning, Mr. Meyers.  My name is Yamile
8  Kalkach, and I'm associated with the law firm that
9  represents Plaintiff, the Estate of Joseph King.
10         Could you please state your full name and current
11 address for the record?
12     A   Harold Walter Meyers, 81 Merritt Place, New
13 Hartford, New York 13413.
14     Q   Thank you, Mr. Meyers.
15         I'm going to go through a few ground rules to
16 help today run as smoothly as possible.
17         Have you ever been deposed before?
18     A   Yes.
19     Q   How many times?
20     A   Once.
21     Q   Once before, okay.
22         Have you ever testified at trial?
23     A   No.
24     Q   And when you were deposed before, what was the
25 nature of the case?

Page 6

1          Now, that means that if you answer a question
2  that I ask, I will assume that you understood the question,
3  and your answer was based on that understanding.
4          It is also very important that you give verbal
5  answers as opposed to like nodding or something like that so
6  that the court reporter may take down your words.
7          Understood?
8      A   Yes.
9      Q   And let's also try our best not to talk over one
10 another because, again, the court reporter is writing
11 everything, down.
12     A   Yes.
13     Q   If at any time today you need a break, please
14 simply just say so, and we'll accommodate.
15         The only thing that I ask is, if there's a
16 question open, I will need you to answer it, and then we can
17 take the break.
18     A   Yes.
19     Q   Okay.  There may be many times today that your
20 attorney may object to a question that I ask you.
21         Only if your attorney directs you not to answer
22 the question, you must still answer.
23         Understood?
24     A   You said unless she does?
25     Q   Exactly.

Page 5

1      A   It was --
2          It had to do with a suicide that occurred in a
3  different correctional facility, but that individual had
4  been at Mid-State, and it was basically to get a background
5  to compare and contrast his care at Mid-State and the
6  facility --
7          I'm assuming it was to compare and contrast his
8  care at Mid-State and the facility where unfortunately he
9  committed suicide.
10     Q   Okay.  So then you're familiar with how the
11 deposition works?
12     A   It's been a number of years, but I have some
13 familiarity.
14     Q   Okay.  Do you understand that you are under oath
15 today?
16     A   Yes.
17     Q   And that this is the same oath that you would
18 take in the courtroom?
19     A   Yes.
20     Q   Okay.  Are you on any medications which may
21 affect your ability to testify truthfully today?
22     A   No, I'm not.
23     Q   Now, if you don't hear or understand a question
24 that I ask you, feel free to ask me to repeat or rephrase
25 the question, and I will, okay?

Page 7

1          So unless she says you cannot -- that you don't
2  answer, then you must answer.
3      A   I've got it.
4      Q   Okay.  Now please shut off all of the devices
5  that you have around you, cell phone, Apple watch, iPad, et
6  cetera, or other computers, and close any other document or
7  program on your screen other than Zoom or the documents --
8  or any other document that I will be showing you today.
9          MS. COWAN:  Is that okay, Mr. Meyers?
10         Do you need to have any phones that are on
11 vibrate or anything in case there's an emergency?
12         THE WITNESS:  I guess -- I've already done an
13 "Away" message.
14         MS. COWAN:  Okay.
15 BY MS. KALKACH:
16     Q   Anything distracting or noises, et cetera, or
17 checking documents.
18     A   Well, I put the volume down on both of my mobile
19 devices.  So it probably would be judicious for me to turn
20 on my State phone in case there was an emergency, but I
21 won't be looking at it during the deposition.
22     Q   Are there any paper documents in front of you?
23     A   No.  No.
24         I mean, nearby.
25     Q   Okay.  Is there anybody else in the room with

Deposition of Hal Meyers                                    Estate of Joseph P. King v. Ward, et al.

Page 8

1  you?
2      A   No, there's not.
3      Q   Are you currently under the influence of any
4  drugs or alcohol that in any way may affect the testimony
5  which you are about to give?
6      A   No, I'm not.
7      Q   Now, what did you do to prepare for today's
8  deposition?
9      A   I assisted with the response to -- I don't know
10 if I'm pronouncing it right -- interrogatories.
11         But beyond that, the only thing I did was do an
12 e-mail search, and only one e-mail came up.
13     Q   Okay.  Did you meet with your counsel?
14     A   We had some phone calls.
15     Q   Did you review any documents when you met with
16 your counsel?
17     A   Just the interrogatories.
18     Q   Interrogatories, okay.
19     A   Yep, that's it.
20     Q   Did you discuss today's deposition with anyone
21 other than counsel?
22     A   No.  The only counsel, Margaret Drake, she is
23 aware that this process is going on.
24     Q   I'm sorry.  Can you please repeat who?
25     A   Margaret Drake, the Office of Mental Health

Page 9

1  Counsel, and she's aware of this process, but I had no
2  contact with her as far as preparing for today.
3      Q   Okay.  You told me that you have been deposed
4  before on a different case.
5          Do you remember the name of the case?
6      A   Benjamin Van Zant was the individual who passed.
7      Q   Can you please spell the last name for me?
8      A   I don't know how to spell it.  It's Van Zant.  I
9  think it's similar to the person with Leonard Skynyrd, but I
10 don't know how to spell it.
11     Q   Okay.  Now, do you keep notes about your workday?
12     A   No, I do not.
13         Generally, I do not.
14     Q   Do you keep a diary about your work?
15     A   No.
16     Q   Have you ever used any other names?
17     A   No.
18     Q   Have you ever been convicted of a crime?
19     A   No, I have not.
20     Q   When were you born?
21     A   April 7, 1960.
22     Q   Where were you born?
23     A   In Camden, New Jersey.
24     Q   Are you married?
25     A   Divorced.

Page 10

1      Q   Divorced?
2      A   Yes.
3      Q   Do you have kids?
4      A   Yes.
5      Q   How old are they?
6      A   31, 30 and 29.
7      Q   What are their names?
8          MS. COWAN:  I'm going to object to that.  I'm not
9  really sure why we have to get this personal about his
10 family.  I think I'm going to direct him not to answer
11 this.
12         Is there some relevance to the case about who his
13 children are?
14         MS. KALKACH:  No.  It's just background
15 information.
16         MS. COWAN:  I'd rather not have him name his
17 children or family members for this case.
18         MS. KALKACH:  So you're directing him not to
19 answer?
20         MS. COWAN:  Yeah.  I mean, he gave you his
21 birthdate, his address, you know, where he was born.  I
22 don't know that we need to go too far into his family
23 life, I guess.
24 BY MS. KALKACH:
25     Q   Aside from this action, do you know if any

Page 11

1  complaints or grievances have been filed against you?
2      A   Periodically incarcerated individuals will
3  make -- they'll write letters or, you know, have concerns
4  about their services generally around, you know, just issues
5  that might come up, but no formal complaints, no formal
6  issues like that.
7      Q   So were these complaints the subject of a
8  lawsuit?
9      A   No, no, they were not like formal complaints.
10 They were more letters of concern about, you know, some
11 grievance or something going on in somebody's life that they
12 wanted to share.
13     Q   Okay.  Were you ever the subject of a
14 disciplinary complaint?
15     A   No.
16     Q   Have you ever been a party in a lawsuit before?
17     A   Just the one that I referenced before in regards
18 to Mr. Van Zant.
19     Q   Okay.  When was this, what year?
20     A   I don't recall.
21     Q   Approximately was it 10 years ago, 20 years ago
22 or something else?
23         You know, do you have like an approximation?
24     A   Approximately 6 -- 6, 7 years ago.
25     Q   And what kind of witness were you?

Deposition of Hal Meyers                                                    Estate of Joseph P. King v. Ward, et al.

Page 12

1  Were you an expert in the case, or were you a
2  defendant?  Were you a fact witness?
3     A    Well, I was a defendant in terms of working for
4  New York State in the Office of Mental Health.
5     I referenced at least what I thought why I was
6  involved in the case was to contrast the care at the
7  facility at Mid-State with --
8     And I think they were trying to compare and
9  contrast the care that Mr. Van Zant received at Mid-State as
10 opposed to the correctional facility where he successfully
11 committed suicide.
12    Q    You told me you did a search for e-mail, and I
13 would like to know what was that search about?
14    What was the e-mail you were looking for?
15    A    I wasn't looking for any specific e-mail.  Just
16 in preparation, I just wanted an idea of any e-mails I might
17 have sent or received in regards to Mr. King.
18    Q    The e-mail that came up, what did it say, and who
19 was it for?
20    A    I didn't generate it.
21    I was --
22    I was CC'd on it.
23    It was generated by the RCTP coordinator in
24 response to an inquiry from the Department of Correctional
25 and Community Services Mental Health Unit.  It was just a

Page 13

1  standard thing that they do after a successful suicide.
2     Q    Do you remember the date of the e-mail?
3     A    No.
4     It would have been shortly after Mr. King's
5  passing.
6     Q    Do you have that e-mail right now with you?
7     A    I have it nearby, yes.
8     MS. KALKACH:  I'm going to take a really quick
9  break.
10    MS. COWAN:  Okay.
11    THE WITNESS:  Okay.
12    (Recess was taken.)
13 BY MS. KALKACH:
14    Q    So you told me who generated the e-mail, but I
15 want to know to whom it was sent.
16    Who sent it?
17    A    It was sent to DOCCS, the DOCCS Mental Health in
18 Albany.  I don't recall the specific person from DOCCS
19 Mental Health that it was sent to.
20    It's a standard procedure after somebody's
21 passing.
22    Q    Okay.  Did you share this e-mail with your
23 attorney?
24    A    I do not recall sharing it with her, no.
25    MS. COWAN:  So I believe the e-mail that he's

Page 14

1  speaking about is contained within some of the OMH
2  investigation documents that I gave you.  I'm searching
3  for it right now to try to find the actual Bates stamp.
4  But he was CC'd on an e-mail, so his name pops up.  So
5  if you do like a word search for it, it should pop up,
6  but I'm trying to search for it right now.
7     MS. NAPPI:  You don't have to search for it now.
8  We'll just make a demand to the extent that it was not
9  produced, that it be produced.
10    MS. COWAN:  Sure, yeah.  When I was meeting with
11 him, we spoke about it, and I found it, and it should
12 be in the documents, but I'll make a search for it
13 after.
14    MS. KALKACH:  Okay, thank you.
15 BY MS. KALKACH:
16    Q    Okay.  Did you attend college?
17    A    Yes, I did.
18    Q    Where did you go to college?
19    A    All my colleges or just my most recent one?
20    Q    The most recent one.  I'll get to the other ones
21 afterwards.
22    A    Okay.  I went to the University at Albany School
23 of Social Work, and it's a State University.
24    Q    When was this?
25    A    I went part time between approximately 1985.  I

Page 15

1  graduated in 1990.
2     Q    And besides this, did you do any other
3  certification program or licensing program or more college?
4     A    No.  Master's in social work is as far as I went.
5     Q    But before --
6     I mean besides this one, did you do any other
7  one, even if it was a different degree?
8     It doesn't have to be something higher.
9     A    Yes.  I have a two-year degree in Liberal Arts in
10 English, and that was at the Adirondack Community College in
11 Glens Falls.
12    And then after I completed the two-year program
13 or two year -- got my two-year degree, I went to the State
14 University at Utica-Rome, where I got a Bachelor's of
15 Professional Studies in Human Services.  And then I worked,
16 and that's when I was going part time to graduate school to
17 become a social worker.
18    Q    I see.
19    For the Liberal Arts, do you remember from when
20 to when did you go there?
21    A    I believe it was 1979 to 1982, and I believe --
22    I'm sorry.
23    Q    No, tell me.
24    A    And I graduated from SUNY in Utica-Rome in 1984.
25    Q    Okay.  Do you have any licenses?

Page 16

1  A    I have a license, Master of Social Work, yes.
2  Q    Okay.  Could you briefly walk me through your
3  employment history leading up to your current position?
4  A    Would you like me to limit that to the Office of
5  Mental Health?
6  Q    I just want to go through like your whole
7  employment history briefly.  You don't have to go into
8  everything right now.  I just want to know where you have
9  worked.
10  A    Okay.  After I got my four-year degree, I worked
11  for the House of Good Shepherd with emotionally disturbed
12  children.  That's when I started graduate school during that
13  period of time.
14        And then I worked for the United County of Mental
15  Health, first as an intake worker in the clinic for
16  approximately six months, and then I worked in the United
17  County Jail as a psychiatric social work assistant for
18  approximately three to four years.  Then I worked as a
19  county intensive case manager at the Lewis County Department
20  of Mental Health.
21        I obtained my Master's Degree in 1990, and then I
22  worked for what was then the Office of Mental Retardation,
23  OMRDD, and now it's OPPW.  I worked there from 1990 to 1996.
24        Then I worked for Oasis, the Office of Substance
25  Abuse Services.  I worked in a rehabilitation program,

Page 17

1  McPike in Utica, where I helped develop treatment for people
2  with occurring disorders, addiction and mental health
3  concerns.
4        Then in 1998 I joined the Office of Mental
5  Health, where I worked as a Social Worker II at the
6  Mid-State Correctional Facility for approximately two years.
7        Then I worked in the Office of Mental Health
8  field office, which was located in Syracuse, and I was an
9  assistant outpatient treatment compliance specialist for
10  approximately four years.
11        Then I was a unit chief at the Auburn
12  Correctional Facility for Central New York Psychiatric
13  Center.  I was there for approximately three years.
14        Then I worked for one year at the Division of
15  Forensic Services in Albany.
16        Then I returned to Central New York Psychiatric
17  Center, where I served as a unit chief in the Special
18  Programs Office for about 18 months.
19        And then I became a unit chief at the Mid-State
20  Correctional Facility, and I was a unit chief there for
21  approximately 10 years before my current position, which is
22  Forensic Program Administrator II.
23  Q    When did you start the position you have right
24  now?
25  A    I think it was this 2019.

Page 18

1  Q    Which month?
2  A    I'm not sure.  I don't recall.
3  Q    Okay.  Before the position that you were working
4  right now, can you just please repeat where you were
5  working?
6  A    I was working at the Mid-State Correctional
7  Facility for approximately 10 years as unit chief.
8  Q    Since you got --
9        For 10 years you were the unit chief?
10  A    Correct.
11  Q    What were your duties and responsibilities?
12  A    Mid-State is the largest mental health satellite
13  unit in the state, and it was my job to pretty much oversee
14  the day-to-day operations from an administrative vantage
15  point.
16  Q    Did you report to someone?
17  A    Yes, I did.
18  Q    Who did you report to?
19  A    I reported to the forensic program administrator,
20  and during the 10 years there was a number of them, Lauri
21  Seymour, Katrina Kemory, Lori Schatzel.
22        To the best of my knowledge, they were the -- one
23  more, Cristina -- I can't remember her last name, but I
24  think that would cover the number of people I reported to
25  over those 10 years.

Page 19

1  Q    When did you start working, and when did you
2  finish working there?
3        I know you said 10 years, but that could be --
4        I just need to know from when to when.
5  A    Approximately 2009 to when I started as an FPA,
6  which was in 2019.
7  Q    And what was the reason you left this work?
8  A    From unit chief to forensic program
9  administrator?
10  Q    Yes.
11  A    It was a promotion.
12  Q    Okay.  Did you ever talk about this lawsuit with
13  anyone you work with?
14  A    Did I ever talk about what?
15  Q    This lawsuit.
16  A    No, I have not.
17  Q    Do you remember when this lawsuit was filed?
18  A    No, I do not.
19        MS. KALKACH:  Okay.  Now, I would like to offer
20  Mr. Meyers Exhibit A into evidence.
21        MS. NAPPI:  I'm sorry.  If the tech could put up
22  Exhibit A on the screen so Mr. Meyers can see it.
23        (Exhibit A was marked for identification.)
24  A    I see it, thank you.
25

Page 20

BY MS. KALKACH:

Q    Perfect.  Please take a moment to review this exhibit.  Let us know or let the tech to go down if you need to, switch pages whenever you need it.

A    Okay, I recall I was served with this.

Q    Okay.  You can take a minute to review it, and then just let me know when you're done.

A    I can scroll it myself?

Q    I think the tech is the one that needs to do that.  Just ask the tech to scroll it.

A    Next.

MS. COWAN:  Do you want him to read it fully because it's 19 pages?  Maybe just kind of scroll through it.

MS. KALKACH:  Yeah, just to scroll through, exactly.

MS. COWAN:  Yes.

A    I was originally served this, but it was a while ago.

BY MS. KALKACH:

Q    Okay.  So --

A    Okay.

Q    Okay.  I don't think we need to go through the whole document.  I just want to know if you recognize the document that has been marked as Exhibit A.

Page 21

A    Yes, I do.

Q    Okay.  What do you recognize the document to be?

A    This was a copy of the lawsuit that I was served, you know, some time ago.  It appears to be.

Q    Okay.  So how are you familiar with this document?

A    I was served.

Q    Did you review this document prior to today?

A    I reviewed it at --
I have reviewed it, but not recently.

Q    When was the last time that you reviewed it?

A    It's probably been at least three or four months.

MS. KALKACH:  Okay.  Now, please, if you could, I would like to offer Mr. Meyers' Exhibit B into evidence.  So could you pull it up?

(Exhibit B was marked for identification.)

BY MS. KALKACH:

Q    Okay.  Now, Mr. Meyers, please now again take a minute to review this document, and when you're finished reviewing it, please let me know.

A    Okay.

Q    If you could scroll down.  I just need to know if he recognizes the document.  Thank you.  Perfect, thank you.
Do you recognize the document which has been marked as Exhibit B?

Page 22

A    I think so.

Q    What is this document?

A    It looks like it would be the next step to the lawsuit that was filed.  I'm not sure.

