# EXHIBIT F

Case 9:20-cv-01413-TJM-ML   Document 79-6   Filed 03/31/23   Page 2 of 35

Deposition of Jami Palladino                                    Estate of Joseph P. King v. Ward, et al.

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF NEW YORK
 2                  CIVIL ACTION NO.: 20-CV-01413

 3

 4   The Estate of Joseph P. King,
     by and through its Administrator
 5   ad Prosequendum Amy King,
     and in her own right,
 6
          Plaintiff,
 7
     v.
 8
     WARD, et al.,
 9
          Defendant.
10   _____

11

12        ************************************

13        REMOTE VIDEO DEPOSITION OF JAMI PALLADINO

14                    MAY 23, 2022

15        ************************************

16

17           REMOTE VIDEO DEPOSITION OF JAMI PALLADINO taken

18   in the above-styled and numbered cause on May 23, 2022,

19   commencing at 1:00 p.m. Eastern Standard Time, before Gina

20   Williams, Registered Professional Reporter, Certified

21   Realtime Reporter, and Certified Realtime Captioner.

22

23

24

25
```

```
 1                    A P P E A R A N C E S

 2              (All attorneys appearing remotely)

 3

 4   On behalf of Plaintiff:

 5        HACH ROSE SCHIRRIPA & CHEVERIE, LLP
          112 Madison Avenue, 10th Floor
 6        New York, New York 10016
     By:  YAMILE KALKACH, ESQUIRE
 7        HILLARY NAPPI, ESQUIRE

 8

 9   On behalf of Defendants:

10        NEW YORK STATE ATTORNEY GENERAL
          SYRACUSE REGIONAL OFFICE
11        300 South State Street
          Suite 300
12        Syracuse, New York 13202
     By:  AIMEE COWAN, ESQUIRE
13

14

15

16

17

18

19        QUOTATION MARKS ARE USED FOR CLARITY AND DO NOT
               NECESSARILY REFLECT A DIRECT QUOTE
20

21

22

23

24

25
```

```
 1                        I N D E X

 2    WITNESS                                    PAGE

 3    JAMI PALLADINO

 4    Examination by Ms. Kalkach                   4

 5                        - - - -

 6                      E X H I B I T S

 7    Number

 8       Exhibit A    Amended Complaint           12

 9       Exhibit B    Answer to Amended Complaint 13

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Deposition of Jami Palladino                                    Estate of Joseph P. King v. Ward, et al.

Page 4

1  WHEREUPON,
2          JAMI PALLADINO
3  was called as a witness and, after having been first duly
4  sworn, was deposed and testified as follows:
5          EXAMINATION
6  BY MS. KALKACH:
7      Q     Good morning, Ms. Palladino.  My name is Yamile
8  Kalkach.  I'm an associate at the law firm that represents
9  Plaintiff, the Estate of Joseph King.
10         Could you please state your full name and current
11 address for the record?
12     A     Jami Ann Palladino.
13         My work address or my home address?
14     Q     Your home address.
15     A     911 Culverton Road, Rome, New York 13440.
16     Q     Thank you.  Ms. Palladino, I'm going to go over a
17 few ground rules to help today to run as quickly and
18 smoothly as possible.
19         Have you ever been deposed before?
20     A     No.
21     Q     Have you ever testified at trial?
22     A     No.
23     Q     So you may not be familiar with how this works;
24 correct?
25     A     Yes.

Page 5

1      Q     So do you understand that you are under oath
2  today?
3      A     Yes.
4      Q     And that this is the same oath that you would
5  take in a courtroom?
6      A     Yes.
7      Q     Are you on any medications which may affect your
8  ability to testify truthfully today?
9      A     No.
10     Q     So if you don't hear or understand a question
11 that I ask you, please feel free to ask me to repeat or
12 rephrase the question, and I will.
13         That means that if you answer a question that I
14 ask, I will assume that you understood the question and your
15 answer was based on that understanding, okay?
16     A     Yes.
17     Q     It's also important that you give me verbal
18 answers as opposed to a head nod or showing me things with
19 your hands, et cetera, so the court reporter may take down
20 your words.
21         Understood?
22     A     Yes.
23     Q     Let's try our best not to talk over one another.
24 Again, the court reporter is writing everything down, so if
25 we talk over one another, she may not be able to understand

Page 6

1  what we're both saying and write it down.
2          Do you understand?
3      A     Yes.
4      Q     If at any time today you need a break, please
5  simply just say so, and I will accommodate.  The only thing
6  that I ask from you is that if I asked a question, you
7  answer it before asking for the break, okay?
8      A     Yes.
9      Q     Perfect.
10         There may be many times today that your attorney
11 may object to a question that I ask you.  Unless your
12 attorney directs you not to answer the question, you still
13 must answer.
14         Understood?
15     A     Yes.
16     Q     Okay.  Now, please shut off or put on vibrate any
17 other device that you have around you.  It could be a cell
18 phone, Apple watch, iPad, or any other computer.
19         Also, please close any other document or program
20 on your screen other than Zoom and the ones that I will --
21 other than Zoom or the programs -- the documents that I will
22 be showing you today.
23         Are there any paper documents in front of you?
24     A     No.
25     Q     Is there anybody in the room with you?

Page 7

1      A     No.
2      Q     Are you currently under the influence of any
3  drugs or alcohol that in any way may affect your testimony?
4      A     No.
5      Q     What did you do, if anything, to prepare for
6  today's deposition?
7      A     I conferred with my legal representation.
8      Q     When?
9      A     On May 10.
10     Q     For how long?
11     A     For about an hour.
12     Q     Other than your counsel, was anybody else
13 present?
14     A     No.
15     Q     Did you review any documents when you met with
16 your counsel?
17     A     No.
18     Q     Did you discuss today's deposition with anyone
19 else other than your counsel?
20     A     No.
21     Q     Do you keep notes about your workday?
22     A     Can you repeat the question?  I'm sorry.
23     Q     Yes.
24         Do you keep notes about your workday?
25     A     No.

Deposition of Jami Palladino                                                                    Estate of Joseph P. King v. Ward, et al.

Page 8

1    Q    Do you keep a diary about your workday?
2    A    No.
3    Q    Have you ever used any other names?
4    A    No.
5    Q    Have you ever been convicted of a crime?
6    A    No.
7    Q    When were you born?
8    A    July 21, 1979.
9    Q    Where were you born?
10   A    Minneola, New York.
11   Q    Are you married?
12   A    No.
13   Q    Do you have kids?
14   A    Yes.
15   Q    How many?
16   A    Three.
17   Q    Aside from the instant action, to your knowledge
18 have any complaints and/or grievances been filed against
19 you?
20   A    No.
21   Q    Have you ever been subject of a disciplinary
22 complaint?
23   A    No.
24   Q    Have you ever been a party in a lawsuit before?
25   A    No.

Page 9

1    Q    Have you ever testified in court?
2    A    No.
3    Q    Have you ever testified in a deposition?
4    A    No.
5    Q    Okay.  Where did you --
6         Please erase that.
7         Did you attend college?
8    A    Yes.
9    Q    Where did you go?
10   A    I went to Stonybrook University.
11   Q    When did you go there?
12   A    2007 until 2010.
13   Q    What did you study?
14   A    Social work.
15   Q    Besides college, do you have any other --
16        Did you ever take any other certification program
17 or licensing program?
18   A    No.
19   Q    Do you have any licenses?
20   A    Yes.
21   Q    What are these licenses?
22   A    Licensed clinical social worker.
23   Q    When did you obtain it?
24   A    2017.
25   Q    How did you obtain it?

Page 10

1    A    I took a test.
2    Q    Okay.  Could you briefly walk me through your
3 employment history leading up to your current position?
4    A    I started working with NTA Connections BRC in
5 2006 to 2008.  I worked in case management from 2009 until
6 2012 for Mental Health Association of Nassau County.  I
7 worked in a PROs program from 2012 to 2013, and I've been at
8 this position since 2013.
9    Q    Which position are you currently in?
10   A    Currently I'm a discharge planner, prerelease
11 coordinator.
12   Q    When did you start working there?
13   A    I switched from general population therapist to
14 prerelease coordinator in December of 2018.
15   Q    Before that what were you doing?
16   A    I was a general population therapist from 2013 to
17 2018, same facility, different position.
18   Q    I understand.
19        What were your duties and responsibilities when
20 you were working as the general population therapist?
21   A    I managed a caseload of people that are open to
22 mental health services, provided monthly therapy.
23   Q    Who did you report to?
24   A    I reported to Hal Meyers, unit chief.
25   Q    And who reported to you?

Page 11

1    A    I'm sorry?
2    Q    Who reported to you?
3    A    Nobody.
4    Q    Did you get training in this job?
5    A    Yes.
6    Q    Describe the training that you received.
7    A    I would --
8         One second.  I'm sorry.
9         My training was, I shadowed another employee
10 where they taught me how to complete the documentation, how
11 to run a session with a patient.
12   Q    Besides this training, did you ever get any other
13 kind of training from the facility?
14   A    I've gotten many different trainings like in
15 different topics.
16   Q    Were those mandatory?
17   A    Yes.
18   Q    What were they?
19   A    I'm just thinking.  There's been quite a few.
20   Q    That's okay.
21   A    Workplace violence.  They have their mandatory
22 training of workplace violence, sexual harassment, of HIPAA,
23 of --
24        Those are the yearly trainings that we get every
25 year.

Deposition of Jami Palladino                                           Estate of Joseph P. King v. Ward, et al.

Page 12

1  Q  Okay.  Only these three or just the ones you're
2  remembering right now?
3  A  Those are just the ones that I can remember right
4  now.
5  Q  Okay.  Did you talk about this lawsuit with
6  anyone you work with?
7  A  No.
8  Q  Do you remember when the lawsuit was filed?
9  A  I don't remember.
10  MS. KALKACH:  I offer Ms. Palladino Exhibit A
11  into evidence.
12  David, could you please show her Exhibit A?
13  (Exhibit A was marked for identification.)
14  BY MS. KALKACH:
15  Q  So just take a minute to read the document.
16  You don't have to read it line by line.  I just
17  want to know if you recognize it.
18  A  Yes.
19  Q  You do?
20  A  Yes.
21  Q  Okay.  What do you recognize this document to be?
22  A  This is the --
23  This is the civil action from the Estate of
24  Mr. King.
25  Q  How are you familiar with this document?

Page 13

1  A  I obtained a copy of this via e-mail.
2  Q  When?
3  A  I don't remember.
4  Q  An approximate date, month and year?
5  A  I don't remember.
6  Q  Do you remember the year?
7  A  The year that it was sent out.
8  No, I don't.
9  Q  Did you review this document prior to today?
10  A  Not since I've received them, no.
11  MS. KALKACH:  Okay.  Now, I offer Ms. Palladino
12  Exhibit B into evidence.
13  David, could you please show Ms. Palladino
14  Exhibit B?
15  (Exhibit B was marked for identification.)
16  BY MS. KALKACH:
17  Q  Ms. Palladino, please take a minute to review
18  this exhibit.  I just want to know if you recognize the
19  document or not.
20  A  Yes.
21  MS. KALKACH:  Okay.  Thank you, David.
22  BY MS. KALKACH:
23  Q  What do you recognize this document to be?
24  A  This is what's been from the Estate of Mr. King.
25  Q  Do you recognize specifically what this document

Page 14

1  is?
2  What does it --
3  A  It's requesting a jury trial.
4  Q  So this is the Answer to the Complaint.
5  Did you ever participate at any time in the
6  drafting of this document?
7  A  No.
8  Q  Have you signed any written statements or made
9  any recorded statements or spoken to attorneys or
10  investigators or reporters about the events related to this
11  lawsuit?
12  A  Just my counsel.
13  Q  Okay.  Did you know Mr. Joseph King?
14  A  Yes.
15  Q  Why did you know him?
16  A  He was my patient.
17  Q  When did you meet him?
18  A  2013.
19  Q  What was the nature of your relationship?
20  A  He was my patient.
21  Q  Do you know when he was incarcerated?
22  A  I don't remember.
23  Q  Do you know why he was incarcerated?
24  A  I don't remember.
25  Q  How often would you converse with Mr. King?

Page 15

1  A  Once a month.
2  Q  What was your role in Mr. King's life while he
3  was incarcerated?
4  A  I was his therapist.
5  Q  And what were your job duties as a therapist with
6  respect to Mr. King?
7  A  To provide supportive counseling, to provide
8  verbal therapy.
9  Q  Were you aware of any specific problems Mr. King
10  dealt while he was incarcerated?
11  MS. COWAN:  Objection.  You can answer.
12  THE WITNESS:  Answer?
13  MS. COWAN:  Yeah, you can answer.
14  A  Can you repeat the question?  I'm sorry.
15  BY MS. KALKACH:
16  Q  Yes.
17  Were you aware of any specific problems Mr. King
18  dealt with while he was incarcerated?
19  A  Yes.
20  Q  Which problems?
21  A  Difficulty in coping with the environment.
22  Q  Were you aware he thought his wife was sleeping
23  with another person?
24  A  No.
25  Q  Were you aware about his thought about his

Deposition of Jami Palladino                                    Estate of Joseph P. King v. Ward, et al.

Page 16

1 marriage suffering?

2    A    No.

3    Q    Were you aware that he had been fighting with his

4 wife the week leading up to his suicide?

5    A    No.

6    Q    Do you know when was the last conversation he had

7 with his wife?

8    A    No.

9    Q    Do you know when was the last conversation he had

10 with his children?

11    A    No.

12    Q    Were you aware he spoke to other inmates about

13 his mental state?

14    A    No.

15    Q    What was the sum and substance of the

16 conversations you had with Mr. King?

17        MS. COWAN:  Objection, but go ahead.

18    A    About his daily --

19        About how he was functioning in general

20 population.

21 BY MS. KALKACH:

22    Q    Did you speak about his behaviors towards other

23 inmates?

24    A    Not that I recall.

25    Q    Were you aware that Mr. King used Suboxone?

Page 17

1    A    Yes.

2    Q    Did you speak to him about his use?

3    A    Yes.

4    Q    What did he tell you about his drug use?

5    A    He stated that he was not using.

6    Q    He stated he was not using, yet you were aware

7 that he was using?

8    A    I'm sorry?

9    Q    So he stated that he was using?

10    A    No.  He stated that he was not using.

11    Q    How did you become aware that he was using

12 Suboxone?

13    A    He had shared it with me.

14    Q    When did he share this with you?

15    A    During session.  I don't remember which one

16 though.

17    Q    Were you aware of any other drugs that he was

18 taking within the time of his incarceration?

19    A    No.

20    Q    Were you aware of any prescription drugs that he

21 was taking during the time of his incarceration?

22    A    Will you repeat that, please?

23    Q    Were you aware of any prescription medication

24 that he was taking during the time of his incarceration?

25    A    Yes.

Page 18

1    Q    What kind of prescription medication was he

2 taking?

3    A    I don't recall.

4    Q    Do you know what they were used for?

5    A    For antianxiety and antidepressants.

6    Q    When was he taking them, which period of time?

7    A    He was taking medication for most of his

8 incarceration.

