# EXHIBIT G

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF NEW YORK
 2                 CIVIL ACTION NO.: 20-CV-01413

 3

 4   The Estate of Joseph P. King,
     by and through its Administrator
 5   ad Prosequendum Amy King,
     and in her own right,
 6
          Plaintiff,
 7
     v.
 8
     WARD, et al.,
 9
          Defendant.
10   _____

11

12           *************************************

13          REMOTE VIDEO DEPOSITION OF DR. LI-WEN LEE

14                      JUNE 17, 2022

15           *************************************

16

17       REMOTE VIDEO DEPOSITION OF DR. LI-WEN LEE taken in the

18   above-styled and numbered cause on June 17, 2022, commencing

19   at 10:06 a.m. Eastern Standard Time, before Gina Williams,

20   Registered Professional Reporter, Certified Realtime

21   Reporter, and Certified Realtime Captioner.

22

23

24

25
```

```
 1                    A P P E A R A N C E S

 2              (All attorneys appearing remotely)

 3

 4   On behalf of Plaintiff:

 5        HACH ROSE SCHIRRIPA & CHEVERIE, LLP
          112 Madison Avenue, 10th Floor
 6        New York, New York 10016
     By:  YAMILE KALKACH, ESQUIRE
 7        HILLARY NAPPI, ESQUIRE

 8

 9   On behalf of Defendants:

10        NEW YORK STATE ATTORNEY GENERAL
          SYRACUSE REGIONAL OFFICE
11        300 South State Street
          Suite 300
12        Syracuse, New York 13202
     By:  AIMEE COWAN, ESQUIRE
13

14

15

16

17

18

19

20        QUOTATION MARKS ARE USED FOR CLARITY AND DO NOT
               NECESSARILY REFLECT A DIRECT QUOTE
21

22

23

24

25
```

```
 1                        I N D E X

 2    WITNESS                                        PAGE

 3    DR. LI-WEN LEE

 4    Examination by Ms. Kalkach                       4

 5                         -  -  -  -

 6                     E X H I B I T S

 7    Number

 8       Exhibit A    Amended Complaint              21

 9       Exhibit B    Answer to Amended Complaint    23

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

1  WHEREUPON,
2         DR. LI-WEN LEE
3  was called as a witness and, after having been first duly
4  sworn, was deposed and testified as follows:
5         EXAMINATION
6  BY MS. KALKACH:
7     Q    Good morning, Ms. Lee.  My name is Yamile
8  Kalkach.  I'm with the law firm that represents the
9  Plaintiff, the Estate of Joseph King.
10        Could you please state your full name and current
11 address for the record?
12        MS. COWAN:  You mean business address, right?
13        MS. KALKACH:  Yeah.
14        MS. COWAN:  Okay.
15    A    My full name, you need it spelled?
16 BY MS. KALKACH:
17    Q    Yes, please.
18    A    Li-Wen Lee, L-i - W-e-n, last name is Lee, L-e-e.
19        My address is -- work address is New York State
20 Office of Mental Health, New York City Field Office, 330
21 Fifth Avenue, 9th floor, New York, New York 10001.
22    Q    Thank you.
23        Ms. Lee, I'm going to go over a few ground rules
24 to help you today so we can run this deposition as quickly
25 and smoothly as possible.

Page 5

1         Have you ever been deposed before?
2     A    It's been a long time.  Once before.
3     Q    Have you ever testified at trial?
4     A    What kind of trial?
5         With mental hygiene hearings, yes.
6     Q    What was the nature of the case where you were
7  deposed before?
8     A    This was related to policy on transgender
9  treatment.
10    Q    Do you remember the caption of the case?
11    A    No, I don't.
12    Q    Do you understand that you are under oath today?
13    A    Yes.
14    Q    And that this is the same oath that you would
15 take in a courtroom?
16    A    Yes.
17    Q    Are you on any medications which may affect your
18 ability to testify truthfully today?
19        I'm sorry?
20    A    No.
21    Q    If you don't hear or understand a question that I
22 ask you, please feel free to ask me to repeat or rephrase
23 the question, and I will.
24        That also means that if you answer a question
25 that I ask, I will assume you understood the question and

Page 6

1  your answer was based on that understanding.
2         It is also important that you give verbal answers
3  as opposed to a head nod so that the court reporter may take
4  down your words, okay?
5     A    Okay.
6     Q    And it's also best not to talk over one another.
7  Otherwise the court reporter is going to have a hard time
8  writing down what we're saying.
9         If at any time today you need a break, please
10 just let me know, and we will accommodate.
11        The only thing I ask from you is that if there's
12 a question that hasn't been answered, it has to be answered
13 before we take the break, okay?
14    A    Yes.
15    Q    Now, there may be many times today that your
16 attorney may object to a question, but unless she directs
17 you not to answer, then you still must answer, okay?
18    A    Okay.
19    Q    Now, please turn off all other devices that you
20 have around you, cell phone, Apple watch, iPad, computers,
21 et cetera, or put them on mute or silent.
22    A    Okay.
23    Q    Please also close any other documents or programs
24 on your screen other than Zoom and the ones that -- other
25 than the ones I'll be showing you today.

Page 7

1     A    Okay.
2     Q    Do you have any paper documents in front of you?
3     A    I have a question.
4         Should I be opening up the exhibit link now, or
5  is that --
6     Q    No, we will do that.  You don't have to be --
7     A    Okay.
8     Q    So there's no other paper documents in front of
9  you?
10    A    No.
11    Q    Okay.  Is there anyone else in the room with you?
12    A    No.
13    Q    Are you under the influence of any drugs or
14 alcohol that in any way may affect the testimony which you
15 are about to give?
16    A    No.
17    Q    Okay.  So what did you do to prepare for today's
18 deposition?
19    A    For today's deposition, I spoke with Aimee Cowan,
20 and I reviewed some older documents related to this case,
21 including the psychological autopsy and some of the CNYPC
22 policies.
23    Q    Which policies did you review?
24    A    Around risk assessment, risk management review
25 practices at CNYPC.

Deposition of Dr. Li-Wen Lee                                    Estate of Joseph P. King v. Ward, et al.

Page 8

1  Q   For how long did you meet with your counsel?
2  A   I think about an hour.
3  Q   Other than your counsel, was anyone else present?
4  A   No.
5  Q   Did you discuss today's depositions with anyone
6  other than your counsel?
7  A   No.
8  Q   Have you ever used any other names?
9  A   No.
10 Q   Have you ever been convicted of a crime?
11 A   No.
12 Q   When were you born?
13 A   July 18, 1974.
14 Q   Where were you born?
15 A   Houston, Texas.
16 Q   Are you married?
17 A   Yes.
18 Q   Do you have kids?
19 A   Yes.
20 Q   Have you ever been subject of a disciplinary
21 complaint?
22 A   No.
23 Q   Have any complaints or grievances been filed
24 against you?
25 A   Not that I'm aware of.

Page 9

1  Q   Have you ever been a party of a lawsuit before?
2  A   Not personally.
3  Q   So you told me you testified in court.
4      When was this?
5  A   I'm sorry.  I'm trying to think back.  It's been
6  a while.
7  Q   That's okay.
8  A   I was a clinician up until 2008.  So back then
9  there would have been occasional hearings for treatment over
10 objection or retention hearings, those kinds of hearings,
11 treatment hearings.
12     After that in my OMH role, there were a handful
13 of hearings related to Article 10 -- Mental Hygiene Law
14 Article 10 type decisions.  They've not been recent, not
15 within a few years.
16 Q   When was the last time?
17 A   I don't remember the exact year, so I think if I
18 came up with something, I would be guessing.  Something
19 pre-pandemic.
20 Q   Do you have an approximation, let's say, I
21 mean --
22 A   I don't remember exactly.  I'm sorry.
23     Maybe 2018.
24 Q   What kind of witness were you?
25 A   I was the commissioner's designee for those

Page 10

1  Article 10 hearings.  It's a technical term in Article 10.
2  Q   Okay.  And you told me you testified in a
3  deposition.
4      When was this?
5  A   I don't remember the year.  Maybe 10 years ago.
6  Q   What was the lawsuit about?
7  A   Over a provision of transgender treatment.
8  Q   What kind of witness were you?
9  A   Just explaining policy.
10 Q   Did you attend college?
11 A   Yes.
12 Q   Where did you go?
13 A   University of Texas.
14 Q   When did you go there?
15 A   1992 to 1996.
16 Q   What did you major in?
17 A   Chemical engineering.
18 Q   And did you go to graduate school?
19 A   I went to medical school.
20 Q   When did you go to medical school?
21 A   1996 to 2000.
22 Q   When did you become a medical doctor?
23 A   In 2000 when I received my medical degree.
24 Q   Do you have any other licenses?
25 A   No.  Just medicine.

Page 11

1  Q   Where did you go to graduate school -- to med
2  school?
3  A   University of Texas Medical Branch.
4  Q   Did you specialize in a specific field?
5  A   Psychiatry and then forensic psychiatry.
6  Q   Where did you specialize?
7  A   Sorry?
8  Q   Where did you specialize?
9  A   You mean where did I do my residency training?
10 Q   Yes.
11 A   I completed my residency training at Beth Israel
12 Medical Center in New York City.  And then I did my forensic
13 psychiatry fellowship through Albert Einstein College of
14 Medicine, Bronx.
15 Q   Besides what we have discussed, have you taken
16 any other certification program or licensing program?
17 A   No.
18 Q   Could you briefly walk me through your employment
19 history leading up to your current position?
20 A   After fellowship I took a position at Bellevue
21 Hospital Center on the Inpatient Forensic Psychiatry Unit,
22 and I was there as an attending psychiatrist, and then later
23 as unit chief until 2008.
24     So in 2008 I left Bellevue to come to the Office
25 of Mental Health in a position of medical director for the

Deposition of Dr. Li-Wen Lee                                    Estate of Joseph P. King v. Ward, et al.

Page 12

1  Division of Forensic Services, and I have been at OMH since
2  that time.
3      I have a different title.  I'm no longer the
4  medical director.  Beginning in late 2019, I moved into the
5  associate commissioner role.  Someone else has the medical
6  director role now.
7      Q    Okay.  Now, what were the roles and
8  responsibilities that you had at the Division of Forensic
9  Services?
10     A    The Division of Forensic Services at OMH is
11 responsible for working with the OMH Forensic Psychiatric
12 Centers, as well as local jurisdictions around the
13 statutorily mandated populations, and those include
14 individuals who have been found unfit to stand trial and are
15 in need of restoration to fitness to return to their legal
16 proceedings, as well as the management of individuals who
17 have been found not responsible by reason of mental disease
18 or defect, not in terms of whether or not they reach that
19 verdict, but what happens afterwards.
20     There's also the state prison mental health
21 services that are offered to individuals in state custody,
22 both the inpatient program, as well as the
23 correctional-based programs, and sex offender management
24 under mental hygiene Article 10.
25     So within the Division of Forensic Services,

Page 13

1  we're not providing any of those services directly, but we
2  are working with the facilities to help them with the
3  responsibilities and the services that they're providing, as
4  well as coordinating with any other stakeholders.
5      So local jurisdictions that might have patients
6  coming to and from services or the court systems
7  correctional facilities, those kinds of parties.  In broad
8  strokes, that's --
9      The medical director, the role was to provide
10 some of that clinical insight and understanding into the
11 services that were being provided to assist the central
12 office in navigating those relationships, as well as helping
13 the facilities in certain situations.
14     Q    Okay.  Division of Forensic Services, how long
15 did you work -- did you work there?
16     A    Since 2008.
17     Q    To whom did you report?
18     A    As a medical director, I would report to the
19 associate commissioner.
20     Q    Both?
21     I'll separate it.
22     To whom did you report when you were medical
23 director?
24     A    As medical director, I reported to whoever the
25 associate commissioner was at the time.

Page 14

1      Q    What's the name of the position you have right
2  now?
3      A    Associate commissioner for the Division of
4  Forensic Services.
5      Q    Who do you report to now?
6      A    Now I report to --
7      What's his title?
8      -- deputy commissioner.
9      Q    What's the name of the deputy commissioner?
10     A    Jeremy Darman.
11     Q    Who reports to you?
12     A    We have a deputy director within the Division of
13 Forensic Services who reports to me, and the medical
14 director also directly reports to me.
15     Q    Do you know Ann Marie Sullivan?
16     A    I do know Ann Maria Sullivan.
17     Q    You do?
18     A    Yes.
19     Q    What is your relationship with her?
20     A    She is the commissioner for the Office of Mental
21 Health, and so I know her in her role as the commissioner
22 for our agency.
23     Q    So do you have projects together?
24     A    There are times that we would -- she would have
25 something that she would want looked into, or there are

Page 15

1  overall agency projects that the division might be
2  participating in.
3      We do not interact with her on a daily basis.
4      Q    Did you have a conversation with her before this
5  deposition?
6      A    Not about this deposition.
7      Q    When was the last time that you spoke to her?
8      A    Today is Friday.  I spoke to her on Tuesday.
9      MS. COWAN:  I think we lost you on video.
10     Is anyone else able to see her?
11     MS. KALKACH:  For me it's the other way around.
12 I cannot see anyone, I just noticed.  Like I can see
13 my --
14     Oh, my God, what is going on?
15     MS. COWAN:  We can see you now.
16     MS. KALKACH:  You can see me?
17     MS. COWAN:  Yes.
18     MS. KALKACH:  I don't know what's going on with
19 all my devices, apparently.
20     MS. COWAN:  Let's go off the record for a second.
21     (Discussion was held off the record.)
22     (Last question was read back.)
23 BY MS. KALKACH:
24     Q    Did she reach out to you or you reach out to her
25 or something else?

Deposition of Dr. Li-Wen Lee                                  Estate of Joseph P. King v. Ward, et al.

Page 16

1   A   I reached out to her.  I had a question.
2   Q   So what was the sum and substance of this
3 conversation?
4   A   I wanted to ask her about her thoughts on
5 accreditation options for the Article 10 program.
6   Q   Did you have a conversation with her regarding
7 this case?
8   A   No.
9   Q   Are you aware of what this lawsuit is about?
10  A   I think in large part, yes.
11  Q   How did you become aware of that information?
12  A   When I was contacted in terms of the
13 deposition -- this deposition.
14  Q   So when you say "in large part, yes," what does
15 that entail?
16  A   That this is about an inmate suicide -- inmate
17 patient suicide.
18  Q   Do you know Mr. Hal Meyers?
19  A   I do know him, yes.
20  Q   What is your relationship with him?
21  A   He has had --
22      He works for Central New York Psychiatric Center
23 in corrections-based operations, so there are times when he
24 will be at a meeting that the facility is having for
25 different reasons.

Page 17

1       There is also a brief period when I had first
2 started working at OMH within the Division of Forensic
3 Services when he was also working within the Division of
4 Forensic Services.
5       I do not know how long he was there, but he was
6 not there much longer after I got there.
7   Q   Did you have a conversation with him about this
8 deposition?
9   A   No.
10  Q   Did you have a conversation with him before this
11 deposition?
12  A   I've known him since 2008, so at various times
13 I've talked to him.
14  Q   When was the last time that you spoke to him?
15  A   The last time that I've personally spoken to him
16 has been quite some time.  I cannot put a time frame on it
17 because I don't remember.  Not this year.
18  Q   How is the Office of Mental Health organized?
19      MS. COWAN:  Objection.
20  A   Well, it's --
21      There are different components within the central
22 office.  Some of them are folks on the community side, some
23 of them on licensing.
24      There is an Adult & Children's Division that
25 focuses on civil -- the civil side.

Page 18

1       And then there's also forensics, which I've
2 described in terms of the key areas that are covered or
3 encompassed within forensics.
4       But there are also the psychiatric centers, which
5 is how direct services are organized.  The psychiatric
6 centers, some of them deliver only inpatient services.  Some
7 of them have an outpatient footprint as well.  And they have
8 their own structure of administration and supervision.
9 BY MS. KALKACH:
10  Q   How many divisions does the Office of Mental
11 Health have?
12  A   How many what?
13  Q   Divisions.
14  A   How many divisions?
15  Q   Yes.
16  A   I mean, I know it will sound odd, but I will
17 actually need to look at it to count up the formal
18 divisions.  They're not all called divisions.  Some are
19 bureaus.  It gets complicated.
20  Q   I'm going to move to strike the portions that are
21 not responsive.
22      And what is the objective of the Office of Mental
23 Health for New York State?
24      MS. COWAN:  Objection.
25  A   The Office of Mental Health is a combination of

Page 19

1 providing mental health services in the public sector, as
2 well as promoting and establishing policies for delivery of
3 mental health services in New York State beyond the
4 state-operated services.
5 BY MS. KALKACH:
6   Q   What is the mission of the Office of Mental
7 Health for New York State?
8   A   I can't quote it to you.
9   Q   Okay.  Do you know the specific facts of this
10 case?
11      MS. COWAN:  Objection.
12  A   I know facts about this case.  I don't know if I
13 know every single fact about this case that you might know
14 or be thinking about.
15 BY MS. KALKACH:
16  Q   Were you aware that Mr. King committed suicide in
17 the New York State correctional facility?
18  A   Yes.
19  Q   Are you aware that Mr. King used his shoelaces to
20 commit suicide?
21  A   Yes.
22  Q   Are you aware that Mr. King had already attempted
23 to commit suicide with his shoelaces a couple of years
24 before?
25  A   Yes.

Case 9:20-cv-01413-TJM-ML   Document 79-7   Filed 03/31/23   Page 9 of 40

Deposition of Dr. Li-Wen Lee                                    Estate of Joseph P. King v. Ward, et al.

Page 20

Q    Did you ever talk about this lawsuit with anybody you work with?

A    With the lawsuit, only in the context of this deposition and being asked to come and testify.

Q    So, yes, you did?

A    Yes.

Q    Who did you speak to?

A    We have our counsel who notified me that somebody was needed to testify for the commissioner, and she sent me information connecting me with the Attorney General's Office.

Q    Okay.  What are the names of these co-workers?

A    Peggy Drake.  Margaret Drake.

MS. COWAN:  OMH counsel, just so you know.

BY MS. KALKACH:

Q    When did you speak to them?

A    I think around the time that I was asked to testify for the deposition, which may be about a month ago or so, in order to understand what I was going to be speaking to.

Q    Okay.  So what were the sum and substance of the conversation you had with the commissioner?

A    With the commissioner?

Which conversation?

I'm sorry.  I don't understand.

Page 21

Q    I'm sorry.  I thought --

I'm going to rephrase that.

Can you please repeat the names of the two people you spoke with?

A    It was one person.  I'm sorry.  Peggy and Margaret are the same person.

Q    Okay.  What was the sum and substance of the conversation with Margaret?

