# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

The Estate of Joseph P. King, by and through its Administratrix, Amy King, and Amy King in her own right,

*Plaintiff*,

- against -

9:20-cv-1413-TJM-ML

Anthony J. Annucci, Acting Commissioner, State of New York Department of Corrections, in his individual capacity; Marie T. Sullivan, Commissioner, State of New York, Department of Mental Health, in her individual capacity; Jami Palladino, Mid-State  Social Worker, in her individual capacity; Hal Meyers, Mid-State Chief Mental Health Counselor, in his individual capacity

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE § 56(a)**

**HACH ROSE SCHIRRIPA & CHEVERIE, LLP**
Hillary Nappi, Esq.
112 Madison Avenue, 10th Floor
New York, New York 10016

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ...................................................................................... 1

STANDARD OF REVIEW ..................................................................................... 6

ARGUMENT ........................................................................................................ 7

I.    PLAINTIFFS' EIGHTH AMENDMENT CLAIM MUST NOT BE DISMISSED. ................ 7

  A.    Annucci, Sullivan, Meyers Acted With Deliberately Indifference. .................................. 9

  B.    Jami Palladino was Deliberately Indifferent in Response to Decedent's Increased Risk of
  Suicide. ........................................................................................................... 13

  C.    Defendants Are Not Entitled To Qualified Immunity .................................................... 14

II.   PLAINTIFFS' § 1983 FAILURE TO TRAIN CLAIM MUST NOT BE DISMISSED. ........ 16

III.  PLAINTIFFS' NELIGENGE CLAIMS MUST NOT BE DISMISSED. .............................. 17

IV.   PLAINTIFF'S WRONGFUL DEATH AND SURVIVOR CLAIMS SHOULD NOT BE
      DISMISSED ...................................................................................................... 19

CONCLUSION ...................................................................................................... 20

CERTIFICATE OF SERVICE ................................................................................ 21

## TABLE OF AUTHORITIES

Cases

*Allah v. Kemp*, 2010 WL 5860290, at \*9 (N.D.N.Y. Nov. 9, 2010)................................................ 8, 9

*Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir.1995) ................................................................................ 6

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ............................................................. 6

*Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) ................................................................................ 15

*Betts v. Shearman*, 751 F.3d 78, 83 (2d Cir. 2014) (*quoting Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007) ..................................................................................................................... 15

*Brock v. Wright*, 315 F3d 158, 166 (2d Cir 2003). ......................................................................... 11

*Burke v. Warren County Sheriff's Dep't*, No. 900–CV–597, 1994 WL 675042, at \*6, 1994 U.S. Dist. LEXIS 17233, at \*19–20 (N.D.N.Y. Nov. 25, 1994) ............................................................ 9

*Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998) .............................................................. 9, 14

*Charles v. Orange County*, 925 F.3d 73, 86 (2d Cir. 2019) ............................................................ 8

*Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000)...................................................................... 8

*Curry v. City of Syracuse*, 316 F.3d 324, 333 (2d Cir.2003) ........................................................... 6

*Dixon v. Lupis*, 3:20-CV-1754 (VLB), 2022 WL 4598857, at \*2 (D Conn Sept. 30, 2022)............ 10

*Estate of Leombruno by and through Douglas v County of Greene*, 919CV374TJMCFH, 2022 WL 467622, at \*16 (NDNY Jan. 25, 2022). ...................................................................................... 20

Estelle v. Gamble, 429 U.S. 97, 102–03 (1976) ......................................................................... 7, 9

*Farmer v. Brennan*, 511 U.S. 825, 832 (1994) .................................................................................. 7

*Ford v. McGinnis*, 352 F.3d 582, 597 (2d Cir.2003) ...................................................................... 15

*Funderburke v. Canfield*, 2016 WL 831974, at \*8 (W.D.N.Y. Feb. 29, 2016) ............................... 14

*Gabriel v County of Herkimer*, 889 F Supp 2d 374, 405 (NDNY 2012)........................................ 19

*Gordon v. New York*, 70 N.Y.2d 839, 840 (1987) ........................................................................... 17

*Grullon v. City of New Haven*, 720 F3d 133, 139 (2d Cir 2013)...................................................... 10

*Harlow v. Fitzgerald,* 457 U.S. 800 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) ................................. 15

*Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) .................................................................. 8

*Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011)......................................................................... 13

*Holtz v. Rockefeller & Co.*, 258 F.3d 62 (2d Cir. 2001) ................................................................... 6

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)................................ 6

Matthews v. Armitage, 36 F.Supp.2d 121, 124–25 (N.D.N.Y.1999) ............................................... 8

*McKenna v Wright*, 386 F3d 432, 438 (2d Cir 2004) ...................................................................... 16

*Murray v. Goord*, 668 F Supp 2d 344,357-358 (N..N.Y 2009 ........................................................... 7

*Naumovski v. Norris*, 934 F.3d 200, 211 (2nd Cir. 2019).............................................................. 15

*Reichle v. Howards*, 566 U.S. 658, 664 (2012) ............................................................................ 15

*Ricci v. DeStefano*, 557 U.S. 557, 586, 1 (2009) .......................................................................... 6

*Salahuddin v. Goord*, 467 F3d 263, 280 (2d Cir 2006) ................................................................ 8

*Sanders v. City of New York*, 2018 WL 3117508, at *8 (S.D.N.Y. June 25, 2018) ......................... 8

