UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

| | |
|---|---|
| The Estate of Joseph P. King, by and through its Administratrix, Amy King, and Amy King in her own right,<br>             *Plaintiff*,<br><br>    -against-<br><br>Anthony J. Annucci, Acting Commissioner, State of New York Department of Corrections, in his individual capacity; and Marie T. Sullivan, Commissioner, State of New York Department of Mental Health, in her individual capacity; Jami Palladino, Mid-State Social Worker, in her individual capacity; Hal Meyers, Mid-State Chief Mental Health Counselor, in his individual capacity;<br><br>             *Defendants*. | **DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS**<br><br>9:20-CV-1413<br>(TJM/ML) |

Pursuant to Rule 7.1(a)(3) of the Local Rules of this Court, Defendants Anthony J. Annucci, Acting Commissioner, State of New York Department of Corrections, in his individual capacity; Ann Marie T. Sullivan, Commissioner, State of New York Department of Mental Health, in her individual capacity; Jami Palladino, Mid-State Social Worker, in her individual capacity; and Hal Meyers, Mid-State Chief Mental Health Counselor, in his individual capacity respond to Plaintiff's Additional Statement of Material Facts (ECF No. 78) as follows:

1) In November 2018, Defendant Annucci's position was Acting Commissioner of the Department of Corrections and Community Supervision. Nappi Decl., Ex. A, Annucci Interrogatory Responses at 7.

**Response**: **ADMIT**.

2) Defendant Annucci's responsibilities related to Decedent are the general duties of, superintendence, management and control of the correctional facilities of the Department and of the incarcerated individuals therein. Id.

**Response**: **ADMIT**.

3) In 2018, Defendant Sullivan was the Commissioner of the Office of Mental Health. Nappi Decl., Ex. C, Sullivan Interrogatory Responses at 7.

**Response**:    **ADMIT**.

4) Her responsibility included fulfilling primary executive responsibility for the direction of State and Office of Mental Health policy; conducting liaison activities with executive staff in other agencies and with the Office of the Governor; providing operational leadership and policy direction and oversight to the State's psychiatric hospitals; implementing mental health initiatives by fostering collaboration between stakeholders and federal, State, and local governments, including prisons. *Id.*

**Response**:    **ADMIT**.

5) Additionally, she led the implementation of a community based system of care and the implementation of a managed care system which provides access to appropriate and effective mental health services for adults with serious mental illness, children with serious emotional disturbance, and consumers with special needs. *Id*.

**Response**:    **ADMIT**.

6) In 2018, Defendant Meyers was I was responsible for ensuring that all policies and procedures pertaining to all OMH patients were followed as a Unit Chief. Nappi Decl., Ex. B, Meyers Interrogatory Responses at 8.

**Response**:    **ADMIT**.

7) Mid-State at times had over 800 people active a mental health caseload in 2018 because it's a medium-security facility and inmates are coming and going all the time. Nappi Decl. Ex. E., Meyers Dep. Tran. 23:7-9.

**Response**:  **ADMIT to the extent Defendant Meyers testified that "at times" Mid-State had over 800 people active on their caseload.**

8) Meyers' primary role was to ensure that policies and procedures were being followed, not just for Mr. King, but for all the individuals who we provided service to; Meyers was more responsible for administrative functions rather than like clinical determinations. Nappi Decl. Ex. E., Meyers Dep. Tran. 24:2-6.

**Response**:    **ADMIT.**

9) Meyers was responsible for inmates, and Mr. King, getting appropriate mental health services like other people that were opened up to services, but was less involved in the part of the clinical treatment aspects of services. Nappi Decl. Ex. E., Meyers Dep. Tran. 28:8-12.

**Response**:    **ADMIT.**

10) Meyers received training around suicide factors, but also weaved in "just basically constantly

assessing for suicide risk pretty much every time someone writes a note." Nappi Decl. Ex. E., Meyers Dep. Tran. 44:16-20.

**Response**: **ADMIT to the extent that Defendant Meyers testified: "We receive training, everyone who works for the Office of Mental Health and the prisons, around suicide factors, but there's also different ways that we weave in just basically constantly assessing for suicide risk pretty much every time someone writes a note." (ECF No. 71-17 at 44).**

11) Meyers described that there are "certain things we look for that may be indicative of potential suicide risk and based on those things, someone would be placed -- potentially placed on watch or RCTP status" Nappi Decl. Ex. E., Meyers Dep. Tran.. 46:17-20.

**Response**: **ADMIT.**

12) Meyers identified the potential suicide factors as follows: "[t]here's a number of things. Some would be the same type of things you would think about in the community. Someone that -- maintaining friendships, being withdrawn, maybe a change in their alcohol or drug use where they might become more impulsive. In the community, many times it's signs and symptoms of depression that get worse over time until such time as, you know, someone sees harming themselves or committing suicide as a viable option or a choice. In a correctional setting, there's additional risk factors that are specific to corrections, and they could involve conflicts with other incarcerated individuals, you know, gangs, drug debts, just a number of -- a number of things, you know, being stressed about being in a correctional setting." Nappi Decl. Ex. E., Meyers Dep. Tran. 46:22-47:18.

