UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

The Estate of Joseph P. King, by and through its
Administratrix, Amy King, and Amy King in her own right,

<em>Plaintiff</em>,

      -against-

9:20-CV-1413<br>(TJM/ML)

Anthony J. Annucci, Acting Commissioner, State of New
York Department of Corrections, in his individual capacity;
and Marie T. Sullivan, Commissioner, State of New York
Department of Mental Health, in her individual capacity;
Jami Palladino, Mid-State Social Worker, in her individual
capacity; Hal Meyers, Mid-State Chief Mental Health Counselor,
in his individual capacity;

<em>Defendants</em>.

---

**<u>REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE §56 (a)</u>**

LETITIA JAMES
Attorney General of the State of New York
Syracuse Regional Office
Attorney for Defendants
300 S. State Street, Ste. 300
Syracuse, NY 13202

By:    Aimee Cowan, Esq.
       Assistant Attorney General, of Counsel
       Bar Roll No. 516178
       Telephone: (315) 448-4800
       Fax: (315) 448-4853
       E-mail: Aimee.Cowan@ag.ny.gov

## TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………………….…… iii

ARGUMENT…………………………………………………………………….....1

    **I.**    **PLAINTIFF'S EIGHTH AMENDMENT DELIBERATE INDIFFERENCE CLAIMS MUST BE DISMISSED………………………………………....1**

    **II.**    **PLAINTIFF'S EIGHTH AMENDMENT "FAILURE TO TRAIN" CLAIMS MUST BE DISMISSED………………………………………………....9**

    **III.**    **PLAINTIFF'S NEW YORK CONSTITUTION AND NEW YORK CIVIL RIGHTS ACT CLAIMS SHOULD BE DISMISSED………………….…..10**

    **IV.**    **PLAINTIFF'S NEGLIGENCE CLAIMS SHOULD BE DISMISSED………10**

    **V.**    **PLAINTIFF'S WRONGFUL DEATH AND SURVIVAL ACTION SHOULD BE DISMISSED………………………………………………………....14**

**CONCLUSION**……………………………………………………….…………...15

## TABLE OF AUTHORITIES

<u>**Cases**</u>

<u>Allah v. Kemp,</u> No. 9:08-CV-1008 (NAM/GHL), 2010 WL 5860290 (N.D.N.Y. Nov. 9, 2010)….2

<u>Ashcroft v. Iqbal,</u> 556 U.S. 662 (2009)…………………………………………………....1, 2

<u>Bennett v. Fletcher</u>, 2020 WL 872491 (N.D.N.Y. Jan. 16, 2020)…………………………….10

<u>Boyd v. Doe #1</u>, No. 918CV1333TJMATB, 2021 WL 7542409 (N.D.N.Y. Nov. 30, 2021)…..1, 2

<u>Cole v. New York State Dep't of Corr. & Cmty. Supervision</u>, 2016 WL 5394752 (N.D.N.Y. 2016)………………………………………………………………………………………...11

<u>Colon v. Coughlin</u>, 58 F.3d 865 (2d Cir.1995)……………………………………………………1

<u>Cummins v. Cnty. of Onondaga</u>, 618 N.Y.S.2d 615 (1994)………………………………………15

<u>Dodds v. Richardson</u>, 614 F.3d 1185 (10th Cir. 2010)……………………………………………2

<u>Funderburke v. Canfield</u>, 2016 WL 831974 (WDNY 2016)………………………………………6

<u>Gazzola v. Cnty. of Nassau</u>, 2022 WL 2274710 (E.D.N.Y. 2022)………………………………14

<u>Grullon v. City of New Haven</u>, 720 F3d 133 (2d Cir 2013)………………………………………1

<u>Haque v. Daddazio</u>, 84 A.D.3d 940 (2d Dept. 2011)……………………………………………15

<u>Harnage v. Dzurenda</u>, 2022 WL 972438 (D. Conn. Mar. 31, 2022)……………………………10

<u>Haywood v. Drown</u>, 556 US 729 (2009)…………………………………………………………11, 14

<u>H'Shaka v. O'Gorman</u>, 444 F. Supp. 3d 355 (N.D.N.Y. 2020)…………………………………5

<u>Jennings v. Hunt Companies, Inc.</u>, 367 F. Supp. 3d 66 (S.D.N.Y. 2019)…………………………10

<u>Jordan v. Dep't of Correction</u>, 2023 WL 2503376 (D. Conn. Mar. 13, 2023)……………………10

<u>Kevra v. Vladagin</u>, 96 A.D.3d 805 (2d Dep't 2012)……………………………………………15

<u>Milczarski v. Catone</u>, 2012 WL 12973221 (4th Dept. 2012)……………………………………14

<u>Monell v. Dep't of Soc. Servs.,</u> 436 U.S. 658 (1978)……………………………………………...9

<u>Pearson v. Annucci</u>, No. 9:20-CV-01175, 2023 WL 2537722 (N.D.N.Y. Mar. 16, 2023)………..9

