**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**THE ESTATE OF JOSEPH P. KING, by and through**
**its Administratrix, Amy King, and Amy King in her**
**own right,**

                         **Plaintiff,**

   **vs.**                                                      **9:20cv1413**
                                                                **(TJM/ML)**


**ANTHONY J. ANNUCCI, Acting Commissioner, State**
**of New York Department of Corrections, in his**
**individual capacity; MARIE T. SULLIVAN, Commissioner,**
**New York Department of Mental Health, in her individual**
**capacity; JAMI PALLADINO, Mid-State Social Worker, in**
**her individual capacity; and HAL MEYERS, Mid-State**
**Mental Health Counselor, in his individual capacity,**

                         **Defendants.**
_____

**Thomas J. McAvoy,**
**Sr. U.S. District Judge**

### DECISION & ORDER

Before the Court is Defendants' motion for summary judgment.  <u>See</u> dkt. # 71.  The

parties have briefed the issues, and the Court will decide the matter without oral argument.

## I.     BACKGROUND

This case concerns the death by suicide of Joseph P. King on November 16, 2018.

At the time of his death, Joseph King was an inmate at Mid-State Correctional Facility, an

institution operated by the New York State Department of Corrections and Community

Supervision ("DOCCS").  Plaintiff Amy King, who is the Administratrix of Joseph King's

1

estate, alleges that Defendants, various New York state officials violated Joseph King's rights by failing to act to prevent his suicide.

Joseph King was arrested on January 2, 2012 and later convicted of arson. Defendants' Statement of Material Facts ("Defendants' Statement"), dkt. # 71-1, at ¶ 4.[1] King agreed to a plea deal that sentenced him to between four to twelve years in prison. Id. at ¶ 5.  King's son was thirteen and his daughter eighteen at that time.  Id. at ¶ 6.

King spent fourteen months in the Essex County Jail.  Id. at ¶ 7.  He transferred to DOCCS custody in August 2013.  Id. at ¶ 8.  King attempted suicide while in prison on July 11, 2016.  Id. at ¶ 9.  On that date, King was placed in the Residential Crisis Treatment Program ("RCTP") at Mid-State Correctional Facility ("Mid-State").  Id. at ¶ 10.

Amy King testified that Joseph King told her multiple times after his July 2016 suicide attempt that he would never again attempt suicide.  Id. at ¶ 11.  Defendants contend that Defendant did not make another attempt to take his life until November 16, 2018.  Id. at 12.  Plaintiff admits that the testimony cited by Defendants does not show any other suicide attempts.  Plaintiff's Response to Defendants' Statement of Material Facts ("Plaintiff's Response"), dkt. # 77, at ¶ 12.

DOCCS operates Mid-State.  Defendants' Statement at ¶ 13.  Central New York Psychiatric Center ("CNYPC") staff provides mental health services to incarcerated persons at Mid-State.  Id. at ¶ 14.  Defendant Jami Palladino, a licensed clinical social worker, is employed by the New York State Office of Mental Health ("OMH").  Id. at ¶ 15.

---

[1]The parties filed the statements of material facts about which they claim no dispute exists and the responses required by the local rules.  The Court will cite to the Defendants' statement for facts which are undisputed and cite to the other filings to address facts the parties claim are in dispute.

Palladino worked as general population therapist and had a caseload of approximately 150-180 inmates in 2018.  Id. at ¶¶ 16-17.  Defendant Harold Meyers, the Unit Chief, supervised Palladino.  Id. at ¶ 18.

Palladino began to provide Joseph King therapy in 2013.  Id. at ¶ 19.  Mid-State policy provides that an inmate "open to mental health services will be seen by their therapist" at least once every thirty days.  Id. at ¶ 20. An inmate could be seen more than once a month "in an emergency situation."  Id. at ¶ 21.  Palladino met Joseph King approximately once a month "to provide supportive counseling and verbal therapy."  Id. at ¶ 22.

Inmates at Mid-State must visit their prescriber/psychiatrist at least every three months.  Id.  ¶ 23.  Li-Wen Lee, M.D., Associate Commissioner for OMH, testified that flexibility exists for additional sessions during that three-month period, "left to clinical judgment."  Id. at ¶ 24.  An incarcerated individual who wrote asking to be seen by their therapist more often than once every thirty days would be seen within two weeks.  Id. at ¶ 25.

An incarcerated individual who expressed thoughts of self-harm or showed psychotic symptoms would be brought to the crisis unit immediately.  Id. at ¶ 26.  An inmate transferring to Mid-State would have a suicide risk evaluation completed within two weeks of arrival.  Id. at ¶ 27.  The suicide risk assessment is updated every two years, "or it is updated as indicated, such as when a new risk factor arose [sic]."  Id. at ¶ 28.  "A verbal suicide risk assessment is performed on an incarcerated individual at every session and the risk assessment is updated accordingly."  Id. at ¶ 29.

Joseph King received mental health treatment at Mid-State in the six months before

his death.  Id. at ¶ 30.  During that period, King met with Palladino on May 14, 2018, June 25, 2018, July 23, 2018, August 27, 2018, September 27, 2018, and November 2, 2018. Id. at ¶ 31.

Karen Thomas, MD, evaluated Joseph King on May 14, 2018.  Id. at ¶ 32.  Thomas diagnosed King with "adjustment disorder with mixed anxiety and depressed mood."  Id. at ¶ 33.  Plaintiff agrees that Thomas offered this diagnosis but disputes "the truth of this statement for any period of time other than [the] time referenced by the citation."  Plaintiff's Response at ¶ 33.  King denied suicidal ideation during a suicide assessment at the session.  Defendants' Statement at ¶ 34.  Plaintiff admits that the record reflects this finding, but denies the truth of the statement "for any period of time other than the time referenced by the citation."  Plaintiff's Response at ¶ 34.  King received a prescription of Celexa for depression and Vistaril for anxiety.  Defendants' Statement at ¶ 35.  Plaintiff again denies the truth of this statement for periods other than the date stated in the record.  Plaintiff's Response at ¶ 35.

King also received therapy from Palladino on May 14, 2018.  Defendants' Statement at ¶ 36.  King denied any psychotic symptoms or a desire to harm himself.  Id. at ¶ 37.  Palladino did not find any evidence of warning signs or an acute suicide risk.  Id. at ¶ 38.  Plaintiff denies this statement "for any period of time other than time referenced by the citation."  Plaintiff's Response at ¶ 38.

Dr. Thomas saw decedent for an evaluation on June 25, 2018.  Defendants' Statement at ¶ 39.  Dr. Thomas's progress note indicates that decedent had received a misbehavior ticket for "taking suboxone."  Id. at ¶ 40.  King did not have a prescription for suboxone.  Id. at ¶ 41.  King admitted to Dr. Thomas that he had used suboxone "a few

4

times" since he had last seen her on May 14, 2018.  Id. at ¶ 42.  A suicide assessment performed at that time revealed no warning signs.  Id. at ¶ 43.  Plaintiff admits that the assessment performed at that time did not show any warning signs, but denies the truth of the statement "for any period of time other than time referenced by the citation."  Plaintiff's Response at ¶ 43.  Dr. Thomas discussed King's suboxone use with him.  Id. at ¶ 44.  Thomas also decided that Plaintiff should "taper off and discontinue the Celexa and Vistaril" King has been taking as King "did not find the medication to be effective." Defendants' Statement at ¶ 45.

Palladino also met with King on June 25, 2018.  Id. at ¶ 46.  King denied that he was "experiencing thoughts of self harm or psychotic symptoms."  Id. at ¶ 47.  He also admitted to recent suboxone use and to receiving disciplinary tickets for that conduct.  Id. at ¶ 48.  When Palladino asked King if his mother's recent death "was a trigger for thoughts of suicide or harming himself," King responded "'No way, I'll never do that again.' Id. at ¶ 49.  Palladino's notes, like Thomas's note, "indicates that" King "will taper the use of his medications and would be seen in one month by the prescriber to follow up" on King's progress "and whether medication was clinically indicated."  Id. at ¶ 50.  Palladino concluded that "there was no evidence of any warning signs of suicide risk."  Id. at ¶ 51.