Q    Okay.  Did you participate in a drafting of this document?

A    Is this the interrogatory?

Q    No?

MS. COWAN:  For the record, Exhibit B is the Answer to the Amended Complaint, which I drafted and filed with the Court.  Mr. Meyers didn't draft this document.

MS. KALKACH:  Okay.  I understand he didn't draft it, but I want to know if he participated with the information in order for it to be drafted.

BY MS. KALKACH:

Q    Mr. Meyers, did you participate in this document, not necessarily drafting, but giving information?

A    Yeah, to the best of my knowledge, I believe that I had a phone call with the AG, yes.

Q    Thank you.  Have you signed any recent statements or made any recorded statements or spoken to any attorneys or investigators or reporters about the events related to this lawsuit?

A    Just Ms. Cowan.

Page 23

Q    Okay.  All right.  Did you know Mr. Joseph King?

A    I knew that he was open to mental health services, but I don't recall meeting him.
I know that I did meet him once with Ms. Palladino, but I wouldn't have known Mr. King --
I didn't meet individually with him.  Mid-State at times had over 800 people active on our caseload.  And because it's a medium-security facility, there's people coming and going all the time.

Q    I understand, but you remember that you met with him once with Ms. Palladino?

A    Yes, but that's the extent of my recollection.

Q    Okay.  And when was this?

A    I don't recall.

Q    And who is Ms. Palladino?

A    She's a social worker at the Mid-State Correctional Facility.

Q    Do you know when Mr. King was incarcerated?

A    No, I don't.

Q    Do you know why he was incarcerated?

A    I do not.

Q    Besides that one time that you met with him, did you ever have any other conversation with Mr. King?

A    Not that I can recall.

Q    What would have been your role in Mr. King's life

Page 24

while he was incarcerated?

A   My primary role was to ensure that policies and procedures were being followed, not just for Mr. King, but for all the individuals who we provided service to.

I was more responsible for administrative functions rather than like clinical determinations.

Q   And were you aware of any specific problems that Mr. King dealt with while being incarcerated?

MS. COWAN:  Objection.  You can answer.

A   I recall that Ms. Palladino shared, you know, just that he had concerns about being open on the caseload, you know, just general things like that, which wasn't uncommon.

Sometimes people are open for mental health services, and they don't want to be.

BY MS. KALKACH:

Q   You said that you met with him and Ms. Palladino.

What was the reason that you had that meeting?

What prompted it?

A   Ms. Palladino asked me to join them.

Q   Why?

A   I don't recall the specifics of the meeting, but a lot of times, not just for Mr. King, but for other people, sometimes I'd meet with the individual and their therapist and let them know about, you know, a policy or procedure

Page 25

that might be impacting upon them and their care.

Q   So do you remember what policy or procedure they asked to meet with them about?

A   I don't recall specifically.

Q   Were you aware that Mr. King used Suboxone?

A   Yes, I was.  It was noted in the one document that I found that I was CC'd on.

Q   Okay.

A   I'm sorry.  I don't know --

I have no way of knowing whether that's based on his self-report or if he was tested, if it was ever found on him, if it was in the box.

I have no idea, just that Suboxone was referenced in the one document that was CC'd to me.

Q   So when you say that Mr. King was worried about being open on the caseload, what do you mean by that?

A   What I said was that it wasn't uncommon for individuals open to mental health services sometimes not to -- wouldn't be open to mental health services.

Q   Could you explain --

A   They would have --

I'm sorry.

Q   I asked if you could explain -- if you could please explain a little bit further.

A   Depending on your identified mental health needs,

Page 26

that determines what facility you're housed in to make sure that the mental health resources match what are seen as the mental health needs of an individual at any point in time.

Q   Okay.  And then what was your understanding of his concerns regarding this, Mr. King?

A   My recollection, Mr. King and other individuals, is that by having their case closed or their mental health level increased, that allows them to move within New York State many times closer to their families.

Q   So were you aware about the status of his marriage suffering?

MS. COWAN:  Objection.  Sorry, I don't think I understood the question.

BY MS. KALKACH:

Q   So I'm just asking like if he was aware that Mr. King thought that his marriage was suffering.

A   I didn't provide direct therapy to Mr. King.  I wasn't aware of his perception, you know, that his marriage was suffering.

Q   Okay.  So during the conversation that you had with him, did Mr. King want his mental health services increased or lowered, or what were his concerns?

What did he want?

MS. COWAN:  Objection.

A   I don't --

Page 27

MS. COWAN:  Go ahead.  Sorry.

A   I don't recall the specific things that were discussed during the one time that I can recall that I met with Ms. Palladino and Mr. King.

BY MS. KALKACH:

Q   Normally when you go to these meetings, do you take notes?

A   I'm not one of the treating providers.

What happens commonly is, if I was in a meeting, the person who normally would --

Like a therapist in this case --

No.

Therapist and unit chief met with, you know, so-and-so on this date, what was discussed.

Q   So who took notes for this meeting?

A   If Ms. Palladino saw him, she did a note.

I haven't seen the note.  I don't know anything about the note, what it reflects, what it doesn't reflect.

Q   And when you meet with --

When you meet with inmates and talk to them about policies, et cetera, I understand you don't make notes, but do you have to make reports afterwards?

Do you have to memorialize your meetings in any way?

A   No.  It would be very rare that I would be

Page 28

1  meeting directly with an individual.
2      Q    All right.  So what impact would your job would have
3  had on Mr. King's daily life at Mid-State?
4      MS. COWAN:  Objection.
5      MS. KALKACH:  Can he answer?
6      MS. COWAN:  Yeah, you can answer if you
7  understand.
8      A    Just trying to make sure that he was getting
9  appropriate mental health services like other people that
10 were opened up to services.
11     But as far as like clinical treatment aspects, I
12 would be less involved in that.
13 BY MS. KALKACH:
14     Q    Okay.  So you told me that you did have certain
15 functions at Mid-State.
16     Could you please tell me what were those?
17     A    I monitored people's performance.  I participated
18 in people's evaluations -- their performance evaluations of
19 some of the staff, not all of them.  I was involved, but
20 more directly involved with work performance of clinical
21 staff.
22     Prescribers and nursing staff kind of had their
23 own silo.
24     MS. NAPPI:  Can we take a 10-minute break?
25     MS. KALKACH:  Yes.

Page 29

1      MS. COWAN:  Sure.
2      (Recess was taken.)
3  BY MS. KALKACH:
4      Q    Mr. Meyers, you testified earlier that you
5  received letters from inmates with complaints; is that
6  correct?
7      A    I would rather call them letters of concern
8  because a lot of times there are questions about things, and
9  people are looking for --
10     They're looking for answers, you know, to exert
11 what little control someone, you know, has from the
12 perspective of an incarcerated individual.
13     Q    Okay.  Do you have keep these letters?
14     A    They're part of --
15     They're part of the record.
16     Q    Part of which record?
17     A    They would be under the correspondence section of
18 the patient's record, as would my response to a letter of
19 concern.
20     Q    Were these complaints of any kind of mental
21 health?
22     MS. COWAN:  Objection.
23 BY MS. KALKACH:
24     Q    Were some of these letters of concern about
25 mental health?

Page 30

1      A    Yes, it would be common for me to receive letters
2  of concern around issues related to mental health.
3      Q    Were some of the concerns related to medications
4  inmates received?
5      A    Yeah, sometimes.
6      Q    Did you ever receive a letter of concern from
7  Mr. Joseph King?
8      A    I don't recall.
9      Q    Okay.  You testified earlier that you have been
10 sued by Benjamin Van Zant regarding his suicide; is that
11 correct?
12     A    I was one of the people named in it, yes.
13     Q    Okay.  Where did he commit suicide?
14     A    My recollection, at the Sullivan Correctional
15 Center in the Intermediate Care Program.
16     Q    And what was the nature of how he committed
17 suicide?
18     A    My recollection is it was by hanging.
19     Q    By hanging.
20     A    That's my recollection.
21     It happened at another facility after he had
22 already transferred from the facility where I knew him.
23     Q    Okay.  And how were you involved with Mr. Van
24 Zant?
25     A    I wasn't involved with him.  I had no connection

Page 31

1  to the Sullivan Correctional Facility at the time of his
2  death.  He had transferred from Mid-State to Sullivan.
3      Q    Okay.  In general, do you speak to other inmates?
4      A    In my current role, I do not.
5      Q    Not in your current one.
6      The one at Mid-State.
7      A    Periodically.
8      Q    To whom do you speak or --
9      To whom do you speak?
10     MS. COWAN:  Objection.  I'm not sure I understand
11 the question.
12 BY MS. KALKACH:
13     Q    I'm going to try to explain.  I'm rephrasing.
14     What would be a reason for you to talk to any
15 other inmates?
16     A    Sometimes a therapist would have a patient who
17 they were seeing, and the patient wanted kind of validation
18 of what the therapist was telling them that it was in fact
19 policies and procedures or what would -- you know, what
20 would need to happen for this -- for whatever the
21 individual's concern was.
22     Q    Okay.  Did you speak to any inmates who knew
23 Mr. King?
24     A    No.  No.  After his suicide, the people at the
25 prison where it happened, they don't -- they're not involved

Deposition of Hal Meyers                                    Estate of Joseph P. King v. Ward, et al.

Page 32

1 directly in any --
2      I wouldn't have been involved in any
3 investigations.
4      Q    Okay.  And what about before, before the suicide,
5 did you ever speak to any inmate who was familiar with
6 Mr. King?
7      A    No, I don't recall ever speaking with another
8 inmate in reference to Mr. King because that would be a
9 violation of confidentiality.
10     There would be instances where we could listen to
11 an inmate about another inmate, but we would never talk to
12 an incarcerated individual about another incarcerated
13 individual.
14     Q    Okay.  And at any time did any other inmate spoke
15 to you about any concerns with Mr. King?
16     A    No.
17     Q    Did you ever receive a letter or statement from
18 any other inmate about any concerns with Mr. King?
19     A    Not that I recall.
20     Q    How is the correctional facility arranged?
21     A    A maximum correctional facility, people have
22 their own cells that they're referred to as sometimes their
23 houses, and they're separate cubicles.
24     In a medium-correctional facility such as
25 Mid-State, people live in large dorms.

Page 33

1      Q    Okay.  How many inmates do you have per dorm?
2      A    Mid-State wasn't built as a correctional facility
3 from scratch.  Over the years it had been a number of
4 different things, including a psychiatric center, a
5 treatment place for people with addictions.  So not all the
6 buildings were the same size, so the dorms could range
7 anywhere from approximately 6 people, some people had
8 private rooms, up to 20.  It all depended on where someone
9 was housed.
10     Q    Did you ever speak to anyone sharing a dorm with
11 Mr. King within the week leading up to Mr. King's suicide?
12     A    No.
13     Q    Okay.  Were you aware that Mr. King tried to
14 commit suicide with his shoelaces?
15     A    That was also reflected in the one document that
16 I was CC'd on.
17     So I have limited knowledge, yes.
18     Q    Okay.  But when did you become aware?
19     A    I would have been aware if it occurred at
20 Mid-State in realtime, whenever it occurred.  I just
21 don't --
22     I don't recall when it happened or, you know, a
23 lot of the circumstances around it.  But as a unit chief, if
24 there was any serious self-injury or suicide, I would be
25 aware of it, but more in real time.

Page 34

1      Q    Are you aware of any policy regarding shoelaces
2 and inmates?
3      A    I'm not aware of any --
4      MS. COWAN:  Sorry.
5      A    The only --
6      My only knowledge would be, when someone is in
7 the small hospital in the crisis unit, the Residential
8 Crisis Treatment Program, that they would have limited
9 amenities, which could include not having shoelaces.
10 BY MS. KALKACH:
11     Q    Do you know how I can find those policies?
12     MS. COWAN:  Are you referring to the crisis
13 center policy that he just referred to?
14     MS. KALKACH:  Yes.
15     MS. COWAN:  I did provide that.  It was attached
16 to his interrogatories.
17 BY MS. KALKACH:
18     Q    When --
19     MS. COWAN:  Oh, sorry.  I think it was Exhibit B
20 to his interrogatories.  It's "RCTP Observation Cells
21 and Dormitory Beds."
22     MS. KALKACH:  Oh, yes, I understand.  I just
23 wanted him to --
24     I just wanted to know if he knew where to find
25 them and how to find them, if he could.

Page 35

1      MS. COWAN:  Okay.
2      MS. KALKACH:  I was going to go a little bit
3 further with that but, yes, thank you.
4 BY MS. KALKACH:
5      Q    So admits to the hospital, are they given their
6 shoelaces back?
7      A    While they're in the Residential Crisis Treatment
8 Program, it depends on why they're -- why they're there.
9 There's a variety of reasons why people might be in one of
10 these observation cells.
11     Q    What would be those reasons?
12     A    Sometimes it could be a result of someone
13 engaging in self-injurious behaviors, but many times it's
14 just like in a hospital in a community.  Someone could be
15 experiencing psychiatric decompensation, difficulties with
16 their medications.
17     There's a variety of reasons why someone would be
18 in a Residential Crisis Treatment Program.  And so some
19 people there, it would be clinically determined what
20 amenities someone would be provided because we don't want to
21 violate someone's human rights, but we want to keep them
22 safe during that time period.
23     Q    Okay.  And who decides when inmates go to the
24 hospital or observation cells?
25     A    There's generally an RCTP coordinator, a

Deposition of Hal Meyers                                          Estate of Joseph P. King v. Ward, et al.

Page 36

1  clinician who would evaluate the individual and determine if
2  they needed a higher level of care, and sometimes that would
3  be in conjunction with a prescriber who would also be part
4  of the treatment team in the Residential Crisis Treatment
5  Program.
6      Q    How did you learn about all of these policies?
7      A    It's a very important --
8          I mean, all of our policies and procedures are
9  important, but one of the main places we emphasize our care
10  are in the special housing units and in the RCTP.
11          Policies can change over time, so rather than
12  like print off policies, when someone needs to know one of
13  our policies, generally they would go electronically and
14  follow the current policy, or at least verify that if they
15  did print out a policy previously, that that's still the
16  current policy.
17      Q    Okay.  You were speaking about human rights.
18          Do you think it's a human right to have
19  shoelaces?
20          MS. COWAN:  Objection.  Go ahead.
21      A    It would be, in my mind, a violation of human
22  rights, for someone who wasn't a danger of themselves,
23  depriving them of their clothing and their shoelaces.
24  BY MS. KALKACH:
25      Q    If someone had previously tried to commit suicide

Page 37

1  with shoelaces, you would still think it's a human right to
2  give them their shoelaces back?
3          MS. COWAN:  Objection.  Go ahead.
4      A    Every time that someone would be admitted to the
5  residential crisis treatment program, we would look at the
6  reasons why they were being admitted at that time, and
7  sometimes there might be some historical context if someone
8  had just recently been in for harming themselves or
9  something like that.
10          But generally we would look at the
11  circumstances -- the individual circumstances that would
12  lead to each admission to the RCTP, and then their treatment
13  and our care would be based upon their presenting problems
14  and needs.
15  BY MS. KALKACH:
16      Q    So in this case, in your opinion, it was a best
17  practice to give shoelaces to an inmate who already tried to
18  commit suicide with shoelaces?
19          MS. COWAN:  Objection.
20      A    If someone was admitted to an RCTP following a
21  suicide attempt, following self-injurious behaviors, for the
22  period of time that they were in the RCTP receiving
23  treatment, clinically the team would probably determine to
24  limit their amenities because they were considered a danger
25  to self at the time that they were in the Residential Crisis

Page 38

1  Treatment Program.
2  BY MS. KALKACH:
3      Q    Who is this team that decides?
4      A    I referenced it before.  It would be the
5  Residential Crisis Treatment Program Coordinator, who is
6  generally a clinician, and then a prescriber who is the
7  other part of the RCTP treatment team.
8      Q    Are correctional facilities assigned a mental
9  health level?
10      A    Yes.  Every incarcerated individual has three
11  levels, a medical level that's given by DOCCS, a security
12  level that's given by DOCCS, and a mental health level
13  that's given by the Office of Mental Health.
14      Q    What mental health level was the correctional
15  facility where Mr. King was an inmate?
16      A    It's a full mental health satellite unit, so it's
17  a Level 1 facility, but not all individuals receiving care
18  at Mid-State had mental health services of 1.
19      Q    Was he at this facility since the beginning of
20  his sentence?
21      A    I cannot recall.
22      Q    Was he ever in a mental health care unit?
23      A    He was in the residential --
24          To the best of my knowledge, he was in the
25  Residential Crisis Treatment Program after the suicide

Page 39

1  attempt that you talked about earlier with the shoelaces.
2      Q    When was he transferred to a different one?
3          MS. COWAN:  Do you understand?  Go ahead.
4      A    He was at Mid-State after the suicide attempt
5  with shoelaces.
6          I'm not aware of him being transferred somewhere
7  else.  I don't recall.
8          MS. KALKACH:  I need to take a quick break.
9          MS. COWAN:  Okay.
10          (Recess was taken.)
11  BY MS. KALKACH:
12      Q    Okay, Mr. Meyers, can you please explain to me
13  how the different levels work for every inmate?
14      A    So these would be mental health service levels.
15      Q    Okay.
16      A    The ones that are related to the incarcerated
17  individuals.
18      Q    And what are these levels?
19      A    Okay.  Again, these are levels specific to the
20  individuals, not the facilities.
21      Q    Yes.  And how many levels are they?
22      A    There's five.  They go from 1 to 6, and for
23  whatever reason they skip 5.
24      Q    I see.
25      A    Someone who's a Level 6 is not currently -- is

Deposition of Hal Meyers                                          Estate of Joseph P. King v. Ward, et al.