9    Q    Who prescribed them?

10    A    The prescriber.

11    Q    Do you know his name?

12    A    Dr. Thomas, Dr. Hernandez, Ms. Citrin.

13        There was three of them.

14    Q    There were three of them?

15        Can you please repeat the names?

16    A    Dr. Thomas.

17    Q    Do you know his last name?

18    A    That's her --

19        It's Karen Thomas.

20        Dr. Hernandez.  I don't remember his first name.

21        Kari Citrin.

22    Q    Can you spell that last name for me, please?

23    A    C-i-t-r-i-n.

24    Q    Was he still taking these medications at the time

25 of the suicide?

Page 19

1    A    I think they were discontinued.

2    Q    Do you know when he stopped taking them?

3    A    I don't recall.

4    Q    Do you know why they were discontinued?

5    A    He was --

6        He expressed complaints about his symptoms.  The

7 doctor discontinued the medication and was scheduled to meet

8 with him in two weeks in order to restart medication.

9    Q    When was this?

10    A    That was my last visit with him, November -- the

11 end of November, 2018.

12    Q    Do you know if the medication was cut off at

13 once?

14    A    I don't recall.

15    Q    Who was aware of the decision of taking him off

16 his medication?

17        MS. COWAN:  Objection.  Go ahead.

18    A    The --

19        I guess the nurses.

20 BY MS. KALKACH:

21    Q    Only the nurses and yourself?

22    A    And the prescriber.

23    Q    The three of them?

24    A    There was only one doctor, the last doctor --

25        It was three different doctors at three different

Deposition of Jami Palladino                                        Estate of Joseph P. King v. Ward, et al.

Page 20

1  periods.
2      Q    Okay.
3      A    Dr. Thomas was the last one.
4      Q    What was the period that Dr. Thomas was his
5  prescriber?
6      A    I don't know.
7      Q    Which one was the first one?
8      A    I don't know.  I can't remember.
9      Q    Was Mr. King worried about his medication being
10  cut off?
11     A    Not at the time.
12     Q    At which time?
13     A    Not at the time of when it was discontinued.
14         It was an agreement between the doctor and
15  patient.
16     Q    When did he become concerned or worried about
17  discontinuance of his medication?
18     A    Not to my --
19         Not to my knowledge.
20     Q    I said when.
21         Because you said that at the beginning he wasn't.
22         Was he ever worried that it could affect him not
23  having his medication?
24     A    Not that I'm aware of.
25     Q    Okay.  What if any were Mr. King's feelings about

Page 21

1  his medication not being given to him anymore?
2      A    I did not receive anything indicating that he had
3  any issues about it not being given.
4      Q    Did he ever send you letters?
5      A    Yes.
6      Q    How many letters did you receive?
7      A    A few.
8      Q    When you say "a few," you mean from 1 to 5, 5 to
9  10, 10 to 20, or something else?
10     A    No, probably between 5 to 10, but that's over the
11  duration of the time that we worked together from 2013 to
12  2018.
13     Q    And what was the content of the letters, the sum
14  and substance of what they said?
15     A    Concerns about --
16         They were concerns about his medication being
17  discontinued earlier on before that.
18     Q    Before --
19         Before what?
20     A    Before his final --
21         Before the last one.
22         Before the last time when he met with the doctor.
23  There have been other periods that he discontinued
24  medication.
25     Q    I understand.

Page 22

1      What if anything you did in response of the
2  letters that you received?
3      A    Follow protocol.
4         Our policy is to see the patient within two weeks
5  of receiving a letter, discuss what the concerns are, and
6  bring it to the prescriber's attention.
7      Q    So did you set up sessions to address the
8  letters?
9      A    Yes.
10     Q    And did you report his concerns to the
11  prescriber?
12     A    Yes.
13     Q    Were you aware of Mr. King sending letters to any
14  other of your co-workers?
15     A    Could have been to the prescribers.
16     Q    How did you become aware?
17     A    They were in the chart.
18     Q    Did you ever read those letters?
19     A    Sorry.  I'm in my office.  I'm sorry.
20         Can you repeat that again?
21     Q    Did you ever read those letters?
22     A    Yes.
23     Q    What were the sum and substance of those letters?
24     A    Expressing his concerns about the symptoms he's
25  experiencing and requesting to be seen by the doctor earlier

Page 23

1  or in response to his concerns.
2      Q    And what if anything did you do with this
3  information?
4      A    Conferred with the doctor to make sure to see if
5  the doctor had addressed it.
6      Q    And what did the doctor say to you?
7      A    That his appointment would be scheduled, and he
8  would be seen accordingly.
9      Q    Did you follow up on his appointments being
10  scheduled?
11     A    No.
12     Q    Was Mr. King suffering from withdrawal?
13         MS. COWAN:  Objection.  Go ahead.
14     A    I don't know.
15  BY MS. KALKACH:
16     Q    Did you ever speak to his wife about the way his
17  drugs were administered?
18     A    No.
19     Q    Did you speak with his wife at all about his care
20  while he was incarcerated?
21     A    One time.  I spoke to Mrs. King once.
22     Q    What was the sum and substance of that
23  conversation?
24     A    Mrs. King --
25         You know, Mrs. King expressed concern about

Case 9:20-cv-01413-TJM-ML   Document 79-6   Filed 03/31/23   Page 10 of 35

Deposition of Jami Palladino                                    Estate of Joseph P. King v. Ward, et al.

Page 24

1 because Mr. King was writing -- wrote quite a few letters
2 consecutively, and she wanted to make me aware that he was
3 having some anxiety.
4        And I had an appointment scheduled with him, and
5 I explained to her that I've been trying to work on him --
6 work on with him to use alternative coping skills in
7 addition to medication to help him cope, which he was not
8 receptive to.
9    Q    What was the alternative coping?
10   A    I'm sorry?
11   Q    What were those alternative coping mechanisms?
12   A    Deep breathing, distress intolerance, grounding
13 techniques, and there were worksheets.  I had a bunch of
14 different worksheets that I'd try to give him to use to
15 complete and bring them back to me so he can get a
16 completion certificate for it, but he was not receptive.
17   Q    Why was he not receptive?
18   A    He always wanted to talk about medication, which
19 I had no control over.
20   Q    How close in time to his suicide did you receive
21 a letter from Mr. King?
22   A    I don't recall.  I don't remember.
23   Q    Do you know how close in time to his suicide that
24 Mrs. King received a letter from Mrs. King -- from Mr. King?
25   A    No.

Page 25

1    Q    How close in time to his suicide did you speak to
2 Mrs. King?
3    A    Years.  A couple years before.
4    Q    How close in time to his suicide did you try to
5 do this alternative coping therapy?
6    A    Every time I met with him.
7    Q    So up to the session in November, you were still
8 trying to?
9    A    Yes.
10   Q    Besides Suboxone and the prescription drugs, were
11 you aware of any other drugs that he was taking?
12   A    No.
13   Q    Was Mr. King ever disciplined while he was
14 incarcerated?
15   A    I don't know.
16   Q    Was he ever in isolation?
17   A    Can you repeat that?
18   Q    Was he ever in isolation?
19        MS. COWAN:  Objection.  Go ahead.
20   A    He was in the crisis unit.  Whether he was in the
21 special housing unit, I don't recall.
22 BY MS. KALKACH:
23   Q    In which unit did you say he was?
24   A    I know he went to the crisis unit in 2016.
25   Q    Did he ever get sanctioned?

Page 26

1    A    I don't remember.
2    Q    Do you know if there were any misbehavior
3 reports?
4        MS. COWAN:  Against Mr. King?
5        MS. KALKACH:  Yes, against Mr. King.
6    A    Yes.
7 BY MS. KALKACH:
8    Q    Who made the reports?
9    A    Corrections.  It was corrections officers,
10 DOCCS-related.
11   Q    For what were the misbehavior reports?
12   A    I'm pretty sure it was drug use.
13   Q    Did you speak to Mr. King about parole?
14   A    Yes.
15   Q    Did you speak to him about his upcoming parole
16 hearing?
17   A    I don't remember.
18   Q    When did you speak to him about parole?
19   A    Usually we would talk about it before the parole
20 board would come up because we would discuss discharge
21 planning, so whatever the previous board to that was two
22 years prior to that.
23   Q    And what were his feelings about parole hearing?
24   A    He was hoping to make the board so he could leave
25 so he could go home to his family.

Page 27

1    Q    Was he worried?
2    A    Yes.
3    Q    Did he express any concern about getting more
4 years?
5    A    No.
6    Q    Why was he worried?
7    A    Because he didn't know if he was going to --
8        If he didn't make the board, then it would take
9 longer for him until his conditional release date to go
10 home.
11   Q    Did he think it would lead to his wife leaving
12 him for someone else?
13   A    I don't know.
14   Q    Did you know about Mr. King's mental health
15 diagnosis?
16   A    Yes.
17   Q    What was his diagnosis?
18   A    I don't remember.
19   Q    Were you aware that he tried to commit suicide?
20   A    Yes.
21   Q    Do you know when he tried to commit suicide?
22   A    2016.
23   Q    Do you know the month?
24   A    No.
25   Q    Did he tell you what led to his suicide

Page 28

1 attempt?
2    A    No.
3    Q    Let me clarify this one.
4        Did he tell you what led him to the suicide
5 attempt of 2016?
6    A    No.
7    Q    Are you aware of how he tried to do it?
8    A    Yes.
9    Q    How?
10   A    With shoelaces he tried to hang up.
11   Q    Did you ever speak to him about how he was
12 feeling while in prison regarding suicide?
13   A    Yes.
14   Q    And what was the sum and substance of his
15 conversation with you about it?
16   A    That he would never try that again.
17   Q    How often did you see Mr. King?
18   A    I saw him once a month.
19   Q    Where would you meet?
20   A    In a private room down in the mental health
21 building.
22   Q    Were the meetings established or done by request
23 or something else?
24   A    Policy is for the patient to be seen once every
25 30 days.  And if they wrote a letter, it was within two

Page 29

1 weeks of the letter.
2        So I would see him once a month.  I don't
3 remember how often or not, but if he wrote a letter, I would
4 see him within two weeks of the letter.
5    Q    Are you allowed to take notes when you see
6 inmates?
7    A    Yes.
8    Q    Does anyone else have access to these notes?
9    A    No.
10   Q    Did you take any notes about what you spoke with
11 Mr. King?
12   A    Yes.
13   Q    Where do you keep the notes that you take during
14 a meeting?
15   A    I write my progress notes using those notes that
16 I keep, and then I shred them.
17   Q    Before you shred them, did anybody else review
18 them?
19   A    No.
20   Q    So do you still have the notes that you took
21 during Mr. King's meeting?
22   A    No, not the shredded notes, not my own personal
23 notes.
24   Q    Did you make reports of your meeting with
25 inmates?

Page 30

1    A    Can you clarify that?
2    Q    Yes.
3        So after you met with an inmate, you would make
4 the notes, and then did you have to make a report?
5    A    No.
6        I would write my progress note, file it in the
7 chart, unless I had a concern.
8    Q    What would make you concerned about an inmate?
9    A    If somebody is reporting psychotic symptoms or if
10 somebody is having suicidal ideation or if somebody is
11 having thoughts of self-harm.
12   Q    And who do you report this to?
13   A    To my unit chief and to the crisis coordinator if
14 the person requires a high level of care.
15   Q    Did you ever report to your unit chief at any
16 point?
17       MS. COWAN:  Objection.  With respect to Mr. King
18 or anybody?
19       MS. KALKACH:  With respect to Mr. King, yes.
20 Yes, with respect to Mr. King.
21   A    No.
22 BY MS. KALKACH:
23   Q    Did you ever have a meeting with Hal Meyers,
24 Mr. King and yourself?
25   A    I don't think so, no.

Page 31

1    Q    Did you have concerns about Mr. King in the weeks
2 leading up to the suicide?
3    A    No.
4    Q    Okay.  In general, do you speak to other inmates?
5    A    Yes.
6    Q    To whom do you speak?
7    A    I speak to my caseload, the people that are on my
8 caseload.
9    Q    How many people do you have on your caseload?
10   A    Right now I only have seven.  I do discharge
11 planning.
12   Q    And back in 2018, how many people did you have in
13 your caseload?
14   A    Anywhere between 150 and 180.
15   Q    Why do you have way less inmates in your caseload
16 now?
17   A    Because I do discharge planning.  I no longer do
18 therapy.
19   Q    I see.
20       Did any of the inmates that you spoke to back in
21 2018 know Mr. King?
22   A    I don't know.
23   Q    How is the correctional facility arranged?
24   A    I don't understand what you're asking.
25   Q    So are there cells, dorms, cubes?

Page 32

1  How are the inmates organized?
2  How is the whole facility organized?
3  A  Honestly, I'm not sure.  I don't really venture
4  out of the mental health building.
5  Q  Were you aware if Mr. King had inmates that he
6  shared his cube with, or dorm?
7  A  No, I wasn't sure.
8  Q  So did you speak with any other inmate after
9  Mr. King's suicide?
10  A  Yes.
11  Q  Who did you speak with?
12  A  His name was Thomas Aikens, and my understanding
13  is that he was in the same dorm, but I couldn't tell you how
14  it was arranged.
15  Q  I understand.
16  What was the sum and substance of the
17  communication?
18  A  That he was -- he reported that he was
19  traumatized by the suicide of Mr. King.
20  Q  Did he tell you anything about Mr. King's
21  behavior leading up to the suicide?
22  A  That he was --
23  That --
24  What Mr. Aikens had talked about was that he just
25  couldn't believe that somebody that he lived with did

Page 33

1  something like that.
2  Q  Did he say anything about Mr. King's behavior or
3  just his perception?
4  A  His perception.
5  Just his perception of the event.
6  Q  Have you ever spoken to this inmate before the
7  suicide?
8  A  In regards to --
9  Can you reframe that, please?
10  Q  Have you ever spoke to this inmate before --
11  before the suicide about anything?
12  A  Yes.  He was on my caseload.
13  Q  Okay.  Did he ever tell you anything about
14  Mr. King's behavior?
15  A  No.
16  Q  Did you speak to anybody else besides Thomas
17  Aikens after the suicide?
18  A  No.
19  Not about Mr. King, no.
20  Q  Were you aware of statements made to any of your
21  co-workers about Mr. King's state of mind within the week
22  leading up to the suicide?
23  A  No.
24  Q  Did you speak to any of your co-workers about
25  Mr. King's sessions?

Page 34

1  A  No.
2  Q  Did any of your co-workers speak to you about
3  anything related to Mr. King?
4  A  No.
5  Q  Were you aware of any written or spoken
6  statements made to his family about Mr. King's feelings
7  within the month leading up to his suicide?
8  A  No.
9  Q  Were you aware of any written or spoken
10  statements made by Mr. King to his friends about his
11  feelings within the month leading up to his suicide?
12  A  No.
13  Q  Did you ever see the suicide note Mr. King wrote
14  on November 15, 2018?
15  A  No.
16  Q  In general, does anybody read notes before they
17  are delivered to inmates' family and friends?
18  MS. COWAN:  Objection.  Go ahead.
19  I don't know.  They might be.
20  BY MS. KALKACH:
21  Q  Have you ever spoken to your family about
22  Mr. King?
23  A  No.
24  Q  Are you aware of any policy regarding shoelaces
25  and inmates?