MS. COWAN:  Yeah, I'm going to object to that and direct her not to answer.  That's an attorney that she was speaking with from OMH.

BY MS. KALKACH:

Q    Do you remember when the lawsuit was filed?

A    No, I don't.

MS. KALKACH:  Off the record.

(Discussion was held off the record.)

MS. KALKACH:  I offer Exhibit A into evidence, if you could please put Exhibit A.

VIDEO TECHNICIAN:  That will be marked; is that correct?

MS. KALKACH:  Yes, that's correct.

(Exhibit A was marked for identification.)

BY MS. KALKACH:

Q    Dr. Lee, please take a minute to review this exhibit.

Page 22

MS. KALKACH:  Technician, if you could please just scroll down.  She doesn't have to read every word, just to see if she recognizes the document.

BY MS. KALKACH:

Q    Dr. Lee, if you could please let me know when you're finished reviewing this document.

A    These complaints don't come to me.

Q    Are you finished reviewing the document?

A    I'm on page 2, but what I'm trying to say is, no, I did not read this before.

MS. KALKACH:  Okay.  We can stop showing Exhibit A.  Thank you.

BY MS. KALKACH:

Q    Do you recognize the document which has been marked as Exhibit A?

A    You mean have I seen it before?

I have not spent time with that document before.

Q    Do you recognize it?

A    What are you asking me by asking if I recognize it?

Q    Have you seen it before?

A    No, I haven't read that.

Q    But have you seen it before?

You could have seen it, yet not read it.

A    I'm somewhat confused by that question.

Page 23

Q    Is this the first time that you see the document that was marked as Exhibit A?

A    I believe so, yes.  I haven't read it.

MS. KALKACH:  Okay.  I'm going to move to strike the portions not responsive.

Now I would like to mark Exhibit B into evidence.  Could you please show it to her?

BY MS. KALKACH:

Q    Please take a minute to review this exhibit, and when you're finished, let me know.

A    I'm sorry.  It's too small.

Q    Is that better?

A    That's better.

VIDEO TECHNICIAN:  Did you want to take control and walk through the document, Ms. Lee, or did you just want to keep scrolling?

THE WITNESS:  You're fine.

MS. COWAN:  Were you going to ask if she's ever seen this before?

MS. KALKACH:  Yes, yes, but it's -- that's what I'm going to do.

(Exhibit B was marked for identification.)

BY MS. KALKACH:

Q    Just let me know if you're finished reviewing the document.  I just want to know if you recognize it and if

Page 24

1  you have seen it before.
2      A    I haven't seen it before, and I don't recognize
3  it.
4          MS. KALKACH:  Okay.  Thank you so much,
5      Technician.
6  BY MS. KALKACH:
7      Q    Have you signed any written statements or made
8  any recorded statements or spoken to any attorneys or
9  investigators or reporters about the events related to this
10 lawsuit?
11     A    Not related to the lawsuit.
12         Speaking with Aimee, counsel.
13     Q    Did you know Joseph King?
14     A    I do not know him, no.
15     Q    Before today have you ever heard about Mr. Joseph
16 King?
17     A    Yes, I have.
18     Q    When did you hear about him?
19     A    At the time of his suicide, Central New York has
20 a notification procedure, so they sent out notice.
21     Q    How did you receive notice?
22     A    E-mail notification saying that a suicide has
23 occurred.  It provides a little bit of basic information,
24 where, when, that kind of thing.
25     Q    Do you remember this other information that was

Page 25

1  in the notice?
2      A    The usual notice is generally the same.  It's got
3  the location, the date, basic information, demographic
4  information, age of the individual, some other diagnoses, if
5  there was -- how suicided.
6          It's usually very preliminary information, and
7  it's considered just the notification.
8      Q    Do you know when he was incarcerated?
9      A    I believe that was starting in 2013.
10     Q    How many of these notices have you received in
11 the past year?
12     A    In the past year?
13     Q    Yes.
14     A    I don't have that number accurately off the top
15 of my head.
16         If you want an estimate, I can give you an
17 estimate.
18     Q    Yeah.  Do you have an estimate?
19     A    Maybe in the last 365 days, 8 or so.
20     Q    In 2018 do you have an approximate of how many of
21 these notices that you received?
22     A    2018, the number varies somewhere between --
23 2018, I don't remember the exact number.  For 2018, there
24 might have been around 15 or so.
25         I'm sorry.  When I said earlier about 6 or 8

Page 26

1  notices, I didn't mean 365 days.  That was an inaccuracy.  I
2  meant for the last -- starting for 2022.
3      Q    I see.  So approximately over a year --
4          Okay, strike that.
5          Is there an approximate number of notices that
6  you receive per year since you have been working at the OMH?
7      A    Yeah, there's a range.  It might be maybe 12 to
8  20, in there somewhere.  Every year is different.
9      Q    Do you have access to that information?
10     A    Yes, I do.
11     Q    Is there a yearly report, or where is this
12 information?
13     A    We go over suicides on a recurring basis through
14 the year to try to understand if there are trends or other
15 areas to make a change.
16         So we do talk about the numbers on an ongoing
17 basis with Central New York.
18     Q    How often do you go over the suicide trends?
19     A    It depends.  We talk about trends at least twice
20 a year.
21         Central New York talks about trends internally
22 much more often than that.
23     Q    Once you have the meeting, is there a report that
24 comes out of it or any official document at the conclusion
25 of these meetings?

Page 27

1      A    We don't make an official report.  It's more of a
2  discussion.
3      Q    Who was involved in the discussion?
4      A    There's --
5          So there's a discussion to look at trends, which
6  would involve the medical director for the Division of
7  Forensic Services, deputy director for Central New York's
8  corrections-based operations, director of suicide
9  prevention, clinical director, chief psychologist, executive
10 director, to talk about it.
11         And they have also, again, their own meetings,
12 including some meetings with Department of Corrections, to
13 talk about suicide prevention.
14     Q    Are you aware of any policy regarding inmates
15 with mental illness?
16         MS. COWAN:  Objection.
17     A    Central New York has a whole slew of policies
18 around how they provide services to inmates with mental
19 illness.
20 BY MS. KALKACH:
21     Q    What are the names of these policies?
22     A    I don't know the names of all of them.  There's a
23 lot.
24         They have a policy manual.  If I need something,
25 I'll look it up, but I don't have them off the top of my

Case 9:20-cv-01413-TJM-ML Document 79-7 Filed 03/31/23 Page 11 of 40

Deposition of Dr. Li-Wen Lee                                    Estate of Joseph P. King v. Ward, et al.

Page 28

1  head.

2     Q    Who creates these policies?

3     A    Central New York Psychiatric Center creates those

4  policies to be consistent with OMH agency policies.

5     Q    And who approves the policies?

6     A    The facility policies, they have an internal

7  policy approval that also involves their medical staff

8  organization.

9     Q    So what I want to understand is, what is the

10 process of creating a policy from beginning to end?

11    A    I'm not involved in their policy creation.  I'm

12 not sure I can describe that to you with any accuracy.

13    Q    Do you know how often the policies get updated?

14    A    That's going to depend.  Sometimes I know that if

15 they change a practice, they're going to update a policy.

16       If they set up a new program, they're going to

17 update the policy.

18       If there's a change in a joint commission

19 requirement, they'll change policy to be consistent.

20       So there are different things that will trigger a

21 policy update.

22    Q    Would a trend in suicide be something that would

23 trigger a change in policy?

24    A    A trend by itself doesn't trigger a change in

25 policy, but if there's a change in practice related to a

Page 29

1  trend, then that would trigger a change in policy.

2     Q    Can you please explain this a little bit further?

3     A    I'm trying to think of a way to explain it.

4       So systems of care in psychiatric centers

5  included -- have quality management, quality improvement

6  practices to review the care that's been delivered and

7  review outcomes.

8       If they identify a problem, then they look at how

9  to -- whether it's a systemic issue or a one-time issue and

10 try to make decisions about how to improve upon those

11 issues, those problems, and sometimes those reviews result

12 in deciding to make a modification to a policy.

13       So it would depend.  It's not always a specific

14 trend.  It might just be an area that they're continuously

15 looking to improve upon, so maybe no specific trend, but

16 just something that they think is better, and they might be

17 responding to that.

18    Q    Understood.

19       Who is in charge of updating the policies?

20    A    The facilities update their own policies.

21    Q    Do you know what the process from beginning to

22 end for updating a policy is?

23    A    No, only generally.  I don't know the beginning

24 to end.

25    Q    Can you explain generally how it works?

Page 30

1     A    The psyche centers have their own structure of

2  administration and supervision.

3       When they identify a need, either one of these --

4       Maybe a joint commission accreditation

5  requirement has changed.

6       Maybe they've decided to update a practice.

7       Whatever it is, if they've decided that there's a

8  need to change a policy, then they will pull the policies

9  that are impacted by this change, and they have their own

10 process to revise and review.  I'm not qualified to speak to

11 their internal steps.

12    Q    I understand.

13       When you say "they," do you know what the

14 position of the people that decide when to revise and review

15 are?

16    A    I don't know if it's a specific person that

17 you're looking for who would say, okay, it's time to revise

18 a policy, but they have a team approach to administration

19 and supervision.

20    Q    So this goes to my next question.

21       Which department is in charge of overseeing the

22 updates of the policies?

23    A    It's a combination I think in terms of

24 responsibility for policy development.  They have quality

25 management involved.  The clinical director would be

Page 31

1  involved, the deputy director.

2       There might be other individuals, depending on

3  what kind of policy it is.

4     Q    Who within the department is in charge of

5  overseeing that the policies get updated?

6     A    I don't know who the specific person would be

7  that they would give that to.

8     Q    Would they be in charge of the team that

9  administrates and supervises the policies?

10    A    Their policy development?

11       I'm not involved in their process of policy

12 development.  These questions I don't know the specific

13 answers to.

14    Q    Okay.  After the policy is updated, do you know

15 who is in charge of distribution?

16    A    I do not know who specifically is in charge of

17 distribution.

18    Q    Do you know the position of the person that would

19 be in charge of distribution?

20    A    No.

21       All I know about policy distribution is that when

22 they decide on a new policy, that they have a process of

23 distributing it, but I do not get involved in how they do

24 that.

25    Q    Okay.  Do you know if it's an electronic or paper

Case 9:20-cv-01413-TJM-ML   Document 79-7   Filed 03/31/23   Page 12 of 40

Deposition of Dr. Li-Wen Lee                                                    Estate of Joseph P. King v. Ward, et al.

Page 32

1 distribution?
2    A    I would imagine so.
3    Q    Both, electronic and paper or electronic or only
4 paper?
5    A    I would have to guess.
6         These days there's a lot of electronic
7 distribution, and sometimes there's paper, and sometimes
8 there's both.
9    Q    I'd rather not have you guessing.
10        If you don't know, just --
11        I don't know.  That's what I'm trying to say is,
12 I don't know.
13   Q    Do you know who makes sure that the new policy
14 gets delivered to their distribution destination?
15   A    No, I don't.
16   Q    Do you know who ensures that the policy gets
17 taught to the people who are supposed to follow it?
18   A    No, I don't keep track of that either.
19   Q    Do you know --
20        Do you know the amount of time that could pass
21 between the update of a policy and the training of all the
22 people that are obliged by a policy?
23        MS. COWAN:  Objection.
24   A    I can't answer that.  I don't actually know.
25

Page 33

1 BY MS. KALKACH:
2    Q    Have you read any of the policies regarding
3 inmates with mental illnesses?
4    A    Some of them, yes.
5    Q    Which ones have you read?
6    A    I think I'd need to see the manual, and then I
7 could tell you.  I don't have those memorized.
8    Q    How long ago did you read them?
9    A    I read them on an ongoing basis, depending what
10 I'm looking for, you know.  There's --
11        It can be sporadic, sometimes more often than
12 others.  I'm not sure how to answer that.
13   Q    Why did you read them?
14   A    Usually because I'm looking for how something is
15 defined.
16        There are a lot of different statutes that are
17 put out or proposed that might impact how services are
18 delivered, so I would refer to a policy to understand what
19 that might mean.
20   Q    What did you learn about them?
21   A    What did I learn about them?
22   Q    About the policies as they existed, what did you
23 learn about them?
24   A    Oh, I mean, every psyche center has policies.
25        So when we're looking for policies, we ask the

Page 34

1 psyche center for access.
2    Q    Do you get training on these policies, or do you
3 learn them on your own?
4    A    No.
5         I'm not a facility-based staff person.  I
6 wouldn't get training in their policies.
7    Q    At the facility centers, do you know who provides
8 the training?
9    A    They have an admin training department who
10 provides training.
11   Q    Do they get continuing training, or do they only
12 train once?
13   A    I don't know their schedule for training, but I
14 know that Central New York has a continuous approach to
15 keeping their staff up to date.
16   Q    Do all the people that need to follow the policy
17 receive training when they join the company?
18   A    You want to know if every new employee gets
19 training?
20   Q    Yes.
21   A    All the employees are oriented to a facility and
22 what they need to do.
23   Q    Do they get training in policies?
24   A    I have never sat in on their new employee
25 training.

Page 35

1    Q    Do you know if the training for the policies is
2 voluntary or mandatory or something else?
3    A    I would have to assume.  I'm not involved in
4 their training.
5    Q    Now I'm going to go back a little bit about when
6 we were speaking about the processes.
7         Who would know all this information?
8         MS. COWAN:  Objection.
9 BY MS. KALKACH:
10   Q    Who specific --
11        Who would know the process from beginning to end
12 for updating a policy?
13   A    Central New York administration would be.
14   Q    Are you aware of any document that has all this
15 information?
16   A    There might be.  I don't know.
17   Q    Okay.  Are you aware of any policies regarding
18 shoelaces and inmates?
19   A    Not specifically about shoelaces.
20   Q    Okay.  Are correctional facilities assigned a
21 mental health level?
22   A    Yes.
23   Q    Are you aware which facility Mr. King was housed?
24   A    He was at Mid-State.
25   Q    Do you know which mental health level was it

Page 36

1 assigned?
2    A    I would want to check that to be sure instead of
3 telling you what I think.
4    Q    So you don't know?
5    A    No.
6    Q    How do the correctional facilities obtain their
7 health level?
8    A    It's decided jointly between OMH and the
9 Department of Corrections in terms of where logistically
10 they can set up services, how much capacity is needed.
11    Q    What is the relationship between Mid-State
12 Correctional Facility and the Office of Mental Health of New
13 York?
14        MS. COWAN:  Objection.
15    A    Are you asking --
16        Well, so at Mid-State Correctional Facility, that
17 is a facility operated by the Department of Corrections and
18 Community Services, and they have their own hierarchy.
19        Mental health services are provided on site by
20 Central New York Psychiatric Center staff.  CNYPC is an OMH
21 psychiatric center.
22 BY MS. KALKACH:
23    Q    Okay.  How is it decided when an inmate should be
24 assigned to a specific correctional facility?
25    A    There are different factors that are considered,

Page 37

1 and they're not all up to CNYPC.  But if an individual is
2 admitted to caseload, the clinician will decide what level
3 of services is appropriate, and that will be one of the
4 considerations in terms of which facility they then go to.
5        The Department of Corrections has other
6 considerations for which facility they should go to.
7    Q    When do they see the clinician?
8    Q    When do they see the clinician?
9    Q    Yes.
10    A    They need to see --
11        Depending what kinds of services they're getting,
12 but in general population they would be expected to see the
13 psychiatrist minimally every 90 days and primary therapist
14 monthly, and there's flexibility left for additional
15 in-between sessions left to clinical judgment.
16    Q    When would an in-between session happen?
17        Why would it happen?
18        MS. COWAN:  Objection.
19    A    Hypotheticals, if the clinician and patient were
20 trying to change something, and they thought an in-between
21 session made sense.  If there was some increased level of
22 concern, they might see them more frequently.  If a patient
23 had an issue, they might be seen sooner.
24        It would depend.
25

Page 38

1 BY MS. KALKACH:
2    Q    I understand.
3        Are there any guidelines for a therapist to know
4 when to assign these in-between sessions?
5    A    They're asked to consider circumstances and,
6 again, clinical judgment.
7    Q    Okay.  Are you familiar with the screening that
8 is done to the inmates?
9        MS. COWAN:  Objection.
10    A    Which screening?
11 BY MS. KALKACH:
12    Q    The initial screening.
13    A    Yes.
14    Q    What could be the consequences of the screening?
15        MS. COWAN:  Objection.
16    A    The screening is looking for individuals who
17 might need mental health services.
18        So some individuals wind up being determined to
19 not need any, and they won't be opened to services, others
20 will be, or sometimes additional information is needed.
21 BY MS. KALKACH:
22    Q    Would the screening affect the supervision and
23 treatment that an inmate may receive?
24    A    The screening is used to determine who needs
25 treatment.

Page 39

1    Q    So would it affect the supervision and treatment
2 that an inmate may receive?
3        Yes or no?
4        MS. COWAN:  Objection.
5    A    Yes.
6 BY MS. KALKACH:
7    Q    Who's in charge of prescribing medication to
8 inmates?
9    A    Psychotropic medications or medications in
10 general?
11    Q    Medications in general.
12    A    Then that depends.
13        If it's related to psychiatric treatment, it
14 would be a psychiatrist or nurse practitioner working for
15 Central New York Psychiatric Center.
16        If it's for general medical treatment, then
17 that's the purview of the DOCCS Medical.
18    Q    How many times does an inmate see a medical
19 doctor that could prescribe medication?
20    A    I'm sorry.  For psychiatric treatment or medical
21 treatment?
22    Q    For both.  Let's separate it.
23        How many times does an inmate see a medical
24 doctor for psychiatric treatment that could prescribe
25 medication?

Deposition of Dr. Li-Wen Lee                                    Estate of Joseph P. King v. Ward, et al.

Page 40

1    A    If they're taking medication, the minimum is once
2  every 90 days.
3    Q    And how many times does an inmate see a medical
4  doctor that could prescribe medication, the regular one?
5        MS. COWAN:  Objection.
6    A    They can request a call-out.  I can't speak to
7  DOCCS medical policy.
8  BY MS. KALKACH:
9    Q    How often does an inmate see his or her social
10 worker?
11       MS. COWAN:  Objection.
12   A    You mean the primary therapist?
13 BY MS. KALKACH:
14   Q    Yes.
15   A    They need to see that person monthly.
16   Q    Is there a policy that specifies how often should
17 an inmate see his or her social worker?
18   A    I'm sure there is.
19   Q    Is there a policy that specifies how often should
20 an inmate see his or her medical doctor?
21       MS. COWAN:  Objection.
22   A    Medical doctors in DOCCS medical-medical doctor
23 or if a medical doctor as an MD psychiatrist?
24 BY MS. KALKACH:
25   Q    Both.