*Singleton v. City of Newburgh*, 1 F. Supp. 2d 306, 317 (S.D.N.Y. 1998) ..................................... 20

*Stephenson v. Doe*, 332 F.3d 68, 76 (2nd Cir. 2003) (*quoting McCardle v. Haddad*, 131 F.3d 43, 50

   (2nd Cir. 1997) ........................................................................................................................ 14

*Suarez v. Annucci*, 20 CV 7133 (VB), 2021 WL 6065765, at *5 (S.D.N.Y. Dec. 21, 2021)......... 8, 9

*Tangreti v. Bachmann*, 983 F3d 609 (2d Cir 2020)........................................................................ 9

*Vasquez v. Maloney*, 990 F.3d 232, 238 (2d Cir. 2021) ............................................................... 15

*Will v. Michigan Dept. of State Police*, 491 U.S. 58, 66 (1989)..................................................... 17

*Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112,116 (2d Cir. 2006.................................. 17

Statutes

Fed. R. Civ. P. 56(a) ........................................................................................................................ 6

## PRELIMINARY STATEMENT

Defendants failed to provide Decedent Joseph King with adequate medical and mental health care in response to his documented and expressed suicidality. Defendants' failure to provide this necessary care in response to Decedent King's serious medical need resulted in serious constitutional violations that led to his death.  Defendants seek summary judgment on all of Plaintiffs' causes of action. However, because the Defendants have failed to meet their burden in establishing that all issues of material fact have been resolved, this Court should deny Defendants' motions for reasons set forth herein.

## STATEMENT OF FACTS

Plaintiffs incorporate the admitted statements contained in their response to Defendants' Statement of Material facts.  Plaintiffs also incorporate all of the facts contained in the Plaintiffs' Supplemental Statement of Undisputed Material Facts ("PSSUMF").

At the time of his death, Mr. King was a 50-year old white male serving his first NYS Bid for Arson in the Third Degree with a sentence of 4-12 years. PSSUMF ¶63. He had a conditional release date of May 22, 2020 and a maximum release date of May 22, 2024. PSSUMF ¶64. Prior to incarceration, Mr. King reported receiving outpatient mental health treatment in the community between 2009 and 2013. PSSUMF ¶65. Mr. King also reported his participation in mental health treatment was inconsistent and he most recently attended for two months prior to incarceration. PSSUMF ¶66.  He endorsed a history of cutting to relieve stress and he would often consume alcohol when engaging in the behavior. PSSUMF ¶67. Mr. King entered DOCCS reception at the Clinton Correctional Facility in August 2013 and was admitted to the mental health caseload as a mental health service level (MHSL). PSSUMF ¶68.

Mr. King was diagnosed with Adjustment Disorder with Mixed Anxiety and Depressed Mood,

Alcohol and Cannabis Use Disorder in February 2015. PSSUMF ¶69. Mr. King received a disciplinary drug ticket in May 2018 for Suboxone use.   PSSUMF ¶71.Clinical progress notes indicated that Mr. King was reminded of the dangers of using drugs with psychotropic medications. I PSSUMF ¶72. A determination was made on June 25, 2018 to discontinue all medications (Celexa and Vistaril) in order to start over and determine what medications would be helpful. PSSUMF ¶73. Following complaints of "panic attacks, pacing and a lot of anxiety" in July 2018, Mr. King was prescribed Trazadone and Zoloft.  PSSUMF ¶74.

He continued to voice mental health concerns in August and September however clinical staff informed Mr. King that he couldn't be helped if he wasn't willing to help himself and he didn't appear to be motivated for change. PSSUMF ¶75. During a psychiatric call out in September, his participation in treatment was discussed in detail and it was documented that he would be placed in group therapy to assist with skill building and that time, his Zoloft was discontinued, Prozac was started and Trazadone was continued.  PSSUMF ¶76.

The following month, during Mr. King's last scheduled contact with clinical staff, he acknowledged that he was going to church, attending AA meetings, and going to the yard. PSSUMF ¶77. It was noted that Mr. King had been refusing his Prozac, stating it made him feel weird, and that he finds himself waiting all day to receive his Trazadone because it is the only time, he feels relatively all night.  PSSUMF ¶78. Mr. King was then encouraged to speak with psychiatric staff about any concerns he had about his medications, which according to a previous Psychiatric Progress Note, would have been on or around November 30.  PSSUMF ¶78.

In the six months leading up to his death, Mr. King consistently reported that he was depressed and anxious. However, there were not any overt symptoms of depression or anxiety observed during the sessions. PSSUMF ¶47.  The clinical record indicated that Mr. King was using substances (Suboxone) periodically from May 2018 until September 2018. PSSUMF ¶48. During that time Mr.

King was prescribed psychotropic medications to help manage the depression and anxiety symptoms he reported. PSSUMF ¶49.   The psychiatric and clinical team continued to provide medication education and voiced their concerns about how it was difficult to treat Mr. King's reported symptomatic complaints with psychotropic medications if he continued his substance use. PSSUMF ¶50. Mr. King consistently wanted medication changes as he felt the psychotropic medications, he was prescribed were ineffective. PSSUMF ¶51.