**Response**: **ADMIT.**

13) According to Defendant Meyers "[r]egardless if somebody is in the community or in a correctional setting, we try to observe for changes. And when we see changes, that's when it would be appropriate to make a referral or to determine that someone needs a higher level of care for a limited amount of time." *Id*.

**Response**: **ADMIT.**

14) OMH gets notified when there is a parole board hearing and if it is believe that a mental health evaluation is needed to help the parole commissioners, then a request to the Office of Mental Health will perform parole evaluation for purposes of the commissioner and to recommend appropriate care and treatment for the individual in the event that they are released from prison, what types of supports they would need in the community, and then sometimes they would become condition of parole to help the person stay in the community and try to promote continuity of mental health care and treatment. Nappi Decl. Ex. E., Meyers Dep. Tran.48:17-49:3.

**Response**: **ADMIT to the extent that Defendant Meyers testified that OMH is notified by DOCCS if DOCCS believes that a mental health evaluation is needed to help**

**parole board commissioners. ADMIT that after DOCCS makes a request to OMH, it will perform a parole evaluation for purposes of the parole commissioner and "to recommend appropriate care and treatment for the individual in the event that they are released from prison, what types of supports they would need in the community, and then sometimes they would become condition of parole to help the person stay in the community and try to promote continuity of mental health care and treatment." DENY that Defendant Meyers testified that OMH is notified regarding each and every inmate's parole board hearings. (ECF No. 71-17 at 48).**

15) The evaluation does not provide insight to what the inmate will face if he is denied parole. *Id*.

**Response**: **DENY. The record cited does not reflect this statement.**

16) Decedent King was Jami Pallidno's patient. She provided monthly therapy sessions to her patients unless they request to be seen more often or an emergency arose. Nappi Decl., Ex. D, Palladino Interrogatory Responses at 7.

**Response**: **ADMIT**.

17) According to OMH records, she only provided the required monthly therapy session to Decedent King in November 2018.

**Response**: **Objection on the grounds that Plaintiff failed to cite to any portion of the record reflecting this statement. ADMIT to the extent that Defendant Palladino did provide a monthly therapy session to the Decedent on November 2, 2018. During that session, Palladino noted that Decedent had been refusing medication, stating that it "made him feel weird." (ECF No. 71-9 at 001073). Decedent continued to deny thoughts of self harm, stating "I'll never do THAT [attempt suicide] again." (Id.). Decedent shared that he had been going to church, attending AA (Alcoholics Anonymous) meetings, and going to the recreation yard. (Id.). Decedent shared that he continued to maintain contact with his wife, his children, and his sister, who were all supportive of him. (Id.). He shared that he had been working as a porter and was waiting to return to his ASAT (Alcohol and Substance Abuse Treatment) program. (Id.). Palladino noted: "There is no evidence of any warning signs of acute suicide risk in patient's behavior or affect. There were no signs of anger, anxiety, withdrawal, mood change, purposelessness, hopelessness, recklessness or feelings of being trapped. Patient's risk for suicide will be assessed on an ongoing basis. Patient denied suicidal ideation or thoughts." (Id. at 001074). Decedent did not express any potential suicide indicators to her. (ECF No. 71-18 at 43-44). Palladino provided other therapy sessions in the months prior to his death as well. (See gen., ECF No. 71-9).**

18) In November 2018, Myers was Palladino's supervisor. Id.

**Response**: **ADMIT**.

19) In 2018, Palladino managed a caseload of people that are open to mental health services, provided monthly therapy. Nappi Decl., Ex F., Palladino Tran. 10:19-22.

**Response**:   **ADMIT**.

20) Ms. Palladino was aware that Mr. King was using suboxone because he told her he was using it. Nappi Decl., Ex F., Palladino Tran. 16:25-17:14.

**Response**:   **ADMIT. Also note that Decedent indicated to Palladino at some point during their therapy sessions that he was *not* using suboxone. (ECF No. 71-18 at 17).**

21) Palladino was aware that at times Mr. King's medications were discontinued. Nappi Decl., Ex F., Palladino Tran. 20:9-24.

**Response**:   **ADMIT**.

22) Mr. King wrote Palladino letters throughout her time treating him. Nappi Decl., Ex F., Palladino Tran. 21:4-25.

**Response**:   **ADMIT to the extent that Palladino testified that the Decedent wrote between 5 to 10 letters to her over the course of the 5 years that he was her patient. (ECF No. 71-18 at 21).**

23) The letters contained King's considered expressing his concerns about the symptoms he was experiencing and requesting to be seen by the doctor earlier or in response to his concerns. Nappi Decl., Ex F., Palladino Tran. 21:23-22:1.