Randolph v. Kalies, No. 919CV1161DNHTWD, 2021 WL 5605557 (N.D.N.Y. Nov. 10, 2021)……………………………………………………………………………………2, 4

Robinson v. Taylor, 2019 WL 1429529 (N.D.N.Y.2019)………………………………………….8

Rounds v. Thompson, No. 12-CV-953, 2013 WL 3187074 (N.D.N.Y. June 20, 2013)………….11

Sanders v. Gifford, 9:11-CV-0326 (LEK/RFT), 2014 WL 5662775 (N.D.N.Y. Nov. 4, 2014)…..6

Santana v. Racette, No. 9:17-CV-00102 (BKS/ML), 2020 WL 3412728 (N.D.N.Y. June 22, 2020)…………………………………………………………………………………………..10

Sims v. Gorman, 2012 WL 566875 (W.D.N.Y. 2012)…………………………………....3, 8

Stone #1 v. Annucci, 2021 WL 4463033 (S.D.N.Y. Sept. 28, 2021)……………………………10

Suarez v. Annucci, 2021 WL 6065765 (S.D.N.Y. Dec. 21, 2021)………………………………...3

Tangreti v. Bachmann, 983 F.3d 609 (2d Cir. 2020)………………………………………..1, 2, 3, 9, 10

Walker v. Bellnier, No. 917CV1008GTSCFH, 2020 WL 9264839 (N.D.N.Y. Dec. 1, 2020)…….6

Zulu v. Wells, No. 920CV312LEKDJS, 2020 WL 6482034 (N.D.N.Y. Nov. 4, 2020)……...11, 14

## **Statutes**

42 U.S.C. §1983………………………………………………………………………………1, 10

Fed. R. Civ. P. 56(a)……………………………………………………………………………16

N.Y. CORR. LAW § 24………………………………………………………………10, 11, 14

N.Y. Est. Powers & Trusts § 5-4.3)………………………………………………………...15

<u>**ARGUMENT**</u>

**I.  PLAINTIFF'S EIGHTH AMENDMENT DELIBERATE INDIFFERENCE CLAIMS MUST BE DISMISSED**

As an initial matter, Plaintiff contends that Defendants Annucci, Sullivan, and Meyers have "ignored the meaning of <u>Tangreti</u>" when considering the personal involvement of these Defendants. (ECF No. 80 at 13-14; citing 983 F.3d 609 (2d Cir. 2020). Citing a Second Circuit case from 2013, Plaintiff further argues that the personal involvement of a supervisory official may be shown by evidence that:

> "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring."

(ECF No. 80 at 14, citing <u>Grullon v. City of New Haven</u>, 720 F3d 133, 139 (2d Cir 2013).

However, it is *Plaintiff* who has ignored the wealth of cases following <u>Tangreti</u> establishing that the <u>Colon v. Coughlin</u>, 58 F.3d 865, 873 (2d Cir.1995) factors listed above are now superseded by the standard set forth in <u>Tangreti</u>. Indeed, "…the Second Circuit in <u>Tangreti</u> made clear that in order to attach liability to an individual, regardless of supervisory status, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" <u>Boyd v. Doe #1</u>, No. 918CV1333TJMATB, 2021 WL 7542409, at *15 (N.D.N.Y. Nov. 30, 2021), <u>report and recommendation adopted,</u> 2022 WL 823648 (N.D.N.Y. Mar. 18, 2022)(citing <u>Ashcroft v. Iqbal,</u> 556 U.S. 662, 676 (2009)). "The factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue" because the elements of different constitutional violations vary. <u>Id</u>. The violation must be established against the supervisory official directly. <u>Id</u>. (quoting <u>Iqbal,</u> 556 U.S. at 676).

Quoting a Tenth Circuit case, the <u>Tangreti</u> court stated that "'after *Iqbal,* [a p]laintiff can no longer succeed on a § 1983 claim against [a d]efendant by showing that as a supervisor he behaved knowingly or with deliberate indifference that a constitutional violation would occur at the hands of his subordinates, unless that is the same state of mind required for the constitutional deprivation he alleges.' " <u>Id.</u> (alterations in original) (quoting <u>Dodds v. Richardson</u>, 614 F.3d 1185, 1204 (10th Cir. 2010)) (internal quotation marks omitted) (emphasis added, other citations omitted). The supervisor must have committed the violation him or herself, not by the supervision of others who committed the violation. <u>Id.</u> Likewise, the supervisor must personally display the requisite state of mind, depending on the violation at issue. <u>Id.</u>