Dr. Thomas saw King again on July 23, 2018.  Id. at ¶ 52.  King told Dr. Thomas that he felt depressed, but he denied any suicidal ideation.  Id. at ¶ 53.  A suicide risk assessment did not show any warning signs.  Id. at ¶ 54.  King received a prescription for Zoloft and Trazodone for depression and anxiety.  Id. at ¶ 55.  Palladino also provided therapy on July 23, 2018.  Id. at ¶ 56.  Palladino did not find any evidence or warning signs of an "acute suicide risk."  Id. at ¶ 57.

King saw Dr. Thomas again on August 27, 2018.  Id. at ¶ 58.   He admitted using suboxone 2-3 times since his last visit.  Id. at ¶ 59.  King denied any suicidal ideation and Dr. Thomas did not note any warning signs of suicide.  Id. at ¶ 60.  Dr. Thomas offered counseling on the harms of substance abuse.  Id. at ¶ 61.  King told Thomas that he understood that his medications would be stopped if his drug use continued.  Id. at ¶ 62. King's prescriptions for Zoloft and Trazodone continued.  Id. at ¶ 63.

King also saw Palladino on August 27, 2018.  Id. at ¶ 64.  He denied experiencing psychotic symptoms or having a desire to harm himself.  Id. at ¶ 65.  Palladino told King that his medication could be discontinued if King continued to use other substances.  Id. at ¶ 66.  Palladino explained that his medications would not "effectively treat him if he [was] also using other substances at the same time."  Id.  Palladino reported that she did not see any "evidence of any warning signs of suicide."  Id. at ¶ 67.  Palladino saw King again on August 28, 2018.  Id. at ¶ 68.  Palladino again reported that she saw no evidence of warning signs of acute suicide risk.  Id. at ¶ 69.

Psychiatric Nurse Practitioner Carrie Citrin saw King on October 16, 2018.  Id. at ¶ 70.  Citrin's suicide risk assessment showed no acute suicide risk.  Id. at ¶ 71.  Citrin discussed with King "the expectation that he participates in treatment."  Id. at ¶ 72.  Citrin prescribed King a "trial morning dose of Prozac."  Id. at ¶ 73.  Citrin also noted that "it 'appears at this time [patient's] primary dysfunction is his continued substance abuse.'"  Id. at ¶ 74.  King's prescription was for Prozac in the morning and Trazodone in the evening. Id. at ¶ 75.  Citrin scheduled a follow-up in 45 days, "'or otherwise clinically indicated.'"  Id. at ¶ 76.  King "was directed to be placed into group therapy to assist with skill building." Id. at ¶ 77.

6

King refused his prescribed medications on October 27, 2018 and October 31, 2018.  Id. at ¶¶ 78-79.  Palladino met with King for therapy on November 2, 2018 and noted that King had not been taking his medication."  Id. ¶ 81.  King reported that the medication "'made him feel weird.'"  Id.  Palladino reported that King continued to deny thoughts of self harm, claiming that "I'll never do THAT [attempt suicide] again.'"  Id. at ¶ 82. (emphasis in original).  King reported that he had been going to church, attending Alcoholics Anonymous, and going to the recreation yard.  Id. at ¶ 83.  King also remained in contact with his wife, children, and sister.  Id. at ¶ 84.  All reportedly "were . . . supportive of him."  Id.  King had been working and stated that he "was waiting to return to his ASAT (Alcohol and Substance Abuse Treatment) program."  Id. at ¶ 85.  Palladino recorded that: "'There is no evidence of any warning signs of acute suicide risk in patient's behavior or affect.  There are no signs of anger, anxiety, withdrawal, mood change, purposelessness, hopelessness, recklessness or feelings of being trapped.'"  Id. at ¶ 86.  Palladino stated that "'Patient's risk for suicide will be assessed on an ongoing basis. Patient denied suicidal ideation or thoughts.'"  Id.  Palladino further reported that King "did not express any potential suicide indicators to her."  Id. at ¶ 87.

King again refused his prescribed medications on November 5, 2018, and his prescriber discontinued his Prozac and Trazodone prescriptions.  Id. at ¶¶ 88-89.  Palladino's duties as a social worker "did not include medication management, such as whether to prescribe a patient medication, what medication to prescribe them or when to discontinue a medication."  Id. at ¶ 90.  Palladino did not control whether medications were prescribed or discontinued.  Id. at ¶ 91.  Palladino was not required to monitor any inmate's phone calls and she never monitored or reviewed any phone calls that King

received or placed.  Id. at ¶ 92.  Palladino did not know whether King believed his

marriage was suffering, "particularly in the days leading up to his death."  Id. at ¶ 93.  She

also was not aware of anything that King discussed with family members on the phone in

the days leading to his death.  Id. at ¶ 94.  King never discussed concerns about his

marriage during therapy sessions.  Id. at ¶ 95.  Palladino did not know of any belief by

King that his wife was romantically linked with another man or sleeping with someone else.

Id. at ¶¶ 96-97.

During their therapy sessions, Palladino tried to introduce King to alternative

methods of coping, such a deep breathing, grounding techniques, and worksheets.  Id. at

¶¶ 98-100.  The parties disagree about whether Palladino was aware of any increases in

anxiety and depression on King's part.  Compare Defendants' Statement at ¶ 101 and

Plaintiff's Response at ¶ 101.

Palladino testified that if an inmate reported thoughts of self-harm to her or made

threats of such conduct, should would report to administration and the individual would be

placed in a crisis unit.  Id. at ¶ 102.  King told Palladino after his 2016 suicide attempt that

he would never attempt such action again.  Id. at ¶ 103.  Palladino testified that she had

no concerns about King harming himself in the weeks before his death.  Id. at ¶ 104.  She

further testified that she could not have done anything differently to prevent King's death.

Id. at ¶ 107.

Defendant Harold Meyers is a licensed master social worker who serves as Unit

Chief at Mid-State.  Id. at ¶ 109.  His duties as Unit Chief included "overseeing the day-to-

day operations of Mid-State from an administrative vantage point."  Id. at ¶ 110.  Those

duties did not include "clinical determinations."  Id. at ¶ 111.  Meyers supervised

approximately 28 OMH employees.  Id. at ¶ 112.  Some of those employees "managed a caseload of incarcerated individuals who were receiving mental health services."  Id.  The mental-health caseload sometimes included more than 800 inmates.  Id. at ¶ 113.  Meyers met with King only once, together with Palladino.  Id. at ¶ 114.  Meyers appeared "in a supervisory capacity only."  Id.  Meyers did not provide any direct therapy to King.  Id. at ¶ 115.  Plaintiff denies that Meyers never received any letters or correspondence from King, but offers no record citation to support this denial.  Plaintiff's Response at ¶ 116.  Plaintiff agrees, however, that Meyers had no obligation to monitor inmate phone calls and never monitored or reviewed any phone calls involving King.  See Defendants' Statement at ¶ 117, Plaintiff's Response at ¶ 117.  Meyers was not aware of King's concerns about the state of his marriage or the contents of phone calls with King's family members in the days before King's death.  Id. at ¶¶ 118-19.  Meyers testified that he was not aware of any failures to follow policies or procedures that contributed to King's death.  Id. at ¶ 120.

Plaintiff Amy King testified that she and her daughter visited Joseph King the weekend before he died.  Id. at ¶ 131.  Joseph King did not indicate that he wanted to hurt himself or attempt suicide.  Id.  Their son testified that he had visited his father "'a few weekends'" before he died.  Id. at ¶ 132.  Joseph King did not indicate that he wanted to harm himself.  Id.

Amy King further testified that she spoke to Joseph King the day before he died.  Id. at ¶ 133.  She told him that "she was talking to another man."  Id.  She knew that Joseph King was concerned that she "was talking to and spending time with another man."  Id. at 134.  Joseph King spoke with his son and daughter on November 14, 2018.  Id. at ¶ 135.  King told his daughter that Amy King "was leaving him."  Id. at ¶ 136.  King further

stated that "he [was] 'not going to make it through the night[.]'"  Id. at ¶ 137.  King's daughter "threatened to relay his statement to [Plaintiff Amy King] and that [she] would call his counselor."  Id.  King told his daughter not to tell her mother what he had said.  Id. at ¶ 138.  King spoke with his daughter again about a half-hour later.  Id. at ¶ 139.  King told his daughter that he did not want to live anymore, and his daughter threatened to tell Amy King "to 'call that building.'"  Id. at ¶ 140.  King further stated that I could not "'take this anymore . . . I am going fucking away . . . I don't know what I'm going to do.'"  Id. at ¶ 141.  His daughter told King to "'go to that building.'"  Id. at ¶ 142.  King again "directed her not to tell" her mother.  Id.