Page 40

1  not currently open to mental health services.
2       Someone who's a Level 4 is either being screened
3  for active services.  They can be seen up to three times
4  before we make a determination whether to open them or not,
5  or they could be open with very minor mental health concerns
6  and not on medications.
7       A Level 3 would be someone again with relatively
8  minor mental health conditions in the spectrum of mental
9  health concerns, but receive some type of psychotropic
10 medications.
11      A Level 2 you would start to get into someone who
12 has a more significant mental health diagnosis, and in most
13 cases would be on medications.
14      A Level 1 is someone with more significant mental
15 health concerns that may or may not be well-controlled.  And
16 it's determined that if they have a Level 1 that they should
17 be in a facility like Mid-State that has a lot of mental
18 health resources, where if you're a Level 2 or a 3 or a 4,
19 you can be in a facility that just basically just has clinic
20 services just like in the community where you go in and
21 maybe do verbal therapy.
22      In a Level 1 facility, there's essentially a day
23 treatment program, there's a small hospital, and there's
24 also clinic services, but the resources are there in place
25 ready to go.

Page 41

1       So if somebody has a Level 1, we've made a
2  determination that it would be in their best interest to be
3  in a facility that has a wide array of mental health
4  services readily available to that individual.
5  Q    Okay.  To switch from one to another, that's a
6  decision made by the therapist, correct, or no?
7  A    To change the mental health service level?
8  Q    Yes.
9  A    The therapist would generally do that in
10 conjunction with the prescriber, who is also assigned to
11 that individual, sometimes the full treatment team, and then
12 they would submit a level change form, and a unit chief
13 signs the level change form.
14 Q    Who signs?
15 A    The unit chief.
16 Q    The unit chief, okay.
17      And how often --
18      How often do inmates see their therapists?
19 A    A minimum --
20      It depends on their mental health service level.
21      Someplace like Mid-State, the majority of
22 individuals being served would see their therapist at a
23 minimum once a month and a prescriber at a minimum every
24 three months, and that's if they were just in general
25 population, you know, going about their daily life.

Page 42

1  Q    In order to decide that they have to be switched
2  from one to another, you have to get, I understand, the
3  prescriber in conjunction with the therapist, but I want to
4  know the process to make that change from one level to the
5  other one.
6  A    A clinician and a prescriber would see a change
7  in someone.  Sometimes it could be an indication that they
8  need more services.  Sometimes it's an indication that
9  people benefited from services and are doing well, and their
10 mental health service level should reflect their progress
11 and treatment.  It could go either way.
12 Q    Is there a questionnaire a report or some sort of
13 screening that every inmate has to obtain when they come
14 into the correctional facility?
15 A    Yes.  That would be done at reception.
16 Q    And how is it done?
17 A    When someone comes into the prison system, they
18 go to the reception center, and that's when they would
19 determine -- DOCCS would determine their security level,
20 their medical level.  We would determine their mental health
21 level.
22      And based on those levels, that would determine
23 what facility would make the most sense for that individual
24 to meet their needs.
25 Q    I see.

Page 43

1       If at some point it's not working, then is it up
2  to the therapist or prescriber to figure it out and screen
3  again, or who does -- is it a different screening?
4       How would a transfer happen when an inmate is
5  already in the facility, but needs different care?
6  A    We'd be looking at things based on clinical
7  reasons.
8       As I talked about before, if someone's clinical
9  needs appear to be increasing, their mental health level
10 might be dropped.  They might be at a Level 2 or 3 facility
11 where there's just clinic services and then, based on
12 whatever is going on in their life, somebody might make the
13 determination that that's not enough mental health resources
14 for that person, and they're going to lower their level.
15      And if somebody is doing well over time, their
16 level could -- could be increased.
17 Q    When it's determined that someone is to change a
18 level, how long does it take for the facility to do it -- to
19 make a transfer?
20 A    They're separate things.  Someone could be at
21 let's say Mid-State, for example, where someone has a mental
22 health service Level 1, they have to be in a satellite unit,
23 but not all the people at Mid-State are Level 1s.  There's
24 people there that are 2s and 3s and 4s.
25      So just by changing someone's level, it just

Case 9:20-cv-01413-TJM-ML   Document 79-5   Filed 03/31/23   Page 15 of 38

Deposition of Hal Meyers                                    Estate of Joseph P. King v. Ward, et al.

Page 44

1  indicates what their chronic and projected -- short-term
2  projected mental health needs are.  It wouldn't necessarily
3  mean that someone would be transferred.  But if DOCCS wanted
4  to transfer someone, and at a higher mental health level,
5  that would increase the number of facilities that person
6  could potentially be transferred to, but the Office of
7  Mental Health would play no part in that.
8      Q    Okay.  Are you aware of any potential suicide
9  indicators in any of the policies that the facility must
10 follow?
11     MS. COWAN:  Objection.  Go ahead.
12     A    Yes, I believe those policies were provided to
13 you, but I am aware of them, yes.
14 BY MS. KALKACH:
15     Q    What are those potential suicide indicators?
16     A    We receive training, everyone who works for the
17 Office of Mental Health and the prisons, around suicide
18 factors, but there's also different ways that we weave in
19 just basically constantly assessing for suicide risk pretty
20 much every time someone writes a note.
21     Q    How often do you receive training?
22     A    At least --
23          At least --
24          At least once a year, but a lot of staff are
25 involved in numerous suicide trainings, either attending

Page 45

1  them or providing them, so they would be exposed to the
2  suicide prevention concerns on a very frequent basis.
3      Q    Are they mandatory, these trainings?
4      A    Yes.  We have an Education & Training Department
5  at Central New York that keeps track of all trainings that
6  staff attend or are provided.
7      MS. KALKACH:  Give me one minute just to read
8  over my notes.
9      THE WITNESS:  I'm going to grab a water.
10 BY MS. KALKACH:
11     Q    Do you know what a suicide watch commander is?
12     A    A suicide watch commander?
13     Q    Yes.
14     A    No.
15     Q    Do you know what suicide watch is?
16     A    It's an older term now.
17     Q    What is the new term?
18     A    We used to have people in the small hospital --
19 physically in the small hospital.  They would be considered
20 to be in RCTP.
21          And then on occasion there would be people
22 elsewhere in the facility who would be on a watch because
23 they were considered to be a danger to self or others,
24 usually to self, and there would be a corrections officer --
25 DOCCS would provide a corrections officer to monitor that

Page 46

1  individual.
2          Now all individuals, whether they're in a
3  physical cell in the Residential Crisis Treatment Program or
4  if they're on a watch somewhere else in the facility,
5  they're considered in the RCTP.
6      Q    Well, before when the suicide watch existed, when
7  would an inmate be placed on suicide watch?
8      A    When someone determined that they were a danger
9  to self.
10     Q    And this someone determining are the same people
11 that would determine the level, or who?
12     A    It could be a variety of people.  Someone could
13 present with risk at any time.
14     Q    Are there standard items or anything that someone
15 should be looking for in order to know if an inmate should
16 be placed in suicide watch?
17     A    There's certain things we look for that may be
18 indicative of potential suicide risk.  And based on those
19 things, someone would be placed -- potentially placed on
20 watch or RCTP status.
21     Q    Okay.  And what are those things that would be --
22 that are like potential suicide indicators?
23     A    There's a number of things.  Some would be the
24 same type of things you would think about in the community.
25     Q    Which are?

Page 47

1      A    Someone that -- maintaining friendships, being
2  withdrawn, maybe a change in their alcohol or drug use where
3  they might become more impulsive.
4          In the community, many times it's signs and
5  symptoms of depression that get worse over time until such
6  time as, you know, someone sees harming themselves or
7  committing suicide as a viable option or a choice.
8          In a correctional setting, there's additional
9  risk factors that are specific to corrections, and they
10 could involve conflicts with other incarcerated individuals,
11 you know, gangs, drug debts, just a number of -- a number of
12 things, you know, being stressed about being in a
13 correctional setting.
14          Regardless if somebody is in the community or in
15 a correctional setting, we try to observe for changes.  And
16 when we see changes, that's when it would be appropriate to
17 make a referral or to determine that someone needs a higher
18 level of care for a limited amount of time.
19     Q    So is there any reason to send an inmate to a
20 special housing unit?
21     MS. COWAN:  Objection.  Go ahead.
22     A    A special housing unit is more a disciplinary
23 setting.  And now with the HALT legislation, it's no longer
24 a place where someone could be on RCTP status or a
25 one-to-one watch could be provided, but in a medium-security

Page 48

1  place where they live in dorms, it wouldn't be safe to allow
2  someone to stay like in an open space where they might be
3  able to get ahold of stuff.
4      So in the past, sometimes people would be placed
5  in a SHU cell, but not for disciplinary reasons, but just
6  because that's the safest place to hold them.  An infirmary
7  would be another place.
8      If someone is a danger to themselves, they have
9  to be removed from the dorm environment and monitored
10  somewhere else for their safety.
11  Q    Do you know what a parole board hearing is?
12  A    Yes.
13  Q    Okay.  Do you get notified when an inmate is
14  going to get his or her parole board hearing?
15  A    The Office of Mental Health?
16  Q    Yes.
17  A    Yes, the Office of Mental Health is notified when
18  someone basically DOCCS is parole is part of DOCCS now.
19      If they believe that a mental health evaluation
20  is needed to help the parole commissioners, then they
21  will -- they will make a request to the Office of Mental
22  Health that we do a parole evaluation for purposes of the
23  commissioner and to recommend appropriate care and treatment
24  for the individual in the event that they are released from
25  prison, what types of supports they would need in the

Page 49

1  community, and then sometimes they would become conditions
2  of parole to help the person stay in the community and try
3  to promote continuity of mental health care and treatment.
4  Q    I see.
5      And are there common emotional changes in inmates
6  when the hearing is approaching?
7      MS. COWAN:  Objection.  Go ahead.
8  A    It varies.  It depends on the individual.  But
9  that's potentially something that, you know, a therapist
10  might support somebody around if it came up as an issue or
11  concern.
12  BY MS. KALKACH:
13  Q    Did you ever receive training or education on
14  suicide prevention?
15  A    Yes, I have.
16  Q    When did you receive it?
17  A    I receive it like on a regular basis, you know,
18  at a minimum once a year, but I've actually -- I train, you
19  know, DOCCS staff throughout the state on different mental
20  health training, and we usually incorporate suicide
21  prevention in most of those trainings.  It's one of the
22  things we always include.
23  Q    Okay.  And who paid for the training?
24  A    It's all within the State of New York.
25      The Office of Mental Health, we have internal

Page 50

1  suicide prevention training, and then the Office of Mental
2  Health provides suicide prevention training to employees of
3  the Department of Correctional and Community Services.
4  Q    Okay.  And how long does the training last?
5  A    Generally suicide prevention is a portion of each
6  training.  I would say it goes anywhere from 15 minutes to 4
7  hours, depending on the nature of that specific training.
8  Q    So you get training on suicide prevention for 15
9  minutes once a year, or maybe sometimes --
10  A    No.
11      Every training we do, regardless of the subject,
12  every DOCCS training that we do, we incorporate an element
13  of suicide prevention.
14      So depending on that individual training, it can
15  go anywhere from a smaller amount of time, let's say 15
16  minutes -- probably a half hour would be the minimum -- to
17  as much as 4 hours.
18      It can vary, depending on the nature of the
19  training, the purpose of the training, what we're trying to
20  get across to the staff.
21  Q    Are there training conventions, or how do those
22  work?
23      How does it work?
24  A    We have an Education & Training Department, and
25  they work with DOCCS education and training, and they

Page 51

1  coordinate what trainings we're going to do each year, how
2  many, where they're going to be.
3  Q    Did the correctional do official evaluations for
4  suicide risk?
5      MS. COWAN:  Objection.  Can you answer?
6  A    In certain circumstances.
7  BY MS. KALKACH:
8  Q    What circumstances?
9  A    Just a few examples would be when someone enters
10  disciplinary housing, when someone enters the prison system,
11  when they're transferred.  That would be the main times, but
12  that's a DOCCS function.  It's not a function of the Office
13  of Mental Health.
14  Q    Okay.  Are you aware of any other suicides that
15  happened in the prison from 2013 to 2018?
16      MS. COWAN:  Objection.  Go ahead.
17  A    Unfortunately suicides, regardless of our best
18  efforts, they do occur in the correctional setting for a
19  variety of reasons, and the number of suicides each year, it
20  can vary.
21  BY MS. KALKACH:
22  Q    Okay.  So you are aware?
23  A    I'm sorry.  Yes, I'm aware there's suicides in
24  prison, and they occurred during that period of time, yes.
25  Q    How many, approximately, per year?

Deposition of Hal Meyers                                                    Estate of Joseph P. King v. Ward, et al.

Page 52

1    A    I don't have the stats in front of me. It
2  definitely would be approximate, but generally they run
3  between 10 a year, and I think as a high of 18 or 19.
4        MS. COWAN:  Is that from Mid-State, Mr. Meyers,
5  or is that for all of DOCCS?
6        THE WITNESS:  That would be the whole DOCCS
7  system.
8        MS. COWAN:  Okay.
9        THE WITNESS:  In the 10 years I was at Mid-State,
10  there was a very limited number of suicides.
11  BY MS. KALKACH:
12    Q    Do you know how many?
13    A    I don't know exactly, but it was something that
14  was -- didn't occur very often.
15        I would say, again --
16    Q    You can give an approximation.
17    A    Two or three over the 10 years.  And being that
18  Mid-State was the largest satellite unit with the largest
19  number of people with mental health concerns, in my
20  estimation, it demonstrated that, you know, we were doing a
21  good job.
22        MS. NAPPI:  Objection, move to strike that
23  answer.  It wasn't in response to a question that was
24  pending.
25        THE WITNESS:  Sorry.

Page 53

1        MS. COWAN:  Okay.  Go ahead.
2  BY MS. KALKACH:
3    Q    How many of those were related to a mental health
4  illness?
5        MS. COWAN:  Objection.  If you can answer.
6    A    Out of the three, I don't know.  But the larger
7  numbers that I gave you before, a lot of years it reached
8  down around 50 percent of people who were open to mental
9  health services, and about 50 percent aren't at the time of
10  their death.
11  BY MS. KALKACH:
12    Q    Are you aware of any changes to the policies and
13  directives as a consequence?
14        MS. COWAN:  Objection.  Go ahead.
15    A    What happens is, after every suicide, you know,
16  it's looked at by a number of entities, including the Office
17  of Mental Health.  And based on trends that we see,
18  sometimes that does lead to policy changes.
19        Policies particularly around suicide, they're
20  changed on an ongoing basis to reflect the most current
21  knowledge so everyone can do the best job they can to
22  prevent suicide.
23  BY MS. KALKACH:
24    Q    Did the correctional facility keep a suicide log?
25    A    If someone is on RCTP status and they're in one

Page 54

1  of the hospital cells, then --
2        They have their logbook, you know, for everyone.
3  If someone is on RCTP status and they're on a one-to-one
4  watch, then it's my understanding that DOCCS would keep a
5  log of what was going on with that person.
6        But again, that's not a function related to the
7  Office of Mental Health.
8    Q    Who would have access to the suicide watch log?
9        MS. COWAN:  Objection.  Answer if you can.
10    A    DOCCS staff and then OMH staff, if they were, you
11  know --
12        When they were seeing the individual that was on
13  the one-to-one watch, they would have a chance to review the
14  log, but they don't write in the log.  They don't make any
15  entries in the log.  It's a DOCCS document .
16  BY MS. KALKACH:
17    Q    I see.
18        Where were you on November 16, 2018?
19    A    I don't recall.
20    Q    It's the date Mr. Joseph King took his life.
21    A    I don't recall.
22    Q    How did you learn about Mr. King's suicide?
23    A    I think someone called me.
24        I don't recall.
25    Q    Who called you?

Page 55

1    A    I don't recall whether it was a phone call to me
2  or it was when I went to -- when I went to work the next
3  time.
4        It's a pretty significant event when someone
5  commits suicide, so probably someone called me at home and
6  let me know what had happened because --
7    Q    So you were at home --
8        Or probably someone called you at home?
9    A    To the --
10        That would --
11        If it was outside of normal business hours, which
12  are like 8 to 4:30 or on the weekend, yes, someone would
13  have called me at home.  I wouldn't have been in the
14  correctional facility.
15    Q    Did you go to the scene?
16    A    I don't recall if I went to the scene.
17        I wouldn't actually go to the scene-scene because
18  it's kind of like a crime scene, but one of the duties of a
19  unit chief is to make sure that the clinical record is
20  secured if someone has unfortunately passed as a result of
21  suicide.
22        Sometimes that's done physically, and sometimes
23  someone is delegated to someone to secure the chart and lock
24  it safely until the unit chief can get ahold of it.
25    Q    In the case of Mr. King, do you know who was the

Deposition of Hal Meyers                                                      Estate of Joseph P. King v. Ward, et al.