Page 35

1  A  No.
2  Q  Are correctional facilities assigned a mental
3  health level?
4  A  Yes.
5  Q  What mental health level was the correctional
6  facility where Mr. King was an inmate?
7  A  Level 1.
8  Q  Was he at this facility at the beginning of his
9  sentence?
10  A  I don't know.
11  Q  Was he ever at a mental healthcare unit?
12  A  Yes.
13  Q  When?
14  A  2016 following his previous suicide attempt.
15  Q  Was he at this unit when he committed suicide?
16  A  No.
17  Q  Why?
18  A  He was not in the crisis unit.
19  There was --
20  Q  Where was he when he committed suicide?
21  A  My understanding is, he was in the bathroom of
22  his dorm.
23  Q  Okay.  Back in 2016 when he was in mental
24  healthcare unit, when was he transferred outside of that
25  unit?

Deposition of Jami Palladino                                    Estate of Joseph P. King v. Ward, et al.

1   A   I don't recall.
2   Q   Do you know why he was transferred out of that
3   unit?
4   A   He would have been deemed appropriate to return
5   to general population.
6   Q   Who deems it appropriate?
7   A   The clinical team that runs the crisis unit.
8   Q   Do you know who was this team at that time in
9   2016?
10   A   Dr. Farago and --
11   Q   Can you please spell that last name for me?
12   A   F-a-r-a-g-o, first name Lawrence, and the crisis
13   coordinator was at that time Lisa Williams-Burns.
14   Q   Was he screened again to know where he's supposed
15   to be to receive adequate supervision and treatment?
16       MS. COWAN:  Objection.  Go ahead.
17   A   Can you rephrase that?
18   BY MS. KALKACH:
19   A   Yes.
20       When he left the mental healthcare unit in 2016,
21   was he screened again to know what kind of treatment he
22   needed to receive at the new facility?
23   A   It wasn't a new facility.  It was here.
24       He was just released from the crisis unit back to
25   general population.

1   Q   When he was released back to general population,
2   was he screened again to know what kind of care he needed?
3   A   He would have been screened by the crisis
4   coordinator -- would have deemed him appropriate to leave
5   and returned back to his dorm, which then policy is to be
6   seen within seven days of his release, which he would have
7   been seen by me seven days from that release.
8   Q   Did he speak to you about his transfer to general
9   population?
10   A   Yes.
11   Q   What were the sum and substance of that
12   conversation?
13   A   I don't remember.
14   Q   Was he worried about going back to general
15   population?
16   A   Not to my knowledge.
17   Q   Did his wife speak to you about his transfer to
18   general population?
19   A   No.
20   Q   Are you aware of any policy regarding inmates
21   with mental illness?
22   A   Yes.
23   Q   What are they?
24       MS. COWAN:  Objection.  Go ahead.
25   A   Any specific policy?

1       There's many policies.
2   BY MS. KALKACH:
3   Q   Okay.  Have you read them?
4   A   Yes.
5   Q   How long ago?
6   A   Not since 2018.
7       In regards to how often a person seen, in regards
8   to that they're seen by -- if they went to the crisis unit,
9   they had to be seen within seven days.
10   Q   So were you trained by the correctional facility
11   how to deal with inmates with mental illness?
12   A   Yes.
13   Q   Were you trained by the correctional facility on
14   the process to report when an inmate speaks to you about
15   suicide?
16   A   Yes.
17   Q   How were you trained?
18   A   I was trained by following -- reading the
19   policies and following them.
20   Q   Who gets this training?
21   A   Everybody that works here should.
22   Q   Is it mandatory training?
23   A   Yes.
24   Q   Is this part of the training that you take once a
25   year?

1   A   I think you only just --
2       I mean, the policies are always available to
3   refer back to.
4   Q   But you don't get an actual training where you
5   have to go see someone explain --
6       How is this training?
7   A   No.
8       Usually when you first come, when you first
9   start, and then as necessary.
10   Q   "As necessary" meaning?
11   A   Sometimes they get updated.  If it gets updated,
12   then you have to review them.
13   Q   Do you get an e-mail with the updates, or you
14   have to do it by yourself, or how does it work?
15   A   Get an e-mail with the updates.
16   Q   Does anybody follow up to see if you read the
17   policy?
18   A   No.
19   Q   So the update is not really mandatory?
20       MS. COWAN:  Hang on one second.  Are people
21   trying to come in your office?  Is that what's going
22   on?
23       THE WITNESS:  Yes, of course.  If I wasn't doing
24   anything, nobody would want to talk to me.
25       MS. COWAN:  All right.  Sorry.

Deposition of Jami Palladino                                    Estate of Joseph P. King v. Ward, et al.

Page 40

1   A   Can you repeat that again?
2   BY MS. KALKACH:
3   Q   I asked if the training then is really mandatory.
4   A   Yes.
5   Q   Yet nobody follows up?
6   A   Right.
7   Q   Do people with mental illnesses receive any
8   special care within the correctional?
9       MS. COWAN:  Objection.  Go ahead.
10  A   In regards to?
11      Can you explain better?
12      I'm sorry.
13  BY MS. KALKACH:
14  Q   What kind of special treatment in regards to
15  anything.
16      So, yes or no, if they receive any special care
17  when they have a mental illness.
18  A   Not --
19      No.
20      I'm sorry.
21      MS. COWAN:  Objection.
22  BY MS. KALKACH:
23  Q   Okay.  Is there a specific area within the
24  correctional facility where people with mental illness
25  should be?

Page 41

1   A   No, not exactly.
2       There is an area for individuals that have been
3   diagnosed with a severe mental illness and that are having
4   difficulty functioning because of their mental illness.
5   Q   Was Mr. King there?
6   A   No.
7   Q   Do people that have tried to commit suicide
8   inside the correctional get any special attention or care?
9       MS. COWAN:  Objection.
10  A   No.
11  BY MS. KALKACH:
12  Q   Your answer was "no," correct?
13  A   Yes.
14  Q   Do you know why Mr. King was allowed to have his
15  shoelaces after he had attempted suicide with them in the
16  past?
17  A   I don't know why.
18  Q   Do you know who made that decision?
19  A   Corrections.
20  Q   Do you know which person?
21  A   No.
22  Q   After Mr. King attempted to commit suicide, was
23  there any change in the treatment at the correctional?
24      MS. COWAN:  Objection.  Can you answer that?  I
25  don't really understand myself but...

Page 42

1   A   Can you rephrase that?
2   BY MS. KALKACH:
3   Q   Yes.
4       After Mr. King attempted to commit suicide, was
5   there any change to medication that he received?
6   A   I don't recall.
7   Q   Was there any change on the way that he was being
8   treated by the staff?
9   A   No.
10  Q   Was there any change on the place he was staying?
11  A   No.
12      MS. COWAN:  Objection.
13  BY MS. KALKACH:
14  Q   Was there any change on the supervision that he
15  was getting?
16      MS. COWAN:  Objection, because when we're talking
17  about someone in the correction facility, we're talking
18  about corrections staff and mental health staff, so
19  there's a lot that goes into that.
20      So if you're talking about supervision, I think
21  maybe a little more specific would help.
22      MS. KALKACH:  I'm just waiting to see if she
23  answers or --
24  A   Can you repeat that?
25      MS. KALKACH:  Yes.  Gina, could you please repeat

Page 43

1   my question?
2       (Last question was read back.)
3   A   Supervision from whom?
4   BY MS. KALKACH:
5   Q   From the staff after he committed suicide.
6       MS. COWAN:  Same objection.  Answer if you can.
7   A   After he attempted suicide, he was brought to the
8   crisis care unit.
9   BY MS. KALKACH:
10  Q   Okay.
11  A   So it's a higher level of care.
12  Q   Was he screened in order to know that he needed
13  to be there?
14  A   Usually after a suicide attempt, they're placed
15  in --
16      They are taken --
17      That is kind of their screening.  They take them
18  to the crisis unit for eminent risk.
19  Q   Were there any potential indicators that Mr. King
20  was going to attempt suicide for a second time?
21      MS. COWAN:  Objection.  Go ahead.
22  A   No.
23  BY MS. KALKACH:
24  Q   What are potential suicide indicators?
25  A   Isolation, separation, usually if somebody is

Page 44

1  expressing thoughts of self-harm or suicidal ideation, a
2  recent loss.
3        There's many different things that could be
4  indicated.
5     Q    Did Mr. King show any of the ones that you told
6  me before?
7     A    In our last session, no.
8     Q    Not in the last session, but what about in the
9  six months following -- I mean leading up to the suicide?
10    A    My understanding is that his mom passed way
11 within that, and I updated his suicide risk assessment
12 accordingly, but he adamantly denied thoughts of self-harm.
13       MS. KALKACH:  I move to strike the portions that
14 are nonresponsive.
15 BY MS. KALKACH:
16    Q    Was there any support offered to you by the
17 correctional facility after the suicide?
18    A    Not that I remember.
19    Q    Did Mr. King show increased level of agitation?
20    A    No.
21    Q    Did Mr. King show an increased level of anxiety?
22    A    No.
23    Q    When you spoke about his mom passing, what were
24 his feelings towards that?
25    A    That his mother was in her 90s and that she was

Page 45

1  chronically ill, and he got to speak to her before she
2  passed.
3     Q    What were his feelings regarding the drugs that
4  he was taking?
5        MS. COWAN:  Objection.  You're talking about
6  illegal drugs or the prescription drugs or --
7        MS. KALKACH:  Both.
8        MS. COWAN:  Maybe during like a certain time
9  period?
10 BY MS. KALKACH:
11    Q    Six months leading up to the suicide attempt.
12    A    He was --
13       I don't recall.
14    Q    Did his anxiety level increase because of his
15 parole board hearing?
16    A    Not that I was aware of.
17    Q    Did Mr. King show increased level of depression?
18    A    Not that I was aware of.
19    Q    Do you know what a suicide watch commander is?
20    A    Yes.
21    Q    Who had that position?
22    A    That's --
23       The watch commander?
24    Q    Yes.
25    A    It's one of the sergeants or the deputies up at

Page 46

1  the corrections.
2     Q    And what are this person's duties?
3     A    I don't know.
4        MS. COWAN:  So the watch commander, not the
5  suicide watch commander; right?
6        MS. KALKACH:  No.  The suicide watch commander.
7        MS. COWAN:  Okay.  Are you familiar with the
8  suicide watch commander?
9        THE WITNESS:  No.
10 BY MS. KALKACH:
11    Q    Do you know what suicide watch is?
12    A    Yes.
13    Q    When is an inmate placed on a suicide watch?
14    A    When someone engages in self-harm or is
15 expressing thoughts of -- or if there are threats of
16 self-harm or actually engage in acts of self-harm or a
17 suicide attempt.
18    Q    And what does suicide watch entail?
19    A    Usually they have somebody --
20       They wind up in the crisis unit in a cell -- in
21 an observation cell with all their amenities stripped or
22 they are on a one-to-one watch with a corrections officer.
23    Q    Are there standard items that the inmate could
24 have or could not have?
25    A    Depending on the person's situation.

Page 47

1     Q    Was Mr. King ever placed on suicide watch?
2     A    I don't recall.  I don't know.
3     Q    Do you know what a parole board hearing is?
4     A    Yes.
5     Q    Did you have any role in placing an inmate on
6  suicide watch?
7     A    Yes.
8     Q    What was your role?
9     A    If somebody --
10       If somebody told me that they were having
11 thoughts of self-harm or threats of self-harm, they would be
12 placed in the crisis unit.
13    Q    Yes, but your involvement, what would you do?
14    A    I would make the call to place him in the crisis
15 unit.  I would have assessed the situation, and then if it
16 warranted a higher level of care, then they would be placed
17 in a crisis unit.
18    Q    Okay.  Do you have to report it to someone?
19       How does it get --
20    A    Yes.
21    Q    What was the process?
22    A    I would let the officer at our front desk know,
23 who would let nursing know, and also the watch commander and
24 movement.
25    Q    Did you ever make this call for Mr. King?

Page 48

1    A    No.
2    Q    Do you get notified when an inmate is going to
3  get his or her parole board hearing?
4    A    Usually they give us a parole evaluation to
5  complete, so about 30 days to a couple months before.
6    Q    What does this parole evaluation contain?
7    A    Their mental health history, are they taking
8  medication, are they compliant with medication, when they
9  came to the facility, and when they're scheduled to be
10  released.
11    Q    Are there common emotional changes on inmates
12  when the hearing is approaching?
13       MS. COWAN:  Objection.
14    A    I don't understand.
15  BY MS. KALKACH:
16    Q    Is there something special that you need to watch
17  when there's a parole hearing coming?
18    A    No.
19    Q    And why do you get notified 30 days before it's
20  coming?
21    A    To complete the evaluation.  They give us the
22  evaluation.  It can be anywhere like a couple months to like
23  a month before.
24    Q    And is there any -- any different consequences
25  that --

Page 49

1       Okay, scratch that.
2       Were you aware that Mr. King had a parole hearing
3  in January 2019?
4    A    No.
5    Q    Could there be different outcomes after you
6  complete a parole evaluation --
7       MS. COWAN:  Objection.
8  BY MS. KALKACH:
9    Q    -- depending on -- depending on what you find?
10    A    No.
11       I don't know.
12    Q    Who do you give the parole evaluation to?
13    A    We complete it and provide it to community
14  supervision.
15    Q    Did you speak to Mr. King about his parole
16  hearing that was coming in January of 2019?
17    A    No.
18    Q    Have you ever received training or education on
19  suicide prevention?
20    A    Yes.
21    Q    When did you receive it?
22    A    We receive it --
23       It's one of the mandatory trainings we get
24  yearly.
25    Q    Who provides it?

Page 50

1    A    CNYPC, Central New York Psychiatric Center.
2    Q    Who?
3    A    Education & Training.
4    Q    Who pays for it?
5    A    I don't know.
6    Q    How long does the training last?
7    A    It's usually probably about an hour.
8    Q    So one hour every year to talk about suicide
9  prevention, approximately?
10    A    Yes.
11    Q    Did you do official evaluations for suicide risk?
12    A    Can you repeat that, please?
13    Q    Yes.
14       Did you do any official evaluations for suicide
15  risk?
16    A    Yes.
17    Q    How often would you do those evaluations?
18    A    Within two weeks of somebody being --
19  transferring into the facility.  And policy was, once every
20  two years or as indicated, like if new risks came up, if
21  there were new risks or protective factors.
22    Q    Okay.  And who would indicate it?
23    A    The patient.
24    Q    What would you consider a suicide risk factor?
25    A    Suicide history, family history, substance abuse,

Page 51

1  mental health hospital -- history of mental health
2  hospitalizations, adverse outcome to a parole board, or if
3  somebody got tickets.
4    Q    Within the last year, had Mr. King presented with
5  any of those?
6    A    Yes.
7    Q    How would you perform the evaluation?
8    A    Yes.
9    Q    I mean how.
10    A    How?
11       Based on a discussion with Mr. King.
12    Q    Okay.
13    A    And also if I receive information about -- like
14  if there was a ticket or if he told me about a ticket, then
15  I'd update it to make sure it reflects what was going on in
16  his life at that time.
17    Q    How much time did you take to perform the suicide
18  risk evaluation?
19    A    Usually during a session.
20       It's done --
21       It's done in every session with every patient we
22  assess them for risk.
23    Q    So there are official ones that you do within two
24  weeks of transferring, et cetera, but you also have the ones
25  that you do every session?