Page 41

1    A    So, again, I don't -- I can't speak to another
2  agency's policies for medical practices.
3        For medication management, it's once every 90
4  days.
5    Q    If an inmate requests to see a doctor, how
6  quickly should they be addressed?
7        MS. COWAN:  Objection.
8    A    I don't remember what the CYNPC policy is on how
9  quickly they respond to it.
10 BY MS. KALKACH:
11   Q    Is there a policy that states so?
12   A    If they --
13       States what though?
14       I'm sorry.  Can you reframe your question?
15   Q    Yes, I can.
16       If an inmate requests to see a doctor, is there a
17 policy that states how quickly they should be addressed?
18       MS. COWAN:  Objection.
19   A    I don't know what the actual policy would be on
20 that.
21 BY MS. KALKACH:
22   Q    In general who or what organization oversees that
23 all mental health policies are followed?
24       MS. COWAN:  Objection.
25   A    There's multiple layers of review.

Page 42

1        Within Central New York Psychiatric Center, they
2  have supervisors who work with clinicians.  There are
3  outside entities that review for following policies, the
4  Justice Center, the Commission on Correction.
5  BY MS. KALKACH:
6    Q    What are the consequences of not following a
7  policy?
8        MS. COWAN:  Objection.
9    A    It depends.
10 BY MS. KALKACH:
11   Q    I'm going to make it more specific.
12       What are the consequences of a correctional
13 facility that does not follow a policy?
14       MS. COWAN:  Objection.
15   A    I don't understand.
16 BY MS. KALKACH:
17   Q    So if a correctional facility is not following a
18 policy, what would be the consequences of this?
19       MS. COWAN:  Objection.
20   A    I don't --
21       I don't think we think of a facility not
22 following a policy.
23       Do you mean a staff person not following a
24 policy?
25

Page 43

1  BY MS. KALKACH:
2    Q    Yes.
3    A    It depends on in what way the policy wasn't
4  followed or what that policy was, what the consequences of
5  not following a policy were.
6    Q    Are there --
7        Scratch that.
8        Is there audits or a system that is followed to
9  have correctional facilities in check with their policy
10 compliance?
11   A    Yes, there is accreditation on the correctional
12 side.  We have direct commission accreditation.  Internal
13 CNYPC has their own mechanism for reviewing quality of care.
14   Q    What is the name of this mechanism?
15   A    The mechanism?
16       I don't know what you mean.
17       Scratch that.
18       How does the accreditation work?
19       MS. COWAN:  Objection.
20   A    Accreditation?
21 BY MS. KALKACH:
22   Q    Yes.
23   A    Joint Commission on Accreditation is around every
24 three years.  The Joint Commission will come into the
25 facility, Central New York Psychiatric Center, and while

Page 44

they are accrediting CNYPC, they will also visit some of the correctional locations for CNYPC.

While they're there they will look at documentation. They will talk to staff. They will ask questions. They will look at the environment of care.

Q   So you said they go to some of the correctional facilities.

How do they choose which facilities to go to?

MS. COWAN:  Objection.

A   I don't know.  I have no idea.

BY MS. KALKACH:

Q   Are there any sanctions that should be put in place when a correctional facility does not follow the policies?

MS. COWAN:  Objection.

A   I don't understand what you're asking.

BY MS. KALKACH:

Q   So after they do the audit and they look at the documentation and everything, if a correctional facility is not complying with the policies, is there any sanction that they get?

A   You're asking about accreditation?

Q   Yes.

When the Joint Commission has completed the review, they will tell the facility -- by this I mean

Page 45

Central New York Psychiatric Center -- what their findings are and if there needs to be a corrective action plan or not. That's up to the Joint Commission.

It's theoretically possible that a location could lose accreditation. That hasn't happened.

Q   Could you please repeat that last?

A   That hasn't happened.

Q   Before that.

A   It's theoretically possible to lose accreditation.

They're not accredited by individual correctional facility. Their accreditation is for Central New York.

Q   Are there any policies regarding inmates that have attempted to commit suicide?

MS. COWAN:  Objection.

A   There are policies around suicide, risk assessment, policies for different units.

BY MS. KALKACH:

Q   Who drafted these policies?

A   Those would have been drafted by Central New York Psychiatric Center.

Q   Who oversees these policies are followed?

A   CNYPC.

Q   How often do the policies get updated?

MS. COWAN:  Objection.

Page 46

BY MS. KALKACH:

Q   I'm sorry.  What was your answer?

A   It depends.

Q   What does it depend on?

A   It could depend on if there's a review of a negative outcome.  If they identify a problem and they wanted to change their policy, they might update it then. If they decided to improve their suicide risk assessment, they might update it then as well.

It might not be linked to a specific problem.  If there's a change in requirement somewhere else from the Joint Commission or something like that, they might update it then as well.

Q   Do you know who is in charge of updating these policies?

A   The CYNPC has their process for updating their policies.

I'm not involved in their day-to-day work on updating policies.

Q   So you don't know the process from beginning to end on how to update the policies for CYNPC?

A   I do not.

Q   Okay.  Do you know how they get distributed?

A   I know they get distributed.  I don't get involved in how they distribute, so no.

Page 47

Q   Is there a policy about how to deal with an inmate with a mental illness?

MS. COWAN:  Objection.

A   I'm not sure how to answer that question, how to deal with an inmate with a mental illness.

BY MS. KALKACH:

Q   Yes.  Let me try to rephrase that one.

Is there a policy about how to treat an inmate with a mental illness?

MS. COWAN:  Objection.

A   Treatment isn't dictated through policy. Treatment is guided by clinical judgment, clinical practice.

BY MS. KALKACH:

Q   When I say "treat," I don't mean it as treatment like medical treatment, but more about how they conduct all the actions that you must take when an inmate has a mental illness.

MS. COWAN:  Objection.

A   Policies are structural.  They talk about documentation and program structure.  They don't tell a clinician how to treat someone.

BY MS. KALKACH:

Q   Again, I'm not talking about treatment.  Please scratch that.

Is there a process to report an inmate when they

Page 48

1  speak about suicide?
2      MS. COWAN:  Objection.
3      A    When an inmate says they feel suicidal, is there
4  a process to report it?
5      Is that what you're asking?
6  BY MS. KALKACH:
7      Q    Yes.
8      A    There is an expectation that an inmate who
9  reports suicidal ideation is assessed, and then the
10 clinician takes appropriate steps.
11     Q    So if there's an inmate that has been speaking
12 about suicide, which people in a correctional facility would
13 need to be aware of it?
14     MS. COWAN:  Objection.
15     A    In general, if there's an individual who is
16 reporting suicidal ideation, then we would want the mental
17 health unit made aware so that the individual could be
18 assessed, and they could make a determination about the
19 circumstances and individually assess that person to
20 determine what's appropriate.
21 BY MS. KALKACH:
22     Q    And how would mental health be made aware --
23     Okay, scratch that.
24     Who are the people in a correctional facility
25 that would need to be aware of the process?

Page 49

1      MS. COWAN:  Objection.
2      A    What happened --
3  BY MS. KALKACH:
4      Q    Of the process to report, yes.
5      A    I think staff and correctional facilities on the
6  correctional side or on the mental health side are aware
7  that if an inmate reports suicidal ideation that it needs to
8  be communicated to the mental health unit.
9      Q    How are all of these people that you mentioned
10 made aware of the process?
11     A    I don't know.  I'm not responsible for training
12 any of them.  They're their own policies.
13     Q    Is there a policy that contains any guidance
14 regarding special treatment inside the correctional?
15     MS. COWAN:  Objection.
16     A    What do you mean by "special treatment"?
17 BY MS. KALKACH:
18     Q    Special treatment to people -- inmates with
19 mental illness.
20     MS. COWAN:  Objection.
21     A    There are policies about the programs that are
22 established where they can be or can't be within a
23 correctional facility, what happens in disciplinary.
24     There are policies, but I'm not sure what you
25 mean.

Page 50

1  BY MS. KALKACH:
2      Q    Is there a specific area within the correctional
3  facility where people with mental illness should be?
4      MS. COWAN:  Objection.
5      A    There are different levels of treatment, so it
6  depends on the clinical assessment of their needs.
7  BY MS. KALKACH:
8      Q    Okay.  What are these different levels of
9  treatment?
10     A    They are similar to the community structure of
11 treatment.  So in the community outside of prisons, just
12 because a person has a mental illness doesn't mean by itself
13 where they should or shouldn't be.
14     So within a correctional facility, some
15 individuals who need mental health treatment, but only need
16 clinic-level services can stay in general population and
17 come to the mental health unit for their appointments.
18     Some individuals may live in a more structured
19 unit intended for individuals with serious mental illness
20 who need more support, and some may need inpatient-level
21 treatment, so they would go to CYNPC.
22     There's an assortment of programs trying to
23 provide a spectrum of services.
24     Q    Should people that have tried to commit suicide
25 inside a correctional get any special attention or care?

Page 51

1      MS. COWAN:  Objection.
2      A    If a person has attempted suicide in the past,
3  that's important information, but what kind of care they
4  need currently is going to depend on a number of different
5  factors besides what's happened in the past.
6  BY MS. KALKACH:
7      Q    Which ones are these factors?
8      A    Current circumstances, their symptoms, the
9  overall clinical presentation, how their presentation is
10 understood, what the different contributing issues might be.
11     Individuals who have committed suicide, their
12 clinical presentation and assessment will change over time.
13 There's not an automatic assumption that once you've
14 committed suicide that there's anything -- that you're
15 permanently placed in any particular location.
16     Just like in the community, there are individuals
17 who have committed suicide, but they return home and go
18 about their daily lives again.
19     Q    According to the policies, would an inmate be
20 allowed to have his shoelaces after he had attempted suicide
21 with them in the past?
22     MS. COWAN:  Objection.
23     A    So it depends if they had acute risk and were
24 currently in crisis and admitted to the crisis unit.
25     Maybe not but, if not and they're more stable or

Page 52

1 living in general population, people get their shoelaces
2 back.
3 BY MS. KALKACH:
4    Q    Who makes this decision?
5    A    The treatment team makes these decisions.
6    Q    After a suicide attempt, should an inmate be
7 reevaluated?
8    A    Reassessed after something as serious as a
9 suicide attempt, yes.
10   Q    After a suicide attempt, should an inmate be
11 screened again to know where he's supposed to be to receive
12 adequate supervision and treatment?
13       MS. COWAN:  Objection.
14   A    Part of the assessment is deciding what kind of
15 treatment they need.
16 BY MS. KALKACH:
17   Q    Are you familiar with Special Housing Unit?
18   A    Yes.
19   Q    Is there any reason to send an inmate to a
20 Special Housing Unit?
21       MS. COWAN:  Objection.
22   A    Special Housing Units are run by the Department
23 of Corrections.  They make those decisions about who goes.
24 BY MS. KALKACH:
25   Q    Do you know the reasons for sending an inmate to

Page 53

1 Special Housing Unit?
2    A    It's related to an individual sustaining an
3 infraction.
4    Q    What do you mean by that?
5    A    Breaking one of the rules within the Department
6 of Corrections, they decide -- security decides what the
7 appropriate action is.  Sometimes they decide to send
8 someone to the Special Housing Unit.
9    Q    So it would be only something related to an
10 infraction in order to be sent to a Special Housing Unit?
11   A    To go to Special --
12       Yes.
13   Q    Do you know what a suicide watch commander is?
14       MS. COWAN:  Objection.
15   A    That's on the correctional side.  I'm aware of
16 the term.
17 BY MS. KALKACH:
18   Q    You are aware of the term, or no?
19   A    Yes.
20   Q    Do you know who has this position?
21   A    No, I don't.
22   Q    Do you know what this person's duties are?
23   A    They work with the mental health team on those on
24 suicide watch.
25   Q    Do you know who appoints this person?

Page 54

1    A    No, I do not.
2    Q    Do you know what suicide watch is?
3    A    Yes.
4    Q    When is an inmate placed on suicide watch?
5    A    When there is concern about an inmate's suicide
6 potential for some reason, there can be a decision to put
7 them on watch until it can be assessed.
8    Q    Are there any standard items that an inmate
9 should have when he's put in suicide watch?
10       MS. COWAN:  Objection.
11   A    Standard items of --
12       There are --
13       There can be decisions about what they can't
14 have.
15 BY MS. KALKACH:
16   Q    Who makes these decisions?
17   A    It depends.
18   Q    On what?
19   A    The Department of Corrections DOCCS staff can
20 initiate watches if it's off-hours.  But if someone goes
21 into the RCTP, the mental health treatment team would decide
22 what's appropriate or not appropriate in terms of
23 restrictions.
24   Q    Do you know what a parole board hearing is?
25   A    No, that I don't.

Page 55

1    Q    Is there a policy on suicide prevention?
2    A    There's a policy on suicide risk assessment.
3    Q    Who drafted this policy?
4    A    It's a CNYPC policy.
5    Q    Who oversees that the policy is followed?
6    A    Also CNYPC.
7    Q    Who knows how often the policy gets updated?
8    A    That would depend on different things, like if
9 there's a change -- change in environments or they've
10 decided to change their own practice to try to improve what
11 they're doing.  It depends.
12   Q    If this policy, suicide risk assessment, is not
13 being followed, is there an organization within OMH that
14 follows up on the correctional facilities complying with it?
15   A    Organization within Office of Mental Health
16 that --
17       CYNPC has an incident review process, and they
18 determined if policies are not followed.  They also decide
19 what kind of intervention is appropriate.
20   Q    Which kind of intervention do they have?
21   A    It depends.  Sometimes it might be retraining.
22 In other circumstances it might be other kinds of individual
23 supervision.
24   Q    Are there more, or those are the only
25 interventions?

Deposition of Dr. Li-Wen Lee

Estate of Joseph P. King v. Ward, et al.

Page 56

1  A    I'm sure there are others, and I think it would
2  depend.
3  Q    Who is in charge of the incident review process?
4  A    At the facility level, they have their process,
5  and their administration supervisors are involved in this
6  review process.
7  Q    Who decides the kind of intervention that would
8  apply to the specific case?
9  A    CNYPC administration and the supervisor that's
10 appropriate, depending on what the staff person's discipline
11 was, would decide.
12 Q    Are there training or education on suicide
13 prevention?
14 A    There are, yes.
15 Q    Who receives it?
16 A    There might be some variation in the exact
17 audience, but they provide training to all of their staff.
18       There's also training to the Department of
19 Corrections staff.
20 Q    How often do they receive it?
21 A    New staff receive it.  I believe it's annually
22 given to the Department of Corrections.  Mental health
23 staff, they have different trainings at different points.
24 Q    Okay.  So for a training that is annually, when
25 is this given?

Page 57

1  A    I don't know when they do that.
2  Q    Do you know who provides it?
3  A    There's joint training between the Department of
4  Corrections and OMH and CNYPC.
5  Q    And who pays for the training?
6  A    Who pays for it?
7  Q    Mm-hmm.
8  A    I suppose both, staff time.
9  Q    How long does a training last?
10 A    I don't know that off the top of my head.
11 Q    Is there a policy that speaks about official
12 evaluations for suicide risk?
13 A    They have an official suicide risk assessment
14 tool, yes.
15 Q    Do you know which policy is the one that has this
16 official evaluation?
17 A    The policies are numbered, and I don't remember.
18 Q    Do you know who drafted this policy?
19 A    I don't know which specific person drafted it,
20 no.
21 Q    Do you know which position would this person
22 have -- the person that drafted the policy have?
23 A    My understanding is that their policies are
24 drafted jointly.  It's not one single person who's writing
25 all of these.

Page 58

1  Q    Okay.  What are the positions of the people that
2  draft the policies?
3  A    I don't know which specific people get involved
4  in each policy.  But in general policy development, they
5  have an administrative and supervisory structure who would
6  be involved in some of the revisions, or at least reviewing
7  them.
8  Q    Who oversees that the policy is followed?
9  A    CNYPC has a supervisory structure, and they
10 ensure that their policies are followed.
11 Q    So evaluation for suicide risk, the policies that
12 contain this official evaluation, who oversees that this
13 policy is followed?
14      MS. COWAN:  Objection.
15 A    I feel like you're asking for a specific person.
16      Is that what you're asking?
17 BY MS. KALKACH:
18 Q    No.  I'm asking for either a department or a team
19 or something else.
20 A    Clinical supervision, and there's a structure for
21 that.
22 Q    How often do the evaluations for suicide risk
23 should be made?
24 A    When somebody comes off of services, they get
25 reassessed or the packet is reviewed, potential risks redone

Page 59

1  and transferred to pending.
2       It needs to be redone if the circumstances change
3  or if they've been admitted to the inpatient and are
4  returning to the facility.  They need to be redone.
5  Q    What is a risk factor?
6       MS. COWAN:  Objection.
7  A    I'm sorry.  I talked over you and didn't hear
8  what you said.
9  BY MS. KALKACH:
10 Q    What is a risk factor according with the
11 policies?
12 A    A risk factor is something that increases a
13 person's chances of some sort of outcome that you're trying
14 to avoid.
15 Q    Is there a list of risk factors?
16 A    There's a list of risk factors in CNYPC's risk
17 assessment tool.
18 Q    Do you know what the list is?
19 A    I've seen the list.  There's a lot of them.  It's
20 a combination of historical risk factors, clinical risk
21 factors, acute stressors.
22 Q    Okay.  So how is the evaluation for suicide risk
23 performed?
24 A    It's partly based on the clinical assessment, the
25 interview with the individual, what they have to say, but it

Deposition of Dr. Li-Wen Lee                                      Estate of Joseph P. King v. Ward, et al.

Page 60

1 also takes into account historical information.
2      So it's both of those things that provide the
3 foundation for the information used to fill out the suicide
4 risk assessment.
5      Q    Who performs the evaluation?
6      A    The primary therapist who is doing the
7 assessment.
8      Q    Are the people performing the evaluation trained?
9      A    Yes.
10     Q    How often?
11     A    I don't know how often exactly that they're
12 trained.
13     Q    How long are the trainings?
14     A    I've never delivered one of the trainings.  I do
15 not know how long they are.
16     Q    Who would receive the training?
17     A    Mental health staff at the units.
18     Q    Are you aware of any other suicides that happened
19 in the Mid-State Correctional Facility during 2013 to 2018?
20     A    There might be.  I did not go back and look at
21 that specifically for today.
22     Q    Are you aware of any changes to the policies and
23 directives of Mid-State Correctional Facility as a
24 consequence of other suicides during 2013 to 2018?
25          MS. COWAN:  Objection.