Defendant Palladino's suicide risk assessment sections dated 6/25/2018, 7/23/2018, 9/27/2018, and 11/2/2018 read "No warning signs present" when the focus of the sessions notes Mr. King reported symptoms of depression, anxiety, sleep difficulties, recent hospital visit (June-medically related), and substance use. PSSUMF ¶52. The section "Are there any changes in acute or chronic risk factors noted on the CSRA' should have checked "Yes" and noted the changes in the risk and protective factors. PSSUMF ¶53. Additionally, section B should have listed the warning signs/triggers that were present and noted in the "Focus of Session" section of the document. PSSUMF ¶54. The recent loss of his mother and his Suboxone use should have been listed in section B in every progress note completed from May through last contact. PSSUMF ¶55. In addition, the Psychiatric Progress Notes assessment of suicide risk section dated 6/25/2018, 7/23/2018, 8/27/18 read "No warning signs present'. The documentation notes warning signs/risk factors of increased substance use continued/increased depression/anxiety, loss of his mother in May 2018, and sleep disturbance. PSSUMF ¶56.Both of these events should have been identified as significant risk factors for suicide and the CSRA should have been updated in May of 2018; however, the CSRA was not updated until 8/27/2018. PSSUMF ¶57. While the 8/27/2018 CSRA has substance abuse/dependence history" checked on the front of the form Mr. King's recent return to Suboxone use was not mentioned in the narrative description. PSSUMF ¶58.  Additionally, the narrative section of the 8/27/2018 CSRA did not address the fact that Mr. King's protective factors changed after the loss of his mother and his

strained relationship with his wife, both of which were mentioned in the 8/27/2018 primary therapist progress note. PSSUMF ¶59. Mr. King's Physician's Orders indicate that on November 6, 2018, his medications were discontinued, including his Trazadone. This occurred ten days prior to his suicide, without Mr. King being assessed by psychiatric staff. PSSUMF ¶80.

Mr. King had a documented history of a recent suicide attempt in 2016 in which he tried to hang himself and reported that his triggers were being overwhelmed with his prison sentence and substance abuse. PSSUMF ¶82. Three months prior to his death, Mr. King reported experiencing no energy or motivation, "I lay in bed all day, and I can't sleep. I only get like three or four hours of sleep at night. I'm tired of doing the same thing every day. I can't take this anymore." PSSUMF ¶83. In the two weeks leading up to his death, Mr. King continued to express to mental health staff his frustration with his inability to deal with his reported edginess and worry, even though he reported attending church, AA meetings and going to the yard. PSSUMF ¶92. In the two weeks leading up to his death, Mr. King expressed concerns with his medication and the way they were making him feel and was encouraged by mental health staff to speak with psychiatric staff regarding his medication. PSSUMF ¶93.

The Justice Center for the Protection of People with Special Needs (the Justice Center) completed a review of the mental health services provided to Joseph King (DIN #13A3662), an inmate/patient who died on November 16, 2018 at the Mid-State Correctional Facility (CF). PSSUMF ¶61. The Justice Center's review found concerns related to the standard of care set forth by the Central New York Psychiatric Center (CNYPC) and the Department of Corrections and Community Supervision (DOCCS). PSSUMF ¶62; Nappi Decl., Ex. L. 000562. The Justice Center concluded that Mr. King had extensive changes to his medication regimen in the five months prior to his suicide. PSSUMF ¶70.The Justice Center concluded that OMH failed to recognize the suicide risk factors and warning signs displayed by Mr. King prior to his suicide. Id. Additionally, his symptoms appeared to

4

increase and there was minimal documentary evidence that additional support, programming or crisis intervention was offered. PSSUMF ¶81.

The Mortality and Morbidity Review Committee concluded, "[t]here were many predisposing risk factors for Mr. King's suicide. He had a documented history of mental health treatment both in the community and in his incarceration. Mr. King had an extensive substances abuse history and was continuing to use illicit substances while in prison. He also had one serious suicide attempt while incarcerated following withdrawal from substances. Mr. King was facing marital discord, the death of his mother, various medication changes, and concerns about having to remain in prison for another 2 years with his upcoming parole board." PSSUMF ¶94; Nappi Decl., Ex. M at 000575.

In their recommendations for improvement, Mortality and Morbidity Review recommended, that "if patients are displaying an increase in symptoms, they should be seen more frequently in RCTP from their respective housing unit. It would also be beneficial for more frequent follow-ups when the team receives information from a patient's family that the patient is engaging in odd behavior." PSSUMF ¶95.Further recommendations included, "[if] a clinician is sitting in on the VTC session and wants this contact be considered a monthly contact, it is important for the clinician to write a full monthly progress note to be compliant with policy versus just saying that he or she was present for the VTC contact." PSSUMF ¶96. The Mortality and Morbidity Review also "recommended, based upon findings of recent psych autopsies, to retrieve telephone records/transcripts as they can play a direct role in suicide. Thus, additional collaboration from DOCCS is needed in order to obtain these records, especially when the suicide occurs within 24 hours of the phone conversation." PSSUMF ¶97. Though patients can be designated an S due to recent suicide attempts, his diagnosis of Adjustment Disorder should have been revisited as his symptoms persisted longer than six months. If needed, a testing referral should have been submitted to assist in diagnostic clarification. PSSUMF ¶98.

Specifically, the Mortality and Morbidity Review also declared, "Mr. King was made a mental health level IS in August of 2016. This change occurred following his July suicide attempt; and although, patients can be designated an S due to recent suicide attempts, his diagnosis of Adjustment Disorder should have been revisited as his symptoms persisted longer than six months. If needed, a testing referral should have been submitted to assist in diagnostic clarification." PSSUMF ¶99.

## STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if, considering the record as a whole, a rational juror could find in favor of the non-moving party. *Ricci v. DeStefano*, 557 U.S. 557, 586, 1 (2009) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). In assessing a motion for summary judgment, the court views the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in its favor." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir.1995) (citation omitted).

Where an issue of material fact cannot be resolved without observation of the demeanor of a witness in order to evaluate their credibility, summary judgment is not appropriate. *Redd,* 678 F.3d at 174 citing Fed.R.Civ.P. 56(e) Advisory Committee Note (1963). The evaluation of ambiguous acts is a task for the jury. *Redd,* 678 F.3d at 174, citing *Holtz v. Rockefeller & Co*., 258 F.3d 62, 75 (2d Cir. 2001). Credibility determinations, the weighing of evidence and the drawing of legitimate inferences from the facts are jury functions. *Redd,* 678 F.3d at 174."It is well established that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'" *Curry v. City of Syracuse*, 316 F.3d 324, 333 (2d Cir.2003) (citation omitted). Here, because the Defendants failed to meet their

burden entitling them to summary judgment, the Court should deny their motion.

## **ARGUMENT**

### I.   **PLAINTIFFS' EIGHTH AMENDMENT CLAIM MUST NOT BE DISMISSED.**

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishment. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble*, 429 U.S. 97, 102–03 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Id.* Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). In fulfilling this duty, prison officials must ensure, among other things, that inmates receive adequate medical care. *Id.* (internal citations omitted).

"A prison official's deliberate indifference to the substantial risk of serious harm to an inmate is a violation of the Eighth Amendment." *Id.* at 828 (internal quotation marks and citations omitted). In order to make such a claim, an inmate must show that 1) he suffered a "sufficiently serious" deprivation and 2) defendant had a "sufficiently culpable state of mind." *Id.* at 834. The first prong determines whether, objectively, there was a substantial risk of serious harm to the inmate. *Id.* at 836; *Murray v. Goord*, 668 F Supp 2d 344,357-358 (N.D.N.Y 2009). The second requirement is a subjective deliberate indifference test, which follows from the principle that "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." *Farmer*, 511 U.S. at 834 (citation omitted). "To demonstrate that defendants were deliberately indifferent to his plight, a plaintiff must show that prison officials actually knew of, but disregarded, an excessive risk to his health and safety—'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Murray*, 668 F.Supp.2d

at 358 (quoting *Farmer*, 511 U.S. at 837, and citing *Matthews v. Armitage*, 36 F.Supp.2d 121, 124–25 (N.D.N.Y.1999)).

Courts assess this by examining "how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Id*. If the allegedly offending conduct "is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." *Id*. But if the offending conduct is the "medical treatment given, the seriousness inquiry is narrower." *Id*. Then, courts look to "the alleged inadequate treatment, not the underlying condition alone," and consider "the effectiveness of the treatment the prisoner received, and the harm that resulted from the alleged shortfalls." *Sanders v. City of New York*, 2018 WL 3117508, at *8 (S.D.N.Y. June 25, 2018).

"Depending on their severity, psychiatric or psychological conditions can present serious medical needs in light of our contemporary standards." *Charles v. Orange County*, 925 F.3d 73, 86 (2d Cir. 2019) (citing *Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000)). "The serious medical needs standard contemplates a condition of urgency such as one that may produce death, degeneration, or extreme pain." *See id*. (citing *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996). "In most cases, the actual medical consequences that flow from the denial of care are highly relevant in determining whether the denial of treatment subjected the detainee to a significant risk of serious harm." *Suarez v. Annucci*, 20 CV 7133 (VB), 2021 WL 6065765, at *5 (S.D.N.Y. Dec. 21, 2021)(internal citations omitted).

Further, in the context of medical indifference claims, the mens rea prong requires the plaintiff plausibly to allege "the official acted with deliberate indifference to inmate health." *Salahuddin v. Goord*, 467 F3d 263, 280 (2d Cir 2006). "This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id*.; *see also Allah v. Kemp*, 2010 WL 5860290, at *9 (N.D.N.Y. Nov. 9, 2010) (reasonable jury could conclude

from failure to provide "more extensive mental health assistance" that defendants were deliberately indifferent to plaintiff's serious medical needs), *report and recommendation adopted*, 2011 WL 705210 (Feb. 22, 2011). "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle*, 429 U.S. at 106. In other words, medical malpractice does not rise to the level of a constitutional violation unless the malpractice involves culpable recklessness. *See Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998); *see also Suarez*, 2021 WL 6065765, at *5.

This Court has previously surveyed case law around the country and found that "in the context of suicide, jailers are not required to safeguard every inmate; only those presenting a 'strong likelihood of suicide' are entitled to protection." *Burke v. Warren County Sheriff's Dep't*, No. 900–CV–597, 1994 WL 675042, at *6, 1994 U.S. Dist. LEXIS 17233, at *19–20 (N.D.N.Y. Nov. 25, 1994)(internal citations omitted). "[T]o establish a strong likelihood of suicide, a detainee must have made a previous threat of or an earlier attempt at suicide." *Id.*; *see also Allah*, ,2010 WL 5860290, at *6-7.

### A. Annucci, Sullivan, Meyers Acted With Deliberately Indifference.

Defendants argue that Plaintiffs' Eighth Amendment claims against Defendants Annucci, Sullivan, and Myers must be dismissed because Plaintiff has not and cannot demonstrate that these individual Defendants acted with deliberate indifference because Plaintiffs have failed to show Defendants Annucci, Sullivan, and Meyers' personal involvement. Def. Br. at 6-9.