**Response**:   **DENY that the citations reflect this statement. Palladino testified that the Decedent had sent letters to her regarding concerns about his medication being discontinued on an occasion *prior* to his medications being discontinued the final time before his death. (ECF No. 71-18 at 21).**

24) Upon receipt of those letters, Palladino had to follow protocol and wait approximately two weeks to see him and address his concerns. Nappi Decl., Ex F., Palladino Tran. 22:2-6.

**Response**:   **DENY. Palladino testified that after she received a letter from the Decedent, she would see him <u>within</u> two weeks of receiving the letter—she did not testify that she had to <u>wait</u> two weeks to see him—discuss his concerns, and bring it to the prescriber's attention. (ECF No. 71-18 at 22). She further testified that she always set up sessions to address his letters and reported his concerns to his prescriber.**

25) Palladino did not follow up on the scheduling of the King's follow up appointments with doctors. Nappi Decl., Ex F., Palladino Tran. 23:9-11.

**Response**: **ADMIT to the extent that Palladino testified that she would confer with Decedent's prescribers to make sure the doctor had addressed any concerns he expressed in correspondence with the prescribers. The prescribers would notify Palladino that an appointment would be scheduled, and he would be seen accordingly. (ECF No. 71-18 at 22-23).**

26) In 2018, Palladino had 150 and 180 patients on her caseload. Nappi Decl., Ex F., Palladino Tran. 31:12-14.

**Response**: **ADMIT to the extent that Palladino testified that in 2018 she had anywhere between 150 and 180 inmates in her caseload. (ECF No. 71-18 at 31).**

27) Palladino was trained by trained by the correctional facility on the reporting inmates discloses about suicide. Nappi Decl., Ex F., Palladino Tran. 38:10-16.

**Response**: **Objection on the basis that this statement is confusing and unintelligible. ADMIT to the extent that Palladino testified that she was trained as to the process of reporting when an inmate speaks to her about suicide. (ECF No. 71-18 at 38).**

28) Palladino was trained by reading the policies and following them. Nappi Decl., Ex F., Palladino Tran. 38: 17-19

**Response**: **ADMIT to the extent that Palladino testified she was trained as to the process of reporting when an inmate speaks to her about suicide by reading the policies and following them. (ECF No. 71-18 at 38). However, Palladino testified that she has received other training on other topics during the course of her employment as well. (Id. at 11, 49, 50, 52, 53).**

29) Palladino would have made the call to place an inmate, including Mr. King, in the crisis unit. I would have assessed the situation, and then if it warranted a higher level of care, then they would be placed in a crisis unit. Nappi Decl., Ex F., Palladino Tran. 47:13-17.

**Response**: **ADMIT to the extent that Palladino testified that <u>if someone had told her they were having thoughts of self harm or made threats of self harm</u>, they would be placed in the crisis unit. She testified that she would make that call to place the inmate in the crisis unit after assessing the situation and determining that he warranted a higher level of care. (ECF No. 71-18 at 47).**

30) Palladino admitted that King presented with suicide factors within the year before he killed himself. Nappi Decl., Ex F., Palladino Tran. 50:24-51:6.

**Response**: **ADMIT to the extent that Palladino testified as to what are considered possible suicide risk factors. Palladino was then asked whether the Decedent had presented in the last year with any of the risk factors that she had listed, and Palladino responded "Yes." (ECF No. 71-18 at 50-51).**

31) Documented data demonstrates that suicide risk exists within the forensic population.

Therefore, CNYPC clinicians complete the ongoing process of Comprehensive Suicide Risk Assessment to ensure inmate patient safe ty and timely interventions and to maximize positive inmate-patient outcomes. Nappi Decl., Ex. I at 000529.

**Response**: **ADMIT to the extent that the Central New York Psychiatric Center Comprehensive Suicide Risk Assessment Process policy (Nappi Dec., Ex. I) includes this statement.**

32) Results and recommendations from the suicide risk assessment are taken into consideration whim developing and updating the treatment plan and in making the decision regarding whether to admit to a higher level of care. *Id*.

**Response**: **ADMIT to the extent that the Central New York Psychiatric Center Comprehensive Suicide Risk Assessment Process policy (Nappi Dec., Ex. I) includes this statement.**

33) The Comprehensive Suicide Risk Assessment (CSRA) process begins at the time an OMH clinician screens an inmate or admits an inmate-patient to services. Suicide risk assessment is an on-going process from admission to discharge *Id*. at 000530.

**Response**: **ADMIT to the extent that the Central New York Psychiatric Center Comprehensive Suicide Risk Assessment Process policy (Nappi Dec., Ex. I) includes this statement.**

34) At the time the Treatment Plan is developed, progress notes and the CSRA Form are reviewed for chronic and acute risk factors, protective factors, warning signs and recommendation/plan for addressing suicide risk. Treatment recommendations related to suicide risk are documented on the Treatment Plan. *Id*.