As previously discussed, for an Eighth Amendment claim arising out of an inmate suicide, "there are two scenarios where deliberate indifference may exist." <u>Randolph v. Kalies</u>, 2021 WL 5605557, *6 (N.D.N.Y. Nov. 10, 2021)(citing <u>Allah v. Kemp,</u> 2010 WL 5860290, at *7 (N.D.N.Y. 2010). "First, officials could be deliberately indifferent to the risk of suicide by failing to discover an individual's suicidal tendencies." <u>Id.</u> (quotation marks and citation omitted). "Second, officials could have discovered and have been aware of the suicidal tendencies, but could be deliberately indifferent in the manner by which they respond to the recognized risk of suicide." <u>Id.</u> (quotation marks and citation omitted). "The second scenario focuses on the adequacy of preventive measures." <u>Id.</u> (quotation marks and citation omitted). However, even if a medical defendant's "treatment decision was erroneous, deliberate indifference cannot be inferred [where] the decision was not such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." <u>Sims v. Gorman</u>, 2012 WL 566875, at *6 (W.D.N.Y. 2012) (quotation marks and citation omitted).

Here, Plaintiff argues that Annucci and Sullivan are policymakers, and their policies resulted in the deliberate indifference of their subordinates to the Decedent 's medical needs (ECF No. 80 at 14)[1], which is exactly what <u>Tangreti</u> prohibits. Regardless, Plaintiff contends that the comprehensive suicide risk assessment ("CSRA") policy required progress notes to be made to indicate that the primary therapist, psychiatrist or nurse practitioner address a suicide risk and that "there was a lack of implementation which resulted in Mr. King's death." (<u>Id</u>. at 15). First, Plaintiff is unclear as to how Defendants violated the CSRA policy. Progress notes *were* made following every session with the Decedent and a suicide risk assessment was completed at every session with Decedent. <u>See gen</u>., ECF No. 71-9. Further, it is unclear how the CSRA policy itself resulted in "deliberate indifference" to the Decedent's medical needs. Plaintiff does not allege that any portion of that policy was inadequate in any way. It is also unclear how a "lack of implementation" of this policy resulted in Decedent's death as Plaintiff alleges. In fact, Palladino and the non-party prescribers followed this policy at every session, using the "IS PATH WARM" standard, and determined that there was no evidence of any warning signs of acute suicide risk. (<u>See gen</u>., ECF No. 71-9).

Plaintiff further argues that Defendants' policies were deliberately indifferent to "actually recognizing the suicide indicators." (ECF No. 80 at 17). Again, Plaintiff does not elaborate as to how the policies themselves were inadequate with respect to recognizing suicide indicators. Regardless, Plaintiff still has not shown that Sullivan was personally involved under the <u>Tangreti</u> guidelines. In <u>Suarez v. Annucci</u>, 2021 WL 6065765 at *7 (S.D.N.Y. Dec. 21, 2021), plaintiff's deliberate indifference claim was dismissed where plaintiff alleged that Sullivan was responsible for OMH's provision of services to mentally ill incarcerated people but the amended complaint

---

[1] Page numbers refer to docket page numbers.

contained no allegation that she personally knew about plaintiff, his mental illness, or his incarceration in segregated confinement. Similarly, here, Plaintiff does not allege that Sullivan personally knew the Decedent, knew about his mental illness, personally provided any mental health treatment, received any correspondence from him while he was in DOCCS' custody, or received and/or reviewed his medical records or mental health records. Significantly, Plaintiff has not shown that Sullivan personally failed to discover Decedent's suicidal tendencies or that she could have discovered and have been aware of the suicidal tendencies but was deliberately indifferent in the manner by which she responded to the recognized risk of suicide. See, Randolph, 2021 WL at *6.

With respect to Annucci, Plaintiff fails to specify in her opposition what "policies" promulgated by Annucci allegedly resulted in deliberate indifference to Decedent's medical/psychiatric needs. For example, the CSRA policy referenced above is not a DOCCS policy. No investigation after Decedent's death criticized any DOCCS policies or Annucci himself. Regardless, Plaintiff cannot establish—as she must—that Annucci himself was personally involved. She has not demonstrated that Annucci failed to discover Decedent's suicidal tendencies or that he could have discovered and have been aware of the suicidal tendencies but was deliberately indifferent in the manner by which he responded to the recognized risk of suicide. Plaintiff does not allege that Annucci personally knew the Decedent, knew about his mental illness, personally provided any mental health treatment, received any correspondence from him while he was in DOCCS' custody, or received and/or reviewed his medical records or mental health records.