King called his family approximately 15 times on November 15, 2018, the day before his death.  Id. at ¶ 143.  Those conversations concerned King's suspicions that his wife intended to leave him, and the despair he felt at that prospect.  Id. at ¶¶ 144-48.  King told his daughter that "'this is driving me crazy . . . I can't do it anymore, this is killing me, it's all I think about all day long.'"  Id. at ¶ 148.  Joseph and Amy King spoke several times about their marriage on that day.  Id. at ¶¶ 149-157.  Joseph King expressed concern that Amy King was planning to leave him and that their marriage was over.  Id. at ¶¶ 151-53.  When the two spoke at 10:30 p.m. on November 15, 2018, Joseph King asked Amy King if she wanted him to stop calling her.  Id. at ¶ 156.  She replied "'[i]f you're going to do this.'"  Id.  Joseph King then accused Amy King of not wanting to speak to him anymore.  Id. at ¶ 157.  He stated, "'I wish you would just tell me not to call anymore.'"  Id.

After Joseph King's death, DOCCS staff found a letter in his living area addressed to his wife.  Id. at ¶ 167.  The letter stated in part:

I just got off the phone with you.  And you get so aggravated with me.  I really think

10

> you want to end our relationship.  I don't want to hurt you or the kids, but I really don't think I'll make it through the night.  I feel it's time [to] say goodbye.  I hope your [sic] happy to do what you want now that I'm out of your life. [B]ecause I know you really don't want me anymore.  And I can't live with myself . . . I am so sad, unhappy and you are breaking my heart.  I just can't do this anymore.  I'm sorry.  I love you! . . . tell Megan and Joseph I love them and I'm sorry.

Id. at ¶ 168.

Plaintiff cites to additional material facts relevant to the action.  See Plaintiff's Statement of Additional Material Facts ("Plaintiff's Statement"), dkt. # 78.  Joseph King was Palladino's patient at Midstate.  Id. at ¶ 16.  She "managed a caseload of people . . open to mental health services, provid[ing] monthly therapy" in 2018.  Id. at ¶ 19.  That caseload consisted of 150-180 patients.  Id. at ¶ 25.  OMH records reveal that Palladino saw King once in November as part of their regular therapy session.  Id. at ¶ 17. Defendants point out that the notes reveal that during the therapy session Joseph King told Palladino that "I'll never do THAT [attempt suicide] again."  Defendants' Response to Plaintiff's State of Additional Material Facts ("Defendants' Response"), dkt. # 83, at ¶ 17. Palladino noted that King "had been refusing medication, stating that it made him 'feel weird.'" Id.  She found that "[t]here is no evidence of any warning signs of acute suicide risk in patient's behavior or affect.  There were no signs of anger, anxiety, withdrawal, mood change, purposelessness, hopelessness, recklessness or feelings of being trapped. Patient's risk for suicide will be assessed on an ongoing basis." Id.  Palladino was also aware that King was using suboxone; he told her about his use.  Plaintiff's Statement at ¶ 20.  Defendants point out that King also told Palladino during therapy sessions that he was not using suboxone.  Defendants' Response at ¶ 20.  Palladino also was aware that at times King's medications were discontinued.  Plaintiff's Statement at ¶ 21.

11

King wrote Palladino letters during the time that Palladino treated him.  Id. at ¶ 22.
Defendants point out that Palladino testified that King had written between 5 and 10 letters
to Palladino during the five years that he was her patient.  Defendants' Response at ¶ 22.
King's letters expressed his concerns about the symptoms he was experiencing and
requests to be seen by the doctor sooner than scheduled.  Plaintiff's Statement at ¶ 23.
Defendants contend that Palladino testified that King's letters concerning discontinuing his
medication discuss an occasion prior to the time his medications were discontinued shortly
before his death.  Defendants' Response at ¶ 23.  Palladino testified that "protocol" upon
receipt of such a letter from an inmate was "to see the patient within two weeks of
receiving a letter, discuss what the concerns are, and bring it to the prescriber's attention."
Palladino Deposition, dkt. # 71-18, at 22.  She testified that she reported those concerns
to the prescriber and set up sessions to discuss the letters that King sent.  Id.  Palladino
testified that she received letters from Joseph King "[e]xpressing his concerns about the
symptoms he's experiencing and requesting to be seen by the doctor earlier or in
response to his concerns.  Id. at 22-23.  In response, Palladino "[c]onferred with the doctor
to make sure to see if the doctor had addressed it."  Id. 23.  She did not "follow up,"
however, to see whether the appointments had actually been scheduled.  Id.

Palladino testified that she had been trained about reporting when an inmate
speaks to her about suicide.  Plaintiff's Statement at ¶ 27.  This training came in part by
reading suicide prevention policies established by the prison.  Id. at ¶ 28.  Palladino
testified that, if an inmate reported a desire to commit suicide, her training dictated that
she make a call to place the inmate in the crisis unit.  Id. at ¶ 29.

At her deposition, Plaintiff's counsel asked Palladino to describe what she

12

considered a "suicide risk factor."  Palladino Dep. at 50.  Palladino replied "[s]uicide

history, family history, substance abuse, mental health hospital–history or mental health

hospitalizations, adverse outcome to a parole board, or if anybody got tickets."  Id. at 50-

51.  King, she testified, had "presented" with some of those issues in the year before his

death.  Id. at 51.

Clinicians at the Central New York Psychiatric Center ("CNYCP") perform a

Comprehensive Suicide Risk Assessment "to ensure inmate patient safety and timely

interventions to maximize inmate-patient outcomes" pursuant to CNYCP's policies.

Plaintiff's Statement at ¶ 31; Defendants' Response at ¶ 31.  The Comprehensive Suicide

Risk Assessment Process policy provides that "[r]esults and recommendations form the

suicide risk assessment" be "taken into consideration [when] developing and updating the

treatment plan and in making the decision . . . whether to admit [an inmate] to a higher

level of care."  Plaintiff's Statement at ¶ 32; Defendants' Response at ¶ 32.  Suicide risk

assessment begins with an initial screening and continues in an on-going fashion from

admission to discharge.  Plaintiff's Statement at ¶ 33.  The inmate's Treatment Plan uses

information from the suicide risk assessment to develop a "recommendation/plan for

addressing suicide risk," and documents treatment recommendations related to suicide

risk.  Id. at ¶ 34.  Policies provide that inmates who present with a suicide risk should have

this problem "listed and incorporated into the Treatment Plan[.]"  Id. at ¶ 35.  These

policies further directed that the suicide risk assessment be reviewed whenever an

inmate's treatment plan is reviewed.  Id. at ¶ 36.

Policies also provide that DOCCS and OHM staff are to use a suicide watch to

protect the safety of an inmate who threatens suicide or exhibits suicidal behavior.  Id. at ¶

37.  A suicide watch amounts to "the constant observation of an inmate-patient believed to be at risk of suicide."  Id. at ¶ 38.  A Correction Officer should never observe more than two inmates on suicide watch.  Id.  Plaintiff claims that the policy does not "define what constitutes exhibiting suicid[al] behavior.  Id. at ¶ 39.  The policy states than "'[a]n inmate-patient will be placed on a suicide watch by designated OMH or DOCCS staff, if they engage in behavior which is imminently dangerous to him/herself, or if they threaten either explicitly or implicitly to engage in such behavior.'" Id. at 40.  The Comprehensive Suicide Risk Assessment Policy at CNYPC contains systems and mnemonics to help identify inmates who represent a risk of suicide and factors related to such risks.  Id. at ¶¶ 41-44.  The Policy also "requires progress notes be made to indicate that the primary therapist, psychiatrist or nurse practitioner address the suicide risk."  Id. at ¶ 45.  While the policies address clothing for inmates on suicide watch, no specific policy addresses shoelaces.  Id. at ¶ 46.