Page 56

1  one taking care of this?
2     A    I don't recall whether I physically drove to the
3  facility or I directed someone to secure the chart, but I
4  was aware of the need to secure the chart, and it would have
5  been secured one way or the other.  I would have made sure
6  that was taken care of.
7     Q    Did anyone explain how the suicide occurred?
8     A    I can't --
9         I can't remember all the details.
10        One of the things that happens is, once the chart
11 is secure, we would answer questions to people at Mid-State
12 to anyone that came in to investigate, but we wouldn't
13 really be doing a lot of the investigation ourselves.
14    Q    Okay.  Are you aware of what Mr. King used to
15 kill himself?
16    A    My limited recollection is that he hung himself
17 in a bathroom area.
18    Q    Are you aware with what -- what did he use?
19    A    No, I don't recall.
20    Q    Are you aware of any investigation from the
21 correctional facility after his suicide?
22    A    Yes.  As far as I know, the normal investigative
23 procedures and entities did what they were supposed to do.
24    Q    Do you know the exact location of the suicide?
25    A    To the best of my recollection, it was Building

Page 57

1  20 maybe.  I can't recall.  It was in a housing unit area.
2  That's what I recall.
3     Q    Do you know who discovered the attempt?
4     A    No, I don't recall.
5     Q    Do you know if Mr. King was sent to a hospital?
6     A    I don't recall, but it's not uncommon that if
7  someone completes suicide that they're taken to a hospital
8  and pronounced or examined, but that would be a DOCCS -- a
9  DOCCS procedure, not anything to do with the Office of
10 Mental Health.
11    Q    Do you know if the family was notified?
12    A    DOCCS would be notifying the family in most
13 cases.
14        I'm hoping they were notified in a timely basis,
15 but I don't know.
16    Q    Okay.  Was there anything different that you
17 could have done to prevent his suicide?
18        MS. COWAN:  Objection.
19    A    In my administrative role, I'm not aware of any
20 policies and procedures that were not followed that could
21 have contributed to his death.
22        MS. KALKACH:  Okay.  I'm going to review my notes
23    to see if I have some follow-up questions, and I'm
24    going to ask for a little break to do that, and I hope
25    I don't have that many follow-ups.

Page 58

1         MS. COWAN:  Sounds good.
2         (Recess was taken.)
3         MS. KALKACH:  I have no further questions.  Thank
4  you so much.
5         THE WITNESS:  Thank you.
6         MS. COWAN:  I don't have any questions, so we are
7  good.  You can go off the record.
8         (Whereupon, the deposition was concluded at
9  11:51 a.m.)

1                          CERTIFICATE

2               I, Gina Williams, Registered Professional Court

3     Reporter, do certify that the above deposition was reported

4     by me and that the foregoing transcript is a true and

5     accurate record to the best of my knowledge, skills, and

6     ability.

7               I further certify that I am not an employee of

8     counsel or any of the parties, nor a relative or employee of

9     any attorney or counsel connected with the action, nor

10    financially interested in the action.

11              Subscribed and sworn to before me when taken this

12    23rd day of May, 2022.

13

14              _____
                        *Gina Williams*

15                  GINA WILLIAMS, RPR, CRR

16

17

18

19

20

21

22

23

24

25

1                    ACKNOWLEDGMENT OF DEPONENT

2

3              I, HAL MEYERS, do hereby certify that I have read

4       the foregoing pages and that the same is a correct

5       transcription of the answers given by me to the questions

6       therein propounded, except for the corrections or changes in

7       form or substance, if any, noted in the attached Errata

8       Sheet.

9

10

11      _____

12      HAL MEYERS                                          Date

13

14      Subscribed and sworn to before me this

15      ___ day of _____, 2022.

16      My commission expires:_____

17

18      _____

19      Notary Public

20

21

22

23

24

25

```
1                        – – – – – – –

2                            ERRATA

3                        – – – – – – –

4    PAGE   LINE                      CHANGE/REASON

5    _____  _____  _____

6    _____  _____  _____

7    _____  _____  _____

8    _____  _____  _____

9    _____  _____  _____

10   _____  _____  _____

11   _____  _____  _____

12   _____  _____  _____

13   _____  _____  _____

14   _____  _____  _____

15   _____  _____  _____

16   _____  _____  _____

17   _____  _____  _____

18   _____  _____  _____

19   _____  _____  _____

20   _____  _____  _____

21   _____  _____  _____

22   _____  _____  _____

23   _____  _____  _____

24   _____  _____  _____

25
```

Case 9:20-cv-01413-TJM-ML   Document 79-5   Filed 03/31/23   Page 22 of 38

Deposition of Hal Meyers                                                    Estate of Joseph P. King v. Ward, et al.

## WORD INDEX

**< 1 >**
**1** 38:*17, 18* 39:*22*
40:*14, 16, 22* 41:*1*
43:*22*
**10** 11:*21* 17:*21* 18:*7,*
*9, 20, 25* 19:*3* 52:*3, 9,*
*17*
**10:05** 1:*19*
**10016** 2:*6*
**10-minute** 28:*24*
**10th** 2:*5*
**11:51** 58:*9*
**112** 2:*5*
**13202** 2:*12*
**13413** 4:*13*
**15** 50:*6, 8, 15*
**16** 54:*18*
**18** 17:*18* 52:*3*
**19** 3:*8* 20:*13* 52:*3*
**1960** 9:*21*
**1979** 15:*21*
**1982** 15:*21*
**1984** 15:*24*
**1985** 14:*25*
**1990** 15:*1* 16:*21, 23*
**1996** 16:*23*
**1998** 17:*4*
**1s** 43:*23*

**< 2 >**
**2** 40:*11, 18* 43:*10*
**20** 11:*21* 33:*8* 57:*1*
**2009** 19:*5*
**2013** 51:*15*
**2018** 51:*15* 54:*18*
**2019** 17:*25* 19:*6*
**2022** 1:*14, 18* 59:*12*
60:*15*
**20-CV-01413** 1:*2*
**21** 3:*9*
**23** 1:*14, 18*
**23rd** 59:*12*
**29** 10:*6*
**2s** 43:*24*

**< 3 >**
**3** 40:*7, 18* 43:*10*

**30** 10:*6*
**300** 2:*11*
**31** 10:*6*
**3s** 43:*24*

**< 4 >**
**4** 3:*4* 40:*2, 18* 50:*6,*
*17*
**4:30** 55:*12*
**4s** 43:*24*

**< 5 >**
**5** 39:*23*
**50** 53:*8, 9*

**< 6 >**
**6** 11:*24* 33:*7* 39:*22,*
*25*

**< 7 >**
**7** 9:*21* 11:*24*

**< 8 >**
**8** 55:*12*
**800** 23:*7*
**81** 4:*12*

**< A >**
**a.m** 1:*19* 58:*9*
**ability** 5:*21* 59:*6*
**able** 48:*3*
**above-styled** 1:*18*
**Abuse** 16:*25*
**access** 54:*8*
**accommodate** 6:*14*
**accurate** 59:*5*
**ACKNOWLEDGMEN
T** 60:*1*
**ACTION** 1:*2* 10:*25*
59:*9, 10*
**active** 23:*7* 40:*3*
**actual** 14:*3*
**ad** 1:*5*
**addiction** 17:*2*
**addictions** 33:*5*
**additional** 47:*8*
**address** 4:*11* 10:*21*
**Adirondack** 15:*10*
**administrative** 18:*14*
24:*5* 57:*19*

**Administrator** 1:*4*
17:*22* 18:*19* 19:*9*
**admission** 37:*12*
**admits** 35:*5*
**admitted** 37:*4, 6, 20*
**affect** 5:*21* 8:*4*
**AG** 22:*20*
**ago** 11:*21, 24* 20:*19*
21:*4*
**ahead** 27:*1* 36:*20*
37:*3* 39:*3* 44:*11*
47:*21* 49:*7* 51:*16*
53:*1, 14*
**ahold** 48:*3* 55:*24*
**AIMEE** 2:*12*
**al** 1:*5*
**Albany** 13:*18* 14:*22*
17:*15*
**alcohol** 8:*4* 47:*2*
**allow** 48:*1*
**allows** 26:*8*
**Amended** 3:*8, 9*
22:*10*
**amenities** 34:*9* 35:*20*
37:*24*
**amount** 47:*18* 50:*15*
**Amy** 1:*5*
**Answer** 3:*9* 6:*1, 3,*
*16, 21, 22* 7:*2* 10:*10,*
*19* 22:*10* 24:*9* 28:*5,*
*6* 51:*5* 52:*23* 53:*5*
54:*9* 56:*11*
**answers** 6:*5* 29:*10*
60:*5*
**anybody** 7:*25*
**appear** 43:*9*
**appearing** 2:*2*
**appears** 21:*4*
**Apple** 7:*5*
**approaching** 49:*6*
**appropriate** 28:*9*
47:*16* 48:*23*
**approximate** 52:*2*
**Approximately** 11:*21,*
*24* 14:*25* 16:*16, 18*
17:*6, 10, 13, 21* 18:*7*
19:*5* 33:*7* 51:*25*
**approximation** 11:*23*
52:*16*

**April** 9:*21*
**area** 56:*17* 57:*1*
**arranged** 32:*20*
**array** 41:*3*
**Arts** 15:*9, 19*
**Aside** 10:*25*
**asked** 24:*20* 25:*3, 23*
**asking** 26:*15*
**aspects** 28:*11*
**assessing** 44:*19*
**assigned** 38:*8* 41:*10*
**assistant** 16:*17* 17:*9*
**assisted** 8:*9*
**associated** 4:*8*
**assume** 6:*2*
**assuming** 5:*7*
**attached** 34:*15* 60:*7*
**attempt** 37:*21* 39:*1,*
*4* 57:*3*
**attend** 14:*16* 45:*6*
**attending** 44:*25*
**ATTORNEY** 2:*10*
6:*20, 21* 13:*23* 59:*9*
**attorneys** 2:*2* 22:*22*
**Auburn** 17:*11*
**available** 41:*4*
**Avenue** 2:*5*
**aware** 8:*23* 9:*1*
24:*7* 25:*5* 26:*10, 15,*
*18* 33:*13, 18, 19, 25*
34:*1, 3* 39:*6* 44:*8, 13*
51:*14, 22, 23* 53:*12*
56:*4, 14, 18, 20* 57:*19*

**< B >**
**Bachelor's** 15:*14*
**back** 35:*6* 37:*2*
**background** 5:*4*
10:*14*
**based** 6:*3* 25:*10*
37:*13* 42:*22* 43:*6, 11*
46:*18* 53:*17*
**basically** 5:*4* 40:*19*
44:*19* 48:*18*
**basis** 45:*2* 49:*17*
53:*20* 57:*14*
**Bates** 14:*3*
**bathroom** 56:*17*
**Beds** 34:*21*

Deposition of Hal Meyers

Estate of Joseph P. King v. Ward, et al.

beginning  38:*19*
behalf  2:*4, 9*
behaviors  35:*13*
  37:*21*
believe  13:*25*  15:*21*
  22:*19*  44:*12*  48:*19*
benefited  42:*9*
Benjamin  9:*6*  30:*10*
best  6:*9*  18:*22*
  22:*19*  37:*16*  38:*24*
  41:*2*  51:*17*  53:*21*
  56:*25*  59:*5*
beyond  8:*11*
birthdate  10:*21*
bit  25:*24*  35:*2*
board  48:*11, 14*
born  9:*20, 22*  10:*21*
box  25:*12*
break  6:*13, 17*  13:*9*
  28:*24*  39:*8*  57:*24*
briefly  16:*2, 7*
Building  56:*25*
buildings  33:*6*
built  33:*2*
business  55:*11*

< C >
call  22:*20*  29:*7*  55:*1*
called  4:*3*  54:*23, 25*
  55:*5, 8, 13*
calls  8:*14*
Camden  9:*23*
Captioner  1:*21*
care  5:*5, 8*  12:*6, 9*
  25:*1*  30:*15*  36:*2, 9*
  37:*13*  38:*17, 22*  43:*5*
  47:*18*  48:*23*  49:*3*
  56:*1, 6*
case  4:*25*  7:*11, 20*
  9:*4, 5*  10:*12, 17*  12:*1,
  6*  16:*19*  26:*7*  27:*11*
  37:*16*  55:*25*
caseload  23:*7*  24:*11*
  25:*16*
cases  40:*13*  57:*13*
cause  1:*18*
CC'd  12:*22*  14:*4*
  25:*7, 14*  33:*16*
cell  7:*5*  46:*3*  48:*5*

cells  32:*22*  34:*20*
  35:*10, 24*  54:*1*
Center  17:*13, 17*
  30:*15*  33:*4*  34:*13*
  42:*18*
Central  17:*12, 16*
  45:*5*
certain  28:*14*  46:*17*
  51:*6*
CERTIFICATE  59:*1*
certification  15:*3*
Certified  1:*20, 21*
certify  59:*3, 7*  60:*3*
cetera  7:*6, 16*  27:*21*
chance  54:*13*
change  36:*11*  41:*7,
  12, 13*  42:*4, 6*  43:*17*
  47:*2*
CHANGE/REASON
  61:*4*
changed  53:*20*
changes  47:*15, 16*
  49:*5*  53:*12, 18*  60:*6*
changing  43:*25*
chart  55:*23*  56:*3, 4,
  10*
checking  7:*17*
CHEVERIE  2:*5*
chief  17:*11, 17, 19, 20*
  18:*7, 9*  19:*8*  27:*13*
  33:*23*  41:*12, 15, 16*
  55:*19, 24*
children  10:*13, 17*
  16:*12*
choice  47:*7*
chronic  44:*1*
circumstances  33:*23*
  37:*11*  51:*6, 8*
CIVIL  1:*2*
CLARITY  2:*19*
clinic  16:*15*  40:*19,
  24*  43:*11*
clinical  24:*6*  28:*11,
  20*  43:*6, 8*  55:*19*
clinically  35:*19*  37:*23*
clinician  36:*1*  38:*6*
  42:*6*
close  7:*6*
closed  26:*7*

closer  26:*9*
clothing  36:*23*
college  14:*16, 18*
  15:*3, 10*
colleges  14:*19*
come  11:*5*  42:*13*
comes  42:*17*
coming  23:*9*
commander  45:*11, 12*
commencing  1:*19*
commission  60:*16*
commissioner  48:*23*
commissioners  48:*20*
commit  30:*13*  33:*14*
  36:*25*  37:*18*
commits  55:*5*
committed  5:*9*  12:*11*
  30:*16*
committing  47:*7*
common  30:*1*  49:*5*
commonly  27:*9*
Community  12:*25*
  15:*10*  35:*14*  40:*20*
  46:*24*  47:*4, 14*  49:*1,
  2*  50:*3*
compare  5:*5, 7*  12:*8*
Complaint  3:*8, 9*
  11:*14*  22:*10*
complaints  11:*1, 5, 7,
  9*  29:*5, 20*
completed  15:*12*
completes  57:*7*
compliance  17:*9*
computers  7:*6*
concern  11:*10*  29:*7,
  19, 24*  30:*2, 6*  31:*21*
  49:*11*
concerns  11:*3*  17:*3*
  24:*11*  26:*5, 22*  30:*3*
  32:*15, 18*  40:*5, 9, 15*
  45:*2*  52:*19*
concluded  58:*8*
conditions  40:*8*  49:*1*
confidentiality  32:*9*
conflicts  47:*10*
conjunction  36:*3*
  41:*10*  42:*3*
connected  59:*9*
connection  30:*25*
consequence  53:*13*

considered  37:*24*
  45:*19, 23*  46:*5*
constantly  44:*19*
contact  9:*2*
contained  14:*1*
context  37:*7*
continuity  49:*3*
contrast  5:*5, 7*  12:*6,
9*
contributed  57:*21*
control  29:*11*
conventions  50:*21*
conversation  23:*23*
  26:*20*
convicted  9:*18*
coordinate  51:*1*
coordinator  12:*23*
  35:*25*  38:*5*
copy  21:*3*
Correct  18:*10*  29:*6*
  30:*11*  41:*6*  60:*4*
correctional  5:*3*
  12:*10, 24*  17:*6, 12, 20*
  18:*6*  23:*17*  30:*14*
  31:*1*  32:*20, 21*  33:*2*
  38:*8, 14*  42:*14*  47:*8,
  13, 15*  50:*3*  51:*3, 18*
  53:*24*  55:*14*  56:*21*
corrections  45:*24, 25*
  47:*9*  60:*6*
correspondence  29:*17*
counsel  8:*13, 16, 21,
  22*  9:*1*  59:*8, 9*
County  16:*14, 17, 19*
COURT  1:*1*  6:*6, 10*
  22:*11*  59:*2*
courtroom  5:*18*
cover  18:*24*
COWAN  2:*12*  7:*9,
  14*  10:*8, 16, 20*  13:*10,
  25*  14:*10*  20:*12, 17*
  22:*9, 25*  24:*9*  26:*12,
  24*  27:*1*  28:*4, 6*  29:*1,
  22*  31:*10*  34:*4, 12, 15,
  19*  35:*1*  36:*20*  37:*3,
  19*  39:*3, 9*  44:*11*
  47:*21*  49:*7*  51:*5, 16*
  52:*4, 8*  53:*1, 5, 14*
  54:*9*  57:*18*  58:*1, 6*
crime  9:*18*  55:*18*

Case 9:20-cv-01413-TJM-ML   Document 79-5   Filed 03/31/23   Page 24 of 38

Deposition of Hal Meyers                                    Estate of Joseph P. King v. Ward, et al.

crisis   34:7, 8, 12
  35:7, 18   36:4   37:5,
  25   38:5, 25   46:3
Cristina   18:23
CRR   59:15
cubicles   32:23
current   4:10   16:3
  17:21   31:4, 5   36:14,
  16   53:20
currently   8:3   39:25
  40:1