Page 52

1  A   Yeah.  Basically we review that same one and
2  check for new risk or protective factors and update it
3  accordingly.
4  Q   How long do the sessions normally take?
5  A   Between 30 and 45 minutes.
6  Q   And when you do the official evaluation, do you
7  take -- is it a different session, or is it also within --
8  A   It's usually within the first session.  It's
9  usually --
10     We do the core documentation.  Usually the first
11 session is a little longer than the rest of them.
12 Q   How long is it approximately?
13 A   Probably between 45 minutes to an hour.
14 Q   How did you learn to take the evaluations?
15 A   I was trained in my training when I started here.
16 Q   Who gave you the training?
17 A   It was the person that trained me from when I
18 started working here.
19 Q   What was the name of the department that gives
20 the training?
21 A   It's not a department.  It's usually a fellow
22 therapist that was training me.
23 Q   The one that you were shadowing?
24 A   Yes.
25 Q   Do you remember his name or her name?

Page 53

1  A   Her name was Amy Sowich.
2  Q   Can you spell last name for me?
3  A   S-o-w-i-c-h.
4  Q   How often would you have the training?
5  A   I was trained for probably the first couple weeks
6  that I was here in 2013.
7  Q   How long was the training session?
8  A   Oh, I was trained for the entire day.
9  Q   So the entire day for the first couple of weeks?
10 A   Weeks, yes.
11 Q   When you say "the first couple of weeks," you
12 mean two weeks, three weeks, four weeks or something else?
13 A   Probably about three weeks -- three, four weeks.
14 Q   Are you aware of any other suicides that happened
15 in the prison during 2013 through 2018?
16 A   Not that I can recall.
17 Q   Do you know if the correctional facility kept a
18 suicide watch log?
19 A   I don't know.
20 Q   Where were you on November 16, 2018?
21     This is the date that Mr. Joseph King took his
22 life.
23 A   I was here.  I came to work.  By the time I --
24     It had already happened by the time I got in to
25 work.

Page 54

1  Q   How did you learn about the event?
2  A   My co-worker informed me.
3  Q   What's the name of your co-worker?
4  A   It was Amanda Knoeller.
5  Q   Can you please spell that for me?
6  A   K-n-o-e-l-l-e-r.  She was the SHU coordinator.
7  Q   When did you receive notice?
8  A   Official notice?
9  Q   Yes.
10 A   Later on that afternoon from the acting unit
11 chief.
12 Q   Was it in person, or did you receive an e-mail,
13 or how did they give you official notice?
14 A   They send out an e-mail to make the facility
15 aware that there's a passing.
16 Q   Where were you when you received notice?
17 A   I was at my desk.
18 Q   And where were you when you were informally told
19 about the event?
20 A   I was at the front door before I walked in the
21 building.
22 Q   Did you go to the scene?
23 A   No.
24 Q   Did anyone explain to you how the suicide
25 occurred?

Page 55

1  A   Yes.
2  Q   Who explained it to you?
3  A   Hal Meyers, the unit chief.
4  Q   Are you aware of what Mr. King used to kill
5  himself?
6  A   No.
7  Q   How did the suicide occur?
8  A   My understanding is that he put his shoes in one
9  bathroom stall and that he hung himself in another one to
10 make it look like he was in a different stall and that he
11 hung up.
12 Q   Do you know what he used to hang himself?
13 A   No.
14 Q   Are you aware of any investigation from the
15 correctional facility after his suicide?
16 A   No.
17 Q   Do you know the exact location of the suicide?
18 A   No.
19 Q   Do you know who discovered the attempt?
20     Was it staff, inmate, or someone else?
21 A   I don't know.
22 Q   Do you know if he was sent to the hospital?
23 A   I don't know.
24 Q   Do you know if the family was notified?
25 A   I don't know.

Deposition of Jami Palladino                                           Estate of Joseph P. King v. Ward, et al.

Page 56

1  Q   Do you know who was Mr. King's emergency contact?
2  A   It was his wife.
3  Q   Do you know his wife's name?
4  A   Amy King.
5  Q   Do you know if she was notified?
6  A   I don't know.
7  Q   Do you know Mr. King's reasons for his actions?
8  A   I'm sorry.
9      Can you repeat that?
10 Q   Yes.
11     Do you know Mr. King's reasons for his actions?
12 A   No.
13 Q   Was there anything different that you could have
14 done to prevent his suicide?
15     MS. COWAN:  Objection.
16 A   No.
17     MS. KALKACH:  Now I'm going to ask for a couple
18 of minutes to review my notes and see if I have any
19 more questions.
20     MS. COWAN:  Okay.
21     MS. KALKACH:  Thank you.
22     (Recess was taken.)
23     MS. KALKACH:  I only have a couple of follow-up
24 questions.
25

Page 57

1  BY MS. KALKACH:
2  Q   Ms. Palladino?
3  A   Yes.
4  Q   After an inmate expresses that they need to see a
5  doctor, you testified that it could take a week or two to be
6  seen; is that correct?
7  A   If an inmate is requesting to see a doctor and
8  it's not an emergency situation, it could take --
9      It depends on the person's situation.  It depends
10 on the circumstance.
11 Q   What could be understood as an emergency
12 situation?
13 A   If somebody is expressing thoughts of self-harm
14 or they're having psychotic symptoms, they may be able to --
15 they would be brought to the crisis unit.
16     Otherwise, prescribers usually don't see their
17 patients --
18     They see them once every three months.
19 Q   And in your opinion, does that meet what could be
20 a serious need to see a mental health provider?
21     MS. COWAN:  Objection.  Go ahead.
22 A   If a person's experiencing thoughts of self-harm
23 or if they're having a -- if they're having psychotic
24 symptoms, yes.
25

Page 58

1  BY MS. KALKACH:
2  Q   Okay.  You also testified that you routinely see
3  inmates -- saw inmates once per month; is that correct?
4  A   Yes.
5  Q   In your opinion, is this policy sufficient to
6  provide care for an inmate with a health illness?
7      MS. COWAN:  Objection.  Go ahead.
8  A   Yes, as long as the situation is warranted.
9      If there's an emergency, then they may be seen
10 more than one time a month.
11 BY MS. KALKACH:
12 Q   You've got to use a lot of discretion in your
13 role; correct?
14 A   Yes.
15     MS. KALKACH:  I have no further questions.
16     MS. COWAN:  All right.  I don't have any
17 questions for you, so we can go off the record now.  I
18 want them to read and sign.  I totally forgot to
19 mention that during Mr. Meyers' deposition.  Sorry
20 about that.  If you could just add that to the
21 transcript, that would be great.
22     (Whereupon, the deposition was concluded at
23 2:31 p.m.)
24
25

1                          CERTIFICATE

2              I, Gina Williams, Registered Professional Court

3       Reporter, do certify that the above deposition was reported

4       by me and that the foregoing transcript is a true and

5       accurate record to the best of my knowledge, skills, and

6       ability.

7              I further certify that I am not an employee of

8       counsel or any of the parties, nor a relative or employee of

9       any attorney or counsel connected with the action, nor

10      financially interested in the action.

11             Subscribed and sworn to before me when taken this

12      23rd day of May, 2022.

13

14                      _Gina Williams_

15                      GINA WILLIAMS, RPR, CRR

16

17

18

19

20

21

22

23

24

25

1          ACKNOWLEDGMENT OF DEPONENT

2

3          I, JAMI PALLADINO, do hereby certify that I have

4    read the foregoing pages and that the same is a correct

5    transcription of the answers given by me to the questions

6    therein propounded, except for the corrections or changes in

7    form or substance, if any, noted in the attached Errata

8    Sheet.

9

10

11    _____

12    JAMI PALLADINO                                          Date

13

14    Subscribed and sworn to before me this

15    ___ day of _____, 2022.

16    My commission expires:_____

17

18    _____

19    Notary Public

20

21

22

23

24

25

```
 1                         _ _ _ _ _ _ _

 2                             ERRATA

 3                         _ _ _ _ _ _ _

 4       PAGE    LINE                     CHANGE/REASON

 5       _____   _____   _____

 6       _____   _____   _____

 7       _____   _____   _____

 8       _____   _____   _____

 9       _____   _____   _____

10       _____   _____   _____

11       _____   _____   _____

12       _____   _____   _____

13       _____   _____   _____

14       _____   _____   _____

15       _____   _____   _____

16       _____   _____   _____

17       _____   _____   _____

18       _____   _____   _____

19       _____   _____   _____

20       _____   _____   _____

21       _____   _____   _____

22       _____   _____   _____

23       _____   _____   _____

24       _____   _____   _____

25
```

## WORD INDEX

**< 1 >**
**1**  21:*8*  35:*7*
**1:00**  1:*19*
**10**  7:*9*  21:*9, 10*
**10016**  2:*6*
**10th**  2:*5*
**112**  2:*5*
**12**  3:*8*
**13**  3:*9*
**13202**  2:*12*
**13440**  4:*15*
**15**  34:*14*
**150**  31:*14*
**16**  53:*20*
**180**  31:*14*
**1979**  8:*8*

**< 2 >**
**2:31**  58:*23*
**20**  21:*9*
**2006**  10:*5*
**2007**  9:*12*
**2008**  10:*5*
**2009**  10:*5*
**2010**  9:*12*
**2012**  10:*6, 7*
**2013**  10:*7, 8, 16*
  14:*18*  21:*11*  53:*6, 15*
**2016**  25:*24*  27:*22*
  28:*5*  35:*14, 23*  36:*9,
  20*
**2017**  9:*24*
**2018**  10:*14, 17*  19:*11*
  21:*12*  31:*12, 21*
  34:*14*  38:*6*  53:*15, 20*
**2019**  49:*3, 16*
**2022**  1:*14, 18*  59:*12*
  60:*15*
**20-CV-01413**  1:*2*
**21**  8:*8*
**23**  1:*14, 18*
**23rd**  59:*12*

**< 3 >**
**30**  28:*25*  48:*5, 19*
  52:*5*
**300**  2:*11*

**< 4 >**
**4**  3:*4*
**45**  52:*5, 13*

**< 5 >**
**5**  21:*8, 10*

**< 9 >**
**90s**  44:*25*
**911**  4:*15*

**< A >**
**ability**  5:*8*  59:*6*
**able**  5:*25*  57:*14*
**above-styled**  1:*18*
**abuse**  50:*25*
**access**  29:*8*
**accommodate**  6:*5*
**accurate**  59:*5*
**ACKNOWLEDGMEN
T**  60:*1*
**acting**  54:*10*
**ACTION**  1:*2*  8:*17*
  12:*23*  59:*9, 10*
**actions**  56:*7, 11*
**acts**  46:*16*
**actual**  39:*4*
**ad**  1:*5*
**adamantly**  44:*12*
**add**  58:*20*
**addition**  24:*7*
**address**  4:*11, 13, 14*
  22:*7*
**addressed**  23:*5*
**adequate**  36:*15*
**administered**  23:*17*
**Administrator**  1:*4*
**adverse**  51:*2*
**afternoon**  54:*10*
**agitation**  44:*19*
**ago**  38:*5*
**agreement**  20:*14*
**ahead**  16:*17*  19:*17*
  23:*13*  25:*19*  34:*18*
  36:*16*  37:*24*  40:*9*
  43:*21*  57:*21*  58:*7*
**Aikens**  32:*12, 24*

**33**:*17*
**AIMEE**  2:*12*
**al**  1:*5*
**alcohol**  7:*3*
**allowed**  29:*5*  41:*14*
**alternative**  24:*6, 9, 11*
  25:*5*
**Amanda**  54:*4*
**Amended**  3:*8, 9*
**amenities**  46:*21*
**Amy**  1:*5*  53:*1*  56:*4*
**and/or**  8:*18*
**Ann**  4:*12*
**Answer**  3:*9*  5:*13, 15*
  6:*7, 12, 13*  14:*4*
  15:*11, 12, 13*  41:*12,
  24*  43:*6*
**answers**  5:*18*  42:*23*
  60:*5*
**antianxiety**  18:*5*
**antidepressants**  18:*5*
**anxiety**  24:*3*  44:*21*
  45:*14*
**anybody**  6:*25*  7:*12*
  29:*17*  30:*18*  33:*16*
  34:*16*  39:*16*
**anymore**  21:*1*
**appearing**  2:*2*
**Apple**  6:*18*
**appointment**  23:*7*
  24:*4*
**appointments**  23:*9*
**approaching**  48:*12*
**appropriate**  36:*4, 6*
  37:*4*
**approximate**  13:*4*
**approximately**  50:*9*
  52:*12*
**area**  40:*23*  41:*2*
**arranged**  31:*23*
  32:*14*
**Aside**  8:*17*
**asked**  6:*6*  40:*3*
**asking**  6:*7*  31:*24*
**assess**  51:*22*
**assessed**  47:*15*
**assessment**  44:*11*
**assigned**  35:*2*
**associate**  4:*8*

**Association**  10:*6*
**assume**  5:*14*
**attached**  60:*7*
**attempt**  28:*1, 5*
  35:*14*  43:*14, 20*
  45:*11*  46:*17*  55:*19*
**attempted**  41:*15, 22*
  42:*4*  43:*7*
**attend**  9:*7*
**attention**  22:*6*  41:*8*
**ATTORNEY**  2:*10*
  6:*10, 12*  59:*9*
**attorneys**  2:*2*  14:*9*
**available**  39:*2*
**Avenue**  2:*5*
**aware**  15:*9, 17, 22, 25*
  16:*3, 12, 25*  17:*6, 11,
  17, 20, 23*  19:*15*
  20:*24*  22:*13, 16*  24:*2*
  25:*11*  27:*19*  28:*7*
  32:*5*  33:*20*  34:*5, 9,
  24*  37:*20*  45:*16, 18*
  49:*2*  53:*14*  54:*15*
  55:*4, 14*