Page 61

1      A    I don't know that specifically.
2 BY MS. KALKACH:
3      Q    Do you know if Mid-State Correctional Facility
4 kept a suicide watch log?
5      A    I would have to guess that they did, but I did
6 not see it.  I don't know.
7      Q    In general, who has access to a facility suicide
8 watch log?
9      A    I've never gotten involved in that question.  I
10 don't know the answer to it.
11     Q    Okay.  Are there any policies about suicide?
12          MS. COWAN:  Objection.
13     A    Policies about suicide?
14          There's policies, and some of them encompass
15 suicide.
16 BY MS. KALKACH:
17     Q    Do you know the name of them?
18     A    No, I don't know the specific name.
19     Q    What would be the procedure that needs to be
20 taken after a person commits suicide?
21     A    After a suicide, the facility would make
22 notifications.  They notify Central Office.  They notify the
23 Justice Center.  They notify the Commission on Corrections.
24 They start the process of internal review, which includes
25 communication with the Department of Corrections to try to

Page 62

1 get available information, talking to staff, talking to
2 peers, reviewing the record.
3      It's meant to determine if policies were
4 followed, also meant to take a look at things clinically and
5 try to understand why the suicide happened.
6      Q    Who needs to be notified after a suicide occurs?
7      A    Central Office and then the Justice Center,
8 Commission on Corrections.  The family is also notified if
9 they haven't been notified already.
10     Q    Who gives the notifications?
11     A    CNYPC staff have their process for doing so.
12          MS. KALKACH:  Can I have just one minute please?
13 Oh, never mind.
14          MS. COWAN:  Do you want to take like a
15 five-minute break since we've been going for about two
16 hours?
17          MS. KALKACH:  Yes, definitely, but I have three
18 more questions, and then I want to review my notes so
19 that we can take a break then.
20          MS. COWAN:  Okay, yeah.
21          MS. KALKACH:  Back on the record.
22 BY MS. KALKACH:
23     Q    Was there anything different that should be
24 changed to prevent these situations from happening?
25          MS. COWAN:  Objection.

Page 63

1      A    That seems very broad.
2 BY MS. KALKACH:
3      Q    I'm going to rephrase.
4          In your opinion, is there anything different that
5 should be changed to prevent suicides in
6 correctional facilities from happening?
7      A    Suicides are often very individual, and
8 individual circumstances are unique.
9          So sometimes in looking at adverse events,
10 including suicides, there are things that could have been
11 decided differently sometimes in hindsight, but you couldn't
12 have known it at the time, or there are opportunities for
13 improved communication.  Sometimes somebody knew something
14 and didn't say anything.  Sometimes a peer knew or family
15 member knew.
16          So there are lots of different examples, I
17 suppose, where clinically somebody might try to learn --
18 have lesson learned and try to respond to it, but it
19 depends.
20          In our look at suicides over the years, there
21 haven't been overarching trends that connect them all
22 together that would lead to one solution.
23          MS. KALKACH:  Okay.  I will move to strike the
24 portion not responsive.
25          Now I would like to -- I would like to take a few

Deposition of Dr. Li-Wen Lee                                      Estate of Joseph P. King v. Ward, et al.

Page 64

1    minutes to review my notes and see what else, and then
2    come back.  So we can take a five-minute break.
3        MS. COWAN:  Okay.
4        (Recess was taken.)
5        MS. KALKACH:  I have no further questions.  Thank
6    you so much, Ms. Lee, for your time.
7        MS. COWAN:  I don't have any questions.  I just
8    want to put on the record, though, that I'll have Dr.
9    Lee read and sign.
10       Typically what I have done is, the person that
11   notices the deposition pays for the transcript, so I
12   wasn't sure what everyone else's practice was on that.
13   That's what I've always practiced.
14       MS. NAPPI:  That's exactly what we're going to do
15   here and in the prior.
16       (Whereupon, the deposition was concluded at
17   12:10 p.m.)
18
19
20
21
22
23
24
25

Deposition of Dr. Li-Wen Lee                                    Estate of Joseph P. King v. Ward, et al.

```
 1                        CERTIFICATE

 2            I, Gina Williams, Registered Professional Court

 3   Reporter, do certify that the above deposition was reported

 4   by me and that the foregoing transcript is a true and

 5   accurate record to the best of my knowledge, skills, and

 6   ability.

 7            I further certify that I am not an employee of

 8   counsel or any of the parties, nor a relative or employee of

 9   any attorney or counsel connected with the action, nor

10   financially interested in the action.

11            Subscribed and sworn to before me when taken this

12   17th day of June, 2022.

13

14                        _Gina Williams_

15                    GINA WILLIAMS, RPR, CRR

16

17

18

19

20

21

22

23

24

25
```

ACKNOWLEDGMENT OF DEPONENT

        I, DR. LI-WEN LEE, do hereby certify that I have
read the foregoing pages and that the same is a correct
transcription of the answers given by me to the questions
therein propounded, except for the corrections or changes in
form or substance, if any, noted in the attached Errata
Sheet.


_____
DR. LI-WEN LEE                                          Date


Subscribed and sworn to before me this

___ day of _____, 2022.

My commission expires:_____


_____
Notary Public

1                           — — — — — — —

2                              ERRATA

3                           — — — — — — —

4      PAGE    LINE                      CHANGE/REASON

5      _____   _____   _____

6      _____   _____   _____

7      _____   _____   _____

8      _____   _____   _____

9      _____   _____   _____

10     _____   _____   _____

11     _____   _____   _____

12     _____   _____   _____

13     _____   _____   _____

14     _____   _____   _____

15     _____   _____   _____

16     _____   _____   _____

17     _____   _____   _____

18     _____   _____   _____

19     _____   _____   _____

20     _____   _____   _____

21     _____   _____   _____

22     _____   _____   _____

23     _____   _____   _____

24     _____   _____   _____

25

Case 9:20-cv-01413-TJM-ML   Document 79-7   Filed 03/31/23   Page 24 of 40

Deposition of Dr. Li-Wen Lee                                    Estate of Joseph P. King v. Ward, et al.

## WORD INDEX

**< 1 >**
**10**  9:*13, 14*  10:*1, 5*
*12:24*  16:*5*
**10:06**  1:*19*
**10001**  4:*21*
**10016**  2:*6*
**10th**  2:*5*
**112**  2:*5*
**12**  26:*7*
**12:10**  64:*17*
**13202**  2:*12*
**15**  25:*24*
**17**  1:*14, 18*
**17th**  65:*12*
**18**  8:*13*
**1974**  8:*13*
**1992**  10:*15*
**1996**  10:*15, 21*

**< 2 >**
**2**  22:*9*
**20**  26:*8*
**2000**  10:*21, 23*
**2008**  9:*8*  11:*23, 24*
*13:16*  17:*12*
**2013**  25:*9*  60:*19, 24*
**2018**  9:*23*  25:*20, 22,*
*23*  60:*19, 24*
**2019**  12:*4*
**2022**  1:*14, 18*  26:*2*
*65:12*  66:*15*
**20-CV-01413**  1:*2*
**21**  3:*8*
**23**  3:*9*

**< 3 >**
**300**  2:*11*
**330**  4:*20*
**365**  25:*19*  26:*1*

**< 4 >**
**4**  3:*4*

**< 6 >**
**6**  25:*25*

**< 8 >**

**8**  25:*19, 25*

**< 9 >**
**90**  37:*13*  40:*2*  41:*3*
**9th**  4:*21*

**< A >**
**a.m**  1:*19*
**ability**  5:*18*  65:*6*
**able**  15:*10*
**above-styled**  1:*18*
**access**  26:*9*  34:*1*
*61:7*
**accommodate**  6:*10*
**account**  60:*1*
**accreditation**  16:*5*
*30:4*  43:*11, 12, 18, 20,*
*23*  44:*22*  45:*5, 10, 12*
**accredited**  45:*11*
**accrediting**  44:*1*
**accuracy**  28:*12*
**accurate**  65:*5*
**accurately**  25:*14*
**ACKNOWLEDGMEN
T**  66:*1*
**ACTION**  1:*2*  45:*2*
*53:7*  65:*9, 10*
**actions**  47:*16*
**actual**  41:*19*
**acute**  51:*23*  59:*21*
**ad**  1:*5*
**additional**  37:*14*
*38:20*
**address**  4:*11, 12, 19*
**addressed**  41:*6, 17*
**adequate**  52:*12*
**admin**  34:*9*
**administrates**  31:*9*
**administration**  18:*8*
*30:2, 18*  35:*13*  56:*5,*
*9*
**administrative**  58:*5*
**Administrator**  1:*4*
**admitted**  37:*2*  51:*24*
*59:3*
**Adult**  17:*24*
**adverse**  63:*9*
**affect**  5:*17*  7:*14*
*38:22*  39:*1*
**age**  25:*4*

**agency**  14:*22*  15:*1*
*28:4*
**agency's**  41:*2*
**ago**  10:*5*  20:*18*  33:*8*
**AIMEE**  2:*12*  7:*19*
*24:12*
**al**  1:*5*
**Albert**  11:*13*
**alcohol**  7:*14*
**allowed**  51:*20*
**Amended**  3:*8, 9*
**amount**  32:*20*
**Amy**  1:*5*
**Ann**  14:*15, 16*
**annually**  56:*21, 24*
**Answer**  3:*9*  5:*24*
*6:1, 17*  21:*10*  32:*24*
*33:12*  46:*2*  47:*4*
*61:10*
**answered**  6:*12*
**answers**  6:*2*  31:*13*
*66:5*
**anybody**  20:*1*
**apparently**  15:*19*
**appearing**  2:*2*
**Apple**  6:*20*
**apply**  56:*8*
**appointments**  50:*17*
**appoints**  53:*25*
**approach**  30:*18*
*34:14*
**appropriate**  37:*3*
*48:10, 20*  53:*7*  54:*22*
*55:19*  56:*10*
**approval**  28:*7*
**approves**  28:*5*
**approximate**  25:*20*
*26:5*
**approximately**  26:*3*
**approximation**  9:*20*
**area**  29:*14*  50:*2*
**areas**  18:*2*  26:*15*
**Article**  9:*13, 14*  10:*1*
*12:24*  16:*5*
**asked**  20:*4, 17*  38:*5*
**asking**  22:*19*  36:*15*
*44:16, 22*  48:*5*  58:*15,*
*16, 18*
**assess**  48:*19*

**assessed**  48:*9, 18*
*54:7*
**assessment**  7:*24*
*45:17*  46:*8*  50:*6*
*51:12*  52:*14*  55:*2, 12*
*57:13*  59:*17, 24*  60:*4,*
*7*
**assign**  38:*4*
**assigned**  35:*20*  36:*1,*
*24*
**assist**  13:*11*
**associate**  12:*5*  13:*19,*
*25*  14:*3*
**assortment**  50:*22*
**assume**  5:*25*  35:*3*
**assumption**  51:*13*
**attached**  66:*7*
**attempt**  52:*6, 9, 10*
**attempted**  19:*22*
*45:14*  51:*2, 20*
**attend**  10:*10*
**attending**  11:*22*
**attention**  50:*25*
**ATTORNEY**  2:*10*
*6:16*  20:*10*  21:*10*
*65:9*
**attorneys**  2:*2*  24:*8*
**audience**  56:*17*
**audit**  44:*18*
**audits**  43:*8*
**automatic**  51:*13*
**autopsy**  7:*21*
**available**  62:*1*
**Avenue**  2:*5*  4:*21*
**avoid**  59:*14*
**aware**  8:*25*  16:*9, 11*
*19:16, 19, 22*  27:*14*
*35:14, 17, 23*  48:*13,*
*17, 22, 25*  49:*6, 10*
*53:15, 18*  60:*18, 22*

**< B >**
**back**  9:*5, 8*  15:*22*
*35:5*  52:*2*  60:*20*
*62:21*  64:*2*
**based**  6:*1*  59:*24*
**basic**  24:*23*  25:*3*
**basis**  15:*3*  26:*13, 17*
*33:9*

Case 9:20-cv-01413-TJM-ML   Document 79-7   Filed 03/31/23   Page 25 of 40

Deposition of Dr. Li-Wen Lee                                    Estate of Joseph P. King v. Ward, et al.

**Beginning** 12:*4*
28:*10* 29:*21, 23*
35:*11* 46:*20*
**behalf** 2:*4, 9*
**believe** 23:*3* 25:*9*
56:*21*
**Bellevue** 11:*20, 24*
**best** 6:*6* 65:*5*
**Beth** 11:*11*
**better** 23:*12, 13*
29:*16*
**beyond** 19:*3*
**bit** 24:*23* 29:*2* 35:*5*
**board** 54:*24*
**born** 8:*12, 14*
**Branch** 11:*3*
**break** 6:*9, 13* 62:*15,
19* 64:*2*
**Breaking** 53:*5*
**brief** 17:*1*
**briefly** 11:*18*
**broad** 13:*7* 63:*1*
**Bronx** 11:*14*
**bureaus** 18:*19*
**business** 4:*12*

**< C >**
**called** 4:*3* 18:*18*
**call-out** 40:*6*
**capacity** 36:*10*
**caption** 5:*10*
**Captioner** 1:*21*
**care** 29:*4, 6* 43:*13*
44:*5* 50:*25* 51:*3*
**case** 5:*6, 10* 7:*20*
16:*7* 19:*10, 12, 13*
56:*8*
**caseload** 37:*2*
**cause** 1:*18*
**cell** 6:*20*
**Center** 11:*12, 21*
16:*22* 28:*3* 33:*24*
34:*1* 36:*20, 21* 39:*15*
42:*1, 4* 43:*25* 45:*1,
21* 61:*23* 62:*7*
**Centers** 12:*12* 18:*4,
6* 29:*4* 30:*1* 34:*7*
**central** 13:*11* 16:*22*
17:*21* 24:*19* 26:*17,
21* 27:*7, 17* 28:*3*

34:*14* 35:*13* 36:*20*
39:*15* 42:*1* 43:*25*
45:*1, 12, 20* 61:*22*
62:*7*
**certain** 13:*13*
**CERTIFICATE** 65:*1*
**certification** 11:*16*
**Certified** 1:*20, 21*
**certify** 65:*3, 7* 66:*3*
**cetera** 6:*21*
**chances** 59:*13*
**change** 26:*15* 28:*15,
18, 19, 23, 24, 25* 29:*1*
30:*8, 9* 37:*20* 46:*7,
11* 51:*12* 55:*9, 10*
59:*2*
**CHANGE/REASON**
67:*4*
**changed** 30:*5* 62:*24*
63:*5*
**changes** 60:*22* 66:*6*
**charge** 29:*19* 30:*21*
31:*4, 8, 15, 16, 19*
39:*7* 46:*14* 56:*3*
**check** 36:*2* 43:*9*
**Chemical** 10:*17*
**CHEVERIE** 2:*5*
**chief** 11:*23* 27:*9*
**Children's** 17:*24*
**choose** 44:*8*
**circumstances** 38:*5*
48:*19* 51:*8* 55:*22*
59:*2* 63:*8*
**City** 4:*20* 11:*12*
**CIVIL** 1:*2* 17:*25*
**CLARITY** 2:*20*
**clinical** 13:*10* 27:*9*
30:*25* 37:*15* 38:*6*
47:*12* 50:*6* 51:*9, 12*
58:*20* 59:*20, 24*
**clinically** 62:*4* 63:*17*
**clinician** 9:*8* 37:*2, 7,
8, 19* 47:*21* 48:*10*
**clinicians** 42:*2*
**clinic-level** 50:*16*
**close** 6:*23*
**CNYPC** 7:*21, 25*
36:*20* 37:*1* 43:*13*
44:*1, 2* 45:*23* 55:*4, 6*

56:*9* 57:*4* 58:*9*
62:*11*
**CNYPC's** 59:*16*
**college** 10:*10* 11:*13*
**combination** 18:*25*
30:*23* 59:*20*
**come** 11:*24* 20:*4*
22:*7* 43:*24* 50:*17*
64:*2*
**comes** 26:*24* 58:*24*
**coming** 13:*6*
**commander** 53:*13*
**commencing** 1:*18*
**commission** 28:*18*
30:*4* 42:*4* 43:*12, 23,
24* 44:*24* 45:*3* 46:*12*
61:*23* 62:*8* 66:*16*
**commissioner** 12:*5*
13:*19, 25* 14:*3, 8, 9,
20, 21* 20:*9, 22, 23*
**commissioner's** 9:*25*
**commit** 19:*20, 23*
45:*14* 50:*24*
**commits** 61:*20*
**committed** 19:*16*
51:*11, 14, 17*
**communicated** 49:*8*
**communication** 61:*25*
63:*13*
**community** 17:*22*
36:*18* 50:*10, 11*
51:*16*
**company** 34:*17*
**Complaint** 3:*8, 9*
8:*21*
**complaints** 8:*23* 22:*7*
**completed** 11:*11*
44:*24*
**compliance** 43:*10*
**complicated** 18:*19*
**complying** 44:*20*
55:*14*
**components** 17:*21*
**computers** 6:*20*
**concern** 37:*22* 54:*5*
**concluded** 64:*16*
**conclusion** 26:*24*
**conduct** 47:*15*
**confused** 22:*25*

**connect** 63:*21*
**connected** 65:*9*
**connecting** 20:*10*
**consequence** 60:*24*
**consequences** 38:*14*
42:*6, 12, 18* 43:*4*
**consider** 38:*5*
**considerations** 37:*4, 6*
**considered** 25:*7*
36:*25*
**consistent** 28:*4, 19*
**contacted** 16:*12*
**contain** 58:*12*
**contains** 49:*13*
**context** 20:*3*
**continuing** 34:*11*
**continuous** 34:*14*
**continuously** 29:*14*
**contributing** 51:*10*
**control** 23:*14*
**conversation** 15:*4*
16:*3, 6* 17:*7, 10*
20:*22, 24* 21:*8*
**convicted** 8:*10*
**coordinating** 13:*4*
**correct** 21:*20, 21*
66:*4*
**Correction** 42:*4*
**correctional** 13:*7*
19:*17* 35:*20* 36:*6, 12,
16, 24* 42:*12, 17* 43:*9,
11* 44:*2, 6, 13, 19*
45:*11* 48:*12, 24* 49:*5,
6, 14, 23* 50:*2, 14, 25*
53:*15* 55:*14* 60:*19,
23* 61:*3* 63:*6*
**correctional-based**
12:*23*
**Corrections** 27:*12*
36:*9, 17* 37:*5* 52:*23*
53:*6* 54:*19* 56:*19, 22*
57:*4* 61:*23, 25* 62:*8*
66:*6*
**corrections-based**
16:*23* 27:*8*
**corrective** 45:*2*
**counsel** 8:*1, 3, 6*
20:*8, 14* 24:*12* 65:*8,
9*

Case 9:20-cv-01413-TJM-ML   Document 79-7   Filed 03/31/23   Page 26 of 40

Deposition of Dr. Li-Wen Lee                                    Estate of Joseph P. King v. Ward, et al.