In so arguing, Defendants heavily rely on *Tangreti v. Bachmann*, 983 F3d 609 (2d Cir 2020). However, Defendants seem to ignore the meaning of *Tangreti*. As a threshold matter, this Court clarified the rationale behind *Tangreti*, writing, "the Second Circuit in *Tangreti* made clear that in order to attach liability to an individual, regardless of supervisory status, a plaintiff must plead and

9

prove "that each Government-official defendant, through the official's own individual actions, has violated the Constitution . . .The factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue" because the elements of different constitutional violations vary.  The violation must be established against the supervisory official directly." *Boyd v. Doe #1*, 918CV1333TJMATB, 2021 WL 7542409, at *15 (N.D.N.Y. Nov. 30, 2021), *report and recommendation adopted*, 918CV1333TJMATB, 2022 WL 823648 (N.D.N.Y. Mar. 18, 2022)(internal quotations and citations omitted). Thus, a prison official can be liable if they both had personal knowledge and disregarded an excessive risk to health or safety. 983 F.3d at 619; *Dixon v. Lupis*, 3:20-CV-1754 (VLB), 2022 WL 4598857, at *2 (D Conn Sept. 30, 2022).

Indeed, personal involvement of a supervisory defendant may be shown by evidence that: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Grullon v. City of New Haven*, 720 F3d 133, 139 (2d Cir 2013).

First, as a threshold matter, Plaintiff has established – and Defendants do not argue otherwise – that Annucci and Sullivan are policymakers. Further, Defendants concede that Meyers was the Unit Chief overseeing the day-to-day operations, which including implementing policies. Def. Br. a 9. Defendants also acknowledge that Meyers was responsible for supervising Palladino.   As such, the question before the Court is whether policies set by Annucci and Sullivan  resulted in deliberate indifference to King's medical needs. If so, summary judgment may not be granted in favor of Defendants, since unconstitutional acts would then have occurred as the result of a policy promulgated

by Defendants. *Brock v. Wright*, 315 F3d 158, 166 (2d Cir 2003).

Defendants' argument focuses on a lack of services provided but ignores the failures in the operative policies and that internal investigations revealed that these policies needed to be amended after Mr. King's suicide and while noting the failures of the policy to help prevent his death. Indeed, the comprehensive suicide risk assessment process policy defines the warning signs indicators of imminent suicidal behavior, summarized by the IS PATH WARM.  PSSUMF¶ 43-44.  Defendants' own policy required progress notes be made to indicate that the primary therapist, psychiatrist or nurse practitioner address the suicide risk.  PSSUMF¶ 45; Nappi, Decl. Ex. N.  Yet, despite the policy's requirement, there was a lack of implementation which resulted in Mr. King's death.

Indeed, the Justice Center for the Protection of People with Special Needs (the "Justice Center") completed a review of the mental health services provided to Mr. King.,.  PSSUMF¶60; Nappi Decl., Ex. L.   The Justice Center concluded that Mr. King had extensive changes to his medication regimen in the five months prior to his suicide.  PSSUMF¶69; Nappi Decl., Ex. L. at 000566. The Justice Center concluded that OMH failed to recognize the suicide risk factors and warning signs displayed by Mr. King prior to his suicide.  PSSUMF¶80; Nappi Decl., Ex. L. at 000566. Additionally, his symptoms appeared to increase and there was minimal documentary evidence that additional support, programming or crisis intervention was offered. *Id*. Further, the Justice Center noted that the two weeks leading up to his death, Mr. King continued to express to mental health staff his frustration with his inability to deal with his reported edginess and worry, even though he reported attending church, AA meetings and going to the yard.  PSSUMF¶91. And that in the two weeks leading up to his death, Mr. King expressed concerns with his medication and the way they were making him feel and was encouraged by mental health staff to speak with psychiatric staff regarding his medication.  PSSUMF¶92.  These conclusions stand in stark comparison to the facts presented by the Defendants' that imply that Mr. King failed to present any indicators that he was at

11

risk for suicide.

Similarly, the Defendants completely ignore the findings of the Morbidity and Morality Committee. Indeed, the Mortality and Morbidity Review Committee concluded, "[t]here were many predisposing risk factors for Mr. King's suicide. He had a documented history of mental health treatment both in the community and in his incarceration. Mr. King had an extensive substances abuse history and was continuing to use illicit substances while in prison. He also had one serious suicide attempt while incarcerated following withdrawal from substances. Mr. King was facing marital discord, the death of his mother, various medication changes, and concerns about having to remain in prison for another 2 years with his upcoming parole board." PSSUMF¶93; Nappi Decl., Ex. M at 000575. In their recommendations for improvement, Mortality and Morbidity Review recommended, that "if patients are displaying an increase in symptoms, they should be seen more frequently in RCTP from their respective housing unit. It would also be beneficial for more frequent follow-ups when the team receives information from a patient's family that the patient is engaging in odd behavior." PSSUMF¶94; Nappi Decl., Ex. M at 000575.