**Response**: **ADMIT to the extent that the Central New York Psychiatric Center Comprehensive Suicide Risk Assessment Process policy (Nappi Dec., Ex. I) includes this statement.**

35) If the inmate-patient is at risk for suicide, this problem should be listed and incorporated into the Treatment Plan with goals, objectives and methods to include addressing dynamic risk factors and increasing protective factors to reduce overall suicide risk. *Id*.

**Response**: **ADMIT to the extent that the Central New York Psychiatric Center Comprehensive Suicide Risk Assessment Process policy (Nappi Dec., Ex. I) includes this statement.**

36) The CSRA Form will be reviewed at each Treatment Plan Review (TPR). The review will be documented in the TPR identifying any changes to the CSRA Form and subsequent updates to treatment goals, objectives and methods, as indicated. *Id*.

**Response**: **ADMIT to the extent that the Central New York Psychiatric Center Comprehensive Suicide Risk Assessment Process policy (Nappi Dec., Ex. I)**

>     **includes this statement.**

37) DOCCS and OMH staff will utilize suicide watches to insure the safety of inmate patients exhibiting or threatening suicidal behavior. Nappi Decl., Ex. N at 000541

**Response**:   **ADMIT to the extent that the Central New York Psychiatric Center Suicide Watches policy (Nappi Dec., Ex. N) includes this statement.**

38) The Crisis Intervention Services Policy defines Suicide Watch as the constant observation of an inmate-patient believed to be at risk of suicide. The ratio will never exceed one Corrections officer providing constant and simultaneous observation of two inmate-patients. *Id*.

**Response**:   **ADMIT to the extent that the Central New York Psychiatric Center Suicide Watches policy (Nappi Dec., Ex. N) includes this statement.**

39) The policy fails to define what constitutes exhibiting suicide behavior. *Id*.

**Response**:   **DENY. The policy states: An inmate-patient will be placed on a suicide watch by designated OMH or DOCCS staff, if they engage in behavior which is imminently dangerous to him/herself, or if they threaten either explicitly or implicitly to engage in such behavior." (ECF No. 79-14 at 000541). To the Defendants' knowledge, the Decedent was <u>not</u> engaging in behavior that was imminently dangerous to himself and he did not threaten, either explicitly or implicitly, to engage in such behavior in the days or weeks prior to his death.**

40) Instead, the policy states, "An inmate-patient will be placed on a suicide watch by designated OMH or DOCCS staff, if they engage in behavior which is imminently dangerous to him/herself, or if they threaten either explicitly or implicitly to engage in such behavior." *Id*.

**Response**:   **ADMIT to the extent that the Central New York Psychiatric Center Suicide Watches policy (Nappi Dec., Ex. N) includes this statement.**

41) The comprehensive suicide risk assessment process policy If an inmate is admitted to services, the clinician assesses and documents acute and chronic risk factors and protective factors, notes the presence or absence of warning signs (IS PA TH WARM) of imminent suicide risk, and documents a plan of action to address any suicide risk identified. Results and recommendations from the suicide risk assessment are taken into consideration when developing and updating the treatment plan and in making the decision regarding whether to admit to a higher level of care. Nappi Decl., Ex. H at 000550.

**Response**:   **ADMIT to the extent that the Central New York Psychiatric Center Comprehensive Suicide Risk Assessment policy (Nappi Dec., Ex. H) includes this statement.**

42) The Joint Commission National Patient Safety Goal #15 IS PATH WARM mnemonic (American Association of Suicidology, www.suicidologv.org) is a HOT FLAGS mnemonic for prison-based risk factors for imminent suicide risk. *Id*.

**Response**:   **ADMIT to the extent that the Central New York Psychiatric Center Comprehensive Suicide Risk Assessment policy (Nappi Dec., Ex. H) lists references for the policy, including:**
> **The Joint Commission National Patient Safety Goal #15**
> **IS PATH WARM mnemonic (American Association of Suicidology, www.suicidology.org)**
> **HOT FLAGS mnemonic for prison-based risk factors for imminent suicide risk.**

43) The comprehensive suicide risk assessment process policy defines the waring signs indicators of imminent suicidal behavior, summarized by the IS PATH WARM. *Id.*

**Response**:   **ADMIT to the extent that the Central New York Psychiatric Center Comprehensive Suicide Risk Assessment policy (Nappi Dec., Ex. H) includes this statement.**

44) IS PATH WARM is defined as:
   a. Ideation - Threats, talk about death, dying, suicide
   b. Substance Abuse - Increased use of alcohol, of drugs
   c. Purposeless - Feeling like a failure, burden, no reasons for living
   d. Anxiety - Agitation, restlessness, unable to sleep
   e. Trapped - No options, no way out
   f. Hopelessness - Defeated, no value to anyone, nobody cares
   g. Withdrawal - From friends, family, sleeping all the time
   h. Anger - Irritable, enraged, seeking revenge
   i. Recklessness - Impulsive, risky activities
   j. Mood Changes - Depressed, preoccupied, agitated, sudden calm

*Id*.