With respect to Meyers, he is certainly not a policymaker, so Plaintiff instead alleges that his duties include "implementing policies." (ECF No. 80 at 14). There is no further discussion

whatsoever as to how Meyers was personally involved under <u>Tangreti</u> or how Meyers acted with deliberate indifference. While Plaintiff detailed certain recommendations made after an investigation was performed following Decedent's death, Plaintiff does not allege that any findings were critical of Meyers; for example, neither the investigation findings nor Plaintiff herself criticizes Meyers for failing to recognize "suicide risk factors and warning signs displayed by Mr. King." Plaintiff has not shown that Meyers failed to discover Decedent's suicidal tendencies or that he could have discovered and have been aware of the suicidal tendencies, but was deliberately indifferent in the manner by which he responded to the recognized risk of suicide.

As previously discussed, Meyers did not meet individually with the Decedent, other than on one occasion with Palladino in a supervisory capacity only. Meyers did not provide direct therapy to the Decedent. Further, because Meyers is not a medical doctor, his duties did not include patient medication management, such as whether to prescribe a patient medication, what medication to prescribe them or when to discontinue a medication. Meyers never received any letters or correspondence from the Decedent. Significantly, Meyers was not required to monitor any incarcerated individual's telephone calls and he did not monitor or review any of Decedent's phone calls. Consequently, he was not aware that the Decedent believed his marriage was suffering, particularly in the days leading up to his death. He was not aware of anything the Decedent discussed with his family members on the telephone in the days leading up to his death.

With respect to Palladino, Plaintiff argues that there is a question of fact as to whether Palladino acted with deliberate indifference. (ECF No. 80 at 18). In support of her argument, she contends that Palladino's "decisions pertaining to Decedent's treatment in October and November 2018 do not appear reasoned or considerate of Decedent's wellbeing." (<u>Id</u>.). The only legal authority she cites in support of her position is <u>Funderburke v. Canfield</u>, 2016 WL 831974 (WDNY

2016), in which plaintiff alleged that his pain medication was discontinued by a <u>physician and physician's assistant</u> in violation of his Eighth Amendment rights. However here, as a social worker, Palladino's duties did not include patient medication management, such as whether to prescribe a patient medication, what medication to prescribe them or when to discontinue a medication. (ECF No. 71-6 at ¶ 19). Palladino had no control over what medications Decedent was prescribed or whether they would be discontinued. (<u>Id</u>.). Plaintiff *does* admit that Palladino provided him therapy in the six months prior to his death, during which Decedent denied psychotic symptoms or wanting to harm himself and she determined there were no evidence of any warning signs of acute suicide risk. (ECF No. 77 at 7-14). Plaintiff admits the following, as well:

- Two weeks before his death, on November 2, 2018, Decedent was given therapy from Palladino, during which she noted that Decedent continued to deny thoughts of self harm, stating "I'll never do THAT again." (<u>Id</u>. at 14-16).
- Decedent shared that he had been going to church, attending AA (Alcoholics Anonymous) meetings, and going to the recreation yard. (<u>Id</u>.).
- Decedent shared that he continued to maintain contact with his wife, his children, and his sister, who were all supportive of him. (<u>Id</u>.).
- He shared that he had been working as a porter and was waiting to return to his ASAT (Alcohol and Substance Abuse) program. (<u>Id</u>.).
- Palladino noted: "There is no evidence of any warning signs of acute suicide risk in patient's behavior or affect. There were no signs of anger, anxiety, withdrawal, mood change, purposelessness, hopelessness, recklessness or feelings of being trapped. Patient's risk for suicide will be assessed on an ongoing basis. Patient denied suicidal ideation or thoughts." (<u>Id</u>.). Decedent did not express any potential suicide indicators to her. (<u>Id</u>.).
- Palladino had no control over what medications Decedent was prescribed or whether they would be discontinued. (<u>Id</u>. at 16).
- Palladino was not required to monitor any incarcerated individual's telephone calls and she did not monitor or review any phone calls Mr. King placed or received. (<u>Id</u>.). Consequently, she was not aware that the Decedent believed his marriage was suffering, particularly in the days leading up to his death. (<u>Id</u>.). She was not aware of anything he discussed with his family members on the telephone in the days leading up to his death. (<u>Id</u>.).
- Decedent never discussed any concerns about his marriage with Palladino during their therapy sessions. (<u>Id</u>. at 17). He never discussed with Palladino any fears that his wife was romantically involved with another man or that he feared she would divorce him. (<u>Id</u>.).