The record contains evidence that King consistently reported during counseling sessions that he felt depressed and anxious, but that the treatment notes did not record observing any systems of depression or anxiety.  Id. at ¶ 47.  The clinical record also indicated that King was using suboxone "periodically from May 2018 until September 2018."  Id. at ¶ 48.  At the same time, King was taking prescribed psychiatric medication for depression and anxiety.  Id. at ¶ 49.  His psychiatric and clinical team provided education and expressed concern about the difficulty of treating and addressing King's complaints about his prescribed medication when he continued to use suboxone.  Id. at ¶ 50.  King "consistently" sought changes to his medications because he found the medications prescribed him were not effective.  Id. at ¶ 51.

14

Palladino's therapy notes from June through November 2018 consistently report that there were "'[n]o warning signs present'" for suicide, even though the progress notes also report "symptoms of depression, anxiety, sleep difficulties, recent hospital visit (June–medically related), and substance abuse." Id. at ¶ 52.  Plaintiff points out that the form should have contained notations that specific warning signs and triggers of suicide existed in the progress notes. Id. at ¶¶ 53-60.  Every progress note from May until November, Plaintiff asserts, should have pointed to the recent loss of King's mother and his suboxone abuse. Id. at ¶ 55.  The June, July, and August reports assess suicide risk and note that "no warning signs" were present. Id. at ¶ 56.  They fail to mention increased substance use, continued and increased depression and anxiety, sleeping difficulties, and the loss of King's mother in May 2018. Id.  These changes should have been part of an updated Comprehensive Suicide Risk Assessment in May 2018, but no such updated Assessment appeared until August 27, 2018. Id. at ¶ 57.  That August 27, 2018 assessment had "substance abuse/dependence history" checked on the front of the form, but the narrative did not address recent use of suboxone. Id. at ¶ 58.  The narrative portion of the Assessment also did not mention the loss of King's mother or his strained marital relationship, even though the primary therapist notes contain such information. Id. at ¶ 59.  The note also errs in stating King's mother died in June 2018; she died in May 2018. Id. at ¶ 60.

Plaintiff points to two additional documents.  The first, a report from the Justice Center for the Protection of People with Special Needs, provides a "Mental Health Service Review" for Joseph King.  See dkt. # 79-12 ("Justice Center Report").  After reviewing "documentation related to the care provided by" CNYPC and DOCCS to King in the six

months prior to his death, the Justice Center concluded that "the Office of Mental Health (OMH) failed to recognize the suicide risk factors and warning signs displayed by Mr. King."  Id. at 1.  The report details King's complaints of depression and anxiety, difficulty sleeping, complaints about psychiatric medication, and use of illicit drugs while in prison. Id. at 1-3.  The Justice Center found that King "had extensive changes to his medication regimen in the five months prior to his suicide."  Id. at 3.  Ten days before he died "Physician's Orders indicate that on November 6, 2018, his medications were discontinued . . . without Mr. King being assessed by psychiatric staff."  Id. at 3.  The Center also found that "OMH failed to recognize the suicide risk factors and warning signs displayed by Mr. King prior to his suicide" and did not provide "additional support" when his symptoms seemed to get worse.  Id.  The Report notes that, while King denied any suicidal ideation in the six months before he died, "he repeatedly reported to mental health staff during his callouts that he was depressed, anxious, worried, not sleeping, had decreased motivation and was concerned about his upcoming parole board" meeting.  Id. at 4.  His suicide assessment "indicated he had 21 chronic/acute risk factors which included substance use 'an identifiable trigger for increased suicide risk.'"  Id.  Further, "King reported experiencing no energy or motivation" during the three months prior to his death, and having difficulty sleeping.  Id.  Though he sought adjustments to his medication, but mental health staff refused any changes to his medication until he tried "alternative coping skills."  Id.  King had quit attending AA and NA meetings and stopped attending religious services.  Id.  In the two weeks before his death, King still expressed frustration about feeling edgy and worried and the effectiveness of his medications, though he had started attending church and AA meetings.  Id.

16

The Justice Center recommended that "the OMH Clinical Director or Regional Psychiatrist should complete a comprehensive review of the mental health treatment afforded to Mr. King in the six months leading up to his death and provide the Justice Center with any documentation demonstrating his course of care was reviewed and evaluated to ensure the appropriateness of: a. the psychiatric medication administration practices and; b. the Clinical care provided to an individual with a history of suicide attempts, substance use and chronic/acute suicide risk factor and warning signs."

Plaintiff also offers the minutes of the DOCCS's Morbidity and Morality Review Committee Meeting. See dkt. # 79-13. The report again detailed King's mental treatment history, noting his previous suicide attempt and his reports and complaints to clinicians.[2] Id. at 1-2. The Meetings then offer a series of "discussions/recommendations." Id. at 2-3. The Committee recommended that, "[i]f patients are displaying an increase in symptoms," they should be seen more often for care. Id. at 2. If the treatment team receives information from a patient's family "that the patient is engaged in odd behavior," the treatment team should perform more "follow-ups." Id. The Committee also recommended that a clinician sitting in on a session not part of

---

[2]The report finds:

There were many predisposing risk factors for Mr. King's suicide. He had a documented history of mental health treatment both in the community and in his incarceration. Mr. King had an extensive substances abuse history and was continuing to use illicit substances while in prison. He also had one serious suicide attempt while incarcerated following withdrawal from substances. Mr. King was facing marital discord, the death of his mother, various medication changes, and concerns about having to remain in prison for another 2 years with his upcoming parole board.

Minutes at 2.

17

the monthly sessions normal for inmates, should "write a full monthly progress note to be

compliant with policy versus just saying that he or she was present for the" meeting.  Id.

The Committee further found that "[t]hough patients can be designated" to receive specific

care "due to recent suicide attempts, King's diagnosis of Adjustment Order, which

persisted for more than six months, should have led to his status being "revisited."  Id.

"[B]ased upon findings of recent psych autopsies," the Committee recommended that staff

"retrieve telephone records/transcripts as they can play a direct role in suicide."  Id.

Taking this step would require "additional collaboration from DOCCS," especially when the

suicide occurs within 24 hours of the phone conversation.  Id.  The Committee also

recommended clarifying with family members "how to contact staff to express concerns of

unusual or dangerous behavior," putting up "new suicide prevention posters" in housing

units, and "[e]nsuring increased communication between" the Morbidity and Morality

Review Committee and the Incident Review Committee."  Id. at 3.

Plaintiff filed a Complaint in this Court on November 16, 2020.  See dkt. # 1.

Plaintiff filed an Amended Complaint on June 21, 2021.  See dkt. # 50.  The Amended

Complaint names as Defendants Anthony Annucci, Acting Department of Corrections

Commissioner, Marie T. Sullivan, MD, Commissioner of the New York State Department

of Mental Health, Palladino, and Meyers.  Count 1, brought pursuant to 42 U.S.C. § 1983,

alleges that Defendants violated Joseph King's Eighth Amendment right to be free of cruel

and unusual punishment by deliberately failing to provide him with mental health

treatment, conduct that led to King's death.  Count 2 alleges that Annucci and Sullivan are

liable for failing to train employees to avoid violating King's Eighth Amendment rights and

instituting policies that violated those rights.  Count 3 alleges that Defendants Palladino

and Meyers violated King's right under the New York Constitution and the New York Civil Rights Act.  Count 4 alleges negligence against all the Defendants.  Count 5 is a wrongful death claim against all Defendants, and Count 6 is a survival claim against all Defendants.

The parties engaged in discovery after service of the Amended Complaint.  At the end of the discovery period, Defendants filed the motion presently before the Court.  The parties then briefed the issues, and the matter is ripe for disposition.

## II.    LEGAL STANDARD

The Defendants seek summary judgment.  It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, see Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a).  An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the movant is able to establish a *prima facie* basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor.  Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  A party opposing a properly

supported motion for summary judgment may not rest upon "mere allegations or denials"

asserted in his pleadings, Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d

Cir. 1994), or on conclusory allegations or unsubstantiated speculation. Scotto v.

Almenas, 143 F.3d 105, 114 (2d Cir. 1998).

## III.    ANALYSIS

Defendants seek summary judgment on each of Plaintiff's claims in the Amended

Complaint, which the Court will address in turn.