< D >
daily   28:3   41:25
danger   36:22   37:24
  45:23   46:8   48:8
date   13:2   27:14
  54:20   60:12
day   40:22   59:12
  60:15
day-to-day   18:14
dealt   24:8
death   31:2   53:10
  57:21
debts   47:11
decide   42:1
decides   35:23   38:3
decision   41:6
decompensation
  35:15
Defendant   1:5   12:2,
  3
Defendants   2:9
definitely   52:2
degree   15:7, 9, 13
  16:10, 21
delegated   55:23
demand   14:8
demonstrated   52:20
Department   12:24
  16:19   45:4   50:3, 24
depended   33:8
Depending   25:25
  50:7, 14, 18
depends   35:8   41:20
  49:8
DEPONENT   60:1
deposed   4:4, 17, 24
  9:3

DEPOSITION   1:13,
  17   5:11   7:21   8:8, 20
  58:8   59:3
depression   47:5
depriving   36:23
details   56:9
determination   40:4
  41:2   43:13
determinations   24:6
determine   36:1
  37:23   42:19, 20, 22
  46:11   47:17
determined   35:19
  40:16   43:17   46:8
determines   26:1
determining   46:10
develop   17:1
devices   7:4, 19
diagnosis   40:12
diary   9:14
different   5:3   9:4
  15:7   33:4   39:2, 13
  43:3, 5   44:18   49:19
  57:16
difficulties   35:15
DIRECT   2:19   10:10
  26:17
directed   56:3
directing   10:18
directives   53:13
directly   28:1, 20   32:1
directs   6:21
disciplinary   11:14
  47:22   48:5   51:10
discovered   57:3
discuss   8:20
discussed   27:3, 14
disorders   17:2
distracting   7:16
DISTRICT   1:1
disturbed   16:11
Division   17:14
Divorced   9:25   10:1
DOCCS   13:17, 18
  38:11, 12   42:19   44:3
  45:25   48:18   49:19
  50:12, 25   51:12   52:5,
  6   54:4, 10, 15   57:8, 9,
  12

document   7:6, 8
  20:24, 25   21:2, 6, 8,
  19, 23, 24   22:2, 6, 12,
  17   25:6, 14   33:15
  54:15
documents   7:7, 17, 22
  8:15   14:2, 12
doing   42:9   43:15
  52:20   56:13
dorm   33:1, 10   48:9
Dormitory   34:21
dorms   32:25   33:6
  48:1
draft   22:11, 13
drafted   22:10, 15
drafting   22:5, 18
Drake   8:22, 25
dropped   43:10
drove   56:2
drug   47:2, 11
drugs   8:4
duly   4:3
duties   18:11   55:18

< E >
earlier   29:4   30:9
  39:1
Eastern   1:19
Education   45:4
  49:13   50:24, 25
efforts   51:18
either   40:2   42:11
  44:25
electronically   36:13
element   50:12
e-mail   8:12   12:12,
  14, 15, 18   13:2, 6, 14,
  22, 25   14:4
e-mails   12:16
emergency   7:11, 20
emotional   49:5
emotionally   16:11
emphasize   36:9
employee   59:7, 8
employees   50:2
employment   16:3, 7
engaging   35:13
English   15:10
ensure   24:2

enters   51:9, 10
entities   53:16   56:23
entries   54:15
environment   48:9
Errata   60:7   61:2
ESQUIRE   2:6, 7, 12
essentially   40:22
Estate   1:4   4:9
estimation   52:20
et   1:5   7:5, 16   27:21
evaluate   36:1
evaluation   48:19, 22
evaluations   28:18
  51:3
event   48:24   55:4
events   22:23
evidence   19:20   21:15
exact   56:24
Exactly   6:25   20:16
  52:13
Examination   3:4   4:5
examined   57:8
example   43:21
examples   51:9
exert   29:10
Exhibit   3:8, 9   19:20,
  22, 23   20:3, 25   21:14,
  16, 25   22:9   34:19
existed   46:6
experiencing   35:15
expert   12:1
expires   60:16
explain   25:20, 23, 24
  31:13   39:12   56:7
exposed   45:1
extent   14:8   23:12

< F >
facilities   38:8   39:20
  44:5
facility   5:3, 6, 8   12:7,
  10   17:6, 12, 20   18:7
  23:8, 17   26:1   30:21,
  22   31:1   32:20, 21, 24
  33:2   38:15, 17, 19
  40:17, 19, 22   41:3
  42:14, 23   43:5, 10, 18
  44:9   45:22   46:4
  53:24   55:14   56:3, 21

fact 12:2 31:18
factors 44:18 47:9
Falls 15:11
familiar 5:10 21:5
  32:5
familiarity 5:13
families 26:9
family 10:10, 17, 22
  57:11, 12
far 9:2 10:22 15:4
  28:11 56:22
feel 5:24
field 17:8
figure 43:2
filed 11:1 19:17
  22:4, 11
financially 59:10
find 14:3 34:11, 24,
  25
finish 19:2
finished 21:19
firm 4:8
first 4:3 16:15
five 39:22
Floor 2:5
follow 36:14 44:10
followed 24:3 57:20
following 37:20, 21
follows 4:4
follow-up 57:23
follow-ups 57:25
foregoing 59:4 60:4
Forensic 17:15, 22
  18:19 19:8
form 41:12, 13 60:7
formal 11:5, 9
found 14:11 25:7, 11
four 16:18 17:10
  21:12
four-year 16:10
FPA 19:5
free 5:24
frequent 45:2
friendships 47:1
front 7:22 52:1
full 4:10 38:16
  41:11
fully 20:12
function 51:12 54:6
functions 24:6 28:15

further 25:24 35:3
  58:3 59:7

< G >
gangs 47:11
GENERAL 2:10
  24:12 31:3 41:24
Generally 9:13 11:4
  35:25 36:13 37:10
  38:6 41:9 50:5 52:2
generate 12:20
generated 12:23
  13:14
getting 28:8
Gina 1:19 59:2, 15
give 6:4 8:5 37:2,
  17 45:7 52:16
given 35:5 38:11, 12,
  13 60:5
giving 22:18
Glens 15:11
go 4:15 10:22 14:18
  15:20 16:6, 7 20:3,
  23 27:1, 6 35:2, 23
  36:13, 20 37:3 39:3,
  22 40:20, 25 42:11,
  18 44:11 47:21 49:7
  50:15 51:16 53:1, 14
  55:15, 17 58:7
goes 50:6
going 4:15 8:23
  10:8, 10 11:11 13:8
  15:16 23:9 31:13
  35:2 41:25 43:12, 14
  45:9 48:14 51:1, 2
  54:5 57:22, 24
Good 4:7 16:11
  52:21 58:1, 7
grab 45:9
graduate 15:16 16:12
graduated 15:1, 24
grievance 11:11
grievances 11:1
ground 4:15
guess 7:12 10:23

< H >
HACH 2:5
HAL 1:13, 17 3:3

4:2 60:3, 12
half 50:16
HALT 47:23
hanging 30:18, 19
happen 31:20 43:4
happened 30:21
  31:25 33:22 51:15
  55:6
happens 27:9 53:15
  56:10
harming 37:8 47:6
Harold 4:12
Hartford 4:13
Health 8:25 12:4, 25
  13:17, 19 16:5, 15, 20
  17:2, 5, 7 18:12 23:2
  24:14 25:18, 19, 25
  26:2, 3, 7, 21 28:9
  29:21, 25 30:2 38:9,
  12, 13, 14, 16, 18, 22
  39:14 40:1, 5, 8, 9, 12,
  15, 18 41:3, 7, 20
  42:10, 20 43:9, 13, 22
  44:2, 4, 7, 17 48:15,
  17, 19, 22 49:3, 20, 25
  50:2 51:13 52:19
  53:3, 9, 17 54:7
  57:10
hear 5:23
hearing 48:11, 14
  49:6
help 4:16 48:20
  49:2
helped 17:1
high 52:3
higher 15:8 36:2
  44:4 47:17
HILLARY 2:7
historical 37:7
history 16:3, 7
hold 48:6
home 55:5, 7, 8, 13
hope 57:24
hoping 57:14
hospital 34:7 35:5,
  14, 24 40:23 45:18,
  19 54:1 57:5, 7
hour 50:16
hours 50:7, 17 55:11

House 16:11
housed 26:1 33:9
houses 32:23
housing 36:10 47:20,
  22 51:10 57:1
Human 15:15 35:21
  36:17, 18, 21 37:1
hung 56:16

< I >
idea 12:16 25:13
identification 19:23
  21:16
identified 25:25
II 17:5, 22
illness 53:4
impact 28:2
impacting 25:1
important 6:4 36:7, 9
impulsive 47:3
incarcerated 11:2
  23:18, 20 24:1, 8
  29:12 32:12 38:10
  39:16 47:10
include 34:9 49:22
including 33:4 53:16
incorporate 49:20
  50:12
increase 44:5
increased 26:8, 22
  43:16
increasing 43:9
indicates 44:1
indication 42:7, 8
indicative 46:18
indicators 44:9, 15
  46:22
individual 5:3 9:6
  24:24 26:3 28:1
  29:12 32:12, 13 36:1
  37:11 38:10 41:4, 11
  42:23 46:1 48:24
  49:8 50:14 54:12
individually 23:6
individuals 11:2
  24:4 25:18 26:6
  38:17 39:17, 20
  41:22 46:2 47:10
individual's 31:21

Case 9:20-cv-01413-TJM-ML    Document 79-5    Filed 03/31/23    Page 26 of 38

Deposition of Hal Meyers                                          Estate of Joseph P. King v. Ward, et al.

infirmary  48:6
influence  8:3
information  10:15
22:15, 18
inmate  32:5, 8, 11, 14,
18  37:17  38:15
39:13  42:13  43:4
46:7, 15  47:19  48:13
inmates  27:20  29:5
30:4  31:3, 15, 22
33:1  34:2  35:23
41:18  49:5
inquiry  12:24
instances  32:10
intake  16:15
intensive  16:19
interest  41:2
interested  59:10
Intermediate  30:15
internal  49:25
interrogatories  8:10,
17, 18  34:16, 20
interrogatory  22:7
investigate  56:12
investigation  14:2
56:13, 20
investigations  32:3
investigative  56:22
investigators  22:23
involve  47:10
involved  12:6  28:12,
19, 20  30:23, 25
31:25  32:2  44:25
iPad  7:5
issue  49:10
issues  11:4, 6  30:2
items  46:14
its  1:4

< J >
Jail  16:17
Jersey  9:23
job  18:13  28:2
52:21  53:21
join  24:20
joined  17:4
Joseph  1:4  4:9  23:1
30:7  54:20
judicious  7:19

< K >
KALKACH  2:6  3:4
4:6, 8  7:15  10:14, 18,
24  13:8, 13  14:14, 15
19:19  20:1, 15, 20
21:13, 17  22:13, 16
24:16  26:14  27:5
28:5, 13, 25  29:3, 23
31:12  34:10, 14, 17,
22  35:2, 4  36:24
37:15  38:2  39:8, 11
44:14  45:7, 10  49:12
51:7, 21  52:11  53:2,
11, 23  54:16  57:22
58:3
Katrina  18:21
keep  9:11, 14  29:13
35:21  53:24  54:4
keeps  45:5
Kemory  18:21
kids  10:3
kill  56:15
kind  11:25  20:13
28:22  29:20  31:17
55:18
King  1:4, 5  4:9
12:17  23:1, 5, 18, 23
24:3, 8, 23  25:5, 15
26:5, 6, 16, 17, 21
27:4  30:7  31:23
32:6, 8, 15, 18  33:11,
13  38:15  54:20
55:25  56:14  57:5
King's  13:4  23:25
28:3  33:11  54:22
knew  23:2  30:22
31:22  34:24
know  8:9  9:8, 10
10:21, 22, 25  11:3, 4,
10, 23  12:13  13:15
16:8  19:3, 4  20:3, 7,
24  21:4, 20, 22  22:14
23:1, 4, 18, 20  24:10,
12, 25  25:9  26:18
27:13, 17  29:10, 11
31:19  33:22  34:11,
24  36:12  41:25  42:4
45:11, 15  46:15  47:6,
11, 12  48:11  49:9, 17,

19  52:12, 13, 20  53:6,
15  54:2, 11  55:6, 25
56:22, 24  57:3, 5, 11,
15
knowing  25:10
knowledge  18:22
22:19  33:17  34:6
38:24  53:21  59:5
known  23:5

< L >
large  32:25
larger  53:6
largest  18:12  52:18
Lauri  18:20
law  4:8
lawsuit  11:8, 16
19:12, 15, 17  21:3
22:4, 24
lead  37:12  53:18
leading  16:3  33:11
learn  36:6  54:22
left  19:7
legislation  47:23
Leonard  9:9
letter  29:18  30:6
32:17
letters  11:3, 10  29:5,
7, 13, 24  30:1
level  26:8  36:2  38:9,
11, 12, 14, 17  39:25
40:2, 7, 11, 14, 16, 18,
22  41:1, 7, 12, 13, 20
42:4, 10, 19, 20, 21
43:9, 10, 14, 16, 18, 22,
23, 25  44:4  46:11
47:18
levels  38:11  39:13,
14, 18, 19, 21  42:22
Lewis  16:19
Liberal  15:9, 19
license  16:1
licenses  15:25
licensing  15:3
life  10:23  11:11
23:25  28:3  41:25
43:12  54:20
limit  16:4  37:24
limited  33:17  34:8

47:18  52:10  56:16
LINE  61:4
listen  32:10
little  25:24  29:11
35:2  57:24
live  32:25  48:1
LLP  2:5
located  17:8
location  56:24
lock  55:23
log  53:24  54:5, 8, 14,
15
logbook  54:2
long  43:18  50:4
longer  47:23
look  37:5, 10  46:17
looked  53:16
looking  7:21  12:14,
15  29:9, 10  43:6
46:15
looks  22:3
Lori  18:21
lot  24:23  29:8
33:23  40:17  44:24
53:7  56:13
lower  43:14
lowered  26:22

< M >
Madison  2:5
main  36:9  51:11
maintaining  47:1
majority  41:21
manager  16:19
mandatory  45:3
Margaret  8:22, 25
marked  19:23  20:25
21:16, 25
MARKS  2:19
marriage  26:11, 16,
18
married  9:24
Master  16:1
Master's  15:4  16:21
match  26:2
maximum  32:21
McPike  17:1
mean  7:24  10:20
15:6  25:16  36:8

44:*3*
**means** 6:*1*
**medical** 38:*11* 42:*20*
**medications** 5:*20*
30:*3* 35:*16* 40:*6, 10,*
*13*
**medium-correctional**
32:*24*
**medium-security**
23:*8* 47:*25*
**meet** 8:*13* 23:*4, 6*
24:*24* 25:*3* 27:*19, 20*
42:*24*
**meeting** 14:*10* 23:*3*
24:*18, 22* 27:*9, 15*
28:*1*
**meetings** 27:*6, 23*
**members** 10:*17*
**memorialize** 27:*23*
**Mental** 8:*25* 12:*4, 25*
13:*17, 19* 16:*5, 14, 20,*
*22* 17:*2, 4, 7* 18:*12*
23:*2* 24:*14* 25:*18, 19,*
*25* 26:*2, 3, 7, 21* 28:*9*
29:*20, 25* 30:*2* 38:*8,*
*12, 13, 14, 16, 18, 22*
39:*14* 40:*1, 5, 8, 12,*
*14, 17* 41:*3, 7, 20*
42:*10, 20* 43:*9, 13, 21*
44:*2, 4, 7, 17* 48:*15,*
*17, 19, 21* 49:*3, 19, 25*
50:*1* 51:*13* 52:*19*
53:*3, 8, 17* 54:*7*
57:*10*
**Merritt** 4:*12*
**message** 7:*13*
**met** 8:*15* 23:*10, 22*
24:*17* 27:*3, 13*
**MEYERS** 1:*13, 17*
3:*3* 4:*2, 7, 12, 14* 7:*9*
19:*20, 22* 21:*14, 18*
22:*11, 17* 29:*4* 39:*12*
52:*4* 60:*3, 12*
**Mid-State** 5:*4, 5, 8*
12:*7, 9* 17:*6, 19* 18:*6,*
*12* 23:*6, 16* 28:*3, 15*
31:*2, 6* 32:*25* 33:*2,*
*20* 38:*18* 39:*4* 40:*17*
41:*21* 43:*21, 23* 52:*4,*

*9, 18* 56:*11*
**mind** 36:*21*
**minimum** 41:*19, 23*
49:*18* 50:*16*
**minor** 40:*5, 8*
**minute** 20:*6* 21:*19*
45:*7*
**minutes** 50:*6, 9, 16*
**mobile** 7:*18*
**moment** 20:*2*
**monitor** 45:*25*
**monitored** 28:*17*
48:*9*
**month** 18:*1* 41:*23*
**months** 16:*16* 17:*18*
21:*12* 41:*24*
**morning** 4:*7*
**move** 26:*8* 52:*22*

< N >
**name** 4:*7, 10* 9:*5, 7*
10:*16* 14:*4* 18:*23*
**named** 30:*12*
**names** 9:*16* 10:*7*
**NAPPI** 2:*7* 14:*7*
19:*21* 28:*24* 52:*22*
**nature** 4:*25* 30:*16*
50:*7, 18*
**nearby** 7:*24* 13:*7*
**NECESSARILY** 2:*19*
22:*18* 44:*2*
**need** 6:*13, 16* 7:*10*
10:*22* 19:*4* 20:*3, 4,*
*23* 21:*22* 31:*20* 39:*8*
42:*8* 48:*25* 56:*4*
**needed** 36:*2* 48:*20*
**needs** 20:*9* 25:*25*
26:*3* 36:*12* 37:*14*
42:*24* 43:*5, 9* 44:*2*
47:*17*
**never** 32:*11*
**NEW** 1:*1* 2:*6, 10, 12*
4:*12, 13* 9:*23* 12:*4*
17:*12, 16* 26:*8* 45:*5,*
*17* 49:*24*
**nodding** 6:*5*
**noises** 7:*16*
**normal** 55:*11* 56:*22*
**Normally** 27:*6, 10*