**< B >**
**back**  24:*15*  31:*12, 20*
  35:*23*  36:*24*  37:*1, 5,
  14*  39:*3*  43:*2*
**based**  5:*15*  51:*11*
**Basically**  52:*1*
**bathroom**  35:*21*  55:*9*
**beginning**  20:*21*  35:*8*
**behalf**  2:*4, 9*
**behavior**  32:*21*  33:*2,
  14*
**behaviors**  16:*22*
**believe**  32:*25*
**best**  5:*23*  59:*5*
**better**  40:*11*
**board**  26:*20, 21, 24*
  27:*8*  45:*15*  47:*3*
  48:*3*  51:*2*
**born**  8:*7, 9*
**BRC**  10:*4*
**break**  6:*4, 7*
**breathing**  24:*12*
**briefly**  10:*2*
**bring**  22:*6*  24:*15*
**brought**  43:*7*  57:*15*

building  28:*21*  32:4
54:*21*
bunch  24:*13*

< C >
call  47:*14*, 25
called  4:3
Captioner  1:*21*
care  23:*19*  30:*14*
37:2  40:*8, 16*  41:8
43:*8, 11*  47:16  58:6
case  10:5
caseload  10:*21*  31:7,
8, 9, 13, 15  33:12
cause  1:*18*
cell  6:*17*  46:20, 21
cells  31:25
Center  50:*1*
Central  50:*1*
certain  45:8
certificate  24:*16*  59:*1*
certification  9:*16*
Certified  1:*20, 21*
certify  59:3, 7  60:3
cetera  5:*19*  51:*24*
change  41:*23*  42:5, 7,
10, 14
CHANGE/REASON
61:*4*
changes  48:*11*  60:6
chart  22:*17*  30:7
check  52:2
CHEVERIE  2:5
chief  10:*24*  30:*13*, 15
54:*11*  55:3
children  16:*10*
chronically  45:*1*
circumstance  57:*10*
Citrin  18:*12, 21*
C-i-t-r-i-n  18:*23*
CIVIL  1:2  12:*23*
clarify  28:3  30:*1*
CLARITY  2:*19*
clinical  9:*22*  36:7
close  6:*19*  24:20, 23
25:*1*, 4
CNYPC  50:*1*
college  9:7, 15
come  26:*20*  39:*8, 21*

coming  48:*17, 20*
49:*16*
commander  45:*19, 23*
46:4, 5, 6, 8  47:*23*
commencing  1:*19*
commission  60:*16*
commit  27:*19, 21*
41:7, 22  42:4
committed  35:*15, 20*
43:5
common  48:*11*
communication  32:*17*
community  49:*13*
Complaint  3:8, 9
8:*22*  14:4
complaints  8:*18*  19:6
complete  11:*10*
24:*15*  48:5, 21  49:*6,
13*
completion  24:*16*
compliant  48:8
computer  6:*18*
concern  23:*25*  27:3
30:7
concerned  20:*16*
30:8
Concerns  21:*15, 16*
22:5, 10, 24  23:*1*
31:*1*
concluded  58:*22*
conditional  27:9
conferred  7:7  23:4
connected  59:9
Connections  10:4
consecutively  24:2
consequences  48:*24*
consider  50:*24*
contact  56:*1*
contain  48:6
content  21:*13*
control  24:*19*
conversation  16:*6, 9*
23:*23*  28:15  37:*12*
conversations  16:*16*
converse  14:*25*
convicted  8:5
coordinator  10:*11, 14*
30:*13*  36:13  37:4
54:6
cope  24:7

coping  15:*21*  24:6, 9,
11  25:5
copy  13:*1*
core  52:*10*
correct  4:*24*  41:*12*
57:6  58:3, 13  60:4
correction  42:*17*
correctional  31:*23*
35:2, 5  38:*10, 13*
40:8, 24  41:8, 23
44:*17*  53:17  55:*15*
Corrections  26:9
41:*19*  42:18  46:*1, 22*
60:6
counsel  7:*12, 16, 19*
14:*12*  59:8, 9
counseling  15:7
County  10:6
couple  25:3  48:5, 22
53:5, 9, 11  56:*17, 23*
course  39:*23*
COURT  1:*1*  5:*19,
24*  9:*1*  59:2
courtroom  5:5
COWAN  2:*12*  15:*11,
13*  16:*17*  19:*17*
23:*13*  25:*19*  26:4
30:*17*  34:18  36:*16*
37:*24*  39:*20, 25*  40:*9,
21*  41:*9, 24*  42:*12, 16*
43:*6, 21*  45:5, 8  46:4,
7  48:*13*  49:7  56:*15,
20*  57:21  58:7, 16
co-worker  54:2, 3
co-workers  22:*14*
33:*21, 24*  34:2
crime  8:5
crisis  25:*20, 24*
30:*13*  35:18  36:7, 12,
24*  37:3  38:8  43:8,
18  46:20  47:*12, 14,
17*  57:15
CRR  59:*15*
cube  32:6
cubes  31:25
Culverton  4:*15*
current  4:*10*  10:3
currently  7:2  10:9,
10

cut  19:*12*  20:*10*

< D >
daily  16:*18*
date  13:*4*  27:9
53:*21*  60:*12*
David  12:*12*  13:*13,
21*
day  53:*8, 9*  59:*12*
60:*15*
days  28:*25*  37:6, 7
38:9  48:5, 19
deal  38:*11*
dealt  15:*10, 18*
December  10:*14*
decision  19:*15*  41:*18*
deemed  36:4  37:4
deems  36:6
Deep  24:*12*
Defendant  1:5
Defendants  2:9
delivered  34:*17*
denied  44:*12*
department  52:*19, 21*
Depending  46:*25*
49:9
depends  57:9
DEPONENT  60:*1*
deposed  4:4, 19
DEPOSITION  1:*13,
17*  7:6, 18  9:3  58:*19,
22*  59:3
depression  45:*17*
deputies  45:25
Describe  11:6
desk  47:*22*  54:*17*
device  6:*17*
diagnosed  41:3
diagnosis  27:*15, 17*
diary  8:*1*
different  10:*17*
11:*14, 15*  19:*25*
24:*14*  44:3  48:*24*
49:5  52:7  55:*10*
56:*13*
Difficulty  15:*21*  41:4
DIRECT  2:*19*
directs  6:*12*
discharge  10:*10*

26:20  31:10, 17
**disciplinary**  8:21
**disciplined**  25:13
**discontinuance**  20:17
**discontinued**  19:1, 4,
7  20:13  21:17, 23
**discovered**  55:19
**discretion**  58:12
**discuss**  7:18  22:5
26:20
**discussion**  51:11
**distress**  24:12
**DISTRICT**  1:1
**DOCCS-related**  26:10
**doctor**  19:7, 24
20:14  21:22  22:25
23:4, 5, 6  57:5, 7
**doctors**  19:25
**document**  6:19
12:15, 21, 25  13:9, 19,
23, 25  14:6
**documentation**  11:10
52:10
**documents**  6:21, 23
7:15
**doing**  10:15  39:23
**door**  54:20
**dorm**  32:6, 13  35:22
37:5
**dorms**  31:25
**Dr**  18:12, 16, 20
20:3, 4  36:10
**drafting**  14:6
**drug**  17:4  26:12
**drugs**  7:3  17:17, 20
23:17  25:10, 11  45:3,
6
**duly**  4:3
**duration**  21:11
**duties**  10:19  15:5
46:2

**< E >**
**earlier**  21:17  22:25
**Eastern**  1:19
**education**  49:18  50:3
**e-mail**  13:1  39:13,
15  54:12, 14
**emergency**  56:1  57:8,

11  58:9
**eminent**  43:18
**emotional**  48:11
**employee**  11:9  59:7,
8
**employment**  10:3
**engage**  46:16
**engages**  46:14
**entail**  46:18
**entire**  53:8, 9
**environment**  15:21
**erase**  9:6
**Errata**  60:7  61:2
**ESQUIRE**  2:6, 7, 12
**established**  28:22
**Estate**  1:4  4:9
12:23  13:24
**et**  1:5  5:19  51:24
**evaluation**  48:4, 6, 21,
22  49:6, 12  51:7, 18
52:6
**evaluations**  50:11, 14,
17  52:14
**event**  33:5  54:1, 19
**events**  14:10
**Everybody**  38:21
**evidence**  12:11  13:12
**exact**  55:17
**exactly**  41:1
**Examination**  3:4  4:5
**Exhibit**  3:8, 9  12:10,
12, 13  13:12, 14, 15,
18
**experiencing**  22:25
57:22
**expires**  60:16
**explain**  39:5  40:11
54:24
**explained**  24:5  55:2
**express**  27:3
**expressed**  19:6  23:25
**expresses**  57:4
**Expressing**  22:24
44:1  46:15  57:13

**< F >**
**facilities**  35:2
**facility**  10:17  11:13
31:23  32:2  35:6, 8
36:22, 23  38:10, 13

40:24  42:17  44:17
48:9  50:19  53:17
54:14  55:15
**factor**  50:24
**factors**  50:21  52:2
**familiar**  4:23  12:25
46:7
**family**  26:25  34:6,
17, 21  50:25  55:24
**Farago**  36:10
**F-a-r-a-g-o**  36:12
**feel**  5:11
**feeling**  28:12
**feelings**  20:25  26:23
34:6, 11  44:24  45:3
**fellow**  52:21
**fighting**  16:3
**file**  30:6
**filed**  8:18  12:8
**final**  21:20
**financially**  59:10
**find**  49:9
**firm**  4:8
**first**  4:3  18:20  20:7
36:12  39:8  52:8, 10
53:5, 9, 11
**Floor**  2:5
**Follow**  22:3  23:9
39:16
**following**  35:14
38:18, 19  44:9
**follows**  4:4  40:5
**follow-up**  56:23
**foregoing**  59:4  60:4
**forgot**  58:18
**form**  60:7
**four**  53:12, 13
**free**  5:11
**friends**  34:10, 17
**front**  6:23  47:22
54:20
**full**  4:10
**functioning**  16:19
41:4
**further**  58:15  59:7

**< G >**
**GENERAL**  2:10
10:13, 16, 20  16:19

31:4  34:16  36:5, 25
37:1, 8, 14, 18
**getting**  27:3  42:15
**Gina**  1:19  42:25
59:2, 15
**give**  5:17  24:14
48:4, 21  49:12  54:13
**given**  21:1, 3  60:5
**gives**  52:19
**go**  4:16  9:9, 11
16:17  19:17  23:13
25:19  26:25  27:9
34:18  36:16  37:24
39:5  40:9  43:21
54:22  57:21  58:7, 17
**goes**  42:19
**going**  4:16  27:7
37:14  39:21  43:20
48:2  51:15  56:17
**Good**  4:7
**gotten**  11:14
**great**  58:21
**grievances**  8:18
**ground**  4:17
**grounding**  24:12
**guess**  19:19

**< H >**
**HACH**  2:5
**Hal**  10:24  30:23
55:3
**hands**  5:19
**hang**  28:10  39:20
55:12
**happened**  53:14, 24
**harassment**  11:22
**head**  5:18
**Health**  10:6, 22
27:14  28:20  32:4
35:3, 5  42:18  48:7
51:1  57:20  58:6
**healthcare**  35:11, 24
36:20
**hear**  5:10
**hearing**  26:16, 23
45:15  47:3  48:3, 12,
17  49:2, 16
**help**  4:17  24:7
42:21

Deposition of Jami Palladino                                                    Estate of Joseph P. King v. Ward, et al.

Hernandez  18:*12, 20*
high  30:*14*
higher  43:*11*  47:*16*
HILLARY  2:*7*
HIPAA  11:*22*
history  10:*3*  48:*7*
  50:*25*  51:*1*
home  4:*13, 14*  26:*25*
  27:*10*
Honestly  32:*3*
hoping  26:*24*
hospital  51:*1*  55:*22*
hospitalizations  51:*2*
hour  7:*11*  50:*7, 8*
  52:*13*
housing  25:*21*
hung  55:*9, 11*

< I >
ideation  30:*10*  44:*1*
identification  12:*13*
  13:*15*
ill  45:*1*
illegal  45:*6*
illness  37:*21*  38:*11*
  40:*17, 24*  41:*3, 4*
  58:*6*
illnesses  40:*7*
important  5:*17*
incarcerated  14:*21,*
  *23*  15:*3, 10, 18*  23:*20*
  25:*14*
incarceration  17:*18,*
  *21, 24*  18:*8*
increase  45:*14*
increased  44:*19, 21*
  45:*17*
indicate  50:*22*
indicated  44:*4*  50:*20*
indicating  21:*2*
indicators  43:*19, 24*
individuals  41:*2*
influence  7:*2*
informally  54:*18*
information  23:*3*
  51:*13*
informed  54:*2*
inmate  30:*3, 8*  32:*8*
  33:*6, 10*  35:*6*  38:*14*

46:*13, 23*  47:*5*  48:*2*
  55:*20*  57:*4, 7*  58:*6*
inmates  16:*12, 23*
  29:*6, 25*  31:*4, 15, 20*
  32:*1, 5*  34:*17, 25*
  37:*20*  38:*11*  48:*11*
  58:*3*
inside  41:*8*
instant  8:*17*
interested  59:*10*
intolerance  24:*12*
investigation  55:*14*
investigators  14:*10*
involvement  47:*13*
iPad  6:*18*
isolation  25:*16, 18*
  43:*25*
issues  21:*3*
items  46:*23*
its  1:*4*

< J >
JAMI  1:*13, 17*  3:*3*
  4:*2, 12*  60:*3, 12*
January  49:*3, 16*
job  11:*4*  15:*5*
Joseph  1:*4*  4:*9*
  14:*13*  53:*21*
July  8:*8*
jury  14:*3*

< K >
KALKACH  2:*6*  3:*4*
  4:*6, 8*  12:*10, 14*
  13:*11, 16, 21, 22*
  15:*15*  16:*21*  19:*20*
  23:*15*  25:*22*  26:*5, 7*
  30:*19, 22*  34:*20*
  36:*18*  38:*2*  40:*2, 13,*
  *22*  41:*11*  42:*2, 13, 22,*
  *25*  43:*4, 9, 23*  44:*13,*
  *15*  45:*7, 10*  46:*6, 10*
  48:*15*  49:*8*  56:*17, 21,*
  *23*  57:*1*  58:*1, 11, 15*
Karen  18:*19*
Kari  18:*21*
keep  7:*21, 24*  8:*1*
  29:*13, 16*
kept  53:*17*

kids  8:*13*
kill  55:*4*
kind  11:*13*  18:*1*
  36:*21*  37:*2*  40:*14*
  43:*17*
King  1:*4, 5*  4:*9*
  12:*24*  13:*24*  14:*13,*
  *25*  15:*6, 9, 17*  16:*16,*
  *25*  20:*9*  22:*13*  23:*12,*
  *21, 24, 25*  24:*1, 21, 24*
  25:*2, 13*  26:*4, 5, 13*
  28:*17*  29:*11*  30:*17,*
  *19, 20, 24*  31:*1, 21*
  32:*5, 19*  33:*19*  34:*3,*
  *10, 19, 22*  35:*6*  41:*5,*
  *14, 22*  42:*4*  43:*19*
  44:*5, 19, 21*  45:*17*
  47:*1, 25*  49:*2, 15*
  51:*4, 11*  53:*21*  55:*4*
  56:*4*
King's  15:*2*  20:*25*
  27:*14*  29:*21*  32:*9, 20*
  33:*2, 14, 21, 25*  34:*6*
  56:*1, 7, 11*
Knoeller  54:*4*
K-n-o-e-l-l-e-r  54:*6*
know  12:*17*  13:*18*
  14:*13, 15, 21, 23*  16:*6,*
  *9*  18:*4, 11, 17*  19:*2, 4,*
  *12*  20:*6, 8*  23:*14, 25*
  24:*23*  25:*15, 24*  26:*2*
  27:*7, 13, 14, 21, 23*
  31:*21, 22*  34:*19*
  35:*10*  36:*2, 8, 14, 21*
  37:*2*  41:*14, 17, 18, 20*
  43:*12*  45:*19*  46:*3, 11*
  47:*2, 3, 22, 23*  49:*11*
  50:*5*  53:*17, 19*  55:*12,*
  *17, 19, 21, 22, 23, 24,*
  *25*  56:*1, 3, 5, 6, 7, 11*
knowledge  8:*17*
  20:*19*  37:*16*  59:*5*

< L >
law  4:*8*
Lawrence  36:*12*
lawsuit  8:*24*  12:*5, 8*
  14:*11*
lead  27:*11*

leading  10:*3*  16:*4*
  31:*2*  32:*21*  33:*22*
  34:*7, 11*  44:*9*  45:*11*
learn  52:*14*  54:*1*
leave  26:*24*  37:*4*
leaving  27:*11*
led  27:*25*  28:*4*
left  36:*20*
legal  7:*7*
letter  22:*5*  24:*21, 24*
  28:*25*  29:*1, 3, 4*
letters  21:*4, 6, 13*
  22:*2, 8, 13, 18, 21, 23*
  24:*1*
level  30:*14*  35:*3, 5, 7*
  43:*11*  44:*19, 21*
  45:*14, 17*  47:*16*
Licensed  9:*22*
licenses  9:*19, 21*
licensing  9:*17*
life  15:*2*  51:*16*
  53:*22*
line  12:*16*  61:*4*
Lisa  36:*13*
little  42:*21*  52:*11*
lived  32:*25*
LLP  2:*5*
location  55:*17*
log  53:*18*
long  7:*10*  38:*5*  50:*6*
  52:*4, 12*  53:*7*  58:*8*
longer  27:*9*  31:*17*
  52:*11*
look  55:*10*
loss  44:*2*
lot  42:*19*  58:*12*

< M >
Madison  2:*5*
managed  10:*21*
management  10:*5*
mandatory  11:*16, 21*
  38:*22*  39:*19*  40:*3*
  49:*23*
marked  12:*13*  13:*15*
MARKS  2:*19*
marriage  16:*1*
married  8:*11*
mean  21:*8*  39:*2*

Case 9:20-cv-01413-TJM-ML   Document 79-6   Filed 03/31/23   Page 26 of 35

Deposition of Jami Palladino                                          Estate of Joseph P. King v. Ward, et al.