count 18:17
couple 19:23
COURT 1:1 6:3, 7
9:3 13:6 65:2
courtroom 5:15
covered 18:2
COWAN 2:12 4:12,
14 7:19 15:9, 15, 17,
20 17:19 18:24
19:11 20:14 21:9
23:18 27:16 32:23
35:8 36:14 37:18
38:9, 15 39:4 40:5,
11, 21 41:7, 18, 24
42:8, 14, 19 43:19
44:9, 15 45:15, 25
47:3, 10, 18 48:2, 14
49:1, 15, 20 50:4
51:1, 22 52:13, 21
53:14 54:10 58:14
59:6 60:25 61:12
62:14, 20, 25 64:3, 7
co-workers 20:12
creates 28:2, 3
creating 28:10
creation 28:11
crime 8:10
crisis 51:24
CRR 65:15
current 4:10 11:19
51:8
currently 51:4, 24
custody 12:21
CYNPC 41:8 46:16,
21 50:21 55:17

< D >
daily 15:3 51:18
Darman 14:10
date 25:3 34:15
66:12
day 65:12 66:15
days 25:19 26:1
32:6 37:13 40:2
41:4
day-to-day 46:18
deal 47:1, 5
decide 30:14 31:22
37:2 53:6, 7 54:21
55:18 56:11

decided 30:6, 7 36:8,
23 46:8 55:10 63:11
decides 53:6 56:7
deciding 29:12 52:14
decision 52:4 54:6
decisions 9:14 29:10
52:5, 23 54:13, 16
defect 12:18
Defendant 1:5
Defendants 2:9
defined 33:15
definitely 62:17
degree 10:23
deliver 18:6
delivered 29:6 32:14
33:18 60:14
delivery 19:2
demographic 25:3
Department 27:12
30:21 31:4 34:9
36:9, 17 37:5 52:22
53:5 54:19 56:18, 22
57:3 58:18 61:25
depend 28:14 29:13
37:24 46:4, 5 51:4
55:8 56:2
depending 31:2 33:9
37:11 56:10
depends 26:19 39:12
42:9 43:3 46:3 50:6
51:23 54:17 55:11,
21 63:19
DEPONENT 66:1
deposed 4:4 5:1, 7
DEPOSITION 1:13,
17 4:24 7:18, 19
10:3 15:5, 6 16:13
17:8, 11 20:4, 18
64:11, 16 65:3
depositions 8:5
deputy 14:8, 9, 12
27:7 31:1
describe 28:12
described 18:2
designee 9:25
destination 32:14
determination 48:18
determine 38:24
48:20 62:3

determined 38:18
55:18
development 30:24
31:10, 12 58:4
devices 6:19 15:19
diagnoses 25:4
dictated 47:11
different 12:3 16:25
17:21 26:8 28:20
33:16 36:25 45:17
50:5, 8 51:4, 10 55:8
56:23 62:23 63:4, 16
differently 63:11
DIRECT 2:20 18:5
21:10 43:12
directives 60:23
directly 13:1 14:14
director 11:25 12:4,
6 13:9, 18, 23, 24
14:12, 14 27:6, 7, 8, 9,
10 30:25 31:1
directs 6:16
disciplinary 8:20
49:23
discipline 56:10
discuss 8:5
discussed 11:15
Discussion 15:21
21:16 27:2, 3, 5
disease 12:17
distribute 46:25
distributed 46:23, 24
distributing 31:23
distribution 31:15, 17,
19, 21 32:1, 7, 14
DISTRICT 1:1
Division 12:1, 8, 10,
25 13:14 14:3, 12
15:1 17:2, 3, 24 27:6
divisions 18:10, 13,
14, 18
DOCCS 39:17 40:7,
22 54:19
doctor 10:22 39:19,
24 40:4, 20, 22, 23
41:5, 16
doctors 40:22
document 22:3, 6, 8,
14, 17 23:1, 15, 25
26:24 35:14

documentation 44:4,
19 47:20
documents 6:23 7:2,
8, 20
doing 55:11 60:6
62:11
DR 1:13, 17 3:3 4:2
21:24 22:5 64:8
66:3, 12
draft 58:2
drafted 45:19, 20
55:3 57:18, 19, 22, 24
Drake 20:13
drugs 7:13
duly 4:3
duties 53:22

< E >
earlier 25:25
Eastern 1:19
education 56:12
Einstein 11:13
either 30:3 32:18
58:18
electronic 31:25
32:3, 6
else's 64:12
E-mail 24:22
employee 34:18, 24
65:7, 8
employees 34:21
employment 11:18
encompass 61:14
encompassed 18:3
engineering 10:17
ensure 58:10
ensures 32:16
entail 16:15
entities 42:3
environment 44:5
environments 55:9
Errata 66:7 67:2
ESQUIRE 2:6, 7, 12
established 49:22
establishing 19:2
Estate 1:4 4:9
estimate 25:16, 17, 18
et 1:5 6:21

evaluation 57:*16*
58:*11, 12* 59:*22* 60:*5,
8*
evaluations 57:*12*
58:*22*
events 24:*9* 63:*9*
evidence 21:*17* 23:*6*
exact 9:*17* 25:*23*
56:*16*
exactly 9:*22* 60:*11*
64:*14*
Examination 3:*4* 4:*5*
examples 63:*16*
executive 27:*9*
Exhibit 3:*8, 9* 7:*4*
21:*17, 18, 22, 25*
22:*12, 15* 23:*2, 6, 9,
22*
existed 33:*22*
expectation 48:*8*
expected 37:*12*
expires 66:*16*
explain 29:*2, 3, 25*
explaining 10:*9*

< F >
facilities 13:*2, 7, 13*
29:*20* 35:*20* 36:*6*
43:*9* 44:*7, 8* 49:*5*
55:*14* 63:*6*
facility 16:*24* 19:*17*
28:*6* 34:*7, 21* 35:*23*
36:*12, 16, 17, 24* 37:*4,
6* 42:*13, 17, 21* 43:*25*
44:*13, 19, 25* 45:*12*
48:*12, 24* 49:*23* 50:*3,
14* 56:*4* 59:*4* 60:*19,
23* 61:*3, 7, 21*
facility-based 34:*5*
fact 19:*13*
factor 59:*5, 10, 12*
factors 36:*25* 51:*5, 7*
59:*15, 16, 20, 21*
facts 19:*9, 12*
familiar 38:*7* 52:*17*
family 62:*8* 63:*14*
feel 5:*22* 48:*3* 58:*15*
fellowship 11:*13, 20*
Field 4:*20* 11:*4*

Fifth 4:*21*
filed 8:*23* 21:*13*
fill 60:*3*
financially 65:*10*
findings 45:*1*
fine 23:*17*
finished 22:*6, 8*
23:*10, 24*
firm 4:*8*
first 4:*3* 17:*1* 23:*1*
fitness 12:*15*
five-minute 62:*15*
64:*2*
flexibility 37:*14*
Floor 2:*5* 4:*21*
focuses 17:*25*
folks 17:*22*
follow 32:*17* 34:*16*
42:*13* 44:*13*
followed 41:*23* 43:*4,
8* 45:*22* 55:*5, 13, 18*
58:*8, 10, 13* 62:*4*
following 42:*3, 6, 17,
22, 23* 43:*5*
follows 4:*4* 55:*14*
footprint 18:*7*
foregoing 65:*4* 66:*4*
forensic 11:*5, 12, 21*
12:*1, 8, 10, 11, 25*
13:*14* 14:*4, 13* 17:*2,
4* 27:*7*
forensics 18:*1, 3*
form 66:*7*
formal 18:*17*
found 12:*14, 17*
foundation 60:*3*
frame 17:*16*
free 5:*22*
frequently 37:*22*
Friday 15:*8*
front 7:*2, 8*
full 4:*10, 15*
further 29:*2* 64:*5*
65:*7*

< G >
GENERAL 2:*10*
37:*12* 39:*10, 11, 16*
41:*22* 48:*15* 50:*16*
52:*1* 58:*4* 61:*17*

generally 25:*2* 29:*23,
25*
General's 20:*10*
getting 37:*11*
Gina 1:*19* 65:*2, 15*
give 6:*2* 7:*15* 25:*16*
31:*7*
given 56:*22, 25* 66:*5*
gives 62:*10*
go 4:*23* 10:*12, 14, 18,
20* 11:*1* 15:*20* 26:*13,
18* 35:*5* 37:*4, 6* 44:*6,
8* 50:*21* 51:*17* 53:*11*
60:*20*
God 15:*14*
goes 30:*20* 52:*23*
54:*20*
going 4:*23* 6:*7*
15:*14, 18* 18:*20*
20:*19* 21:*2, 9* 23:*4,
18, 21* 28:*14, 15, 16*
35:*5* 42:*11* 51:*4*
62:*15* 63:*3* 64:*14*
Good 4:*7*
gotten 61:*9*
graduate 10:*18* 11:*1*
grievances 8:*23*
ground 4:*23*
guess 32:*5* 61:*5*
guessing 9:*18* 32:*9*
guidance 49:*13*
guided 47:*12*
guidelines 38:*3*

< H >
HACH 2:*5*
Hal 16:*18*
handful 9:*12*
happen 37:*16, 17*
happened 45:*5, 7*
49:*2* 51:*5* 60:*18*
62:*5*
happening 62:*24*
63:*6*
happens 12:*19* 49:*23*
hard 6:*7*
head 6:*3* 25:*15* 28:*1*
57:*10*
Health 4:*20* 11:*25*
12:*20* 14:*21* 17:*18*

18:*11, 23, 25* 19:*1, 3,
7* 35:*21, 25* 36:*7, 12,
19* 38:*17* 41:*23*
48:*17, 22* 49:*6, 8*
50:*15, 17* 53:*23*
54:*21* 55:*15* 56:*22*
60:*17*
hear 5:*21* 24:*18*
59:*7*
heard 24:*15*
hearing 54:*24*
hearings 5:*5* 9:*9, 10,
11, 13* 10:*1*
held 15:*21* 21:*16*
help 4:*24* 13:*2*
helping 13:*12*
hierarchy 36:*18*
HILLARY 2:*7*
hindsight 63:*11*
historical 59:*20* 60:*1*
history 11:*19*
home 51:*17*
Hospital 11:*21*
hour 8:*2*
hours 62:*16*
housed 35:*23*
Housing 52:*17, 20, 22*
53:*1, 8, 10*
Houston 8:*15*
hygiene 5:*5* 9:*13*
12:*24*
Hypotheticals 37:*19*

< I >
idea 44:*10*
ideation 48:*9, 16*
49:*7*
identification 21:*22*
23:*22*
identify 29:*8* 30:*3*
46:*6*
illness 27:*15, 19*
47:*2, 5, 9, 17* 49:*19*
50:*3, 12, 19*
illnesses 33:*3*
imagine 32:*2*
impact 33:*17*
impacted 30:*9*
important 6:*2* 51:*3*

improve  29:*10*, *15*
46:*8*  55:*10*
improved  63:*13*
improvement  29:*5*
inaccuracy  26:*1*
in-between  37:*15*, *16*,
*20*  38:*4*
incarcerated  25:*8*
incident  55:*17*  56:*3*
include  12:*13*
included  29:*5*
includes  61:*24*
including  7:*21*  27:*12*
63:*10*
increased  37:*21*
increases  59:*12*
individual  25:*4*  37:*1*
45:*11*  48:*15*, *17*  53:*2*
55:*22*  59:*25*  63:*7*, *8*
individually  48:*19*
individuals  12:*14*, *16*,
*21*  31:*2*  38:*16*, *18*
50:*15*, *18*, *19*  51:*11*,
*16*
influence  7:*13*
information  16:*11*
20:*10*  24:*23*, *25*  25:*3*,
*4*, *6*  26:*9*, *12*  35:*7*, *15*
38:*20*  51:*3*  60:*1*, *3*
62:*1*
infraction  53:*3*, *10*
initial  38:*12*
initiate  54:*20*
inmate  16:*16*  36:*23*
38:*23*  39:*2*, *18*, *23*
40:*3*, *9*, *17*, *20*  41:*5*,
*16*  47:*2*, *5*, *8*, *16*, *25*
48:*3*, *8*, *11*  49:*7*
51:*19*  52:*6*, *10*, *19*, *25*
54:*4*, *8*
inmates  27:*14*, *18*
33:*3*  35:*18*  38:*8*
39:*8*  45:*13*  49:*18*
inmate's  54:*5*
Inpatient  11:*21*
12:*22*  18:*6*  59:*3*
inpatient-level  50:*20*
inside  49:*14*  50:*25*
insight  13:*10*

intended  50:*19*
interact  15:*3*
interested  65:*10*
internal  28:*6*  30:*11*
43:*12*  61:*24*
internally  26:*21*
intervention  55:*19*,
*20*  56:*7*
interventions  55:*25*
interview  59:*25*
investigators  24:*9*
involve  27:*6*
involved  27:*3*  28:*11*
30:*25*  31:*1*, *11*, *23*
35:*3*  46:*18*, *25*  56:*5*
58:*3*, *6*  61:*9*
involves  28:*7*
iPad  6:*20*
Israel  11:*11*
issue  29:*9*  37:*23*
issues  29:*11*  51:*10*
items  54:*8*, *11*
its  1:*4*

< J >
Jeremy  14:*10*
join  34:*17*
joint  28:*18*  30:*4*
43:*23*, *24*  44:*24*  45:*3*
46:*12*  57:*3*
jointly  36:*8*  57:*24*
Joseph  1:*4*  4:*9*
24:*13*, *15*
judgment  37:*15*
38:*6*  47:*12*
July  8:*13*
JUNE  1:*14*, *18*  65:*12*
jurisdictions  12:*12*
13:*5*
Justice  42:*4*  61:*23*
62:*7*

< K >
KALKACH  2:*6*  3:*4*
4:*6*, *8*, *13*, *16*  15:*11*,
*16*, *18*, *23*  18:*9*  19:*5*,
*15*  20:*15*  21:*12*, *15*,
*17*, *21*, *23*  22:*1*, *4*, *11*,
*13*  23:*4*, *8*, *20*, *23*
24:*4*, *6*  27:*20*  33:*1*

35:*9*  36:*22*  38:*1*, *11*,
*21*  39:*6*  40:*8*, *13*, *24*
41:*10*, *21*  42:*5*, *10*, *16*
43:*1*, *21*  44:*11*, *17*
45:*18*  46:*1*  47:*6*, *13*,
*22*  48:*6*, *21*  49:*3*, *17*
50:*1*, *7*  51:*6*  52:*3*, *16*,
*24*  53:*17*  54:*15*
58:*17*  59:*9*  61:*2*, *16*
62:*12*, *17*, *21*, *22*  63:*2*,
*23*  64:*5*
keep  23:*16*  32:*18*
keeping  34:*15*
kept  61:*4*
key  18:*2*
kids  8:*18*
kind  5:*4*  9:*24*  10:*8*
24:*24*  31:*3*
52:*14*  55:*19*, *20*  56:*7*
kinds  9:*10*  13:*7*
37:*11*  55:*22*
King  1:*4*, *5*  4:*9*
19:*16*, *19*, *22*  24:*13*,
*16*  35:*23*
knew  63:*13*, *14*, *15*
know  6:*10*  14:*15*, *16*,
*21*  15:*18*  16:*18*, *19*
17:*5*  18:*16*  19:*9*, *12*,
*13*  20:*14*  22:*5*  23:*10*,
*24*, *25*  24:*13*, *14*  25:*8*
27:*22*  28:*13*, *14*
29:*21*, *23*  30:*13*, *16*
31:*6*, *12*, *14*, *16*, *18*, *21*,
*25*  32:*10*, *11*, *12*, *13*,
*16*, *19*, *20*, *24*  33:*10*
34:*7*, *13*, *14*, *18*  35:*1*,
*7*, *11*, *16*, *25*  36:*4*
38:*3*  41:*19*  43:*16*
44:*10*  46:*14*, *20*, *23*,
*24*  49:*11*  52:*11*, *25*
53:*13*, *20*, *22*, *25*  54:*2*,
*24*  57:*1*, *2*, *10*, *15*, *18*,
*19*, *21*  58:*3*  59:*18*
60:*11*, *15*  61:*1*, *3*, *6*,
*10*, *17*, *18*
knowledge  65:*5*
known  17:*12*  63:*12*
knows  55:*7*

< L >
large  16:*10*, *14*
late  12:*4*
law  4:*8*  9:*13*
lawsuit  9:*1*  10:*6*
16:*9*  20:*1*, *3*  21:*13*
24:*10*, *11*
layers  41:*25*
lead  63:*22*
leading  11:*19*
learn  33:*20*, *21*, *23*
34:*3*  63:*17*
learned  63:*18*
LEE  1:*13*, *17*  3:*3*
4:*2*, *7*, *18*, *23*  21:*24*
22:*5*  23:*15*  64:*6*, *9*
66:*3*, *12*
L-e-e  4:*18*
left  11:*24*  37:*14*, *15*
legal  12:*15*
lesson  63:*18*
level  35:*21*, *25*  36:*7*
37:*2*, *21*  56:*4*
levels  50:*5*, *8*
L-i  4:*18*
licenses  10:*24*
licensing  11:*16*  17:*23*
LINE  67:*4*
link  7:*4*
linked  46:*10*
list  59:*15*, *16*, *18*, *19*
little  24:*23*  29:*2*
35:*5*
live  50:*18*
lives  51:*18*
living  52:*1*
LI-WEN  1:*13*, *17*
3:*3*  4:*2*, *18*  66:*3*, *12*
LLP  2:*5*
local  12:*12*  13:*5*
location  25:*3*  45:*4*
51:*15*
locations  44:*2*
log  61:*4*, *8*
logistically  36:*9*
long  5:*2*  8:*1*  13:*14*
17:*5*  33:*8*  57:*9*
60:*13*, *15*
longer  12:*3*  17:*6*

**look** 18:17 27:5, 25 29:8 44:3, 5, 18 60:20 62:4 63:20
**looked** 14:25
**looking** 29:15 30:17 33:10, 14, 25 38:16 63:9
**lose** 45:5, 9
**lost** 15:9
**lot** 27:23 32:6 33:16 59:19
**lots** 63:16