Further recommendations included, "[if] a clinician is sitting in on the VTC session and wants this contact be considered a monthly contact, it is important for the clinician to write a full monthly progress note to be compliant with policy versus just saying that he or she was present for the VTC contact." PSSUMF¶95; Nappi Decl., Ex. M at 000575. The Mortality and Morbidity Review also "recommended, based upon findings of recent psych autopsies, to retrieve telephone records/transcripts as they can play a direct role in suicide. Thus, additional collaboration from DOCCS is needed in order to obtain these records, especially when the suicide occurs within 24 hours of the phone conversation." PSSUMF¶96; Nappi Decl., Ex. M at 000575. Moreover, the Committee concluded, "though patients can be designated an S due to recent suicide attempts, his diagnosis of Adjustment Disorder should have been revisited as his symptoms persisted longer than six months. If

needed, a testing referral should have been submitted to assist in diagnostic clarification. PSSUMF¶97; Nappi Decl., Ex. M at 000575. Specifically, the Mortality and Morbidity Review also declared, "Mr. King was made a mental health level IS in August of 2016. This change occurred following his July suicide attempt; and although, patients can be designated an S due to **recent** suicide attempts, his diagnosis of Adjustment Disorder should have been revisited as his symptoms persisted longer than six months. If needed, a testing referral should have been submitted to assist in diagnostic clarification."  PSSUMF¶98; Nappi Decl., Ex. M at 000586.

Because Plaintiffs evidence that Defendants' policies were deliberately indifferent to actually recognizing the suicide indicators, summary judgment is inappropriate.

### B.   Jami Palladino was Deliberately Indifferent in Response to Decedent's Increased Risk of Suicide.

Plaintiff can establish that Defendant Palladini acted with a "sufficiently culpable state of mind."  *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011). The official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 122. As a result, "[m]ere medical malpractice is not tantamount to deliberate indifference, but it may rise to the level of deliberate indifference when it involves culpable recklessness, *i.e*., an act or a failure to act ... that evinces a conscious disregard of a substantial risk of serious harm." *Cuoco v. Moritsugu*, 222 F.3d 99, 107 (2d Cir. 2000) (internal citations and quotation marks omitted). Defendants paint Defendant Palladino's choices as a caregiver as a simple disagreement between an inmate and a provider and painstakingly argue that she did not see any symptoms of Mr. King's suicidality. *See* Def. Br. 13-15.  Defendants' further point to specific progress notes made by Palladino to prove that those signs did not exist. *See id*.

Yet, the signs and symptoms of Mr. King's suicidality were readily apparent to the Justice

13

Center and the Morbidity and Morality Review Committee.  In her deposition, Palladino proffered little in the way of explanation for the decisions she made, and unconvincingly denies having knowledge of other key facts, Decedent's increasing anxiety and depression, the effect of his mother's death in May 2018 and Decedent's marital issues shortly before Decedent committed suicide on November 16, 2018, strains credulity.  See Nappi Decl. Ex. F 34:24-35:1, 44:5-45:18.  Her treatment decisions are not easily deciphered.  Whether it was her absurdly high case load, over 180 patients, her decisions pertaining to Decedent's treatment in October and November 2018 do not appear reasoned or considerate of Decedent's well being.  Therefore, the Court cannot determine whether Defendants' decisions, and failure to appropriately chart or assess Decedent's suicide risk or intervene despite the mounting risks, were "the product of sound medical judgment, negligence, or deliberate indifference." *Chance v. Armstrong*, 143 F.3d at 703. There is thus a question of fact as to whether Defendants acted with deliberate indifference. *Funderburke v. Canfield*, 2016 WL 831974, at *8 (W.D.N.Y. Feb. 29, 2016) (finding issues of material fact on both the objective and subjective prongs of the plaintiff's Eighth Amendment where the defendants discontinued the plaintiff's Neurontin prescription due to alleged cheeking).

### C.   Defendants Are Not Entitled To Qualified Immunity

Defendants argue that even if the Court were to deny their motion, the Defendants are entitled to qualified immunity. *See* Def. Br. at 19-20.  Defendant argues that "Plaintiffs cannot show a clearly established right was violated. Def. Br. at 20.

"Qualified immunity is an affirmative defense that shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Stephenson v. Doe*, 332 F.3d 68, 76 (2nd Cir. 2003) (*quoting McCardle v. Haddad*, 131 F.3d 43, 50 (2nd Cir. 1997)).  Government officials who perform discretionary functions generally are entitled to qualified immunity from

liability for civil damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. See *Harlow v. Fitzgerald,* 457 U.S. 800, 818, (1982).  Qualified immunity also applies when " 'it was 'objectively reasonable' for [the officer] to believe that [his or her] actions were lawful at the time of the challenged act.' " *Betts v. Shearman*, 751 F.3d 78, 83 (2d Cir. 2014) (*quoting Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007)).

"[C]ourts may grant qualified immunity on the ground that a purported right was not 'clearly established' by the prior case law, without resolving the more difficult question whether the purported right exists at all." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). " 'Clearly established' means that, at the time of the officer's conduct, the law was 'sufficiently clear' that every 'reasonable official would understand that what he is doing' is unlawful." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). As such, "existing law must have placed the constitutionality of the officer's conduct 'beyond debate.'" *Id*. at 741. "This demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id*. "To determine whether a right is clearly established," a court will " 'generally look to Supreme Court and Second Circuit precedent existing at the time of the alleged violation.'" *Vasquez v. Maloney*, 990 F.3d 232, 238 (2d Cir. 2021) (*quoting Garcia v. Doe*, 779 F.3d 84, 92 (2d Cir. 2015)). "When analyzing whether the right violated was 'clearly established,' the Supreme Court has repeatedly (and recently) reminded us that clearly established law must be 'particularized' to the facts of the case and must not be defined at a high level of generality.'" *Naumovski v. Norris*, 934 F.3d 200, 211 (2nd Cir. 2019).