**Response**:   **ADMIT to the extent that the Central New York Psychiatric Center Comprehensive Suicide Risk Assessment policy (Nappi Dec., Ex. H) includes this statement.**

45) The policy requires progress notes be made to indicate that the primary therapist, psychiatrist or nurse practitioner address the suicide risk. *Id.* at 000551.

**Response**:   **ADMIT to the extent that the Central New York Psychiatric Center Comprehensive Suicide Risk Assessment policy (Nappi Dec., Ex. H) includes this statement.**

46) There is no specific written policy "concerning the use of shoelaces by inmates." New York State DOCCS Directive #4101 includes information on clothing issued to incarcerated individuals on suicide watch. Nappi Decl., Ex. A, Annucci Interrogatory Responses at 11.

**Response**:   **ADMIT.**

47) In the six months leading up to his death, Mr. King consistently reported that he was depressed and anxious. However, there were not any overt symptoms of depression or anxiety observed during the sessions. Nappi Decl., Ex. P at 000554.

**Response**:   **ADMIT to the extent that the document cited contains these statements.**

48) The clinical record indicated that Mr. King was using substances (Suboxone) periodically from May 2018 until September 2018. *Id*. at 000555

**Response**:   **ADMIT to the extent that the document cited contains these statements.**

49) During that time Mr. King was prescribed psychotropic medications to help manage the depression and anxiety symptoms he reported. *Id*.

**Response**:   **ADMIT to the extent that the document cited contains these statements.**

50) The psychiatric and clinical team continued to provide medication education and voiced their concerns about how it was difficult to treat Mr. King's reported symptomatic complaints with psychotropic medications if he continued his substance use. *Id*.

**Response**:   **ADMIT to the extent that the document cited contains these statements.**

51) Mr. King consistently wanted medication changes as he felt the psychotropic medications he was prescribed were ineffective. *Id*.

**Response**:   **ADMIT to the extent that the document cited contains these statements.**

52) The Primary Therapist Progress Notes suicide risk assessment sections dated 6/25/2018, 7/23/2018, 9/27/2018, and 11/2/2018 read "No warning signs present" when the focus of the sessions notes Mr. King reported symptoms of depression, anxiety, sleep difficulties, recent hospital visit (June- medically related), and substance use. *Id*. at 000556.

**Response**:   **ADMIT to the extent that the document cited contains these statements.**

53) The section "Are there any changes in acute or chronic risk factors noted on the CSRA' should have checked "Yes" and noted the changes in the risk and protective factors. *Id*.

**Response**:   **ADMIT to the extent that the document cited contains these statements.**

54) Additionally, section B should have listed the warning signs/triggers that were present and noted in the "Focus of Session" section of the document. *Id*.

**Response**:   **ADMIT to the extent that the document cited contains these statements.**

55) The recent loss of his mother and his Suboxone use should have been listed in section B in every progress note completed from May through last contact. *Id*.

**Response**: **ADMIT to the extent that the document cited contains these statements.**

56) In addition, the Psychiatric Progress Notes assessment of suicide risk section dated 6/25/2018, 7/23/2018, 8/27/18 read "No warning signs present'. The documentation notes warning signs/risk factors of increased substance use continued/increased depression/anxiety, loss of his mother in May 2018, and sleep disturbance. *Id*.

**Response**: **ADMIT to the extent that the document cited contains these statements.**

57) Both of these events should have been identified as significant risk factors for suicide and the CSRA should have been updated in May of 2018; however, the CSRA was not updated until 8/27/2018. *Id*. at 000557

**Response**: **ADMIT to the extent that the document cited contains these statements.**

58) While the 8/27/2018 CSRA has substance abuse/dependence history" checked on the front of the form Mr. King's recent return to Suboxone use was not mentioned in the narrative description. *Id*.

**Response**: **ADMIT to the extent that the document cited contains these statements.**

59) Additionally, the narrative section of the 8/27/2018 CSRA did not address the fact that Mr. King's protective factors changed after the loss of his mother and his strained relationship with his wife, both of which were mentioned in the 8/27/2018 primary therapist progress note. *Id*.

**Response**: **ADMIT to the extent that the document cited contains these statements.**

60) Although the 8/27/2018 CSRA does mention Mr. King's mother passed, it incorrectly notes that she passed in June 2018, rather than May 2018. *Id*.

**Response**: **ADMIT to the extent that the document cited contains these statements.**

61) The Justice Center for the Protection of People with Special Needs (the Justice Center) completed a review of the mental health services provided to Joseph King (DIN #13A3662), an inmate/patient who died on November 16, 2018 at the Mid-State Correctional Facility (CF). Nappi Decl., Ex. L.

**Response**: **ADMIT.**

62) The Justice Center's review found concerns related to the standard of care set forth by the Central New York Psychiatric Center (CNYPC) and the Department of Corrections and

    Community Supervision (DOCCS). Nappi Decl., Ex. L. 000562.