Plaintiff contends that Palladino ignored: increasing anxiety and depression, marital discord, the death of his mother, medication changes, and concerns about having to remain in prison with upcoming parole board hearing. (ECF No. 80 at 16-18). However, Palladino testified that she did not observe increasing depression and anxiety during her sessions with him (ECF No. 71-18 at 44-45); during his last session he simply indicated that he felt "edgy and worried." (ECF No. 71-9 at 00173). He was reminded as to how to reach out to mental health in case of emergency. (Id.). With respect to the death of Decedent's mother, Palladino did follow up with Decedent and noted in her Progress Notes that she engaged in discussion about how he had been coping. (ECF No. 71-9 at 001058 and 001061). Palladino further testified that when she spoke to Decedent about his mother passing, he told her that his mother was in her 90s, chronically ill, and that he was able to speak to her before she passed. (ECF No. 71-18 at 44-45). Plaintiff admits that Palladino was *not* aware of any marital discord (Id. at 15-16), and in fact, during her last session with Decedent, he shared that he continued to maintain contact with his wife, his children, and his sister, who were all supportive of him (ECF No. 71-9 at 001073). With respect to his medications, the prescriber decided to discontinue them after Palladino's last session with him, but Decedent was scheduled to meet with the prescriber in two weeks to restart medication. (ECF No. 71-18 at 19; ECF No. 71-9 at 001075).

Further, although Plaintiff relies heavily on an investigation performed by the Justice Center after Decedent's death, the Justice Center did admit that in the six months prior to his death, the Decedent "denied wanting to harm himself during his monthly mental health callouts and according to mental health staff, he did not display overt signs of suicidal ideation or evidence or any warning signs of acute suicide risk in his behavior or affect."[2] (ECF No. 79-12 at 000566).

---

[2] Note that the Office of Mental Health responded on February 22, 2019, disagreeing with the Justice Center's findings. See, Attorney Cowan Reply Declaration, Exhibit "A".

Plaintiff must show that Palladino failed to discover Decedent's suicidal tendencies or that she could have discovered and have been aware of the suicidal tendencies, but was deliberately indifferent in the manner by which she responded to the recognized risk of suicide.  Based on the undisputed facts to which Plaintiff has admitted (See gen., ECF No. 77), Plaintiff has not done that here. Moreover, Plaintiff fails to address the authority cited by Defendants in their original memorandum of law, in which the mere fact that defendants "might have ultimately been wrong in [their] professional judgment does not support a showing of deliberate indifference." See, Robinson v. Taylor, 2019 WL 1429529, *7 (N.D.N.Y.2019). Indeed, even if Palladino's "treatment decision was erroneous, deliberate indifference cannot be inferred [where] the decision was not such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." Plaintiff offers no authority or expert opinion establishing that Palladino's decisions were such a departure. Sims, 2012 WL 566875 at *6.

Lastly, to the extent that Plaintiff argues that any of the Defendants violated Decedent's Eighth Amendment rights for failing to properly follow DOCCS/OMH policies, a failure to adhere to an internal policy does not constitute a violation of Section 1983. See, H'Shaka v. O'Gorman, 444 F. Supp. 3d 355, 385 (N.D.N.Y. 2020); see also, Walker v. Bellnier, 2020 WL 9264839, at *10 (N.D.N.Y. Dec. 1, 2020), report and recommendation adopted, 2021 WL 855842 (N.D.N.Y. Mar. 8, 2021)(citing Sanders v. Gifford, 2014 WL 5662775, at *4 (N.D.N.Y. 2014).

With respect to Defendants' qualified immunity defense, Plaintiff has not shown that *any* of the Defendants violated a statutory or constitutional right that was clearly established. Further, Defendants have demonstrated that it was objectively reasonable for them to believe their conduct

was lawful for the reasons stated above and in their original memorandum of law. Consequently, Defendants are entitled to qualified immunity.

## II.     PLAINTIFF'S EIGHTH AMENDMENT "FAILURE TO TRAIN" CLAIMS MUST BE DISMISSED

In her opposition, Plaintiff maintains that Annucci and Sullivan are policymakers that failed to train or supervise their subordinates "to such an extent that it amounts to 'deliberate indifference' to the rights of those who come in contact with the municipal employees" which "has long been established as a proper vehicle for liability." (ECF No. 80 at 20). After review of the cases cited in support of her argument (ECF No. 80 at 20), Plaintiff appears to incorrectly conflate municipal liability guidelines established under Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978), with the supervisory personal involvement guidelines set forth in Tangreti. Indeed, Plaintiff's authority involves questions of municipal liability, which is not at issue here.