### A.    Eighth Amendment Deliberate Indifference Claim

Defendants first argue that Plaintiff's Eighth Amendment deliberate indifference

claim, brought against all Defendants, should be dismissed.  Defendants contend that

Plaintiff has failed to produce evidence that any of the Defendants acted with deliberate

indifference to a serious medical need.  While Defendants admit that the risk of suicide

represents a serious medical need, they contend that their conduct in this case does not

represent deliberate indifference. With reference to Defendants Annucci, Sullivan, and

Meyers, Defendants argue that no evidence indicates that those Defendants had any

direct involvement in treating Joseph King, and Plaintiff therefore cannot demonstrate any

deliberate indifference on their part.  In terms of Defendant Palladino, Defendants contend

that no evidence supports a finding that she was aware of and ignored a substantial risk of

suicide, and no reasonable juror could therefore find that she acted with the requisite

deliberate indifference.

"The Eighth Amendment prohibition of the infliction of 'cruel and unusual

punishments,' extends to punishments that involve the 'unnecessary and wanton infliction of pain.'" Hill v. Curcione, 657 F.3d 116, 122 (2d Cir. 2011) (quoting Gregg v. Georgia, 428 U.S. 153, 173 (1976) (internal citation omitted)).  Such a claim "arising out of medical care requires a demonstration of 'deliberate indifference to [a prisoner's] serious medical needs.'" Id. (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)).  A plaintiff alleging deliberate indifference must demonstrate both "a subjective component and an objective component."  Id.  "The objective component requires that 'the alleged deprivation . . . be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists.'" Id. (quoting Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996)).  "Subjectively, the official charged with deliberate indifference must act with a 'sufficiently culpable state fo mind.'" Id. (quoting Wilson v. Seiter, 501 U.S. 295, 298 (1991)).  To meet that standard, "the official must 'know [] of and disregard[] an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference.'" Id. (quoting Farmer v. Brennan, 511 U.S. 825, 837, (1994) (alterations in original)).

"In the context of an inmate's risk of suicide, the subjective [element] of the deliberate indifference standard requires 'a dual showing that the defendant: [1] subjectively knew the prisoner was at substantial risk of committing suicide; and [2] intentionally disregarded that risk.'" McTerrell v. Koenigsmann, No. 18cv1028, 2021 U.S. Dist. LEXIS 156334, at *19-20 (W.D.N.Y. Aug. 19, 2021) (quoting Phillips v. Mitchell, No. 19cv383, 2021 U.S. Dist. LEXIS 58834, 2021 WL 1175051, at *4 (N.D.N.Y. Mar. 29, 2021)).  In this setting, "'deliberate indifference may exist pursuant to one of two broad fact

21

scenarios.'" Randolph v. Kalies, No. 19cv383, 2021 U.S. Dist. LEXIS 11322 at *12 (N.D.N.Y. Jan. 19, 2021) (quoting Kelsey v. City of New York, No. 03-CV-5978, 2006 U.S. Dist. LEXIS 91977, at *5 (E.D.N.Y. Dec. 18, 2006)).  In that sense, a "defendant 'could be deliberately indifferent to the risk of suicide by failing to discover an individual's suicidal tendencies[,]'" or defendants "'could have discovered and have been aware of the suicidal tendencies, but could be deliberately indifferent in the manner by which they respond to the recognized risk of suicide.'" Id. (quoting Kelsey, 2006 U.S. Dist. LEXIS 91977 at *5).

The parties here disagree about the standard used to determine whether supervisors can be liable for violating an inmate's Eighth Amendment rights.  At one point, courts in this Circuit applied a test for supervisory liability that did not require direct involvement in the constitutional violation by the supervisor, though courts concluded that "liability for supervisory government officials cannot be premised on a theory of *respondeat superior* because § 1983 requires individual, personalized liability on the part of each government defendant."  Raspardo v. Carlone, 770 F.3d 97, 116 (2d Cir. 2014). For this reason, a plaintiff had to introduce "[e]vidence of a supervisory official's 'personal involvement' in the challenged conduct."  Hayut v. State Univ. of N.Y., 352 F.3d 733, 753 (2d Cir. 2003) (quoting Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 254 (2d Cir. 2001)).  Personal involvement could include "direct participation by the supervisor in the challenged conduct."  Id.  Personal involvement by a supervisor can "also be established by evidence of an official's (1) failure to take correct action after learning of a subordinate's unlawful conduct, (2) creation of a policy or custom fostering the unlawful conduct, (3) gross negligence in supervising subordinates who commit unlawful acts, or (4) deliberate indifference to the rights of others by failing to act on information regarding

the unlawful conduct of subordinates." Id.

That test no longer applies in this Circuit.  Instead, "there is no special rule for supervisory liability" in Section 1983 cases.  Tangreti v. Bachman, 983 F.3d 609, 618 (2d Cir. 2020).  A plaintiff has to "plead and prove 'that each Government official defendant, through the official's own actions, has violated the Constitution.'"  Id.  (quoting Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009)).  "'The factors necessary to establish a [§1983] violation will vary with the constitutional provision at issue.'"  Id.  (quoting Iqbal, 556 U.S. at 676.  "In the context of the Eighth Amendment, that requires a showing of deliberate indifference on the part of the state official[.]" Id. at 620 (2d Cir. 2020).  "[F]or deliberate-indifference claims under the Eighth Amendment against a prison supervisor, the plaintiff must plead and prove that the supervisor had subjective knowledge of a substantial risk of serious harm to an inmate and disregarded it."  Id. at 616.  After Tangreti, a failure to train claim cannot be premised simply on the existence of inadequate training or policies established under the supervision of an individual defendant.  Instead, a plaintiff must point to "facts showing that each supervisor was aware that his or her actions would cause a substantial risk of harm and then disregarded that risk."  Crispin v. Peiri, No. 3:21-cv-475, 2023 U.S. Dist. LEXIS 64811 at * 22 (Dist. Conn. April 13, 2023).  "Absent such allegations, the failure to supervise subordinates does not state a cognizable claim for supervisory liability."  Id.

The parties do not appear to dispute that King's mental state represented a serious medical condition.  They disagree about whether the Defendants displayed deliberate indifference to that condition.  Defendants argue that no evidence in this case supports any finding that Defendants Annucci, Sullivan, and Meyer had subjective knowledge of a

23

substantial risk of serious harm and failed to act.  Plaintiff does not argue that any such

evidence exists, but instead argues that those Defendants can be liable under the

standard articulated before Tangreti.[3]  The Court finds that the evidence in this case

indicates that none of these Defendants had any knowledge of Joseph King's particular

circumstances and the likelihood that he would commit suicide.  The evidence is clear that

Annucci and Sullivan had no particular knowledge of any danger that Joseph King would

commit suicide, and that they played no role in his mental-health treatment.  They cannot

be liable under the circumstances for deliberate indifference to a risk about which they

were completely unaware and for treatment in which they played no direct role.

In terms of Meyers, the evidence related above indicates that Meyers met with King

only once, together with Palladino.  Defendants' Statement at ¶ 114.  Meyers appeared "in

---

[3]Plaintiff relies on the standard for supervisory liability laid out by the Second Circuit in cases like Grullon v. City of New Haven, 720 F.3d 133, 139 (2d Cir. 2013).  Those cases hold that supervisory liability under Section 1983 can be

> shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [the plaintiffs] by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).  The Court of Appeals rejected this test for supervisory liability in Tangreti: "We [hold that] after Iqbal, there is no special rule for supervisory liability.  Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" Tangreti, 983 F.3d at 618 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009)).  A "violation must be established against the supervisory official directly."  Id. Plaintiff is incorrect that she could prevail if she proved that "policies set by Annucci and Sullivan resulted in deliberate indifference to King's medical needs."

a supervisory capacity only." Id.  Meyers did not provide any direct therapy to King.  Id. at ¶ 115.  Plaintiff denies that Meyers never received any letters or correspondence from King, but offers no record citation to support this denial.  Plaintiff's Response at ¶ 116.  Plaintiff agrees, however, that Meyers had no obligation to monitor inmate phone calls and never monitored or reviewed any phone calls involving King.  See Defendants' Statement at ¶ 117, Plaintiff's Response at ¶ 117.  Meyers was not aware of King's concerns about the state of his marriage or the contents of phone calls with King's family members in the days before King's death.  Id. at ¶¶ 118-19.  Meyers testified that he was not aware of any failures to follow policies or procedures that contributed to King's death.  Id. at ¶ 120.  None of this evidence indicates that Meyers "had subjective knowledge of a substantial risk of serious harm to an inmate and disregarded it."  Tangreti, 984 F.3d at 616.  The Court will grant the motion in this respect as well.