**NORTHERN** 1:*1*
**Notary** 60:*19*
**note** 27:*16, 17, 18*
44:*20*
**noted** 25:*6* 60:*7*
**notes** 9:*11* 27:*7, 15,*
*21* 45:*8* 57:*22*
**notified** 48:*13, 17*
57:*11, 14*
**notifying** 57:*12*
**November** 54:*18*
**Number** 3:*7* 5:*12*
18:*20, 24* 33:*3* 44:*5*
46:*23* 47:*11* 51:*19*
52:*10, 19* 53:*16*
**numbered** 1:*18*
**numbers** 53:*7*
**numerous** 44:*25*
**nursing** 28:*22*

< O >
**Oasis** 16:*24*
**oath** 5:*14, 17*
**object** 6:*20* 10:*8*
**Objection** 24:*9*
26:*12, 24* 28:*4* 29:*22*
31:*10* 36:*20* 37:*3, 19*
44:*11* 47:*21* 49:*7*
51:*5, 16* 52:*22* 53:*5,*
*14* 54:*9* 57:*18*
**Observation** 34:*20*
35:*10, 24*
**observe** 47:*15*
**obtain** 42:*13*
**obtained** 16:*21*
**occasion** 45:*21*
**occur** 51:*18* 52:*14*
**occurred** 5:*2* 33:*19,*
*20* 51:*24* 56:*7*
**occurring** 17:*2*
**offer** 19:*19* 21:*14*
**OFFICE** 2:*10* 8:*25*
12:*4* 16:*4, 22, 24*
17:*4, 7, 8, 18* 38:*13*
44:*6, 17* 48:*15, 17, 21*
49:*25* 50:*1* 51:*12*
53:*16* 54:*7* 57:*9*
**officer** 45:*24, 25*
**official** 51:*3*
**Oh** 34:*19, 22*

**okay** 4:*21* 5:*10, 14,*
*20, 25* 6:*19* 7:*4, 9, 14,*
*25* 8:*13, 18* 9:*3, 11*
11:*13, 19* 13:*10, 11,*
*22* 14:*14, 16, 22*
15:*25* 16:*2, 10* 18:*3*
19:*12, 19* 20:*5, 6, 21,*
*22, 23* 21:*2, 5, 13, 18,*
*21* 22:*5, 13* 23:*1, 13*
25:*8* 26:*4, 20* 28:*14*
29:*13* 30:*9, 13, 23*
31:*3, 22* 32:*4, 14*
33:*1, 13, 18* 35:*1, 23*
36:*17* 39:*9, 12, 15, 19*
41:*5, 16* 44:*8* 46:*21*
48:*13* 49:*23* 50:*4*
51:*14, 22* 52:*8* 53:*1*
56:*14* 57:*16, 22*
**old** 10:*5*
**older** 45:*16*
**OMH** 14:*1* 54:*10*
**OMRDD** 16:*23*
**Once** 4:*20, 21* 23:*4,*
*11* 41:*23* 44:*24*
49:*18* 50:*9* 56:*10*
**ones** 14:*20* 39:*16*
**one-to-one** 47:*25*
54:*3, 13*
**ongoing** 53:*20*
**open** 6:*16* 23:*2*
24:*11, 14* 25:*16, 18,*
*19* 40:*1, 4, 5* 48:*2*
53:*8*
**opened** 28:*10*
**operations** 18:*14*
**opinion** 37:*16*
**opposed** 6:*5* 12:*10*
**OPPW** 16:*23*
**option** 47:*7*
**order** 22:*15* 42:*1*
46:*15*
**originally** 20:*18*
**outpatient** 17:*9*
**outside** 55:*11*
**oversee** 18:*13*

< P >
**PAGE** 3:*2* 61:*4*
**pages** 20:*4, 13* 60:*4*
**paid** 49:*23*

**Palladino** 23:5, *11, 15*
24:*10, 17, 20* 27:4, *16*
**paper** 7:22
**parole** 48:*11, 14, 18,
20, 22* 49:2
**part** 14:25 15:*16*
29:*14, 15, 16* 36:3
38:7 44:7 48:18
**participate** 22:5, *17*
**participated** 22:*14*
28:17
**particularly** 53:*19*
**parties** 59:8
**party** 11:*16*
**passed** 9:6 55:20
**passing** 13:5, *21*
**patient** 31:*16, 17*
**patient's** 29:*18*
**pending** 52:24
**people** 17:*1* 18:*24*
23:7, *8* 24:*14, 23*
28:9 29:9 30:*12*
31:*24* 32:*21, 25* 33:5,
*7* 35:9, *19* 42:9
43:23, *24* 45:18, *21*
46:*10, 12* 48:4 52:*19*
53:*8* 56:*11*
**people's** 28:*17, 18*
**percent** 53:*8, 9*
**perception** 26:*18*
**Perfect** 20:2 21:*23*
**performance** 28:*17,
18, 20*
**period** 16:*13* 35:22
37:22 51:24
**Periodically** 11:*2*
31:7
**person** 9:9 13:*18*
27:*10* 43:*14* 44:5
49:2 54:5
**personal** 10:9
**perspective** 29:*12*
**phone** 7:5, *20* 8:*14*
22:20 55:*1*
**phones** 7:*10*
**physical** 46:3
**physically** 45:*19*
55:22 56:2

**Place** 4:*12* 33:5
40:24 47:24 48:*1, 6,
7*
**placed** 46:7, *16, 19*
48:4
**places** 36:9
**Plaintiff** 1:5 2:4 4:9
**play** 44:7
**please** 4:*10* 6:*13*
7:4 8:24 9:7 18:4
20:2 21:*13, 18, 20*
25:24 28:16 39:12
**point** 18:*15* 26:3
43:*1*
**policies** 24:2 27:*21*
31:*19* 34:*11* 36:6, *8,
11, 12, 13* 44:9, *12*
53:*12, 19* 57:20
**policy** 24:25 25:2
34:*1, 13* 36:*14, 15, 16*
53:18
**pop** 14:5
**pops** 14:*4*
**population** 41:*25*
**portion** 50:5
**position** 16:3 17:*21,
23* 18:3
**possible** 4:*16*
**potential** 44:8, *15*
46:*18, 22*
**potentially** 44:6
46:*19* 49:9
**practice** 37:*17*
**preparation** 12:*16*
**prepare** 8:7
**preparing** 9:2
**prescriber** 36:3 38:6
41:*10, 23* 42:3, *6*
43:2
**Prescribers** 28:22
**present** 46:*13*
**presenting** 37:*13*
**pretty** 18:*13* 44:*19*
55:4
**prevent** 53:22 57:*17*
**prevention** 45:2
49:*14, 21* 50:*1, 2, 5, 8,
13*
**previously** 36:*15, 25*

**primary** 24:*2*
**print** 36:*12, 15*
**prior** 21:8
**prison** 31:25 42:*17*
48:25 51:*10, 15, 24*
**prisons** 44:*17*
**private** 33:8
**probably** 7:*19* 21:*12*
37:23 50:*16* 55:5, *8*
**problems** 24:7 37:*13*
**procedure** 13:*20*
24:25 25:2 57:9
**procedures** 24:3
31:*19* 36:8 56:23
57:20
**process** 8:23 9:*1*
42:4
**produced** 14:9
**Professional** 1:*20*
15:15 59:2
**program** 7:7 15:3,
*12* 16:25 17:22
18:*19* 19:8 30:*15*
34:8 35:8, *18* 36:5
37:5 38:*1, 5, 25*
40:23 46:3
**Programs** 17:*18*
**progress** 42:*10*
**projected** 44:*1, 2*
**promote** 49:3
**promotion** 19:*11*
**prompted** 24:*19*
**pronounced** 57:8
**pronouncing** 8:*10*
**propounded** 60:6
**Prosequendum** 1:5
**provide** 26:*17* 34:*15*
45:25
**provided** 24:4 35:20
44:*12* 45:6 47:25
**providers** 27:8
**provides** 50:2
**providing** 45:*1*
**psychiatric** 16:*17*
17:*12, 16* 33:4 35:*15*
**psychotropic** 40:9
**Public** 60:*19*
**pull** 21:*15*
**purpose** 50:*19*

**purposes** 48:22
**put** 7:*18* 19:*21*

**< Q >**
**question** 5:23, *25*
6:*1, 2, 16, 20, 22*
26:*13* 31:*11* 52:23
**questionnaire** 42:*12*
**questions** 29:8 56:*11*
57:23 58:3, *6* 60:5
**quick** 13:8 39:8
**QUOTATION** 2:*19*
**QUOTE** 2:*19*

**< R >**
**range** 33:6
**rare** 27:25
**RCTP** 12:23 34:*20*
35:25 36:*10* 37:*12,
20, 22* 38:7 45:*20*
46:5, *20* 47:24 53:25
54:3
**reached** 53:7
**read** 20:*12* 45:7
60:3
**readily** 41:*4*
**ready** 40:*25*
**real** 33:25
**really** 10:9 13:8
56:13
**Realtime** 1:*21* 33:*20*
**reason** 19:7 24:*18*
31:*14* 39:23 47:*19*
**reasons** 35:9, *11, 17*
37:6 43:7 48:5
51:*19*
**recall** 11:*20* 13:*18,
24* 18:2 20:5 23:3,
14, 24* 24:*10, 22* 25:4
27:2, *3* 30:8 32:*7, 19*
33:22 38:21 39:7
54:*19, 21, 24* 55:*1, 16*
56:2, *19* 57:*1, 2, 4, 6*
**receive** 30:*1, 6* 32:*17*
40:9 44:*16, 21* 49:*13,
16, 17*
**received** 12:9, *17*
29:5 30:4
**receiving** 37:22

38:*17*
**reception** 42:*15, 18*
**Recess** 13:*12* 29:*2*
39:*10* 58:*2*
**recognize** 20:*24* 21:*2,*
*24*
**recognizes** 21:*23*
**recollection** 23:*12*
26:*6* 30:*14, 18, 20*
56:*16, 25*
**recommend** 48:*23*
**record** 4:*11* 22:*9*
29:*15, 16, 18* 55:*19*
58:*7* 59:*5*
**recorded** 22:*22*
**reference** 32:*8*
**referenced** 11:*17*
12:*5* 25:*13* 38:*4*
**referral** 47:*17*
**referred** 32:*22* 34:*13*
**referring** 34:*12*
**REFLECT** 2:*19*
27:*18* 42:*10* 53:*20*
**reflected** 33:*15*
**reflects** 27:*18*
**regarding** 26:*5*
30:*10* 34:*1*
**Regardless** 47:*14*
50:*11* 51:*17*
**regards** 11:*17* 12:*17*
**REGIONAL** 2:*10*
**Registered** 1:*20* 59:*2*
**regular** 49:*17*
**rehabilitation** 16:*25*
**related** 22:*23* 30:*2, 3*
39:*16* 53:*3* 54:*6*
**relative** 59:*8*
**relatively** 40:*7*
**released** 48:*24*
**relevance** 10:*12*
**remember** 9:*5* 13:*2*
15:*19* 18:*23* 19:*17*
23:*10* 25:*2* 56:*9*
**REMOTE** 1:*13, 17*
**remotely** 2:*2*
**removed** 48:*9*
**repeat** 5:*24* 8:*24*
18:*4*
**rephrase** 5:*24*
**rephrasing** 31:*13*

**report** 18:*16, 18*
42:*12*
**reported** 18:*19, 24*
59:*3*
**Reporter** 1:*20, 21*
6:*6, 10* 59:*3*
**reporters** 22:*23*
**reports** 27:*22*
**represents** 4:*9*
**request** 48:*21*
**Residential** 34:*7*
35:*7, 18* 36:*4* 37:*5,*
*25* 38:*5, 23, 25* 46:*3*
**resources** 26:*2* 40:*18,*
*24* 43:*13*
**response** 8:*9* 12:*24*
29:*18* 52:*23*
**responsibilities** 18:*11*
**responsible** 24:*5*
**result** 35:*12* 55:*20*
**Retardation** 16:*22*
**returned** 17:*16*
**review** 8:*15* 20:*2, 6*
21:*8, 19* 54:*13* 57:*22*
**reviewed** 21:*9, 10, 11*
**reviewing** 21:*20*
**right** 1:*5* 8:*10* 13:*6*
14:*3, 6* 16:*8* 17:*23*
18:*4* 23:*1* 28:*2*
36:*18* 37:*1*
**rights** 35:*21* 36:*17,*
*22*
**risk** 44:*19* 46:*13, 18*
47:*9* 51:*4*
**role** 23:*25* 24:*2*
31:*4* 57:*19*
**room** 7:*25*
**rooms** 33:*8*
**ROSE** 2:*5*
**RPR** 59:*15*
**rules** 4:*15*
**run** 4:*16* 52:*2*

**< S >**
**safe** 35:*22* 48:*1*
**safely** 55:*24*
**safest** 48:*6*
**safety** 48:*10*
**satellite** 18:*12* 38:*16*

43:*22* 52:*18*
**saw** 27:*16*
**says** 7:*1*
**scene** 55:*15, 16, 18*
**scene-scene** 55:*17*
**Schatzel** 18:*21*
**SCHIRRIPA** 2:*5*
**School** 14:*22* 15:*16*
16:*12*
**scratch** 33:*3*
**screen** 7:*7* 19:*22*
43:*2*
**screened** 40:*2*
**screening** 42:*13* 43:*3*
**scroll** 20:*8, 10, 13, 15*
21:*22*
**search** 8:*12* 12:*12,*
*13* 14:*5, 6, 7, 12*
**searching** 14:*2*
**section** 29:*17*
**secure** 55:*23* 56:*3, 4,*
*11*
**secured** 55:*20* 56:*5*
**security** 38:*11* 42:*19*
**see** 15:*18* 19:*22, 24*
39:*24* 41:*18, 22* 42:*6,*
*25* 47:*16* 49:*4* 53:*17*
54:*17* 57:*23*
**seeing** 31:*17* 54:*12*
**seen** 26:*2* 27:*17*
40:*3*
**sees** 47:*6*
**self** 37:*25* 45:*23, 24*
46:*9*
**self-injurious** 35:*13*
37:*21*
**self-injury** 33:*24*
**self-report** 25:*11*
**send** 47:*19*
**sense** 42:*23*
**sent** 12:*17* 13:*15, 16,*
*17, 19* 57:*5*
**sentence** 38:*20*
**separate** 32:*23* 43:*20*
**serious** 33:*24*
**served** 17:*17* 20:*5,*
*18* 21:*3, 7* 41:*22*
**service** 24:*4* 39:*14*
41:*7, 20* 42:*10* 43:*22*

**services** 11:*4* 12:*25*
15:*15* 16:*25* 17:*15*
23:*3* 24:*15* 25:*18, 19*
26:*21* 28:*9, 10* 38:*18*
40:*1, 3, 20, 24* 41:*4*
42:*8, 9* 43:*11* 50:*3*
53:*9*
**setting** 47:*8, 13, 15,*
*23* 51:*18*
**Seymour** 18:*21*
**share** 11:*12* 13:*22*
**shared** 24:*10*
**sharing** 13:*24* 33:*10*
**Sheet** 60:*8*
**Shepherd** 16:*11*
**shoelaces** 33:*14* 34:*1,*
*9* 35:*6* 36:*19, 23*
37:*1, 2, 17, 18* 39:*1, 5*
**shortly** 13:*4*
**short-term** 44:*1*
**showing** 7:*8*
**SHU** 48:*5*
**shut** 7:*4*
**signed** 22:*21*
**significant** 40:*12, 14*
55:*4*
**signs** 41:*13, 14* 47:*4*
**silo** 28:*23*
**similar** 9:*9*
**simply** 6:*14*
**six** 16:*16*
**size** 33:*6*
**skills** 59:*5*
**skip** 39:*23*
**Skynyrd** 9:*9*
**small** 34:*7* 40:*23*
45:*18, 19*
**smaller** 50:*15*
**smoothly** 4:*16*
**so-and-so** 27:*14*
**Social** 14:*23* 15:*4, 17*
16:*1, 17* 17:*5* 23:*16*
**somebody** 41:*1*
43:*12, 15* 47:*14*
49:*10*
**somebody's** 11:*11*
13:*20*
**someone's** 35:*21*
43:*8, 25*
**Someplace** 41:*21*

sorry   8:*24*   15:*22*
19:*21*   25:*9, 22*   26:*12*
27:*1*   34:*4, 19*   51:*23*
52:*25*
sort   42:*12*
Sounds   58:*1*
South   2:*11*
space   48:*2*
speak   31:*3, 8, 9, 22*
32:*5*   33:*10*
speaking   14:*1*   32:*7*
36:*17*
Special   17:*17*   36:*10*
47:*20, 22*
specialist   17:*9*
specific   12:*15*   13:*18*
24:*7*   27:*2*   39:*19*
47:*9*   50:*7*
specifically   25:*4*
specifics   24:*22*
spectrum   40:*8*
spell   9:*7, 8, 10*
spoke   14:*11*   32:*14*
spoken   22:*22*
staff   28:*19, 21, 22*
44:*24*   45:*6*   49:*19*
50:*20*   54:*10*
stamp   14:*3*
Standard   1:*19*   13:*1,*
20   46:*14*
start   17:*23*   19:*1*
40:*11*
started   16:*12*   19:*5*
STATE   2:*10, 11*
4:*10*   7:*20*   12:*4*
14:*23*   15:*13*   18:*13*
26:*9*   49:*19, 24*
statement   32:*17*
statements   22:*21, 22*
STATES   1:*1*
stats   52:*1*
status   26:*10*   46:*20*
47:*24*   53:*25*   54:*3*
stay   48:*2*   49:*2*
step   22:*3*
Street   2:*11*
stressed   47:*12*
strike   52:*22*
Studies   15:*15*
stuff   48:*3*

subject   11:*7, 13*
50:*11*
submit   41:*12*
Suboxone   25:*5, 13*
Subscribed   59:*11*
60:*14*
Substance   16:*24*   60:*7*
successful   13:*1*
successfully   12:*10*
sued   30:*10*
suffering   26:*11, 16, 19*
suicide   5:*2, 9*   12:*11*
13:*1*   30:*10, 13, 17*
31:*24*   32:*4*   33:*11, 14,*
24   36:*25*   37:*18, 21*
38:*25*   39:*4*   44:*8, 15,*
17, 19, 25   45:*2, 11, 12,*
15   46:*6, 7, 16, 18, 22*
47:*7*   49:*14, 20*   50:*1,*
2, 5, 8, 13   51:*4*   53:*15,*
19, 22, 24   54:*8, 22*
55:*5, 21*   56:*7, 21, 24*
57:*7, 17*
suicides   51:*14, 17, 19,*
23   52:*10*
Suite   2:*11*
Sullivan   30:*14*   31:*1,*
2
SUNY   15:*24*
support   49:*10*
supports   48:*25*
supposed   56:*23*
sure   10:*9*   14:*10*
18:*2*   22:*4*   26:*1*   28:*8*
29:*1*   31:*10*   55:*19*
56:*5*
switch   20:*4*   41:*5*
switched   42:*1*
sworn   4:*4*   59:*11*
60:*14*
symptoms   47:*5*
SYRACUSE   2:*10, 12*
17:*8*
system   42:*17*   51:*10*
52:*7*