44:9  51:9  53:12
**meaning**  39:10
**means**  5:13
**mechanisms**  24:11
**medication**  17:23
18:1, 7  19:7, 8, 12, 16
20:9, 17, 23  21:1, 16,
24  24:7, 18  42:5
48:8
**medications**  5:7
18:24
**meet**  14:17  19:7
28:19  57:19
**meeting**  29:14, 21, 24
30:23
**meetings**  28:22
**Mental**  10:6, 22
16:13  27:14  28:20
32:4  35:2, 5, 11, 23
36:20  37:21  38:11
40:7, 17, 24  41:3, 4
42:18  48:7  51:1
57:20
**mention**  58:19
**met**  7:15  21:22
25:6  30:3
**Meyers**  10:24  30:23
55:3  58:19
**mind**  33:21
**Minneola**  8:10
**minute**  12:15  13:17
**minutes**  52:5, 13
56:18
**misbehavior**  26:2, 11
**mom**  44:10, 23
**month**  13:4  15:1
27:23  28:18  29:2
34:7, 11  48:23  58:3,
10
**monthly**  10:22
**months**  44:9  45:11
48:5, 22  57:18
**morning**  4:7
**mother**  44:25
**move**  44:13
**movement**  47:24

**< N >**
**name**  4:7, 10  18:11,
17, 20, 22  32:12

36:11, 12  52:19, 25
53:1, 2  54:3  56:3
**names**  8:3  18:15
**NAPPI**  2:7
**Nassau**  10:6
**nature**  14:19
**NECESSARILY**  2:19
**necessary**  39:9, 10
**need**  6:4  48:16  57:4,
20
**needed**  36:22  37:2
43:12
**never**  28:16
**NEW**  1:1  2:6, 10, 12
4:15  8:10  36:22, 23
50:1, 20, 21  52:2
**nod**  5:18
**nonresponsive**  44:14
**normally**  52:4
**NORTHERN**  1:1
**Notary**  60:19
**note**  30:6  34:13
**noted**  60:7
**notes**  7:21, 24  29:5,
8, 10, 13, 15, 20, 22, 23
30:4  34:16  56:18
**notice**  54:7, 8, 13, 16
**notified**  48:2, 19
55:24  56:5
**November**  19:10, 11
25:7  34:14  53:20
**NTA**  10:4
**Number**  3:7
**numbered**  1:18
**nurses**  19:19, 21
**nursing**  47:23

**< O >**
**oath**  5:1, 4
**object**  6:11
**Objection**  15:11
16:17  19:17  23:13
25:19  30:17  34:18
36:16  37:24  40:9, 21
41:9, 24  42:12, 16
43:6, 21  45:5  48:13
49:7  56:15  57:21
58:7
**observation**  46:21

**obtain**  9:23, 25
**obtained**  13:1
**occur**  55:7
**occurred**  54:25
**offer**  12:10  13:11
**offered**  44:16
**OFFICE**  2:10  22:19
39:21
**officer**  46:22  47:22
**officers**  26:9
**official**  50:11, 14
51:23  52:6  54:8, 13
**Oh**  53:8
**okay**  5:15  6:7, 16
9:5  10:2  11:20  12:1,
5, 21  13:11, 21  14:13
20:2, 25  31:4  33:13
35:23  38:3  40:23
43:10  46:7  47:18
49:1  50:22  51:12
56:20  58:2
**Once**  15:1  19:13
23:21  28:18, 24  29:2
38:24  50:19  57:18
58:3
**ones**  6:20  12:1, 3
44:5  51:23, 24
**one-to-one**  46:22
**open**  10:21
**opinion**  57:19  58:5
**opposed**  42:9
**order**  19:8  43:12
**organized**  32:1, 2
**outcome**  51:2
**outcomes**  49:5
**outside**  35:24

**< P >**
**p.m**  1:19  58:23
**PAGE**  3:2  61:4
**pages**  60:4
**PALLADINO**  1:13,
17  3:3  4:2, 7, 12, 16
12:10  13:11, 13, 17
57:2  60:3, 12
**paper**  6:23
**parole**  26:13, 15, 18,
19, 23  45:15  47:3
48:3, 4, 6, 17  49:2, 6,

12, 15  51:2
**part**  38:24
**participate**  14:5
**parties**  59:8
**party**  8:2
**passed**  44:10  45:2
**passing**  44:23  54:15
**patient**  11:11  14:16,
20  20:15  22:4  28:24
50:23  51:21
**patients**  57:17
**pays**  50:4
**people**  10:21  31:7, 9,
12  39:20  40:7, 24
41:7
**perception**  33:3, 4, 5
**Perfect**  6:9
**perform**  51:7, 17
**period**  18:6  20:4
45:9
**periods**  20:1  21:23
**person**  15:23  30:14
38:7  41:20  52:17
54:12
**personal**  29:22
**person's**  46:2, 25
57:9, 22
**phone**  6:18
**place**  42:10  47:14
**placed**  43:14  46:13
47:1, 12, 16
**placing**  47:5
**Plaintiff**  1:5  2:4  4:9
**planner**  10:10
**planning**  26:21
31:11, 17
**please**  4:10  5:11
6:4, 16, 19  9:6  12:12
13:13, 17  17:22
18:15, 22  33:9  36:11
42:25  50:12  54:5
**point**  30:16
**policies**  38:1, 19  39:2
**policy**  22:4  28:24
34:24  37:5, 20, 25
39:17  50:19  58:5
**population**  10:13, 16,
20  16:20  36:5, 25
37:1, 9, 15, 18
**portions**  44:13

**position** 10:*3, 8, 9, 17*
*45:21*
**possible** 4:*18*
**potential** 43:*19, 24*
**prepare** 7:*5*
**prerelease** 10:*10, 14*
**prescribed** 18:*9*
**prescriber** 18:*10*
*19:22 20:5 22:11*
**prescribers** 22:*15*
*57:16*
**prescriber's** 22:*6*
**prescription** 17:*20,*
*23* 18:*1* 25:*10* 45:*6*
**present** 7:*13*
**presented** 51:*4*
**pretty** 26:*12*
**prevent** 56:*14*
**prevention** 49:*19*
*50:9*
**previous** 26:*21* 35:*14*
**prior** 13:*9* 26:*22*
**prison** 28:*12* 53:*15*
**private** 28:*20*
**probably** 21:*10* 50:*7*
*52:13* 53:*5, 13*
**problems** 15:*9, 17, 20*
**process** 38:*14* 47:*21*
**Professional** 1:*20*
*59:2*
**program** 6:*19* 9:*16,*
*17* 10:*7*
**programs** 6:*21*
**progress** 29:*15* 30:*6*
**propounded** 60:*6*
**PROs** 10:*7*
**Prosequendum** 1:*5*
**protective** 50:*21* 52:*2*
**protocol** 22:*3*
**provide** 15:*7* 49:*13*
*58:6*
**provided** 10:*22*
**provider** 57:*20*
**provides** 49:*25*
**Psychiatric** 50:*1*
**psychotic** 30:*9* 57:*14,*
*23*
**Public** 60:*19*
**put** 6:*16* 55:*8*

**< Q >**
**question** 5:*10, 12, 13,*
*14* 6:*6, 11, 12* 7:*22*
*15:14* 43:*1, 2*
**questions** 56:*19, 24*
*58:15, 17* 60:*5*
**quickly** 4:*17*
**quite** 11:*19* 24:*1*
**QUOTATION** 2:*19*
**QUOTE** 2:*19*

**< R >**
**read** 12:*15, 16* 22:*18,*
*21* 34:*16* 38:*3* 39:*16*
*43:2* 58:*18* 60:*4*
**reading** 38:*18*
**really** 32:*3* 39:*19*
*40:3* 41:*25*
**Realtime** 1:*21*
**reasons** 56:*7, 11*
**recall** 16:*24* 18:*3*
*19:3, 14* 24:*22* 25:*21*
*36:1* 42:*6* 45:*13*
*47:2* 53:*16*
**receive** 21:*2, 6* 24:*20*
*36:15, 22* 40:*7, 16*
*49:21, 22* 51:*13* 54:*7,*
*12*
**received** 11:*6* 13:*10*
*22:2* 24:*24* 42:*5*
*49:18* 54:*16*
**receiving** 22:*5*
**receptive** 24:*8, 16, 17*
**Recess** 56:*22*
**recognize** 12:*17, 21*
*13:18, 23, 25*
**record** 4:*11* 58:*17*
*59:5*
**recorded** 14:*9*
**refer** 39:*3*
**REFLECT** 2:*19*
**reflects** 51:*15*
**reframe** 33:*9*
**regarding** 28:*12*
*34:24* 37:*20* 45:*3*
**regards** 33:*8* 38:*7*
*40:10, 14*
**REGIONAL** 2:*10*

**Registered** 1:*20* 59:*2*
**related** 14:*10* 34:*3*
**relationship** 14:*19*
**relative** 59:*8*
**release** 27:*9* 37:*6, 7*
**released** 36:*24* 37:*1*
*48:10*
**remember** 12:*3, 8, 9*
*13:3, 5, 6* 14:*22, 24*
*17:15* 18:*20* 20:*8*
*24:22* 26:*1, 17* 27:*18*
*29:3* 37:*13* 44:*18*
*52:25*
**remembering** 12:*2*
**REMOTE** 1:*13, 17*
**remotely** 2:*2*
**repeat** 5:*11* 7:*22*
*15:14* 17:*22* 18:*15*
*22:20* 25:*17* 40:*1*
*42:24, 25* 50:*12* 56:*9*
**rephrase** 5:*12* 36:*17*
*42:1*
**report** 10:*23* 22:*10*
*30:4, 12, 15* 38:*14*
*47:18*
**reported** 10:*24, 25*
*11:2* 32:*18* 59:*3*
**Reporter** 1:*20, 21*
*5:19, 24* 59:*3*
**reporters** 14:*10*
**reporting** 30:*9*
**reports** 26:*3, 8, 11*
*29:24*
**representation** 7:*7*
**represents** 4:*8*
**request** 28:*22*
**requesting** 14:*3*
*22:25* 57:*7*
**requires** 30:*14*
**respect** 15:*6* 30:*17,*
*19, 20*
**response** 22:*1* 23:*1*
**responsibilities** 10:*19*
**rest** 52:*11*
**restart** 19:*8*
**return** 36:*4*
**returned** 37:*5*
**review** 7:*15* 13:*9, 17*
*29:17* 39:*12* 52:*1*
*56:18*

**right** 1:*5* 12:*2, 3*
*31:10* 39:*25* 40:*6*
*46:5* 58:*16*
**risk** 43:*18* 44:*11*
*50:11, 15, 24* 51:*18,*
*22* 52:*2*
**risks** 50:*20, 21*
**Road** 4:*15*
**role** 15:*2* 47:*5, 8*
*58:13*
**Rome** 4:*15*
**room** 6:*25* 28:*20*
**ROSE** 2:*5*
**routinely** 58:*2*
**RPR** 59:*15*
**rules** 4:*17*
**run** 4:*17* 11:*11*
**runs** 36:*7*

**< S >**
**sanctioned** 25:*25*
**saw** 22:*4* 58:*3*
**saying** 6:*1*
**scene** 54:*22*
**scheduled** 19:*7* 23:*7,*
*10* 24:*4* 48:*9*
**SCHIRRIPA** 2:*5*
**scratch** 49:*1*
**screen** 6:*20*
**screened** 36:*14, 21*
*37:2, 3* 43:*12*
**screening** 43:*17*
**second** 11:*8* 39:*20*
*43:20*
**see** 22:*4* 23:*4* 28:*17*
*29:2, 4, 5* 31:*19*
*34:13* 39:*5, 16* 42:*22*
*56:18* 57:*4, 7, 16, 18,*
*20* 58:*2*
**seen** 22:*25* 23:*8*
*28:24* 37:*6, 7* 38:*7, 8,*
*9* 57:*6* 58:*9*
**self-harm** 30:*11* 44:*1,*
*12* 46:*14, 16* 47:*11*
*57:13, 22*
**send** 21:*4* 54:*14*
**sending** 22:*13*
**sent** 13:*7* 55:*22*
**sentence** 35:*9*

Case 9:20-cv-01413-TJM-ML   Document 79-6   Filed 03/31/23   Page 28 of 35

Deposition of Jami Palladino                                    Estate of Joseph P. King v. Ward, et al.

separation  43:*25*

sergeants  45:*25*

serious  57:*20*

services  10:*22*

session  11:*11*  17:*15*
25:*7*  44:*7, 8*  51:*19,
21, 25*  52:*7, 8, 11*
53:*7*

sessions  22:*7*  33:*25*
52:*4*

set  22:*7*

seven  31:*10*  37:*6, 7*
38:*9*

severe  41:*3*

sexual  11:*22*

shadowed  11:*9*

shadowing  52:*23*

share  17:*14*

shared  17:*13*  32:*6*

Sheet  60:*8*

shoelaces  28:*10*
34:*24*  41:*15*

shoes  55:*8*

show  12:*12*  13:*13*
44:*5, 19, 21*  45:*17*

showing  5:*18*  6:*22*

shred  29:*16, 17*

shredded  29:*22*

SHU  54:*6*

shut  6:*16*

sign  58:*18*

signed  14:*8*

simply  6:*5*

situation  46:*25*
47:*15*  57:*8, 9, 12*
58:*8*

six  44:*9*  45:*11*

skills  24:*6*  59:*5*

sleeping  15:*22*

smoothly  4:*18*

Social  9:*14, 22*

somebody  30:*9, 10*
32:*25*  43:*25*  46:*19*
47:*9, 10*  50:*18*  51:*3*
57:*13*

sorry  7:*22*  11:*1, 8*
15:*14*  17:*8*  22:*19*
24:*10*  39:*25*  40:*12,
20*  56:*8*  58:*19*