**< M >**
**Madison** 2:5
**major** 10:16
**management** 7:24 12:16, 23 29:5 30:25 41:3
**mandated** 12:13
**mandatory** 35:2
**manual** 27:24 33:6
**Margaret** 20:13 21:6, 8
**Maria** 14:16
**Marie** 14:15
**mark** 23:6
**marked** 21:19, 22 22:15 23:2, 22
**MARKS** 2:20
**married** 8:16
**MD** 40:23
**mean** 4:12 9:21 11:9 18:16 22:16 26:1 33:19, 24 40:12 42:23 43:16 44:25 47:14 49:16, 25 50:12 53:4
**means** 5:24
**meant** 26:2 62:3, 4
**mechanism** 43:13, 14, 15
**med** 11:1
**medical** 10:19, 20, 22, 23 11:3, 12, 25 12:4, 5 13:9, 18, 22, 24 14:13 27:6 28:7 39:16, 17, 18, 20, 23 40:3, 7, 20, 22, 23 41:2 47:15

**medical-medical** 40:22
**medication** 39:7, 19, 25 40:1, 4 41:3
**medications** 5:17 39:9, 11
**medicine** 10:25 11:14
**meet** 8:1
**meeting** 16:24 26:23
**meetings** 26:25 27:11, 12
**member** 63:15
**memorized** 33:7
**Mental** 4:20 5:5 9:13 11:25 12:17, 20, 24 14:20 17:18 18:10, 22, 25 19:1, 3, 6 27:15, 18 33:3 35:21, 25 36:12, 19 38:17 41:23 47:2, 5, 9, 16 48:16, 22 49:6, 8, 19 50:3, 12, 15, 17, 19 53:23 54:21 55:15 56:22 60:17
**mentioned** 49:9
**Meyers** 16:18
**Mid-State** 35:24 36:11, 16 60:19, 23 61:3
**mind** 62:13
**minimally** 37:13
**minimum** 40:1
**minute** 21:24 23:9 62:12
**minutes** 64:1
**mission** 19:6
**Mm-hmm** 57:7
**modification** 29:12
**month** 20:18
**monthly** 37:14 40:15
**morning** 4:7
**move** 18:20 23:4 63:23
**moved** 12:4
**multiple** 41:25
**mute** 6:21

**< N >**

**name** 4:7, 10, 15, 18 14:1, 9 43:14 61:17, 18
**names** 8:8 20:12 21:3 27:21, 22
**NAPPI** 2:7 64:14
**nature** 5:6
**navigating** 13:12
**NECESSARILY** 2:20
**need** 4:15 6:9 12:15 18:17 27:24 30:3, 8 33:6 34:16, 22 37:10 38:17, 19 40:15 48:13, 25 50:15, 20 51:4 52:15 59:4
**needed** 20:9 36:10 38:20
**needs** 38:24 45:2 49:7 50:6 59:2 61:19 62:6
**negative** 46:6
**never** 34:24 60:14 61:9 62:13
**NEW** 1:1 2:6, 10, 12 4:19, 20, 21 11:12 16:22 18:23 19:3, 7, 17 24:19 26:17, 21 27:7, 17 28:3, 16 31:22 32:13 34:14, 18, 24 35:13 36:12, 20 39:15 42:1 43:25 45:1, 12, 20 56:21
**nod** 6:3
**NORTHERN** 1:1
**Notary** 66:19
**noted** 66:7
**notes** 62:18 64:1
**notice** 24:20, 21 25:1, 2
**noticed** 15:12
**notices** 25:10, 21 26:1, 5 64:11
**notification** 24:20, 22 25:7
**notifications** 61:22 62:10
**notified** 20:8 62:6, 8, 9
**notify** 61:22, 23

**Number** 3:7 25:14, 22, 23 26:5 51:4
**numbered** 1:18 57:17
**numbers** 26:16
**nurse** 39:14

**< O >**
**oath** 5:12, 14
**object** 6:16 21:9
**objection** 9:10 17:19 18:24 19:11 27:16 32:23 35:8 36:14 37:18 38:9, 15 39:4 40:5, 11, 21 41:7, 18, 24 42:8, 14, 19 43:19 44:9, 15 45:15, 25 47:3, 10, 18 48:2, 14 49:1, 15, 20 50:4 51:1, 22 52:13, 21 53:14 54:10 58:14 59:6 60:25 61:12 62:25
**objective** 18:22
**obliged** 32:22
**obtain** 36:6
**occasional** 9:9
**occurred** 24:23
**occurs** 62:6
**odd** 18:16
**offender** 12:23
**offer** 21:17
**offered** 12:21
**off-hours** 54:20
**OFFICE** 2:10 4:20 11:24 13:12 14:20 17:18, 22 18:10, 22, 25 19:6 20:11 36:12 55:15 61:22 62:7
**official** 26:24 27:1 57:11, 13, 16 58:12
**Oh** 15:14 33:24 62:13
**Okay** 4:14 6:4, 5, 13, 17, 18, 22 7:1, 7, 11, 17 9:7 10:2 12:7 13:14 19:9 20:12, 21 21:7 22:11 23:4 24:4 26:4 30:17 31:14, 25 35:17, 20

Deposition of Dr. Li-Wen Lee | Estate of Joseph P. King v. Ward, et al.

36:23  38:7  46:23
48:23  50:8  56:24
58:1  59:22  61:11
62:20  63:23  64:3
**older**  7:20
**OMH**  9:12  12:1, 10,
11  17:2  20:14  21:11
26:6  28:4  36:8, 20
55:13  57:4
**Once**  5:2  26:23
34:12  40:1  41:3
51:13
**ones**  6:24, 25  33:5
51:7
**one-time**  29:9
**ongoing**  26:16  33:9
**opened**  38:19
**opening**  7:4
**operated**  36:17
**operations**  16:23
27:8
**opinion**  63:4
**opportunities**  63:12
**opposed**  6:3
**options**  16:5
**order**  20:19  53:10
**organization**  28:8
41:22  55:13, 15
**organized**  17:18  18:5
**oriented**  34:21
**outcome**  46:6  59:13
**outcomes**  29:7
**outpatient**  18:7
**outside**  42:3  50:11
**overall**  15:1  51:9
**overarching**  63:2
**overseeing**  30:21
31:5
**oversees**  41:22  45:22
55:5  58:8, 12

**< P >**
**p.m**  64:17
**packet**  58:25
**PAGE**  3:2  22:9  67:4
**pages**  66:4
**paper**  7:2, 8  31:25
32:3, 4, 7
**parole**  54:24

**part**  16:10, 14  52:14
**participating**  15:2
**particular**  51:15
**parties**  13:7  65:8
**partly**  59:24
**party**  9:1
**pass**  32:20
**patient**  16:17  37:19,
22
**patients**  13:5
**pays**  57:5, 6  64:11
**peer**  63:14
**peers**  62:2
**Peggy**  20:13  21:5
**pending**  59:1
**people**  21:3  30:14
32:17, 22  34:16
48:12, 24  49:9, 18
50:3, 24  52:1  58:1, 3
60:8
**performed**  59:23
**performing**  60:8
**performs**  60:5
**period**  17:1
**permanently**  51:15
**person**  21:5, 6  30:16
31:6, 18  34:5  40:15
42:23  48:19  50:12
51:2  53:25  57:19, 21,
22, 24  58:15  61:20
64:10
**personally**  9:2  17:15
**person's**  53:22  56:10
59:13
**phone**  6:20
**place**  44:13
**placed**  51:15  54:4
**Plaintiff**  1:5  2:4  4:9
**plan**  45:2
**please**  4:10, 17  5:22
6:9, 19, 23  21:3, 18,
24  22:1, 5  23:7, 9
29:2  45:6  47:23
62:12
**points**  56:23
**policies**  7:22, 23
19:2  27:17, 21  28:2,
4, 5, 6, 13  29:19, 20
30:8, 22  31:5, 9  33:2,
22, 24, 25  34:2, 6, 23

35:1, 17  41:2, 23
42:3  44:14, 20  45:13,
16, 17, 19, 22, 24
46:15, 17, 19, 21
47:19  49:12, 21, 24
51:19  55:18  57:17,
23  58:2, 10, 11  59:11
60:22  61:11, 13, 14
62:3
**policy**  5:8  10:9
27:14, 24  28:7, 10, 11,
15, 17, 19, 21, 23, 25
29:1, 12, 22  30:8, 18,
24  31:3, 10, 11, 14, 21,
22  32:13, 16, 21, 22
33:18  34:16  35:12
40:7, 16, 19  41:8, 11,
17, 19  42:7, 13, 18, 22,
24  43:3, 4, 5, 9  46:7
47:1, 8, 11  49:13
55:1, 2, 3, 4, 5, 7, 12
57:11, 15, 18, 22  58:4,
8, 13
**population**  37:12
50:16  52:1
**populations**  12:13
**portion**  63:24
**portions**  18:20  23:5
**position**  11:19, 20, 25
14:1  30:14  31:18
53:20  57:21
**positions**  58:1
**possible**  4:25  45:4, 9
**potential**  54:6  58:25
**practice**  28:15, 25
30:6  47:12  55:10
64:12
**practiced**  64:13
**practices**  7:25  29:6
41:2
**practitioner**  39:14
**preliminary**  25:6
**pre-pandemic**  9:19
**prepare**  7:17
**prescribe**  39:19, 24
40:4
**prescribing**  39:7
**present**  8:3
**presentation**  51:9, 12
**prevent**  62:24  63:5

**prevention**  27:9, 13
55:1  56:13
**primary**  37:13  40:12
60:6
**prior**  64:15
**prison**  12:20
**prisons**  50:11
**problem**  29:8  46:6,
10
**problems**  29:11
**procedure**  24:20
61:19
**proceedings**  12:16
**process**  28:10  29:21
30:10  31:11, 22
35:11  46:16, 20
47:25  48:4, 25  49:4,
10  55:17  56:3, 4, 6
61:24  62:11
**processes**  35:6
**Professional**  1:20
65:2
**program**  11:16
12:22  16:5  28:16
47:20
**programs**  6:23
12:23  49:21  50:22
**projects**  14:23  15:1
**promoting**  19:2
**proposed**  33:17
**propounded**  66:6
**Prosequendum**  1:5
**provide**  13:9  27:18
50:23  56:17  60:2
**provided**  13:11  36:19
**provides**  24:23  34:7,
10  57:2
**providing**  13:1, 3
19:1
**provision**  10:7
**psyche**  30:1  33:24
34:1
**Psychiatric**  12:11
16:22  18:4, 5  28:3
29:4  36:20, 21  39:13,
15, 20, 24  42:1  43:25
45:1, 21
**psychiatrist**  11:22
37:13  39:14  40:23

Psychiatry  11:*5*, *13*, *21*
psychological  7:*21*
psychologist  27:*9*
Psychotropic  39:*9*
public  19:*1*  66:*19*
pull  30:*8*
purview  39:*17*
put  6:*21*  17:*16*
  21:*18*  33:*17*  44:*12*
  54:*6*, *9*  64:*8*

< Q >
qualified  30:*10*
quality  29:*5*  30:*24*
  43:*13*
question  5:*21*, *23*, *24*,
  *25*  6:*12*, *16*  7:*3*
  15:*22*  16:*1*  22:*25*
  30:*20*  41:*14*  47:*4*
  61:*9*
questions  31:*12*  44:*5*
  62:*18*  64:*5*, *7*  66:*5*
quickly  4:*24*  41:*6*, *9*,
  *17*
quite  17:*16*
QUOTATION  2:*20*
QUOTE  2:*20*  19:*8*

< R >
range  26:*7*
RCTP  54:*21*
reach  12:*18*  15:*24*
reached  16:*1*
read  15:*22*  22:*2*, *10*,
  *22*, *24*  23:*3*  33:*2*, *5*, *8*,
  *9*, *13*  64:*9*  66:*4*
Realtime  1:*20*, *21*
reason  12:*17*  52:*19*
  54:*6*
reasons  16:*25*  52:*25*
Reassessed  52:*8*
  58:*25*
receive  24:*21*  26:*6*
  34:*17*  38:*23*  39:*2*
  52:*11*  56:*20*, *21*
  60:*16*
received  10:*23*  25:*10*,
  *21*

receives  56:*15*
Recess  64:*4*
recognize  22:*14*, *18*,
  *19*  23:*25*  24:*2*
recognizes  22:*3*
record  4:*11*  15:*20*,
  *21*  21:*15*, *16*  62:*2*, *21*
  64:*8*  65:*5*
recorded  24:*8*
recurring  26:*13*
redone  58:*25*  59:*2*, *4*
reevaluated  52:*7*
refer  33:*18*
REFLECT  2:*20*
reframe  41:*14*
regarding  16:*6*
  27:*14*  33:*2*  35:*17*
  45:*13*  49:*14*
REGIONAL  2:*10*
Registered  1:*20*  65:*2*
regular  40:*4*
related  5:*8*  7:*20*
  9:*13*  24:*9*, *11*  28:*25*
  39:*13*  53:*2*, *9*
relationship  14:*19*
  16:*20*  36:*11*
relationships  13:*12*
relative  65:*8*
remember  5:*10*  9:*17*,
  *22*  10:*5*  17:*17*  21:*13*
  24:*25*  25:*23*  41:*8*
  57:*17*
REMOTE  1:*13*, *17*
remotely  2:*2*
repeat  5:*22*  21:*3*
  45:*6*
rephrase  5:*22*  21:*2*
  47:*7*  63:*3*
report  13:*17*, *18*, *22*
  14:*5*, *6*  26:*11*, *23*
  27:*1*  47:*25*  48:*4*
  49:*4*
reported  13:*24*  65:*3*
Reporter  1:*20*, *21*
  6:*3*, *7*  65:*3*
reporters  24:*9*
reporting  48:*16*
reports  14:*11*, *13*, *14*
  48:*9*  49:*7*

represents  4:*8*
request  40:*6*
requests  41:*5*, *16*
requirement  28:*19*
  30:*5*  46:*11*
residency  11:*9*, *11*
respond  41:*9*  63:*18*
responding  29:*17*
responsibilities  12:*8*
  13:*3*
responsibility  30:*24*
responsible  12:*11*, *17*
  49:*11*
responsive  18:*21*
  23:*5*  63:*24*
restoration  12:*15*
restrictions  54:*23*
result  29:*11*
retention  9:*10*
retraining  55:*21*
return  12:*15*  51:*17*
returning  59:*4*
review  7:*23*, *24*
  21:*24*  23:*9*  29:*6*, *7*
  30:*10*, *14*  41:*25*  42:*3*
  44:*25*  46:*5*  55:*17*
  56:*3*, *6*  61:*24*  62:*18*
  64:*1*
reviewed  7:*20*  58:*25*
reviewing  22:*6*, *8*
  23:*24*  43:*13*  58:*6*
  62:*2*
reviews  29:*11*
revise  30:*10*, *14*, *17*
revisions  58:*6*
right  1:*5*  4:*12*  14:*1*
risk  7:*24*  45:*16*
  46:*8*  51:*23*  55:*2*, *12*
  57:*12*, *13*  58:*11*, *22*
  59:*5*, *10*, *12*, *15*, *16*, *20*,
  *22*  60:*4*
risks  58:*25*
role  9:*12*  12:*5*, *6*
  13:*9*  14:*21*
roles  12:*7*
room  7:*11*
ROSE  2:*5*
RPR  65:*15*
rules  4:*23*  53:*5*

run  4:*24*  52:*22*

< S >
sanction  44:*20*
sanctions  44:*12*
sat  34:*24*
saying  6:*8*  24:*22*
says  48:*3*
schedule  34:*13*
SCHIRRIPA  2:*5*
school  10:*18*, *19*, *20*
  11:*1*, *2*
Scratch  43:*7*, *17*
  47:*24*  48:*23*
screen  6:*24*
screened  52:*11*
screening  38:*7*, *10*, *12*,
  *14*, *16*, *22*, *24*
scroll  22:*2*
scrolling  23:*16*
second  15:*20*
sector  19:*1*
security  53:*6*
see  15:*10*, *12*, *15*, *16*
  22:*3*  23:*1*  26:*3*  33:*6*
  37:*7*, *8*, *10*, *12*, *22*
  39:*18*, *23*  40:*3*, *9*, *15*,
  *17*, *20*  41:*5*, *16*  61:*6*
  64:*1*
seen  22:*16*, *21*, *23*, *24*
  23:*19*  24:*1*, *2*  37:*23*
  59:*19*
send  52:*19*  53:*7*
sending  52:*25*
sense  37:*21*
sent  20:*9*  24:*20*
  53:*10*
separate  13:*21*  39:*22*
serious  50:*19*  52:*8*
Services  12:*1*, *9*, *10*,
  *21*, *25*  13:*1*, *3*, *6*, *11*,
  *14*  14:*4*, *13*  17:*3*, *4*
  18:*5*, *6*  19:*1*, *3*, *4*
  27:*7*, *18*  33:*17*  36:*10*,
  *18*, *19*  37:*3*, *11*  38:*17*,
  *19*  50:*16*, *23*  58:*24*
session  37:*16*, *21*
sessions  37:*15*  38:*4*
set  28:*16*  36:*10*

Case 9:20-cv-01413-TJM-ML   Document 79-7   Filed 03/31/23   Page 32 of 40

Deposition of Dr. Li-Wen Lee                                    Estate of Joseph P. King v. Ward, et al.