It is the Defendants' burden to establish that they are entitled to qualified immunity and must show that it was "objectively reasonable," *Ford v. McGinnis*, 352 F.3d 582, 597 (2d Cir.2003). Here, Plaintiffs have established questions of fact concerning the enforcement of and allowing the continuation of the policies that resulted in the denial of appropriate medical treatment for Mr. King

and as such, it would be improper for the Court to grant the defense of qualified immunity as it is a question for the trier of fact. *See e.g., McKenna v Wright*, 386 F3d 432, 438 (2d Cir 2004).

## II. PLAINTIFFS' § 1983 FAILURE TO TRAIN CLAIM MUST NOT BE DISMISSED.

Defendants argue that Plaintiffs' Second Claim for failure to train against Defendants Annucci and Sullivan failed to properly train and supervise their employees must be dismissed because Plaintiffs have failed to establish their personal involvement. *See* Def. Br. at 20.

As argued *supra*, Annucci and Sullivan are policymakers. Failure by policymakers to train or supervise subordinates to such an extent that it amounts to 'deliberate indifference' to the rights of those who come in contact with the municipal employees has long been established as a proper vehicle for liability. *See Jackson v. Onondaga County*, 549 F Supp 2d 204, 223 (NDNY 2008) citing *Dorsett–Felicelli, Inc. v. County of Clinton*, 371 F.Supp.2d 183, 194 (N.D.N.Y.2005) (Kahn, J.) (citing three Supreme Court cases for these four ways), accord, *Dunbar v. County of Saratoga*, 358 F.Supp.2d 115, 133–134 (N.D.N.Y.2005) (Munson, J.); *see also Clayton v. City of Kingston*, 44 F.Supp.2d 177, 183 (N.D.N.Y.1999) (McAvoy, J.) (transposing order of second and third ways, and citing five more Supreme Court cases). As discussed supra, Defendants were responsible for the creation of a policy which was not only lacking in ways to recognize the identified suicide factors, but also in providing training for those individuals who were tasked with following the policy. Indeed, Defendant Meyers – a Unit Chief – who supervised Defendant Palladino and others, testified to his subpar training. Meyers received training around suicide factors, but also weaved in "just basically constantly assessing for suicide risk pretty much every time someone writes a note." PSSUMF¶10; Nappi Decl. Ex. E., Meyers Dep. Tran. 44:16-20.  With the results of internal investigations revealing inadequate policies and Meyers' testifying to the fact that he was always training by watching for factors no one could actually identify, it is a fair conclusion that the policies created by Defendants Annucci and Sullivan were the cause of Mr. King's lack of adequate treatment for his suicidality and eventual

16

death.

### III. PLAINTIFFS' NELIGENGE CLAIMS MUST NOT BE DISMISSED.

First, Defendants argue that Plaintiffs' negligence claims against Annucci must be dismissed because they are barred by New York Correction Law § 24. See Def Br. 25-26.  However, that argument holds no water.  The intent of this section is to strip state courts of jurisdiction over inmate damages claims against correction employees, many of which are deemed "frivolous and vexatious," and instead require inmates to pursue such claims against the State of New York in the Court of Claims. An inmate seeking damages against the state in the Court of Claims cannot use 42 U.S.C. § 1983, the preferred remedy for prisoner civil rights suits, because a state is not a "person" under § 1983. *See Will v. Michigan Dept. of State Police*, 491 U.S. 58, 66 (1989).  Further, The United States Supreme Court declared New York Corrections §24 unconstitutional. *See Haywood v. Drown*, 556 U.S. 729 (2009). The Supreme Court held that, having made the decision to create courts of general jurisdiction which regularly sit to hear analogous civil rights actions against state officials other than correctional employees, New York State may not shut the doors of those courts to civil rights actions to recover damages from correctional employees for acts within the scope of their employment and instead require such claims to be brought only against the state in another court of limited jurisdiction. *Haywood* at 741.

In New York, a plaintiff offers prima facie evidence of negligence when he shows that "(1) the defendant owed the plaintiff a cognizable duty of care; (2) the defendant breached that duty; and (3) the plaintiff suffered damage as a proximate result." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112,116 (2d Cir. 2006). During incarceration, "a duty of care is owed by prison authorities with respect to the health and safety of their charges." *Gordon v. New York*, 70 N.Y.2d 839, 840 (1987). "When prison authorities know or should know a prisoner has suicidal tendencies or that a prisoner might physically harm himself, a duty arises to provide reasonable care to assure that such

17

harm does not occur." *Id.* "Whether a breach of duty has occurred depends upon whether the resulting harm was a reasonably foreseeable consequence of the defendant's acts or admission." *Id.* at 841. If the Defendant could not have "reasonably foreseen" the injury, "or if defendant's conduct was reasonable in light of what could have been anticipated, there is no breach of duty, no negligence, and no liability." *Id.*

Defendants argue that Mr. King's suicide was not reasonably foreseeable to Defendants Annucci, Sullivan, and Meyers. However, Plaintiffs have alleged that the policies created by Annucci and Sullivan were grossly negligent. C*f. Mayo v. County of Albany*, 357 Fed Appx 339, 343 (2d Cir 2009). Plaintiffs have further alleged that Meyers was responsible for the implementation of the grossly negligent plan and either did not pay attention or ignored the signs that the policy was inadequate to address mental health needs of suicidal inmates.