**Response**: **ADMIT to the extent that the document cited contains these statements. However, note that the Justice Center requested that the Office of Mental Health respond to their findings and recommendations. (ECF No. 79-12). The Office of Mental Health responded on February 22, 2019, disagreeing with the Justice Center's findings. See, Attorney Cowan Reply Declaration, Exhibit "A".**

63) At the time of his death, Mr. King was a 50-year old white male serving his first NYS Bid for Arson in the Third Degree with a sentence of 4-12 years. *Id*. at 000564

**Response**: **ADMIT to the extent that the document cited contains these statements.**

64) He had a conditional release date of May 22, 2020 and a maximum release date of May 22, 2024. *Id*

**Response**: **ADMIT to the extent that the document cited contains these statements.**

65) Prior to incarceration, Mr. King reported receiving outpatient mental health treatment in the community between 2009 and 2013. *Id.*

**Response**: **ADMIT to the extent that the document cited contains these statements.**

66) Mr. King also reported his participation in mental health treatment was inconsistent and he most recently attended for two months prior to incarceration. *Id*.

**Response**: **ADMIT to the extent that the document cited contains these statements.**

67) He endorsed a history of cutting to relieve stress and he would often consume alcohol when engaging in the behavior. *Id.*

**Response**: **ADMIT to the extent that the document cited contains these statements.**

68) Mr. King entered DOCCS reception at the Clinton Correctional Facility in August 2013 and was admitted to the mental health caseload as a mental health service level (MHSL). *Id.*

**Response**: **ADMIT to the extent that the document cited contains these statements, but note that the document states he was admitted as a mental health service level 3.**

69) Mr. King was diagnosed with Adjustment Disorder with Mixed Anxiety and Depressed Mood, Alcohol and Cannabis Use Disorder in February 2015. *Id.*

**Response**: **ADMIT to the extent that the document cited contains these statements.**

70) The Justice Center concluded that Mr. King had extensive changes to his medication regimen in the five months prior to his suicide. *Id.* at 000566.

**Response**: **ADMIT to the extent that the document cited contains these statements but note**

**that the Office of Mental Health disagreed with the Justice Center's findings. (See, Cowan Reply Dec., Ex. A).**

71) Mr. King received a disciplinary drug ticket in May 2018 for Suboxone use. *Id.*

**Response**: **ADMIT to the extent that the document cited contains these statements.**

72) Clinical progress notes indicated that Mr. King was reminded of the dangers of using drugs with psychotropic medications. *Id.*

**Response**: **ADMIT to the extent that the document cited contains these statements.**

73) A determination was made on June 25, 2018 to discontinue all medications (Celexa and Vistaril) in order to start over and determine what medications would be helpful. *Id.*

**Response**: **ADMIT to the extent that the document cited contains these statements. OMH's response to the Justice Center states: "…Mr. King's medication was discussed and addressed at every psychiatric callout. Most medication changes were implemented in response to his feedback about efficacy or lack of efficacy of the medication, or about the experience of negative side effects." (Cowan Reply Dec., Ex. A).**

74) Following complaints of "panic attacks, pacing and a lot of anxiety" in July 2018, Mr. King was prescribed Trazadone and Zoloft. *Id.*

**Response**: **ADMIT to the extent that the document cited contains these statements.**

75) He continued to voice mental health concerns in August and September however clinical staff informed Mr. King that he couldn't be helped if he wasn't willing to help himself and he didn't appear to be motivated for change. *Id.*

**Response**: **ADMIT to the extent that the document cited contains these statements.**

76) During a psychiatric call out in September, his participation in treatment was discussed in detail and it was documented that he would be placed in group therapy to assist with skill building and that time, his Zoloft was discontinued, Prozac was started and Trazadone was continued. *Id.*

**Response**: **ADMIT to the extent that the document cited contains these statements.**

77) The following month, during Mr. King's last scheduled contact with clinical staff, he acknowledged that he was going to church, attending AA meetings, and going to the yard. *Id*.

**Response**: **ADMIT to the extent that the document cited contains these statements.**

78) It was noted that Mr. King had been refusing his Prozac, stating it made him feel weird, and that he finds himself waiting all day to receive his Trazadone because it is the only time he feels relatively all **n**ight. *Id.*

**Response**:     **ADMIT to the extent that the document cited contains these statements.**

79) Mr. King was then encouraged to speak with psychiatric staff about any concerns he had about his medications, which according to a previous Psychiatric Progress Note, would have been on or around November 30. *Id.*

**Response**:     **ADMIT to the extent that the document cited contains these statements.**

80) Mr. King's Physician's Orders indicate that on November 6, 2018, his medications were discontinued, including his Trazadone. This occurred ten days prior to his suicide, without Mr. King being assessed by psychiatric staff. *Id*.

**Response**:     **ADMIT to the extent that the document cited contains these statements.**

81) The Justice Center concluded that OMH failed to recognize the suicide risk factors and warning signs displayed by Mr. King prior to his suicide. *Id.*. Additionally, his symptoms appeared to increase and there was minimal documentary evidence that additional support, programming or crisis intervention was offered. *Id*.