Further, her cited authority precedes the Tangreti decision, and she ignores the wealth of decisions that have followed Tangreti in which Courts in this circuit have held that allegations regarding policymaking authority and general awareness of unconstitutional practices are insufficient to adequately plead personal involvement. (ECF No. 71-2 at 27-29). See also, Pearson v. Annucci, No. 9:20-CV-01175, 2023 WL 2537722, at *8 (N.D.N.Y. Mar. 16, 2023). Plaintiff also ignores the decisions since Tangreti where Courts in this district have specifically held that where plaintiff alleges a supervisory defendant failed to adequately train and supervise their employees, it is not enough to plausibly allege personal involvement. (ECF No. 71-2 at 28).[3]

---

[3] Plaintiff alleges that "Defendants were responsible for the creation of a policy which was not only lacking in ways to recognize the identified suicide factors" and additionally, Meyers "testified to his subpar training." (ECF No. 80 at 20). Plaintiff offers nothing to support these conclusory allegations. "…to state a claim that a supervisor has created or perpetuated an unconstitutional policy, a plaintiff must do more than make "conclusory statements that [the supervisor] participated in the creation of a policy under which he was denied [constitutional rights], and that [he/]she knew or should have known that [plaintiff] would suffer

III.    **PLAINTIFF'S NEW YORK STATE CONSTITUTION AND NEW YORK CIVIL RIGHTS ACT CLAIMS SHOULD BE DISMISSED**

Nowhere in her opposition does Plaintiff set forth any disagreement as to Defendants' legal arguments regarding her New York State Constitution and New York Civil Rights Act claims. "Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." See, Bennett v. Fletcher, 2020 WL 872491, at *5 (N.D.N.Y. Jan. 16, 2020). Consequently, Defendants respectfully request that Plaintiff's New York State Constitution claim and New York Civil Rights Act claim be deemed abandoned and dismissed with prejudice. See, Jennings v. Hunt Companies, Inc., 367 F. Supp. 3d 66, 70 (S.D.N.Y. 2019); Santana v. Racette, No. 9:17-CV-00102 (BKS/ML), 2020 WL 3412728, at *8, n. 12 (N.D.N.Y. June 22, 2020).

IV.    **PLAINTIFF'S NEGLIGENCE CLAIMS SHOULD BE DISMISSED**

With respect to Annucci, Plaintiff argues this Court does not lack subject matter jurisdiction pursuant to Corrections Law §24 because "the intent of this section is to strip state courts of jurisdiction over inmate damages claims against correction employees, many of which are deemed 'frivolous and vexatious,' and instead require inmates to pursue such claims against the State of New York in the Court of Claims." (ECF No. 80 at 21). However, Plaintiff notes, an inmate seeking damages against the state in the Court of Claims cannot use 42 U.S.C. § 1983

---

harm as a result." Jordan v. Dep't of Correction, 2023 WL 2503376, at *11 (D. Conn. Mar. 13, 2023)(citing Harnage v. Dzurenda, 2022 WL 972438, at *9 (D. Conn. Mar. 31, 2022)). "To be held liable as a policymaker, a plaintiff must demonstrate that the defendant had 'the requisite *mens rea*,' specifically that 'the supervisor had subjective knowledge of a substantial risk of serious harm to a [person] and disregarded it.' " Id. (citations ommitted). "Reading *Tangreti* and ... other decisions together ... a senior prison official can still be held liable for his role in creating a policy ... but ... only if the pleadings or record evidence 'permit the inference that [he] had subjective knowledge of the risk of the ... abuse inflicted on [plaintiffs] and that [he] decided to disregard that risk.' " Id., (citing Stone #1 v. Annucci, 2021 WL 4463033, at *9 (S.D.N.Y. Sept. 28, 2021).

because a state is not a "person" under §1983. (Id.). This argument is confusing, given that a state law negligence claim is at issue here, not a Section 1983 action.

Further, citing Haywood v. Drown, 556 US 729 (2009), Plaintiff argues that the Supreme Court has declared that Corrections Law §24 is unconstitutional. (ECF No. 80 at 21). However, Plaintiff's interpretation of Haywood is incorrect. Haywood only held §24 to be unconstitutional as far as § 24 precludes inmates from pursuing § 1983 claims in state court. See, Zulu v. Wells, No. 920CV312LEKDJS, 2020 WL 6482034, at *3 (N.D.N.Y. Nov. 4, 2020)(citing Rounds v. Thompson, No. 12-CV-953, 2013 WL 3187074, at *4 (N.D.N.Y. June 20, 2013). Consequently, the application of Corrections Law §24 is constitutional in this context because it is barring a state law claim in federal court, not a federal claim in state court.

As previously discussed, New York vests correctional employees with immunity from suits for damages arising from conduct performed within the scope of their employment. See, Cole v. New York State Dep't of Corr. & Cmty. Supervision, 2016 WL 5394752, at *32 (N.D.N.Y. 2016), report and rec. adopted, 2016 WL 5374125 (N.D.N.Y. 2016)(citing N.Y. Corr. Law § 24). Nowhere in her opposition does Plaintiff allege that Annucci's alleged conduct arose outside the scope of his employment and, consequently, her negligence claim must be dismissed.