    As to Palladino, the evidence indicates that she provided direct treatment to King for five years.  Palladino was aware of King's 2016 suicide attempt.  Defendants point out that Palladino and the psychiatric professionals who evaluated King in the months before his death did not report any warning signs of acute suicide risk.  Those professionals, Defendants point out, performed multiple suicide evaluations and never found an elevated risk.  King repeatedly denied any intent or desire to die by suicide.  While Palladino was aware of changes in medication, she was not aware of King's sense that his marriage was failing or his conversations with his family.  She met with King monthly and, like other health professionals, never reported any evidence of an acute suicide risk.  Plaintiff argues that "signs and symptoms of Mr. King's suicidality were readily apparent to the Justice Center and the Morbidity and Mortality Review Committee," organizations that investigated

King's death.[4]  Plaintiff contends that the Palladino's "treatment decisions are not easily

deciphered.  Whether it was her absurdly high case load–over 180 patients–her decisions

pertaining to Decedent's treatment in October and November 2018 do not appear

reasoned or considerate of Decedent's well being."  As such, Plaintiff contends, "the Court

cannot determine whether Defendants' decisions, and failure to appropriately chart or

assess Decedent's suicide risk or intervene despite the mounting risks, were 'the product

of sound medical judgment, negligence, or deliberate indifference.'" (quoting Chance v.

Armstrong, 143 F.3d 698, 703 (2d Cir. 1978)).

The Court finds that Plaintiff cannot demonstrate that Palladino acted with

deliberate indifference to the risk that King might commit suicide.  The evidence in this

case indicates that Palladino treated King for a considerable period of time.  During the

sessions in the relevant time period, the treatment notes indicate that Palladino assessed

King's suicide risk and found that the risk was not acute.  While Palladino was aware that

King had complaints about his medication, that he had used an illicit substance, and that

his treating psychiatrists had tried him on different medications and substituted others,

_____

[4]As explained above, these reports are part of the record provided by Plaintiff in
response to Defendants' motion.  The Court has examined them.  While the reports clearly
indicate that more could have been done to recognize that King's issues and protect him
from harm, Defendants' alleged failings in doing all they could do to discover his fragile
mental state and to protect against King harming himself are not, without more, evidence
that supports a finding of deliberate indifference.  "Because the Eighth Amendment is not
a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not
every lapse in prison medical care will rise to the level of a constitutional violation."  Smith
v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003).  "'An official acts with the requisite
deliberate indifference when that official knows of and disregards an excessive risk to
inmate health or safety,' a state of mind equivalent to the familiar standard of
'recklessness' as used in criminal law."  Id. (quoting Chance v. Armstrong, 143 F.3d 698,
702 (2d Cir. 1998) (internal citations and quotations omitted)).

nothing indicates that she concluded that these changes led to an increased likelihood

that King would attempt or complete suicide.  In addition, nothing indicates that King made

Palladino aware of the marital difficulties he felt he was experiencing.  While Palladino

was aware that King had attempted suicide in 2016, King also denied to Palladino in

strong terms that he ever intended such self-harm again.  Plaintiff has not pointed to

evidence that Palladino was subjectively aware that King was a suicide risk in 2018, which

provides a basis for dismissal of this claim.[5]  See, e.g. Fontaine v. Cornwall, 2019 U.S.

Dist. LEXIS 152907 at *16 (N.D.N.Y. Sept. 9, 2019) (Plaintiff failed to show that defendant

was deliberately indifferent to the likelihood he might attempt suicide because the

evidence showed only that "after two examinations of plaintiff, with recurring examinations

scheduled, [defendant] determined that plaintiff was largely seeking attention, and made

the express inference that plaintiff presented no risk of suicidality and presented no

evidence of an increase in that risk.").  While Plaintiff may contend that Palladino missed

warning signs of suicide before King's death, such criticism points to failings in

professional judgment, not deliberate indifference.  See, e.g., Sims v. Gorman, No.

09cv6643, 2012 U.S. Dist LEXIS 21614, at *17 (W.D.N.Y. Feb. 21, 2012) (even if the

MHU Defendants' treatment decision was erroneous, deliberate indifference cannot be

inferred because the decision was not 'such a substantial departure from accepted

professional judgment, practice, or standards as to demonstrate that the person

---

[5]Plaintiff also points to the investigations discussed above from the Justice Center and the Mortality and Morbidity Committee, which found that there were signs that mental health staff, including Palladino, missed evidence that King's mental health was deteriorating and his likelihood of harming himself increasing.  Those accounts do not demonstrate that Palladino made more than a mistake of judgment.  Such failings do not constitute deliberate indifference.

responsible did not base the decision on such judgment.'") (quoting Estate of Cole by Pardue v. Fromm, 94 F.3d 254, 262 (7th Cir. 1996); Randolph v. Kalies, No. 19cv1161, 2021 U.S. Dist. LEXIS 217924 at *14 (N.D.N.Y. Nov. 10, 2021) ("'[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.'") (quoting Farmer v. Brennan, 511 U.S. 825, 838 (1994)).

### B.   Failure to Train

Defendants next seek dismissal of Plaintiff's failure-to-train claim, raised against Annucci and Sullivan.  They argue that Tangreti forecloses such a claim because that case requires personal involvement of a defendant in the actual violation of a party's rights.  Plaintiff responds by arguing that "[f]ailure by policymakers to train or supervise subordinates to such an extent that it amounts to 'deliberate indifference' to the rights of those who come in contact with . . . municipal employees has long been established as a proper vehicle for liability."  (citing Jackson v. Onondaga County, 549 F.Supp.2d 204, 233 (N.D.N.Y. 2008).   Plaintiff does not cite to any cases decided after Tangreti.  She contends that Sullivan and Annucci were "responsible for the creation of a policy which was not only lacking in ways to recognize the identified suicide factors, but also in providing training for those individuals who were tasked with following the policy."

The Court will grant the Defendants' motion in this respect as well.  As explained above, Tangreti established that an individual defendant accused in a Section 1983 case of violating a plaintiff's civil rights must have been "aware that his or her actions would cause a substantial risk of harm and then disregarded that risk."  Crispin, 2023 U.S. Dist. LEXIS 64811 at * 22.  Plaintiff has not pointed to any evidence that indicates an

28

awareness by either Sullivan or Annucci that their conduct would cause a substantial risk

of harm to King in particular, and no evidence that they disregarded that risk.  The

evidence does not show any personal involvement by either defendant in the treatment

decisions that preceded King's death.  Whatever the merits of Plaintiff's claim under the

older standard, Plaintiff's claim must fail under the current rules.  See, e.g., Britt v. Doe,

No. 22cv692, 2022 U.S. Dist. LEXIS 199351, *19 (N.D.N.Y. Oct. 13, 2022)

(recommending that claims against county sheriff be dismissed because accusations that

the defendant "failed to adequately train, enforce training, or supervise his officers on how

to properly resolve domestic abuse incidents" do not "plausibly suggest the personal

involvement of" the defendant); Powell v. City of Jamestown, 2022 U.S. Dist. LEXIS

99749, at 41 (W.D.N.Y. June 3, 2022) (dismissing claims against supervising officers

when no allegation indicates that they were personally involved in any of the alleged

excessive force but instead claims liability for failure-to-train); Guzman v. McCarthy, 2022

U.S. Dist. LEXIS 39038 , at *6 (N.D.N.Y. Mar. 4, 2022) (an allegation that defendant "failed

to train his officers to protect inmates from harm . . . is not enough to plausibly allege the

person involvement of" that defendant).[6]

_____

[6]Defendants also argue that they are entitled to qualified immunity from these
Section 1983 claims.  "Qualified immunity is an affirmative defense that shields
government officials 'from liability for civil damages insofar as their conduct does not
violate clearly established statutory or constitutional rights of which a reasonable person
would have known.'" Stephenson v. Doe, 332 F.3d 68, 76 (2d Cir. 2003) (quoting
McCardle v. Haddad, 131 F.3d 43, 50 (2d Cir. 1997)). Qualified immunity also applies
when "'it was 'objectively reasonable' for [the officer] to believe that [his or her] actions
were lawful at the time of the challenged act.'" Betts v. Shearman, 751 F.3d 78, 83 (2d
Cir. 2014) (quoting Jenkins v. City of New York, 478 F.3d 76, 87 (2d Cir. 2007)).  Since the
Court has concluded that Defendants cannot be liable for violating King's constitutional
rights, the Court will decline to address qualified immunity.