< T >
take   5:*18*   6:*6, 17*
13:*8*   20:*2, 6*   21:*18*

27:*7*   28:*24*   39:*8*
43:*18*
taken   1:*17*   13:*12*
29:*2*   39:*10*   56:*6*
57:*7*   58:*2*   59:*11*
talk   6:*9*   19:*12, 14*
27:*20*   31:*14*   32:*11*
talked   39:*1*   43:*8*
team   36:*4*   37:*23*
38:*3, 7*   41:*11*
tech   19:*21*   20:*3, 9, 10*
tell   15:*23*   28:*16*
telling   31:*18*
term   45:*16, 17*
terms   12:*3*
tested   25:*11*
testified   4:*4, 22*   29:*4*
30:*9*
testify   5:*21*
testimony   8:*4*
Thank   4:*14*   14:*14*
19:*24*   21:*23*   22:*21*
35:*3*   58:*3, 5*
therapist   24:*24*
27:*11, 13*   31:*16, 18*
41:*6, 9, 22*   42:*3*   43:*2*
49:*9*
therapists   41:*18*
therapy   26:*17*   40:*21*
thing   6:*15*   8:*11*   13:*1*
things   24:*12*   27:*2*
29:*8*   33:*4*   43:*6, 20*
46:*17, 19, 21, 23, 24*
47:*12*   49:*22*   56:*10*
think   9:*9*   10:*10*
12:*8*   17:*25*   18:*24*
20:*9, 23*   22:*1*   26:*12*
34:*19*   36:*18*   37:*1*
46:*24*   52:*3*   54:*23*
thought   12:*5*   26:*16*
three   16:*18*   17:*13*
21:*12*   38:*10*   40:*3*
41:*24*   52:*17*   53:*6*
Time   1:*19*   6:*13*
14:*25*   15:*16*   16:*13*
21:*4, 11*   23:*9, 22*
26:*3*   27:*3*   31:*1*
32:*14*   33:*25*   35:*22*
36:*11*   37:*4, 6, 22, 25*
43:*15*   44:*20*   46:*13*

47:*5, 6, 18*   50:*15*
51:*24*   53:*9*   55:*3*
timely   57:*14*
times   4:*19*   6:*19*
23:*7*   24:*23*   26:*9*
29:*8*   35:*13*   40:*3*
47:*4*   51:*11*
today   4:*16*   5:*15, 21*
6:*13, 19*   7:*8*   9:*2*
21:*8*
today's   8:*7, 20*
told   9:*3*   12:*12*
13:*14*   28:*14*
track   45:*5*
train   49:*18*
training   44:*16, 21*
45:*4*   49:*13, 20, 23*
50:*1, 2, 4, 6, 7, 8, 11,*
12, 14, 19, 21, 24, 25
trainings   44:*25*   45:*3,*
5   49:*21*   51:*1*
transcript   59:*4*
transcription   60:*5*
transfer   43:*4, 19*
44:*4*
transferred   30:*22*
31:*2*   39:*2, 6*   44:*3, 6*
51:*11*
treating   27:*8*
treatment   17:*1, 9*
28:*11*   33:*5*   34:*8*
35:*7, 18*   36:*4*   37:*5,*
12, 23   38:*1, 5, 7, 25*
40:*23*   41:*11*   42:*11*
46:*3*   48:*23*   49:*3*
trends   53:*17*
trial   4:*22*
tried   33:*13*   36:*25*
37:*17*
true   59:*4*
truthfully   5:*21*
try   6:*9*   14:*3*   31:*13*
47:*15*   49:*2*
trying   12:*8*   14:*6*
28:*8*   50:*19*
turn   7:*19*
two   15:*13*   17:*6*
52:*17*
two-year   15:*9, 12, 13*

Case 9:20-cv-01413-TJM-ML   Document 79-5   Filed 03/31/23   Page 31 of 38

Deposition of Hal Meyers                                                    Estate of Joseph P. King v. Ward, et al.

type 40:*9*  46:*24*
types  48:*25*

**< U >**
uncommon  24:*13*
25:*17*  57:6
understand  5:*14, 23*
22:*13*  23:*10*  27:21
28:7  31:*10*  34:22
39:*3*  42:2
understanding  6:*3*
26:4  54:4
understood  6:*2, 7, 23*
26:*13*
unfortunately  5:*8*
51:*17*  55:20
Unit  12:*25*  17:*11, 17,
19, 20*  18:7, *9, 13*
19:*8*  27:*13*  33:23
34:7  38:*16, 22*  41:*12,
15, 16*  43:22  47:*20,
22*  52:*18*  55:*19, 24*
57:*1*
UNITED  1:*1*  16:*14,
16*
units  36:*10*
University  14:*22, 23*
15:*14*
use  47:2  56:*18*
usually  45:*24*  49:*20*
Utica  17:*1*
Utica-Rome  15:*14, 24*

**< V >**
validation  31:*17*
Van  9:*6, 8*  11:*18*
12:*9*  30:*10, 23*
vantage  18:*14*
varies  49:*8*
variety  35:*9, 17*
46:*12*  51:*19*
vary  50:*18*  51:*20*
verbal  6:*4*  40:*21*
verify  36:*14*
viable  47:7
vibrate  7:*11*
VIDEO  1:*13, 17*
violate  35:*21*
violation  32:*9*  36:*21*

volume  7:*18*

**< W >**
walk  16:*2*
Walter  4:*12*
want  13:*15*  16:*6, 8*
20:*12, 24*  22:*14*
24:*15*  26:*21, 23*
35:*20, 21*  42:*3*
wanted  11:*12*  12:*16*
31:*17*  34:*23, 24*  44:*3*
WARD  1:*5*
watch  7:*5*  45:*11, 12,
15, 22*  46:*4, 6, 7, 16,
20*  47:*25*  54:*4, 8, 13*
water  45:*9*
way  8:*4*  25:*10*
27:*24*  42:*11*  56:*5*
ways  44:*18*
weave  44:*18*
week  33:*11*
weekend  55:*12*
Well  7:*18*  12:*3*  42:*9*
43:*15*  46:*6*
well-controlled  40:*15*
went  14:*22, 25*  15:*4,
13*  55:*2, 16*
we're  50:*19*  51:*1*
we've  41:*1*
wide  41:*3*
Williams  1:*20*  59:*2,
15*
withdrawn  47:*2*
WITNESS  3:*2*  4:*3*
7:*12*  11:*25*  12:*2*
13:*11*  45:*9*  52:*6, 9,
25*  58:*5*
word  14:*5*
words  6:*6*
work  9:*14*  14:*23*
15:*4*  16:*1, 17*  19:*7,
13*  28:*20*  39:*13*
50:*22, 23, 25*  55:*2*
workday  9:*11*
worked  15:*15*  16:*9,
10, 14, 16, 18, 22, 23,
24, 25*  17:*5, 7, 14*
worker  15:*17*  16:*15*
17:*5*  23:*16*

working  12:*3*  18:*3, 5,
6*  19:*1, 2*  43:*1*
works  5:*11*  44:*16*
worried  25:*15*
worse  47:*5*
write  11:*3*  54:*14*
writes  44:*20*
writing  6:*10*

**< Y >**
YAMILE  2:*6*  4:*7*
Yeah  10:*20*  14:*10*
20:*15*  22:*19*  28:*6*
30:*5*
year  11:*19*  15:*13*
17:*14*  44:*24*  49:*18*
50:*9*  51:*1, 19, 25*
52:*3*
years  5:*12*  11:*21, 24*
16:*18*  17:*6, 10, 13, 21*
18:*7, 9, 20, 25*  19:*3*
33:*3*  52:*9, 17*  53:*7*
Yep  8:*19*
YORK  1:*1*  2:*6, 10,
12*  4:*13*  12:*4*  17:*12,
16*  26:*8*  45:*5*  49:*24*

**< Z >**
Zant  9:*6, 8*  11:*18*
12:*9*  30:*10, 24*
Zoom  7:*7*

Deposition of Hal Meyers

Estate of Joseph P. King v. Ward, et al.

## WORD LIST

**< 1 >**
**1** *(8)*
**10** *(10)*
**10:05** *(1)*
**10016** *(1)*
**10-minute** *(1)*
**10th** *(1)*
**11:51** *(1)*
**112** *(1)*
**13202** *(1)*
**13413** *(1)*
**15** *(3)*
**16** *(1)*
**18** *(2)*
**19** *(3)*
**1960** *(1)*
**1979** *(1)*
**1982** *(1)*
**1984** *(1)*
**1985** *(1)*
**1990** *(3)*
**1996** *(1)*
**1998** *(1)*
**1s** *(1)*

**< 2 >**
**2** *(3)*
**20** *(3)*
**2009** *(1)*
**2013** *(1)*
**2018** *(2)*
**2019** *(2)*
**2022** *(4)*
**20-CV-01413** *(1)*
**21** *(1)*
**23** *(2)*
**23rd** *(1)*
**29** *(1)*
**2s** *(1)*

**< 3 >**
**3** *(3)*
**30** *(1)*
**300** *(2)*
**31** *(1)*
**3s** *(1)*

**< 4 >**
**4** *(5)*
**4:30** *(1)*
**4s** *(1)*

**< 5 >**
**5** *(1)*
**50** *(2)*

**< 6 >**
**6** *(5)*

**< 7 >**
**7** *(2)*

**< 8 >**
**8** *(1)*
**800** *(1)*
**81** *(1)*

**< A >**
**a.m** *(2)*
**ability** *(2)*
**able** *(1)*
**above-styled** *(1)*
**Abuse** *(1)*
**access** *(1)*
**accommodate** *(1)*
**accurate** *(1)*
**ACKNOWLEDGMENT** *(1)*
**ACTION** *(4)*
**active** *(2)*
**actual** *(1)*
**ad** *(1)*
**addiction** *(1)*
**addictions** *(1)*
**additional** *(1)*
**address** *(2)*
**Adirondack** *(1)*
**administrative** *(3)*
**Administrator** *(4)*
**admission** *(1)*
**admits** *(1)*
**admitted** *(3)*
**affect** *(2)*
**AG** *(1)*
**ago** *(5)*
**ahead** *(10)*

**ahold** *(2)*
**AIMEE** *(1)*
**al** *(1)*
**Albany** *(3)*
**alcohol** *(2)*
**allow** *(1)*
**allows** *(1)*
**Amended** *(3)*
**amenities** *(3)*
**amount** *(2)*
**Amy** *(1)*
**Answer** *(19)*
**answers** *(3)*
**anybody** *(1)*
**appear** *(1)*
**appearing** *(1)*
**appears** *(1)*
**Apple** *(1)*
**approaching** *(1)*
**appropriate** *(3)*
**approximate** *(1)*
**Approximately** *(13)*
**approximation** *(2)*
**April** *(1)*
**area** *(2)*
**arranged** *(1)*
**array** *(1)*
**Arts** *(2)*
**Aside** *(1)*
**asked** *(3)*
**asking** *(1)*
**aspects** *(1)*
**assessing** *(1)*
**assigned** *(2)*
**assistant** *(2)*
**assisted** *(1)*
**associated** *(1)*
**assume** *(1)*
**assuming** *(1)*
**attached** *(2)*
**attempt** *(4)*
**attend** *(2)*
**attending** *(1)*
**ATTORNEY** *(5)*
**attorneys** *(2)*
**Auburn** *(1)*
**available** *(1)*
**Avenue** *(1)*
**aware** *(25)*

**< B >**
**Bachelor's** *(1)*
**back** *(2)*
**background** *(2)*
**based** *(8)*
**basically** *(4)*
**basis** *(4)*
**Bates** *(1)*
**bathroom** *(1)*
**Beds** *(1)*
**beginning** *(1)*
**behalf** *(2)*
**behaviors** *(2)*
**believe** *(6)*
**benefited** *(1)*
**Benjamin** *(2)*
**best** *(10)*
**beyond** *(1)*
**birthdate** *(1)*
**bit** *(2)*
**board** *(2)*
**born** *(3)*
**box** *(1)*
**break** *(6)*
**briefly** *(2)*
**Building** *(1)*
**buildings** *(1)*
**built** *(1)*
**business** *(1)*

**< C >**
**call** *(3)*
**called** *(6)*
**calls** *(1)*
**Camden** *(1)*
**Captioner** *(1)*
**care** *(17)*
**case** *(14)*
**caseload** *(3)*
**cases** *(2)*
**cause** *(1)*
**CC'd** *(5)*
**cell** *(3)*
**cells** *(5)*
**Center** *(6)*
**Central** *(3)*
**certain** *(3)*
**CERTIFICATE** *(1)*

certification *(1)*
Certified *(2)*
certify *(3)*
cetera *(3)*
chance *(1)*
change *(8)*
CHANGE/REASON *(1)*
changed *(1)*
changes *(6)*
changing *(1)*
chart *(4)*
checking *(1)*
CHEVERIE *(1)*
chief *(14)*
children *(3)*
choice *(1)*
chronic *(1)*
circumstances *(5)*
CIVIL *(1)*
CLARITY *(1)*
clinic *(4)*
clinical *(6)*
clinically *(2)*
clinician *(3)*
close *(1)*
closed *(1)*
closer *(1)*
clothing *(1)*
college *(4)*
colleges *(1)*
come *(2)*
comes *(1)*
coming *(1)*
commander *(2)*
commencing *(1)*
commission *(1)*
commissioner *(1)*
commissioners *(1)*
commit *(4)*
commits *(1)*
committed *(3)*
committing *(1)*
common *(2)*
commonly *(1)*
Community *(10)*
compare *(3)*
Complaint *(4)*
complaints *(6)*

completed *(1)*
completes *(1)*
compliance *(1)*
computers *(1)*
concern *(8)*
concerns *(13)*
concluded *(1)*
conditions *(2)*
confidentiality *(1)*
conflicts *(1)*
conjunction *(3)*
connected *(1)*
connection *(1)*
consequence *(1)*
considered *(4)*
constantly *(1)*
contact *(1)*
contained *(1)*
context *(1)*
continuity *(1)*
contrast *(4)*
contributed *(1)*
control *(1)*
conventions *(1)*
conversation *(2)*
convicted *(1)*
coordinate *(1)*
coordinator *(3)*
copy *(1)*
Correct *(5)*
correctional *(25)*
corrections *(4)*
correspondence *(1)*
counsel *(7)*
County *(4)*
COURT *(5)*
courtroom *(1)*
cover *(1)*
COWAN *(46)*
crime *(2)*
crisis *(11)*
Cristina *(1)*
CRR *(1)*
cubicles *(1)*
current *(8)*
currently *(3)*

< D >
daily *(2)*

danger *(5)*
date *(4)*
day *(3)*
day-to-day *(1)*
dealt *(1)*
death *(3)*
debts *(1)*
decide *(1)*
decides *(2)*
decision *(1)*
decompensation *(1)*
Defendant *(3)*
Defendants *(1)*
definitely *(1)*
degree *(5)*
delegated *(1)*
demand *(1)*
demonstrated *(1)*
Department *(5)*
depended *(1)*
Depending *(4)*
depends *(3)*
DEPONENT *(1)*
deposed *(4)*
DEPOSITION *(8)*
depression *(1)*
depriving *(1)*
details *(1)*
determination *(3)*
determinations *(1)*
determine *(8)*
determined *(2)*
determines *(1)*
determining *(1)*
develop *(1)*
devices *(2)*
diagnosis *(1)*
diary *(1)*
different *(11)*
difficulties *(1)*
DIRECT *(3)*
directed *(1)*
directing *(1)*
directives *(1)*
directly *(3)*
directs *(1)*
disciplinary *(4)*
discovered *(1)*
discuss *(1)*

discussed *(2)*
disorders *(1)*
distracting *(1)*
DISTRICT *(2)*
disturbed *(1)*
Division *(1)*
Divorced *(2)*
DOCCS *(22)*
document *(18)*
documents *(6)*
doing *(4)*
dorm *(3)*
Dormitory *(1)*
dorms *(3)*
draft *(2)*
drafted *(2)*
drafting *(2)*
Drake *(2)*
dropped *(1)*
drove *(1)*
drug *(2)*
drugs *(1)*
duly *(1)*
duties *(2)*

< E >
earlier *(3)*
Eastern *(1)*
Education *(4)*
efforts *(1)*
either *(3)*
electronically *(1)*
element *(1)*
e-mail *(12)*
e-mails *(1)*
emergency *(2)*
emotional *(1)*
emotionally *(1)*
emphasize *(1)*
employee *(2)*
employees *(1)*
employment *(2)*
engaging *(1)*
English *(1)*
ensure *(2)*
enters *(2)*
entities *(2)*
entries *(1)*
environment *(1)*

Case 9:20-cv-01413-TJM-ML   Document 79-5   Filed 03/31/23   Page 34 of 38
Deposition of Hal Meyers
Estate of Joseph P. King v. Ward, et al.