South  2:*11*

Sowich  53:*1*

S-o-w-i-c-h  53:*3*

speak  16:*22*  17:*2*
23:*16, 19*  25:*1*  26:*13,
15, 18*  28:*11*  31:*4, 6,
7*  32:*8, 11*  33:*16, 24*
34:*2*  37:*8, 17*  45:*1*
49:*15*

speaks  38:*14*

special  25:*21*  40:*8,
14, 16*  41:*8*  48:*16*

specific  15:*9, 17*
37:*25*  40:*23*  42:*21*

specifically  13:*25*

spell  18:*22*  36:*11*
53:*2*  54:*5*

spoke  16:*12*  23:*21*
29:*10*  31:*20*  33:*10*
44:*23*

spoken  14:*9*  33:*6*
34:*5, 9, 21*

staff  42:*8, 18*  43:*5*
55:*20*

stall  55:*9, 10*

Standard  1:*19*  46:*23*

start  10:*12*  39:*9*

started  10:*4*  52:*15,
18*

STATE  2:*10, 11*
4:*10*  16:*13*  33:*21*

stated  17:*5, 6, 9, 10*

statements  14:*8, 9*
33:*20*  34:*6, 10*

STATES  1:*1*

staying  42:*10*

Stonybrook  9:*10*

stopped  19:*2*

Street  2:*11*

strike  44:*13*

stripped  46:*21*

study  9:*13*

subject  8:*21*

Suboxone  16:*25*
17:*12*  25:*10*

Subscribed  59:*11*
60:*14*

substance  16:*15*
21:*14*  22:*23*  23:*22*

28:*14*  32:*16*  37:*11*
50:*25*  60:*7*

suffering  16:*1*  23:*12*

sufficient  58:*5*

suicidal  30:*10*  44:*1*

suicide  16:*4*  18:*25*
24:*20, 23*  25:*1, 4*
27:*19, 21, 25*  28:*4, 12*
31:*2*  32:*9, 19, 21*
33:*7, 11, 17, 22*  34:*7,
11, 13*  35:*14, 15, 20*
38:*15*  41:*7, 15, 22*
42:*4*  43:*5, 7, 14, 20,
24*  44:*9, 11, 17*  45:*11,
19*  46:*5, 6, 8, 11, 13,
17, 18*  47:*1, 6*  49:*19*
50:*8, 11, 14, 24, 25*
51:*17*  53:*18*  54:*24*
55:*7, 15, 17*  56:*14*

suicides  53:*14*

Suite  2:*11*

sum  16:*15*  21:*13*
22:*23*  23:*22*  28:*14*
32:*16*  37:*11*

supervision  36:*15*
42:*14, 20*  43:*3*  49:*14*

support  44:*16*

supportive  15:*7*

supposed  36:*14*

sure  23:*4*  26:*12*
32:*3, 7*  51:*15*

switched  10:*13*

sworn  4:*4*  59:*11*
60:*14*

symptoms  19:*6*
22:*24*  30:*9*  57:*14, 24*

SYRACUSE  2:*10, 12*


< T >

take  5:*5, 19*  9:*16*
12:*15*  13:*17*  27:*8*
29:*5, 10, 13*  38:*24*
43:*17*  51:*17*  52:*4, 7,
14*  57:*5, 8*

taken  1:*17*  43:*16*
56:*22*  59:*11*

talk  5:*23, 25*  12:*5*
24:*18*  26:*19*  39:*24*
50:*8*

talked  32:*24*

talking  42:*16, 17, 20*
45:*5*

taught  11:*10*

team  36:*7, 8*

techniques  24:*13*

tell  17:*4*  27:*25*  28:*4*
32:*13, 20*  33:*13*

test  10:*1*

testified  4:*4, 21*  9:*1,
3*  57:*5*  58:*2*

testify  5:*8*

testimony  7:*3*

Thank  4:*16*  13:*21*
56:*21*

therapist  10:*13, 16,
20*  15:*4, 5*  52:*22*

therapy  10:*22*  15:*8*
25:*5*  31:*18*

thing  6:*5*

things  5:*18*  44:*3*

think  19:*1*  27:*11*
30:*25*  39:*1*  42:*20*

thinking  11:*19*

Thomas  18:*12, 16, 19*
20:*3, 4*  32:*12*  33:*16*

thought  15:*22, 25*

thoughts  30:*11*  44:*1,
12*  46:*15*  47:*11*
57:*13, 22*

threats  46:*15*  47:*11*

Three  8:*16*  12:*1*
18:*13, 14*  19:*23, 25*
53:*12, 13*  57:*18*

ticket  51:*14*

tickets  51:*3*

Time  1:*19*  6:*4*  14:*5*
17:*18, 21, 24*  18:*6, 24*
20:*11, 12, 13*  21:*11,
22*  23:*21*  24:*20, 23*
25:*1, 4, 6*  36:*8, 13*
43:*20*  45:*8*  51:*16, 17*
53:*23, 24*  58:*10*

times  6:*10*

today  4:*17*  5:*2, 8*
6:*4, 10, 22*  13:*9*

today's  7:*6, 18*

told  44:*5*  47:*10*
51:*14*  54:*18*

topics  11:*15*

totally  58:*18*

Case 9:20-cv-01413-TJM-ML   Document 79-6   Filed 03/31/23   Page 29 of 35

Deposition of Jami Palladino                                    Estate of Joseph P. King v. Ward, et al.

**trained** 38:*10, 13, 17, 18* 52:*15, 17* 53:*5, 8*

**training** 11:*4, 6, 9, 12, 13, 22* 38:*20, 22, 24* 39:*4, 6* 40:*3* 49:*18* 50:*3, 6* 52:*15, 16, 20, 22* 53:*4, 7*

**trainings** 11:*14, 24* 49:*23*

**transcript** 58:*21* 59:*4*

**transcription** 60:*5*

**transfer** 37:*8, 17*

**transferred** 35:*24* 36:*2*

**transferring** 50:*19* 51:*24*

**traumatized** 32:*19*

**treated** 42:*8*

**treatment** 36:*15, 21* 40:*14* 41:*23*

**trial** 4:*21* 14:*3*

**tried** 27:*19, 21* 28:*7, 10* 41:*7*

**true** 59:*4*

**truthfully** 5:*8*

**try** 5:*23* 24:*14* 25:*4* 28:*16*

**trying** 24:*5* 25:*8* 39:*21*

**two** 19:*8* 22:*4* 26:*21* 28:*25* 29:*4* 50:*18, 20* 51:*23* 53:*12* 57:*5*

**< U >**

**understand** 5:*1, 10, 25* 6:*2* 10:*18* 21:*25* 31:*24* 32:*15* 41:*25* 48:*14*

**understanding** 5:*15* 32:*12* 35:*21* 44:*10* 55:*8*

**understood** 5:*14, 21* 6:*14* 57:*11*

**unit** 10:*24* 25:*20, 21, 23, 24* 30:*13, 15* 35:*11, 15, 18, 24, 25* 36:*3, 7, 20, 24* 38:*8* 43:*8, 18* 46:*20* 47:*12, 15, 17* 54:*10* 55:*3*

57:*15*

**UNITED** 1:*1*

**University** 9:*10*

**upcoming** 26:*15*

**update** 39:*19* 51:*15* 52:*2*

**updated** 39:*11* 44:*11*

**updates** 39:*13, 15*

**use** 17:*2, 4* 24:*6, 14* 26:*12* 58:*12*

**Usually** 26:*19* 39:*8* 43:*14, 25* 46:*19* 48:*4* 50:*7* 51:*19* 52:*8, 9, 10, 21* 57:*16*

**< V >**

**venture** 32:*3*

**verbal** 5:*17* 15:*8*

**vibrate** 6:*16*

**VIDEO** 1:*13, 17*

**violence** 11:*21, 22*

**visit** 19:*10*

**< W >**

**waiting** 42:*22*

**walk** 10:*2*

**walked** 54:*20*

**want** 12:*17* 13:*18* 39:*24* 58:*18*

**wanted** 24:*2, 18*

**WARD** 1:*5*

**warranted** 47:*16* 58:*8*

**watch** 6:*18* 45:*19, 23* 46:*4, 5, 6, 8, 11, 13, 18, 22* 47:*1, 6, 23* 48:*16* 53:*18*

**way** 7:*3* 23:*16* 31:*15* 42:*7* 44:*10*

**week** 16:*4* 33:*21* 57:*5*

**weeks** 19:*8* 22:*4* 29:*1, 4* 31:*1* 50:*18* 51:*24* 53:*5, 9, 10, 11, 12, 13*

**went** 9:*10* 25:*24* 38:*8*

**we're** 6:*1* 42:*16, 17*

**wife** 15:*22* 16:*4, 7* 23:*16, 19* 27:*11* 37:*17* 56:*2*

**wife's** 56:*3*

**Williams** 1:*20* 59:*2, 15*

**Williams-Burns** 36:*13*

**wind** 46:*20*

**withdrawal** 23:*12*

**WITNESS** 3:*2* 4:*3* 15:*12* 39:*23* 46:*9*

**words** 5:*20*

**work** 4:*13* 9:*14* 12:*6* 24:*5, 6* 39:*14* 53:*23, 25*

**workday** 7:*21, 24* 8:*1*

**worked** 10:*5, 7* 21:*11*

**worker** 9:*22*

**working** 10:*4, 12, 20* 52:*18*

**Workplace** 11:*21, 22*

**works** 4:*23* 38:*21*

**worksheets** 24:*13, 14*

**worried** 20:*9, 16, 22* 27:*1, 6* 37:*14*

**write** 6:*1* 29:*15* 30:*6*

**writing** 5:*24* 24:*1*

**written** 14:*8* 34:*5, 9*

**wrote** 24:*1* 28:*25* 29:*3* 34:*13*

**< Y >**

**YAMILE** 2:*6* 4:*7*

**Yeah** 15:*13* 52:*1*

**year** 11:*25* 13:*4, 6, 7* 38:*25* 50:*8* 51:*4*

**yearly** 11:*24* 49:*24*

**Years** 25:*3* 26:*22* 27:*4* 50:*20*

**YORK** 1:*1* 2:*6, 10, 12* 4:*15* 8:*10* 50:*1*

**< Z >**

**Zoom** 6:*20, 21*

Deposition of Jami Palladino                                                                 Estate of Joseph P. King v. Ward, et al.

## WORD LIST

**< 1 >**
**1** *(2)*
**1:00** *(1)*
**10** *(4)*
**10016** *(1)*
**10th** *(1)*
**112** *(1)*
**12** *(1)*
**13** *(1)*
**13202** *(1)*
**13440** *(1)*
**15** *(1)*
**150** *(1)*
**16** *(1)*
**180** *(1)*
**1979** *(1)*

**< 2 >**
**2:31** *(1)*
**20** *(1)*
**2006** *(1)*
**2007** *(1)*
**2008** *(1)*
**2009** *(1)*
**2010** *(1)*
**2012** *(2)*
**2013** *(7)*
**2016** *(7)*
**2017** *(1)*
**2018** *(10)*
**2019** *(2)*
**2022** *(4)*
**20-CV-01413** *(1)*
**21** *(1)*
**23** *(2)*
**23rd** *(1)*

**< 3 >**
**30** *(4)*
**300** *(2)*

**< 4 >**
**4** *(1)*
**45** *(2)*

**< 5 >**
**5** *(3)*

**< 9 >**
**90s** *(1)*
**911** *(1)*

**< A >**
**ability** *(2)*
**able** *(2)*
**above-styled** *(1)*
**abuse** *(1)*
**access** *(1)*
**accommodate** *(1)*
**accurate** *(1)*
**ACKNOWLEDGMEN
T** *(1)*
**acting** *(1)*
**ACTION** *(5)*
**actions** *(2)*
**acts** *(1)*
**actual** *(1)*
**ad** *(1)*
**adamantly** *(1)*
**add** *(1)*
**addition** *(1)*
**address** *(5)*
**addressed** *(1)*
**adequate** *(1)*
**administered** *(1)*
**Administrator** *(1)*
**adverse** *(1)*
**affect** *(3)*
**afternoon** *(1)*
**agitation** *(1)*
**ago** *(1)*
**agreement** *(1)*
**ahead** *(11)*
**Aikens** *(3)*
**AIMEE** *(1)*
**al** *(1)*
**alcohol** *(1)*
**allowed** *(2)*
**alternative** *(4)*
**Amanda** *(1)*
**Amended** *(2)*
**amenities** *(1)*
**Amy** *(3)*
**and/or** *(1)*
**Ann** *(1)*
**Answer** *(13)*

**answers** *(3)*
**antianxiety** *(1)*
**antidepressants** *(1)*
**anxiety** *(3)*
**anybody** *(7)*
**anymore** *(1)*
**appearing** *(1)*
**Apple** *(1)*
**appointment** *(2)*
**appointments** *(1)*
**approaching** *(1)*
**appropriate** *(3)*
**approximate** *(1)*
**approximately** *(2)*
**area** *(2)*
**arranged** *(2)*
**Aside** *(1)*
**asked** *(2)*
**asking** *(2)*
**assess** *(1)*
**assessed** *(1)*
**assessment** *(1)*
**assigned** *(1)*
**associate** *(1)*
**Association** *(1)*
**assume** *(1)*
**attached** *(1)*
**attempt** *(8)*
**attempted** *(4)*
**attend** *(1)*
**attention** *(2)*
**ATTORNEY** *(4)*
**attorneys** *(2)*
**available** *(1)*
**Avenue** *(1)*
**aware** *(33)*

**< B >**
**back** *(10)*
**based** *(1)*
**Basically** *(1)*
**bathroom** *(2)*
**beginning** *(2)*
**behalf** *(2)*
**behavior** *(3)*
**behaviors** *(1)*
**believe** *(1)*
**best** *(2)*
**better** *(1)*

**board** *(8)*
**born** *(2)*
**BRC** *(1)*
**break** *(2)*
**breathing** *(1)*
**briefly** *(1)*
**bring** *(2)*
**brought** *(2)*
**building** *(3)*
**bunch** *(1)*

**< C >**
**call** *(2)*
**called** *(1)*
**Captioner** *(1)*
**care** *(10)*
**case** *(1)*
**caseload** *(7)*
**cause** *(1)*
**cell** *(3)*
**cells** *(1)*
**Center** *(1)*
**Central** *(1)*
**certain** *(1)*
**certificate** *(2)*
**certification** *(1)*
**Certified** *(1)*
**certify** *(3)*
**cetera** *(2)*
**change** *(5)*
**CHANGE/REASON**
  *(1)*
**changes** *(2)*
**chart** *(2)*
**check** *(1)*
**CHEVERIE** *(1)*
**chief** *(5)*
**children** *(1)*
**chronically** *(1)*
**circumstance** *(1)*
**Citrin** *(2)*
**C-i-t-r-i-n** *(1)*
**CIVIL** *(2)*
**clarify** *(1)*
**CLARITY** *(1)*
**clinical** *(2)*
**close** *(5)*
**CNYPC** *(1)*
**college** *(2)*

Case 9:20-cv-01413-TJM-ML   Document 79-6   Filed 03/31/23   Page 31 of 35

Deposition of Jami Palladino                                    Estate of Joseph P. King v. Ward, et al.

come  (3)
coming  (3)
commander  (7)
commencing  (1)
commission  (1)
commit  (5)
committed  (3)
common  (1)
communication  (1)
community  (1)
Complaint  (4)
complaints  (2)
complete  (6)
completion  (1)
compliant  (1)
computer  (1)
concern  (3)
concerned  (2)
Concerns  (7)
concluded  (1)
conditional  (1)
conferred  (2)
connected  (1)
Connections  (1)
consecutively  (1)
consequences  (1)
consider  (1)
contact  (1)
contain  (1)
content  (1)
control  (1)
conversation  (5)
conversations  (1)
converse  (1)
convicted  (1)
coordinator  (6)
cope  (1)
coping  (5)
copy  (1)
core  (1)
correct  (6)
correction  (1)
correctional  (12)
Corrections  (7)
counsel  (6)
counseling  (1)
County  (1)
couple  (8)
course  (1)