**sex** 12:*23*
**Sheet** 66:*8*
**shoelaces** 19:*19, 23*
35:*18, 19* 51:*20* 52:*1*
**show** 23:*7*
**showing** 6:*25* 22:*11*
**side** 17:*22, 25* 43:*12*
49:*6* 53:*15*
**sign** 64:*9*
**signed** 24:*7*
**silent** 6:*21*
**similar** 50:*10*
**single** 19:*13* 57:*24*
**site** 36:*19*
**situations** 13:*13*
62:*24*
**skills** 65:*5*
**slew** 27:*17*
**small** 23:*11*
**smoothly** 4:*25*
**social** 40:*9, 17*
**solution** 63:*22*
**somebody** 20:*8*
58:*24* 63:*13, 17*
**somewhat** 22:*25*
**sooner** 37:*23*
**sorry** 5:*19* 9:*5, 22*
11:*7* 20:*25* 21:*1, 5*
23:*11* 25:*25* 39:*20*
41:*14* 46:*2* 59:*7*
**sort** 59:*13*
**sound** 18:*16*
**South** 2:*11*
**speak** 20:*7, 16* 30:*10*
40:*6* 41:*1* 48:*1*
**speaking** 20:*20*
21:*11* 24:*12* 35:*6*
48:*11*
**speaks** 57:*11*
**special** 49:*14, 16, 18*
50:*25* 52:*17, 20, 22*
53:*1, 8, 10, 11*
**specialize** 11:*4, 6, 8*
**specific** 11:*4* 19:*9*
29:*13, 15* 30:*16* 31:*6,*
*12* 35:*10* 36:*24*
42:*11* 46:*10* 50:*2*
56:*8* 57:*19* 58:*3, 15*
61:*18*

**specifically** 31:*16*
35:*19* 60:*21* 61:*1*
**specifies** 40:*16, 19*
**spectrum** 50:*23*
**spelled** 4:*15*
**spent** 22:*17*
**spoke** 7:*19* 15:*7, 8*
17:*14* 21:*4*
**spoken** 17:*15* 24:*8*
**sporadic** 33:*11*
**stable** 51:*25*
**staff** 28:*7* 34:*5, 15*
36:*20* 42:*23* 44:*4*
49:*5* 54:*19* 56:*10, 17,*
*19, 21, 23* 57:*8* 60:*17*
62:*1, 11*
**stakeholders** 13:*4*
**stand** 12:*14*
**Standard** 1:*19* 54:*8,*
*11*
**start** 61:*24*
**started** 17:*2*
**starting** 25:*9* 26:*2*
**STATE** 2:*10, 11*
4:*10, 19* 12:*20, 21*
18:*23* 19:*3, 7, 17*
**statements** 24:*7, 8*
**state-operated** 19:*4*
**STATES** 1:*1* 41:*11,*
*13, 17*
**statutes** 33:*16*
**statutorily** 12:*13*
**stay** 50:*16*
**steps** 30:*11* 48:*10*
**stop** 22:*11*
**Street** 2:*11*
**stressors** 59:*21*
**strike** 18:*20* 23:*4*
26:*4* 63:*23*
**strokes** 13:*8*
**structural** 47:*19*
**structure** 18:*8* 30:*1*
47:*20* 50:*10* 58:*5, 9,*
*20*
**structured** 50:*18*
**subject** 8:*20*
**Subscribed** 65:*11*
66:*14*
**substance** 16:*2*
20:*21* 21:*7* 66:*7*

**suicidal** 48:*3, 9, 16*
49:*7*
**suicide** 16:*16, 17*
19:*16, 20, 23* 24:*19,*
*22* 26:*18* 27:*8, 13*
28:*22* 45:*14, 16* 46:*8*
48:*1, 12* 50:*24* 51:*2,*
*11, 14, 17, 20* 52:*6, 9,*
*10* 53:*13, 24* 54:*2, 4,*
*5, 9* 55:*1, 2, 12* 56:*12*
57:*12, 13* 58:*11, 22*
59:*22* 60:*3* 61:*4, 7,*
*11, 13, 15, 20, 21* 62:*5,*
*6*
**suicided** 25:*5*
**suicides** 26:*13* 60:*18,*
*24* 63:*5, 7, 10, 20*
**Suite** 2:*11*
**Sullivan** 14:*15, 16*
**sum** 16:*2* 20:*21* 21:*7*
**supervises** 31:*9*
**supervision** 18:*8*
30:*2, 19* 38:*22* 39:*1*
52:*12* 55:*23* 58:*20*
**supervisor** 56:*9*
**supervisors** 42:*2*
56:*5*
**supervisory** 58:*5, 9*
**support** 50:*20*
**suppose** 57:*8* 63:*17*
**supposed** 32:*17*
52:*11*
**sure** 28:*12* 32:*13*
33:*12* 36:*2* 40:*18*
47:*4* 49:*24* 56:*1*
64:*12*
**sustaining** 53:*2*
**sworn** 4:*4* 65:*11*
66:*14*
**symptoms** 51:*8*
**SYRACUSE** 2:*10, 12*
**system** 43:*8*
**systemic** 29:*9*
**systems** 13:*6* 29:*4*

**< T >**
**take** 5:*15* 6:*3, 13*
21:*24* 23:*9, 14* 47:*16*
62:*4, 14, 19* 63:*25*
64:*2*

**taken** 1:*17* 11:*15*
61:*20* 64:*4* 65:*11*
**takes** 48:*10* 60:*1*
**talk** 6:*6* 20:*1* 26:*16,*
*19* 27:*10, 13* 44:*4*
47:*19*
**talked** 17:*13* 59:*7*
**talking** 47:*23* 62:*1*
**talks** 26:*21*
**taught** 32:*17*
**team** 30:*18* 31:*8*
52:*5* 53:*23* 54:*21*
58:*18*
**technical** 10:*1*
**TECHNICIAN** 21:*19*
22:*1* 23:*14* 24:*5*
**tell** 33:*7* 44:*25*
47:*20*
**telling** 36:*3*
**term** 10:*1* 53:*16, 18*
**terms** 12:*18* 16:*12*
18:*2* 30:*23* 36:*9*
37:*4* 54:*22*
**testified** 4:*4* 5:*3* 9:*3*
10:*2*
**testify** 5:*18* 20:*4, 9,*
*18*
**testimony** 7:*14*
**Texas** 8:*15* 10:*13*
11:*3*
**Thank** 4:*22* 22:*12*
24:*4* 64:*5*
**theoretically** 45:*4, 9*
**therapist** 37:*13* 38:*3*
40:*12* 60:*6*
**thing** 6:*11* 24:*24*
**things** 28:*20* 55:*8*
60:*2* 62:*4* 63:*10*
**think** 8:*2* 9:*5, 17*
15:*9* 16:*10* 20:*17*
29:*3, 16* 30:*23* 33:*6*
36:*3* 42:*21* 49:*5*
56:*1*
**thinking** 19:*14*
**thought** 21:*1* 37:*20*
**thoughts** 16:*4*
**three** 43:*24* 62:*17*
**Time** 1:*19* 5:*2* 6:*7,*
*9* 9:*16* 12:*2* 13:*25*
15:*7* 17:*14, 15, 16*

Case 9:20-cv-01413-TJM-ML   Document 79-7   Filed 03/31/23   Page 33 of 40

Deposition of Dr. Li-Wen Lee                                  Estate of Joseph P. King v. Ward, et al.

20:*17*  22:*17*  23:*1*
24:*19*  30:*17*  32:*20*
51:*12*  57:*8*  63:*12*
64:*6*
**times**  6:*15*  14:*24*
16:*23*  17:*12*  39:*18*,
*23*  40:*3*
**title**  12:*3*  14:*7*
**today**  4:*24*  5:*12*, *18*
6:*9*, *15*, *25*  15:*8*
24:*15*  60:*21*
**today's**  7:*17*, *19*  8:*5*
**told**  9:*3*  10:*2*
**tool**  57:*14*  59:*17*
**top**  25:*14*  27:*25*
57:*10*
**track**  32:*18*
**train**  34:*12*
**trained**  60:*8*, *12*
**training**  11:*9*, *11*
32:*21*  34:*2*, *6*, *8*, *9*, *10*,
*11*, *13*, *17*, *19*, *23*, *25*
35:*1*, *4*  49:*11*  56:*12*,
*17*, *18*, *24*  57:*3*, *5*, *9*
60:*16*
**trainings**  56:*23*
60:*13*, *14*
**transcript**  64:*11*  65:*4*
**transcription**  66:*5*
**transferred**  59:*1*
**transgender**  5:*8*  10:*7*
**treat**  47:*8*, *14*, *21*
**treatment**  5:*9*  9:*9*,
*11*  10:*7*  38:*23*, *25*
39:*1*, *13*, *16*, *20*, *21*, *24*
47:*11*, *12*, *14*, *15*, *23*
49:*14*, *16*, *18*  50:*5*, *9*,
*11*, *15*, *21*  52:*5*, *12*, *15*
54:*21*
**trend**  28:*22*, *24*  29:*1*,
*14*, *15*
**trends**  26:*14*, *18*, *19*,
*21*  27:*5*  63:*21*
**trial**  5:*3*, *4*  12:*14*
**tried**  50:*24*
**trigger**  28:*20*, *23*, *24*
*29*:*1*
**true**  65:*4*
**truthfully**  5:*18*

**try**  26:*14*  29:*10*
47:*7*  55:*10*  61:*25*
62:*5*  63:*17*, *18*
**trying**  9:*5*  22:*9*
29:*3*  32:*11*  37:*20*
50:*22*  59:*13*
**Tuesday**  15:*8*
**turn**  6:*19*
**twice**  26:*19*
**two**  21:*3*  62:*15*
**type**  9:*14*
**Typically**  64:*10*

**< U >**
**understand**  5:*12*, *21*
20:*19*, *25*  26:*14*  28:*9*
30:*12*  33:*18*  38:*2*
42:*15*  44:*16*  62:*5*
**understanding**  6:*1*
13:*10*  57:*23*
**understood**  5:*25*
29:*18*  51:*10*
**unfit**  12:*14*
**unique**  63:*8*
**Unit**  11:*21*, *23*  48:*17*
49:*8*  50:*17*, *19*  51:*24*
52:*17*, *20*  53:*1*, *8*, *10*
**UNITED**  1:*1*
**units**  45:*17*  52:*22*
60:*17*
**University**  10:*13*
11:*3*
**update**  28:*15*, *17*, *21*
29:*20*  30:*6*  32:*21*
46:*7*, *9*, *12*, *21*
**updated**  28:*13*  31:*5*,
*14*  45:*24*  55:*7*
**updates**  30:*22*
**updating**  29:*19*, *22*
35:*12*  46:*14*, *16*, *19*
**usual**  25:*2*
**usually**  25:*6*  33:*14*

**< V >**
**variation**  56:*16*
**varies**  25:*22*
**various**  17:*12*
**verbal**  6:*2*
**verdict**  12:*19*

**VIDEO**  1:*13*, *17*
15:*9*  21:*19*  23:*14*
**visit**  44:*1*
**voluntary**  35:*2*

**< W >**
**walk**  11:*18*  23:*15*
**want**  14:*25*  23:*14*,
*16*, *25*  25:*16*  28:*9*
34:*18*  36:*2*  48:*16*
62:*14*, *18*  64:*8*
**wanted**  16:*4*  46:*7*
**WARD**  1:*5*
**watch**  6:*20*  53:*13*, *24*
54:*2*, *4*, *7*, *9*  61:*4*, *8*
**watches**  54:*20*
**way**  7:*14*  15:*11*
29:*3*  43:*3*
**well**  12:*12*, *16*, *22*
13:*4*, *12*  17:*20*  18:*7*
19:*2*  36:*16*  46:*9*, *13*
**W-e-n**  4:*18*
**went**  10:*19*
**we're**  6:*8*  13:*1*
33:*25*  64:*14*
**we've**  62:*15*
**Williams**  1:*19*  65:*2*,
*15*
**wind**  38:*18*
**WITNESS**  3:*2*  4:*3*
9:*24*  10:*8*  23:*17*
**word**  22:*2*
**words**  6:*4*
**work**  4:*19*  13:*15*
20:*2*  42:*2*  43:*18*
46:*18*  53:*23*
**worker**  40:*10*, *17*
**working**  12:*11*  13:*2*
17:*2*, *3*  26:*6*  39:*14*
**works**  16:*22*  29:*25*
**writing**  6:*8*  57:*24*
**written**  24:*7*

**< Y >**
**YAMILE**  2:*6*  4:*7*
**Yeah**  4:*13*  21:*9*
25:*18*  26:*7*  62:*20*
**year**  9:*17*  10:*5*
17:*17*  25:*11*, *12*  26:*3*,

*6*, *8*, *14*, *20*
**yearly**  26:*11*
**years**  9:*15*  10:*5*
19:*23*  43:*24*  63:*20*
**YORK**  1:*1*  2:*6*, *10*,
*12*  4:*19*, *20*, *21*  11:*12*
16:*22*  18:*23*  19:*3*, *7*,
*17*  24:*19*  26:*17*, *21*
27:*17*  28:*3*  34:*14*
35:*13*  36:*13*, *20*
39:*15*  42:*1*  43:*25*
45:*1*, *12*, *20*
**York's**  27:*7*

**< Z >**
**Zoom**  6:*24*

Case 9:20-cv-01413-TJM-ML    Document 79-7    Filed 03/31/23    Page 34 of 40

Deposition of Dr. Li-Wen Lee                                    Estate of Joseph P. King v. Ward, et al.

## WORD LIST

**< 1 >**
**10**  *(7)*
**10:06**  *(1)*
**10001**  *(1)*
**10016**  *(1)*
**10th**  *(1)*
**112**  *(1)*
**12**  *(1)*
**12:10**  *(1)*
**13202**  *(1)*
**15**  *(1)*
**17**  *(2)*
**17th**  *(1)*
**18**  *(1)*
**1974**  *(1)*
**1992**  *(1)*
**1996**  *(2)*

**< 2 >**
**2**  *(1)*
**20**  *(1)*
**2000**  *(2)*
**2008**  *(5)*
**2013**  *(3)*
**2018**  *(7)*
**2019**  *(1)*
**2022**  *(5)*
**20-CV-01413**  *(1)*
**21**  *(1)*
**23**  *(1)*

**< 3 >**
**300**  *(2)*
**330**  *(1)*
**365**  *(2)*

**< 4 >**
**4**  *(1)*

**< 6 >**
**6**  *(1)*

**< 8 >**
**8**  *(2)*

**< 9 >**
**90**  *(3)*

**9th**  *(1)*

**< A >**
**a.m**  *(1)*
**ability**  *(2)*
**able**  *(1)*
**above-styled**  *(1)*
**access**  *(3)*
**accommodate**  *(1)*
**account**  *(1)*
**accreditation**  *(11)*
**accredited**  *(1)*
**accrediting**  *(1)*
**accuracy**  *(1)*
**accurate**  *(1)*
**accurately**  *(1)*
**ACKNOWLEDGMEN T**  *(1)*
**ACTION**  *(5)*
**actions**  *(1)*
**actual**  *(1)*
**acute**  *(2)*
**ad**  *(1)*
**additional**  *(2)*
**address**  *(4)*
**addressed**  *(2)*
**adequate**  *(1)*
**admin**  *(1)*
**administrates**  *(1)*
**administration**  *(6)*
**administrative**  *(1)*
**Administrator**  *(1)*
**admitted**  *(3)*
**Adult**  *(1)*
**adverse**  *(1)*
**affect**  *(4)*
**age**  *(1)*
**agency**  *(3)*
**agency's**  *(1)*
**ago**  *(3)*
**AIMEE**  *(3)*
**al**  *(1)*
**Albert**  *(1)*
**alcohol**  *(1)*
**allowed**  *(1)*
**Amended**  *(2)*
**amount**  *(1)*
**Amy**  *(1)*
**Ann**  *(2)*

**annually**  *(2)*
**Answer**  *(11)*
**answered**  *(2)*
**answers**  *(3)*
**anybody**  *(1)*
**apparently**  *(1)*
**appearing**  *(1)*
**Apple**  *(1)*
**apply**  *(1)*
**appointments**  *(1)*
**appoints**  *(1)*
**approach**  *(2)*
**appropriate**  *(8)*
**approval**  *(1)*
**approves**  *(1)*
**approximate**  *(2)*
**approximately**  *(1)*
**approximation**  *(1)*
**area**  *(2)*
**areas**  *(2)*
**Article**  *(6)*
**asked**  *(3)*
**asking**  *(9)*
**assess**  *(1)*
**assessed**  *(3)*
**assessment**  *(13)*
**assign**  *(1)*
**assigned**  *(3)*
**assist**  *(1)*
**associate**  *(4)*
**assortment**  *(1)*
**assume**  *(1)*
**assumption**  *(1)*
**attached**  *(1)*
**attempt**  *(3)*
**attempted**  *(4)*
**attend**  *(1)*
**attending**  *(1)*
**attention**  *(1)*
**ATTORNEY**  *(5)*
**attorneys**  *(2)*
**audience**  *(1)*
**audit**  *(1)*
**audits**  *(1)*
**automatic**  *(1)*
**autopsy**  *(1)*
**available**  *(1)*
**Avenue**  *(2)*
**avoid**  *(1)*

**aware**  *(20)*

**< B >**
**back**  *(8)*
**based**  *(2)*
**basic**  *(2)*
**basis**  *(4)*
**Beginning**  *(6)*
**behalf**  *(2)*
**believe**  *(3)*
**Bellevue**  *(2)*
**best**  *(2)*
**Beth**  *(1)*
**better**  *(1)*
**beyond**  *(1)*
**bit**  *(3)*
**board**  *(1)*
**born**  *(2)*
**Branch**  *(1)*
**break**  *(5)*
**Breaking**  *(1)*
**brief**  *(1)*
**briefly**  *(1)*
**broad**  *(2)*
**Bronx**  *(1)*
**bureaus**  *(1)*
**business**  *(1)*

**< C >**
**called**  *(2)*
**call-out**  *(1)*
**capacity**  *(1)*
**caption**  *(1)*
**Captioner**  *(1)*
**care**  *(6)*
**case**  *(8)*
**caseload**  *(1)*
**cause**  *(1)*
**cell**  *(1)*
**Center**  *(16)*
**Centers**  *(6)*
**central**  *(20)*
**certain**  *(1)*
**CERTIFICATE**  *(1)*
**certification**  *(1)*
**Certified**  *(2)*
**certify**  *(3)*
**cetera**  *(1)*
**chances**  *(1)*
**change**  *(18)*

Case 9:20-cv-01413-TJM-ML Document 79-7 Filed 03/31/23 Page 35 of 40

Deposition of Dr. Li-Wen Lee        Estate of Joseph P. King v. Ward, et al.