In arguing the lack of foreseeability, Defendants ignore that Plaintiffs have proffered evidence that Mr. King's suicide attempt was a reasonably foreseeable consequence of defendants' actions. Specifically, Plaintiffs have established that the evaluative tools employed indicated that King posed a suicide risk; (2) King exhibited symptoms of withdrawal until the day of his attempt (3) in anticipation of withdrawal symptoms, King was not given any further treatment or any further help.

Defendant argues that Plaintiffs' negligence claims against Palladino should be dismissed because Defendant Palladino lacked concerns about his suicidality and because she could not have proscribed him medications. Def. Br. at 31. First, Palladino was negligent as she owed Decedent a duty to protect him as an inmate she counseled as his assigned therapist, and performed suicide risk assessments for. She failed to do this, and further failed to follow the OMH policies pertaining to maintaining progress notes, up to date and accurately (Policy 9.30), failing to perform and update Comprehensive Suicide Risk Assessments (Policy 9.16) and submitting timely notes for entry. See Nappi Decl., Ex. Q at 000612-000613. Palladino's failure to follow OMH's own policy, especially

her failure to update the suicide risk assessments each month of 2018, where there were increasing risks for suicide, amount to a breached duty Palladino owed to Decedent. Palladino's negligent lack of awareness, along with her ignorance of the institution's Suicide Watch protocol, including removing Decedent's shoe laces, were an egregious breach of her duty as Decedent's therapist. This is especially so given the increasing risk factors (substance abuse, medication discontinuance, depression, anxiety, etc.) for suicide throughout 2018, and his prior suicide attempt with shoe laces in 2016, when these risk factors were again present. Further, the lack of Palladino's recognitions of Mr. King's suicidality was obvious and foreseeable as evidenced by the findings of the Justice Center and the Morality and Morbidity Review Committee.

## IV. PLAINTIFF'S WRONGFUL DEATH AND SURVIVOR CLAIMS SHOULD NOT BE DISMISSED

To succeed on a cause of action to recover damages for wrongful death under New York law, a plaintiff must establish the following elements: "(1) the death of a human being, (2) the wrongful act, neglect or default of the defendant by which the decedent's death was caused, (3) the survival of distributees who suffered pecuniary loss by reason of the death of decedent, and (4) the appointment of a personal representative of the decedent." *Gabriel v County of Herkimer*, 889 F Supp 2d 374, 405 (NDNY 2012).

Defendants concede that Plaintiffs establish that Mr. King was a human being and that his wife was appointed a personal representative. *See* Def. Br. at 31. Defendants first argue that Plaintiffs; wrongful death claim should be dismissed because the Court lacks jurisdiction over Annucci. However, this is premised on a unconstitutional law.

Defendants then piggyback on their foreseeability argument and argue that no duty was breached which caused Mr. King's death. Plaintiffs have proffered evidence by which reasonable jurors could find that Defendants knew or should have known that Mr. King presented a risk of suicide

and that Defendants did not act in a reasonable way to prevent that suicide. If a reasonable juror came to that conclusion, that juror could find that Defendants breached their duty to the Decedent and that his breach caused Mr. King's death. *See Estate of Leombruno by and through Douglas v County of Greene*, 919CV374TJMCFH, 2022 WL 467622, at \*16 (NDNY Jan. 25, 2022).

Defendants next argue that Plaintiffs has not established her claim for pecuniary loss beyond funeral and burial expenses. *See* Def. Br. at 32-33. "[T]o defeat a motion for summary judgment in a wrongful death case, the plaintiff must offer proof of pecuniary loss," such as loss of support, voluntary assistance, or inheritance. *Singleton v. City of Newburgh*, 1 F. Supp. 2d 306, 317 (S.D.N.Y. 1998). *See also Gazzola v County of Nassau*, 16-CV-0909(JS)(AYS), 2022 WL 2274710, at \*15 (EDNY June 23, 2022).

Defendants concede that Amy King testified about paying for funeral expenses. Defendants fail to overlook that had Mr. King lived, he would have likely contributed support for his children. His daughter's deposition testimony makes clear that they had a close relationship, which had not changed despite his incarceration and that prior to his incarceration he was gainfully employed. See PSSUMF ¶¶99-103.

Finally, Defendants argue that Plaintiffs' survival actions should be dismissed. Defendants simply argue that because Mr. King was found to be unconscious at the time he was discovered means that he did not suffer. It is Defendants' burden to prove that the decedent did not suffer conscious pain and suffering Here, Defendants have offered no evidence of same and as such, summary judgment should ne denied.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Defendants' motion for summary judgment.

Dated:  New York, New York
     March 31, 2023         HACH ROSE SCHIRRIPA & CHEVERIE, LLP

By:  _/s/ Hillary Nappi_____

        Hillary M. Nappi
        112 Madison Avenue, 10th Floor
        New York, NY 10016
        Telephone: (212) 213-8311
        Facsimile: (212) 779-0028
        *Counsel for Plaintiffs*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 31st day of March 2023, I caused the foregoing **Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment** to be filed electronically with the Clerk of the Court by using the CM/ECF system which will serve a copy on all interested parties registered for electronic filing, and is available for viewing and downloading from the ECF system.

        _/s/ Hillary Nappi_____
        Hillary M. Nappi