**Response**:     **ADMIT to the extent that the document cited contains these statements but note that the Office of Mental Health disagreed with the Justice Center's findings. (See, Cowan Reply Dec., Ex. A).  The Justice Center also noted that in the six months prior to his death, the Decedent denied wanting to harm himself during his monthly sessions and did not display overt signs of suicidal ideation or evidence or any warning signs of acute suicide risk in his behavior or affect. (ECF No. 79-12 at 000566).**

82) Mr. King had a documented history of a recent suicide attempt in 2016 in which he tried to hang himself and reported that his triggers were being overwhelmed with his prison sentence and substance abuse. *Id*.

**Response**:     **ADMIT to the extent that the document cited contains these statements. But note that Decedent repeatedly told staff that he would not hurt himself again and repeatedly denied suicidal ideation. (ECF No. 71-9 at 001058; 001061-62; 000892-000893; 000896-000897; 000898-000899; 001065-001066; 01074**).

83) Three months prior to his death, Mr. King reported experiencing no energy or motivation, "I lay in bed all day, and I can't sleep. I only get like three or four hours of sleep at night. I'm tired of doing the same thing every day. I can't take this anymore." *Id*. at 000567.

**Response**:     **ADMIT to the extent that the document cited contains these statements.**

84) Mr. King asked for medication adjustments but was informed by mental health staff on. numerous callouts that his medication would not be changed until he attempted to use alternative coping skills. *Id*.

**Response**: **ADMIT to the extent that the document cited contains these statements but note that Decedent's medications were changed in response to his feedback about efficacy or negative side effects. (Cowan Reply Dec., Ex. A).**

85) Mental health staff noted that in the last year before his death, Mr. King had an increase in substance use, quit his paint crew job, stopped attending AA/NA meetings and stopped going to religious services. *Id.*

**Response**: **ADMIT to the extent that the document cited contains these statements but note that <u>during the last session two weeks before his death</u>, Decedent continued to deny thoughts of self harm, stating "I'll never do THAT [attempt suicide] again." (ECF No. 71-9 at 001073). Decedent shared that he *had* been going to church, attending AA (Alcoholics Anonymous) meetings, and going to the recreation yard. (<u>Id</u>.). Decedent shared that he continued to maintain contact with his wife, his children, and his sister, who were all supportive of him. (<u>Id</u>.). He shared that he had been working as a porter and was waiting to return to his ASAT (Alcohol and Substance Abuse Treatment) program. (<u>Id</u>.).**

86) In January of 2018, the clinician expressed concern that Mr. King resigned from his painting job, quit AA meetings and no longer attended church which he had previously reported that those activities had helped him going bad. *Id.*

**Response**: **DENY that the record cited reflects these statements.**

87) Of note, records indicated that his wife had not been on a visit since April of 2018. *Id.*

**Response**: **DENY that the record cited reflects these statements. Regardless, according to the visitor log, Decedent's wife visited several times after April 2018, including her last visit on November 12, 2018. (<u>See</u>, Cowan Reply Dec., Ex. B).**

88) Mr. King was again removed from his drug treatment programming due to his drug use and tickets, and that his mother had passed. *Id.*

**Response**: **DENY that the record cited reflects these statements.**

89) Mr. King reported using illicit substances and that it was due to visits with his wife.

**Response**: **DENY. This statement fails to comply with Local Rule 7.1(a)(3) given that it does not contain any citation to the record.**

90) In January of 2018, the clinician expressed concern that Mr. King resigned from his painting job, quit AA meetings and no longer attended church which he had previously reported that those activities had helped him, and that his mother had passed. *Id.*

**Response**: **DENY that the record cited reflects these statements.**

91) He reported using illicit substances and that it was due to visits with his wife. *Id.*

**Response**:   **DENY that the record cited reflects these statements.**

92) In the two weeks leading up to his death, Mr. King continued to express to mental health staff his frustration with his inability to deal with his reported edginess and worry, even though he reported attending church, AA meetings and going to the yard. *Id*.

**Response**:   **ADMIT to the extent that the document cited contains these statements but note that <u>during the last session two weeks before his death</u>, Decedent continued to deny thoughts of self harm, stating "I'll never do THAT [attempt suicide] again." (ECF No. 71-9 at 001073). Decedent shared that he had been going to church, attending AA (Alcoholics Anonymous) meetings, and going to the recreation yard. (<u>Id</u>.). Decedent shared that he continued to maintain contact with his wife, his children, and his sister, who were all supportive of him. (<u>Id</u>.). He shared that he had been working as a porter and was waiting to return to his ASAT (Alcohol and Substance Abuse Treatment) program. (<u>Id</u>.).**

93) In the two weeks leading up to his death, Mr. King expressed concerns with his medication and the way they were making him feel and was encouraged by mental health staff to speak with psychiatric staff regarding his medication. *Id*.