With respect to whether Plaintiff's suicide was reasonably foreseeable to Annucci and/or Sullivan, Plaintiff provides nothing more than a bald allegation that "the policies created by Annucci and Sullivan were grossly negligent." (ECF No. 80 at 22). Plaintiff fails to demonstrate how Decedent 's suicide was reasonably foreseeable based on actions or lack of actions by Annucci or Sullivan. Neither Annucci nor Sullivan ever spoke to the Decedent at any time prior to his death; never received correspondence from the Decedent while he was in DOCCS' custody; and never received and/or reviewed his medical records or mental health records. (ECF No. 71-3 at ¶ 9, ECF

No. 71-4 at ⁋ 9). Further, neither Annucci nor Sullivan personally provided the Decedent with any medical/mental health treatment, and neither were involved in any decisions related to his mental health care. (Id. at ⁋ 10). Plaintiff offers no contrary expert opinion.

For Meyers, Plaintiff argues in conclusory fashion that he "was responsible for the implementation of the grossly negligent plan" and either "did not pay attention" or "ignored the signs" that "the policy" was inadequate to address mental health needs. (Id.). Plaintiff fails to elaborate as to what "grossly negligent plan" or "policy" she is referring to and what alleged "signs" he personally ignored. Regardless, Plaintiff ignores the fact that Meyers did not meet individually with the Decedent, other than on one occasion in a supervisory capacity only. (ECF No. 71-5 at ⁋9). Meyers did not provide direct therapy to the Decedent (ECF No. 71-17 at 26) and his duties did not include patient medication management.  (ECF No. 71-5 at ⁋8). Meyers never received any letters or correspondence from the Decedent. (Id. at ⁋10). Significantly, Meyers was not required to, and he did not, monitor or review any phone calls the Decedent placed or received. (Id. at ⁋11). Consequently, he was not aware that the Decedent believed his marriage was suffering, particularly in the days leading up to his death.

Plaintiff contends that Decedent's suicide was reasonably foreseeable because he "exhibited symptoms of withdrawal" until the day of his suicide attempt and that he should have been given further treatment in anticipation of these symptoms. (ECF No. 80 at 22). Neither of these contentions are supported by the record, expert opinion or any other authority. Regardless, Plaintiff fails to establish that any of the Defendants observed any alleged symptoms of "withdrawal" or that it was reasonably foreseeable for any of the named Defendants to assume that he should have been given further treatment in anticipation of these alleged symptoms.

Finally, with respect to Palladino, she did not fail to perform suicide risk assessments as Plaintiff alleges. During each session in the six months leading up to his death, Decedent denied psychotic symptoms or wanting to harm himself. Palladino performed a suicide risk assessment at every session, and at each session, she determined there were no evidence of any warning signs of acute suicide risk.[4] (ECF No. 71-9 at 001059, 001062, 001064, 001066, 001068, 001074).

Plaintiff further argues that Palladino failed to follow OMH policy with regard to maintaining progress notes and updating the CSRA. (ECF No. 80 at 22-23). While a Risk Management review was performed after Decedent 's death, and the investigation did note some recommendations, Risk Management found that "the mental health care provided to Mr. King was adequate in terms of the treatment goals identified and risk assessments conducted. There were some issues noted with the case, as described below. It appears that these issues did not contribute directly to the outcome of this case." (ECF No. 79-17 at 00611). Furthermore, none of the alleged shortcomings that can be attributed to Palladino would have made his suicide arguably reasonably foreseeable. For example, even if we were to accept that Palladino inadvertently indicated in her progress note that Decedent was compliant with medications in July 2018, but his medications had been discontinued as of the date of that note (ECF No. 79-17 at 00612), nothing about that error would make it reasonably foreseeable to Palladino that Decedent would commit suicide. Similarly, even if Palladino had failed to update the CSRA to include his mother's death and his suboxone use in May of 2018 instead of August of 2018 as the report noted, nothing about that error would make it reasonably foreseeable to Palladino that Decedent would commit suicide.

Lastly, Plaintiff baldly states that Palladino was ignorant as to "the Suicide Watch protocol, including removing Decedent 's shoelaces." (ECF No. 80 at 23). Plaintiff provides no explanation

---

[4] The Justice Center acknowledged same. (ECF No. 79-12 at 000566).

as to what the "suicide watch" protocol was, how Palladino was ignorant, and what obligation she had to remove Decedent 's shoelaces. In fact, there *is* no specific policy regarding removal of an inmate's shoelaces, unless that inmate (1) expressed thoughts of self harm or psychotic symptoms, (2) had been evaluated by the Residential Crisis Treatment Program ("RCTP") coordinator and (3) subsequently admitted to the RCTP. (ECF No. 71-17 at 35-36; ECF No. 71-18 at 57; ECF No. 79-3 at 9). For the reasons set forth above and in Defendants' original memorandum of law, Palladino could not have "reasonably foreseen" Decedent's suicide. Plaintiff offers no expert opinion to the contrary.