**C.     New York State Constitution and New York Civil Rights Act**

Defendants next contend that Plaintiff's claim brought pursuant to Article I, Section 5 of the New York Constitution and Section 1 of the New York Civil Rights Law should be dismissed.  Defendants contend that New York law does not permit Plaintiff to bring such claims in this Court against these Defendants.  Plaintiff does not respond to these arguments.

The Court will grant the motion in this respect as well.  Plaintiff is represented by counsel, and did not respond to Defendants' argument in this respect.  In those circumstances, Courts can deem the claims in question abandoned.  See Molinari v. Bloomberg, 564 F.3d 587, 609 n. 15 (2d Cir. 2009) (deeming a claim abandoned when opposing party "[made] no argument whatsoever" on the issue); Wick v. Wabash Holding Corp., 801 F.Supp.2d 93, 105 (W.D.N.Y. 2010) ("the court may, in its discretion, deem Plaintiff's failure to warn claim abandoned based on Plaintiff's failure to argue in opposition to summary judgment on the claim.")).  Plaintiff had an opportunity to oppose summary judgment on this claim, as she did on the others, and chose not to.  The Court therefore finds that she has abandoned those claims and will grant Defendant summary judgment on them.  See Taylor v. City of New York, 269 F.Supp.2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.") (citing Douglas v. Victor Capital Group, 21 F.Supp.2d 379, 393 (S.D.N.Y. 1998)).

**D.     State Law Claims against Annucci**

Defendants next seek summary judgment on Plaintiff's state-law claims.  First, they

contend that the Court lacks subject matter jurisdiction over such claims, since "[b]y statute, New York vests state employees, including correctional employees, with immunity from suits for damages arising from conduct performed within the scope of their employment."  As the issue is dispositive with reference to Annucci, the Court will consider first whether New York law divests the Court of jurisdiction over state-law claims against corrections officers and employees.  New York Correction Law § 24 provides:

> 1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, which for purposes of this section shall include members of the state board of parole, in his or her personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

> 2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

N.Y. Correc. L. § 24(1-2).  The United States Supreme Court has described the way this statute functions: "a prisoner seeking damages from a correction officer will have his claim dismissed for want of jurisdiction and will be left, instead, to pursue a claim for damages against an entirely different party (the State) in the Court of Claims–a court of limited jurisdiction."  Haywood v. Drown, 556 U.S. 729, 734 (2009).

The Second Circuit Court of Appeals examined this provision in Baker v. Coughlin, 77 F.3d 12 (2d Cir. 1996).  In Baker, the administratrix of an inmate's estate brought a claim in the federal district court against "officers and employees of the New York State Department of Correctional Services," in whose custody the plaintiff's decedent resided at the time of his death by strangulation.  Id. at 13.  Plaintiff's complaint raised Section 1983 and state-law claims for "common law intentional tort, negligence, and medical

31

malpractice." Id.  Defendants moved to dismiss the state-law claims, in part, for "lack of subject matter jurisdiction pursuant to New York Correction Law § 24." Id. The district court denied the motion with respect to § 24, finding that the statute "was a procedural and indemnity provision that did not provide corrections officers with immunity from state law claims brought against them in their personal capacities in federal court." Id.

On appeal, the plaintiff conceded that § 24 prevented her from bringing the state-law claims against the Defendants in a New York court, but argued that "§ 24 does not prevent her from bringing those same claims in federal court." Id.  The language of § 24(1) only applied "to actions brought 'in any court of the state,'" and plaintiff argued that such language "[did] not abrogate her common law rights against corrections officers to the extent that relief is sought in federal court." Id.  The Court of Appeals rejected this position by pointing to § 24(2), which "requires that state law claims for damages against corrections officers 'shall be brought . . . [as] claims against the state.'" Id. That language, the Court of Appeals concluded, "precludes the assertion of claims against corrections officers in any court, including the federal courts." Id.  "It is of no significance that § 24(1) refers only to actions in state courts, because a federal court acts essentially as a state court in addressing pendent state law claims." Id.  In the end, the Court found, the defendants were "entitled to invoke the benefits of § 24 irrespective of the forum in which [plaintiff] chooses to pursue her claims.  Because a New York court would have dismissed" those "claims . . . pursuant to § 24, the district court should have done so."  As such, when it comes to state-law claims, "New York law prevents an inmate from suing, in either federal or state court, a correctional employee in her individual capacity." Gordon v. City of New York, 2005 U.S. App. LEXIS 23931, at *2 (2d Cir. 2005); see also, Parker v.

Miller, 1999 U.S. App. LEXIS 277392 at * 6-7 (2d Cir. 1999) ("Under New York State

Corrections Law § 24, tort claims against prison officials can only be brought in the Court

of Claims for the State of New York."

Plaintiff responds to this argument by contending that the purpose of the statute "is

to strip state courts of jurisdiction over inmate damages claims against correction

employees, many of which are deemed 'frivolous and vexatious,' and instead requires

inmates to pursue such claims against the State of New York in the Court of Claims."

Plaintiff also contends that "[a]n inmate seeking damages against the state in the Court of

Claims cannot use 42 U.S.C. § 1983, the preferred remedy for prisoner civil rights suits,

because a state is not a 'person' under § 1983."[7]  Citing to Haywood, 556 U.S. 729),

Plaintiff further argues that Section 24 is unconstitutional.

The Courts finds Plaintiff's arguments unpersuasive and will grant the motion in this

respect.  New York law clearly deprives courts like this court of jurisdiction to hear state-

law tort claims against corrections officials and officers when those claims arise out of their

employment.  The claims in this case are against a DOCCS official and arise out of that

official's supervision and mental-health treatment of Joseph King, a DOCCS inmate.  As

the courts cited above have explained, this Court lacks authority to entertain such claims.

Plaintiff's citation to Haywood v. Drown for the proposition that Section 24 is

unconstitutional is not persuasive either.  Haywood did not address the feature of the

statute here in question–whether a federal court had jurisdiction to hear state-law claims

_____

[7]States are not amendable to suit under Section 1983 for a different reason:
"sovereign immunity bars section 1983 claims, whether rooted in alleged violations of
constitutional or statutory law, against New York State or its officers in their official
capacities."  Goonewardena v. New York, 47 5F.Supp.2d 310, 329 (S.D.N.Y. 2007).

brought against state corrections officers or officials—but instead considered whether Section 24 provided officers and officials immunity from suits brought under 42 U.S.C. § 1983.  Haywood, 556 U.S. at 729.  The Supreme Court rejected the idea that the State of New York could make officers immune from liability under Section 1983 when federal law exposed those officers to liability.  The Court concluded that whether "New York strongly favors a rule shielding correction officers from personal damages liability and substituting the State as the party responsible for compensating individual victims is irrelevant."  Id. at 737.  The Court concluded that "[t]he State cannot condition its enforcement of federal law on the demand that those individuals whose conduct federal law seeks to regulate must nevertheless escape liability."  Id.  As such, Section 24 did not affect whether correction officers and officials could be liable in state courts under Section 1983.  The question in this case is not whether Annucci could be liable under Section 1983 for conduct related to King's death, but instead whether Annucci can be liable under state tort law for that conduct.  The Court is convinced he cannot, and will grant the motion in that respect as well.

Here, the Court finds subject matter jurisdiction does not exist to hear claims brought under state law against Annucci due to Section 24 of the Corrections law. Plaintiff's remedy for Annucci's conduct under state law lies in the Court of Claims against the State of New York, not this Court.  The Court will therefore dismiss all of the Plaintiff's state-law claims against Annucci.  As the Court's opinion on whether Plaintiff has evidence to support such claims would be merely advisory, the Court will not consider in the alternative whether Plaintiff has evidence to support such claims.

### E.    Other State-Law Claims

As to the other Defendants, who are employees of the Office of Mental Health, Defendants argue that no evidence exists to support the claims against them.  The claims in question involve negligence, wrongful death, and a survival action.  The Court will address them in turn.