Errata  (2)
ESQUIRE  (3)
essentially  (1)
Estate  (2)
estimation  (1)
et  (4)
evaluate  (1)
evaluation  (2)
evaluations  (3)
event  (2)
events  (1)
evidence  (2)
exact  (1)
Exactly  (3)
Examination  (2)
examined  (1)
example  (1)
examples  (1)
exert  (1)
Exhibit  (12)
existed  (1)
experiencing  (1)
expert  (1)
expires  (1)
explain  (6)
exposed  (1)
extent  (2)

< F >
facilities  (3)
facility  (38)
fact  (2)
factors  (2)
Falls  (1)
familiar  (3)
familiarity  (1)
families  (1)
family  (5)
far  (5)
feel  (1)
field  (1)
figure  (1)
filed  (4)
financially  (1)
find  (4)
finish  (1)
finished  (1)
firm  (1)
first  (2)

five  (1)
Floor  (1)
follow  (2)
followed  (2)
following  (2)
follows  (1)
follow-up  (1)
follow-ups  (1)
foregoing  (2)
Forensic  (4)
form  (3)
formal  (3)
found  (3)
four  (3)
four-year  (1)
FPA  (1)
free  (1)
frequent  (1)
friendships  (1)
front  (2)
full  (3)
fully  (1)
function  (3)
functions  (2)
further  (4)

< G >
gangs  (1)
GENERAL  (4)
Generally  (9)
generate  (1)
generated  (2)
getting  (1)
Gina  (3)
give  (6)
given  (5)
giving  (1)
Glens  (1)
go  (31)
goes  (1)
going  (20)
Good  (5)
grab  (1)
graduate  (2)
graduated  (2)
grievance  (1)
grievances  (1)
ground  (1)
guess  (2)

< H >
HACH  (1)
HAL  (6)
half  (1)
HALT  (1)
hanging  (2)
happen  (2)
happened  (5)
happens  (3)
harming  (2)
Harold  (1)
Hartford  (1)
Health  (67)
hear  (1)
hearing  (3)
help  (3)
helped  (1)
high  (1)
higher  (4)
HILLARY  (1)
historical  (1)
history  (2)
hold  (1)
home  (4)
hope  (1)
hoping  (1)
hospital  (10)
hour  (1)
hours  (3)
House  (1)
housed  (2)
houses  (1)
housing  (5)
Human  (6)
hung  (1)

< I >
idea  (2)
identification  (2)
identified  (1)
II  (2)
illness  (1)
impact  (1)
impacting  (1)
important  (3)
impulsive  (1)
incarcerated  (11)
include  (2)

including  (2)
incorporate  (2)
increase  (1)
increased  (3)
increasing  (1)
indicates  (1)
indication  (2)
indicative  (1)
indicators  (3)
individual  (19)
individually  (1)
individuals  (10)
individual's  (1)
infirmary  (1)
influence  (1)
information  (3)
inmate  (15)
inmates  (11)
inquiry  (1)
instances  (1)
intake  (1)
intensive  (1)
interest  (1)
interested  (1)
Intermediate  (1)
internal  (1)
interrogatories  (5)
interrogatory  (1)
investigate  (1)
investigation  (3)
investigations  (1)
investigative  (1)
investigators  (1)
involve  (1)
involved  (9)
iPad  (1)
issue  (1)
issues  (3)
items  (1)
its  (1)

< J >
Jail  (1)
Jersey  (1)
job  (4)
join  (1)
joined  (1)
Joseph  (5)
judicious  (1)

Deposition of Hal Meyers

Estate of Joseph P. King v. Ward, et al.

**< K >**
**KALKACH** (*53*)
**Katrina** (*1*)
**keep** (*6*)
**keeps** (*1*)
**Kemory** (*1*)
**kids** (*1*)
**kill** (*1*)
**kind** (*6*)
**King** (*32*)
**King's** (*5*)
**knew** (*4*)
**know** (*68*)
**knowing** (*1*)
**knowledge** (*7*)
**known** (*1*)

**< L >**
**large** (*1*)
**larger** (*1*)
**largest** (*3*)
**Lauri** (*1*)
**law** (*1*)
**lawsuit** (*8*)
**lead** (*2*)
**leading** (*2*)
**learn** (*2*)
**left** (*1*)
**legislation** (*1*)
**Leonard** (*1*)
**letter** (*3*)
**letters** (*7*)
**level** (*37*)
**levels** (*7*)
**Lewis** (*1*)
**Liberal** (*2*)
**license** (*1*)
**licenses** (*1*)
**licensing** (*1*)
**life** (*7*)
**limit** (*2*)
**limited** (*5*)
**LINE** (*1*)
**listen** (*1*)
**little** (*4*)
**live** (*2*)
**LLP** (*1*)
**located** (*1*)

**location** (*1*)
**lock** (*1*)
**log** (*6*)
**logbook** (*1*)
**long** (*2*)
**longer** (*1*)
**look** (*3*)
**looked** (*1*)
**looking** (*7*)
**looks** (*1*)
**Lori** (*1*)
**lot** (*7*)
**lower** (*1*)
**lowered** (*1*)

**< M >**
**Madison** (*1*)
**main** (*2*)
**maintaining** (*1*)
**majority** (*1*)
**manager** (*1*)
**mandatory** (*1*)
**Margaret** (*2*)
**marked** (*4*)
**MARKS** (*1*)
**marriage** (*3*)
**married** (*1*)
**Master** (*1*)
**Master's** (*2*)
**match** (*1*)
**maximum** (*1*)
**McPike** (*1*)
**mean** (*6*)
**means** (*1*)
**medical** (*2*)
**medications** (*6*)
**medium-correctional** (*1*)
**medium-security** (*2*)
**meet** (*8*)
**meeting** (*7*)
**meetings** (*2*)
**members** (*1*)
**memorialize** (*1*)
**Mental** (*68*)
**Merritt** (*1*)
**message** (*1*)
**met** (*6*)
**MEYERS** (*19*)

**Mid-State** (*28*)
**mind** (*1*)
**minimum** (*5*)
**minor** (*2*)
**minute** (*3*)
**minutes** (*3*)
**mobile** (*1*)
**moment** (*1*)
**monitor** (*1*)
**monitored** (*2*)
**month** (*2*)
**months** (*4*)
**morning** (*1*)
**move** (*2*)

**< N >**
**name** (*7*)
**named** (*1*)
**names** (*2*)
**NAPPI** (*5*)
**nature** (*4*)
**nearby** (*2*)
**NECESSARILY** (*3*)
**need** (*14*)
**needed** (*2*)
**needs** (*10*)
**never** (*1*)
**NEW** (*15*)
**nodding** (*1*)
**noises** (*1*)
**normal** (*2*)
**Normally** (*2*)
**NORTHERN** (*1*)
**Notary** (*1*)
**note** (*4*)
**noted** (*2*)
**notes** (*6*)
**notified** (*4*)
**notifying** (*1*)
**November** (*1*)
**Number** (*13*)
**numbered** (*1*)
**numbers** (*1*)
**numerous** (*1*)
**nursing** (*1*)

**< O >**
**Oasis** (*1*)
**oath** (*2*)

**object** (*2*)
**Objection** (*19*)
**Observation** (*3*)
**observe** (*1*)
**obtain** (*1*)
**obtained** (*1*)
**occasion** (*1*)
**occur** (*2*)
**occurred** (*5*)
**occurring** (*1*)
**offer** (*2*)
**OFFICE** (*22*)
**officer** (*2*)
**official** (*1*)
**Oh** (*2*)
**okay** (*78*)
**old** (*1*)
**older** (*1*)
**OMH** (*2*)
**OMRDD** (*1*)
**Once** (*9*)
**ones** (*1*)
**one-to-one** (*3*)
**ongoing** (*1*)
**open** (*12*)
**opened** (*1*)
**operations** (*1*)
**opinion** (*1*)
**opposed** (*2*)
**OPPW** (*1*)
**option** (*1*)
**order** (*3*)
**originally** (*1*)
**outpatient** (*1*)
**outside** (*1*)
**oversee** (*1*)

**< P >**
**PAGE** (*2*)
**pages** (*3*)
**paid** (*1*)
**Palladino** (*8*)
**paper** (*1*)
**parole** (*6*)
**part** (*9*)
**participate** (*2*)
**participated** (*2*)
**particularly** (*1*)
**parties** (*1*)

Deposition of Hal Meyers

Estate of Joseph P. King v. Ward, et al.

party *(1)*
passed *(2)*
passing *(2)*
patient *(2)*
patient's *(1)*
pending *(1)*
people *(28)*
people's *(2)*
percent *(2)*
perception *(1)*
Perfect *(2)*
performance *(3)*
period *(4)*
Periodically *(2)*
person *(7)*
personal *(1)*
perspective *(1)*
phone *(5)*
phones *(1)*
physical *(1)*
physically *(3)*
Place *(7)*
placed *(5)*
places *(1)*
Plaintiff *(3)*
play *(1)*
please *(13)*
point *(3)*
policies *(14)*
policy *(8)*
pop *(1)*
pops *(1)*
population *(1)*
portion *(1)*
position *(4)*
possible *(1)*
potential *(4)*
potentially *(3)*
practice *(1)*
preparation *(1)*
prepare *(1)*
preparing *(1)*
prescriber *(7)*
Prescribers *(1)*
present *(1)*
presenting *(1)*
pretty *(3)*
prevent *(2)*
prevention *(8)*

previously *(2)*
primary *(1)*
print *(2)*
prior *(1)*
prison *(6)*
prisons *(1)*
private *(1)*
probably *(6)*
problems *(2)*
procedure *(4)*
procedures *(5)*
process *(3)*
produced *(2)*
Professional *(3)*
program *(19)*
Programs *(1)*
progress *(1)*
projected *(2)*
promote *(1)*
promotion *(1)*
prompted *(1)*
pronounced *(1)*
pronouncing *(1)*
propounded *(1)*
Prosequendum *(1)*
provide *(3)*
provided *(5)*
providers *(1)*
provides *(1)*
providing *(1)*
psychiatric *(5)*
psychotropic *(1)*
Public *(1)*
pull *(1)*
purpose *(1)*
purposes *(1)*
put *(2)*

< Q >
question *(10)*
questionnaire *(1)*
questions *(6)*
quick *(2)*
QUOTATION *(1)*
QUOTE *(1)*

< R >
range *(1)*
rare *(1)*

RCTP *(14)*
reached *(1)*
read *(3)*
readily *(1)*
ready *(1)*
real *(1)*
really *(3)*
Realtime *(3)*
reason *(5)*
reasons *(7)*
recall *(30)*
receive *(9)*
received *(4)*
receiving *(2)*
reception *(2)*
Recess *(4)*
recognize *(3)*
recognizes *(1)*
recollection *(7)*
recommend *(1)*
record *(8)*
recorded *(1)*
reference *(1)*
referenced *(4)*
referral *(1)*
referred *(2)*
referring *(1)*
REFLECT *(4)*
reflected *(1)*
reflects *(1)*
regarding *(3)*
Regardless *(3)*
regards *(2)*
REGIONAL *(1)*
Registered *(2)*
regular *(1)*
rehabilitation *(1)*
related *(6)*
relative *(1)*
relatively *(1)*
released *(1)*
relevance *(1)*
remember *(8)*
REMOTE *(2)*
remotely *(1)*
removed *(1)*
repeat *(3)*
rephrase *(1)*
rephrasing *(1)*

report *(3)*
reported *(3)*
Reporter *(5)*
reporters *(1)*
reports *(1)*
represents *(1)*
request *(1)*
Residential *(10)*
resources *(4)*
response *(4)*
responsibilities *(1)*
responsible *(1)*
result *(2)*
Retardation *(1)*
returned *(1)*
review *(7)*
reviewed *(3)*
reviewing *(1)*
right *(12)*
rights *(3)*
risk *(5)*
role *(4)*
room *(2)*
rooms *(1)*
ROSE *(1)*
RPR *(1)*
rules *(1)*
run *(2)*

< S >
safe *(2)*
safely *(1)*
safest *(1)*
safety *(1)*
satellite *(4)*
saw *(1)*
says *(1)*
scene *(3)*
scene-scene *(1)*
Schatzel *(1)*
SCHIRRIPA *(1)*
School *(3)*
scratch *(1)*
screen *(3)*
screened *(1)*
screening *(2)*
scroll *(5)*
search *(7)*
searching *(1)*

section (1)
secure (4)
secured (2)
security (2)
see (13)
seeing (2)
seen (3)
sees (1)
self (4)
self-injurious (2)
self-injury (1)
self-report (1)
send (1)
sense (1)
sent (6)
sentence (1)
separate (2)
serious (1)
served (6)
service (6)
services (23)
setting (5)
Seymour (1)
share (2)
shared (1)
sharing (2)
Sheet (1)
Shepherd (1)
shoelaces (12)
shortly (1)
short-term (1)
showing (1)
SHU (1)
shut (1)
signed (1)
significant (3)
signs (3)
silo (1)
similar (1)
simply (1)
six (1)
size (1)
skills (1)
skip (1)
Skynyrd (1)
small (4)
smaller (1)
smoothly (1)
so-and-so (1)

Social (7)
somebody (5)
somebody's (2)
someone's (3)
Someplace (1)
sorry (11)
sort (1)
Sounds (1)
South (1)
space (1)
speak (6)
speaking (3)
Special (4)
specialist (1)
specific (7)
specifically (1)
specifics (1)
spectrum (1)
spell (3)
spoke (2)
spoken (1)
staff (9)
stamp (1)
Standard (4)
start (3)
started (2)
STATE (11)
statement (1)
statements (2)
STATES (1)
stats (1)
status (5)
stay (2)
step (1)
Street (1)
stressed (1)
strike (1)
Studies (1)
stuff (1)
subject (3)
submit (1)
Suboxone (2)
Subscribed (2)
Substance (2)
successful (1)
successfully (1)
sued (1)
suffering (3)
suicide (53)

suicides (5)
Suite (1)
Sullivan (3)
SUNY (1)
support (1)
supports (1)
supposed (1)
sure (10)
switch (2)
switched (1)
sworn (3)
symptoms (1)
SYRACUSE (3)
system (3)

< T >
take (11)
taken (8)
talk (6)
talked (2)
team (5)
tech (4)
tell (2)
telling (1)
term (2)
terms (1)
tested (2)
testified (4)
testify (1)
testimony (1)
Thank (9)
therapist (11)
therapists (1)
therapy (2)
thing (3)
things (14)
think (15)
thought (2)
three (8)
Time (30)
timely (1)
times (10)
today (8)
today's (2)
told (4)
track (1)
train (1)
training (20)
trainings (5)

transcript (1)
transcription (1)
transfer (3)
transferred (7)
treating (1)
treatment (22)
trends (1)
trial (1)
tried (3)
true (1)
truthfully (1)
try (5)
trying (4)
turn (1)
two (3)
two-year (3)
type (2)
types (1)

< U >
uncommon (3)
understand (10)
understanding (3)
understood (4)
unfortunately (3)
Unit (24)
UNITED (3)
units (1)
University (3)
use (2)
usually (2)
Utica (1)
Utica-Rome (2)

< V >
validation (1)
Van (6)
vantage (1)
varies (1)
variety (4)
vary (2)
verbal (2)
verify (1)
viable (1)
vibrate (1)
VIDEO (2)
violate (1)
violation (2)
volume (1)

Deposition of Hal Meyers

Estate of Joseph P. King v. Ward, et al.

**< W >**
**walk**  *(1)*
**Walter**  *(1)*
**want**  *(12)*
**wanted**  *(6)*
**WARD**  *(1)*
**watch**  *(14)*
**water**  *(1)*
**way**  *(5)*
**ways**  *(1)*
**weave**  *(1)*
**week**  *(1)*
**weekend**  *(1)*
**Well**  *(5)*
**well-controlled**  *(1)*
**went**  *(7)*
**we're**  *(2)*
**we've**  *(1)*
**wide**  *(1)*
**Williams**  *(3)*
**withdrawn**  *(1)*
**WITNESS**  *(11)*
**word**  *(1)*
**words**  *(1)*
**work**  *(13)*
**workday**  *(1)*
**worked**  *(13)*
**worker**  *(4)*
**working**  *(7)*
**works**  *(2)*
**worried**  *(1)*
**worse**  *(1)*
**write**  *(2)*
**writes**  *(1)*
**writing**  *(1)*

**< Y >**
**YAMILE**  *(2)*
**Yeah**  *(6)*
**year**  *(10)*
**years**  *(18)*
**Yep**  *(1)*
**YORK**  *(12)*

**< Z >**
**Zant**  *(6)*
**Zoom**  *(1)*