COURT  (5)
courtroom  (1)
COWAN  (33)
co-worker  (2)
co-workers  (4)
crime  (1)
crisis  (16)
CRR  (1)
cube  (1)
cubes  (1)
Culverton  (1)
current  (2)
currently  (3)
cut  (2)

< D >
daily  (1)
date  (4)
David  (3)
day  (4)
days  (6)
deal  (1)
dealt  (2)
December  (1)
decision  (2)
deemed  (2)
deems  (1)
Deep  (1)
Defendant  (1)
Defendants  (1)
delivered  (1)
denied  (1)
department  (2)
Depending  (3)
depends  (2)
DEPONENT  (1)
deposed  (2)
DEPOSITION  (8)
depression  (1)
deputies  (1)
Describe  (1)
desk  (2)
device  (1)
diagnosed  (1)
diagnosis  (2)
diary  (1)
different  (12)
Difficulty  (2)
DIRECT  (1)

directs  (1)
discharge  (4)
disciplinary  (1)
disciplined  (1)
discontinuance  (1)
discontinued  (6)
discovered  (1)
discretion  (1)
discuss  (3)
discussion  (1)
distress  (1)
DISTRICT  (2)
DOCCS-related  (1)
doctor  (11)
doctors  (1)
document  (9)
documentation  (2)
documents  (3)
doing  (1)
door  (1)
dorm  (4)
dorms  (1)
Dr  (7)
drafting  (1)
drug  (2)
drugs  (9)
duly  (1)
duration  (1)
duties  (3)

< E >
earlier  (2)
Eastern  (1)
education  (2)
e-mail  (5)
emergency  (4)
eminent  (1)
emotional  (1)
employee  (3)
employment  (1)
engage  (1)
engages  (1)
entail  (1)
entire  (2)
environment  (1)
erase  (1)
Errata  (2)
ESQUIRE  (3)
established  (1)

Estate  (4)
et  (3)
evaluation  (9)
evaluations  (4)
event  (3)
events  (1)
Everybody  (1)
evidence  (2)
exact  (1)
exactly  (1)
Examination  (2)
Exhibit  (9)
experiencing  (2)
expires  (1)
explain  (3)
explained  (2)
express  (1)
expressed  (2)
expresses  (1)
Expressing  (4)

< F >
facilities  (1)
facility  (18)
factor  (1)
factors  (2)
familiar  (3)
family  (6)
Farago  (1)
F-a-r-a-g-o  (1)
feel  (1)
feeling  (1)
feelings  (6)
fellow  (1)
fighting  (1)
file  (1)
filed  (2)
final  (1)
financially  (1)
find  (1)
firm  (1)
first  (11)
Floor  (1)
Follow  (3)
following  (4)
follows  (2)
follow-up  (1)
foregoing  (2)
forgot  (1)

form  (1)
four  (2)
free  (1)
friends  (2)
front  (3)
full  (1)
functioning  (2)
further  (2)

< G >
GENERAL  (13)
getting  (2)
Gina  (4)
give  (6)
given  (3)
gives  (1)
go  (19)
goes  (1)
going  (8)
Good  (1)
gotten  (1)
great  (1)
grievances  (1)
ground  (1)
grounding  (1)
guess  (1)

< H >
HACH  (1)
Hal  (3)
hands  (1)
hang  (3)
happened  (2)
harassment  (1)
head  (1)
Health  (13)
healthcare  (3)
hear  (1)
hearing  (9)
help  (3)
Hernandez  (2)
high  (1)
higher  (2)
HILLARY  (1)
HIPAA  (1)
history  (5)
home  (4)
Honestly  (1)
hoping  (1)

hospital  (2)
hospitalizations  (1)
hour  (4)
housing  (1)
hung  (2)

< I >
ideation  (2)
identification  (2)
ill  (1)
illegal  (1)
illness  (7)
illnesses  (1)
important  (1)
incarcerated  (7)
incarceration  (4)
increase  (1)
increased  (3)
indicate  (1)
indicated  (2)
indicating  (1)
indicators  (1)
individuals  (1)
influence  (1)
informally  (1)
information  (2)
informed  (1)
inmate  (15)
inmates  (16)
inside  (1)
instant  (1)
interested  (1)
intolerance  (1)
investigation  (1)
investigators  (1)
involvement  (1)
iPad  (1)
isolation  (3)
issues  (1)
items  (1)
its  (1)

< J >
JAMI  (7)
January  (2)
job  (2)
Joseph  (4)
July  (1)
jury  (1)

hospital  (2)
< K >
KALKACH  (48)
Karen  (1)
Kari  (1)
keep  (5)
kept  (1)
kids  (1)
kill  (1)
kind  (6)
King  (62)
King's  (14)
Knoeller  (1)
K-n-o-e-l-l-e-r  (1)
know  (66)
knowledge  (4)

< L >
law  (1)
Lawrence  (1)
lawsuit  (4)
lead  (1)
leading  (9)
learn  (2)
leave  (2)
leaving  (1)
led  (2)
left  (1)
legal  (1)
letter  (7)
letters  (10)
level  (10)
Licensed  (1)
licenses  (2)
licensing  (1)
life  (1)
line  (3)
Lisa  (1)
little  (2)
lived  (1)
LLP  (1)
location  (1)
log  (1)
long  (7)
longer  (3)
look  (1)
loss  (1)
lot  (2)

< M >
Madison  (1)
managed  (1)
management  (1)
mandatory  (6)
marked  (2)
MARKS  (1)
marriage  (1)
married  (1)
mean  (5)
meaning  (1)
means  (1)
mechanisms  (1)
medication  (18)
medications  (2)
meet  (4)
meeting  (4)
meetings  (1)
Mental  (23)
mention  (1)
met  (4)
Meyers  (4)
mind  (1)
Minneola  (1)
minute  (2)
minutes  (3)
misbehavior  (2)
mom  (2)
month  (10)
monthly  (1)
months  (5)
morning  (1)
mother  (1)
move  (1)
movement  (1)

< N >
name  (16)
names  (2)
NAPPI  (1)
Nassau  (1)
nature  (1)
NECESSARILY  (1)
necessary  (2)
need  (4)
needed  (3)
never  (1)
NEW  (13)
nod  (1)

nonresponsive *(1)*
normally *(1)*
**NORTHERN** *(1)*
Notary *(1)*
note *(2)*
noted *(1)*
notes *(14)*
notice *(4)*
notified *(4)*
November *(5)*
NTA *(1)*
Number *(1)*
numbered *(1)*
nurses *(2)*
nursing *(1)*

**< O >**
oath *(2)*
object *(1)*
Objection *(23)*
observation *(1)*
obtain *(2)*
obtained *(1)*
occur *(1)*
occurred *(1)*
offer *(2)*
offered *(1)*
OFFICE *(3)*
officer *(2)*
officers *(1)*
official *(6)*
Oh *(1)*
okay *(27)*
Once *(10)*
ones *(6)*
one-to-one *(1)*
open *(1)*
opinion *(2)*
opposed *(1)*
order *(2)*
organized *(2)*
outcome *(1)*
outcomes *(1)*
outside *(1)*

**< P >**
p.m *(2)*
PAGE *(2)*
pages *(1)*

**PALLADINO** *(14)*
paper *(1)*
parole *(16)*
part *(1)*
participate *(1)*
parties *(1)*
party *(1)*
passed *(2)*
passing *(2)*
patient *(8)*
patients *(1)*
pays *(1)*
people *(8)*
perception *(3)*
Perfect *(1)*
perform *(2)*
period *(3)*
periods *(2)*
person *(6)*
personal *(1)*
person's *(4)*
phone *(1)*
place *(2)*
placed *(5)*
placing *(1)*
Plaintiff *(3)*
planner *(1)*
planning *(3)*
please *(17)*
point *(1)*
policies *(3)*
policy *(9)*
population *(10)*
portions *(1)*
position *(5)*
possible *(1)*
potential *(2)*
prepare *(1)*
prerelease *(2)*
prescribed *(1)*
prescriber *(4)*
prescribers *(2)*
prescriber's *(1)*
prescription *(5)*
present *(1)*
presented *(1)*
pretty *(1)*
prevent *(1)*
prevention *(2)*

previous *(2)*
prior *(2)*
prison *(2)*
private *(1)*
probably *(5)*
problems *(3)*
process *(2)*
Professional *(2)*
program *(4)*
programs *(1)*
progress *(2)*
propounded *(1)*
PROs *(1)*
Prosequendum *(1)*
protective *(1)*
protocol *(1)*
provide *(4)*
provided *(1)*
provider *(1)*
provides *(1)*
Psychiatric *(1)*
psychotic *(3)*
Public *(1)*
put *(2)*

**< Q >**
question *(11)*
questions *(5)*
quickly *(1)*
quite *(2)*
QUOTATION *(1)*
QUOTE *(1)*

**< R >**
read *(10)*
reading *(1)*
really *(4)*
Realtime *(2)*
reasons *(2)*
recall *(11)*
receive *(12)*
received *(7)*
receiving *(1)*
receptive *(3)*
Recess *(1)*
recognize *(5)*
record *(3)*
recorded *(1)*
refer *(1)*

**REFLECT** *(1)*
reflects *(1)*
reframe *(1)*
regarding *(4)*
regards *(5)*
**REGIONAL** *(1)*
Registered *(2)*
related *(2)*
relationship *(1)*
relative *(1)*
release *(3)*
released *(3)*
remember *(19)*
remembering *(1)*
**REMOTE** *(2)*
remotely *(1)*
repeat *(12)*
rephrase *(3)*
report *(7)*
reported *(5)*
Reporter *(5)*
reporters *(1)*
reporting *(1)*
reports *(4)*
representation *(1)*
represents *(1)*
request *(1)*
requesting *(3)*
requires *(1)*
respect *(4)*
response *(2)*
responsibilities *(1)*
rest *(1)*
restart *(1)*
return *(1)*
returned *(1)*
review *(7)*
right *(8)*
risk *(8)*
risks *(2)*
Road *(1)*
role *(4)*
Rome *(1)*
room *(2)*
ROSE *(1)*
routinely *(1)*
RPR *(1)*
rules *(1)*
run *(2)*

Case 9:20-cv-01413-TJM-ML   Document 79-6   Filed 03/31/23   Page 34 of 35

Deposition of Jami Palladino                                          Estate of Joseph P. King v. Ward, et al.

runs *(1)*

**< S >**
sanctioned *(1)*
saw *(2)*
saying *(1)*
scene *(1)*
scheduled *(5)*
SCHIRRIPA *(1)*
scratch *(1)*
screen *(1)*
screened *(5)*
screening *(1)*
second *(3)*
see *(18)*
seen *(10)*
self-harm *(10)*
send *(2)*
sending *(1)*
sent *(2)*
sentence *(1)*
separation *(1)*
sergeants *(1)*
serious *(1)*
services *(1)*
session *(12)*
sessions *(3)*
set *(1)*
seven *(4)*
severe *(1)*
sexual *(1)*
shadowed *(1)*
shadowing *(1)*
share *(1)*
shared *(2)*
Sheet *(1)*
shoelaces *(3)*
shoes *(1)*
show *(6)*
showing *(2)*
shred *(2)*
shredded *(1)*
SHU *(1)*
shut *(1)*
sign *(1)*
signed *(1)*
simply *(1)*
situation *(6)*
six *(2)*

skills *(2)*
sleeping *(1)*
smoothly *(1)*
Social *(2)*
somebody *(11)*
sorry *(13)*
South *(1)*
Sowich *(1)*
S-o-w-i-c-h *(1)*
speak *(21)*
speaks *(1)*
special *(6)*
specific *(5)*
specifically *(1)*
spell *(4)*
spoke *(6)*
spoken *(5)*
staff *(5)*
stall *(2)*
Standard *(2)*
start *(2)*
started *(3)*
STATE *(5)*
stated *(4)*
statements *(5)*
STATES *(1)*
staying *(1)*
Stonybrook *(1)*
stopped *(1)*
Street *(1)*
strike *(1)*
stripped *(1)*
study *(1)*
subject *(1)*
Suboxone *(3)*
Subscribed *(2)*
substance *(9)*
suffering *(2)*
sufficient *(1)*
suicidal *(2)*
suicide *(62)*
suicides *(1)*
Suite *(1)*
sum *(7)*
supervision *(5)*
support *(1)*
supportive *(1)*
supposed *(1)*
sure *(5)*

switched *(1)*
sworn *(3)*
symptoms *(5)*
SYRACUSE *(2)*

**< T >**
take *(17)*
taken *(4)*
talk *(7)*
talked *(1)*
talking *(4)*
taught *(1)*
team *(2)*
techniques *(1)*
tell *(6)*
test *(1)*
testified *(6)*
testify *(1)*
testimony *(1)*
Thank *(3)*
therapist *(6)*
therapy *(4)*
thing *(1)*
things *(2)*
think *(5)*
thinking *(1)*
Thomas *(7)*
thought *(2)*
thoughts *(7)*
threats *(2)*
Three *(11)*
ticket *(2)*
tickets *(1)*
Time *(28)*
times *(1)*
today *(7)*
today's *(2)*
told *(4)*
topics *(1)*
totally *(1)*
trained *(8)*
training *(21)*
trainings *(3)*
transcript *(2)*
transcription *(1)*
transfer *(2)*
transferred *(2)*
transferring *(2)*
traumatized *(1)*

treated *(1)*
treatment *(4)*
trial *(2)*
tried *(5)*
true *(1)*
truthfully *(1)*
try *(4)*
trying *(3)*
two *(10)*

**< U >**
understand *(10)*
understanding *(5)*
understood *(4)*
unit *(26)*
UNITED *(1)*
University *(1)*
upcoming *(1)*
update *(3)*
updated *(3)*
updates *(2)*
use *(6)*
Usually *(13)*

**< V >**
venture *(1)*
verbal *(2)*
vibrate *(1)*
VIDEO *(2)*
violence *(2)*
visit *(1)*

**< W >**
waiting *(1)*
walk *(1)*
walked *(1)*
want *(4)*
wanted *(2)*
WARD *(1)*
warranted *(2)*
watch *(16)*
way *(5)*
week *(3)*
weeks *(16)*
went *(3)*
we're *(3)*
wife *(8)*
wife's *(1)*
Williams *(3)*

**Williams-Burns** *(1)*
**wind** *(1)*
**withdrawal** *(1)*
**WITNESS** *(5)*
**words** *(1)*
**work** *(8)*
**workday** *(3)*
**worked** *(3)*
**worker** *(1)*
**working** *(4)*
**Workplace** *(2)*
**works** *(2)*
**worksheets** *(2)*
**worried** *(6)*
**write** *(3)*
**writing** *(2)*
**written** *(3)*
**wrote** *(4)*

**< Y >**
**YAMILE** *(2)*
**Yeah** *(2)*
**year** *(7)*
**yearly** *(2)*
**Years** *(5)*
**YORK** *(8)*

**< Z >**
**Zoom** *(2)*