**CHANGE/REASON** *(1)*
**changed** *(3)*
**changes** *(2)*
**charge** *(10)*
**check** *(2)*
**Chemical** *(1)*
**CHEVERIE** *(1)*
**chief** *(2)*
**Children's** *(1)*
**choose** *(1)*
**circumstances** *(6)*
**City** *(2)*
**CIVIL** *(3)*
**CLARITY** *(1)*
**clinical** *(13)*
**clinically** *(2)*
**clinician** *(7)*
**clinicians** *(1)*
**clinic-level** *(1)*
**close** *(1)*
**CNYPC** *(14)*
**CNYPC's** *(1)*
**college** *(2)*
**combination** *(3)*
**come** *(6)*
**comes** *(2)*
**coming** *(1)*
**commander** *(1)*
**commencing** *(1)*
**commission** *(12)*
**commissioner** *(11)*
**commissioner's** *(1)*
**commit** *(4)*
**commits** *(1)*
**committed** *(4)*
**communicated** *(1)*
**communication** *(2)*
**community** *(5)*
**company** *(1)*
**Complaint** *(3)*
**complaints** *(2)*
**completed** *(2)*
**compliance** *(1)*
**complicated** *(1)*
**complying** *(2)*
**components** *(1)*
**computers** *(1)*
**concern** *(2)*

**concluded** *(1)*
**conclusion** *(1)*
**conduct** *(1)*
**confused** *(1)*
**connect** *(1)*
**connected** *(1)*
**connecting** *(1)*
**consequence** *(1)*
**consequences** *(5)*
**consider** *(1)*
**considerations** *(2)*
**considered** *(2)*
**consistent** *(2)*
**contacted** *(1)*
**contain** *(1)*
**contains** *(1)*
**context** *(1)*
**continuing** *(1)*
**continuous** *(1)*
**continuously** *(1)*
**contributing** *(1)*
**control** *(1)*
**conversation** *(8)*
**convicted** *(1)*
**coordinating** *(1)*
**correct** *(3)*
**Correction** *(1)*
**correctional** *(31)*
**correctional-based** *(1)*
**Corrections** *(14)*
**corrections-based** *(2)*
**corrective** *(1)*
**counsel** *(8)*
**count** *(1)*
**couple** *(1)*
**COURT** *(6)*
**courtroom** *(1)*
**covered** *(1)*
**COWAN** *(60)*
**co-workers** *(1)*
**creates** *(1)*
**creating** *(1)*
**creation** *(1)*
**crime** *(1)*
**crisis** *(2)*
**CRR** *(1)*
**current** *(3)*
**currently** *(2)*
**custody** *(1)*

**CYNPC** *(5)*

**< D >**
**daily** *(2)*
**Darman** *(1)*
**date** *(3)*
**day** *(2)*
**days** *(6)*
**day-to-day** *(1)*
**deal** *(1)*
**decide** *(8)*
**decided** *(7)*
**decides** *(2)*
**deciding** *(2)*
**decision** *(2)*
**decisions** *(6)*
**defect** *(1)*
**Defendant** *(1)*
**Defendants** *(1)*
**defined** *(1)*
**definitely** *(1)*
**degree** *(1)*
**deliver** *(1)*
**delivered** *(4)*
**delivery** *(1)*
**demographic** *(1)*
**Department** *(15)*
**depend** *(8)*
**depending** *(4)*
**depends** *(11)*
**DEPONENT** *(1)*
**deposed** *(3)*
**DEPOSITION** *(17)*
**depositions** *(1)*
**deputy** *(5)*
**describe** *(1)*
**described** *(1)*
**designee** *(1)*
**destination** *(1)*
**determination** *(1)*
**determine** *(3)*
**determined** *(2)*
**development** *(4)*
**devices** *(2)*
**diagnoses** *(1)*
**dictated** *(1)*
**different** *(18)*
**differently** *(1)*
**DIRECT** *(4)*

**directives** *(1)*
**directly** *(2)*
**director** *(16)*
**directs** *(1)*
**disciplinary** *(2)*
**discipline** *(1)*
**discuss** *(1)*
**discussed** *(1)*
**Discussion** *(5)*
**disease** *(1)*
**distribute** *(1)*
**distributed** *(2)*
**distributing** *(1)*
**distribution** *(3)*
**DISTRICT** *(2)*
**Division** *(12)*
**divisions** *(5)*
**DOCCS** *(4)*
**doctor** *(9)*
**doctors** *(1)*
**document** *(10)*
**documentation** *(3)*
**documents** *(4)*
**doing** *(3)*
**DR** *(9)*
**draft** *(1)*
**drafted** *(7)*
**Drake** *(2)*
**drugs** *(1)*
**duly** *(1)*
**duties** *(1)*

**< E >**
**earlier** *(1)*
**Eastern** *(1)*
**education** *(1)*
**Einstein** *(1)*
**either** *(3)*
**electronic** *(4)*
**else's** *(1)*
**E-mail** *(1)*
**employee** *(4)*
**employees** *(1)*
**employment** *(1)*
**encompass** *(1)*
**encompassed** *(1)*
**engineering** *(1)*
**ensure** *(1)*
**ensures** *(1)*

entail (1)
entities (1)
environment (1)
environments (1)
Errata (2)
ESQUIRE (3)
established (1)
establishing (1)
Estate (2)
estimate (3)
et (2)
evaluation (6)
evaluations (2)
events (2)
evidence (2)
exact (3)
exactly (3)
Examination (2)
examples (1)
executive (1)
Exhibit (13)
existed (1)
expectation (1)
expected (1)
expires (1)
explain (3)
explaining (1)

< F >
facilities (12)
facility (32)
facility-based (1)
fact (1)
factor (3)
factors (7)
facts (2)
familiar (2)
family (2)
feel (3)
fellowship (2)
Field (2)
Fifth (1)
filed (2)
fill (1)
financially (1)
findings (1)
fine (1)
finished (4)
firm (1)

first (3)
fitness (1)
five-minute (2)
flexibility (1)
Floor (2)
focuses (1)
folks (1)
follow (4)
followed (11)
following (6)
follows (2)
footprint (1)
foregoing (2)
forensic (14)
forensics (1)
form (1)
formal (1)
found (2)
foundation (1)
frame (1)
free (1)
frequently (1)
Friday (1)
front (2)
full (2)
further (3)

< G >
GENERAL (11)
generally (3)
General's (1)
getting (1)
Gina (3)
give (4)
given (3)
gives (1)
go (18)
God (1)
goes (3)
going (20)
Good (1)
gotten (1)
graduate (2)
grievances (1)
ground (1)
guess (2)
guessing (2)
guidance (1)
guided (1)

guidelines (1)

< H >
HACH (1)
Hal (1)
handful (1)
happen (2)
happened (6)
happening (2)
happens (2)
hard (1)
head (4)
Health (29)
hear (3)
heard (1)
hearing (1)
hearings (7)
held (2)
help (2)
helping (1)
hierarchy (1)
HILLARY (1)
hindsight (1)
historical (2)
history (1)
home (1)
Hospital (1)
hour (1)
hours (1)
housed (1)
Housing (6)
Houston (1)
hygiene (3)
Hypotheticals (1)

< I >
idea (1)
ideation (3)
identification (2)
identify (3)
illness (10)
illnesses (1)
imagine (1)
impact (1)
impacted (1)
important (2)
improve (4)
improved (1)
improvement (1)

inaccuracy (1)
in-between (4)
incarcerated (1)
incident (2)
include (1)
included (1)
includes (1)
including (3)
increased (1)
increases (1)
individual (10)
individually (1)
individuals (11)
influence (1)
information (16)
infraction (2)
initial (1)
initiate (1)
inmate (29)
inmates (8)
inmate's (1)
Inpatient (4)
inpatient-level (1)
inside (2)
insight (1)
intended (1)
interact (1)
interested (1)
internal (4)
internally (1)
intervention (3)
interventions (1)
interview (1)
investigators (1)
involve (1)
involved (13)
involves (1)
iPad (1)
Israel (1)
issue (3)
issues (1)
items (2)
its (1)

< J >
Jeremy (1)
join (1)
joint (8)
jointly (2)

Deposition of Dr. Li-Wen Lee                                                      Estate of Joseph P. King v. Ward, et al.

Joseph  (4)
judgment  (3)
July  (1)
JUNE  (3)
jurisdictions  (2)
Justice  (3)

< K >
KALKACH  (77)
keep  (2)
keeping  (1)
kept  (1)
key  (1)
kids  (1)
kind  (10)
kinds  (4)
King  (9)
knew  (3)
know  (89)
knowledge  (1)
known  (2)
knows  (1)

< L >
large  (2)
late  (1)
law  (2)
lawsuit  (8)
layers  (1)
lead  (1)
leading  (1)
learn  (5)
learned  (1)
LEE  (15)
L-e-e  (1)
left  (3)
legal  (1)
lesson  (1)
level  (6)
levels  (2)
L-i  (1)
licenses  (1)
licensing  (2)
LINE  (1)
link  (1)
linked  (1)
list  (4)
little  (3)
live  (1)

lives  (1)
living  (1)
LI-WEN  (7)
LLP  (1)
local  (2)
location  (3)
locations  (1)
log  (2)
logistically  (1)
long  (8)
longer  (2)
look  (10)
looked  (1)
looking  (7)
lose  (2)
lost  (1)
lot  (4)
lots  (1)

< M >
Madison  (1)
major  (1)
management  (6)
mandated  (1)
mandatory  (1)
manual  (2)
Margaret  (3)
Maria  (1)
Marie  (1)
mark  (1)
marked  (5)
MARKS  (1)
married  (1)
MD  (1)
mean  (17)
means  (1)
meant  (3)
mechanism  (3)
med  (1)
medical  (28)
medical-medical  (1)
medication  (6)
medications  (4)
medicine  (2)
meet  (1)
meeting  (2)
meetings  (3)
member  (1)
memorized  (1)

Mental  (43)
mentioned  (1)
Meyers  (1)
Mid-State  (6)
mind  (1)
minimally  (1)
minimum  (1)
minute  (3)
minutes  (1)
mission  (1)
Mm-hmm  (1)
modification  (1)
month  (1)
monthly  (2)
morning  (1)
move  (3)
moved  (1)
multiple  (1)
mute  (1)

< N >
name  (9)
names  (5)
NAPPI  (2)
nature  (1)
navigating  (1)
NECESSARILY  (1)
need  (23)
needed  (3)
needs  (7)
negative  (4)
never  (4)
NEW  (37)
nod  (1)
NORTHERN  (1)
Notary  (1)
noted  (1)
notes  (2)
notice  (4)
noticed  (1)
notices  (5)
notification  (3)
notifications  (2)
notified  (4)
notify  (3)
Number  (6)
numbered  (2)
numbers  (1)
nurse  (1)

< O >
oath  (2)
object  (2)
objection  (46)
objective  (1)
obliged  (1)
obtain  (1)
occasional  (1)
occurred  (1)
occurs  (1)
odd  (1)
offender  (1)
offer  (1)
offered  (1)
off-hours  (1)
OFFICE  (17)
official  (6)
Oh  (3)
Okay  (40)
older  (1)
OMH  (13)
Once  (6)
ones  (4)
one-time  (1)
ongoing  (2)
opened  (1)
opening  (1)
operated  (1)
operations  (2)
opinion  (1)
opportunities  (1)
opposed  (1)
options  (1)
order  (2)
organization  (4)
organized  (2)
oriented  (1)
outcome  (2)
outcomes  (1)
outpatient  (1)
outside  (2)
overall  (2)
overarching  (1)
overseeing  (2)
oversees  (5)

< P >
p.m  (1)

packet *(1)*
PAGE *(3)*
pages *(1)*
paper *(6)*
parole *(1)*
part *(3)*
participating *(1)*
particular *(1)*
parties *(2)*
partly *(1)*
party *(1)*
pass *(1)*
patient *(3)*
patients *(1)*
pays *(3)*
peer *(1)*
peers *(1)*
Peggy *(2)*
pending *(1)*
people *(15)*
performed *(1)*
performing *(1)*
performs *(1)*
period *(1)*
permanently *(1)*
person *(19)*
personally *(2)*
person's *(3)*
phone *(1)*
place *(1)*
placed *(2)*
Plaintiff *(3)*
plan *(1)*
please *(17)*
points *(1)*
policies *(58)*
policy *(68)*
population *(3)*
populations *(1)*
portion *(1)*
portions *(2)*
position *(8)*
positions *(1)*
possible *(3)*
potential *(2)*
practice *(6)*
practiced *(1)*
practices *(3)*
practitioner *(1)*

preliminary *(1)*
pre-pandemic *(1)*
prepare *(1)*
prescribe *(3)*
prescribing *(1)*
present *(1)*
presentation *(3)*
prevent *(2)*
prevention *(4)*
primary *(3)*
prior *(1)*
prison *(1)*
prisons *(1)*
problem *(3)*
problems *(1)*
procedure *(2)*
proceedings *(1)*
process *(19)*
processes *(1)*
Professional *(2)*
program *(6)*
programs *(4)*
projects *(2)*
promoting *(1)*
proposed *(1)*
propounded *(1)*
Prosequendum *(1)*
provide *(5)*
provided *(2)*
provides *(4)*
providing *(3)*
provision *(1)*
psyche *(3)*
Psychiatric *(16)*
psychiatrist *(1)*
Psychiatry *(4)*
psychological *(1)*
psychologist *(1)*
Psychotropic *(1)*
public *(2)*
pull *(1)*
purview *(1)*
put *(8)*

**< Q >**
qualified *(1)*
quality *(4)*
question *(14)*
questions *(6)*

quickly *(4)*
quite *(1)*
QUOTATION *(1)*
QUOTE *(2)*

**< R >**
range *(1)*
RCTP *(1)*
reach *(3)*
reached *(1)*
read *(13)*
Realtime *(2)*
reason *(3)*
reasons *(2)*
Reassessed *(2)*
receive *(9)*
received *(3)*
receives *(1)*
Recess *(1)*
recognize *(5)*
recognizes *(1)*
record *(9)*
recorded *(1)*
recurring *(1)*
redone *(3)*
reevaluated *(1)*
refer *(1)*
REFLECT *(1)*
reframe *(1)*
regarding *(6)*
REGIONAL *(1)*
Registered *(2)*
regular *(1)*
related *(9)*
relationship *(3)*
relationships *(1)*
relative *(1)*
remember *(10)*
REMOTE *(2)*
remotely *(1)*
repeat *(3)*
rephrase *(4)*
report *(11)*
reported *(2)*
Reporter *(5)*
reporters *(1)*
reporting *(1)*
reports *(5)*
represents *(1)*

request *(1)*
requests *(2)*
requirement *(3)*
residency *(2)*
respond *(2)*
responding *(1)*
responsibilities *(2)*
responsibility *(1)*
responsible *(3)*
responsive *(3)*
restoration *(1)*
restrictions *(1)*
result *(1)*
retention *(1)*
retraining *(1)*
return *(2)*
returning *(1)*
review *(18)*
reviewed *(2)*
reviewing *(6)*
reviews *(1)*
revise *(3)*
revisions *(1)*
right *(3)*
risk *(21)*
risks *(1)*
role *(5)*
roles *(1)*
room *(1)*
ROSE *(1)*
RPR *(1)*
rules *(2)*
run *(2)*

**< S >**
sanction *(1)*
sanctions *(1)*
sat *(1)*
saying *(2)*
says *(1)*
schedule *(1)*
SCHIRRIPA *(1)*
school *(5)*
Scratch *(4)*
screen *(1)*
screened *(1)*
screening *(7)*
scroll *(1)*
scrolling *(1)*

second *(1)*
sector *(1)*
security *(1)*
see *(25)*
seen *(9)*
send *(2)*
sending *(1)*
sense *(1)*
sent *(3)*
separate *(2)*
serious *(2)*
Services *(32)*
session *(2)*
sessions *(2)*
set *(2)*
sex *(1)*
Sheet *(1)*
shoelaces *(6)*
show *(1)*
showing *(2)*
side *(6)*
sign *(1)*
signed *(1)*
silent *(1)*
similar *(1)*
single *(2)*
site *(1)*
situations *(2)*
skills *(1)*
slew *(1)*
small *(1)*
smoothly *(1)*
social *(2)*
solution *(1)*
somebody *(4)*
somewhat *(1)*
sooner *(1)*
sorry *(13)*
sort *(1)*
sound *(1)*
South *(1)*
speak *(6)*
speaking *(5)*
speaks *(1)*
special *(11)*
specialize *(3)*
specific *(17)*
specifically *(4)*
specifies *(2)*

spectrum *(1)*
spelled *(1)*
spent *(1)*
spoke *(5)*
spoken *(2)*
sporadic *(1)*
stable *(1)*
staff *(17)*
stakeholders *(1)*
stand *(1)*
Standard *(3)*
start *(1)*
started *(1)*
starting *(2)*
STATE *(10)*
statements *(2)*
state-operated *(1)*
STATES *(4)*
statutes *(1)*
statutorily *(1)*
stay *(1)*
steps *(2)*
stop *(1)*
Street *(1)*
stressors *(1)*
strike *(4)*
strokes *(1)*
structural *(1)*
structure *(7)*
structured *(1)*
subject *(1)*
Subscribed *(2)*
substance *(4)*
suicidal *(4)*
suicide *(50)*
suicided *(1)*
suicides *(7)*
Suite *(1)*
Sullivan *(2)*
sum *(3)*
supervises *(1)*
supervision *(8)*
supervisor *(1)*
supervisors *(2)*
supervisory *(2)*
support *(1)*
suppose *(2)*
supposed *(2)*
sure *(9)*

sustaining *(1)*
sworn *(3)*
symptoms *(1)*
SYRACUSE *(2)*
system *(1)*
systemic *(1)*
systems *(2)*

< T >
take *(12)*
taken *(5)*
takes *(2)*
talk *(8)*
talked *(2)*
talking *(3)*
talks *(1)*
taught *(1)*
team *(6)*
technical *(1)*
TECHNICIAN *(4)*
tell *(3)*
telling *(1)*
term *(3)*
terms *(7)*
testified *(4)*
testify *(4)*
testimony *(1)*
Texas *(3)*
Thank *(4)*
theoretically *(2)*
therapist *(4)*
thing *(2)*
things *(5)*
think *(15)*
thinking *(1)*
thought *(2)*
thoughts *(1)*
three *(2)*
Time *(22)*
times *(7)*
title *(2)*
today *(9)*
today's *(3)*
told *(2)*
tool *(2)*
top *(3)*
track *(1)*
train *(1)*
trained *(2)*

training *(25)*
trainings *(3)*
transcript *(2)*
transcription *(1)*
transferred *(1)*
transgender *(2)*
treat *(3)*
treatment *(29)*
trend *(5)*
trends *(6)*
trial *(3)*
tried *(1)*
trigger *(4)*
true *(1)*
truthfully *(1)*
try *(8)*
trying *(7)*
Tuesday *(1)*
turn *(1)*
twice *(1)*
two *(2)*
type *(1)*
Typically *(1)*

< U >
understand *(12)*
understanding *(3)*
understood *(3)*
unfit *(1)*
unique *(1)*
Unit *(12)*
UNITED *(1)*
units *(3)*
University *(2)*
update *(10)*
updated *(5)*
updates *(1)*
updating *(6)*
usual *(1)*
usually *(2)*

< V >
variation *(1)*
varies *(1)*
various *(1)*
verbal *(1)*
verdict *(1)*
VIDEO *(5)*
visit *(1)*

**voluntary**  *(1)*

**< W >**
**walk**  *(2)*
**want**  *(12)*
**wanted**  *(2)*
**WARD**  *(1)*
**watch**  *(9)*
**watches**  *(1)*
**way**  *(4)*
**well**  *(11)*
**W-e-n**  *(1)*
**went**  *(1)*
**we're**  *(4)*
**we've**  *(1)*
**Williams**  *(3)*
**wind**  *(1)*
**WITNESS**  *(5)*
**word**  *(1)*
**words**  *(1)*
**work**  *(8)*
**worker**  *(2)*
**working**  *(6)*
**works**  *(2)*
**writing**  *(2)*
**written**  *(1)*

**< Y >**
**YAMILE**  *(2)*
**Yeah**  *(5)*
**year**  *(10)*
**yearly**  *(1)*
**years**  *(5)*
**YORK**  *(30)*
**York's**  *(1)*

**< Z >**
**Zoom**  *(1)*