**Response**:   **ADMIT to the extent that the document cited contains these statements and note that Decedent's medications were discontinued and he was scheduled to meet with the prescriber in two weeks in order to restart medication. (ECF No. 71-18 at 19).**

94) The Mortality and Morbidity Review Committee concluded, "[t]here were many predisposing risk factors for Mr. King's suicide. He had a documented history of mental health treatment both in the community and in his incarceration. Mr. King had an extensive substances abuse history and was continuing to use illicit substances while in prison. He also had one serious suicide attempt while incarcerated following withdrawal from substances. Mr. King was facing marital discord, the death of his mother, various medication changes, and concerns about having to remain in prison for another 2 years with his upcoming parole board." Nappi Decl., Ex. M at 000575.

**Response**:   **ADMIT to the extent that the document cited contains these statements.**

95) In their recommendations for improvement, Mortality and Morbidity Review recommended, that " if patients are displaying an increase in symptoms, they should be seen more frequently in RCTP from their respective housing unit. It would also be beneficial for more frequent follow-ups when the team receives information from a patient's family that the patient is engaging in odd behavior." *Id*.

**Response**:   **ADMIT to the extent that the document cited contains these statements but note that none of the Defendants received any information from Decedent 's family about engaging in "odd behavior."**

96) Further recommendations included, "[if] a clinician is sitting in on the VTC session and wants this contact be considered a monthly contact, it is important for the clinician to write a full

monthly progress note to be compliant with policy versus just saying that he or she was present for the VTC contact." *Id*.

**Response**:   **ADMIT to the extent that the document cited contains these statements.**

97) The Mortality and Morbidity Review also "recommended, based upon findings of recent psych autopsies, to retrieve telephone records/transcripts as they can play a direct role in suicide. Thus, additional collaboration from DOCCS is needed in order to obtain these records, especially when the suicide occurs within 24 hours of the phone conversation." *Id*.

**Response**:   **ADMIT to the extent that the document cited contains these statements.**

98) Though patients can be designated an S due to recent suicide attempts, his diagnosis of Adjustment Disorder should have been revisited as his symptoms persisted longer than six months. If needed, a testing referral should have been submitted to assist in diagnostic clarification. *Id*.

**Response**:   **ADMIT to the extent that the document cited contains these statements.**

99) Specifically, the Mortality and Morbidity Review also declared, "Mr. King was made a mental health level IS in August of 2016. This change occurred following his July suicide attempt; and although, patients can be designated an S due to **recent** suicide attempts, his diagnosis of Adjustment Disorder should have been revisited as his symptoms persisted longer than six months. If needed, a testing referral should have been submitted to assist in diagnostic clarification." *Id*. at 000586.

**Response**:   **DENY that the record cited reflects these statements.**

100)   Meghan King had a close relationship with her father prior to his incarceration and they would spend quality time together doing normal father daughter things.". Nappi Decl., Ex. R, Meghan King Deposition Tran. 15:16-22.

**Response**:   **ADMIT to the extent that the document cited contains these statements.**

101)   Meghan's relationship did not change with Mr. King despite his incarceration. Nappi Decl., Ex. R, Meghan King Deposition Tran. 24:6-9.

**Response**:   **ADMIT to the extent that the document cited contains these statements, but note that Meghan testified that obviously his physical presence in her life changed and he did not provide any financial support to her or her family from jail. (ECF No. 71-21 at 24).**

102)   Meghan visited her father every other week. Nappi Decl., Ex. R, Meghan King Deposition Tran. 24:15-16.

**Response:**   **DENY. According to visitor logs, Meghan visited the Decedent four (4) times in 2018. (Cowan Reply Dec., Ex. B).**

103) Meghan spoke with her father every other day on the telephone. Nappi Decl., Ex. R, Meghan King Deposition Tran. 25:1-13.

**Response**: **ADMIT to the extent that Meghan King testified that she spoke with the Decedent almost every day unless "I was busy with things going on in life." (ECF No. 71-21 at 25).**

104) Prior to his incarceration, Mr. King worked at various jobs, including a full time job at Walmart. Nappi Decl., Ex. R, Meghan King Deposition Tran. 16:13-17:16..

**Response**: **ADMIT to the extent that the document cited contains these statements. However, note that Plaintiff refused to disclose any of Decedent's employment records and Plaintiff is not claiming lost wages. (ECF No. 71-10 at 6-7, ECF No. 71-11 at 6, 8 and ECF No. 71-15 at 4-5).**

Dated: Syracuse, New York
April 10, 2023

LETITIA JAMES
Attorney General of the State of New York
Attorney for Defendants
300 S. State Street, Ste. 300
Syracuse, New York 13202
By: _____s/_____
Aimee Cowan, Esq.
Assistant Attorney General
Bar Roll No. 516178
Telephone:  (315) 448-4800
Fax: (315) 448-4853
Email: aimee.cowan@ag.ny.gov