## V.   PLAINTIFF'S WRONGFUL DEATH AND SURVIVAL ACTION SHOULD BE DISMISSED

As an initial matter, Plaintiff again claims that the Court does not lack jurisdiction over Annucci because Corrections Law §24 is "unconstitutional law." (ECF No. 80 at 23). As discussed above under Point IV, the application of Corrections Law § 24 is constitutional in this context, because it bars state law claims in federal court, not federal claims in state court. The state law wrongful death claim against Annucci should be dismissed. Further, for the reasons stated above under Point IV and in Defendants' original Memorandum of Law, Plaintiff has not demonstrated that it was reasonably foreseeable to Defendants that Decedent would take his life.

Next, "to defeat a motion for summary judgment in a wrongful death case, the plaintiff must offer proof of pecuniary loss," such as loss of support, voluntary assistance, or inheritance. Gazzola v. Cnty. of Nassau, 2022 WL 2274710, *14 (E.D.N.Y. 2022)(citation omitted). Summary judgment is appropriate where there is no "evidentiary basis for a reasonable expectation of pecuniary loss" on the part of the Decedent 's beneficiaries for whom the wrongful death action was commenced. Milczarski v. Catone, 2012 WL 12973221 (4th Dept. 2012). New York law is clear that "grief, loss of companionship, loss of society, affection, etc." are not

14

"pecuniary injuries" as contemplated by the statute (E.P.T.L. § 5-4.3) and "in accordance with New York law, may not be recovered in an action for wrongful death." (Id.). Here, Plaintiff has not submitted evidence of funeral expenses, medical expenses, or any other pecuniary losses. In her opposition, Plaintiff fails to offer evidence of pecuniary loss, instead speculating that had he lived, Decedent "likely" would have contributed support for his children. (ECF No. 80 at 24).

Finally, Plaintiff has failed to raise a triable issue of fact with respect to whether Decedent suffered conscious pain and suffering. Indeed, Defendants submitted evidence that as soon as Mid-State Correction Officer Smaldon heard a "loud bang" in the bathroom area, he immediately responded to the bathroom where he found Decedent unconscious. (ECF No. 71-22 at 000070-71). Decedent never regained consciousness. (Id.). Plaintiff provided nothing in response, other than the conclusory allegation that Defendants failed to carry their burden. "Without legally sufficient proof of consciousness following an accident, a claim for conscious pain and suffering must be dismissed." Kevra v. Vladagin, 96 A.D.3d 805, 806, 949 N.Y.S.2d 64, 65 (2d Dept. 2012)(citing Cummins v. County of Onondaga, 84 N.Y.2d 322, 325 (1994). "Mere conjecture, surmise, or speculation is insufficient to sustain a cause of action to recover damages for conscious pain and suffering." (Id.). See also, Haque v. Daddazio, 84 A.D.3d 940, 941 (2d Dept. 2011).

## **CONCLUSION**

For all of the foregoing reasons, the Defendants' motion pursuant to Fed. R. Civ. P 56(a) for an order granting summary judgment and dismissing Plaintiff's Amended Complaint in its entirety and with prejudice must be granted, together with such other and further relief that the Court deems just and equitable.

15

Dated: Syracuse, New York
     April 10, 2023

                          LETITIA JAMES
                          Attorney General of the State of New York
                          Attorney for Defendants
                          300 S. State Street, Ste. 300
                          Syracuse, New York 13202
                          By: _____s/_____
                          Aimee Cowan, Esq.
                          Assistant Attorney General
                          Bar Roll No. 516178
                          Telephone:      (315) 448-4800
                          Fax: (315) 448-4853
                          Email: aimee.cowan@ag.ny.gov

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on April 10, 2023, she filed Defendants' Reply Memorandum of Law by electronically filing with the Clerk of the Court herein, which is understood to have sent notification of such filing electronically to the following:

Hillary Nappi, Esq.
Hach Rose Schirripa & Cheverie, LLP
112 Madison Avenue
New York, NY 10016

Dated:          April 10, 2023

LETITIA JAMES
Attorney General of the State of New York
Attorney for Defendants
300 S. State Street, Ste. 300
Syracuse, New York 13202
By: _____/s_____
Aimee Cowan, Esq.
Assistant Attorney General
Bar Roll No. 516178
Telephone:     (315) 448-4800
Fax:  (315) 448-4853
Email: aimee.cowan@ag.ny.gov