### I.      Negligence

In New York, a plaintiff offers prima facie evidence of negligence when he shows that "(1) the defendant owed the plaintiff a cognizable duty of care; (2) the defendant breached that duty; and (3) the plaintiff suffered damage as a proximate result." Williams v. Utica Coll. of Syracuse Univ., 453 F.3d 112,116 (2d Cir. 2006).  "[A] duty of care is owed by prison authorities with respect to the health and safety of their charges." Gordon v. New York, 70 N.Y.2d 839, 840 (N.Y. 1987).  In light of that duty, a defendant "can, in some circumstances, be held liable if [the defendant] fails to prevent a reasonably foreseeable inmate suicide." Matter of Bezio v. Dorsey, 21 N.Y.3d 93, 104 (N.Y. 2013).  This duty flows from the fact that while "the State owes a duty of care to safeguard inmates, . . . [t]hat duty does not, however, render the State an insurer of inmate safety." Sanchez v. State, 99 N.Y.2d 247, 252-53 (N.Y. 2002).  Therefore, "[w]hen prison authorities know or should know that a prisoner has suicidal tendencies or that a prisoner might physically harm himself, a duty arises to provide reasonable care to assure that such harm does not occur." Gordon, 70 N.Y.2d at 40.  "Whether a breach of duty has occurred depends upon whether the resulting harm was a reasonably foreseeable consequence of the defendant's acts or omissions." Id. at 841.

With respect to Defendant Sullivan, Defendants argue that King's death was not reasonably foreseeable and that she did not provide King with any treatment and was not

personally involved in any decisions related to his mental care.  As to Defendant Meyers, Defendants argue that he had only minimal contact with King and was not aware of any of the conditions that may have led to his death.  Meyers was not aware of King's concerns about the state of his marriage and was not aware of any of the things King told his family on the telephone they day before he died.  King's death was not foreseeable for Meyers, Defendants claim.  As to Palladino, though she had repeated and direct contact with King, Defendants insist that she cannot be liable in negligence because she did not have a duty to monitor his medications or telephone calls, she provided him the treatment required by her office, and she provided assessments but did not have an indication that he was at an acute suicide risk the last time she saw him before his death.  King's propensity to suicide was thus not reasonably foreseeable to Palladino, Defendants claim.[8]

Plaintiff responds that King's death was a reasonably foreseeable consequence of Defendants' conduct.  She argues that Sullivan created "grossly negligent" policies that caused King's death, and that "Meyers was responsible for the implementation of the grossly negligent plan and either did not pay attention or ignored the signs that the policy

---

[8]Defendants argue that King:

consistently denied thoughts of self harm or psychotic symptoms, particularly in the six months preceding his death. Palladino testified that she did not have any concerns about decedent in the weeks leading up to his death and was not aware of any increase in decedent's anxiety or depression leading up to his suicide. She had no ability to prescribe or modify his medications. The record also clearly reflects that Palladino was unaware of any marital issues decedent was having; issues that were apparent in decedent's final phone call to his wife the night before he committed suicide. However, none of his family members brought this issue to anyone's attention at Mid-State, including Palladino. It is clear from the record that Palladino could not have "reasonably foreseen" decedent's suicide. Plaintiff offers no expert opinion to the contrary.

was inadequate to address mental health needs of suicidal inmates." She contends that the tools that Defendants used to evaluate prisoners for suicide risk "indicated that King posed a suicide risk," that King had been showing "symptoms of withdrawal until the day of his attempt," and "in anticipation of withdrawal symptoms, King was not given any further treatment or any further help."

With respect to Sullivan and Meyers, the evidence related above demonstrates that King's death was not reasonably foreseeable to those Defendants, and therefore no reasonable juror could conclude that Defendants breached a duty to take action to prevent that death. The evidence indicates that Sullivan and Meyers both played no direct role in treating King, and that they had no opportunity to conclude that he represented a danger to himself. Under those circumstances, no negligence claim can lie against him. The Court will grant the motion in this respect against these Defendants.

As to Palladino, Plaintiff argues that "Palladino was negligent as she owed Decedent a duty to protect him as an inmate she counseled as his assigned therapist, and performed suicide risk assessments for. She failed to do this, and further failed to follow the OMH policies pertaining to maintaining progress notes, up to date and accurately, failing to perform and update Comprehensive Suicide Risk Assessments and submitting timely notes for entry." Palladino allegedly breached her duty when she failed to update the suicide risk assessments each month in 2018, a time when King's risk increased because of his substance abuse, discontinuation of mental health medication, depression, and anxiety. Palladino, Plaintiff claims, also was not aware of "the institution's Suicide Watch protocol, including removing Decedent's shoe laces," which amounted to "an egregious breach of her duty as Decedent's therapist." Plaintiff also contends that the

37

reports of the Justice Center and the Morality and Morbidity Review Committee are evidence that "Mr. King's suicidality was obvious and foreseeable."

The Court finds that no reasonable juror could conclude, based on the evidence before the Court, that King's death "was a reasonably foreseeable consequence of the defendant's acts or omissions." Gordon, 70 N.Y.2d at 841. "'Whether hindsight reveals that greater precautions could have been taken to avoid the harm that [occurred] is irrelevant if the injury could not reasonably have been foreseen at the moment the defendant engaged in the activity which later proves harmful.'" Id. (quoting Danielenko v. Kinney Rent a Car, 57 N.Y.2d 198, 204 (N.Y. 1982)).   The record indicates that Palladino performed regular suicide evaluations during her sessions with King, and that he regularly and explicitly denied any suicidal ideation.  Palladino was not unaware that King suffered from depression and anxiety, was using suboxone, was dissatisfied with the effects of his psychiatric medications, and had suffered the recent loss of his mother.  Palladino factored that information in her assessments, but did not see an extreme risk of suicide. No evidence indicates that Palladino had any information about contents of King's phone calls with his family, or that was aware that King felt despondent about the state of his marriage.  While Plaintiff points to after-the-fact assessments and reviews to indicate that Palladino and others providing treatment failed to recognize warning signs of suicide risk, those reports do not find that Palladino erred in her suicide risk assessment or necessarily conclude that a better awareness of all the factors affecting King's mental health would have made King's death reasonably foreseeable.  While there is evidence in this case about suicide screening procedures used by DOCCS, jurors would be forced to speculate about any connection between King's mental state and the foreseeability of his death by

38

suicide.  A reasonable juror could not conclude, based on this evidence, that King's suicide was reasonably foreseeable to Palladino.

The Court will therefore grant the motion in this respect as well.

### ii.    Wrongful Death

Defendants next seek dismissal of Plaintiff's wrongful death claim.  To prevail on such a claim, a plaintiff must show: "'(1) the death of a human being, (2) the wrongful act, neglect, or default of the defendant by which the decedent's death was caused, (3) the survival of distributees who suffered pecuniary loss by reason of the death of the decedent, and (4) the appointment of a personal representative of the decedent.'"  Gabriel v. County of Herkimer, 889 F.Supp.2d 374, 405 (N.D.N.Y. 2012) (quoting Chong v. N.Y.C. Tr. Auth., 83 A.D.2d 546, 547 (2d Dept. 1981)).  Here, the Court has concluded that no wrongful act, neglect, or default by a defendant occurred that caused King's death.  The Court will therefore grant summary judgment on this claim as well.

### iii.    Survival Action

New York law allows "the representative of the estate to prosecute a so-called 'survival action' to recover for the conscious pain and suffering or other compensable damages caused by the defendant and sustained by a decedent while the decedent remained alive."  Beadell v. Eros Mgt. Realty LLC, No. 139132/2017, 2023 NYLJ LEXIS 1432, at *18 (N.Y. Cty. Sup. Ct. June 1, 2023) (citing Cragg v. Allstate Indem. Corp., 17 N.Y.3d 118, 121 (N.Y. 2011), Heslin v. County of Greene, 14 N.Y.3d 67, 76-77 (N.Y. 2010)).  Here, no evidence supports a finding that a defendant caused any conscious pain and suffering that King may have suffered, and the Court will grant summary judgment on

this claim as well.

**IV.     CONCLUSION**

For the reasons stated above, Defendants' motion for summary judgment, dkt. #

71, is hereby **GRANTED**.  The Clerk of Court is directed to **CLOSE** the case.

**IT IS SO ORDERED.**

**Dated:** September 19, 2023

Thomas J. McAvoy
Senior, U.S. District Judge